## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

No. 1:08-cv-119

_____

|   |   |
|---|---|
| EDWARD CARRINGTON, CASEY J. CARROLL, MICHAEL P. CATALINO, GALE CATALINO, THOMAS V. CLUTE, KEVIN COLEMAN, JOSHUA R. COVELESKI, EDWARD J. CROTTY, EDWARD S. DOUGLAS, KYLE DOWD, PATRICIA DOWD, DANIEL FLANNERY, RICHARD GIBBS FOGARTY, ZACHARY GREER, IRENE GREER, ERIK S. HENKELMAN, STEVEN W. HENKELMAN, JOHN E. JENNISON, BEN KOESTERER, MARK KOESTERER, JOYCE KOESTERER, FRED KROM, PETER J. LAMADE, ADAM LANGLEY, CHRISTOPHER LOFTUS, DANIEL LOFTUS, BARBARA LOFTUS, ANTHONY MCDEVITT, GLENN NICK, NICHOLAS O'HARA, LYNNDA O'HARA, DANIEL OPPEDISANO, SAM PAYTON, JOHN BRADLEY ROSS, KENNETH SAUER, III, STEVE SCHOEFFEL, ROBERT SCHROEDER, DEVON SHERWOOD, DANIEL THEODORIDIS, BRET THOMPSON, CHRISTOPHER TKAC, TRACY TKAC, JOHN WALSH, JR., MICHAEL WARD, ROBERT H. WELLINGTON, IV, WILLIAM WOLCOTT, MICHAEL YOUNG, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
|  | ) **CIVIL COMPLAINT** ) ) **JURY TRIAL** ) **DEMANDED** |
| DUKE UNIVERSITY, DUKE UNIVERSITY HEALTH SYSTEM, INC., RICHARD BRODHEAD, PETER LANGE, LARRY MONETA, JOHN BURNESS, TALLMAN TRASK, SUZANNE WASIOLEK, MATTHEW DRUMMOND, AARON GRAVES, ROBERT DEAN, TARA LEVICY, THERESA ARICO, J. WESLEY COVINGTON, KATE HENDRICKS, VICTOR DZAU, CITY OF DURHAM, LINWOOD WILSON, MARK GOTTLIEB, BENJAMIN HIMAN, PATRICK BAKER, STEVEN CHALMERS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

RONALD HODGE, LEE RUSS, STEPHEN MIHAICH,    )
BEVERLY COUNCIL, JEFF LAMB, MICHAEL         )
RIPBERGER, AND DAVID ADDISON                )
                                            )
        Defendants.                         )
                                            )
_____     )

## COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF THE ACTION ...................................................1

PARTIES.........................................................................................................................10

I.    The Plaintiffs..........................................................................................................10

II.   The Defendants. .....................................................................................................16

    A.    The Duke Defendants. ................................................................................16

    B.    The Durham Defendants..............................................................................22

        1.    The Durham Investigators. ..............................................................22

        2.    The Durham Supervisors .................................................................23

JURISDICTION AND VENUE ....................................................................................26

FACTS ...........................................................................................................................26

I.    Background .............................................................................................................26

    A.    Duke University's Championship Men's Lacrosse Team ...........................26

    B.    The Party On March 13, 2006 ....................................................................29

II.   Mangum Alleges She Was Raped And Is Examined At Duke Hospital ................32

    A.    Mangum's Rape Allegations At Duke Hospital Are Wildly Inconsistent And Facially Implausible...............................................................................34

    B.    Durham And Duke Police Were Fully Aware That Mangum's Rape Allegations Were Not Credible.................................................................37

    C.    Duke's Forensic Exam Reveals No Objective Medical Or Physical Evidence Of Rape ....................................................................................38

III.  Durham Police Sergeant Gottlieb Takes Over The Rape Investigation ................43

i

A.  Duke Advises Lacrosse Players Not To Seek Legal Counsel ....................45

B.  Duke Nurse Tara Levicy Lends Credibility to Mangum's False Rape Allegations ....................................................................................48

C.  Mangum Fails To Identify Any Of The Lacrosse Players In Photo Lineup ............................................................................................50

D.  Police Search 610 N. Buchanan and Interrogate Team Captains ...............52

E.  Duke Steers Players To Duke's Lawyer -- Wes Covington ........................54

F.  Duke Colludes With Gottlieb Against The Players .....................................57

G.  Roberts Tells Police That Mangum's Rape Allegations Are "A Crock" ....58

H.  Duke Nurse Levicy Again Falsely Corroborates Rape Allegations ...........60

I.  Mangum Fails Second Attempt At Photo Identification .............................63

J.  Players' Parents Learn Of Rape Allegations .................................................64

K.  Parents Reject Advice Of Duke Lawyer Covington ....................................65

L.  Relying On Levicy's Misrepresentations Of The Medical Evidence, Gottlieb Obtains A Non-Testimonial Order For DNA Samples From The Players ........................................................................................66

IV.  The Media Frenzy Begins, And District Attorney Nifong Takes Control Of The Rape Investigation .............................................................................69

V.  Duke Reacts To The Rape Charge, Closing Its Eyes To The Truth And Condemning, Punishing, Harassing, And Betraying The Lacrosse Players ...........72

A.  Duke Administration Capitulates To The Demands Of The Media, Activist Faculty, And Student Protestors .....................................................72

B.  Duke Publicly Maligns The Players .............................................................75

C.  Duke Cancels Two Lacrosse Games To Punish Team For The Party .........76

D.  President Brodhead Refuses To Meet With Lacrosse Parents ....................79

ii

E.     Duke Refuses Parents' Request To Stop Faculty Harassment ....................80

F.     Brodhead Publicly Maligns The Players And Fosters "Wall of Silence" Myth ...........................................................................................................81

G.    Duke Faculty Encourage Campus Protests Against Lacrosse Players ........83

H.    Duke's Campus Atmosphere Becomes Hostile And Perilous For Players..87

VI.   District Attorney Nifong Pursues Investigation Despite Overwhelming Exculpatory Evidence ...............................................................................................90

VII.  Nifong Launches False And Unethical Media Campaign Against Players, And Duke Withholds The Truth ...........................................................................90

A.    Nifong Repeatedly Emphasizes That Duke Hospital's Forensic Exam Supported Mangum's Rape Charge, And Duke Says Nothing....................91

B.    Nifong Falsely Implies That Mangum's Rape Allegations Were Consistent And Credible, And Duke Suppresses Officer Day's Contrary Police Report ................................................................................94

C.    Nifong Falsely Accuses Team Of "Wall of Silence," And Duke Falsely Concurs ......................................................................................................95

VIII. Duke's Hostility To The Lacrosse Team Intensifies .............................................97

A.    Duke Campus Is Flooded With WANTED Posters.....................................97

B.    Brodhead Provides False Assurances To The Players.................................99

C.    Brodhead Suspends The Lacrosse Season ................................................100

D.    Brodhead Credits Exotic Dancer's Claims In 911 Tape............................101

E.    Professor Baker Defames The Lacrosse Players As Racist, Violent, Privileged Rapists ........................................................................103

IX.   DNA Evidence Dispositively Exonerates The Lacrosse Players But Is Ignored By Defendants.......................................................................................................106

A.    The State Bureau Of Investigation's DNA Testing Results Are Negative106

iii

B.     Nifong Suggests That Rapists May Have Used Condoms, And Duke Says Nothing ............................................................................. 109

X.     Players Fear For Their Safety As Campus Hostility Spawns Threats Of Violence ................................................................................................ 109

     A.     Duke's Faculty Members Attack Team ...................................... 109

     B.     Duke Players Are Threatened With Racial Violence ................. 111

XI.    Duke Improperly Assists Nifong's Patently Corrupt Investigation ...................... 112

     A.     Duke Suppresses Officer Day's Exculpatory Police Report .................... 112

     B.     Duke Illegally Gives Nifong Key Card Reports On Lacrosse Players ...... 113

     C.     Duke Withholds Exculpatory Information That Directly Contradicts Nifong's Public Claims and Accusations ..................................... 115

     D.     Duke Hospital Again Falsely Corroborates Mangum's Rape Charges ..... 117

     E.     Duke Breaks Its Promises Of Confidentiality To The Players ................. 119

     F.     Duke Hospital Turns Over Falsified Medical Records To Durham Investigators ............................................................................. 120

XII.   Mangum Selects Players Seligmann And Finnerty As Two Of Her Attackers In Third Rigged Photo Identification Procedure ..................................... 121

XIII.  Duke Cancels The Lacrosse Season And Fires Coach Pressler To Appease Activist Faculty And Students ...................................................................... 124

XIV.  The "Group Of 88" Members Of The Duke Faculty Publish An Ad Condemning The Lacrosse Players As Guilty And Encouraging Public Protests Against Them ......................................................................... 129

XV.   Mangum's Story Changes Yet Again In Written Statement To Durham Investigators ............................................................................. 133

iv

XVI.   Nifong Hires A Private DNA Testing Firm And Then Conspires To Suppress Its Exculpatory Test Results .......................................................................134

XVII.  The SBI's Negative DNA Test Results Become Public ........................................136

    A.   Nifong Suggests That Rapists May Have Used Condoms, And Duke Says Nothing.................................................................................................137

    B.   Nifong Justifies Continued Investigation On Medical Evidence From Duke Hospital, And Duke Says Nothing......................................................138

XVIII. Duke Assists Durham Investigators In Making Warrantless Entries Of Dorm Rooms And Uncounseled Interrogations Of Players .............................................139

XIX.   Lacrosse Players Seligmann And Finnerty Are Indicted.......................................141

XX.    Nifong's Conspiracy To Conceal Private DNA Firm's Exculpatory Test Results Continues...................................................................................................142

XXI.   The New Black Panthers March Against The Lacrosse Team .............................143

XXII.  Duke Releases Study Of Lacrosse Team's Disciplinary Records ........................144

XXIII. The Duke And Durham Defendants Discredit Exculpatory Evidence ................146

    A.   Duke Discredits Officer Day's Exculpatory Police Report.......................147

    B.   Durham Destroys And Discredits Evidence That Mangum Not Credible.....................................................................................................149

    C.   Gottlieb Produces "Supplemental Case Notes" .........................................150

XXIV. Nifong Conspires With DNA Testing Firm To Produce A Fraudulent DNA Report .............................................................................................................151

XXV.  Lacrosse Player Evans Is Indicted ........................................................................152

XXVI. Duke Conspires With The Durham Investigators To Fraudulently Conceal Duke's FERPA Violations .......................................................................................153

XXVII. Duke Violates Its Own Anti-Harassment Policy.................................................156

XXVIII. The Lacrosse Team Is Exonerated ...................................................161

    A.    Mangum Recants Rape Charge And Nifong's Corruption Is Exposed .....161

    B.    The Attorney General Takes Over The Investigation, Finds "No Credible Evidence" Of Rape, And Declares The Lacrosse Players "Innocent".......163

    C.    Nifong Is Disbarred.................................................................................165

XXIX. Defendants' Misconduct Severely Injured The Plaintiffs....................165

COUNT ONE........................................................................................................167
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS -- I
    (Against Defendants Duke University, DUHS, Richard Brodhead, Victor Dzau, Theresa Arico, Tara Levicy)

COUNT TWO........................................................................................................169
NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – I
    (Against Defendants Duke University, DUHS, Richard Brodhead, Victor Dzau, Theresa Arico, Tara Levicy)

COUNT THREE ....................................................................................................170
NEGLIGENT SUPERVISION OF EMPLOYEES ARICO AND LEVICY
    (Against Defendants Duke University, DUHS, Richard Brodhead, Victor Dzau, Theresa Arico)

COUNT FOUR ......................................................................................................172
BREACH OF DUTY OF CARE IN CONDUCTING AND REPORTING OF FORENSIC MEDICAL EXAMINATION
    (Against Defendants Duke University, DUHS, Richard Brodhead, Victor Dzau, Theresa Arico, and Tara Levicy)

COUNT FIVE ........................................................................................................173
BREACH OF DUTY TO WARN AND PROTECT AGAINST HAZARD CREATED BY DEFENDANTS
    (Against Defendants Duke University, DUHS, Richard Brodhead, Victor Dzau, Theresa Arico, Tara Levicy)

vi

COUNT SIX..................................................................................175
    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS -- II
    (Against Defendants Duke University, DUHS, Richard Brodhead, Larry Moneta,
    Peter Lange, John Burness, Tallman Trask, Sue Wasiolek, Victor Dzau,
    Kate Hendricks, Matthew Drummond, the Duke Police)

COUNT SEVEN ...........................................................................177
    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – II
    (Against Defendants Duke University, DUHS, Richard Brodhead, Larry Moneta,
    Peter Lange, Sue Wasiolek, John Burness, Tallman Trask, Victor Dzau,
    Kate Hendricks, Matthew Drummond, Duke Police)

COUNT EIGHT ............................................................................178
    FRAUD AND CONSPIRACY TO DEFRAUD
    (Against Defendants Duke University, Kate Hendricks, Matthew Drummond,
    the Duke Police, the Durham Investigators, the City of Durham)

COUNT NINE ..............................................................................180
    NEGLIGENT MISREPRESENTATION
    (Duke University, Kate Hendricks, Matthew Drummond)

COUNT TEN ................................................................................180
    ABUSE OF PROCESS AND CONSPIRACY TO ABUSE PROCESS
    (Against Defendants Duke University, Kate Hendricks, Matthew Drummond,
    the Duke Police, the Durham Investigators, the City of Durham)

COUNT ELEVEN ........................................................................182
    CONSTRUCTIVE FRAUD THROUGH ABUSE OF
    CONFIDENTIAL RELATIONSHIP
    (Against Defendants Duke University, Richard Brodhead, Tallman Trask,
    Sue Wasiolek, J. Wesley Covington)

COUNT TWELVE.........................................................................185
    BREACH OF DUTY OF CARE IN THE CONDUCT OF
    A VOLUNTARY UNDERTAKING
    (Against Defendants Duke University, Richard Brodhead,
    Tallman Trask, Sue Wasiolek, Wes Covington)

COUNT THIRTEEN .....................................................................186
    BREACH OF DUTY BASED ON SPECIAL
    RELATIONSHIP OF MUTUAL BENEFIT
    (Against Defendants Duke University, Richard Brodhead)

COUNT FOURTEEN .................................................................................................188
   BREACH OF DUTY TO PROTECT STUDENTS FROM KNOWN
   DANGERS AND HARASSMENT
   (Against Defendant Duke University)

COUNT FIFTEEN ....................................................................................................189
   BREACH OF CONTRACT
   (Against Defendant Duke University)

COUNT SIXTEEN ....................................................................................................193
   TORTIOUS BREACH OF CONTRACT
   (Against Defendant Duke University)

COUNT SEVENTEEN................................................................................................194
   PROMISSORY ESTOPPEL
   (Against Defendant Duke University)

COUNT EIGHTEEN ..................................................................................................195
   INTRUSION UPON SECLUSION, SOLITUDE, AND PRIVATE AFFAIRS
   (Against Defendants Duke University, Richard Brodhead,
   Tallman Trask, Peter Lange, John Burness, Larry Moneta,

COUNT NINETEEN ..................................................................................................197
   NEGLIGENT SUPERVISION OF DUKE PROFESSORS AND EMPLOYEES
   (Against Defendants Duke University, Richard Brodhead,
   Larry Moneta, Peter Lange, Tallman Trask)

COUNT TWENTY .....................................................................................................198
   VIOLATION OF AND CONSPIRACY TO VIOLATE FOURTH AMENDMENT
   RIGHTS UNDER 42 U.S.C. § 1983 -- KEY CARD REPORTS
   (Against Defendants Duke University, Kate Hendricks, Matthew Drummond,
   the Duke Police, the Durham Investigators, City of Durham)

COUNT TWENTY-ONE...............................................................................................200
   VIOLATION OF AND CONSPIRACY TO VIOLATE FOURTH AMENDMENT
   RIGHTS UNDER 42 U.S.C. § 1983 -- DNA SAMPLES
   (Against Defendants Duke University, DUHS, Theresa Arico, Tara Levicy, the
   Durham Investigators, City of Durham)

COUNT TWENTY-TWO.........................................................................201
VIOLATION OF AND CONSPIRACY TO VIOLATE FOURTEENTH
AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983 -- MALICIOUS
INVESTIGATION
(Against All Defendants)

COUNT TWENTY-THREE......................................................................203
OBSTRUCTION OF AND CONSPIRACY TO OBSTRUCT PUBLIC JUSTICE
(Against All Defendants)

COUNT TWENTY-FOUR .......................................................................205
DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW
IN VIOLATION OF 42 U.S.C. § 1983
(Against Durham Investigators, Durham Supervisors, City of Durham)

COUNT TWENTY-FIVE..........................................................................206
FALSE PUBLIC STATEMENTS IN VIOLATION OF 42 U.S.C. § 1983
(Against the Durham Investigators, David Addison, City of Durham)

COUNT TWENTY-SIX ...........................................................................208
VIOLATIONS OF 42 U.S.C. § 1983 UNDER *MONELL v. DEP'T OF SOC. SERVS.*
(Against the City of Durham; Durham Investigators in their official capacities;
Durham Supervisors in their official capacities)

    A.    While Exercising Delegated Final Policymaking Authority For
The City Of Durham, Nifong Implemented Policies That
Violated Plaintiffs' Constitutional Rights..................................208

    B.    Durham Officials With Final Policymaking Authority
Approved And Ratified The Unconstitutional Conduct
Of Their Subordinates...............................................................209

    C.    Durham Officials With Final Policymaking Authority Failed
To Exercise Adequate Supervisory Authority Over Nifong......................210

    D.    Durham Officials With Final Policymaking Authority Failed
To Exercise Adequate Supervisory Authority Over Gottlieb....................211

    E.    Durham Police Had An Established Policy Or Custom
Of Targeting Duke Students For Harassment Through
Selective And Improper Criminal Law Enforcement.................................212

ix

     F.     Durham Police Had An Established Policy Or Custom Of
             Prematurely Publishing Conclusions Of Criminality Or Guilt..................213

COUNT TWENTY-SEVEN........................................................................214
NEGLIGENT SUPERVISION OF THE DURHAM INVESTIGATORS
IN VIOLATION OF 42 U.S.C. § 1983
(Against the Durham Supervisors)

     A.     The Durham Supervisors' Failure To Supervise The Investigation
             Resulted In Violations Of Plaintiffs' Constitutional Rights......................215

     B.     The Durham Supervisors' Failure To Control And Supervise
             Gottlieb Resulted In Violations Of Plaintiffs' Constitutional Rights........216

     C.     The Durham Supervisors' Failure To Train, Control, And Supervise
             Addison Resulted In Violations Of Plaintiffs' Constitutional Rights. ......217

COUNT TWENTY-EIGHT........................................................................219
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS -- III
(Against Durham Investigators, Durham Supervisors, City of Durham)

COUNT TWENTY-NINE ........................................................................220
NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – III
(Against Durham Supervisors, Durham Investigators, City of Durham)

COUNT THIRTY ....................................................................................221
NEGLIGENCE BY DURHAM POLICE
(Against Durham Investigators, Durham Supervisors, City of Durham)

COUNT THIRTY-ONE............................................................................222
NEGLIGENT HIRING, TRAINING, SUPERVISION, RETENTION,
AND DISCIPLINE BY DURHAM POLICE
(Against Durham Supervisors, City of Durham)

PRAYER FOR RELIEF...........................................................................223

JURY TRIAL DEMAND .........................................................................224

x

## INTRODUCTION AND SUMMARY OF THE ACTION

1. This action for damages is brought by 38 of the 47 members of the 2006 Duke University men's lacrosse team, and by certain members of their families. The tragic tale that gives rise to their claims is known to almost everyone in the United States and to millions more throughout the world. For these Duke students were for 13 months in 2006-2007 reviled almost daily in the local and national media as a depraved gang of privileged, white hooligans who had hired a black exotic dancer to perform at a team party, had brutally gang raped and sodomized her in a crowded bathroom, and had joined together in a "wall of silence" to hide the truth of their heinous crimes. But it was a vile and shameful lie, and it caused the plaintiffs tremendous suffering and grievous, lasting injuries.

2. The individual defendants named in this action do not include Crystal Mangum, whose allegations of a gang rape by three white lacrosse players shocked and outraged the Duke University campus, the Durham community, and the Nation. She is a deeply mentally disturbed, drug-dependent young woman, as was readily apparent from her bizarre behavior and her wildly inconsistent, patently incredible stories on the night of the alleged rape.

3. The individual defendants in this suit are chiefly (1) Durham officials who corruptly seized upon and exploited Mangum's lie, and the intense media firestorm that it generated, to advance their own career ambitions, to further their own ideological agendas, and/or to gratify their own personal prejudices; and (2) Duke officials who

1

possessed convincing evidence of the players' innocence and who had a responsibility to their students to speak out, but who not only steadfastly remained silent, but also lent Duke's credibility to the rape allegations by capitulating to an angry mob's demands to condemn and punish the innocent players and their blameless coach. The individual defendants acted both in their personal capacities and in their official capacities on behalf of their employers—defendants Duke University and its healthcare affiliates, and the City of Durham.

4.     This tragedy has many villains, as the long list of defendants in the caption makes clear. But the basic nature and contours of this case can be discerned from a brief outline of the actions, and inactions, of three principal wrongdoers.

5.     Chief among them is former Durham District Attorney Michael Nifong, whose name shall forever be inextricably linked to the concept of prosecutorial corruption in the annals of American criminal justice. He and his equally corrupt police investigators -- especially Durham Police Sergeant Mark Gottlieb, whose consuming prejudice against Duke University students was notorious long before the events of this case -- concealed exculpatory evidence, manufactured inculpatory evidence, rigged photo line-ups, tampered with and intimidated witnesses, and blatantly lied to the Court and to the public in a determined effort to indict, try, convict, and ultimately imprison three lacrosse players -- any three would do -- for a crime that the prosecutor and investigators knew had never happened. And Nifong did all this in order to stoke and harness community outrage for the benefit of his election campaign.

2

6.    Nifong's corruption was plainly evident early on to those, such as Duke University President Richard Brodhead and other Duke officials, with access to the objective and overwhelming evidence of the players' innocence, but they kept the truth to themselves while Nifong turned the innocent lacrosse players into national pariahs. Not until defense lawyers and responsible journalists gradually brought forward that exculpatory evidence was Nifong's corruption publicly exposed. Nifong's wrongdoing ultimately resulted in his firing, disbarment, incarceration, and bankruptcy. Because of the automatic stay provisions of federal bankruptcy law, Nifong cannot be named individually as a defendant herein, but his wrongful actions were taken on behalf of, and are attributable to, the City of Durham.

7.    Duke Hospital nurse Tara Levicy and her supervisor, Teresa Arico, played pivotal roles in causing and enabling Nifong and Gottlieb's corrupt rape investigation. Defendant Levicy was the inexperienced, recently certified sexual assault nurse who assisted in the forensic medical examination of Mangum a few hours after the fictitious rape was alleged to have occurred. As North Carolina Attorney General Roy Cooper stated after his independent investigation established the players' innocence, there was "no medical evidence" supporting Mangum's claim of sexual assault. Yet nurse Levicy assured Nifong's investigators on March 16, two days after the alleged rape, that Duke Hospital's forensic examination had yielded evidence "consistent with sexual assault." This statement flatly misrepresented the medical evidence from the examination, and it breathed life-giving credibility into rape allegations that were so openly contradictory --

3

Mangum had variously claimed, and recanted, being raped by one, three, five, and twenty players -- that Duke and Durham police had dismissed them as a transparent hoax.

8.    A few days later, Levicy embellished her misrepresentation, falsely assuring Sergeant Gottlieb that the examination of Mangum had revealed physical evidence of "blunt force trauma" consistent with a vaginal and anal gang rape by three men. Levicy's own report of Mangum's pelvic examination, however, specified that there was no tearing, bleeding, bruising, or other signs of blunt force trauma and that the "anal exam" showed "nothing notable." Levicy's supervisor, defendant Arico, publicly reinforced and corroborated Levicy's false account of the medical evidence. Although she had not been involved in the forensic examination of Mangum, nor had she reviewed the medical records, Arico misinformed the media that the accuser's "injuries are consistent with the story she told."

9.    Throughout Nifong's corrupt investigation, Levicy tailored her statements to suit Nifong's evidentiary needs. For example, when the results of DNA testing were negative for all 46 white lacrosse players, Levicy assured Nifong's investigators that Mangum had been uncertain whether her "attackers" had used condoms, despite Levicy's own exam report's unequivocal statements, thrice, that condoms had not been used. Nifong and his investigators consistently emphasized, both in court filings and in public statements, Levicy's false descriptions of the medical evidence to justify their investigatory actions and their feigned belief that a rape had occurred.

4

10.     Duke University's official statements, actions, and inactions in response to the rape hoax crisis were tightly managed and controlled by President Richard Brodhead himself, with the active oversight of Robert Steel, Chairman of Duke's Board of Trustees. As Steel acknowledged months after Nifong's corruption had been publicly exposed, Brodhead "had consulted regularly with the Trustees" and that "anyone critical of President Brodhead should be similarly critical of the entire Board." Throughout the crisis, Brodhead and Duke consistently sacrificed the rights and interests of the accused Duke students in an effort to avoid embarrassment to Duke and to minimize criticism of Brodhead's administration. Mangum's explosive allegations had created an angry mob led primarily by activist Duke faculty members, student protestors, and a hostile media, and the mob immediately rushed to condemn the lacrosse players, to intimate and denounce the team's defenders, and to demand the team's swift and severe punishment. Brodhead repeatedly succumbed to the mob's intimidation and demands, and he effectively condoned its actions.

11.     Brodhead, who acknowledged after the players had been publicly exonerated that he was fully responsible for Duke's statements and actions throughout the rape hoax crisis, violated the players' rights and interests in three principal ways.

a.     Brodhead and Duke failed to disclose, and actively suppressed, material exculpatory evidence in Duke's exclusive possession; discredited exculpatory evidence that had been publicly disclosed; and refused to review exculpatory evidence compiled by the players' defense counsel. For example:

5

- When Nifong, the media, and others asserted as fact that Mangum had been raped and sodomized by three Duke lacrosse players, Brodhead and Duke did not disclose Duke police officer Christopher Day's contemporaneous incident report stating that Mangum's rape allegations had been so wildly inconsistent that they had been disregarded as incredible by the Durham police. And when Officer Day's report was publicly disclosed, Duke took steps to discredit it.

- When Nifong and his investigators repeatedly relied on nurse Levicy's statements that the medical and physical evidence collected by Duke Hospital corroborated Mangum's accusations, Brodhead and Duke failed to disclose that the records of Duke's forensic exam contained no such evidence.

- When Nifong publicly speculated that condom use might explain the negative DNA test results for all players, Brodhead and Duke failed to disclose that Mangum had *thrice* told doctors and nurses at Duke Hospital that her attackers had not used condoms.

- When Nifong and his investigators repeatedly charged that the lacrosse players were hiding behind a conspiratorial "wall of silence," Brodhead and Duke failed to disclose that the team's co-captains, who had hosted the party at their off-campus residence, had voluntarily assisted police in searching the residence, had voluntarily submitted to an all-night interrogation, had voluntarily provided DNA samples and submitted to physical examinations, and had volunteered to take lie detector tests (which the Durham investigators declined). To the contrary, Brodhead deliberately reinforced the "wall of silence" lie by repeatedly calling on the players to cooperate with police, knowing full well that they had done just that throughout the investigation.

- When defense lawyers for the players repeatedly sought to present Brodhead with convincing evidence of the players' innocence, he repeatedly refused to review it.

Months after the rape allegations and Nifong's investigation had been exposed as a malicious and tragic hoax, Brodhead attempted to defend his refusal to speak out, even as it became increasingly clear to everyone that the Duke students were the victims of a

6

cruel and malicious hoax. He did not want to risk creating the perception "that a well-connected institution was improperly attempting to influence the judicial process." And so Brodhead and Duke remained silent and passively looked on while a politically ambitious and plainly unethical prosecutor, abetted by a mob led by activist Duke professors and student protestors, put 47 innocent Duke students through what Brodhead himself later admitted was "an ordeal the likes of which few have known." The only "wall of silence" erected in this tragedy was Brodhead's.

    b.  Brodhead also looked on passively as activist members of the Duke faculty and student protestors waged an extraordinary public campaign of abuse and harassment against the innocent lacrosse players. This campaign included public condemnations of the players as guilty of rape, racism, and a wall of silence; candlelight vigils and "pot-banging" protests on campus and at the players' residences; display of banners emblazoned with "castrate" and other hostile slogans; distribution throughout campus of WANTED-style posters displaying photos of the players and proclaiming their guilt; and in-class harassment of the players by openly hostile faculty members. Perhaps the most egregious of the attacks on the players was the infamous advertisement placed in the campus newspaper by the so-called "Group of 88" Duke professors. The ad made unmistakably clear that its faculty sponsors believed that the rape had occurred, and it thanked the student protestors "for not waiting" to "mak[e] your selves heard" and exhorted them "to turn up the volume." The ad was paid for with University funds and listed fifteen academic departments and programs as its sponsors. Brodhead took no

steps to enforce Duke's plainly applicable anti-harassment policy; nor did he criticize, let alone discipline, the activist professors and student protestors; nor did he even disassociate the University from their shameful actions and statements. Accordingly, he implicitly condoned these actions and statements and made Duke responsible for them. Indeed, months after the rape hoax had been publicly exposed, Brodhead conceded that activist faculty members and student protestors "were quick to speak as if the [rape] charges were true" and that "the public as well as the accused students and their families could have thought that those were expressions of the university as a whole."

      c.      Finally, Brodhead issued a series of carefully timed public statements and imposed a series of increasingly severe disciplinary measures on the team in an effort to satisfy the mob's demands for immediately and severe sanctions against the team and to distance Duke and its administrators from the intense public hostility that had been focused on the innocent lacrosse players. The inevitable effect of Brodhead's statements and actions was to impute guilt to the players and to further inflame public opinion against them. For example:

- Brodhead opened many of his public statements by stating: "Physical coercion and sexual assault are unacceptable in any setting and will not be tolerated at Duke."

- As noted above, Brodhead repeatedly urged "everyone with information pertinent to the events of March 13 to cooperate with authorities." Again, he knew full well that the lacrosse players had cooperated fully with the investigation from the beginning, and he likewise knew that his statements would imply falsely that the players were attempting to hide the truth.

8

- Brodhead initially cancelled two lacrosse games for the specific purpose of punishing the team for holding a party with exotic dancers and underage drinking. Shortly thereafter, he cancelled the entire lacrosse season and fired the team's coach, just as the activist professors and student protestors had demanded. In announcing these actions, Brodhead noted that "the outpouring of outrage" against the lacrosse players on the campus and within the community was not surprising, thus making clear that he understood and sympathized with those who had rushed to condemn the innocent lacrosse players for committing a heinous crime and then conspiring to cover it up.

- He also effectively apologized for not imposing these severe sanctions on the team sooner, explaining that Duke "learned the full magnitude of the allegations only gradually, as police and other information was reported in the media . . . ." At no time did Brodhead even hint at the existence of substantial exculpatory evidence in Duke's possession indicating that the alleged rape had never occurred.

12. Brodhead's wrongful conduct on behalf of Duke and Nifong's wrongful conduct on behalf of Durham were assisted and supported by the wrongful and/or negligent conduct of several of their subordinates and other agents and representatives of Duke and Durham. Many of these individuals are known, and they are named as defendants and their roles in injuring the plaintiffs are described herein; those wrongdoers who are not yet known will be added as defendants as their roles are disclosed through the discovery process.

13. As a direct and foreseeable result of defendants' actions, plaintiffs have suffered serious deprivations of their rights and interests both under North Carolina law and under federal law, including the United States Constitution, and they have endured grievous, lasting injuries. These injuries include economic costs, invasions of privacy, wholesale deprivations of constitutional rights, and burdensome legal fees. They also

9

include lost educational opportunities, not the least of which was their opportunity to compete for the 2006 NCAA Division I National Championship in men's lacrosse, a goal toward which all the players had strived for most of their lives. And their injuries include, especially, irreparable harm to their reputations and severe emotional anguish. As President Brodhead himself conceded to a lacrosse parent:

> [T]he members of the Duke men's lacrosse team have lived through an ordeal the likes of which few have known. I recognize that, especially in the early days, when the publicity about the case projected a very high certainty that the alleged crime had actually occurred, team members had to deal with a barrage of negative and hostile comments, from inside the Duke community as well as outside. I regret that . . . . There is no undoing the agonies of the last months.

None of the plaintiffs will ever be the same again.

## PARTIES

### I.     The Plaintiffs.

10.     Plaintiff Edward Carrington is a resident of the State of Virginia. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2008.

11.     Plaintiff Casey J. Carroll is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2007.

12.     Plaintiff Michael P. Catalino is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2009. Plaintiff Gale

Catalino is a resident of the State of New York. She is the mother of Plaintiff Michael Catalino.

13. Plaintiff Thomas Clute is a resident of the State of Maryland. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2009.

14. Plaintiff Kevin Coleman is a resident of the State of New Jersey. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2006.

15. Plaintiff Joshua R. Coveleski is a resident of the State of Delaware. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2008.

16. Plaintiff Edward J. Crotty is a resident of the State of New Jersey. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2009.

17. Plaintiff Edward S. Douglas is a resident of the State of Maryland. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2006.

18. Plaintiff Kyle Dowd is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2006. Plaintiff Patricia Dowd is a resident of the State of New York. She is the mother of Plaintiff Kyle Dowd.

11

19.     Plaintiff Daniel Flannery is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2006.

20.     Plaintiff Richard Gibbs Fogarty is a resident of the State of Maryland. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2009.

21.     Plaintiff Zachary Greer is a resident of Canada. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2008. Plaintiff Irene Greer is a resident of Canada. She is the mother of Plaintiff Zachary Greer.

22.     Plaintiff Erik S. Henkelman is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2006. Plaintiff Steven Henkelman is a resident of Pennsylvania. He is the father of Plaintiff Erik S. Henkelman.

23.     Plaintiff John E. Jennison is a resident of the State of Virginia. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2008.

24.     Plaintiff Ben Koesterer is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2007. Plaintiffs Mark and

12

Joyce Koesterer are residents of the State of New York. They are the parents of Plaintiff Ben Koesterer.

25. Plaintiff Fred Krom is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2007.

26. Plaintiff Peter J. Lamade is a resident of the State of Maryland. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2007.

27. Plaintiff Adam Langley is a resident of the State of Illinois. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2008.

28. Plaintiff Christopher Loftus is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2007. Plaintiff Daniel Loftus is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2007. Plaintiff Barbara Loftus is a resident of the State of New York. She is the mother of Plaintiffs Christopher and Daniel Loftus.

29. Plaintiff Anthony McDevitt is a resident of the State of New Jersey. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2007.

13

30. Plaintiff Glenn Nick is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2006.

31. Plaintiff Nicholas O'Hara is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2007. Plaintiff Lynnda O'Hara is a resident of the State of New York. She is the mother of Plaintiff Nicholas O'Hara.

32. Plaintiff Daniel Oppedisano is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2007.

33. Plaintiff Sam Payton is resident of the State of Connecticut. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2009.

34. Plaintiff John Bradley Ross is a resident of the State of Maryland. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2008.

35. Plaintiff Kenneth J. Sauer, III is a resident of the State of New Jersey. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the class of 2006.

36.     Plaintiff Steve Schoeffel is a resident of the State of Virginia.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is member of the Duke class of 2009.

37.     Plaintiff Robert Schroeder is a resident of the State of New Jersey.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2008.

38.     Plaintiff Devon Sherwood is a resident of the State of New York.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2009.

39.     Plaintiff Daniel Theodoridis is a resident of the State of Connecticut.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2009.

40.     Plaintiff Brett Thompson is a resident of the State of Maryland.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He was a member of the Duke class of 2006.

41.     Plaintiff Christopher Tkac is a resident of the State of Maryland.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2009.  Plaintiff Tracy Tkac is a resident of the State of Maryland.  She is the mother of Plaintiff Christopher Tkac.

15

42.  Plaintiff John Walsh, Jr., is a resident of the State of Maryland.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He was a member of the Duke class of 2007.

43.  Plaintiff Michael Ward is a resident of the State of New York.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He was a member of the Duke class of 2007.

44.  Plaintiff Robert Wellington is a resident of the State of Texas.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2008.

45.  Plaintiff William Wolcott is a resident of the State of New York.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He was a member of the Duke class of 2006.

46.  Plaintiff Michael Young is a resident of the State of New York.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2008.

## II.  The Defendants.

### A.  The Duke Defendants.

47.  Defendant Duke University is a private, nonprofit organization incorporated in North Carolina, which owns and operates educational and research facilities as well as a health care system.  Duke University is governed by a board of trustees with 37 members, consisting of the President of Duke and 36 members drawn

16

from private, public, and community interests. At all relevant times herein, Defendant Richard Brodhead was the President of Duke University and Robert Steel was the Chairman of its Board of Trustees. As described below, Duke University organized and controls Defendant Duke University Health System, Inc. ("DUHS"), a North Carolina nonprofit corporation that operates health care facilities including Duke University Hospital, Durham Regional Hospital, Duke Health Raleigh Hospital, and related health care clinics. Duke University's control extends to all divisions of DUHS. As used hereinafter, "Duke" refers to Duke University; DUHS and its divisions; and/or their officers, employees, and agents.

48.     Duke University Medical Center ("DUMC") is a name commonly used to refer to a group of health care facilities on the campus of Duke University, including Duke Hospital, Duke Children's Hospital and Health Center, and Duke Clinic. Hereinafter, "Duke Hospital" is used to refer to the institution to which Crystal Mangum was taken and at which she was examined in the early morning hours of March 14, 2006.

49.     Duke Hospital and DUMC are owned and operated by Defendant Duke University Health System, Inc. ("DUHS"). Duke University Health System, Inc., is a separate, controlled, affiliated nonprofit corporation which was formed by Duke University to own and operate the integrated health system which includes Duke University Hospital and its affiliated health care clinics and other health care activities. The Executive Committee of the Board of Trustees of Duke University has principal responsibility for oversight and control of DUHS, including absolute control over

17

appointments to the Board of Directors, oversight of its operational and financial reports, review and submission to the full Board of Trustees of any proposed changes to its articles of incorporation or bylaws, oversight of its operations, and any other activities which may be required to carry out the responsibilities of Duke University with respect to DUHS. In addition, the President of Duke University, who was Defendant Richard Brodhead at all relevant times herein, shares oversight responsibility with the Board of Directors of DUHS for supervising the activities of the President and Chief Executive Officer of DUHS.

50. Defendant Richard Brodhead was, at all relevant times herein, the President of Duke University. As President, Brodhead was the Chief Administrative Officer of the University. In that capacity, Brodhead served in a supervisory and policymaking role for Duke and all of its employees, agents and constituent entities. Brodhead is responsible to the Board of Trustees. His responsibilities include supervising, managing, and governing the University; interpreting and carrying out the policies of the Board; and presiding at meetings of the University faculty. On information and belief, Brodhead is a citizen and resident of Durham County in the State of North Carolina.

51. Defendant Peter Lange was, at all times relevant to this action, the University's Provost. In that capacity, Lange served in a supervisory and policymaking role for Duke University and all of its employees, agents, and constituent entities. Lange is the University's Chief Academic Officer; his duties include directing the University's

academic operations and overseeing the University's teaching and research missions. Upon information and belief, Lange is a citizen and resident of North Carolina.

52. Defendant Tallman Trask was, at all relevant times herein, Executive Vice President of Duke University. In that capacity, Trask served in a supervisory and policymaking role for Duke University and all of its employees, agents, and constituent entities. Trask is the University's Chief Financial and Administrative Officer; his duties include directing the University's financial operations and overseeing the University's central administrative services and capital projects. On information and belief, Trask is a citizen and resident of Durham County in the State of North Carolina.

53. Defendant Larry Moneta was, at all relevant times herein, Vice President for Student Affairs at Duke University. In that capacity, Moneta served in a supervisory and policymaking role for Duke University and all of the public relations employees, agents and constituent entities. Moneta's duties include supporting undergraduate students in their academic, social, personal, physical and emotional needs. Moneta was responsible for the welfare of all students, and for coordinating the University's emergency responses. On information and belief, Moneta is a citizen and resident of Durham County in the State of North Carolina.

54. Defendant John Burness was, at all relevant times herein, Senior Vice President for Public Affairs and Government Relations at Duke University In that capacity, Burness served in a supervisory and policymaking role for Duke University and all of the public relations employees, agents, and constituent entities. Burness' duties

19

include acting as the Official Spokesperson for the University, and as the University's primary liaison to the City of Durham and the Durham Police Department. On information and belief, Burness is a citizen and resident of Durham County in the State of North Carolina.

55. Defendant Victor Dzau was, at all relevant times herein, the Chancellor for Health Affairs, and President and Chief Executive Officer of Defendant Duke University Health System, Inc. In that capacity, Dzau served in a supervisory and policymaking role for DUHS, all of its employees, agents, and constituent entities. Dzau's duties include administrative oversight of all DUHS entities, including Duke Hospital. On information and belief, Dzau is a citizen and resident of the State of North Carolina.

56. Defendant Suzanne Wasiolek was, at all times relevant herein, the Assistant Vice President for Student Affairs and Dean of Students. Wasiolek is or has been a member of the North Carolina bar and has worked as a practicing attorney. Her duties include administering to the needs of Duke students and assisting Vice President Moneta in carrying out his obligations to coordinate the University's emergency responses. In that capacity, Wasiolek served in a supervisory and policy-making role for Duke University. On information and belief, Wasiolek is a citizen and resident of the State of North Carolina.

57. Defendant Matthew Drummond was, at all times relevant herein, the Head of the University's Duke Card office. On information and belief, Drummond is a citizen and resident of the State of North Carolina.

20

58. Defendant Tara Levicy was, at all relevant times herein, a sexual assault nurse examiner ("SANE") at Duke University Hospital. On information and belief, Levicy is a citizen and resident of the State of New Hampshire.

59. Defendant Theresa Arico was, at all relevant times herein, the Coordinator of the Sexual Assault Nurse Examiner Program at Duke University Hospital. On information and belief, Arico is a citizen and resident of the State of North Carolina.

60. Defendant J. Wesley Covington was, at all relevant times herein, an attorney in Durham, North Carolina. On information and belief, Covington is a citizen and resident of the State of North Carolina.

61. Defendant Kate Hendricks was, at all relevant times herein, Deputy General Counsel in the Office of University Counsel at Duke University. On information and belief, Hendricks is a citizen and resident of Durham County in the State of North Carolina.

62. Defendant Aaron Graves was, at all times relevant herein, Duke University's Associate Vice President for Campus Safety and Security. In that capacity, Graves served in a supervisory and policymaking role for Duke University. At all relevant times to this action, Graves' duties included supervising the Duke Police Department. The Duke Police Department is a North Carolina law enforcement agency authorized and existing under the North Carolina General statutes. Duke Police officers are commissioned under North Carolina General Statutes without limitation; they have the full range of police authority that the State grants to all other municipal law enforcement

21

officers in their respective jurisdictions. The Duke Police Department has primary police jurisdiction over, among other things, crimes reported to have occurred on its campus and on property owned or controlled by Duke University, including adjacent streets and roadways, within the Durham city limits. Upon information and belief, Graves is a citizen and resident of North Carolina.

63. Defendant Robert Dean was, and at all times relevant herein, the Director and Chief of the Duke Police Department. Dean reported directly to Duke University's Associate Vice President for Campus Safety and Security, Defendant Graves. In his capacity as Director and Chief of Police, Dean served in a supervisory and policymaking role for the Duke Police Department. Dean's primary responsibilities include directing and supervising the day-to-day management of the Duke Police Department. Upon information and belief, Dean is a resident of North Carolina.

64. Defendant Graves and Dean, as well as other defendant supervisors and officers of the Duke Police Department not yet known, are referred to herein collectively as the "Duke Police." The Duke Police are "persons" acting under color of law as that term is used in 28 U.S.C. § 1983.

**B.    The Durham Defendants.**

**1.    The Durham Investigators.**

65. Defendant City of Durham is a municipal corporation formed under the laws of North Carolina. On information and belief, the City of Durham has purchased liability insurance and/or participates in a municipal risk-pooling scheme sufficient under

22

N.C.G.S. § 160A-485 to waive its immunity against civil liability. The City of Durham operates the Durham Police Department ("Durham Police"), which is the city department with law enforcement authority in the City of Durham.

66. Defendant Linwood Wilson was, at all times relevant to this action, an investigator employed by the District Attorney for the Fourteenth Prosecutorial District in North Carolina. Wilson was fired from the District Attorney's office on or around June 25, 2007. On information and belief, Wilson is a citizen and resident of North Carolina.

67. Defendant Mark Gottlieb was, at all times relevant to this action, a detective employed by the Durham Police Department. On information and belief, Gottlieb is a citizen and resident of North Carolina.

68. Defendant Benjamin Himan was, at all times relevant to this action, an investigator employed by the Durham Police Department. On information and belief, Himan is a citizen and resident of North Carolina.

69. Defendants Nifong, Wilson, Gottlieb and Himan are referred to herein collectively as the "Durham Investigators."

### 2. The Durham Supervisors.

70. Defendant Patrick Baker was, at all times relevant to this action, the City Manager for the City of Durham. In that capacity, Baker served in a supervisory and policymaking role for the City of Durham and all of its constituent entities, including the Durham Police Department. Upon information and belief, on or shortly after March 14, 2006, Baker assumed the duties of the Chief of Police for the Durham Police Department

23

and retained those duties during the extended period of time in which Defendant

Chalmers was on leave during the police investigation of Mangum's false allegations.

Upon information and belief, Baker is a citizen and resident of North Carolina.

71.  Defendant Steven Chalmers was, at all times relevant to this action, the Chief

of Police for the Durham Police Department.  In this capacity, Chalmers served in a

supervisory and policymaking role for the Durham Police Department.  On information

and belief, Chalmers is a citizen and resident of North Carolina.

72.  Defendant Ronald Hodge was, at all times relevant to this action, the Deputy

Chief of Police for the Durham Police Department.  In this capacity, Hodge served in a

supervisory and policymaking role for the Durham Police Department.  On information

and belief, Hodge is a citizen and resident of North Carolina.

73.  Defendant Lee Russ was, at all times relevant to this action, Executive Officer

to the Chief of Police for the Durham Police Department.  In this capacity, Russ served in

a supervisory and policymaking role for the Durham Police Department.  On information

and belief, Russ is a citizen and resident of North Carolina.

74.  Defendant Stephen Mihaich was, at all times relevant to this action,

Commander of Investigative Services for the Durham Police Department.  In this

capacity, Mihaich served in a supervisory and policymaking role for the Durham Police

Department.  On information and belief, Mihaich is a citizen and resident of North

Carolina.

75.  Defendant Beverly Council was, at all times relevant to this action, Commander of the Uniform Patrol Bureau for the Durham Police Department.  In this capacity, Council served in a supervisory and policymaking role for the Durham Police Department.  On information and belief, Council is a citizen and resident of North Carolina.

76.  Defendant Jeff Lamb was, at all times relevant to this action, Commander of the District Two Uniform Patrol of the Durham Police Department.  In this capacity, Lamb served in a supervisory and policymaking role for the Durham Police Department.  On information and belief, Lamb is a citizen and resident of North Carolina.

77.  Defendant Michael Ripberger was, at all times relevant to this action, a Lieutenant in the Durham Police Department.  On information and belief, Ripberger served in a supervisory and policymaking role for the Durham Police Department.  On information and belief, Ripberger is a citizen and resident of North Carolina.

78.  Defendant David Addison was, at all times relevant to this action, a corporal employed by the Durham Police Department.  On information and belief, Addison's duties included serving as official spokesman for the Durham Police Department.  On information and belief, Addison is a citizen and resident of North Carolina.

79.  Defendants Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, and Addison are referred to collectively herein as the "Durham Supervisors."

25

80. The Durham Supervisors and the Durham Investigators are "persons" acting under color of law within the meaning of 28 U.S.C. § 1983. They are sued in both their individual and official capacities, unless otherwise indicated herein.

## JURISDICTION AND VENUE

81. This action for damages arises under the Constitution and laws of the United States as well as the law of the State of North Carolina. In addition, complete diversity of citizenship exists between the parties, and the matter in controversy exceeds the sum of $75,000 exclusive of costs and interests. This Court has original jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiffs' state claims pursuant to 28 U.S.C. § 1367. In addition, this Court has independent original jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332.

82. Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C. § 1391. Nearly all defendants reside and may be found in the Middle District of North Carolina and a substantial part of the events giving rise to these claims occurred in this district.

## FACTS

### I. Background

#### A. Duke University's Championship Men's Lacrosse Team

83. From 1977 to 1990, the Duke University men's lacrosse team amassed a win-loss record of 2-45 in Atlantic Coast Conference ("ACC") play. In 1991, Duke

26

recruited a new men's lacrosse coach, Mike Pressler, to reverse the team's lackluster performance. Over the next sixteen years, Coach Pressler developed the Duke men's lacrosse program into one of the most successful and celebrated college programs in the nation, and earned for himself a national reputation as one of the best college lacrosse coaches in the country. In those sixteen seasons, Coach Pressler's teams compiled a 153-82 overall record and won three ACC championships; ten NCAA tournament berths; and an appearance in the 2005 Division I men's lacrosse championship game, which the team lost by one goal to Johns Hopkins University. Coach Pressler is a three-time "ACC Coach of the Year" and the 2005 recipient of the U.S. Intercollegiate Lacrosse Association's "F. Morris Touchstone Award" as the National Coach of the Year. Heading into the 2006 season, the Duke men's lacrosse team was uniformly ranked by the media as among the top men's lacrosse teams in the nation and was widely favored to achieve every college athlete's dream -- a Division I national championship title. Many of the lacrosse players had dreamed of achieving this goal for most of their lives.

84.     Many of the players on the Duke men's lacrosse team in 2005-2006 had chosen to attend Duke because they wanted the opportunity to play for Coach Pressler and to compete for a national championship. Many turned down offers from other prestigious schools in order to pursue this dream.

85.     Duke University derived significant benefits from its championship lacrosse program and the national prestige associated with it. The success of the men's lacrosse team helped Duke join an elite handful of schools as a perennial contender for

the Sears Cup, awarded for the cumulative performance of all of a school's NCAA sports teams. Duke's athletic success at the national level and the associated prestige boosted Duke's ability to recruit top student athletes and top academic students as well, since it gave Duke a combination of athletic and academic excellence that is largely unrivaled by competing elite colleges and universities, including the Ivy League schools, and is nearly unique among the nation's private universities.

86.     The success of Duke's varsity athletic teams such as its championship men's lacrosse team is also a significant factor in University fundraising. Duke's prestige as a national Division I athletic powerhouse has boosted its ability to attract the many millions of dollars in alumni and other donations that it receives every year.

87.     Duke viewed and treated its varsity men's lacrosse team, as well as other athletic teams, as ambassadors and representatives of the University to other students, to the local community, and to the nation and world at large. In the words of Duke's Dean of Students, Suzanne Wasiolek, the men's lacrosse players and other varsity athletes "lead a more high-profile life on campus than the other students, [in] that they represent their team and represent Duke University in all they do on and off campus." Likewise, the Duke University Student-Athlete Handbook, *available at* http://www.goduke.com, states that a student-athlete participating in athletic competition is "acting as an official representative of the University."

88.     In order to ensure that its athletes appropriately "represent Duke University in all they do on and off campus," Duke exercises significant authority and control over

Case 1:08-cv-00119-JAB-JEP   Document 1   Filed 02/21/08   Page 40 of 40