suggesting, with the knowledge and approval of the Durham Supervisors, that condoms might have been used by the fictional rapists.

213.    In the afternoon of March 23, Judge Ronald Stephens signed the NTO application, ordering all 46 white members of the lacrosse team to provide DNA samples to the police.

214.    The team members fully and immediately complied with the court's order without objection, providing DNA samples, submitting to examinations for injuries, and sitting for photographs.

215.    When the order was issued, many team members consulted with Ekstrand, leading Covington to complain that Ekstrand was trying to take over his position on the case.  But when one player asked Covington directly, "Are you my lawyer?" Covington refused to answer directly.

216.    The press was tipped off about the NTO order.  When the team members arrived to provide DNA samples in the late afternoon of March 23, therefore, newspaper and television reporters were awaiting them.  The first prominent press coverage of the rape hoax would begin the next morning, with a front-page article in the *Raleigh News & Observer*.  From March 24 onward, a national media frenzy continued for months, fueled in large part by Duke University administrators, officers, professors, and students.

## IV.    The Media Frenzy Begins, And District Attorney Nifong Takes Control Of The Rape Investigation

217.    In the ensuing days and weeks, the combination of faculty animosity, faculty and student protests, community outrage, and a massive invasion of the Duke

69

Dockets.Justia.com

campus by local and national media, transformed Duke into what CBS News described as a "Campus Under Siege." The atmosphere was intensely hostile, even dangerous, for the lacrosse players. They were accosted and intimidated at their homes and on campus by large groups of angry, pot-banging faculty and student protestors carrying "castrate" signs and yelling threats. Their faces appeared on "Wanted"-style posters that flooded the campus and Durham. Some players were publicly singled out in class by their professors for harassment and condemnation. They were besieged by news reporters and camera crews. They lived in fear of physical attacks, under threats of drive-by shootings and racial violence. Increased police patrols were required in the neighborhood where many of them lived. They were forced to flee from town during their final exams when a menacing radical hate group called the New Black Panthers descended on the campus. And in the midst of this intense community outrage and national media attention, 88 Duke professors took out a full-page ad in the campus newspaper publicly thanking student protestors for "not waiting and for making yourselves heard."

218. On or around March 24, on information and belief, Nifong contacted Durham officials, including the Durham Supervisors, to take control of the investigation of Mangum's claims. On information and belief, these Durham officials voluntarily ceded complete control of the investigation to Nifong, and subsequently approved and ratified his conduct.

219. The extensive and negative media coverage of the lacrosse team that began on March 24 was not caused by District Attorney Nifong. To the contrary, Nifong took

an active role in the investigation *because of* the media coverage; not vice versa. In April 2005, the Governor had appointed Nifong to become interim District Attorney for the Fourteenth Prosecutorial District of North Carolina, which includes Durham and Duke. By March 2006, Nifong was engaged in a hotly contested political campaign for election to the position of District Attorney. He faced formidable competition in the Democratic primary from a well-regarded former prosecutor whom he had fired upon his appointment as interim District Attorney. Trailing badly in the polls on March 24, when the case exploded in the media, he viewed the Duke lacrosse prosecution as a golden opportunity to garner, in his own words, "a million dollars of free advertisements." On March 24, he took the unprecedented step of assuming personal charge of the Durham police's rape investigation.

220. On information and belief, the Durham Supervisors knew that it was unprecedented for a district attorney to take direct control of a police investigation, especially when the district attorney was engaged in an obvious conflict of interest due to his hotly contested re-election campaign. It was clear that Nifong would be able to exploit Mangum's high-profile, racially charged rape allegations for personal political gain, and it quickly became obvious that that was exactly what he was doing.

221. On information and belief, Nifong was determined to win the election for district attorney in order to enhance his retirement fund. He had fired the main challenger, Freda Black, when he had become interim district attorney. If she won the

election, she would undoubtedly fire him in return, two years before his service would have qualified his pension for the maximum monthly benefits.

222.    On or around March 24, on information and belief, Durham Police Commander Jeff Lamb instructed Gottlieb and Himan that they should take direction from Nifong during the investigation, but that they should also report regularly to Durham police senior staff regarding the investigation.

223.    On information and belief, Nifong remained in direct and final control of the investigation and prosecution until January 12, 2007, when he was forced to recuse himself due to ethical charges filed against him by the North Carolina bar.

## V.    Duke Reacts To The Rape Charge, Closing Its Eyes To The Truth And Condemning, Punishing, Harassing, And Betraying The Lacrosse Players

### A.    Duke Administration Capitulates To The Demands Of The Media, Activist Faculty, And Student Protestors

224.    At the same time Nifong was seizing control of the investigation, Duke administrators began to chart their own response to the false rape allegations. Duke University President Richard Brodhead and the Chairman of Duke University's Board of Trustees, Robert Steel, devised Duke's official response to virtually every major event in the rape hoax crisis after March 24. Months later, after Mangum's rape allegations had been publicly exposed as a malicious and tragic hoax, Brodhead admitted that he "had responsibility for the statements the university made and the actions the university took" throughout the rape hoax crisis. Chairman Steel, who had taken an active role in collaborating with President Brodhead throughout the crisis, likewise later acknowledged

that Brodhead "had consulted regularly with the Trustees" and that "the board agreed with the . . . actions he took." Steel affirmed that "anyone critical of President Brodhead should be similarly critical of the entire board." Under Brodhead's and Steel's direction, Duke capitulated to the various demands and pressures from the media, activist faculty members, and student protestors with a calculated, skillfully executed strategy of statements, actions, and omissions designed to protect Duke's and their own interests by publicly maligning and punishing the players and distancing Duke from them.

225. This strategy was implemented both in Duke's actions and in Duke's silent failures to act. Throughout the rape hoax crisis, as Nifong, Durham police and city officials, activist Duke professors and student protestors, the media, and others repeatedly publicly declared the players guilty of a savage gang rape and a "wall of silence" designed to conceal the truth, Duke took no action to disclose the exculpatory evidence in Duke's exclusive possession, or to confirm the players' full cooperation with the investigation. Rather, Duke took active steps to *suppress* exculpatory evidence in its possession and to silence its employees who knew of it. Duke also implicitly condoned and approved of, and thereby encouraged, the efforts of Duke faculty members, academic departments, and students to harass and condemn the lacrosse players, even conferring its official imprimatur upon the most inflammatory of faculty statements against the lacrosse team -- the so-called "Group of 88" ad of April 6, discussed below. At the same time, the Brodhead administration executed a series of carefully timed reprimands and other disciplinary actions against the lacrosse team that were based on Mangum's rape

allegations and that generated a public impression of the players' guilt. In addition, key members of the Brodhead administration, such as Senior Vice President and media spokesman John Burness and Vice President for Student Affairs Larry Moneta, publicly and privately condemned and maligned the lacrosse players to the media, and deliberately exacerbated the effects of Duke's actions against the players. Other key Duke officials, such as Dean of Students Wasiolek and Executive Vice President Tallman Trask, used their positions of trust and authority with the lacrosse players, as well as express promises of confidentiality, to solicit and obtain from the players confidential information, and then promptly offered to disclose, and did disclose, that information to Durham police.

226. Duke implemented its campaign against the lacrosse players without delay. On March 24, Coach Pressler and the four lacrosse co-captains met with Executive Vice President Trask, Athletic Director Joe Alleva, and Kennedy. At this meeting, Trask and Alleva asked the co-captains to tell them every detail about the party. (Of course, the Duke administration had known of the players' adamant denials of Mangum's rape allegations for at least nine days.) When the co-captains told Trask that they had been advised not to speak of the events by their lawyer, Trask became angry and demanded to speak with Covington. When advised that Ekstrand, not Covington, had given the advice, Trask told the co-captains that anything they told him would be protected from disclosure by "student-administrator privilege."

227. There is, of course, no such "student-administrator privilege." Rather, Trask, acting on Duke's behalf, was intentionally or recklessly misleading the players to elicit statements that were contrary to their attorney's advice.

228. Contrary to Ekstrand's advice, the co-captains told Trask, Alleva, and Kennedy what happened at the party, again denying the allegations of rape in the strongest possible terms, while admitting the hiring of the exotic dancers and the underage drinking. Alleva told the players that he believed them. Trask also told the co-captains that he believed them, that they should not worry about the allegations, and that they should focus on beating Georgetown the next day. (Promptly thereafter, Trask participated in Brodhead's decision to cancel the Georgetown game. He also later offered to and did disclose to Durham police the communications he had received on the basis of his false assurance of confidentiality.)

**B.      Duke Publicly Maligns the Players**

229. Also, on March 24, Brodhead attended a meeting with faculty members that was dominated by a cadre of Duke's activist professors. These activist faculty members were already demanding that Brodhead immediately disband the lacrosse team and sanction its coach and players.

230. Animus against the lacrosse players spilled over into public in-class harassment of some of the players by some of their teachers. Already on Friday, March 24, at least one lacrosse player, Peter Lamade, was subjected to in-class harassment by his professor before his peers. This would be the first of many such incidents in the

ensuing weeks, as the campus atmosphere, exacerbated by the vitriolic harassment by the activist professors and student protestors, became hostile and intolerable to the lacrosse team.

231. That evening, March 24, Duke's Senior Vice President and media spokesman John Burness was featured on local news programs deploring the rape allegations, without placing any emphasis on the possibility that the allegations were false. Either that very day or the day before, Burness had met with Robert Dean, the Director of the Duke Police, and Dean had once again stated that the Durham police had not considered the rape allegations to be credible. Dean and Burness had Officer Day's March 14 report noting the inconsistencies in Mangum's stories, but they did not disclose the Day report to the players, their parents, or the public.

232. Throughout the rape hoax crisis, Burness repeatedly made not-for-attribution comments to reporters maligning the Duke lacrosse team as a gang of hooligans that included "two or three really bad actors." Burness's comments became a constant theme of the hostile media coverage of the team throughout the rape hoax crisis. Burness's consistently negative comments to the media about the lacrosse team were designed to give credibility to the charges of rape and a team-wide cover-up, by portraying the lacrosse players as capable of committing the crimes alleged against them.

C. **Duke Cancels Two Lacrosse Games To Punish Team For The Party**

233. The next morning, Saturday, March 25, the *Raleigh News & Observer* published a front-page story about the rape allegations that was one-sided and highly

sympathetic to Mangum. The headline read, "DANCER GIVES DETAILS OF ORDEAL," and the story falsely portrayed Mangum as a hard-working single mother and student at North Carolina Central University, a historically black college, who had recently been driven to exotic dancing by her struggle to support her children. This highly misleading account was the only interview that Mangum provided to the media throughout the rape hoax.

234. The same morning, President Brodhead convened a meeting of top Duke officials at his official residence. The participants included Brodhead, Burness, Trask, Wasiolek, Duke attorney Kate Hendricks, Athletic Director Joe Alleva, Duke Academic Council Chairman Paul Haagen, and other officials.

235. On information and belief, Defendants Brodhead, Trask, Moneta, Burness, and other Duke officials established regular conferences to address Duke's response to the rape hoax. On information and belief, Defendant Victor Dzau, CEO of DUHS, was included in such communications.

236. At the March 25 meeting, as Burness later acknowledged, the assembled officials decided that they "needed to send a signal that [they] took seriously *what happened in the house*." (Emphasis added.) Many of these administrators had been aware of the allegations for many days; this newfound "need[] to send a signal" had only arisen in light of the recent torrent of negative publicity. The truth or falsity of the allegations was immaterial to this decision. Brodhead and his top advisors decided to cancel the next two lacrosse games. Later that day, 90 minutes before the Georgetown

game was to begin, and after the Georgetown team was fully suited up and ready to play, Athletic Director Joe Alleva notified Coach Pressler of Brodhead's decision to cancel the next two games as punishment for the underage drinking at the party (which the players had admitted). Alleva assured Coach Pressler and the team (falsely, as it turned out) that there would be no further punishment of the lacrosse team unless criminal charges were brought.

237. Duke claimed that the punishment was not for the rape allegations, but rather was for the underage drinking and hiring exotic dancers at the March 13 party, which the administrators falsely characterized as a "a team-sanctioned event." The reasons given for this punishment were plainly pretextual. In fact, as the Duke officials knew, the March 13 party was not a "team-sanctioned event," and underage drinking and the hiring of exotic dancers were common features of student parties at Duke and at colleges throughout the country. Other Duke athletic teams, including the men's basketball and baseball teams, had engaged in off-campus underage drinking and had hired exotic dancers at their parties, without similar punishment. In fact, at least 20 other Duke athletic teams, fraternities, and sororities had held such parties, with exotic dancers, during the 2005-2006 school year alone. Moreover, Duke officials had been aware, long before the day of the Georgetown game, that underage drinking and exotic dancing had occurred at the party, yet they awaited until the last minute (after the Georgetown team had traveled to Durham and was actually suited up to play) before canceling the game.

238. The purpose and effect of the punishment of the lacrosse team was to distance and insulate Duke and its administrators from the controversy and its negative publicity by sending a public signal that Duke sympathized with the accuser, credited the rape allegations, and condemned the lacrosse players.

239. Duke recently provided a vivid illustration of the double standard that Duke applied to the lacrosse team and its coach when a group of University organizations and programs sponsored, with University approval and funds, an event on campus called the "Sex Workers Art Show." The performance occurred at the Reynolds Theater in February 2008 and featured semi-nude "sex workers" in a series of vignettes, including a dominatrix who simulated masturbation while whipping a dog collar-clad "slave" kneeling beside her, an exotic dancer extracting a string of dollar bills from her rectum, a transvestite displaying an "anal sparkler show" from his rectum, and similar vulgar perversions.

### D.     President Brodhead Refuses To Meet With Lacrosse Parents

240. About 50 parents of the lacrosse players -- many of whom had learned of Mangum's rape allegations only two days before -- had traveled to Durham to watch the Georgetown game. These parents requested a meeting with Brodhead. Although Brodhead repeatedly agreed throughout the rape hoax crisis to meet with protestors, activist faculty members, Durham officials, journalists, non-lacrosse parents, and students, he refused to meet with the lacrosse parents on March 25. He refused similar requests for a meeting with parents on March 26 and 27. In addition, he would later

refuse repeated requests from the players' defense attorneys, who wanted to present to him overwhelming evidence of the lacrosse players' innocence.

241. Later, after North Carolina Attorney General Cooper had exonerated the lacrosse players and effectively declared the rape allegations a tragic hoax, Brodhead admitted his responsibility for "fail[ing] to reach out to the lacrosse players and their families in this time of extraordinary peril," and thereby "causing them to feel abandoned when they most needed support."

### E. Duke Refuses Parents' Request To Stop Faculty Harassment

242. Instead, on the afternoon of March 25, the parents were allowed to meet with Alleva, Dean Wasiolek, Moneta, and Trask. The parents confronted Dean Wasiolek with her directive (which had been echoed by Coach Pressler, under her guidance) that the lacrosse players should not tell their parents that they faced a criminal investigation for rape, and with her decision to bring Covington into the case as the players' legal adviser. Dean Wasiolek insisted that Covington was a "wonderful" lawyer with significant criminal defense experience. In fact, Covington had little or no experience in criminal defense work.

243. At the March 25 meeting, the players' parents demanded that Duke remove their sons' photos from its website. The parents were both concerned for their sons' safety and afraid that the accuser might study publicly available photos in order to falsely pick out lacrosse players from a photo line-up. Although Moneta promised to have the photos removed that day, Duke inexplicably delayed in taking such action. This allowed

enough time for bloggers to download the players' pictures and to post them on websites devoted to attacks on the players. Duke's delay also allowed the photos of 43 players to be downloaded and used on a Wanted-style "Vigilante" poster that was widely distributed on the campus a few days later.

244. At the same meeting, the parents asked Moneta to remind professors of Duke's policy (discussed below) prohibiting harassment of students, including in-class harassment of students by professors. Moneta refused, even though, as noted above, at least one lacrosse player had been the subject of such in-class harassment the day before.

245. Alleva, Trask, and Dean Wasiolek assured the parents that they believed that the players were innocent and that the rape allegations were false. But when asked if they would make a public statement to that effect, they refused. In fact, Trask falsely advised the parents that Duke would make no more statements that day -- even as Brodhead, with whom Trask was in contact, was preparing his first public statement.

### F. Brodhead Publicly Maligns The Players And Fosters "Wall of Silence" Myth

246. The same day, March 25, Brodhead issued his first public statement as University President about the rape hoax crisis. Brodhead's public statement asserted: "Physical coercion and sexual assault are unacceptable in any setting and will not be tolerated at Duke. As none of us would choose to be the object of such conduct, so none of us has the right to subject another person to such behavior. Since they run counter to such fundamental values, the claims against our players, if verified, will warrant very serious penalties, both from the university and in the courts."

247.    Though Brodhead's statement made fleeting reference to the presumption of innocence, it was foreseeably and predictably received as strongly implying the students' guilt.  Headlines in news media in Durham and across the country blared Brodhead's reference to "[p]hysical coercion and sexual assault."  Few reports made much, if anything, of Brodhead's passing reference to the presumption of innocence in the criminal justice system.  Especially in connection with Duke's simultaneous cancellation of the lacrosse games, Brodhead's statement was well calibrated to malign the players in the national media spotlight.

248.    Brodhead's statement also said:  "I urge everyone to cooperate to the fullest with the police inquiry while we wait to learn the truth."  Brodhead and other Duke officials were fully aware that the lacrosse players had emphatically denied Mangum's allegations and had been fully cooperative with the police investigation.  As noted above, the co-captains had waived their constitutional right to counsel and had voluntarily assisted Durham police in the search of 610 North Buchanan, voluntarily provided full and truthful accounts of the events at the March 13 party, voluntarily submitted to an all-night police interrogation, voluntarily provided DNA samples, and volunteered for lie-detector tests.  The day before, Durham Police Corporal Addison had falsely told numerous news media, in widely quoted comments, that all forty-six white lacrosse players had refused to cooperate with police.  Most notably, this allegation had been featured that morning in the *News & Observer*'s article, "DANCER GIVES DETAILS OF ORDEAL," which quoted Corporal Addison and stated that "authorities vowed to

crack the team's wall of solidarity." In this context, Brodhead's statement could only be taken as reinforcing this false and defamatory allegation of the players' concerted non-cooperation. Brodhead and Duke knew or should have known this insinuation to be false.

249. The same day, Burness sent an email to Duke's Board of Trustees about the allegations, revealing the administration's participation in the rush to judgment. He stated that the situation was "complicated by the behavior of the lacrosse team over many years which for those predisposed to be angry with them, *presumes their guilt.*" (Emphasis added.)

### G.    Duke Faculty Encourage Campus Protests Against Lacrosse Players

250. As the Duke administration was thus rebuffing the parents' requests for support for their sons, a large number of Duke faculty members, other Duke employees, and students immediately rushed to condemn the lacrosse team. Over the weekend of March 25-26, they began a prolonged public campaign of harassment and organized protests falsely condemning the lacrosse players both for committing a heinous crime and for attempting to cover it up. They also called upon the Duke administration immediately to condemn the lacrosse team, to cancel the lacrosse season, and to impose disciplinary sanctions on the team, its coach, and its members.

251. On the evening of March 24, Duke English professor Faulkner Fox sent an email to numerous persons associated with Duke, calling for a protest at the lacrosse game. Other Duke professors attended the protest as well. Fox later told the media: "The students need to realize they live in a community, and people are going to talk back if

they do something, or potentially do something, that is disrespectful to women." Protestors holding "DON'T BE A FAN OF RAPISTS" signs arrived at the lacrosse field prior to the scheduled Georgetown game. The game, as noted above, was canceled by Brodhead shortly before it was scheduled to begin.

252. Professor Fox, in addition to calling for the "DON'T BE A FAN OF RAPISTS" protest at the Georgetown game, also helped organize a "candlelight vigil" at 610 North Buchanan on the night of March 25. On the night of Saturday, March 25, over 250 people—including Duke faculty members, staff, and students—gathered outside the house at 610 North Buchanan.

253. Gathered in front of the house, the crowd chanted "shame," and "you can't run, you can't hide," and other hostile slogans. Members of the crowd told local media that every attendee of the March 13 party should be expelled from the university.

254. The same night, the protestors moved from 610 North Buchanan to a nearby duplex located at 1105 and 1103 Urban Avenue. This house, owned by Duke University, was occupied by lacrosse team members William Wolcott, K.J. Sauer, and Erik Henkelman. The protestors surrounded the front of the house and banged on the windows, screaming "Shame!" Wolcott called Larry Moneta, Duke's Vice President for Student Affairs, and asked for help. Moneta said there was nothing he could do.

255. At approximately 6:10 a.m. the next morning, Sunday, March 26, Duke personnel and students, gathered outside the lacrosse team's residences and engaged in a so-called "pot-banging" protest. They banged on pots and pans, trash bins, water jugs,

and empty beer cans. The crowd wielded signs reading "CASTRATE!!", "You can't rape and run," and "It's Sunday morning, time to confess." Other signs stated: "Real men don't protect rapists," "Don't rape and run," "Give Them Equal Measure" and "Get a Conscience, Not a Lawyer." Sam Hummel, Duke University's Environmental Sustainability Coordinator, shouted into a megaphone: "The community consequences for this action, I guarantee, will range far beyond the legal consequences you will face." The crowd chanted: "Who's protecting rapists? They're protecting rapists! So who are the rapists? They must be the rapists!" The protest lasted at least two and a half hours.

256. Upon information and belief, Hummel played an instrumental role in the protests, helping to organize them by, among other things: sending one or more emails calling for a protest, creating and distributing a slanted and harassing "fact sheet," attending the protest and directing multiple signs (including "Get a Conscience, Not a Lawyer") at the lacrosse house and at television cameras, shouting into a megaphone during the protest, and setting up a speaker system for the protest. Hummel also posted harassing and inflammatory messages on the "Durham Responds" Yahoo Group. In one message, Hummel implored readers to attend an event "geared toward educating the larger Duke community about the sexual assault that occurred two weeks ago in a house just off East Campus that is rented by Duke students." In another message, Hummel referenced a protest in which he had recently participated, and then discussed "planning an on-going response to the March 13th sexual assault that addresses root cause issues such as racism, sexism, misogyny, alcohol culture, paternalism, economic exploitation,

athlete impunity, and Duke's (lack of) accountability to the community." On information and belief, Hummel was also involved in creating and/or distributing the WANTED posters, described below.

257. In addition to Hummel, the participation of Duke faculty members in both organizing and attending the protests was extensive. As noted above, on information and belief, professor Faulkner Fox was one of the organizers of the "DON'T BE A FAN OF RAPISTS" and "CASTRATE!!" protests. Likewise, Duke professor Tim Tyson publicly admitted in a National Public Radio interview to participating in the protests, as well as the "candlelight vigil." Duke professor Kim Curtis also participated in protests targeting the lacrosse players.

258. On March 26, Brodhead had a telephone conversation with Durham Mayor Bill Bell. The next day, Bell complained publicly about the team's silence and urged Duke to cancel the whole season to "send a strong message to the community."

259. In the face of these menacing protests, the players reasonably feared for their physical safety. Players Evans, Zash, Flannery, Wolcott, Sauer, and Henkelman were driven from their homes. On or around March 28, Player Bo Carrington was accosted and surrounded on campus by a jostling crowd of students who shouted "Tell the police what you know! Why are you protecting these rapists?" On Sunday, March 26, when pressed by defense counsel to provide more security or at least excused absences from class for the players, Moneta refused, stating "well, frankly, I don't believe them."

## H. Duke's Campus Atmosphere Becomes Hostile And Perilous For Players

260.  By Monday, March 27, Duke's campus bristled with prejudice and hostility against the lacrosse players. This animus was fed by the perception, created and reinforced by Durham Police Corporal Addison, President Brodhead, and other Duke and Durham officials, that the entire team was concealing evidence of the rape in a conspiratorial "wall of silence."

261.  Also on March 27, columnist Ruth Sheehan of the *News & Observer* wrote a column about the lacrosse team, powerfully indicting them for their "blue wall of silence." Entitled, "Team's Silence Is Sickening," the column stated, "Members of the lacrosse team: You know. We know you know.... And one of you needs to come forward and tell the police." (Later, after compelling evidence of innocence finally emerged, Sheehan provided a partial explanation for her and other journalists' rush to judgment: "No one was telling us that players had been cooperative. I now know that was not true. If I'd known that then, I would've never written what I did." She stated that Duke's press spokesman John Burness "could have helped us, that's for sure.")

262.  The "wall of silence" myth was wholly false -- as previously detailed, the lacrosse co-captains had been fully cooperative with Duke and the Durham police, voluntarily assisting in the police search of 610 North Buchanan, providing full and truthful statements concerning the relevant events, providing DNA samples, offering to take polygraph tests, and otherwise attempting to prove their innocence. Duke knew all

these facts, yet Duke said nothing to dispel or rebut the "wall of silence" myth, but rather only reinforced it.

263. In this poisonous atmosphere, activist Duke professors participated in the organization of a massive public protest on the campus quad against the lacrosse players, with Duke's permission and approval, on March 27. This so-called "open mike" protest was attended by at least 200 persons, including Duke faculty members. A contemporaneous account in *The Chronicle*, Duke's student newspaper, described this protest as follows (emphases added):

> Racial tensions ran high across campus on the first day of classes after a weekend of national attention directed at the incident.
>
> More than 200 students, faculty and community members gathered for a "speak-out" in front of the Allen Building Monday morning. Participants stepped to the microphone to express outrage about the issues of gender, race and class surrounding the incident. *The event marked the fourth demonstration in 48 hours.*
>
> *"This is a matter of white privilege,"* senior Tiana Mack said. "When I read what was going on, it made me think about Jim Crow.... *If these three culprits get away with it, it will prove to me that Duke does not honor the black woman's body."* ....
>
> Senior Jay McKenna alluded to the widespread belief that the lacrosse players are not fully cooperating with the investigation.
>
> "The fact that this wall of silence has been constructed only adds to the mystery, which adds to the speculation," he said ....
>
> Near the end of the speak-out, several participants called for an administrator to address the crowd. "Is no one going to come out here and say something?" junior Malik Burnett asked, gesturing toward the Allen Building, where many administrators work. "We've been here for an hour. I know you hear us."
>
> Several administrators, including Vice President for Student Affairs Larry Moneta

and Assistant Vice President for Student Affairs and Dean of Students Sue Wasiolek, observed at least part of the demonstration.

264. Duke professor Tim Tyson, who participated in the quad protest, stated that day on National Public Radio: "I'm not content with Duke's response partly because one of the really terrible things about this is that these young men are banding together and refusing to cooperate with the police investigation. I think that may be illegal. It's certainly a violation of the spirit of the honor code of the university. It's a terrible moral miscalculation that I think you have to be utterly blind to pursue." Tyson also stated: "I think the spirit of the lynch mob lived in that house on Buchanan Street, frankly, and I think that we prefer to think of white supremacists as ignorant, pot-bellied, tobacco-chewing sheriffs and Ku Klux Klan members from Mississippi, but here we have the sons of power and privilege, the wealthy and well-educated among us, who are acting out this history." As Duke knew, all of Tyson's hate-filled comments about the lacrosse players were false.

265. Further protests against the lacrosse team were held on campus on Tuesday, Wednesday, and Thursday of that week (March 28-30). The largest of these occurred on Wednesday, March 29.

266. In the midst of this campus atmosphere of hostility to and condemnation of the lacrosse players, on March 27 Brodhead refused the first of many requests for a meeting with the lacrosse players' counsel, who had already amassed powerful evidence corroborating their claims of innocence using date-stamped photos and electronic records from the night of March 13-14.

## VI. District Attorney Nifong Pursues Investigation Despite Overwhelming Exculpatory Evidence

267.  On Monday morning, March 27, Nifong met with Gottlieb and Himan to receive a briefing on the investigation to date.

268.  On information and belief, at this March 27 briefing, Gottlieb and Himan detailed the overwhelming exculpatory evidence that they had discovered so far.  They told Nifong the numerous material contradictions in Mangum's allegations, and recounted that Roberts had denounced Mangum's claim as "a crock," that Mangum had failed to identify any attackers in photo line-ups, that the three co-captains had voluntarily cooperated with the police and had vehemently denied that any attack occurred, and that Mangum was not credible.

269.  On information and belief, the Durham Supervisors were informed of this exculpatory information as well.

270.  Nifong angrily reacted to this mass of exculpatory evidence by stating, "You know, we're f*cked!"  Nevertheless, the Durham Investigators continued to pursue a prolonged, highly public, and malicious investigation against the lacrosse players.

## VII. Nifong Launches False And Unethical Media Campaign Against Players, And Duke Withholds The Truth

271.  On March 27, District Attorney Nifong launched his notorious and, as the North Carolina Bar authorities later confirmed, unethical media campaign against the lacrosse team.  Announcing publicly that he had taken personal control over the investigation, he threatened that he was prepared to indict *every member* of the team who

attended the party as accessories to rape: "You tell all your clients I will remember their lack of cooperation at sentencing. I hope you know if they didn't do it, they are all aiders and abettors, and that carries the same punishment as rape." Nifong would make the same threat publicly that day on ABC-11 news, which reported that "Nifong may also consider charging other players for not coming forward with information," and quoted Nifong as saying, "My guess is that some of this stone wall of silence that we have seen may tend to crumble once charges start to come out." He repeated the threat in similar terms on March 28 to NBC-17 news.

272. This threat of indictment overshadowed the lacrosse players and their families until January 12, 2007, when Nifong, facing pending ethics charges based on his prosecutorial misconduct, was forced to withdraw from the case and to request the North Carolina Attorney General to take responsibility for the prosecution.

273. Having placed all the players under the public cloud of possible indictment, Nifong then built his political campaign for election as Durham District Attorney on inflammatory and unethical public comments on the case in over 70 media interviews during the week of March 27-31 alone. Nifong's national media offensive centered repeatedly on three main themes. For each of these themes, Duke knew or should have known that Nifong's statements were based entirely on false information.

### A. Nifong Repeatedly Emphasizes that Duke Hospital's Forensic Exam Supported Mangum's Rape Charge, And Duke Says Nothing

274. Most importantly, Nifong and his investigators emphasized the medical and physical evidence from Duke Hospital's forensic examination of Mangum as establishing

that a rape had occurred. Nifong repeatedly based his public condemnations of the

lacrosse players on the March 14 exam at the Duke Hospital. In fact, among the most

persistent themes in the media coverage of the crisis were the repeated public invocations

by Nifong and the other Durham Investigators of the medical and physical evidence

provided by Duke Hospital, its SANE nurse, and the forensic medical exam. For

example:

- The application for a non-testimonial order filed Thursday, March 23, stated that "medical records and interviews ... revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally."

- On March 24, Corporal David Addison of the Durham police told the *Durham Herald-Sun* that there was "really, really strong physical evidence of rape."

- On March 27, Durham police officer Himan filed an affidavit in court stating that Mangum's medical records from Duke Hospital and interviews with "the SANE nurse" "revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally."

- On March 29, Nifong stated on MSNBC's *Abrams Report*: "I am convinced that there was a rape. Yes, sir.... *There is evidence of trauma in the victim's vaginal area that was noted when she was examined by a nurse at the hospital.*" (Emphasis added.)

- On March 30, Nifong told *The Chronicle*, Duke's student newspaper, that "the statements that [the team] makes [claiming innocence] are *inconsistent with the physical evidence in this case.*" (Emphasis added.)

- At an April 11 public forum, after the negative results of the DNA tests became public, Nifong stated: "Duke University Hospital is the best trauma center in the area. This nurse was specially trained in sexual assault and I would just point out that my conviction that a sexual assault actually took place is based on the examination that was done at Duke Hospital." (This statement was repeated and reported on MSNBC and other cable news channels.)

- On April 11, Duke's own newspaper, *The Chronicle*, reported on April 11 that "[s]everal" Duke students said that they did not view negative DNA results as exculpatory because of "the strong assertions of guilt made by District Attorney Mike Nifong and the alleged victim's medical results."

- At a candidate forum on April 12, Nifong stated: "The only thing I've really said about this case publicly is that, based on the medical evidence, I believed that the woman was raped." (This statement was nationally broadcast on cable news networks.)

- On April 17, the day that Nifong procured indictments of two innocent players from the grand jury, the Associated Press reported: "Nifong has repeatedly cited a medical exam of the alleged victim as the reason why he believes a rape occurred."

- On April 18, officers Gottlieb and Himan filed an affidavit in court stating that Mangum's medical records from Duke Hospital and interviews with "the SANE nurse" "revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally."

- On April 21, Nifong stated to the *Raleigh News & Observer*: "I did not accuse anybody of any crime. The only detail I revealed was that based on the medical exam, the woman was the victim of a sexual assault."

- On April 27, another news outlet reported that Nifong had stated "that a rape examination of the victim done at Duke Medical Center that morning revealed evidence of bruising 'consistent' with a brutal sexual assault, with the most likely place it happened at the lacrosse team party."

- As late as August 25, a *New York Times* article on the crisis emphasized nurse Levicy's statement to Durham police that she had found "blunt force trauma ... consistent with the sexual assault that was alleged by the victim," thus reflecting the continuing decisive impact that Levicy's false statements had in the media and upon public opinion, and the aura of credibility that she and Duke Hospital lent to Nifong's rogue investigation.

275. Duke was in exclusive possession of information demonstrating that

Nifong's statements were false. In fact, Nifong was simply parroting the false

information that Duke's SANE nurse, Tara Levicy, had told Gottlieb on March 16 and

21. Not only was there "no medical evidence" consistent with Mangum's rape charges, as North Carolina Attorney General Cooper later confirmed after a thorough review of the medical records, but Nifong also made additional specific claims that were contrary to the evidence in Duke's exclusive possession. For example, Nifong repeated Mangum's claims that she had been raped anally. Again, the medical evidence in Duke's possession decisively refuted this claim. As noted above, even Levicy had stated in her March 14 report that there was no evidence of any anal injury (though Levicy later modified her story when speaking to Gottlieb on March 21). Nifong also claimed that the alleged victim had been strangled or choked during the alleged assault. Mangum had not made this allegation in any of the multiple, conflicting versions of her story at Duke Hospital, including her story to Tara Levicy, nor did Levicy's report of Duke's medical examination of Mangum reflect any physical evidence of choking.

**B. Nifong Falsely Implies That Mangum's Rape Allegations Were Consistent And Credible, And Duke Suppresses Officer Day's Contrary Police Report**

276. Second, Nifong repeatedly implied that the alleged victim's allegations were consistent and credible. The Durham Investigators and the Durham Supervisors knew this to be false. Duke, likewise, was in exclusive possession of the March 14 police report of Officer Day and the reports of Duke's medical examination of Mangum, both of which provided powerful contemporaneous evidence that Mangum's multiple, conflicting rape allegations were patently incredible.

277. Top-level Duke officials were aware of Officer Day's report and of its exculpatory significance. From March 14 through March 23, Duke Police Director Robert Dean had advised Duke officials such as Wasiolek and Burness, on the basis of the Day report, that Mangum's inconsistent, ever-changing allegations were not credible and would come to nothing. Once the case exploded into public view on March 24, however, Duke still did not produce Officer Day's report to the lacrosse players or the public. On the contrary, on information and belief, Duke actively took steps to suppress this report, to silence Officer Day, and later (when the existence of Day's report became public) to discredit the report.

### C. Nifong Falsely Accuses Team Of "Wall of Silence," And Duke Falsely Concurs

278. Third, as detailed above, Nifong's media campaign repeated the accusation that the team members had formed a "wall of silence" and were not cooperating with the police investigation. For example, on March 27, Nifong accused the team of constructing a "stone wall of silence." On March 28, Nifong publicly accused the lacrosse team of "covering up for a bunch of hooligans," and stated separately that "I'm disappointed that no one has been man enough to come forward." On March 29, Nifong stated to CNN: "It just seems like a shame that they are not willing to violate this seeming sacred sense of loyalty to team for loyalty to community."

279. Duke knew full well that Nifong's charge of noncooperation was untrue. Duke did not contradict it; on the contrary, Duke officials had already, and would continue, to reinforce it. For example, on March 27, Duke Provost Peter Lange stated to

news media: "The students would be well advised to come forward. They have chosen not to."

280.  In addition, Nifong repeatedly made statements that were calculated to inflame the racial and class-based passions that had been excited in the Durham community by Mangum's explosive allegations. For example, on March 27, Nifong told ABC News that "where you have an act of rape—essentially a gang rape—is bad enough in and of itself, but when it's made with racial epithets against the victim, I mean, it's just absolutely unconscionable.... The contempt that was shown to the victim, based on her race, was totally abhorrent." On March 28, Nifong told the *New York Times* that "the thing that most of us found so abhorrent ... was the combination of gang-like rape activity accompanied by racial slurs and general racial hostility." On March 29, Nifong told the media that "the circumstances of the rape indicated a deep racial motivation for some of the things that were done.... It makes a crime that is, by nature, one of the most offensive and invasive even more so." On March 30, Nifong was quoted in *USA Today* as promising to pursue the case despite "the feeling that Duke students' daddies could buy them expensive lawyers and that they knew the right people." And at a public forum on April 12, Nifong stated: "I'm not going to allow Durham's view in the minds of the world to be a bunch of lacrosse players at Duke raping a black girl in Durham."

281.  President Brodhead, and many Duke faculty members, directly reinforced these racially inflammatory comments. For example, Brodhead publicly stated, among

other things, that the allegations against the players had "reviv[ed] memories of the systematic racial oppression we had hoped to have left behind us."

## VIII. Duke's Hostility To The Lacrosse Team Intensifies

### A.    Duke Campus Is Flooded With WANTED Posters

282.    The atmosphere of hostility and harassment on the Duke campus continued the next day, Tuesday, March 28, as inflammatory posters were distributed across Duke's campus and in adjacent Durham neighborhoods.  On information and belief, an organization called "CrimeStoppers," which includes such Duke officials as Dean of Students Sue Wasiolek and Duke Police Director Robert Dean on its board of directors, was involved in preparing and/or distributing these posters.  These posters stated:

> On Monday, March 13, 2006 about 11:00pm, the Duke
> University Lacrosse Team solicited a local escort service for
> entertainment.  The victim was paid to dance at the residence located
> at 610 Buchanan.  The Duke Lacrosse Team was hosting a party at the
> residence. *The victim was sodomized, raped, assaulted and robbed.*
> *This horrific crime sent shock waves throughout our community.*
> . . .
> Durham CrimeStoppers will pay *cash* for any information
> which leads to an arrest in this case.

283.    The next day, Duke's campus was flooded with an even more chilling poster featuring the pictures of almost all the lacrosse players (the "Vigilante Poster").  On information and belief, Duke faculty, employees, and students, including Duke Environmental Sustainability Coordinator Sam Hummel, were among those responsible for the production and/or distribution of the Vigilante Poster that blanketed the Duke campus on March 29.  Entitled "PLEASE COME FORWARD," the Vigilante Poster

displayed pictures of the faces of 43 of the 46 white lacrosse players. The bottom of the
poster clarified that three of the players' pictures were missing because their pictures had
been removed from the Duke website before they could be downloaded. The poster
quoted Durham Police spokesman Addison: "We're not saying that all 46 were involved.
But we do know that some of the players inside that house on that evening knew what
transpired and we need them to come forward."

284.   On Sunday, April 2, 2006, the *Raleigh News & Observer* published the
Vigilante Poster, complete with pictures of 43 lacrosse players, in photo format. The
weekend of Friday, March 31 through Sunday, April 2 was a time of maximum racial
tension and hostility to the lacrosse players, during which they were subject to drive-by
shooting and death threats. The widespread publication and distribution of the players'
pictures in the Vigilante Poster, on campus and in a prominent local newspaper,
threatened their physical well-being and safety. On information and belief, Duke took no
steps to suppress or discredit the Vigilante Poster.

285.   Both posters violated the Duke University anti-harassment policy, as set
forth in greater detail below. Due to their inflammatory language imputing guilt and their
blanket distribution on the Duke campus, the posters incited community and campus
resentment and hostility against the lacrosse players that substantially caused and
contributed to a vicious campaign of harassment against the players. One Duke professor
wrote on May 1, 2006: "I reacted with extreme disgust when I became aware that
somebody had taken it upon himself or herself to distribute pictures of all the lacrosse

players -- that changed the game, and it gave terrible way to the potential injustice that was being done."

**B.      Brodhead Provides False Assurances To The Players**

286.   Also on Tuesday, March 28, the four lacrosse co-captains, Evans, Zash, Flannery, and Thompson, obtained a meeting with Brodhead in his office.  Duke's deputy general counsel, Kate Hendricks, and other Duke officials attended the meeting. Brodhead assured the co-captains of confidentiality, with such words as:  "Everything you say here will stay within these walls."  Within less than a week of this promise, Duke officials offered to disclose to the Durham Investigators all communications between Brodhead or other administrators and the lacrosse players.

287.   The co-captains again emphatically proclaimed their innocence and unequivocally denied that a rape or other crime had occurred at the party.  Brodhead assured them that he believed them.  He asked them to consider how much difficulty they had caused *him*, and how he had been placed in a terrible situation.  He also urged them to issue a public apology.  Duke's in-house counsel advised the co-captains that this might help Brodhead resist cancelling the lacrosse season.

288.   Convinced that Brodhead believed them and could be trusted, the co-captains issued a public apology and denial of the rape charges the same day, March 28. The statement "expressed sincere regret over the lapse in judgment in having the party on March 13 which has caused so much anguish for the Duke community and shame to our

families and ourselves." It also "stated unequivocally that any allegation that a sexual assault or rape occurred is totally and transparently false."

### C.    Brodhead Suspends The Lacrosse Season

289.    That same day, Brodhead held a press conference at which he issued his second public statement in the rape hoax crisis. At this conference, he announced, contrary to Duke's assurances to the team and their parents just three days before, that he was suspending the men's lacrosse season indefinitely -- "until the legal situation is clarified." This decision contradicted Duke's assurances to the team and their parents just three days before, and also departed from subsequent assurances to the co-captains that the team could resume competitive play when the DNA test results came back. He also reiterated, "Physical coercion and sexual assault are unacceptable in any setting and will not be tolerated at Duke. As none of us would choose to be the object of such conduct, so none of us has the right to subject another person to such behavior." The purpose of Brodhead's indefinite suspension of the season and accompanying statements was to distance Duke and its administrators from the lacrosse players, and to appease the angry mob of faculty, student, and community activists calling for immediate and severe sanctions against the team. The effect of Brodhead's statements was to impute guilt to the lacrosse players, and to further inflame public opinion against them.

290.    In addition, Brodhead's March 28 statement falsely asserted that Duke had no police investigatory authority over 610 North Buchanan, and that Duke was compelled to be a passive bystander to the Nifong investigation. He stated: "Unavoidably, we have

to look to the Durham Police to take the lead in the investigation. Duke doesn't have the power to compel testimony from citizens of this city, and Duke lacks access to warrants, DNA records, and other confidential information." Likewise, on April 5, Brodhead stated: "Duke must defer its own investigation until the police inquiry is completed ... because the police have access to key witnesses, warrants, and information that we lack ...."

291. Contrary to Brodhead's statements, Duke Police had full municipal police investigatory powers and had jurisdictional authority to investigate reported crimes (including sexual assault) on Duke-owned property, such as 610 North Buchanan, pursuant to state law and a jurisdictional agreement with the Durham police.

**D.    Brodhead Credits Exotic Dancer's Claims In 911 Tape**

292. Also on March 28, the media obtained the tape of Kim Roberts' 911 call placed as she and Mangum were leaving 610 North Buchanan at 12:53 a.m. on March 14. On information and belief, the tape of this 911 call was deliberately leaked to the media by the Durham police in order to inflame race-related community passions against the lacrosse players and to retaliate against them for the exercise of constitutional rights. In leaking the tape, on information and belief, the Durham police suppressed the fact that they knew that Kim Roberts, Mangum's companion dancer, was the caller, and characterized it as an apparently unrelated, racially charged event. A public information officer for Durham police, on information and belief, deliberately misled news media

about the identity of the caller in the 911 tape. On March 31, moreover, Nifong also falsely denied any knowledge of the identity of the 911 caller, on national television.

293.   In this 911 call, as noted above, Roberts had alleged that she and her "black girlfriend" had been subjected to racial harassment outside of 610 North Buchanan. Brodhead was asked about this call at the March 28 press conference, but stated that he had not heard it.

294.   The story told by Roberts in the 911 call was internally inconsistent and filled with lies. (Roberts later admitted that her 911 call was false.) But the 911 call was far more significant for what it did not contain: Roberts made no allegation that her "black girlfriend" had just been savagely gang raped by three men.

295.   On information and belief, both the Durham Supervisors and high-level Duke officials were aware that Roberts was the caller in the 911 tape. Durham police had informed Duke police of this fact as early as 3:00 a.m. on March 14.

296.   The next day, Brodhead issued a follow-up statement regarding Roberts' 911 call. Despite the plain inconsistencies in the 911 tape, Brodhead stated on March 29: "At the news conference I was asked about the 911 tape involving a racial slur, which only became known late yesterday. I have now had the opportunity to listen to the tape. It is disgusting. Racism and its hateful language have no place in this community. I am sorry the woman and her friend were subjected to such abuse."

297.   Brodhead thus seized upon and credited Roberts' claim in the 911 call that Mangum had been subjected to unprovoked racial slurs, but he did not mention the

glaring fact that Roberts had not complained to police that Mangum also had just been brutally gang raped. Nor did Brodhead mention Roberts' statements in the 911 call that she (and, by implication, Mangum) were not "hurt in any way" or "harm[ed] ... in any way."

298. Brodhead's statements about the 911 tape sent a clear message that he and the Duke administration believed Mangum's account of what occurred on the night of March 13-14. Concomitantly, it publicly signaled that he and his administration did *not* believe the players' emphatic denial of Mangum's rape allegations. In addition, it directly accused the lacrosse players of being racists who committed unprovoked racial harassment. Brodhead's statement thus reinforced one of the key fictional themes of Nifong's media blitz, namely that the alleged rape was all the more heinous because it was a racially motivated hate crime. Other Duke faculty, as detailed below, would similarly reinforce this pernicious falsehood, which was designed to inflame community passions against the lacrosse players.

### E.    Professor Baker Defames The Lacrosse Players As Racist, Violent, Privileged Rapists

299. In the meantime, Duke's activist faculty members and student protestors continued to create a campus atmosphere of hostility and harassment toward the lacrosse players. On Wednesday, March 29, the Vigilante Poster, described above, was distributed throughout the Duke campus.

300. Later that same day, Brodhead met with student protestors. He continued to refuse to meet with the lacrosse players' parents and/or defense counsel.

301. Also on March 29, Professor Houston Baker wrote an open letter not only condemning the lacrosse players as violent rapists, but also denouncing them on the basis of their race, class, and gender. On information and belief, Baker distributed this letter publicly, including to media outlets. The letter, which condemned the Duke administration for not imposing sufficiently severe sanctions on the team, stated, in part (emphases added):

> There is no rush to judgment here about the crime—neither the violent racial epithets reported in a 911 call to Durham police, nor the harms to body and soul allegedly perpetrated by *white males* at 610 Buchanan Boulevard. But there is a clear urgency about the erosion of any felt sense of confidence or safety for the rest of us who live and work at Duke University. The lacrosse team—15 of whom have faced misdemeanor charges for drunken misbehavior in the past three years—may well feel they can claim innocence and sport their disgraced jerseys on campus, safe under the cover of *silent whiteness. But where is the black woman who their violence and raucous witness injured for life? Will she ever sleep well again?* And when will the others assaulted by racist epithets while passing 610 Buchanan ever forget that dark moment brought on them by a group of drunken Duke boys? *Young, white, violent, drunken men among us*—implicitly boasted by our athletic directors and administrators—have injured lives.
>
> . . .
>
> All of Duke athletics has now been drawn into the seamy domains of Colorado football and other college and *university blind-eying of male athletes, veritably given license to rape, maraud, deploy hate speech, and feel proud of themselves in the bargain.*
>
> . . .
>
> It is very difficult to feel confidence in an administration that has not addressed in meaningful ways *the horrors that have occurred to actual bodies*, to the Durham community of which we are an integral part, and to our sense of being members of a proactive and caring community. Rather, gag orders and trembling liberal rhetorical spins seem to be behaviors du jour from our leaders.

There can be no confidence in an administration that believes suspending a lacrosse season and removing pictures of Duke lacrosse players from a web page is a dutifully moral response to *abhorrent sexual assault, verbal racial violence, and drunken white male privilege loosed amongst us.*

How many mandates concerning safe, responsible campus citizenship must be transgressed by *white athletes' violent racism* before our university's offices of administration, athletics, security, and publicity courageously declare: enough!

How many more people of color must fall victim to *violent, white, male, athletic privilege . . .* ?

302.    These hate-filled statements not only falsely declared the lacrosse players guilty of a violent rape, they constituted harassment of the lacrosse players on the basis of race, class, and gender.  They violated Duke's anti-harassment policy.  They interfered significantly with the players' work and education, and adversely affected their living conditions.  Moreover, these words inflamed passions against the players and endangered their safety while inflicting on them grave and irreversible emotional torment and reputational harms.  On information and belief, Baker suffered no disciplinary action for his misconduct.

303.    Professor Baker similarly maligned the lacrosse players at a meeting of Duke's Academic Council on March 30 as well.  At a meeting of about 200 faculty members, Baker and other activist faculty members condemned the team and its members and called for their immediate and severe punishment.

**IX.** **DNA Evidence Dispositively Exonerates The Lacrosse Players But Is Ignored By Defendants**

    **A.**     **The State Bureau Of Investigation's DNA Testing Results Are Negative**

    304.    By March 28, on information and belief, the State Bureau of Investigation ("SBI") concluded an initial examination of the rape-kit evidence from the forensic examination of Mangum at Duke Hospital, and the DNA samples from the lacrosse players. On March 28 or March 29, the SBI gave an initial report to Nifong regarding its analysis of these materials.

    305.    The SBI reported to Nifong that their examination of the rape kit items had not discovered any semen, blood, or saliva on any of the rape kit items. The absence of semen, blood, or saliva was obviously highly exculpatory, given Mangum's stories at Duke Hospital, which had alleged a violent gang rape without condoms and with ejaculation into both her mouth and her vagina or anus.

    306.    Either the same day or the next, Duke officials met with key members of Nifong's investigative team and the Durham city government, including Gottlieb, Himan, Durham City Manager Patrick Baker, and Durham Police Chief Steve Chalmers, among others. Duke's administration was represented by Aaron Graves, Duke's Vice President for Campus Security, Duke Police Director Dean, and perhaps other Duke officials. On information and belief, this was the first of several meetings held between Duke and Durham officials during the ensuing investigation. On information and belief, at this meeting, Nifong, Gottlieb, and Himan reported to Duke and Durham officials that Mangum's accounts of the attack were patently inconsistent, that the SBI lab results had

come back negative, and that Mangum had failed to identify any alleged attackers in two separate photo arrays.

307.    John Burness, Duke's chief spokesman, later said that the meeting "was just about the ways the university could assist in the investigation." Gottlieb said in his deposition that Duke Police came to "several" meetings of this same group.

308.    On information and belief, the purpose of this meeting was to coordinate approaches to bolstering the prosecution's case, which was rapidly disintegrating in the face of Mangum's inability to identify any of her purported attackers in the March 16 and March 21 photo arrays and the SBI's report that initial analysis of the rape kit evidence showed no blood, semen, or saliva. On information and belief, during this meeting, the Durham Investigators, the Durham Supervisors, and/or other Durham city officials agreed to expedite the identifications and arrests of Duke lacrosse players, notwithstanding evidence demonstrating the lacrosse players' innocence. On information and belief, Duke Police were present and agreed to cooperate in this expedited effort to make identifications and arrests notwithstanding the evidence.

309.    Also on March 28, Himan conducted a secret interview with Mangum. This interview was not included in Himan's and Gottlieb's police notes that were eventually disclosed to defense attorneys, and was not disclosed during any of the disciplinary proceedings against Nifong. The interview did not come to light until it was reported by the *Durham Herald-Sun* on October 3, 2007.

310.     In the morning of March 30, Nifong again reiterated on CBS's Early Show that his conviction that a sexual assault had occurred was based on the medical and physical evidence reported by Duke Hospital: "The victim was examined at Duke University Hospital by a nurse who was specially trained in sexual assault cases. And the investigation at that time is certainly consistent with sexual assault having taken place." Duke knew or should have known that this was false, but never contradicted him or otherwise disclosed that the medical and physical evidence did not support Mangum's rape allegations. On the contrary, two days later, Theresa Arico, Levicy's supervisor and the director of Duke Hospital's SANE program, would publicly confirm Nifong's statements and their reliance on Duke Hospital's forensic examination of Mangum.

311.     Also, on or around March 30, Nifong received a second exculpatory report from the SBI lab. The SBI concluded that no DNA from any of the players was found on Mangum's rape kit items or clothing. The SBI tests detected DNA from one resident of 610 N. Buchanan on a towel found in the house, and DNA from another resident was found on the floor of one of the bathrooms in the house. On information and belief, the DNA finding from the towel was communicated to Levicy, who (as recounted below) later doctored her SANE exam report to include an allegation that the alleged rapists "wiped [Mangum] off with a rag."

312.     Nifong did not disclose this information to defense counsel until April 10. Together, these SBI reports constituted a decisive confirmation of the absolute innocence of every member of the lacrosse team, as the March 23 NTO application had foretold.