On information and belief, the Durham Investigators, the Durham Supervisors, the Durham Police, and high-level Duke officials were all aware that the SBI lab results had come back negative for the entire team.

### B. Nifong Suggests That Rapists May Have Used Condoms, And Duke Says Nothing

313. Instead of terminating his investigation after the SBI's reports, Nifong immediately began to tailor his public comments to suggest that condoms might have been used in the alleged rape, to prepare the way for later public disclosure of the exculpatory DNA evidence. For example, on March 31, Nifong stated to MSNBC that "if a condom were used, then we might expect that there would not be any DNA evidence recovered from, say, a vaginal swab." Like Nifong and the Durham Supervisors, Duke was aware that this suggestion was false and directly contradicted Mangum's own repeated statements to Duke Hospital that condoms were not used by her fictitious "attackers." Yet Duke stood by silent and did not correct Nifong. On the contrary, as detailed below, Levicy subsequently altered her own account of Mangum's examination to allow for the possibility of condom usage.

### X. Players Fear For Their Safety As Campus Hostility Spawns Threats Of Violence

#### A. Duke's Faculty Members Attack Team

314. On March 30, an extraordinary executive session of Duke's Academic Council was convened, with the full support and participation of President Brodhead. The Academic Council is one of the chief instruments of faculty governance at Duke

Dockets.Justia.com

University. It consists of 85-90 elected faculty members who provide for official representation of considered faculty opinion to the Duke administration. Brodhead and Trask attended the meeting, which was open to all interested faculty. At the meeting, many faculty members, including Houston Baker, Peter Wood, and Wahneema Lubiano, launched vitriolic attacks on the lacrosse team urging the administration to cancel the lacrosse season and disband the team for three years. A chemistry professor, Steve Baldwin, later recalled: "I have never heard presumably intelligent, careful, balanced people being so completely over the top. . . . It was the most disgusting display I've ever seen in my life."

315. Activist Duke professors continued to fuel the campus atmosphere of hostility and harassment by making racially inflammatory attacks on the lacrosse team. For example, Professor William Chafe, a professor of History and former Dean of Duke's Arts and Sciences faculty from 1995 to 2004, published an article on March 31 in *The Chronicle* entitled "Sex and Race" that made a reckless and inflammatory comparison to the 1955 lynching of Emmitt Till: "So sex and race have always interacted in a vicious chemistry of power, privilege, and control. Emmett Till was brutalized and lynched in Mississippi in 1954 [sic] for allegedly speaking with too easy familiarity to a white woman storekeeper. . . . What has all this to do with America today, and with Duke? Among other things, it helps put into context what occurred in Durham two weeks ago [at the lacrosse party]."

316.    The campus atmosphere of intense hostility and racial animosity against the lacrosse players boiled over into racial violence and threats of racial violence.  On Friday, March 31, several incidents threatening racially motivated violence against the lacrosse players occurred.

**B.    Duke Players Are Threatened With Racial Violence**

317.    At 3:00 a.m. at a restaurant in Durham, two white Duke students were blocked in by another car at the drive-thru window.  A young black man approached the car and told the Duke students they weren't welcome there, because "they're going to rape our women."  The Duke student driving the car was struck in the head and was knocked unconscious.

318.    On March 31, *The Chronicle*, Duke's student newspaper, warned residents of the houses around 610 N. Buchanan of the danger of racially motivated gang violence targeted at Duke students.  Cars drove by on Buchanan Street with their passengers yelling epithets and making obscene gestures at students.

319.    The Duke administration was fully aware of the risk of racially motivated on-campus violence.  On March 31, Duke Vice President for Student Affairs Larry Moneta issued a warning about threats of drive-by shootings against lacrosse players and/or other Duke students in the 610 N. Buchanan neighborhood.

320.    At or around the same time, moreover, an anonymous threatening blogsite was launched in support of Mangum at http://justiceforher.blogspot.com.  The blogger went by the ominous pseudonym "Justice From The Deep South."  The site featured a

logo of two AK-47 assault rifles. The site went on to list the names, home addresses, and phone numbers of the parents and families of lacrosse players, and called for readers to "Let the parents know how you feel." It also stated: "I am very angry right now, so please excuse me if I make comments about castrating these assholes."

321. Because of the threat of violence, one lacrosse family living in Durham moved out of its house for fear of attacks. Many of the players moved out of their residences. Others remained secluded in their rooms whenever possible.

## XI. Duke Improperly Assists Nifong's Patently Corrupt Investigation

### A. Duke Suppresses Officer Day's Exculpatory Police Report

322. On March 31, Duke took two actions directed toward bolstering the credibility of Mangum's rape allegations. First, Officer Day of the Duke Police added a "continuation page" as an addendum to his police report prepared at Duke Hospital on March 14, in which he had noted the manifest inconsistencies in Mangum's allegations. Day's "continuation page" purported to cast doubt on the reliability of his own contemporaneous report, which Duke had not yet disclosed to the lacrosse players or the public, by indicating that it was based on hearsay and imperfectly overheard conversations. Upon information and belief, Day was coerced to write this continuation page by Duke administration officials, who had previously prevented his exculpatory version of events from becoming public.

323. On information and belief, in addition to suppressing the Day report, Duke police officials, at Nifong's request, also directed Duke police officers who had been

112

present at Duke Hospital on March 14 to write deliberately misleading accounts of what they witnessed that night. The Duke police officers were directed to prepare statements that suppressed exculpatory facts about Mangum's lack of credibility, selectively asserted facts suggesting the guilt of the players, and mischaracterized their own conduct that night by casting the Duke police as mere bystanders. In particular, on information and belief, one Duke officer who prepared such a statement later admitted that, based on his observation at the time, Mangum was "faking" the whole thing; and another Duke officer was directed to suppress the fact that she had overheard a Durham Police officer, upon emerging from Mangum's hospital room, say loudly, "I think she is lying!"

### B. Duke Illegally Gives Nifong Key Card Reports On Lacrosse Players

324. Second, at some time on March 31, Investigators Smith and Stotsenberg of the Duke Police handed over to Gottlieb several reports. Among the reports, according to Gottlieb's later testimony, was "*one key card report for the Duke team members from March 13 and March 14.*" (Emphasis added.) This report was prepared by the Duke Card Office of Duke University.

325. The key card reports provided information on when and where the members of the lacrosse team had swiped their Duke ID cards in slots on locations at Duke's campus during March 13 and March 14. Many of the doors, dining facilities, vending machines, photocopy machines, and so forth on Duke's campus are operated by these key card slots. For example, to access virtually any exterior door of Duke's dormitories and academic buildings requires the swiping of a Duke key card. The key

113

card reports thus allowed the Durham Investigators to roughly track the movements of lacrosse players on Duke's campus on March 13 and 14. These reports therefore aided the Durham Investigators in their effort to determine which lacrosse players had been in Durham on the night of the alleged rape and had likely attended the party.

326. Armed with this information, on April 4 the Durham Investigators presented the third photo identification array to Mangum, which again consisted only of white lacrosse players. The decision to conduct this April 4 photo array was made by Nifong on March 31, the same day the key card reports were obtained.

327. No subpoena had been issued for these reports. In the absence of a subpoena (and the opportunity for the interested parties to quash the subpoena), the disclosure of information in these reports -- most notably, but not necessarily limited to, the key card report -- was a clear violation of the Family Educational Records and Privacy Act (FERPA), as well as Duke's own privacy policies. *See, e.g.,* 20 U.S.C. § 1232g; 34 C.F.R. Part 99; Duke Faculty Handbook, Appendix R, *available at* http://www.provost.duke.edu/pdfs/fhb/FHB.pdf. As also detailed below, Duke would later engage in a fraudulent conspiracy to conceal the fact that it had violated its students' procedural rights under FERPA by giving the key card reports to Gottlieb.

328. On information and belief, this was not the first time that the Duke Card Office had released protected student information to Gottlieb in violation of FERPA.

329. Moreover, the key card information could not have legally been disclosed by Duke even pursuant to a subpoena. As described below, a judge later quashed

Nifong's subpoena for this information (which was actually already in his possession) on the ground that the prosecution could not show good cause for its disclosure.

330. Gottlieb later testified that this key card information, along with nurse Levicy's misinformation about the medical and physical evidence from Duke's forensic examination of Mangum, played a critical role in Nifong's investigation by confirming for Nifong and Gottlieb which lacrosse players had likely attended the party: "[W]e ha[d] the time cards, per se .... [E]ach student has a magnetic card that if they go in the parking lot or dorm room or buy food, whatever, they use that card it leaves an electronic stamp. And we have a document showing that he arrived back to the dorm at the time as the people who we knew were at the party. So we were able to put together information to at least corroborate, *one, he was there; two, he met the description; three, she was able to show them*; the SANE nurse's report was consistent with a sexual assault. So we have something to work with for an indictment." (Emphases added.)

## C.  Duke Withholds Exculpatory Information That Directly Contradicts Nifong's Public Claims and Accusations

331. Also on March 31, Nifong, aware that the SBI reports had come back negative not only for blood, semen, or saliva, but also for any DNA evidence from any of the 46 white lacrosse players, speculated for the first time on MSNBC that condoms may have been used in the alleged attack. He stated: "If there is no DNA left, then there is obviously nothing to compare. For example, if a condom were used, then we might expect that there would not be any DNA evidence recovered from, say, a vaginal swab." But, as Duke knew or should have known, on March 14 Mangum had unequivocally

denied, at least three times, to Duke's medical personnel that condoms had been used in the alleged attack.

332. In sum, by March 31, in addition to critical evidence of the player's innocence, Duke had abundant additional information revealing that the rape investigation of Nifong and Durham police authorities was not proceeding in good faith against its students. This information included:

- Duke police officer Day's official report, known only to Duke, revealing that the investigating officers on the evening of March 13-14 uniformly viewed Mangum and her multiple, ever-changing, contradictory, and facially implausible rape allegations as not credible.

- Nifong publicly justified his prosecutorial actions on medical evidence of rape from Duke Hospital's forensic exam of Mangum. The medical records, in Duke's exclusive possession, contained no medical or physical evidence supporting Mangum's rape allegations.

- Nifong claimed that condoms might have been used during the rape. Duke knew that Mangum had unequivocally denied this three times to Duke's medical personnel.

- Nifong claimed that Mangum had been choked or strangled. Duke knew that Mangum had made no such claim during her examinations at Duke Hospital and that there was no physical evidence to support such a claim.

- Duke was aware that the attack Mangum described at Duke Hospital -- a violent, vaginal, anal, and oral gang rape by three lacrosse players, without condoms and with ejaculation in both mouth and vagina or anus -- could not have occurred without leaving DNA traces of *any* of the three alleged attackers. When Duke became aware of the negative DNA results, it knew or should have known that the lacrosse players were innocent and that Mangum's rape allegations were a tragic and malicious hoax.

Despite the grievous harm and suffering that Nifong's investigation and false public statements were causing to Duke's own students, Duke withheld the exculpatory

evidence and information in its exclusive possession, and watched silently as Nifong characterized the evidence and otherwise commented on the case and the lacrosse players in a way that Duke knew or should have known to be false. To the contrary, Duke improperly provided Nifong's investigators with critical credibility and cooperation in a number of ways: Duke illegally disclosed the key card reports; Duke took official actions and made official and unofficial statements to the media that were calculated to malign the lacrosse players and to distance Duke from them; Duke took no significant action to ensure that its activist faculty members and student protestors, who were presuming the players' guilt and inflaming public outrage against the lacrosse team, were adhering to University standards of behavior, including its anti-harassment policy. And Duke would continue, in the ensuing weeks, to fuel these attacks on its own students.

### D. Duke Hospital Again Falsely Corroborates Mangum's Rape Charges

333. As noted above, in his statements to the press during the week from Monday, March 27 through Friday, March 31, Nifong had repeatedly relied on the alleged medical and physical evidence from Duke Hospital and its SANE nurse, Levicy, as the basis for his claim that a rape had occurred. Duke took no steps to correct this representation, notwithstanding Duke's actual or constructive knowledge of its falsity. To the contrary, on Saturday, April 1, in an interview with the *Durham Herald-Sun*, Theresa Arico, Duke's SANE program director and Levicy's supervisor, took affirmative steps to confirm Nifong's account of the medical evidence and to ratify Levicy's false statements to Nifong.

334. According to the *Herald-Sun* reporter, Arico described Levicy's purported examination of Mangum: "[Arico] described the process as a comprehensive combination of interviews and physical examinations of the person making the sexual assault complaint." Arico also stated that "blunt force trauma" could be diagnosed in a rape victim "with a high degree of certainty" through the use of a colposcope, which magnifies a woman's internal parts where injuries consistent with sexual assault would occur.

335. This statement implied that Mangum had been examined with a colposcope, and that the physical evidence of blunt force trauma allegedly found by Levicy was thus highly reliable. In fact, on information and belief, Manly had not used a colposcope in Mangum's pelvic examination, and the report of Mangum's examination gave no indication that a colposcope had been used to examine her. Arico thus knew or should have known that Levicy had not herself performed the exam, that a colposcope had not been used, and that the exam report contained no finding of physical or medical evidence of "blunt force trauma" to Mangum.

336. In the same interview, Arico also stated, "*I can reasonably say these injuries are consistent with the story she told.*" (Emphasis added.) On behalf of Duke Hospital, Arico thus publicly corroborated both Levicy's and Mangum's credibility, and her remarks were publicized in the media. Neither Arico nor Duke ever took any steps to correct this understanding.

337. These public statements by Arico, Levicy's supervisor, constituted a direct ratification of Levicy's false statements regarding the medical and physical evidence of sexual assault. Arico knew or had reason to know that Levicy's representations to police and prosecutors were false and misleading. Yet she attempted to bolster Levicy's credibility to the police and to the public with intentional or reckless disregard for the truth.

338. Duke had actual or constructive knowledge of facts showing that Levicy had provided false and misleading information to the police. Duke's failure to come forward and correct Levicy's false and misleading statements constitutes an independent ratification of Levicy's conduct.

**E.     Duke Breaks Its Promises Of Confidentiality To The Players**

339. On or around Monday, April 3, Kate Hendricks, Duke's Deputy General Counsel, sent a letter by fax and mail to Nifong. On information and belief, the letter confirmed (as Nifong had publicly speculated) that lacrosse players had spoken confidentially with Duke administrators about the March 13 party, and it advised Nifong that "several administrators … are very willing to provide the information to you and your investigators." It also stated: "Please be assured that a court order will not be necessary." Hendricks' letter offered: "Please have your investigators contact [Hendricks] or [Officer Dean], and either of us can assist in interviews with any Duke personnel who received first-hand accounts of the incident from the players." In

accordance with this offer, on information and belief, Duke administrators, including Wasiolek, met with Durham police on April 13.

**F.    Duke Hospital Turns Over Falsified Medical Records To Durham Investigators**

340.    On April 5, Duke Hospital finally produced to Nifong the medical records relating to its forensic exam of Mangum. As noted above, this was the first access that Nifong had to the medical records other than Levicy's SANE report, although Duke Hospital had been served with the subpoena on March 21. Prior to April 5, all Nifong's public characterizations of the medical and physical evidence of rape had been based exclusively on nurse Levicy's false and misleading statements to the Durham police investigators about the medical and physical evidence.

341.    On information and belief, Levicy had deliberately falsified the version of the SANE report that Duke Hospital produced to Nifong on April 5. The doctored version that she produced, on information and belief, included multiple strike-outs and addenda that attempted to render her report inculpatory in light of what Levicy understood the evidence to be at the time. For example, in the notation about whether the alleged rapists had sought to conceal evidence, Levicy had initially entered "no." In the version produced on April 5, however, this was crossed out, and "yes" was indicated, with the handwritten notation "wiped her off with a rag."

**XII. Mangum Selects Players Seligmann And Finnerty As Two Of Her Attackers In Third Rigged Photo Identification Procedure**

342.  Gottlieb's notes record that, at 9:00 a.m. on April 4, immediately after contacting Mangum and arranging for a photo identification procedure with her later that day, he "spoke to Vice President Graves at Duke University Police via telephone." Gottlieb's notes do not record the content of their conversation.

343.  As noted previously, on April 4, acting on Nifong's instructions, Gottlieb conducted a third photo identification procedure with Mangum. The photo array again consisted of photos of all and only the white Duke lacrosse players. The procedure was conducted by Gottlieb himself, who knew, from the co-captains' March 16 uncounseled admissions and from the key card reports illegally supplied by Duke, which players had been in Durham on March 13-14 and had likely attended the party. At the beginning of the procedure, Gottlieb told Mangum that the photos were only of Duke lacrosse players "whom we have reason to believe attended the party."

344.  In the words of defense counsel, this photo identification procedure was "a multiple choice test with no wrong answers." To the Durham Investigators, however, there *were* "wrong" answers. It was essential to the Durham Investigators' case not to indict any players who could readily prove that they had not even attended the party. The information Duke illicitly provided through the key card reports was critical to ensure that Mangum did not select a "wrong answer" from the photo line-up.

345.  From the perspective of the players who had attended the party, then, the April 4 photo array was the criminal justice equivalent of a game of Russian roulette.

There were three bullets in Nifong's chambers, and they would randomly strike three party attendees. All players were in roughly equal jeopardy of false indictment and further persecution.

346. Thus, the April 4 photo line-up was conducted in highly suggestive circumstances that violated standard Durham police protocols, as well as fundamental precepts of due process. Durham police protocols in effect in Durham at the time required that a photo identification procedure be conducted by an independent administrator, not someone involved in the investigation, and include five "fillers" (or unrelated photos) for each suspect in the array, with each filler resembling the suspect's description. The April 4 photo array was conducted by Gottlieb with no fillers.

347. Moreover, on information and belief, Gottlieb or other Durham police coached Mangum both prior to and during the photo identification process.

348. During the April 4 photo line-up, Mangum identified lacrosse players Reade Seligmann and Colin Finnerty as two of her attackers with "100%" certainty, although she had recognized Seligmann with only "70%" confidence during the March arrays. (Finnerty's photo had not been included in either of the March photo arrays because he did not remotely resemble any of the descriptions that Mangum had provided of her "attackers.") She also identified Dave Evans as one of her attackers with "90%" certainty; again, she had completely failed to recognize Evans when his photo was shown to her twice during the March photo arrays. Moreover, the attackers she identified failed

to match any of the descriptions of her attackers that she had provided during her March 16 interview with Gottlieb and Himan.

349.    Mangum again identified, however, lacrosse players who Gottlieb and Nifong knew were *not* at the party at 610 North Buchanan.  She claimed that Brad Ross had been standing outside the house talking to the other dancer.  Gottlieb knew that Ross had not even been in Durham during the party.  Mangum also stated that she saw Chris Loftus sitting in the living room or master bedroom during the party.  Gottlieb knew from the key card reports that Loftus likely was in his dorm room at the time of the party, having used the key card to enter his dorm at 10:59 p.m. on March 13.

350.    During the April 4 photo identification procedure, Mangum also identified a *fourth* lacrosse player, Matthew Wilson, as resembling one of her alleged assailants, "Brett." Nifong never brought charges against Wilson.  Mangum also identified players who she had failed to recognize during the March photo line-ups, and failed to identify players whom she had recognized during those prior line-ups.

351.    As Gottlieb later testified (quoted above), information supplied by or with the assistance of Duke about who had attended the party was crucial in Nifong's selection of which three members of the lacrosse team to indict.

352.    On information and belief, the Durham Investigators deliberately delayed in disclosing the procedures used in the April 4 photo line-up to the lacrosse players and their counsel, in violation of N.C.G.S. § 15A-282, thus prolonging the investigation and

the period in which all the white lacrosse players were in jeopardy of being randomly selected for indictment.

353. On information and belief, the Durham Investigators and the Durham Supervisors were aware of the abuses involved in the April 4 photo line-up.

354. On April 4, Nifong's reliance on the authority of Duke Hospital and SANE nurse Levicy to corroborate Mangum's allegations continued to be emphasized in the press. Mark Johnson, a reporter from the *Charlotte Observer* stated in an interview on national cable news that Mangum "was examined at Duke University Hospital, which as you know is a top flight hospital. This was a nurse who was trained in dealing with these types of cases and that examination is largely what the district attorney ... is basing his opinion on when he says that he believes an attack did occur."

## XIII. Duke Cancels The Lacrosse Season And Fires Coach Pressler To Appease Activist Faculty And Students

355. On information and belief, on or before Wednesday, April 5, Duke became aware that the DNA test results had come back negative as to all members of the lacrosse team. The DNA evidence added decisive proof to the already overwhelming evidence in Duke's possession refuting the rape allegations Mangum had made to Levicy and others at Duke Hospital on March 14. Despite actual or constructive knowledge of the lacrosse players' innocence, Duke accelerated its actions against the lacrosse team.

356. On April 5, President Brodhead canceled the remainder of the lacrosse season and forced Coach Pressler to resign, as the activist faculty members and student protestors had demanded.

357. Brodhead announced Coach Pressler's resignation and the cancellation of the remainder of the lacrosse season in a public statement that opened as follows:

> "Allegations against members of the Duke lacrosse team stemming from the party on the evening of March 13 have deeply troubled me and everyone else at this university and our surrounding city. We can't be surprised at the outpouring of outrage. Rape is the substitution of raw power for love, brutality for tenderness, and dehumanization for intimacy. It is also the crudest assertion of inequality, a way to show that the strong are superior to the weak and can rightfully use them as the objects of their pleasure. When reports of racial abuse are added to the mix, the evil is compounded, reviving memories of the systematic racial oppression we had hoped to have left behind us."

In noting that "the outpouring of outrage" against the lacrosse players on the campus and within the community was not surprising, Brodhead made clear that he understood and sympathized with the activist faculty members, student protestors, and others who had rushed to condemn the lacrosse players for committing a violent gang rape and then conspiring to cover it up. Nowhere in his April 5 public statement, nor in any other public utterance throughout the rape hoax crisis, did Brodhead criticize the activist faculty members and student protestors or call upon them to stop their outrageous harassment and threatening behavior and their vitriolic, hate-filled comments toward the lacrosse players. Brodhead thus tacitly condoned and encouraged the activist faculty members and student protestors in their conduct against the lacrosse players.

358. Brodhead acknowledged in his April 5 statement that "[a]t meetings with faculty, students, community members, and others," he had "heard a good deal of criticism of the Duke administration for being slow to respond to the allegations against the team associated with March 13. He explained that "it took time to know how to

respond" because "we learned the full magnitude of the allegations only gradually, as police and other information was reported in the media . . ." In cancelling the lacrosse season and firing Coach Pressler, and effectively apologizing for not having done so sooner, Brodhead succumbed to the demands of the mob -- the activist faculty members and student protestors who had angrily insisted that precisely these sanctions be imposed upon the lacrosse players -- and effectively communicated to the media and the public Duke's belief in the players' guilt.

359. Brodhead acknowledged that "[m]any have urged me to have Duke conduct its own inquiry into these [rape] charges." He had refused to do so, however, because "Duke must defer its own investigation until the police inquiry is completed," noting that "the police have access to key witnesses, warrants, and information that we lack, and that a concurrent inquiry might "negatively affect the legal proceedings." Brodhead thus expressed his trust in the integrity and good faith of Nifong's investigation, notwithstanding that Duke had in its possession at that time overwhelming evidence -- in its own medical records, its own police report, and in the DNA test results -- that the lacrosse players were innocent and that Nifong's investigation was corrupt. Not only did Brodhead refuse to inquire into and to disclose the evidence then in Duke's possession, but he also refused repeated efforts by the lacrosse players and their attorneys to demonstrate their innocence to him through the exculpatory evidence that they had gathered and compiled.

360. Ironically, even as Brodhead in his April 5 statement defended his refusal to examine the evidence before him of the players' innocence, he appointed an Ad Hoc Committee "to look into the behavior of members of the lacrosse team over the past five years, and specifically the record of both charges of inappropriate social conduct and criminal violation and of official Duke, community and team responses to that conduct and those violations." This committee, chaired by James E. Coleman Jr., a member of the Duke law faculty, released a twenty-five page report ("the Coleman Report") on May 1, 2006.

361. In his April 5 statement, Brodhead claimed to embrace "the principle that we have an obligation to seek the truth, and that truth is established through evidence and disciplined inquiry." But the simple truth is that Brodhead and Duke were indifferent to the truth. Indeed, Athletic Director Joe Alleva candidly told Coach Pressler that his firing and the cancellation of the season were "not about the truth."

362. Rather, in firing Pressler and cancelling the lacrosse season, Brodhead and the Duke administration sought to disassociate Duke and themselves from the lacrosse team's coach and players and thus to distance Duke and themselves from the intense public hostility that had been the unjust consequence of rape charges that Duke and its administration, by then, knew or should have known to be false.

363. As noted above, Robert Steel, the chairman of Duke's board of trustees, later acknowledged in an interview with *The New Yorker* that Coach Pressler was forced to resign and the lacrosse season was canceled because "we had to stop those pictures" --

i.e., footage aired in the media of the Duke lacrosse team still playing after the rape allegations. "It doesn't mean that it's fair, but we had to stop it," he said. "It doesn't necessarily mean that I think it was right -- it just had to be done." He also later stated to Sally Fogarty, mother of player Gibbs Fogarty, regarding the firing of Coach Pressler: "Life sucks. Bad things happen to good people and you better get used to it." And in September, Steel defended the firing of Coach Pressler in a meeting with Jason Trumpbour, the spokesman for Friends of Duke, saying that "even though it is not fair, people have to be sacrificed for the good of the organization." Steel further told Trumpbour, in a statement which provided telling insight into Duke's selfish motivation for abandoning the lacrosse players, that Duke actually wanted the case to go to trial because it would be better for Duke's image. In fact, Steel went so far as to suggest that if the indicted players were convicted it would not matter because the problems with the case would be sorted out on appeal.

364. Along the same lines, Brodhead also later admitted that subsequent investigation had "prove[d] Pressler's history of responsiveness" and had "fully exonerate[d] him" of the charge of lax oversight of the team.

365. Also on April 5, Brodhead released a second statement, which reiterated: "I once again urge everyone with information pertinent to the events of March 13 to cooperate with authorities." Again, he knew full well that the lacrosse players had been fully cooperating with the investigation from the beginning, and he likewise knew that his statements would imply falsely that the players were attempting to hide the truth.

**XIV. The "Group Of 88" Members Of The Duke Faculty Publish An Ad Condemning The Lacrosse Players As Guilty And Encouraging Public Protests Against Them**

366.  On April 6, 2006, the day after Brodhead canceled the lacrosse team's season and fired Coach Pressler, a full-page advertisement appeared in the *Duke Chronicle*. It was signed by 88 Duke faculty members and was sponsored by and bore the imprimatur of 15 Duke academic departments and programs.

367.  The cover email sent by Duke faculty member Wahneema Lubianco soliciting support for the Group of 88 ad stated that "African & African-American studies is placing an ad in *The Chronicle* about the lacrosse team incident." It urged faculty members to solicit official support from Duke departments and department chairs, and noted that the ad would list "the supporting departments and program units."

368.  In large font across the middle of the page, the "Group of 88" ad stated: "What Does a Social Disaster Sound Like?" The text of the ad leaves no doubt that it was, as Professor Lubiano's cover message made clear, a direct response to the rape allegations against the lacrosse team and was designed to promote and encourage the student protests against the players. The ad opens with the following introduction:

> **"We are listening to our students.** . . . [W]hat is apparent everyday now is the anger and fear of many students who know themselves to be objects of racism and sexism; who see illuminated in this moment's extraordinary spotlight what they live with everyday. . . . These students are shouting and whispering about *what happened to this young woman* and to themselves. . . ."

The ad then quotes a series of public statements about the lacrosse case allegedly made by Duke students. Among the quoted statements were the following:

- "We want the absence of terror."

- "If it turns out that these students are guilty, I want them expelled."

- "I am only comfortable talking about this event in my room with close friends."

- "If something like this happens to me . . . What would be used against me -- my clothing?"

- "[N]o one is really talking about how to keep the young woman herself central to this conversation, how to keep her humanity before us . . . she doesn't seem to be visible in this. Not for the university, not for us."

- "I can't help but think about the different attention given to what has happened from what it would have been if the guys had been not just black but participating in a different sport, like football, something that's not so upscale."

- "And this is what I'm thinking right now – Duke isn't really responding to this. Not really. And this, what has happened, is a disaster. This is a social disaster."

The ad concluded by expressly encouraging public protests against the lacrosse players: "The students know that the disaster didn't begin on March 13th and won't end with what the police say or the court decides. . . . We're turning up the volume in a moment when some of the most vulnerable among us are being asked to quiet down while we wait. To the students speaking individually and to the protestors making collective noise, thank you for not waiting and for making yourselves heard."

369. The ad made clear that it was sponsored by, and represented the official position of, 15 Duke academic departments and programs: "We thank the following departments and programs for signing onto this ad with African & African American Studies: Romance Studies; Psychology; Social and Health Sciences; Franklin Humanities Institute; Critical U.S. Studies; Art, Art History, and Visual Studies; Classical Studies; Asian and African Languages and Literature; Women's Studies; Latino/a Studies; Latin American and Caribbean Studies; Medieval and Renaissance Studies; European Studies; and the Center for Documentary Studies."

370. On information and belief, the Group of 88 ad was paid for by the African and African American Studies Department with Duke University funds.

371. The ad included a link to a website with the names of 88 Duke faculty and staff who "signed on in support" of the ad but were not named in the ad itself "[b]ecause of space limitations." The ad remained published on the website of Duke's African & African American Studies department for many months.

372.     Months later, after Mangum's rape charge, and the ensuing investigation into it, had been exposed as a malicious and tragic hoax, a professor who signed the Group of 88 ad said to a parent of a lacrosse player: "I deeply regret, deeply regret contributing to tremendous harm that was done to [the plaintiffs]. I can understand any hostility they feel for me." The professor also explained to a lacrosse player that she dared not break with the Group of 88 and publicly apologize for signing the ad because if she did, "my voice won't count for much in my world."

373.     This ad constituted harassment of the players in violation of Duke's anti-harassment policy, as described in further detail below. On its face, and when considered in light of all the circumstances surrounding its publication, the ad made unmistakably clear that its faculty signatories and departmental sponsors believed that Mangum's rape allegations were true, and it wrongfully, knowingly, and willfully subjected the players to notoriety, opprobrium, derision, humiliation, and well-founded fear for their own safety. Due to its defamatory and inflammatory message, its express exhortation to the "protestors making collective noise" to "turn up the volume" and "make yourselves heard," and its high profile on the Duke campus (and throughout the country), the ad interfered significantly with the players' work and education, adversely affected their living conditions, and caused the players serious harm—emotional, reputational, and otherwise.

374.     Duke said nothing in response to the Group of 88 ad, refusing to denounce or otherwise disavow its message of guilt and condemnation of the lacrosse players.

Through its silence, Duke confirmed that the ad represented the official position not only of 15 Duke academic departments and programs, but of Duke University itself. Months later, after Mangum's rape allegations and Nifong's investigation had been publicly exposed as a malicious and tragic hoax, Brodhead acknowledged that activist faculty members and student protestors "were quick to speak as if the [rape] charges were true . . ., and some faculty made statements that were ill-judged and divisive." Brodhead also admitted that "the public as well as the accused students and their families could have thought that those were expressions of the university as a whole."

375. On or around April 6, Duke women's lacrosse coach Kerstin Kimel advised President Brodhead of the in-class verbal harassment that some of the lacrosse players were suffering at the hands of their professors. Brodhead was dismissive of her concerns, stating that reports of faculty abuse were exaggerated.

## XV. Mangum's Story Changes Yet Again In Written Statement To Durham Investigators

376. On April 6, Mangum provided Gottlieb and Himan with a written statement recounting her allegations of the events at the March 14 party. This written statement contradicted each of her previous versions in several material respects. The various sex acts allegedly performed by each of her three assailants varied in this statement from her statements at Duke Hospital on March 14 and her oral statement to Gottlieb and Himan on March 16. The identity of the supposed "bachelor" among the three assailants varied among the three accounts as well. Roberts' role in the purported crime varied among the three versions as well, from abettor and robber (March 14), to bystander (March 16), to

co-victim of the purported crime (April 6). And, in a transparent effort to reconcile her allegations with her performance in the April 4 photo arrays, Mangum's April 6 written statement differed from her prior accounts by alleging for the first time that she knew that the names used by the three assailants were aliases, not their real names.

377. On information and belief, the Durham Investigators and the Durham Supervisors were aware of the inconsistencies in Mangum's various oral and written statements made between March 14 and April 6.

378. Also on April 6, Nifong, like Brodhead, declined offers to review the mass of exculpatory evidence compiled by defense attorneys. Multiple defense attorneys offered to meet with Nifong throughout the crisis to explain to him the compelling case for innocence, but Nifong repeatedly rejected such offers.

## XVI. Nifong Hires A Private DNA Testing Firm And Then Conspires To Suppress Its Exculpatory Test Results

379. On April 4, Nifong instructed Durham Police Investigator Michelle Soucie to locate a private laboratory to conduct additional DNA testing. At Nifong's direction, Soucie contacted Brian Meehan of DNA Security, Inc. ("DSI"), a private lab in Burlington, North Carolina. Meehan advised Soucie that his lab could perform more sensitive DNA testing than could the SBI, and that DSI was willing to work for discounted rates in order to be involved in the high-profile rape investigation. Nifong decided to hire DSI.

380. The next day, April 5, the District Attorney's office obtained an order from Judge Ronald Stephens to allow the transfer of Mangum's rape kit items to DSI from

state custody. On information and belief, Nifong obtained this order through a sealed ex parte application that he did not reveal to the lacrosse players or their counsel. On April 6, the rape kit items were transferred to DSI's custody.

381. From April 7 through April 10, DSI performed sophisticated DNA tests on these items.

382. On April 8 through April 10, DSI performed analyses on the rape kit items that resulted in the exclusion with 100 percent certainty of every member of the lacrosse team as possible donors of DNA found on the items. Specifically, DSI concluded that stains and semen residue from Mangum's panties and rectal swab contained the DNA of at least four males. DSI concluded, with 100 percent scientific certainty, that none of the lacrosse players was the source of this DNA.

383. On or around April 10, Nifong, Himan, and Gottlieb met with DSI representatives at DSI's offices in Burlington. Laboratory Director Brian Meehan and DSI President Richard Clark attended the meeting. At this meeting, Meehan reported the results from DSI's testing to date, including the critical fact that the rape kit provided decisive evidence of Mangum's sexual activity with at least four males around March 13—*none* of whom was a Duke lacrosse player.

384. Rather than terminating the investigation then and there, on information and belief Nifong, Himan, Gottlieb, Meehan, and Clark conspired to illegally conceal DSI's findings. They agreed not to take any notes to memorialize these meetings, and agreed to obfuscate or conceal the full results of DSI's tests from the players and their

attorneys. The intention and effect of this conspiracy was to permit Nifong to proceed to indict three randomly selected players for rape, despite dispositive evidence that Mangum's claim was a hoax.

385.   On information and belief, the Durham Supervisors were aware of the substance of this April 10 meeting between Nifong and DSI, yet they continued to allow Nifong to direct the investigation and to proceed with indictments.

## XVII. The SBI's Negative DNA Test Results Become Public

386.   On Monday, April 10, Nifong disclosed to the lacrosse players' defense attorneys, and the public became aware, that the SBI had found no DNA from any of the 46 lacrosse players anywhere on or within Mangum's body, clothing, or belongings. At this stage Nifong did not, however, reveal the suppression of the even more dramatically exculpatory results from DSI's testing. Even if Duke had not been aware of the negative DNA test results before then, as of April 10 it was in possession of overwhelming evidence of innocence. As noted above, if *any* of the inconsistent stories told by Mangum to Duke Hospital personnel on March 14 had been true, it was inconceivable that her assailants would have left no DNA traces whatsoever. Nevertheless, Duke continued to remain silent and suppress the overwhelming evidence in its possession of the players' innocence.

387.   Though he was aware of the negative test results as early as March 29 or 30, Nifong delayed in disclosing the results to the players until April 10. During the intervening days, several actions taken by Duke served to inflame public outrage against

the players and strengthen public trust in Nifong's credibility. As noted above, these actions included, among other things, Arico's public statement that the forensic examination of Mangum at Duke Hospital yielded evidence "consistent with the story she told," Brodhead's cancellation of the lacrosse season and firing of Coach Pressler, and the Group of 88 ad. As a result of these and other actions, Nifong's investigation retained momentum and credibility in the eyes of the media and the public to survive the release of the negative DNA results.

### A. Nifong Suggests That Rapists May Have Used Condoms, And Duke Says Nothing

388. When the DNA test results were made public, media reports widely reiterated Nifong's strategic public speculation, on March 30 and 31, that condoms might have been used by Mangum's assailants: "I wouldn't be surprised if condoms were used. Probably an exotic dancer would not be your first choice for unprotected sex." Nifong implied the same conclusion at a public forum on April 11: "[T]he absence of DNA ... doesn't mean nothing happened. It just means that nothing was left behind." Press accounts also quoted many other commentators who echoed Nifong's statements that condoms might have been used.

389. As Duke knew or should have known, Mangum had affirmatively told Duke Hospital employees at least three times that condoms had not been used in the alleged attack, and that ejaculation had occurred. Duke never made any statement to contradict Nifong's public speculation about condom use to explain the absence of DNA evidence.

**B.** **Nifong Justifies Continued Investigation On Medical Evidence From Duke Hospital, And Duke Says Nothing**

390. On April 11, Nifong again invoked the authority of Duke Hospital to counteract the effect of the negative DNA results on public perception and his public credibility. He was quoted on national cable news stating: "Duke University Hospital is the best trauma center in the area. This nurse was specially trained in sexual assault and I would just point out that my conviction that a sexual assault actually took place is based on the examination that was done at Duke Hospital." Duke knew or should have known that Duke Hospital's examination of Mangum yielded no objective medical or physical evidence supporting her rape allegations, yet Duke remained silent in the face of Nifong's false claims to the contrary.

391. By April 10, and before, Duke had abundant reason to know that Nifong was not proceeding in good faith against its students, but rather was abusing his prosecutorial powers for his own political purposes. But Duke continued to suppress exculpatory evidence in its exclusive possession, to defame the lacrosse players in public and private statements, to quietly condone and encourage the outrageous behavior and comments of its activist faculty members and student protestors, and to engage in improper, supererogatory cooperation with Nifong's patently corrupt investigation.

392. In July 2006 Brodhead privately acknowledged to a lacrosse parent that "after many weeks of media stories that made it seem almost self-evidently true that a rape occurred, recent stories have offered extensive evidence exonerating the indicted students and questioning the legitimacy of the case." Yet Brodhead still refused to

138

disclose the exculpatory evidence in Duke's possession or otherwise to speak up in defense of the innocent students. Rather, he was resolved to maintain his silence "until our students [are] proved innocent."

393. Months later, after Mangum's rape allegations and Nifong's investigation had been publicly exposed as a malicious and tragic hoax, Brodhead attempted to explain why he had insisted on Duke maintaining its silence even after "evidence mounted that the prosecutor was not acting in accordance with the standards of his profession." Brodhead was "concerned," he said, "that if Duke spoke out in an overly aggressive fashion, it would be perceived that a well-connected institution was improperly attempting to influence the judicial process." He also lamented that "there was no legal recourse against the District Attorney, for me or anyone else. Under North Carolina laws, no one had authority to take an active case from a DA absent the DA's own request, as finally happened in January." So Brodhead and Duke remained silent, and looked on passively as a politically ambitious and plainly unethical prosecutor, abetted by a mob composed of, among others, activist Duke faculty members and student protestors, angry Durham community leaders, and a hostile media, put 47 innocent Duke students and their families through a hellish ordeal.

## XVIII. Duke Assists Durham Investigators In Making Warrantless Entries Of Dorm Rooms And Uncounseled Interrogations Of Players

394. The grand jury was to sit on Monday, April 17, and Nifong had announced his intention to seek indictments on that day. At the end of the prior week, the Durham Investigators made several last-ditch efforts to gather further confirmation of the

identities of all the party attendees in order to ensure against indicting a player who could readily establish an alibi. These efforts were facilitated by Duke's cooperation and included, on information and belief, warrantless entry and searches of a dorm and dorm rooms and uncounseled interrogation of lacrosse players known to be represented by counsel. On information and belief, Duke attempted to conceal its cooperation with these warrantless entries and uncounseled interrogations of students. Duke was later forced to make a public statement attempting to explain its cooperation in warrantless entries.

395. The next day, Vice President For Campus Security Aaron Graves issued a statement that stated: "Two Durham police detectives visited a residence hall on the Duke University campus yesterday evening. They were there as part of the ongoing police investigation of the March 13 incident on North Buchanan Boulevard, and they notified the Duke Police Department ahead of time. No search warrants were executed. The purpose of the visit was to conduct interviews. We do not know who they interviewed during the hour and 15 minutes they were in the Edens Residence Hall."

396. As late as Friday, April 14, Himan made repeated phone calls to defense counsel in attempting to determine who had attended the party. On information and belief, Himan was looking for any evidence or statement that would help him confirm which lacrosse players had, and had not, attended the March 13 party. The grand jury was to meet on April 17, and Nifong's team was still deeply concerned about the risk of bringing indictments against players who had not attended the party.

## XIX. Lacrosse Players Seligmann And Finnerty Are Indicted

397.   On Monday, April 17, Gottlieb testified before the grand jury in support of

indictments against two lacrosse players.  On information and belief, his testimony placed

decisive emphasis on nurse Levicy's attestation that Duke's forensic examination of

Mangum yielded physical and medical evidence consistent with her charges of rape, and

on the (false) statement that after Levicy "managed to calm [Mangum] down, her story

never changed after that point."

398.   Again, in subsequently defending the decision to investigate and prosecute

Mangum's multiple, conflicting, ever-changing rape charges, Gottlieb placed decisive

emphasis on Levicy's corroboration of Mangum's allegations.  He stated: "I believe there

was corroborating evidence.  Meaning, the SANE nurse said the victim's accounts of the

attack were consistent with the sexual assault.  Her findings were consistent with the

sexual assault.  And, you know, you have a statement being provided by a victim.  You

have a SANE nurse who is backing up that person's statement."  Without the "findings"

of "the SANE nurse," and without the "SANE nurse ... backing up [Mangum's]

statement," there would have been no credible basis for pursuing the rape investigation,

and Mangum's multiple, conflicting, ever-changing stories of what happened at the

March 13 party would have been seen, and dismissed, by the police as the facially

incredible hoax that it was.

399.   On April 17, the grand jury indicted two lacrosse players, Reade Seligmann

and Colin Finnerty, on charges of rape, sexual assault, and kidnapping.  Nifong made

clear that he would indict a third player, which he did, almost a month later, on May 15. In a press release on April 18, Nifong stated: "It had been my hope to be able to charge all three of the assailants at the same time, but the evidence available to me at this moment does not permit that. Investigation into the identity of the third assailant will continue in the hope that he also can be identified with certainty." The threat of a third rape indictment, and perhaps indictments of other players as supposed accomplices, continued to hang over the players and their families after April 17.

400. In a speech on April 20 to the Durham Chamber of Commerce, Brodhead revealed his callous indifference to the truth, suggesting that even if the alleged rape had never occurred, the lacrosse players were getting what they deserved. "If they didn't do it," he said, "whatever they did was bad enough."

## XX. Nifong's Conspiracy To Conceal Private DNA Firm's Exculpatory Test Results Continues

401. At around this same time, Nifong assigned defendant Linwood Wilson, an investigator with the district attorney's office, to coordinate with Gottlieb and Himan on the rape investigation. On information and belief, Wilson had very limited experience prior to this investigation, and had handled only very routine matters such as scheduling witnesses and serving subpoenas. He joined fellow rookie Himan on the investigative team. Moreover, on information and belief, Wilson had a record of misconduct while working as a private investigator.

402. On April 21, the Durham Investigators met again in Burlington with Meehan and Clark of DSI. At this April 21 meeting, Meehan confirmed that the DNA

from four males was found on the items in the rape kit. Every single one of the lacrosse players, including the two who had already been indicted, had been eliminated with 100 percent certainty as a possible source for this DNA.

403. On information and belief, at this meeting, the Durham Investigators, Clark, and Meehan agreed that DSI would produce a written report that would purport to be the final and complete report of the results of all DNA testing conducted by DSI, but that this report would omit crucial exculpatory findings of DSI's testing, including the fact that none of the players' DNA profiles matched or were consistent with any of the DNA found on the rape kit items. Again, the participants of the meeting agreed that there would be no written notes memorializing the substance of their discussions.

404. On information and belief, the Durham Supervisors were aware of the substance of the April 21 meeting, including the agreement for DSI to prepare a final report that omitted the exculpatory nature of DSI's findings, but continued to allow Nifong to direct the investigation and to pursue an indictment of a third player for a rape that they knew had never happened.

## XXI. The New Black Panthers March Against The Lacrosse Team

405. The campus atmosphere continued to be hostile to the lacrosse players. On Monday, May 1, the first day of exam week for Duke students, a radical hate group called the New Black Panther Party conducted a menacing march and rally adjacent to the Duke campus. (Upon information and belief, Duke had originally decided to allow the march to occur on campus, but in order to avoid disturbing the Duke students who were

143

studying for exams, Duke did not allow this. Notably, the refusal to allow the march on campus was not related to concerns for the welfare of the lacrosse players). According to the *Raleigh News & Observer*, the New Black Panther marchers were "dressed in fatigues, combat boots and flak jackets -- some sporting knives on their belts." The group set forth a series of "demands," including a conviction of the accused lacrosse players and expulsion from school for those who attended the lacrosse party.

406.    A spokesman for the New Black Panthers stated the purpose of their mission: "We are conducting an independent investigation, and we intend to enter the campus and interview lacrosse players. We seek to ensure an adequate, strong, and vigorous prosecution." Combined with the New Black Panthers' weaponry and martial array, their words and actions placed the lacrosse players in well-founded fear for their safety.

407.    Lacrosse parents learned of the New Black Panthers march only through news reports. They rounded up most lacrosse players and removed them from the campus on the day of the march. Because the march occurred during exam period, some players had too much work and studying to leave campus. The parents requested that the University put these players up in a hotel or otherwise provide security for them. Duke refused.

## XXII. Duke Releases Study Of Lacrosse Team's Disciplinary Records.

408.    As noted above, on April 5 Brodhead appointed an Ad Hoc Committee, chaired by Duke law professor James Coleman, to investigate the disciplinary records of

lacrosse team members for the previous five years. On information and belief, the data on student behavior supplied by Duke University to the committee was knowingly incomplete and unreliable. Indeed, the Committee itself admitted that a comparison to Duke students generally was not possible because the University did not regularly keep statistics of Duke students' misconduct, at least not instances of misconduct that were as common and minor as the infractions for which lacrosse team members had been cited. Pursuant to its obligations under the Cleary Act, the University kept regular statistics of Duke students' serious misconduct, such as assaults, sexual offenses, and other serious crimes, as well as instances of student alcohol abuse that led to hospitalization. The lacrosse players had not engaged in any instance of such serious misconduct or alcohol abuse. Rather, the Committee undertook only to compare the frequency of team members' petty infractions as compared to selected other teams.

409.    Duke University began in October 2004 systematically recording data of incidents of all alcohol policy violations involving students. Prior to October 2004, records of such misconduct were maintained only to the extent that Stephen Bryan, the Associate Dean of Students and Director of Judicial Affairs, wished to keep them for his own enforcement purposes. Rather than utilize the systematically kept post-October 2004 data, however, the Committee relied upon Bryan's arbitrarily-kept records of pre-October 2004 violations. Upon information and belief, a statistically valid study of the incidents of student misconduct would not support the conclusion that the conduct of the

lacrosse team members was aberrant or otherwise out-of-step with the general male student population at Duke University.

410.    The Coleman Committee's report was released on May 1 in a press conference attended by virtually every national and local media outlet, which were told extemporaneously by Committee Chairman Coleman that the "pattern" of behavior of the team members was "deplorable"

411.    Press accounts of the committee's report, and of Coleman's remarks at the nationally televised press conference, painted a highly prejudicial, highly unfair picture of the behavior of lacrosse players.  For example:

- On May 1, 2006, NBC reported that the University's report "found that alcohol abuse is a major factor behind [the lacrosse team's] disciplinary problems both on and off campus."

- On May 2, 2006, a *New York Times* article stated:  " 'Deplorable,' said James E. Coleman Jr., describing how team members behaved when they drank excessively."

- On May 1, 2006, ESPN reported that the University's report concluded that "the team needed strict monitoring because of a history of problems tied to alcohol."

412.    Ironically, the Coleman Report was largely positive.  The Committee found that the players had no record before March 13 of bullying, fighting, racist language or conduct, hostility toward women, cheating, or other serious misconduct.  The Committee specifically noted that it "has not heard evidence that the cohesiveness of [the lacrosse team] is either racist or sexist."  The Committee found that "members of the Duke Lacrosse team have been academically and athletically responsible students."  "The

lacrosse team's academic performance generally is one of the best among all Duke athletic teams." Even the Committee's finding that lacrosse team members "have been socially irresponsibly when under the influence of alcohol," was found "not different in character than the conduct of the typical Duke student who abuses alcohol." More importantly, team members' "reported conduct has not involved fighting, sexual assault or harassment, or racist behavior." Further, as detailed in the Coleman Report, Captain Sarvis of the Durham Police, informed the Committee that "lacrosse players did not represent a special or unique problem" and that "none of the houses rented by lacrosse players was among the worst of those whose loud parties attracted hundreds of disorderly Duke students on weekends." Lacrosse players' houses were not even in the top ten.

413.   In short, the Coleman Report, while detailing some alcohol problems not at all uncommon to almost any university in America, overall was in direct contradiction to the media's portrayal of the players as hooligans -- a portrayal bolstered by Duke's own statements and actions.

## XXIII. The Duke And Durham Defendants Discredit Exculpatory Evidence

### A.   Duke Discredits Officer Day's Exculpatory Police Report

414.   As noted above, Duke had suppressed the exculpatory March 14 police report of Officer Day, which recounted Mangum's inconsistent stories and her lack of credibility with the investigating police officers.  In May, the existence of the Day report became public serendipitously.  On May 8, 2006, the so-called Bowen Committee, which had been established by Brodhead to examine complaints, primarily from the activist

faculty members and student protestors, that the Brodhead administration had acted too slowly in cancelling the season, issued its report. The report sought to divert any blame for the rape hoax crisis from Brodhead and other high Duke officials. It stated, ironically, that the administration's "slowness" to respond to the allegations was not Brodhead's fault, but was the fault of Duke Police who told administration officials that Mangum's rape charges were not credible. The existence of Officer Day's report was a surprise to the team members, their parents, and their lawyers, who were unaware that the Duke police had made such exculpatory statements based on information from the actual time and place where the false allegations were originally made.

415.    As noted previously, Duke officials such as Vice President Graves, police Director Robert Dean, and Dean of Students Wasiolek had been aware of the report and/or its conclusions since March 14, but had not disclosed it. Moreover, on March 31, Officer Day had been coerced to write a "continuation page" casting doubt on his own report.

416.    Within a day of the report's release, Duke officials and Durham officials rushed to discredit the report. Both Duke and Durham officials provided the same "spin" on the report: that it was unreliable because it was based on partially and imperfectly overhead conversations between Durham police officers, which Officer Day had misunderstood and misrepresented. This was the same story told in the March 31 "continuation page."