417. On May 10, Durham City Manager Baker criticized Officer Day's report, saying that Day "did not speak to our officer" and that he "appears to have overheard half a conversation," by eavesdropping on a Durham Police officer's cell phone conversation.

418. Aaron Graves, Duke's Vice President for Campus Safety and Security, publicly provided exactly the same spin on the Day report. He stated that what Duke police officers "thought they heard... may not have been direct information." Graves said the police report was preliminary, based on secondhand information rather than direct statements from Durham police. Duke's Police Director Dean also publicly dismissed Day's report as "what he overheard at the time."

419. These statements were made within a week before the grand jury that eventually indicted the third lacrosse player was to convene. Their purpose and effect was to dissipate and weaken the exculpatory significance of Officer Day's March 14 report.

420. Upon information and belief, Duke Police and other Duke officers used their authority to silence Officer Day, in order to prevent exculpatory information from coming out.

### B. Durham Destroys And Discredits Evidence That Mangum Not Credible

421. Durham police officials likewise sought to suppress their officers' on-the-scene judgment that Mangum's rape allegations on March 14 were not credible. On information and belief, during the early morning hours of March 14, Durham police officers made numerous comments to each other, over the police radio, expressing grave

149

doubts of Mangum's credibility. This police radio discussion was recorded on tape. When defense lawyers for the indicted players requested the tape, it had been destroyed.

422. Similarly, upon information and belief, in May 2006, senior police and other officials in the City of Durham subjected Sergeant Shelton to an internal investigation, accusations of unprofessional conduct, and threats of disciplinary action in an attempt to intimidate and discredit him for reporting Mangum's recantation of her rape claim while at Duke Hospital on March 13.

423. On information and belief, Duke Police and other Duke officials conspired with the Durham Investigators and Durham Supervisors to suppress exculpatory information related to the judgment of Mangum's credibility made by officers at the scene on the night of March 14, and to discredit that information when it emerged.

## C. Gottlieb Produces "Supplemental Case Notes"

In a blatant departure from standard police practice, over four months after the start of the investigation into Mangum's rape allegations and only after defense counsel had come forward with exculpatory evidence poking huge holes in the prosecution's case, did Gottlieb produce a type-written, thirty-three page document entitled "Supplemental Case Notes." These "supplemental" notes were created from memory as Gottlieb had virtually no contemporaneous notes of witness interviews or other investigative tasks. Conveniently, these supplemental notes attempted to address many gaping holes exposed by defense counsel in the prosecution's case, and to shore up the case at its weakest points. These "from memory" supplemental notes, however,

contradicted the contemporaneous, handwritten notes of the other officers, investigators and medical personnel who saw Mangum the day after the alleged attack.

## XXIV. Nifong Conspires With DNA Testing Firm To Produce A Fraudulent DNA Report

424. On May 12, the Durham Investigators met with DSI's Clark and Meehan again to discuss DSI's report on its DNA testing results.

425. On information and belief, at this meeting Meehan provided Nifong with a 10-page report regarding the DNA testing.

426. The Durham Investigators, Meehan, and Clark understood that this report would be provided to the lacrosse players and to the court under the knowingly false pretense that it represented a final and complete report of DSI's work and contained all of DSI's findings with respect to DNA testing.

427. The report, however, used a limited reporting formula that the Durham Investigators, Meehan, and Clark had agreed upon to conceal certain DSI findings. Specifically, the May 12 report disclosed only DNA test results of the individuals who had provided DNA for testing—e.g., Mangum's boyfriend and the 46 lacrosse players. It intentionally omitted reference to DNA findings related to persons who had not provided samples. In other words, it intentionally omitted any reference to the four unidentified males whose DNA had been found in Mangum's panties and swabs. By deliberately suppressing some of the results of the DNA testing, this report violated industry standards, North Carolina law, and FBI standards.

428. On May 12, Nifong provided the deliberately misleading report to the lacrosse players.

429. On information and belief, the Durham Supervisors knew or should have known about the substance of the May 12 meeting and May 12 report, including the fact that it intentionally concealed exculpatory results of DSI's testing. They continued to allow Nifong to direct the investigation and proceed with a third indictment.

**XXV. Lacrosse Player Evans Is Indicted**

430. The weekend of May 13-14 was graduation weekend at Duke. That weekend, instead of rejoicing in a spirit of celebration, the graduating lacrosse seniors and their parents endured the severe emotional anguish of anticipating that one of the players would soon be indicted for an atrocious crime that had never occurred. At the graduation ceremony itself, Duke Provost Peter Lange humiliated the lacrosse seniors and their families before thousands of people by stating to the crowd, "This was a year when it was easy to forget how good most of the Duke students really are."

431. Even on graduation weekend, Duke acknowledged that its campus had become too perilous a place for the lacrosse players and their families. For example, the Washington Duke Inn, which is owned by Duke University, refused to allow the 2006 senior lacrosse players and their families to have their graduation dinner at the Inn, despite the fact that they had made reservations a year in advance. The stated reason for this cancellation was that it would be unsafe to allow the players and their families to attend the dinner at the Inn, which is located on or adjacent to Duke's campus.

432.   On Monday, May 15, Nifong sought and obtained from the Durham grand jury an indictment of David Evans on charges of rape, kidnapping, and sexual assault. Though Nifong announced at the time that this would be the last indictment based on "the evidence that we have developed," the remaining lacrosse players nevertheless continued to live in reasonable fear of potential future indictment for many months. Nifong's promises had proven untrustworthy. And in March, Nifong had repeatedly threatened to indict the entire team as accomplices, for their alleged conspiracy of silence.

## XXVI. Duke Conspires With The Durham Investigators To Fraudulently Conceal Duke's FERPA Violations

433.   As noted above, on March 31, Duke had secretly disclosed March 13-14 key card reports for lacrosse players to the Durham police, who had used this critical information to determine which players likely had attended, and had not attended, the March 13 party. Duke never notified the lacrosse players, their families, or their lawyers of this disclosure.

434.   On May 31, Nifong subpoenaed Duke University to obtain the key card records that he already possessed and had used in his investigation and prosecution of the Duke students. This subpoena was a sham. Duke had already turned the key card information over to Nifong illegally. Both Duke and Nifong knew that the subpoena was a sham; they were collaborating in a charade designed to disclose the information pursuant to subpoena in order to paper over the fact of its prior illegal disclosure.

435.  On June 2, Duke's Director of the key card office, Matthew Drummond, sent letters to all 47 members of the lacrosse team.  The letter stated in relevant part as follows:

> Duke University has received a subpoena (copy attached) requiring us to produce certain information regarding use of your DukeCard.  If you wish to object to the release of these records by the University, your attorney must file a motion to that effect.  If we have not heard from you by Monday, June 12, 2006, at 9:00 a.m., we intend to comply with the terms of the subpoena.  If you file a motion to quash or otherwise object to the subpoena please send us copies of the relevant papers at your earliest convenience.

436.  Similar letters were sent by Kate Hendricks of Duke's Office of Counsel to defense attorneys for the lacrosse players.  In these letters, Duke acknowledged its obligations under FERPA but did not disclose that it had already violated these obligations.  For example, a letter dated June 1, 2006, to Bill Thomas, who was counsel for a lacrosse player, stated:  "Please find enclosed copies of two subpoenas issued to Duke University that request your client's home address as well as information regarding use of his Duke Card.  Duke University considers such information to be educational records subject to the Family Educational Records & Privacy Act, 20 U.S.C. § 1232g ("FERPA").  As such, Duke is obligated to notify your client of the subpoenas and of its intent to comply with the subpoenas."  The letter also stated:  "We will provide you with a copy of any information produced in response to the subpoenas."

437.  These letters from Drummond and Hendricks falsely implied that Duke had never provided the players' key card information to Nifong prior to issuance of the subpoenas.

438. On information and belief, Hendricks, Drummond, Duke Police, Kemel Dawkins, Duke's Vice President for Campus Services, and the Durham Investigators knew that Duke had already produced the relevant key card reports to Nifong and that the subpoena was a sham.

439. In reliance on the false representation that Duke had not already disclosed this information, attorneys for virtually all of the unindicted lacrosse players prepared and filed motions to quash the subpoena for key card information. The preparation, filing, and argument of these motions required a significant expenditure of time, effort, and legal fees.

440. On July 17, Durham County Superior Court Judge Kenneth C. Titus held a hearing on these motions to quash. At the hearing, Nifong argued strenuously for the State's right to obtain the information.

441. On information and belief, attorneys for Duke attended the July 17 hearing. Throughout the hearing, these Duke representatives knowingly sat silent as Nifong urged the court to order Duke to provide information that Duke already had provided to him. Through this collaboration, Duke and Nifong jointly perpetrated a fraud upon the court.

442. On July 21, Judge Titus ruled that the State was not entitled to the FERPA-protected key card information. The protective order quashing the subpoena stated: "The request for key card information for all listed students without any showing of materiality or necessity does not rise to the level required to overcome the confidentiality of student information assured by FERPA."

443. Though neither Judge Titus nor the lacrosse players knew it, the protective order was futile because Nifong already had the key card information. Moreover, the Durham Investigators had already made use of the key card information to obtain indictments from the grand jury. These indictments ensured that the vitriolic public defamation and harassment on campus and in the media against the lacrosse players, including the unindicted players, would continue unabated for months to come, as would the threat of prosecution by Nifong as accessories to all members of the team.

## XXVII. Duke Violates Its Own Anti-Harassment Policy

444. Duke University has a formal, written policy strictly forbidding harassment of any student "for any reason," by anyone enrolled at or employed by Duke. Similarly, the Duke Faculty Handbook provides: "Members of the faculty expect Duke students to meet high standards of performance and behavior. It is only appropriate, therefore, that the faculty adheres to comparably high standards in dealing with students . . . Students are fellow members of the university community, deserving of respect and consideration in their dealings with the faculty."

445. Many of the actions and statements described above violated Duke's anti-harassment policy. These acts and statements include but are not limited to: myriad public and private statements by Richard Brodhead, Robert Steel, John Burness, the activist faculty members and student protestors, and others condemning the plaintiffs, impugning their integrity, and implying and/or explicitly stating that they were guilty of criminal activity; the ad placed in the *Duke Chronicle* and subsequent group and

individual statements by the Group of 88; harassing student protests on campus and in front of the lacrosse players' residences, which were conducted and/or organized in part by Duke faculty members and other employees; the "Wanted" and other posters distributed and posted throughout campus because of the acts and/or omissions of Duke and its agents; and in-class condemnations by Duke professors.

446. Duke's anti-harassment policy also specifically prohibits harassment of any student "on any demographic basis," including among other things race, color, ethnic origin, gender, and class. Throughout the rape hoax crisis, however, Duke made no effort whatever to enforce its anti-harassment policy against the open and flagrant violations of the policy by certain activist faculty members and student protestors, as described above. On April 5, as alleged above, when President Brodhead announced the firing of coach Pressler and the cancellation of the lacrosse season, he also appointed a committee to look into and evaluate the "criticism of the Duke Administration for being slow to respond to the allegations against the team associated with March 13." This "Bowen Committee" reported its findings on May 4. As the Committee noted, "the lacrosse team was seen by at least some part of the Duke/Durham Community as a manifestation of white, elitist, arrogant sub-culture that was both indulged and self-indulgent."

447. As noted above, numerous statements made by Duke faculty members evinced discrimination and bias against the lacrosse players on the basis of their race, gender, and class.

448. Professor Houston Baker's open letter to the Duke administration of March 29, 2006 declared the players guilty of rape and denounced them on the basis of their race, class, and gender. In an email of June 10, 2006, Baker also stated that "46 white guys on the lacrosse team at Duke may well have raped more than one woman." On New Year's Eve, December 31, 2006, Professor Baker wrote an email to Patricia Dowd, mother of lacrosse player Kyle Dowd, that was rife with racial animus: "[Y]ou are just a provocateur on a happy New Year's Eve trying to get credit for a *scummy bunch of white males!* You know you are in search of sympathy for young white guys ... live like a bunch of farm animals near campus. . . . Unhappy new year to you . . . and forgive me if you really are, quite sadly, mother of a farm animal." (Emphasis added; grammatical and spelling errors corrected.) Baker's conduct constituted harassment of the players on the basis of race and gender in violation of Duke's anti-harassment policy, causing the players grave emotional harm, interfering significantly with the players' work and education, and adversely affecting their living conditions.

449. William Chafe is a professor of History at Duke University and was Dean of Duke's Arts and Sciences faculty from 1995 to 2004. On March 31, 2006, he published an article in the *Duke Chronicle* entitled "Sex and Race." It stated, in part: "So sex and race have always interacted in a vicious chemistry of power, privilege, and control. Emmett Till was brutalized and lynched in Mississippi in 1954 [sic] for allegedly speaking with too easy familiarity to a white woman storekeeper. . . . What has all this to do with America today, and with Duke? Among other things, it helps put into

context what occurred in Durham two weeks ago [at the lacrosse party]." By stating that the kidnapping, beating, and murder of Emmett Till provided the proper "context" for understanding the events that transpired on March 13, Professor Chafe harassed the lacrosse players on the basis of race in violation of Duke's anti-harassment policy, causing the players severe emotional harm, interfering significantly with the players' work and education, and adversely affecting their living conditions.

450.     Reeve Huston is a history professor at Duke University.  In Spring 2006, Professor Huston taught a class on United States labor law.  Five members of the lacrosse team were enrolled in the class.  In late March or early April 2006, Professor Huston started class by saying that there was a long-standing problem of alpha white males assaulting black females in America.  Referencing the lacrosse party, Professor Huston said that a sexual assault, complete with ejaculation, had occurred.  Several of the players left class to escape this harassment.  Professor Huston's comments constituted harassment of the players on the basis of race and gender in violation of Duke's anti-harassment policy.  Professor Huston's accusations subjecting the entire lacrosse team (including plaintiffs), as well as the five individuals in the class, to notoriety, derision, humiliation, and caused them to fear for their own safety.  Due to his position of authority in the classroom, Professor Huston's statements were particularly damaging, causing grave emotional and reputational harm while severely interfering with the players' work and education, and adversely affected their living conditions.

451.     As noted above, Duke Professor Tim Tyson, who participated in organized

public protests against the players, publicly maligned the players in racially charged

terms in an NPR broadcast on March 27.  He likened the lacrosse players to "white

supremacists" and said that the March 13 party reflected "the spirit of the lynch mob."

452.     On April 13, Duke Professor Wahneema Lubiano wrote in an online article,

"I understand the impulse of those outraged and who see the alleged offenders as the

exemplars of the upper end of the class hierarchy, the politically dominant race and

ethnicity, the dominant gender, the dominant sexuality, and the dominant social group on

campus."  In a similar vein, Duke Professor Karla Holloway wrote in an online article:

"Judgments about the issues of race and gender that the lacrosse team's sleazy conduct

exposed *cannot be left to the courtroom*."  (Emphasis added.)

453.     Professor Grant Farred stated at a public forum in September 2006 that

"[t]he secret of Duke lacrosse came and continues to be burdened, arguably (overly so,

we might argue), with its own history . . . A tendency toward misogyny and arrogant

sexual prowess."  He later publicly asserted:  "At the heart of the lacrosse team's

behavior is the racist history of the South."

454.     When Duke professors made racially biased and harassing statements,

Duke stood by silently, making no effort to enforce Duke's anti-harassment policy

against them.  Duke did not publicly disavow their statements, let alone publicly rebuke

them or otherwise discourage them or other faculty members from continuing their

campaigns of racial and sex-based harassment against the players.

455. Lacrosse players were also subjected to in-class harassment on the basis of race and/or gender. Duke took no action to investigate, punish, or otherwise enforce its anti-harassment policies against these clear violations.

## XXVIII. The Lacrosse Team Is Exonerated

### A. Mangum Recants Rape Charge and Nifong's Corruption Is Exposed

456. Nifong's case against the indicted players eventually began to unravel under the scrutiny of defense attorneys and responsible journalists.

457. At a public hearing on December 15, 2006, it became evident that the Durham Investigators had illegally conspired with DSI to conceal DNA results indicating that the DNA of at least four men, none of whom were Duke lacrosse players, had been found in Mangum's vaginal and anal regions. Nifong had also made fraudulent misrepresentations to the court regarding this conspiracy and suppression. Nifong was later found guilty of criminal contempt for these misrepresentations and sentenced to one day in jail.

458. On or around December 20, 2006, Nifong received notice that the North Carolina State Bar was preparing an ethics complaint against him for violations of the North Carolina Revised Rules of Professional Conduct based on his public conduct during the investigation and prosecution of the lacrosse players. These ethics charges arose, in large part, from Nifong's inflammatory media campaign against the lacrosse players during March and April 2006.

459. The challenged statements included Nifong's false public claim that the evidence from Duke Hospital's forensic examination of Mangum had led him to believe that a rape had occurred: "Nifong stated to a representative of the news media that a rape examination of the victim done at Duke Medical Center the morning of the alleged attack revealed evidence of bruising consistent with a brutal sexual assault, 'with the most likely place that it happened at the lacrosse team party.' " As noted above, Duke had known or should have known from the outset that these claims were false, but stood by silent.

460. The challenged statements also included Nifong's public statements falsely speculating that condoms had been used in the alleged rape, which he had made to defuse the impact of the negative DNA test results: "Nifong stated to a representative of the news media '[i]f a condom were used, then we might expect that there might not be any DNA evidence recovered from say a vaginal swab' …. [and] 'I would not be surprised if condoms were used. Probably an exotic dancer would not be your first choice for unprotected sex.' " Again, as alleged above, Duke knew or should have known from the outset that these statements were false, but stood by silent.

461. On December 21 Mangum told Nifong's investigators that she could no longer be 100% sure that she had actually been raped. Nifong dismissed the rape charges against the three indicted lacrosse players on December 22, but continued to prosecute the kidnapping and sexual assault charges.

462. On January 10, 2007, with Nifong under ethics charges for claiming, contrary to the medical records, that Mangum's assailants may have used condoms,

Nurse Levicy met with Durham Investigators Wilson and Himan and speculated, for the first time, that condoms might have been used in the alleged assault. This speculation, as noted above, contradicted her records that Mangum had explicitly denied, three times, that condoms were used in the alleged assault. (On February 28, Nifong relied on this statement of Levicy in his disciplinary proceedings, stating that "his comments [speculating about condom use] are consistent with the opinion of the SANE nurse who examined the victim on the night of the alleged attack.")

463.    In her January 10 interview with Durham Investigators Wilson and Himan, Levicy also "stated that she wasn't surprised when she heard no DNA was found because rape is not about passion or ejaculation but about power."

**B.    The Attorney General Takes Over The Investigation, Finds "No Credible Evidence" Of Rape, And Declares The Lacrosse Players "Innocent"**

464.    On January 12, 2007, Nifong was forced to recuse himself from the prosecution, and he referred the cases to the North Carolina Attorney General.

465.    Soon after Nifong was removed from the case, Levicy met with investigators from the North Carolina Attorney General's office and conceded, for the first time, that it was possible that "no attack had occurred."

466.    On January 24, 2007, a formal complaint was filed against Nifong before the Disciplinary Hearing Commission of the North Carolina State Bar.

467.    The North Carolina Attorney General, who assumed responsibility for the case upon Nifong's recusal, conducted an intensive, thorough, and independent

investigation of the evidence. His special investigators pursued the documented inconsistencies in the accuser's allegations, examined the medical and DNA evidence, and reviewed evidence provided by defense counsel.

468. On April 11, 2007, the Attorney General dismissed all charges against the indicted lacrosse players. In his public statement the same day, he stated: "We believe that these cases were the tragic result of a rush to accuse and a failure to verify serious allegations.... [W]e believe these three individuals are innocent of these charges."

469. The Attorney General also issued a detailed report of his review of the evidence. The report stated that there was "no credible evidence that an attack occurred in that house that night." The report concluded: "Based on the significant inconsistencies between the evidence and the various accounts given by the accusing witness, the Attorney General and his prosecutors determined that the three individuals were innocent of the criminal charges and dismissed the cases April 11, 2007."

470. The Attorney General's special investigators had conducted a careful review of medical and physical evidence from Duke Hospital's forensic examination of Mangum on March 14. The Attorney General's report concluded: "No medical evidence confirmed [the accuser's] stories. The SANE based her opinion that the exam was consistent with what the accusing witness was reporting largely on the accusing witness's demeanor and complaints of pain rather than on objective evidence."

## C.  Nifong Is Disbarred

471.  On June 16, 2007, Nifong was disbarred by the North Carolina State Bar for his actions relating to the lacrosse players. In announcing the hearing committee's decision, committee chair F. Lane Williamson stated, "This matter has been a fiasco. There's no doubt about it." He also stated, "We acknowledge the actual innocence of the defendants, and there's nothing here that has done anything but support that assertion."

## XXIX.  Defendants' Misconduct Severely Injured The Plaintiffs

472.  Defendants' acts and omissions throughout the rape hoax crisis directly and proximately caused numerous injuries to the plaintiffs.

473.  Defendants' actions both directly caused irreparable reputational injury, and enhanced the injury to reputation caused by others, to every member of the lacrosse team. As President Brodhead has himself stated, "if people have their names known across this country and around the world because of a false accusation, that is a serious injustice." Likewise, one Duke professor wrote:

> I do believe absolutely that neither the university administration nor the faculty collective can wash their hands off from protecting their (our) students at the level of defending not only their rights to due process, etc., but also the right to a good name and a good reputation and a good, unblemished record ....

474.  Defendants' actions both directly caused severe emotional distress to plaintiffs, and enhanced the severe emotional distress inflicted by the actions of others. As President Brodhead himself has conceded, "the members of the Duke men's lacrosse team have lived through an ordeal the likes of which few have known.... There is no

undoing the agonies of the last months." One Duke professor, writing as late as

November 2006 to the mother of one of the plaintiffs herein, aptly summarized the ordeal

that all the lacrosse players were still experiencing:

> I know I can't imagine what you've all gone through, are going through.
> The financial toll alone would be crippling. The physiological toll from
> waking up every day with a pit in your stomach must be high as well. And
> the kind of grief for lost ideals you're describing would burn a hole in most
> souls.

475.    Defendants' actions subjected plaintiffs to harassment and vile abuse. As

President Brodhead himself has conceded, "team members had to deal with a barrage of

negative and hostile comments, from inside the Duke community as well as outside."

Due to defendants' conduct, plaintiffs feared for their lives and safety. Defendants'

actions subjected plaintiffs to virtual house arrest, restraining their freedom of movement.

Defendants' actions disrupted the lives of plaintiffs, forcing many of them to flee from

their homes and incur economic damages and lost educational opportunities due to

alternative living arrangements.

476.    Defendants' actions caused the plaintiffs to suffer unjustifiable losses of

unique and irreplaceable athletic opportunities. Defendants' actions caused the plaintiffs

to lose their unique and irreplaceable opportunity to compete for and possibly achieve the

2006 ACC and National Championship titles in NCAA Division I men's lacrosse.

477.    Defendants' actions caused certain plaintiffs to lose job opportunities or

other lucrative business opportunities.

478. Due to defendants' actions, plaintiffs were forced to engage legal counsel and incur legal and other professional costs and fees to avoid legal jeopardy. These costs include, but are not limited to, attorneys' fees expended in quashing Nifong's sham subpoena on Duke for plaintiffs' key card reports.

479. Defendants were aware of, and intentionally or recklessly disregarded, the injuries they inflicted on the plaintiffs.

480. Plaintiffs are entitled to recover compensatory damages from defendants for all of these injuries.

481. Defendants' treatment of plaintiffs was fraudulent, malicious, willful and wanton. Defendants are liable to plaintiffs for punitive damages.

## COUNT ONE

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS -- I
(Against Defendants Duke University, DUHS, Richard Brodhead, Victor Dzau, Theresa Arico, Tara Levicy)

482. Plaintiffs incorporate the allegations in Paragraphs 1 through 481 above as if set forth fully herein.

483. Defendant Tara Levicy intentionally provided to the Durham Investigators information about the medical and physical evidence of rape that was false and misleading. This information was provided in repeated interviews over a prolonged period of time with intentional or reckless disregard for the truth. The Durham Investigators expressly relied on this misinformation, and without it the rape investigation either would not have occurred or would have been terminated promptly. Her course of

conduct was extreme and outrageous and exceeded all bounds of decency tolerated by society. It was intended to and did cause mental anguish and severe emotional distress to the plaintiffs or was committed with reckless disregard for its foreseeable impact on the plaintiffs' emotional states.

484. Levicy's actions were malicious, willful and wanton.

485. The actions of Levicy were performed in the scope of employment. Managers, trustees, and/or officers of Defendants Duke University, DUHS, and Duke Hospital participated in, condoned, and ratified Levicy's actions.

486. The above-named defendants ratified Levicy's course of conduct by express action through Levicy's supervisor, Theresa Arico. Arico's actions in deliberately ratifying Levicy's conduct were intentional, willful and wanton, and malicious. They were extreme and outrageous and exceeded all bounds of decency tolerated by society. And they were intended to and did inflict mental anguish and severe emotional distress on the plaintiffs or were committed with reckless disregard for their foreseeable impact on the plaintiffs' emotional state. Arico's actions were performed in the scope of employment.

487. The above-named defendants also ratified Levicy's and Arico's course of conduct through inaction, by failing to act after being apprised of material facts, and failing to conduct an investigation or adopt corrective measures in the exercise of ordinary care.

488. The above-named defendants intended to cause mental anguish and severe emotional distress to plaintiffs or acted in reckless disregard for the plaintiffs' emotional state. As a direct and foreseeable consequence of these actions, plaintiffs suffered mental anguish and severe emotional distress, as well as other injuries such as reputational harm, economic injuries, lost educational and athletic opportunities, and other harms.

## COUNT TWO

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – I
(Against Defendants Duke University, DUHS, Richard Brodhead,
Victor Dzau, Theresa Arico, Tara Levicy)

489. Plaintiffs incorporate the allegations in Paragraphs 1 through 488 above as if set forth fully herein.

490. The actions of the above-named defendants described in Count One were, at least, grossly negligent and reckless with regard to the plaintiffs' emotional state. These defendants failed to exercise due care in discharging their duties.

491. Levicy's conduct was grossly negligent and reckless in breaching the duty of care and professional judgment required of a sexual assault nurse examiner. Among other things, she did not exercise due care and recklessly disregarded standards of professional judgment in the examination of Crystal Mangum and her misreporting of it, and in her deliberate and/or reckless mischaracterization of the medical evidence to the Durham Investigators.

492. Arico's conduct was grossly negligent and reckless in breaching the duty of care and professional judgment required of a SANE supervisor. Among other things, she

did not exercise due care and recklessly disregarded standards of professional judgment in her supervision of Tara Levicy and in her deliberate, public ratification of Levicy's misrepresentations to the Durham Investigators.

493. The above-named defendants were grossly negligent and reckless in their supervision of Levicy and Arico. In addition, defendants ratified Levicy's and Arico's negligent conduct through express action and inaction.

494. It was reasonably foreseeable that these negligent actions would cause the plaintiffs mental anguish and severe emotional distress.

495. The negligence of these defendants did in fact cause the plaintiffs mental anguish and severe emotional distress, as well as other injuries including reputational injuries, economic injuries, dislocation from their homes and disrupted lives, lost educational, athletic, and business opportunities, and other injuries.

496. The actions of defendants Levicy and Arico were performed in the scope of employment. Managers and/or officers of defendants Duke University, DUHS and Duke Hospital participated in, ratified, and condoned these actions.

## COUNT THREE

### NEGLIGENT SUPERVISION OF EMPLOYEES
### ARICO AND LEVICY
(Against Defendants Duke University, DUHS, Richard Brodhead,
Victor Dzau, Theresa Arico)

497. Plaintiffs incorporate the allegations in Paragraphs 1 through 496 above as if set forth fully herein.

498. At all relevant times herein, defendants Tara Levicy and Theresa Arico were employees of Duke University, DUHS, and/or Duke Hospital.

499. As alleged above in Count One, Tara Levicy and Theresa Arico, acting in the scope of employment, committed tortious acts resulting in injuries to the plaintiffs.

500. The above-named defendants knew or had reason to know, on the basis of information in their custody, of Levicy and Arico's tortious course of conduct directed against the plaintiffs.

501. These defendants failed to exercise due care to supervise and to take steps to prevent and stop Levicy and Arico from committing and continuing their tortious course of conduct, and failed to exercise due care to correct the injuries caused by plaintiffs by their tortious acts. Rather, these defendants ratified and condoned Levicy's dissemination of misinformation to police and prosecutors.

502. These defendants' breach of their duty to supervise proximately caused injuries to the plaintiffs, including irreparable reputational harm, severe emotional distress, economic injuries, and loss of educational and athletic opportunities, as well as enhancing injuries caused by other actors.

503. On information and belief, the breach of their duty to supervise was committed through knowing and intentional actions of the officers, managers, and directors of Duke University, DUHS, and Duke Hospital acting in their scope of employment. It was willful and wanton, and malicious.

## COUNT FOUR

### BREACH OF DUTY OF CARE IN CONDUCTING AND REPORTING
### OF FORENSIC MEDICAL EXAMINATION
(Against Defendants Duke University, DUHS, Richard Brodhead,
Victor Dzau, Theresa Arico, and Tara Levicy)

504.   Plaintiffs incorporate the allegations in Paragraphs 1 through 503 above as if set forth fully herein.

505.   The above-named defendants owed plaintiffs a duty of reasonable care in the conduct of Duke Hospital's forensic and/or medical examinations of Mangum in connection with her allegations of rape.  This duty included the duty to exercise due care in collecting, assessing, analyzing, and reporting the physical and medical evidence derived from Duke's examinations of Mangum on March 14, 2006.

506.   The above-named defendants, by and through their managers and employees Arico and Levicy, intentionally and/or recklessly breached this duty of care. This breach included, but was not necessarily limited to, Levicy's misrepresentations to the Durham Investigators and others that the medical and physical evidence was consistent with Mangum's rape allegations; defendants' failure to require sufficient training to its sexual assault nurse examiners and its failure to ensure that a properly trained SANE nurse examined Mangum; defendants' failure to provide adequate supervision of Levicy and other SANE nurses; Levicy's subsequent mischaracterizations of the medical and physical evidence to the Durham Investigators; defendants' suppression of and/or failure to disclose exculpatory information derived from Duke's examinations of Mangum on March 14; Arico's public statements ratifying Levicy's

misrepresentations concerning the medical and physical evidence from Duke's examinations of Mangum; defendants' failure to correct Levicy's misrepresentations concerning the medical and physical evidence from Duke's examinations of Mangum; and other actions.

507. As a direct and foreseeable consequence of these defendants' breach of duty, the plaintiffs suffered injuries including irreparable reputational harm, severe emotional distress, economic injuries, and loss of educational and athletic opportunities, as well as enhancement of injuries caused by other actors.

508. Levicy and Arico's actions were performed in the scope of employment. Managers and/or officers of DUHS and Duke Hospital participated in, ratified, and condoned this breach of duty.

509. The breach of this duty was committed through intentional actions, as well as conduct that was reckless, grossly negligent, and/or negligent. It was willful and wanton, and malicious.

## COUNT FIVE

### BREACH OF DUTY TO WARN AND PROTECT AGAINST HAZARD CREATED BY DEFENDANTS
(Against Defendants Duke University, DUHS, Richard Brodhead, Victor Dzau, Theresa Arico, Tara Levicy)

510. Plaintiffs incorporate the allegations in Paragraphs 1 through 509 above as if set forth fully herein.

511. As related above, defendants Duke University and its controlled affiliates DUHS and Duke Hospital, by and through their officers and employees including Arico,

Levicy, and unnamed others, intentionally and/or recklessly created a hazardous condition that foreseeably threatened and injured the liberty, physical safety, reputations, emotional state, and educational opportunities of the plaintiffs and their families. They created this hazardous condition by intentionally and/or recklessly providing false and misleading information to the Durham Investigators and thereby instigating, encouraging, and/or prolonging a baseless criminal investigation against the plaintiffs.

512. The above-named defendants, based on information in their exclusive possession, knew and should have known that this hazardous condition unjustly and unjustifiably threatened the plaintiffs. The plaintiffs were thereby subject to an unreasonable risk of grievous injury.

513. The above-named defendants had a duty to warn the plaintiffs about and to protect the plaintiffs from this hazardous condition that defendants themselves had created.

514. These defendants failed to exercise due care to warn the plaintiffs about and to protect the plaintiffs from the hazardous condition. They took no reasonable steps to disclose to the plaintiffs the false and misleading nature of the information provided to the Durham Investigators or to otherwise protect plaintiffs from the dangerous situation that defendants had created. Rather, they took affirmative steps to maximize the plaintiffs' exposure to the danger by concealing and suppressing exculpatory information, defrauding and harassing the plaintiffs, and actively conspiring and collaborating with the Durham Supervisors and Durham Investigators to aggravate and prolong the ordeal.

515.   The defendants' breach of this duty directly and foreseeably caused injuries to the plaintiffs, including irreparable reputational harm, mental anguish, severe emotional distress, economic injuries, and loss of educational and athletic opportunities, as well as enhancing injuries caused by other actors.

516.   The actions of these defendants in failing to warn and to protect were performed in the scope of employment, and Duke's officers, directors, trustees, and/or managers participated in, ratified, and condoned this breach of duty.

517.   The breach of this duty was committed through intentional actions. It was fraudulent, willful and wanton, and malicious.

## COUNT SIX

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS -- II
(Against Defendants Duke University, DUHS, Richard Brodhead, Larry Moneta,
Peter Lange, John Burness, Tallman Trask, Sue Wasiolek, Victor Dzau,
Kate Hendricks, Matthew Drummond, the Duke Police)

518.   Plaintiffs incorporate the allegations in Paragraphs 1 through 517 above as if set forth fully herein.

519.   The course of conduct adopted by defendants and by defendant Duke University, by and through the above-named defendant officials and employees, throughout the rape hoax crisis was extreme and outrageous and exceeded all bounds of decency tolerated in society. It was intended to cause, and did cause, mental anguish and severe emotional distress to the plaintiffs.

520.   The above-named defendants' course of conduct throughout the rape hoax crisis was malicious, willful and wanton. It involved fraud, duplicity, and deceit. It was

175

treacherous and involved repeated abuses by Duke officers of positions of trust to achieve their own ends and protect Duke's interests and their own interests at the expense of plaintiffs.

521. This course of conduct includes, but is not limited to: defendants' ratification of defendant Levicy's misrepresentations to the Durham Investigators; the abuse of trust by defendants and other Duke officials in attempting to interfere with plaintiffs' exercise of their constitutional rights; defendants' active suppression of exculpatory evidence; the conduct and statements by defendants and other Duke administration officials, including Robert Steel, maligning the lacrosse players and inciting public resentment and passions against them; defendants' active conspiracy and collaboration with the Durham Investigators and Durham Supervisors, who defendants knew or had reason to know to be acting in bad faith, to deprive the plaintiffs of their constitutional and legal rights; defendants' fraudulent conspiracy with the Durham Investigators to conceal violations of FERPA; defendants' bad-faith breaches of contract against the plaintiffs, including harassment and cancellation of the lacrosse season; defendants' unjustified and bad faith discharge of the lacrosse team's coach; defendants' failure to supervise its own professors, employees, and students to prevent them from, or sanction them for, subjecting the plaintiffs to humiliating and defamatory public harassment, including racial and gender-motivated harassment; and defendants' organization, acquiescence in, and approval of campus protests and other public harassment of the plaintiffs by Duke's professors, employees, and students.

522.    Defendants performed these actions with intentional and/or reckless disregard for the emotional state of the plaintiffs.

523.    This extreme and outrageous conduct was intended to, and did cause, mental anguish and severe emotional distress to the plaintiffs.

524.    The actions of these defendant officers and employees in perpetrating this outrageous conduct were performed in the scope of employment. Duke's officers, directors, trustees and/or managers participated in, ratified, and condoned this outrageous course of conduct.

525.    This course of conduct was fraudulent, willful and wanton, and malicious.

## COUNT SEVEN

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – II
(Against Defendants Duke University, DUHS, Richard Brodhead, Larry Moneta, Peter Lange, Sue Wasiolek, John Burness, Tallman Trask, Victor Dzau, Kate Hendricks, Matthew Drummond, Duke Police)

526.    Plaintiffs incorporate the allegations in Paragraphs 1 through 525 above as if set forth fully herein.

527.    The conduct described above involved numerous repeated breaches of the above-named defendants' identified duties of due care. These breaches were grossly negligent and reckless with respect to the duties owed to the plaintiffs and with respect to the plaintiffs' emotional state. Moreover, taken together, these defendants' breaches of duty constituted a reprehensible course of conduct that, in addition to being intentional, was reckless and grossly negligent with respect to the duties owed to the plaintiffs and to their emotional states.

528. It was reasonably foreseeable that these breaches of duty would cause the plaintiffs mental anguish and severe emotional distress.

529. These breaches of duty did in fact cause the plaintiffs mental anguish and severe emotional distress, as well as other injuries including reputational harm, economic damages, dislocation from homes and disruption of lives, lost educational, athletic, and business opportunities, and other injuries.

530. The repeated breaches of duty committed through these actions were malicious, willful and wanton, and were performed in the scope of defendants' employment. Duke's officers, directors, trustees, and/or managers participated in, ratified, and condoned these actions.

## COUNT EIGHT

### FRAUD AND CONSPIRACY TO DEFRAUD
(Against Defendants Duke University, Kate Hendricks, Matthew Drummond, the Duke Police, the Durham Investigators, the City of Durham)

531. Plaintiffs incorporate the allegations in Paragraphs 1 through 530 above as if set forth fully herein.

532. The letters sent to the plaintiffs and their attorneys by defendants Kate Hendricks and Matthew Drummond constituted false representations and/or concealment of the material fact that defendant Duke University had already disclosed the plaintiffs' confidential March 13 and 14 key card reports to the Durham Investigators in violation of FERPA.

533. These representations and concealments were reasonably calculated to deceive plaintiffs and their counsel, and did in fact deceive them, into believing that Duke had not already disclosed the key card information.

534. On information and belief, the above-named defendants and/or other senior Duke University and Durham officials were aware that Duke had already disclosed this information to the Durham Investigators. These misrepresentations and concealments were made with intent to deceive plaintiffs.

535. Plaintiffs and their attorneys reasonably believed and relied upon the representation that the key card information had not been disclosed. Among other things, they expended significant time, effort, resources, and attorney's fees in moving to quash the sham subpoena that Nifong had served for the key card reports that he already had. The above-named defendants, and/or other Duke University and Durham officials knew that this subpoena was a sham.

536. On information and belief, the above-named defendants conspired and collaborated with one another in issuing the sham subpoena and the fraudulent letters with the intent to deceive plaintiffs and to conceal Duke University's illegal prior disclosure, and the Durham Investigators' illegal prior use, of the key card reports.

537. Defendants' actions, individually and in concert, were fraudulent, willful and wanton, and malicious.

538. The actions of the above-named defendants, individually and jointly, were performed in the scope of employment. On information and belief, Duke University

officers, directors, trustees, and/or managers and the Durham Supervisors participated in, ratified, and condoned the fraud.

## COUNT NINE

### NEGLIGENT MISREPRESENTATION
(Duke University, Kate Hendricks, Matthew Drummond)

539.  Plaintiffs incorporate the allegations in Paragraphs 1 through 538 above as if set forth fully herein.

540.  Even if the misrepresentations and concealments alleged above were not intentional, they were performed by the above-named defendants in breach of their duty to take care not to make false statements to and/or conceal material facts from plaintiffs. The plaintiffs justifiably relied to their detriment on defendants' misrepresentations and concealments.

541.  As a direct and foreseeable consequence of defendants' misrepresentations, plaintiffs suffered injuries including the expenditure of time, effort, resources, and attorney's fees in quashing the sham subpoena.

## COUNT TEN

### ABUSE OF PROCESS AND CONSPIRACY TO ABUSE PROCESS
(Against Defendants Duke University, Kate Hendricks, Matthew Drummond, the Duke Police, the Durham Investigators, the City of Durham)

542.  Plaintiffs incorporate the allegations in Paragraphs 1 through 541 above as if set forth fully herein.

543.  As alleged in above, the above-named defendants, acting individually and in concert with one another, obtained the issuance and service of a sham subpoena for plaintiffs' key card reports.

544.  This subpoena was sought and served by these defendants to achieve a collateral purpose not within the intended scope of the process used -- namely, to conceal the facts that Duke University had already illegally disclosed, and the Durham Investigators had illegally used the key card reports.

545.  By collaborating in the issuance and use of a sham subpoena, the defendants committed a willful act whereby they sought to use the subpoena power of the court as a means to gain advantage of the plaintiffs in respect to some collateral matter -- namely, to conceal from plaintiffs defendants' illegal prior disclosure and use of the key card reports.

546.  The defendants' actions, individually and jointly, proximately caused injuries to the plaintiffs, including the concealment of defendants' prior illegal disclosures and use of the key card reports and the consequent expenditure of time, effort, and attorney's fees in seeking to quash the sham subpoena.

547.  Defendants' actions, individually and jointly, were performed in the scope of employment.  On information and belief, Duke's officers, directors, trustees, and/or managers and the Durham Supervisors participated in, ratified, and condoned these actions.

548. The breach of this duty was committed through intentional actions. It was fraudulent, willful and wanton, and malicious.

## COUNT ELEVEN

### CONSTRUCTIVE FRAUD THROUGH ABUSE OF CONFIDENTIAL RELATIONSHIP
(Against Defendants Duke University, Richard Brodhead, Tallman Trask, Sue Wasiolek, J. Wesley Covington)

549. Plaintiffs incorporate the allegations in Paragraphs 1 through 548 above as if set forth fully herein.

550. A relationship of trust and confidence existed between defendant Sue Wasiolek and the plaintiffs, whom she voluntarily undertook to advise during the lacrosse rape hoax crisis. This confidential relationship was based upon her official role as Dean of Students and her status a trusted and authoritative advisor to students in difficulty; her role as an attorney bound by canons of legal ethics and upright dealing; and her role as an authorized representative and agent of Duke University to its students. She stood in a special relationship of mutual benefit and control with respect to the lacrosse players. Defendants Richard Brodhead and Tallman Trask held similar positions of authority at Duke University, and enjoyed a similar relationship of trust and confidence with plaintiffs. Due to this relationship of trust and confidence, the above-named defendants were bound in equity and good conscience to act in good faith and with due regard for the interests of plaintiffs, who reposed confidence in them.

551. Defendants abused their relationship of trust and confidence to harm the plaintiffs. Defendant Wasiolek did so by advising the plaintiff lacrosse players not to tell

their parents of the rape allegations made against them and of the legal jeopardy facing them, and advising them not to seek and obtain legal representation, in violation of North Carolina rules of professional ethics. Among other Duke officials, Defendant Brodhead contributed to this constructive fraud by reinforcing and reaffirming that the Duke administration stood in a relationship of trust and confidence with the players, and Defendant Trask contributed to it by reinforcing Wasiolek's advice to the players not to procure legal representation. This conduct was directly contrary to the plaintiffs' interest, placed them in grave legal jeopardy, and had the direct and predictable effect of prolonging and exacerbating the rape hoax crisis, and thereby harmed plaintiffs.

552. These defendants also abused their relationship of trust and confidence with the plaintiffs by steering them to defendant Wes Covington for confidential advice and guidance, including legal advice. Wasiolek and Covington also exploited the unique relationship of trust, confidence, and authority that Coach Pressler enjoyed with the plaintiffs by using Pressler as a conduit for their advice, and a promoter of Covington. Covington and Wasiolek also used Pressler's relationship with the plaintiffs to arrange for uncounseled interrogations with the Durham Investigators that were contrary to the plaintiffs' legal interests.

553. Defendant Wes Covington enjoyed a position of trust and confidence with the plaintiffs. This position was created by his holding himself out to them as their lawyer and/or confidential counselor, and was reinforced by Wasiolek's recommendation that the plaintiffs seek his confidential advice and her representation that he was acting on

their behalf. Covington collaborated with Wasiolek and other Duke officials in abusing this position, and subordinating the interests of the plaintiff lacrosse players to the interests of Duke University and its officials.

554. In abusing their positions of trust and confidence, above-named defendants were motivated by the desire to serve and protect Duke University's and their own personal interests over the interests of the plaintiffs. Defendants did not disclose this conflict of interest to the plaintiffs.

555. Plaintiffs suffered injuries as a direct and foreseeable consequence of the abuse of these positions of trust and confidence. Among other things, this abuse prevented them from procuring independent legal representation at the critical initial stages of the rape hoax investigation. It foreseeably and proximately caused the prolonging of the rape investigation and the resulting emotional distress, permanent reputational harm, loss of educational opportunities, and other injuries to plaintiffs. It also enhanced the injury inflicted on the plaintiffs by other defendants in the rape hoax crisis.

556. The actions of defendant Duke officers and employees in perpetrating this constructive fraud were performed in the scope of employment. Duke's officers, directors, trustees and/or managers participated in, ratified, and condoned the fraud.

557. This constructive fraud was fraudulent, willful and wanton, and malicious.

# COUNT TWELVE

## BREACH OF DUTY OF CARE IN THE CONDUCT OF
## A VOLUNTARY UNDERTAKING
(Against Defendants Duke University, Richard Brodhead,
Tallman Trask, Sue Wasiolek, Wes Covington)

558. Plaintiffs incorporate the allegations in Paragraphs 1 through 557 above as if set forth fully herein.

559. As related above, the above-named defendants voluntarily undertook to counsel, advise, guide and assist the plaintiffs in protecting their interests in the rape hoax crisis. They deliberately acted to discourage the plaintiffs from seeking the advice of other counselors, advisors, and helpers, such as the plaintiffs' parents and independent attorneys.

560. Having voluntarily undertaken the responsibility of advising, counseling, and guiding the lacrosse players during the crisis, the above-named defendants assumed the duty to exercise due care in the provision of this counsel and guidance.

561. Defendants failed to exercise due care in the provision of advice, counsel, and guidance. They were reckless with regard to the well-being of those they undertook to counsel and advise. They intentionally breached their duty to exercise due care as counselors and advisors, seeking instead to deceive plaintiffs into subordinating their own rights and interests to the interests of Duke University and themselves.

562. The defendants' breach directly and foreseeably caused injuries to the plaintiffs, including irreparable reputational harm, severe emotional distress, economic

injuries, and loss of educational and athletic opportunities, as well as enhancing injuries caused by other actors.

563.   The actions of defendants in breaching this duty were performed in the scope of employment.  Duke's officers, directors, trustees, and/or managers participated in, ratified, and condoned this breach of duty.

564.   The breach of this duty was committed through intentional actions.  It was fraudulent, willful and wanton, and malicious.

## COUNT THIRTEEN

### BREACH OF DUTY BASED ON SPECIAL
### RELATIONSHIP OF MUTUAL BENEFIT
(Against Defendants Duke University, Richard Brodhead)

565.   Plaintiffs incorporate the allegations in Paragraphs 1 through 564 above as if set forth fully herein.

566.   Defendant Duke University has a special relationship with its varsity athletes, including plaintiff lacrosse players.  It enjoyed numerous benefits from the lacrosse team, and exerted significant control over the team and its players.

567.   Among other benefits, Duke University enjoyed increased revenues and fundraising, recruitment of students and student-athletes, national media attention, and national prestige due to its championship lacrosse team.

568.   Defendant Duke University exercises substantial control over the lacrosse players and other student athletes, subjecting them to enhanced expectations of academic performance and on- and off-campus behavior.

569.    By virtue of this special relationship of mutual benefit and control, defendants had a duty to take reasonable steps to protect its student-athletes from harm, including threats to their liberty, personal safety, and reputation due to false allegations of rape, harassment, and a rogue criminal investigation.

570.    As related above, defendants repeatedly breached this duty of care by failing to take reasonable steps to protect the lacrosse players from threats to their liberty, physical and economic well-being, reputation, emotional states, and enjoyment of athletic and educational opportunities.

571.    The defendants' breach directly and foreseeably caused injuries to the plaintiffs, including irreparable reputational harm, severe emotional distress, economic injuries, and loss of educational and athletic opportunities, as well as enhancing injuries caused by other actors.

572.    The actions of defendant officers and employees in breaching this duty were performed in the scope of employment. Duke's officers, directors, trustees, and/or managers participated in, ratified, and condoned this breach of duty.

573.    The breach of this duty was committed through intentional actions. It was fraudulent, willful and wanton, and malicious.

## COUNT FOURTEEN

### BREACH OF DUTY TO PROTECT STUDENTS FROM KNOWN DANGERS AND HARASSMENT
(Against Defendant Duke University)

574.  Plaintiffs incorporate the allegations in Paragraphs 1 through 573 above as if set forth fully herein.

575.  By and through the adoption, promulgation, and enforcement of the anti-harassment policies described below, among other actions, defendant Duke University voluntarily undertook a duty to exercise reasonable care in preventing harassment against the plaintiffs.

576.  This duty is also reinforced by Duke University's contractual and implied contractual duties to the plaintiffs, and by defendants' duties to plaintiffs as invitees on University property.

577.  The acts of harassment, including racial, class-based, and gender-based harassment by Duke professors, students, and employees against plaintiffs detailed herein were both actually known and foreseeable to Duke University and to defendant University officials.  The persons committing these acts of harassment were subject to defendants' control and supervision.

578.  Defendant Duke University breached its duty to protect the plaintiffs from harassment by negligently failing to prevent the harassment, by failing to exercise its authority to put an end to the harassment and to sanction those responsible for it, and by intentionally inciting, participating in, promoting, and ratifying the harassment.