IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

EDWARD CARRINGTON, *et al,*        )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )        No. 1:08-CV-119
                                    )
DUKE UNIVERSITY, *et al,*          )
                                    )
        Defendants.                 )

―――――――――――――――――――――――――――――――――――――――――――

**BRIEF OF DEFENDANTS BAKER, CHALMERS, COUNCIL, HODGE,
LAMB, MIHAICH, RIPBERGER, and RUSS
IN SUPPORT OF THEIR MOTION TO DISMISS**

―――――――――――――――――――――――――――――――――――――――――――

## STATEMENT OF THE CASE

Plaintiffs filed this action on February 21, 2008, seeking damages, pursuant to 42

U.S.C. § 1983 and the common law of North Carolina, arising out of an investigation of

charges of rape, sexual assault, and kidnapping.  This matter is before the Court on the

Motion to Dismiss of Defendants Baker, Chalmers, Council, Hodge, Lamb, Mihaich,

Ripberger, and Russ ("Defendants"),[1] pursuant to FED. R. CIV. P. 12(b)(6), for failure to

state a claim upon which relief can be granted.

## STATEMENT OF FACTS

Plaintiffs are all members, or parents of members, of the 2006 Duke University

men's lacrosse team.  (Compl. ¶¶ 1, 10-36.)  On March 13, 2006, many of the players on

that team attended an off-campus party at 610 North Buchanan Avenue, in Durham.  (*Id.*

―――――――――――――――――――――

[1] In the Complaint, Defendants, along with Addison, are labeled "Durham Supervisors."

1

¶ 90.) Two female exotic dancers performed at the party, a commonplace event at Duke. (*Id.* ¶¶ 90, 237.)

In the early morning hours of March 14, 2006, one of the performers, Crystal Mangum, informed a nurse, and then police, that she had been raped at the party. (Compl. ¶¶ 102, 105-06.) She was taken to Duke Hospital for a forensic rape exam. (*Id.* ¶ 103.) While at the Duke, she saw seven doctors and nurses, and told them that she had been raped and that she was in intense pain. (*Id.* ¶ 106.)

Mangum gave a detailed account to Duke nurse Tara Levicy, who interviewed her as a sexual assault examiner ("SANE"), and also assisted in the physical examination performed by Dr. Julie Manly. (Compl. ¶ 106.) Mangum told Levicy that she had beaten and raped, orally, vaginally, and anally by three men. (*Id.*) During the exam, Mangum screamed hysterically, and complained of severe pain when Dr. Manly inserted a speculum for vaginal examination. (*Id.* ¶ 128.) Dr. Manly observed scratches on Mangum's right knee and ankle, and "diffuse edema [i.e., swelling] of the vaginal walls." (*Id.* ¶¶ 125, 126.)

On March 16, Himan, an investigator with the Durham Police Department ("DPD"), (Compl. ¶ 68), had a "critical conversation with Nurse Levicy." (*Id* ¶ 150.) "Levicy told Himan that 'due to HIPAA laws she was unable to divulge patient information,' but that '*there were signs consistent with sexual assault* during her test.'" (*Id.*) (emphasis in original.) Plaintiffs allege that "Levicy's statement to Himan was a critical factor in launching, sustaining, and prolonging the rape investigation," because

"on March 16, Duke Hospital's sexual assault examiner advised Durham police that a rape had likely occurred." (*Id.* ¶ 153.) Further, the "prestige and credibility of Duke University Hospital thus provided the core support for the investigation." (*Id.* ¶ 154.)

On March 16, Himan and Gottlieb, a detective with the DPD, (Compl. ¶ 67), interviewed Mangum. (*Id.* ¶¶ 150, 155.) She told them that she had been attacked by three men. (*Id.* ¶ 156.) Mangum was shown photo arrays, made up of photos of lacrosse players obtained from Duke police. (*Id.* ¶¶ 149, 157.) Mangum was unable to identify her attackers in those photos, because to her, the pictures "all look[ed] alike." (*Id.* ¶ 158.)

On March 21, Gottlieb served Levicy with a subpoena to produce Mangum's medical records, which were not provided until April 5. (Compl. ¶¶ 150, 185.) On March 21, Levicy "told Gottlieb that the examination of Mangum had revealed physical evidence of 'blunt force trauma,' and that the blunt force trauma was 'consistent with the victim's statement' alleging a forcible gang rape by three men." (*Id.* ¶ 185.) She also told him that "the evidence corroborated Mangum's claim of both vaginal and anal rape." (*Id.* ¶ 186.) She further told him that "Mangum 'had edema and tenderness to palpation both anally and vaginally.'" (*Id.*) Plaintiffs allege that these statements were also "critical factors in sustaining the ensuing rape investigation." (*Id.* ¶ 188.) Subsequently, Levicy told the prosecutor, Nifong, that Mangum's behavior and symptoms "were '*consistent with sexual assault emotionally and physically*' and with 'rape trauma syndrome.'" (*Id.* ¶ 191) (emphasis in original.) She further told Nifong that "Mangum showed no signs of intoxication, and that Mangum offered 'consistent responses.'" (*Id.*)

On March 16, after their interview of Mangum, Gottlieb, Himan, and other officers searched the 610 N. Buchanan Avenue home pursuant to a search warrant. (Compl. ¶ 162.)  When the search ended, the three residents of the home, Plaintiff Flannery, Dave Evans and Matt Zash, voluntarily accompanied police to the station, where they were each interviewed and physically examined.  (*Id.* ¶¶ 90, 164.)

Subsequently, Gottlieb and Himan arranged for similar voluntary interviews with the remaining players who had attended the party.  (Compl. ¶¶ 176, 179, 198.)  The entire team was scheduled to meet with police for interviews and the taking of DNA samples on March 22, (*Id.* ¶ 197), but these meetings were postponed by the players "[a]t the last minute" and rescheduled for March 29.  (*Id.* ¶ 202.)

When the meetings for March 22 were cancelled, Himan and Gottlieb prepared an application for a nontestimonial order ("NTO") from a judge to compel the production of DNA samples.  (Compl. ¶ 205.)  The application, which was filed on March 23, relied on the information supplied by Levicy in asserting that medical evidence suggested symptoms and injuries consistent with rape.  (*Id.* ¶ 205.)  According to the Complaint, the medical evidence in "Duke's exclusive possession" demonstrated that these assertions were false.  (*Id.* ¶ 206.)  Statements that the rape allegations "were supported by medical evidence collected at Duke – an allegation that owed its existence entirely to nurse Levicy – gave the spurious rape allegations a *powerful aura of credibility* to the media and the public."  (*Id.* ¶ 210) (emphasis added.)  Plaintiffs further declare:

> If the Durham Police had been advised truthfully by Levicy that the physical and medical evidence was inconsistent with Mangum's multiple,

4

ever-changing, conflicting stories, *then the rape investigation,* which had been dropped by Durham Police Investigator B.S. Jones, *would not have been revived and pursued.*

(*Id.* ¶ 211) (emphasis added.)

On March 23, Judge Ronald Stephens entered an order on the application. (Compl. ¶ 213.) The team members complied with the order, providing DNA samples, submitting to examinations for injuries, and sitting for photographs. (*Id.* ¶ 214.) The three co-captains were the only players to volunteer to be interviewed by police, all other players apparently refused. (*See id.* ¶¶ 248, 262.)

The day after the entry of the NTO, March 24, Nifong is alleged to have contacted the DPD to "take control" of the investigation. (Compl. ¶ 218.) On March 27, Gottlieb and Himan briefed Nifong on the results of the investigation to date. (*Id.* ¶ 267.) Nifong's response suggested that he believed the information provided was insufficient to successfully prosecute the case. (*Id.* ¶ 270.) That same day, Nifong made his first public threat to prosecute the players as aiders and abettors, if they did not talk to police. (*Id.* ¶ 271.)

Subsequently, Nifong made numerous public statements about the case. (Compl. ¶ 273.) "Most importantly," the statements of Nifong, Himan, and Addison "emphasized the medical and physical evidence from Duke Hospital's forensic examination of Mangum as establishing that a rape had occurred." (*Id.* ¶ 274.) Reference to this evidence was one "of the most persistent themes in the media coverage." (*Id.*) In making these statements, "Nifong was simply parroting the false information that Duke's SANE

nurse, Levicy, had told Gottlieb on March 16 and 21." (*Id.* ¶ 275, 354.) Although Plaintiffs contend that the information provided by Levicy was false, the DPD investigators and supervisors did not know this: "Duke was in *exclusive possession* of information demonstrating that Nifong's statements were false." (*Id.; see also* ¶¶ 310, 390) (emphasis added.)

On March 28 or 29, and on March 30, Nifong received the results of DNA testing from the SBI laboratory. (Compl. ¶¶ 304, 311.) No DNA from any of the players was found on the rape kit items or Mangum's clothing, although DNA from one of the residents of 610 N. Buchanan Avenue was on a towel found in the house, and from another resident was found on the bathroom floor. (*Id.* ¶ 311.) On April 10, Nifong disclosed this evidence to the players' defense counsel, and the information was revealed to the public. (*Id.* ¶¶ 312, 386.)

On March 31, Nifong suggested to MSNBC that the DNA results could have been negative, if a condom had been used. (Compl. ¶ 313.) Months later, Levicy met with Himan and Gottlieb, and suggested to them that condoms could have been used. (*Id.* ¶¶ 313, 462.) She further told them that she was not surprised that no DNA was found "'because rape is not about passion or ejaculation but about power.'" (*Id.* ¶ 462.)

On April 1, Arico, Duke's SANE program director and Levicy's supervisor, publicly described the examination of Mangum, and asserted that "I can reasonably say these injuries are consistent with the story she told." (Compl. ¶¶ 333-36.) By her

statements, Arico "attempted to bolster Levicy's credibility to the police and to the public." (*Id.* ¶ 337.)

On April 5, Duke produced medical records relating to its forensic exam of Mangum for the first time. (Compl. ¶¶ 333-36.) Plaintiffs allege that Levicy falsified the version of the SANE report produced to Nifong, to render it inculpatory based upon the evidence she knew at the time. (*Id.* ¶ 341.) For example, she is alleged to have added a handwritten notation that the rapists had "wiped her off with a rag," (*id.* ¶ 337), to make the report consistent with the finding of DNA on a towel. (*Id.* ¶ 311.)

Three lacrosse players, Reade Seligmann, Colin Finnerty, and Dave Evans, none of whom are plaintiffs in this case, were identified by Mangum as her assailants, (Compl. ¶ 348.) Selgimann and Finnerty were indicted by the grand jury on April 17. (*Id.* ¶ 399.) Gottlieb testified before the grand jury that Levicy had told him that once she "'managed to calm [Mangum] down, her story never changed after that point.'" (*Id.* ¶ 397.) He believed that Levicy's statements corroborated Mangum's account because they had "a SANE nurse who was backing up [a victim's] statement." (*Id.* ¶ 398.) Indeed, without the information provided by Levicy, "there would have been no credible basis for pursuing the rape investigation, and Mangum's multiple, conflicting, ever-changing stories of what happened at the March 13 party would have been seen, and dismissed, by the police as the facially incredible hoax that it was." (*Id.*)

Subsequently, on May 15, Nifong sought and obtained an indictment of Evans. (Compl. ¶ 432.) Despite earlier threats to indict the entire team as accomplices, Nifong

announced that "this would be the last indictment based on 'the evidence that we have developed.'" (*Id.*)

## QUESTIONS PRESENTED

1.    Whether the official capacity claims should be dismissed.

2.    Whether Plaintiffs have alleged a violation of a constitutional right.

3.    Whether Plaintiffs fail to state a claim under 42 U.S.C. § 1983.

4.    Whether Defendants are entitled to qualified immunity.

5.    Whether Plaintiffs have alleged the essential elements of their North Carolina common law claims.

6.    Whether Defendants are entitled to public officer immunity.

## ARGUMENT

### I.    APPLICABLE STANDARD OF REVIEW

In any complaint, "[t]he plaintiff's factual allegations must be enough to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)).  Last year, the Supreme Court in *Twombly* held "that a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion."  *Port Dock & Stone Corp.*, 507 F.3d at 121 (citing *Iqbal v. Hasty*, 490 F.3d 143, 155-58 (2d Cir. 2007) (applying plausibility standard across the board, including section 1983 claims); *see also LULAC v. Bredson*, 500 F.3d 523, 527 (6th Cir. 2007) ("The factual allegations, assumed to be true, must do more than create

speculation of suspicion of a legally cognizable cause of action; they must show entitlement to relief."); *German v. Fox*, No. 07-1406, 2008 U.S. App. LEXIS 1288 (4th Cir. Jan. 23, 2008) (affirming dismissal of a 42 U.S.C. § 1983 claim for violation of First Amendment rights where facts did nothing more than create a suspicion of a legally cognizable right of action) (unpublished).  Marshalling facts that actively and plausibly suggest cognizable liability "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly,* 127 S. Ct. at 1965.

> While a plaintiff is not charged with pleading facts sufficient to prove her case, as an evidentiary matter, in her complaint, a plaintiff is required to allege facts that support a claim for relief.  The words "hostile work environment" are not talismanic, for they are but a legal conclusion; it is the alleged facts supporting those words, construed liberally, which are the proper focus at the motion to dismiss stage.

*Bass v. E.I. DuPont de Nemours & Comp*., 324 F.3d 761, 765 (4th Cir. 2003); *see also Gladden v. Winston Salem State Univ.*, 495 F. Supp. 2d 517, 521 (M.D.N.C. 2007) ("The presence of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support the legal conclusion.").

Yet, a complaint that weighs in at well over seven hundred factual allegations can still come up short of the plausibility threshold recognized by the Supreme Court and applied by the Fourth Circuit.  Here, Plaintiffs' Complaint fails to state a claim not because there are not enough factual allegations, but because in the haystack of factual allegations there is no needle: the allegations do not support the requisite grounds of *legally cognizable* section 1983 and state tort claims.  "Thus, a motion to dismiss will be

granted if there is either a lack of cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Tolley v. Kivett*, No. 1:01-CV-410, 2002 U.S. Dist. LEXIS 24368, *6 (M.D.N.C. July 1, 2002) (citations and quotations omitted).

## II. OFFICIAL CAPACITY CLAIMS ARE REDUNDANT
(Official Capacity Claims in the Twenty-Second, Twenty-Third, Twenty-Fourth, Twenty-Sixth, Twenty-Seventh, Twenty-Eighth, Twenty-Ninth, Thirtieth, and Thirty-First Counts)

Plaintiffs explicitly allege that Defendants "are sued in both their individual and official capacities." (Compl. ¶ 80.) The distinction between the two is not merely a pleading safety net or academic surplusage; rather, it designates a theory and manner of recovery that warrants partial dismissal of nearly all of Plaintiffs claims.

"In *Kentucky v. Graham*, 473 U.S. 159, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985), the [Supreme] Court sought to eliminate lingering confusion about the distinction between personal-and official-capacity suits." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). In *Graham*, the Court noted that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 165-66, 168 n.14 (1985) (citations and quotations omitted).

> Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, "the entity's 'policy or custom' must have played a part in the violation of federal law." *Graham, supra*, at 166 (quoting *Monell* [*v. New York City Dept. of Social Services*, 436 U.S. 658,] 694 (1978)). For the same reason, the only immunities available to the defendant in an official-capacity action are those that the governmental entity possesses. *Graham*, 473 U.S. at 167.

*Hafer*, 502 U.S. at 25. The Supreme Court made this entity-oriented point "explicit" in

*Brandon v. Holt*, 469 U.S. 464, 471-72 (1985): "a judgment against a public servant 'in

his official capacity' imposes liability on the entity that he represents provided, of course,

the public entity received notice and an opportunity to respond." Thus, while an

individual may be a named defendant, when sued in their official capacity, the suit is

against the entity that employs them—as if the plaintiff named the defendant's position

and not the person. *See Hafer*, 502 U.S. at 25 ("Indeed, when officials sued in this

capacity in federal court die or leave office, their successors automatically assume their

roles in the litigation.") (citations and quotations omitted).

Based on the reasoning of *Graham*—and where the governmental entity is named

as a defendant in the action—courts of this Circuit have held that any claims asserted

against Defendants in their official capacities should be dismissed as duplicative or

redundant. *See Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) (affirming a

district court's determination to dismiss official capacity claims in a section 1983 action

against an official when the governmental entity was a named defendant); *W.E.T. v.

Mitchell*, No. 1:06-CV-487, 2007 U.S. Dist. LEXIS 68376, *30 (M.D.N.C. Sept. 14,

2007) ("Claims against the official in his or her official capacity which are duplicative of

claims against a government entity are subject to dismissal."); *Sheaffer v. County of

Chatham*, 337 F. Supp. 2d 709, 721 (M.D.N.C. 2004) ("Because official capacity suits

are essentially suits against the entity itself, they may be dismissed, where, as here, the

government entity is sued."). Not only is dismissal sound legal reasoning in these

circumstances, but it further promotes efficient litigation: "naming a local government officer in an official capacity claim only leads to a duplication of documents and pleadings, as well as wasted public resources for increased attorneys fees." *Wisler v. City of Fresno*, No. CV F 06-1694, [2007 U.S. Dist. LEXIS 18666, *19](E.D. Cal. Mar. 16, 2007).

Application of this controlling and efficient principle means that Plaintiffs' various constitutionally-driven section 1983 claims—the twenty-second, twenty-fourth, and twenty-seventh counts—should be dismissed; these claims are made up in part of official-capacity claims against Defendants, (*see* Compl. ¶ 80); and the City of Durham, the entity that employees Defendants, is a named defendant.[2] *See, e.g., Conley v. Town of Elkton*, No. 5:04-CV-30, [2005 U.S. Dist. LEXIS 2602, *21](W.D. Va. Feb. 22, 2005) (Plaintiffs claims against police chief and members of town council in their official capacity claims should be dismissed where town is a named defendant).

Additionally, the North Carolina Supreme Court has adopted the United States Supreme Court's holding in *Graham*, "that official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent," and held that "where the governmental entity may be held liable for damages resulting from its official policy, a suit naming public officers in their official capacity is redundant." *Moore v. City of Creedmoor*, [345 N.C. 356, 367](), 481 S.E.2d 14, 21-22 (1997). Thus, this

---

[2] To the extent, if any, that the Court rejects dismissal of official-capacity claims on the basis of redundancy, Defendants hereby incorporate the corresponding analysis and argument of the City of Durham in its Brief in Support of its Motion to Dismiss.

principle of dismissing duplicative or redundant claims should equally apply to Plaintiffs' state law claims against Defendants in their official capacities: the twenty-third, twenty-eighth, twenty-ninth, thirtieth, and thirty-first counts.

III.     <u>NO LIABILITY FOR DEFENDANTS PURSUANT TO 42 U.S.C. § 1983</u>
        (Twenty-Second, Twenty-Fourth, and Twenty-Seventh Counts)

"Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law." *Hafer*, 502 U.S. at 25. Even though Defendants do not dispute their status as officers acting under the color of state law, Plaintiffs assertion of individual liability based on section 1983 must include "facts that show . . . a deprivation of a right, privilege, or immunity secured by the Constitution or federal laws," *DeBerry v. Runyon*, No. 1:97-CV-777, 1998 U.S. Dist. LEXIS 12532, *8 (M.D.N.C. Apr. 20, 1998), and show that the official was *personally involved* in the alleged constitutional violation. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).

Framing and forecasting this level of involvement against a supervisor is arduous because "respondeat superior does not apply in these actions"; rather, in the supervisory context, "[s]uch liability must be based on a showing of some personal responsibility for the conduct of [one's subordinates]." *Williams v. Vincent*, 508 F.2d 541, 546 (2d Cir. 1974). Further, "officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law." *Hafer*, 502 U.S. at 25. Here, Plaintiffs' fail to state a section

1983 claim because individual liability is inadequately and unsoundly pled, and the absence of constitutional infringement entitles Defendants to qualified immunity.

## A. Inadequate and Conclusory Pleading Against Specific Defendants Warrants Dismissal of Section 1983 claims

Plaintiffs' attempt to plead personal responsibility is inadequate: they either fail to include any allegations against certain individuals or attempt to attribute personalized conduct to each Defendant by corralling these individuals into a group and disparaging the group. Thus, this Count must be dismissed.

### 1. Failing to Aver Factual Allegations Against Council, Mihiach, Ripberger, and Russ Necessitate Their Dismissal

Foremost, "courts have consistently held that, where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted." *Humphreys v. Nager*, 962 F. Supp. 347, 351 (E.D.N.Y. 1997); *see also Tolley*, U.S. Dist. LEXIS 24368 at*7; *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999); *Greene v. Wright*, 389 F. Supp. 2d 416, 429 (D. Conn. 2005).

Plaintiffs have sued Council, Mihaich, Ripberger, and Russ, individually, but failed to make any allegation beyond jurisdiction and their capacity with the DPD. (Compl. ¶¶ 75, 74, 77, 73, and 79, respectively.) In *Tolley*, 2002 U.S. Dist. LEXIS 24368 at *8, this Court dismissed claims against a chief of police in a section 1983 action, "[b]ecause the complaint only name[ed] Defendant Gainey in paragraph 3 and the

caption, and contain[ed] no allegations indicating how the defendant violated the law or injured Tolley[.]"  On its face, this type of *im*personal pleading is woefully insufficient to meet Plaintiffs' obligation to factually support the elements of their claims.  *See Crawford v. Dep't of Corrections*, No. 07-C-840, 2008 U.S. Dist. LEXIS 6048, *6-7 (E.D. Wis. Jan. 16, 2008) ("Because the complaint does not allege that defendant Nygren caused or participated in any constitutional violation, she will be dismissed from this action for lack of personal involvement.").

## 2. Allegations Against "Durham Supervisors" Are Not Sufficient to State Individual Liability

Plaintiffs' "group" or "team" pleading methodology blurs principled notice pleading against Baker, Chalmers, Council, Hodge, Lamb, Mihiach, Ripberger, and Russ and lowers Plaintiffs' burden of proof below the appropriate threshold.  *See Jones v. Williams*, 297 F.3d 930, 939 (9th Cir. 2002) ("We reject the idea that mere presence at a search or membership in a group, without personal involvement in and a causal connection to the unlawful act, can create liability under section 1983.").  Here, the vast majority of allegations against Defendants are leveled against them as a group, collectively referred to as "Durham Supervisors."[3]  (*See* Compl. ¶¶ 79-80, 110, 160, 167, 181-82, 195, 212, 218, 220, 269, 276, 295, 308, 312-13, 353, 377, 385, 404, 423, 429, 514, 521, 538, 547, 625, 633, 641, 647, 670, 672, 674, 676-79, 682, 685, 687-88, 690, 692, 697-99, 701-02, 706-08, 712, 714, 716, 718-19, 722, 727, 733, 740, 743-46.)

---

[3] Plaintiffs inexplicably put Addison in the class of "Durham Supervisors," although they fail to allege that he supervised anyone.  Addison is separately represented.

"Durham Supervisors" is properly limited, if proper at all, as a short-hand way of alleging liability against the City, through the official or collective actions of "policymakers," "final decisionmakers," or "supervisors."  It is ineffective, however, at giving Baker, Chalmers, Council, Hodge, Lamb, Mihaich, Ripberger, or Russ, as individual defendants, proper Rule 8 notice of what each is specifically alleged to have done wrong.  *See Negrich v. Hohn*, 379 F.2d 213, 215 (3d Cir. 1967) (affirming the dismissal of a complaint for cruel and unusual punishment where charges were alleged against defendants, generally, and several individuals were not named beyond the caption; "It is apparent that *all* defendants could not have inflicted the beatings at the times and places indicated."); *see also Evancho v. Fisher*, 423 F.3d 347, 354 (3rd Cir. 2005) (Faced with only conclusory allegations against a group, "it is not possible for [a defendant] to frame an answer."); *Crawford*, 2008 U.S. Dist. LEXIS 6048, *13 ("In the absence of such allegations, defendant . . . is not given fair notice of what the claim is against her or the grounds upon which those claims rest as required under Rule 8(a)."); *Ashcroft v. Dep't of Corrections*, No. 05-CV-488, 2007 U.S. Dist. LEXIS 49079, *29 (W.D.N.Y. July 6, 2007) (omitting which defendants participated in a denial of privileges, and instead making allegations against "defendants," "fails to state a plausible claim for relief."); *Agresta v. City of Philadelphia*, 694 F. Supp. 117, 120-21 (E.D. Pa. 1988) (Complaints that "lump all the defendants together so that it is impossible to tell with specificity which defendants are responsible for which acts," should be dismissed.).

Moreover, "the 'team effort' standard allows the jury to lump all the defendants together, rather than require it to base each individual's liability on his [or her] own conduct." *Chuman v. Wright*, 76 F.3d 292, 295 (9th Cir. 1996).

> The underlying problem with a 'team effort' theory is that it is an improper alternative grounds for liability. It removes individual liability as the issue and allows a jury to find a defendant liable on the ground that even if the defendant had no role in the unlawful conduct, he would nonetheless be guilty if the conduct was the result of a 'team effort.'

*Id.*

For example, in *Wisler v. City of Fresno*, the plaintiff sued numerous police officers following his arrest. *Wisler*, 2007 U.S. Dist. LEXIS 18666, *6-7. The plaintiff alleged that his physical and emotional injuries arising from the arrest were a result of a policy and practice of excessive force. *Id.* at *7-9. Although suing all officers in their individual capacities, the plaintiff was only able to allege individual involvement against the three arresting officers. As a result of the impersonal pleading against the other officers, the Court dismissed the action against them. *Id.* at 12. In so doing, the Court rejected the plaintiff's proffer that these officers were part of a group that committed the constitutional violations stating that personal liability "under Section 1983 requires integral participation by officers rather than simple participation in a team effort." *Id.* at 14. Just as the plaintiff in *Wisler*, Plaintiffs here have failed to allege specific conduct on behalf of Defendants and instead have chosen to meet their burden of plausible individual liability by grouping Defendants together. This is simply improper and insufficient. *See id.* at *15.

### 3. Individual Liability Under Section 1983 Cannot Arise from Merely Being In The Chain of Command

It is also insufficient to rest personal liability on allegations of the chain of command or who supervised whom—a quintessential example of relying on an improper respondeat superior theory. A complaint that attempts to achieve personal liability through doing so should be dismissed, *see Williams*, 508 F.2d at 546 (superintendent of prison not personally liable where a section 1983 complaint regarding an assault does nothing more than allege that he was in charge of the prison), because it lacks "link[ing] each named defendant with some *affirmative* act or omission that demonstrates a violation of plaintiff's federal rights." *Wisler*, 2007 U.S. Dist. LEXIS 18666 at *11-12. For instance, the Third Circuit recently determined that a complaint alleging a section 1983 violation for a job transfer within a state's investigative office did not state a claim for personal liability on behalf of the state's attorney general, a named defendant:

> In contrast to the personal involvement that the Third Circuit rightly requires for a civil rights complaint, Evancho's amended complaint merely hypothesizes that Attorney General Fisher may have been somehow involved simply because of his position as the head of the Office of the Attorney General. This conclusion, however, is not a reasonable inference to be drawn from facts alleged in Evancho's complaint.

*Evancho*, 423 F.3d at 354. In sum, when doling out claims of personal liability, the burden is squarely on Plaintiffs to allege a specified affirmative act or omission against each defendant, and not rely on group-think, team action, or mere chain of command. As Plaintiffs have failed to meet this burden, these counts should be dismissed.

### B. No Constitutional Rights Established by Plaintiffs' Complaint or Infringed Upon By Defendants' Conduct

Plaintiffs fail to allege a specific constitutional injury supposedly violated by the investigation into the events occurring on March 13, 2006, other than it was "malicious" within the contours of the Fourteenth and Fourth Amendment. (*See* Compl. ¶¶ 636, 650, 703, 709, and 719.) A complaint failing this basic task is subject to dismissal based on the failure to plainly state the elements of a section 1983 claim or qualified immunity. *See Baker v. McCollan*, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution, *not* for violations of duties of care arising out of tort law."); *Osborne v. Rose*, Nos. 97-1259 & 1264, 1998 U.S. App. LEXIS 850, *9 (4th Cir. Jan. 20, 1998) ("[C]ivil liability under § 1983 may be imposed for deprivation of a constitutional right if, but only if, in the light of pre-existing law the unlawfulness under the Constitution is apparent.") (citations and quotations omitted). At a bare minimum, Plaintiffs failure to articulate the certain right at issue leaves the Court and Defendants to speculate where one might arise. *See Taylor v. Waters*, 81 F.3d 429, 433 (4th Cir. 1996) (complaint that simply states that "the facts alleged implicate rights protected by the Fourth, Fifth, and Fourteenth Amendments" forces the defendant and court to stylize the specific right in question) (citations and quotations omitted). However, even prospecting Plaintiffs' Complaint in the light most favorable to them, it is still too dark to find the violation of any constitutional right.

## 1. No Claim Under the Fourteenth Amendment

In *Chavez v. Martinez*, 538 U.S. 760 (2003), the United States Supreme Court reviewed a plaintiff's claims that unwanted police questioning violated his Fifth

Amendment rights as well as his Fourteenth Amendment right to be free from coercive questioning. There, the plaintiff was involved in an altercation during an arrest where he took an officer's gun and was then shot by another officer. *Id.* at 764. While being treated at the hospital for his injuries another officer interrogated the plaintiff about the incident. *Id.* The pain-sickened plaintiff admitted to sequences of events that potentially left him culpable for his own injuries and guilty of criminal conduct. *Id.* Notably though, the plaintiff was never charged with a crime and no statements were ever used against him. *Id.* at 765. Although the district court and Ninth Circuit split as to whether the questioning violated any of the plaintiff's rights, the Supreme Court held that it did not. *Id.* at 765-66.

Looking first to determine whether qualified immunity was present, the Court analyzed whether any constitutional right had been violated. It held that infringement only upon the text of the Fifth Amendment would yield liability for section 1983, *id.* at 767 ("The text of the *Self-Incrimination Clause* simply cannot support the Ninth Circuit's view that the mere use of compulsive questioning, without more, violates the Constitution.") (emphasis in original), because the plaintiff had no criminal case in which he became a witness against himself. *See id.* at 772-73.

The Court essentially held that the core right against bearing self-witness was what must be infringed upon before section 1983 liability could arise, and transgressing "[r]ules designed to safeguard a constitutional right" would not suffice. *Id.* at 772. Those rules, the Court stated, "do not extend the scope of the constitutional right itself, just as

violations of judicially crafted prophylactic rules do not violate the constitutional rights of any person." *Id.* This holding by the Supreme Court, not even three years prior to this investigation, emphasizes the principle that section 1983 liability cannot arise from violation of rules designed to safeguard constitutional rights, but must be based on transgressing one of the amendments themselves, many of which protect a fair *trial. See, e.g.*, *Stovall v. Denno*, 388 U.S. 293 (1967) (introduction of suggestive lineup at trial violates Due Process rights of defendant), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314 (1987); *Antonio v. Moore*, 174 Fed. Appx. 131, 135 (4th Cir. 2006) (suggestive lineup claims actionable under § 1983 only when conduct "impair[s] . . . defendant's core right—i.e., the right to a fair trial"); *Pace v. City of Des Moines*, 201 F.3d 1050, 1055 (8th Cir. 2000) (because plaintiff "does not allege that his trial was unfair," his claims regarding unduly suggestive lineups fail; there is no "constitutional right to be free of suggestive lineups"); *Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006) ("The Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality."); *Burrell v. Virginia*, 395 F.3d 508, 513-14 (4th Cir. 2005) (even if officer's questioning would have violated Fifth Amendment standards, no constitutional violation occurred unless incriminating statements used at trial).

The Court did not hold that pre-trial actions giving rise to liability could simply be extinguished by never bringing charges; rather, "the *Fourteenth Amendment's Due Process Clause*, rather than the *Fifth Amendment's Self-Incrimination Clause*, would

govern the inquiry in those cases and provide relief in appropriate circumstances."

*Chavez*, [538 U.S. at 773](#).

> The *Fourteenth Amendment* provides that no person shall be deprived 'of life, liberty, or property, without due process of law.' Convictions based on evidence obtained by methods that are 'so brutal and so offensive to human dignity' that they 'shock the conscience' violate the *Due Process Clause*. Although *Rochin* did not establish a civil remedy for abusive police behavior, we recognized in *County of Sacremento v. Lewis*, [523 U.S. 833, 846](#), 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998), that deprivations of liberty caused by the 'most egregious official conduct may violate the *Due Process Clause*.

[*Id.* at 774 (citations omitted)](#). Looking briefly at *Lewis* though—where an officer's high speed chase in which a passenger on the motorcycle being chased was killed by the officer's car was held to be insufficient for liability under the Fourteenth Amendment— demonstrates just how high the Court has established the threshold of conduct that "shocks the conscience."

> We have accordingly rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that <u>the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process</u>. It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

*Lewis*, [523 U.S. at 848-49](#) (emphasis added).

This high threshold of intentional conduct absent any justifiable reason is why the Court in *Martinez* held that the plaintiff's interrogation did not violate the due process clause of the Fourteenth Amendment: "there [was] no evidence that Chavez acted with a

purpose to harm Martinez by intentionally interfering with his medical treatment"; and "the need to investigate whether there had been a police misconduct constituted justifiable government interest . . . ." *Martinez*, 538 U.S. at 775. Here, Plaintiffs admit that Defendants acted on a justifiable interest: investigating serious allegations of felonious sexual misconduct. (*See* Compl. ¶¶ 150, 153-54, 185-85, 191, 205-06, 210-11.) To the extent that investigation was handled negligently, it "is categorically beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849. Under these circumstances, Plaintiffs' claims cannot, as a matter of law, pass the due process threshold for "shocking the conscience."

However, the Fourteenth Amendment also has a substantive due process component; it protects specific "fundamental liberty interests from deprivation by the government," but only when those "rights and liberties" . . . are 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty . . . .'" *Id.* at 848-49 (citations omitted). These rights and liberties cannot be established by "vague generalities," instead they require "careful description"; and the Court is reluctant to expand upon them 'because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.'" *Id.* (citations omitted).

The *Chavez* court examined the plaintiff's claim of a fundamental liberty interest to be free of unwanted police questioning and rejected it:

> In these circumstances, we can find no basis in our prior jurisprudence, *see, e.g., Miranda*, 384 U.S., at 477-478, 16 L. Ed. 2d 694, 86 S. Ct. 1602 ("It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement"), or in our Nation's

history and traditions to suppose that freedom from unwanted police
questioning is a right so fundamental that it cannot be abridged absent a
'compelling state interest.'

*Martinez*, 538 U.S. at 776.  Thus, even though the plaintiff did not want an investigation

and questioning, he was a critical witness to possible evidence that might have been lost

with his death, and "unwanted police questioning" in those circumstances is not a right or

liberty warranting protection.  *See also Burrill v. Harrington*, No. 82-2428, 1983 U.S.

Dist. LEXIS 11448, *8-9 (D. Mass. Nov. 22, 1983) (district court dismisses section 1983

complaint alleging that officers violated the plaintiff's constitutional rights by accusing

him of murder, investigating him, subjecting him to polygraph tests, and disseminating

comments that the police believed the plaintiff was a suspect).

The rejection of a right to be free of criminal investigation is universal, whether it

is analyzed as a Fourteenth Amendment claim (as suggested by Plaintiffs) or reviewed

under some other Amendment's text.  *See McNabb v. North Carolina*, No. 1:00-CV-203,

2001 U.S. Dist. LEXIS 13181, *40 (W.D.N.C. April 11, 2001) ("There is no

constitutional right to be free from a criminal investigation."), *portion adopted by*, 156 F.

Supp. 2d 546 (W.D.N.C. 2001), *vacated on other grounds*, 33 Fed. Appx. 91 (4th Cir.

N.C. 2002); *see also Hale v. Townley* 45 F.3d 914, 920 (5th Cir. 1995) (citing *U.S. v.

Allibhai,* 939 F.2d 244, 249 (5th Cir. 1991); *Watterson v. Page*, 987 F.2d 1, 8 (1st Cir.

1993) ("The right to family integrity clearly does not include a constitutional right to be

free from child abuse investigations.") (*cited with approval in Hodge v. Jones*, 31 F.3d

157, 164 (4th Cir. 1994)); *United States v. Jacobson*, 916 F.2d 467, 469 (8th Cir. 1990),

*rev'd on other grounds*, 503 U.S. 540 (1992); *United States v. Trayer*, 898 F.2d 805, 808 (D.C. Cir. 1990).

Importantly, there is not even a *constitutional* right to have officials follow state statutes, regulations, policies, procedures, or general orders the agencies may have in place. *See, e.g., McNabb*, 2001 U.S. Dist. LEXIS 13181, *19-21. Like Plaintiffs here, the plaintiff in *McNabb* complained that federal agents investigating him "fail[ed] to follow their agency regulations or procedures in conducting [a] search." *Id.* at *19. The Court, however, rejected that a "compliance" theory was rooted in the constitution:

> [P]laintiffs' position that an individual has a constitutionally protected right to have agency officials adhere to statutory and regulatory procedures during an investigation finds no support as a matter of law. Violation of an agency rule or regulation does not automatically deny citizens a protected liberty or property interest. If the inverse were true, the courts would be inundated with due-process claims.

*Id.* at *20-21.

Plaintiffs here have already demonstrated their inability to carefully describe what fundamental liberty interest was harmed by Defendants. Without more, this Court should not wander aimlessly through the annals of jurisprudence searching for a right so fundamental that Plaintiffs apparently missed it. To be certain, the right to compete in a collegiate athletic tournament, (Compl. ¶ 652), is not one of those rights "deeply rooted in this Nation's history and tradition."

### 2. No Violation of the Fourth Amendment

In *Albright v. Oliver*, 510 U.S. 266, 268 (1994), the Supreme Court held that a plaintiff's constitutional claim regarding a criminal prosecution must be adjudged

pursuant to the Fourth Amendment, which explicitly pertains to "matter[s] of pretrial deprivations of liberty," *id.* at 274-75, and not the substantive due process clause of the Fourteenth Amendment. *Id.* at 273. The Fourth Circuit has followed suit, looking only to the Fourth Amendment for matters of pretrial deprivations of liberty. *See Taylor v. Waters*, 81 F.3d 429, 436 (4th Cir. 1996) (determining that *Albright* "held that no substantive due process right against prosecution on less than probable cause exists under the Fourteenth Amendment."). The only conceivable Fourth Amendment issue raised by Plaintiffs' complaint, (*see* Compl. ¶ 637), is whether Plaintiffs' compliance with the NTO amounted to a seizure and unlawful deprivation of liberty. The answer is no.

Plaintiffs, along with their teammates, complied with a NTO to give cheek swabbings and submit to being photographed for potential identification. (Compl. ¶ 213-14.) Securing this NTO and using it to focus in or eliminate potential suspects is "an important investigative procedure," *see* N.C. Gen. Stat. § 15A-271 *et. seq.* (official commentary to Article 14), however, does not unduly infringe upon the Fourth Amendment.

"Article 14, in which North Carolina General Statutes section 15A-271, *et. seq.* appears, was enacted in order to provide the State with a valuable new investigative tool to compel the presence of unwilling suspects for nontestimonial identification procedures, even though insufficient probable cause existed to permit their arrest." *State v. Coplen*, 138 N.C. App. 48, 53, 530 S.E.2d 313, 318 (2000) (quotations omitted). Consistent with the Article's purpose, Plaintiffs' compliance with the Court's NTO

eliminated them as potential perpetrators: they were not identified as attackers by the alleged victim in a photo array, nor supported as such through DNA evidence. (*See* Compl. ¶¶ 348, 386, and 402.) Pursuant to both state and federal courts, the NTO procedure followed in this case is constitutional.

Foremost, in *State v. Pearson*, 145 N.C. App. 506, 551 S.E.2d 471 (2001), the North Carolina Court of Appeals rejected an argument that an NTO for cheek swabbing and pubic hair needed to be supported by probable cause instead of the statutorily mandated reasonable suspicion found in N.C. Gen. Stat. § 15A-273:

> The taking of saliva and pubic hair is not as intrusive as a blood sample, which must be taken from below the body's surface. Saliva and hair are commonly seen and can be removed by the suspect rather than a technician. They can be quickly and easily removed without pain and, unlike blood removal, there is virtually no risk of medical complications. Moreover, hair and saliva are commonly deposited in public places, as hair sheds and saliva can be left while eating or when someone spits.

*Pearson*, 145 N.C. App. at 518, 551 S.E.2d at 479. Based on that reasoning, the Court held "the taking of hair and saliva samples without a showing of probable cause did not abridge either the North Carolina or United States Constitutions." *Id.* This case was affirmed by the North Carolina Supreme Court in a unanimous decision. *See State v. Pearson*, 356 N.C. 22, 566 S.E.2d 50 (2002). In affirming, the Court conclusively stated, "[c]ollection procedures like those involved in the present case require only reasonable suspicion to be constitutionally permissible." *Id.* at 39, 566 S.E.2d at 60 (citing *Hayes v. Florida*, 470 U.S. 811, 817 (1985)). Thus, as of 2002 and through today, North Carolina

courts have held that reasonable suspicion is a sufficient constitutional safeguard for an NTO.

Federal courts have held precisely the same thing. In *In re Shabazz*, 200 F. Supp. 2d 578 (D.S.C. 2002), the plaintiff-prison guard was under investigation for engaging in sexual relations with inmates. She moved to quash a subpoena from a grand jury issued for a DNA cheek swabbing in order to test that against other DNA collected during the investigation. *Id.* at 581-82. She argued that pursuant to the Fourth Amendment, any DNA could only be collected on the basis of probable cause, a standard which the grand jury could not meet. The Court rejected this argument:

> [T]he privacy concerns that led the Court to require probable cause in those cases are not as pronounced in this case because a saliva swab is not as intrusive as a blood test or a surgical bullet-removal procedure. Although the saliva swab involves a slight invasion of a person's bodily integrity, it is not a 'surgical procedure' and therefore does not fall within *Schmerber's* threshold requirement of probable cause. Thus, no showing of probable cause is needed before the grand jury may issue a subpoena duces tecum requiring Petitioner to submit a saliva sample.

*Id*. at 584.

The Court did, however, determine that the search or seizure instituted by the grand jury must "be based on reasonable individualized suspicion that Petitioner was engaged in criminal wrongdoing." *Id.* at 585. In addition, the Court held that there should be a balancing of interests under the circumstances:

> To determine the reasonableness of procedures to obtain physical evidence, the 'extent to which the procedure may threaten the safety or health of the individual' and the 'extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity' should be 'weighed against . . . the community's interest in fairly and accurately determining

guilt or innocence.' A balancing of these factors in this case reveals that the procedure used to obtain the saliva swab is plainly 'reasonable' under the Fourth Amendment. First, there is no evidence that the saliva swab presents any safety or health risk to the Petitioner. Second, the saliva sample is a relatively minor intrusion into Petitioner's dignitary interest in personal privacy and bodily integrity. The sample is obtained by simply swabbing the inside of her mouth and does not involve any risk of pain or embarrassment. On the public interest side of the equation, the grand jury has a clear interest in obtaining the DNA as highly probative evidence of identifying or eliminating Petitioner as a suspect in the case. The saliva swab is much less intrusive than the blood sample procedure upheld by the Court in *Schmerber*. And it is easily distinguishable from the operation in *Winston*, which was potentially dangerous and was of uncertain evidentiary value. Thus, the means and procedures used to obtain the saliva sample are 'reasonable' under the Fourth Amendment.

*In re Shabazz*, 200 F. Supp. 2d at 585 (citations omitted).

The same reasons the *Shabazz* and *Pearson* courts rejected a Fourth Amendment claim exist here. Due to Mangum's allegation and early investigation that all of the party attendees and alleged attackers were lacrosse players, there was a reasonable suspicion any one present at the party could have committed the crime. Gottlieb, Himan, and the district attorney's office prepared the NTO and Judge Stephens found the information alleged to support a reasonable suspicion of criminal activity. (Compl. ¶¶ 213-14.) Suspects could be eliminated by complying, and indeed all Plaintiffs were eliminated, and the same procedural safeguards in *Shabazz* were statutorily used with Plaintiffs here.

Furthermore, even though Defendants did not need probable cause to investigate Plaintiffs for potential sexual assault, on the face of the complaint, Plaintiffs nonetheless allege that it was present. Plaintiffs allege that "[i]f the Durham Police had been advised truthfully by Levicy that the physical and medical evidence was inconsistent with

Mangum's . . . stories, then the rape investigation . . . would not have been . . . pursued."

(Compl. ¶¶ 211, 398.)  In a remarkably similar scenario, the district court in *Martinez v.*

*Golding*, 499 F. Supp. 2d 561, 568-69 (S.D.N.Y. 2007), found probable cause for an

arrest.

There, the plaintiff argued that the allegedly raped complainant was wholly

uncredible and inconsistent, that officers failed to interview key witnesses and ignored

explanations for bruising, and that scientific evidence was not properly gathered and

preserved.  The Court rejected these claims and found probable cause on the basis of a

SANE examination demonstrating injury consistent with rape, detailed statements by the

victim, and a positive identification.  *See also McZorn v. Endicott Police Dep't*, No. 3:06-

CV-0033, 2008 U.S. Dist. LEXIS 3513, *19-22 (N.D.N.Y. Jan. 16, 2008) (holding that a

victim's identification is sufficient basis for probable cause in an alleged rape case that

was rejected by two grand juries and resulted in a Section 1983 action).  As Plaintiffs

allege, Levicy played an integral role in keeping the investigation aloft and providing

probable cause; her statements "gave the spurious rape allegations a powerful aura of

credibility . . . ."  (Compl. ¶ 210.)  Thus, even though probable cause is not the standard,

Defendants nevertheless met that standard.

### 3. Injury to Reputation Not Cognizable as a Constitutional Claim

Plaintiffs repeatedly allege injury to reputation as a basis for constitutional claims

as well.  It is not recoverable, however, pursuant to any Amendment.  To state a claim for

infringement of privacy rights or deprivation of liberty under the Due Process Clause,

Plaintiffs must show damage to reputation plus the loss of a liberty or property interest.

*See Smith v. Coughlin*, 727 F. Supp. 834, 841 (S.D.N.Y. 1989) ("*Paul* [*v. Davis*, 424 U.S. 693 (1975),] holds that the plaintiff must demonstrate damage to reputation *and* the impairment of a right or status recognized by state law—that is, he must show 'stigma plus'—in order to establish a constitutional deprivation.") (citing *Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir. 1989).  Because Plaintiffs were investigated for an alleged crime, that additional liberty or property interest is missing:

> The interests for which plaintiff claims protection do not rise to that level. There is no constitutional protection against the disclosure of the fact of an ongoing investigation.  As in *Paul*, plaintiff's "claim is based, not upon any challenge to the State's ability to restrict his freedom of action in a sphere contended to be 'private,' but instead on a claim that the State may not publicize a record of an official act such as an arrest," or, in this case, an investigation or accusation.  Thus, defendants' motions to dismiss the complaint are granted with respect to the privacy right claim.

*Smith*, 727 F. Supp. at 843 (complaint that inmate's daughter's allegations that she was sexually assaulted during a visit harmed the inmate's reputation, caused a loss of privileges and job, and resulted in a transfer was dismissed as not protected by constitution) (emphasis added).  This principle is fundamental across the board.

In *Kipps v. Ewell*, 391 F. Supp. 1285 (W.D. Va. 1975), a 15-year-old's body was found decomposing in a field.  The plaintiff's arrest and trial for the murder received a large amount of publicity due to the "noticeable" public demand and pressure for results. *Id.* at 1287, n.1.  Although eventually acquitted, the plaintiff filed a section 1983 action alleging that the "defendants conspired together to target plaintiff as the murderer although they did not have sufficient cause to believe plaintiff culpable, and allegedly had

reason to know that plaintiff could not have committed the murder." *Id.* at 1286. The plaintiff sought to impose liability on defendants for officers' comments to the media, including that an officer "had been working his head off to solve this case," as well as the release of his photo to the papers. *Id.* at 1286-87. This media blitz was alleged to have been part of a "deliberate effort to generate a prejudiced atmosphere within the community in which plaintiff was to be tried." *Id.* at 1286.

Reviewing these claims against the officer, however, the Court relied on precedent from the Second and Ninth Circuits regarding the release of information about a criminal investigation and held that the conduct alleged not only must be beyond the limits of proper police procedure, but that the publicity had actually affected the result *at trial*. *Id.* at 1290. Here, Plaintiffs were never tried or even charged with any crime; thus, any claim regarding or arising from comments by Defendants or their subordinates about the investigation are *constitutionally* lacking. *See Rosenberg v. Martin*, 478 F.2d 520 (2d Cir. 1973) (analyzed publicity by officers as implicating right to fair trial and found no violation where multiple inflammatory comments were made to media implying guilt of accused).

### C.     Qualified Immunity Protects Defendants

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982). "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (citations and quotations omitted). It "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"In evaluating whether a government official is entitled to qualified immunity, a court is required to determine, first, whether the facts alleged show that the official's conduct violated a constitutional right." *Layman*, 294 F. Supp. 2d at 792-93 (citing *Saucier*, 533 U.S. at 201).

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified. . . . It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987) (citations and quotations omitted). Thus, the substantive weakness of Plaintiffs' Complaint, their inability to allege a specific constitutional deprivation of rights, serves as an entitlement to qualified immunity. *See Chavez*, 538 U.S. at 766, 776 (reversing Ninth Circuit on basis of qualified immunity where no constitutional right established).

IV. **NO ACTIONABLE STATE LAW CLAIMS ALLEGED**
(Twenty-Third, Twenty-Eighth, Twenty-Ninth, Thirtieth, Thirty-First Counts)

A. **Plaintiffs Have No Claim for Obstruction of Justice**
(Twenty-Third Count)

Without naming any specific person or entity, Plaintiffs' attempt to pin an obstruction of justice claim against thirty defendants, on conclusory allegations and talismanic elements, must fail as a matter of law. *See Bass v. E.I. DuPont de Nemours & Comp.*, 324 F.3d 761, 765 (4th Cir. 2003) (absent sufficient supporting factual allegations, legal conclusions cannot survive a motion to dismiss). In North Carolina, obstruction of justice is a civil offense "to do any act which prevents, obstructs, impedes or hinders public or legal justice." *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 33, 588 S.E.2d 20, 30 (2003) (The defendants' allegedly false statements did not support an obstruction of justice claim where there was no evidence that the defendants' actions "in some way judicially prevented, obstructed, impeded or hindered" the plaintiff's case.); *see also Burgess v. Busby*, 142 N.C. App. 393, 408, 544 S.E.2d 4, 12 (2001). Plaintiffs' allegations against Baker, Chalmers, Council, Hodge, Lamb, Mihaich, Ripberger, and Russ simply do not constitute obstruction of justice.

Plaintiffs' only allegation against Lamb is that he communicated the decision to Himan and Gottlieb that they should report directly to Nifong. (Compl. ¶¶ 222, 668.) The only allegation against Chalmers is that he attended a meeting with Duke officials and Nifong where a decision was made to expedite identification and arrest, ultimately of other players. (*Id.* ¶¶ 306, 308.) In addition to attending this meeting, Baker is alleged to have criticized a Duke police officer's report as hearsay. (*Id.* ¶ 417.) Similarly, the only

allegation against Hodge is that he remarked that the case was strong.[4]  (*Id.* ¶¶ 693, 717.)

These allegations fall woefully short of stating a claim that Defendants hindered or

impeded Plaintiffs in any way in any legal action.  Plaintiffs do not allege that Defendants

attempted to blackmail them into not filing a case, *c.f. Reed v. Buckeye Fire Equip.*, 241

Fed. Appx. 917, 922, 928 (4th Cir. 2007) (unpublished) (threat of blackmail sufficient

allegation to support obstruction of justice claim); attempted to make them testify falsely,

*c.f. Jackson v. Blue Dolphin Commc'ns of N.C.*, 226 F. Supp. 2d 785, 794-95 (W.D.N.C.

2002) (forcing false testimony sufficient allegation to support obstruction of justice

claim); or attempted to destroy evidence, *c.f. Grant v. High Point Reg. Health Sys.*, ___

N.C. App. ___, ___, 645 S.E.2d 851, 855 (2007) (destruction of evidence sufficient

allegation to support obstruction of justice claim).  Absent allegations of these types,

Defendants' actions in investigating what Plaintiffs allege was a credible claim of rape,

(Compl. ¶¶ 210-11), cannot support a claim for obstruction of justice.

    **B.**     <u>**Insufficient Allegations of Extreme or Outrageous Conduct to Support**</u>
             <u>**Intentional Infliction of Emotional Distress**</u>
             (Twenty-Eighth Count)

Plaintiffs seek to hold Defendants liable for intentional infliction of emotional

distress by lumping them in with Gottlieb, Himan, Addison, and the City of Durham.

Removing the allegations of conduct ascribed to other defendants, however, shows that

---

[4] Obviously, an obstruction of justice claim against Council, Mihaich, Ripberger, and
Russ fails because these Defendants are only named in the caption, *Tolley v. Kivett*, No.
1:01-CV-410, 2002 U.S. Dist. LEXIS 24368, *7-8 (M.D.N.C. July 1, 2002) (defendants
named only in the caption should be dismissed), and their existence as officers in the
DPD, (Compl. ¶¶ 75, 74, 77, 73), can hardly put them on notice of how they allegedly
obstructed justice.

what little Plaintiffs have attributed to Baker, Chalmers, Council, Hodge, Lamb, Mihaich, Ripberger, or Russ does not rise to the level of extreme and outrageous conduct necessary to make out this claim.  *See Waddle v. Sparks*, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992) (one of the essential elements of this claim is "extreme and outrageous conduct by the defendant") (citation omitted).

"The determination of whether the conduct alleged was intentional and was extreme and outrageous enough to support such an action is a question of law for the trial judge."  *Lenins v. K-Mart Corp.*, 98 N.C. App. 590, 599, 391 S.E.2d 843, 848 (1990).  "A claim for intentional infliction of emotional distress exists when a defendant's conduct exceeds all bounds usually tolerated by decent society[.]"  *Watson v. Dixon*, 130 N.C. App. 47, 52, 502 S.E.2d 15, 20 (1998) (citations and quotations omitted).  Conduct is extreme and outrageous when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly 'intolerable in a civilized' community."  *Briggs v. Rosenthal*, 73 N.C. App. 672, 677, 327 S.E.2d 308, 311 (1985) (citation and quotations omitted).

As with other claims, Plaintiffs do not bother to specify what conduct by which of these Defendants supports this claim.  Instead, they make general allegations that the "Durham Investigators," the "Durham Supervisors," and the City engaged in conduct such as pursuing a "criminal investigation against plaintiffs in the face of overwhelming exculpatory evidence," and "knowingly making false public statements."(Compl. ¶724.)

These conclusions, however, are belied by the specific factual allegations of the Complaint.

For example, while Plaintiffs assert in this claim that Mangum's allegations should not have been investigated, they specifically allege detailed facts demonstrating that the investigation was justified, and even necessary, in light of the evidence available to the DPD. Plaintiffs repeatedly allege that Levicy, the SANE nurse at Duke University Hospital, consistently told investigators that Mangum had been raped. (Compl. ¶¶ 150, 153-54, 185-86, 191, 205-06, 210-11.) Among other details, Levicy told officers that the examination of Mangum had "had revealed physical evidence of 'blunt force trauma,'" which "was 'consistent with the victim's statement, alleging a forcible gang rape by three men.'" (*Id.* ¶ 185.) She also told them that "the evidence corroborated Mangum's claim of both vaginal and anal rape." (*Id.* ¶ 186.) She further stated that "Mangum 'had edema and tenderness to palpation both anally and vaginally.'" (*Id.*) Her statements gave a "powerful aura of credibility" to Mangum's allegations of rape. (*Id.* ¶ 210.) While Plaintiffs allege that information provided by Levicy was false, the true facts were in "Duke's exclusive possession." (*Id.* ¶¶ 206, 310, 390.) Levicy is alleged to have provided this information to investigators on March 16 and March 21, (*Id.* ¶ 150, 185), well before the meeting attended by Baker and Chalmers[5] on March 28 or 29, where numerous named and unnamed "officials" are alleged to have authorized the continuation of the investigation. (*Id.* ¶ 306.) Thus, as Plaintiffs have affirmatively alleged that the

_____

[5] None of the other Defendants in the "Durham Supervisors" group are alleged to have participated in this meeting.

DPD was presented with credible allegations of rape, the investigation of those allegations cannot be considered "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly 'intolerable in a civilized' community." *Briggs*, 73 N.C. App. at 677, 327 S.E.2d at 311.

Further, Plaintiffs have alleged no facts at all supporting any conclusion that Defendants made "false public statements condemning plaintiffs for committing rape and hiding behind a conspiracy of silence." (Compl. ¶ 724.) While Plaintiffs have made allegations of this nature against Nifong, (*Id.* ¶ 278), they have not asserted them against any of these Defendants. Even though they allege that Hodge publicly stated that "Durham Police had a strong case against members of the Duke lacrosse team," (*id.* ¶ 717), there is no allegation that his remark "condemned" Plaintiffs, or anyone else of "committing rape," or accused them of "hiding behind a conspiracy of silence."

Even if Plaintiffs had alleged that one of these Defendants had made statements of this nature about them, such allegations would be insufficient to support a claim for intentional infliction of emotional distress. *See Smith-Price v. Charter Behavioral Health Sys.,* 164 N.C. App. 349, 354-55, 595 S.E.2d 778, 782-83 (2004) (false accusations of sexual harassment at work, while sufficient to support a claim for defamation, were not sufficiently extreme or outrageous to support a claim for intentional infliction of emotional distress); *Dobson v. Harris,* 134 N.C. App. 573, 579, 521 S.E.2d 710, 715 (1999) (false accusation of child abuse was not "extreme and outrageous conduct" that

would support a claim for intentional infliction of emotional distress), *rev'd on other grounds,* 352 N.C. 77, 530 S.E.2d 829 (2000); *Ausley v. Bishop*, 133 N.C. App. 210, 221, 515 S.E.2d 72, 80 (1999) (false report to police resulting in embezzlement charges, and negative and accusatory comments to creditors and potential clients, although "deplorable," did not meet standard). Additionally, any state tort claims arising out of alleged false statements, all of which were made in 2006, including any claims for intentional infliction of emotional distress, are barred by North Carolina's one-year statute of limitations for defamation. *See Adams v. McIntyre*, No. 4:97-CV-210, 1997 U.S. Dist. LEXIS 15942, *4 (W.D.N.C. Sept. 4, 1997) (citing *Dickens v. Puryear,* 302 N.C. 437, 276 S.E.2d 325 (1981)).

The remaining allegations in support of this claim are made in a similar, conclusory fashion, and are not attributed to any particular Defendant. The only allegation concerning Lamb is that he instructed Himan and Gottlieb to take direction from Nifong, as well as report to senior staff in the DPD.[6] (Compl. ¶¶ 222, 668.) In addition to his participation in the meeting discussed above, Baker is alleged only to have "criticized" a report by Duke Officer Day, by "saying that Day 'did not speak to our officer' and that he 'appears to have overheard half a conversation,' by eavesdropping on a Durham Police officers' cell phone conversation." (*Id.* ¶ 417.) While Plaintiffs may have found this conduct upsetting, it did not "exceed[] all bounds usually tolerated by decent society[.]" *Watson*, 130 N.C. App. at 52-53, 502 S.E.2d at 19-20. Thus, the

---

[6] As discussed above, Plaintiffs make no specific factual allegations at all concerning Russ, Council, Mihiach or Ripberger.

alleged conduct of these Defendants is insufficient to meet an element of a claim for intentional infliction of emotional distress.

**C.**     **Plaintiffs' Negligence Claims Are Insufficient**
        (Twenty-Ninth, Thirtieth and Thirty-First Counts)

All of Plaintiffs' negligence claims are subject to dismissal based on public officer immunity. "A public officer performing discretionary acts . . . is absolutely immune from mere negligence claims." *Shaw v. Stroud*, 13 F.3d 791, 803 (4th Cir. 1994); *see also W.E.T.*, 2007 U.S. Dist. LEXIS 68376 at *50 ("Under the North Carolina doctrine of public official immunity, a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence in respect thereto.") (citations and quotations omitted). A police officer performing his official duties is engaged in a discretionary, governmental function. *Wright v. Hill*, No. 1:03-CV-109, 2004 U.S. Dist. LEXIS 13667, *17 (M.D.N.C. July 16, 2004).

Moreover, "the North Carolina Supreme Court has never allowed a showing of gross negligence to suffice to pierce an officer's immunity, absent a statute specifically abolishing the common law immunity." *Shaw*, 13 F.3d at 803. "Stated another way, 'public officers are absolutely immune from liability for discretionary acts absent a showing of malice or corruption.'" *Layman v. Alexander,* 294 F. Supp. 2d 784, 795 (W.D.N.C. 2003) (quoting *Jones v. Kearns*, 120 N.C. App. 301, 305, 462 S.E.2d 245, 247 (1995)). Since police officers are public officers, "a police officer in North Carolina enjoys absolute immunity from personal liability for discretionary acts done without

corruption or malice." *Wright*, [2004 U.S. Dist. LEXIS 13667 at *17-18](#). "A plaintiff seeking to hold a public official liable for conduct in the performance of official or governmental duties involving the exercise of discretion, therefore, must allege and prove corruption or malice; allegations of negligence or even 'reckless indifference' are not sufficient." *Layman*, [294 F. Supp. 2d at 795](#).

### 1. Negligent Infliction of Emotional Distress

In the twenty-ninth count, Plaintiffs seek to maintain a claim for negligent infliction of emotional distress against Defendants. In *Shaw*, [13 F.3d at 803](#), the Fourth Circuit affirmed the dismissal of a plaintiff's negligent infliction of emotional distress claim against a police officer based upon that officer's immunity from claims for negligence: "A negligent infliction of emotional distress claim, by its very definition, necessarily alleges only negligence. Therefore, [defendant] is absolutely immune from any negligent infliction of emotional distress claim under North Carolina law." *[Id.](#)* The Court further indicated that because a claim for negligent infliction of emotional distress necessarily involves neither malice nor corruption, the exception to immunity did not apply. *[Id.](#)* Thus, this count is barred by immunity, and should be dismissed.

Additionally, Plaintiffs have failed to allege sufficient facts to state this claim for relief. The essential elements of a claim for negligent infliction of emotional distress have been clearly defined by the North Carolina Supreme Court:

> [T]o state a claim for negligent infliction of emotional distress, a plaintiff must allege that (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress, . . . and (3) the conduct did in fact cause the

plaintiff severe emotional distress. Although an allegation of ordinary negligence will suffice, a plaintiff must also allege that severe emotional distress was the foreseeable and proximate result of such negligence in order to state a claim; mere temporary fright, disappointment or regret will not suffice. In this context, the term "severe emotional distress" means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so.

*Johnson v. Ruark Obstetrics & Gynecology Assoc., P.A.*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990) (citations omitted). Here, Plaintiffs have failed to allege that Defendants engaged in negligent conduct, or that it was foreseeable that the conduct alleged would cause these Plaintiffs severe emotional distress.

In this claim, Plaintiffs generally allege that the "Durham Investigators" and the "Durham Supervisors" engaged in conduct that breached their "identified duties of care," without specifying which conduct or duties to which they refer. Rather than state any specific acts that Plaintiffs contend are negligent, they merely incorporate their prior allegations of intentional conduct. (Compl. ¶¶ 729-30.) As this Court has consistently held, "however, 'when the plaintiff's complaint alleges acts . . . that are intentional in nature, and simply concludes that the acts were committed negligently, it is insufficient to state a claim for negligent infliction of emotional distress.'" *Sabrowski v. Albani-Bayeux, Inc.*, No. 1:02-CV-728, 2003 U.S. Dist. LEXIS 23242, *16-17 (M.D.N.C. Dec. 19, 2003) (quoting *Barbier v. Durham County Bd. of Educ.*, 225 F. Supp. 2d 617, 631 (M.D.N.C. 2002)). Thus, the twenty-ninth count should be dismissed on this basis as well.

Additionally, Plaintiffs' factual allegations negate any conclusion of a breach of any duty in allowing an investigation of Mangum's claims. As discussed above, Plaintiffs specifically allege that the SANE nurse provide police with credible evidence that Mangum had been raped. (Compl. ¶¶ 150, 153-54, 185-86, 191, 205-06, 210-11.) Thus, as Plaintiffs have affirmatively and repeatedly alleged that the DPD was presented with credible allegations of rape, Plaintiffs cannot contend that the investigation of those allegations constitutes negligence.

Plaintiffs have also failed to allege facts showing that any emotional distress was foreseeable. Nine of these Plaintiffs allege only that they are parents of members of the Duke lacrosse team: Gale Catalino, Patricia Dowd, Irene Greer, Steven Henkelman, Mark and Joyce Koesterer, Barbara Loftus, Lynda O'Hara, and Tracy Tkac. (*See* Compl. ¶¶ 12, 18, 21, 22, 24, 28, 31, and 41, respectively.) Even though the Complaint fails to distinguish between the players and their parents in alleging injuries to "Plaintiffs," this is the only claim that the parents, who are not alleged to be the subject of the rape investigation, could have standing to bring against Defendants. Where a claim for emotional distress arises from an injury inflicted on another, in determining whether the distress was foreseeable, the "'factors to be considered' include, but are not limited to: (1) 'the plaintiff's proximity to the negligent act' causing injury to the other person, (2) 'the relationship between the plaintiff and the other person,' and (3) 'whether the plaintiff personally observed the negligent act.'" *Sorrells v. M.Y.B. Hospitality Ventures*, 334 N.C. 669, 672, 435 S.E.2d 320, 322 (1993) (citations omitted). Failing to allege more

than the existence of a parent-child relationship is fatal to the claim, because this relationship alone is insufficient to allege foreseeability. *See id.*; *see also Hickman by & Through Womble v. McKoin*, 337 N.C. 460, 446 S.E.2d 80 (1994); *Gardner v. Gardner*, 334 N.C. 662, 435 S.E.2d 324 (1993).

The player-Plaintiffs also have insufficient facts to support the element of foreseeability. In *Robblee v. Budd Servs.*, 136 N.C. App. 793, 525 S.E.2d 847 (2000), the plaintiff sought damages for the emotional distress she sustained as a result of being a potential target of a workplace shooting incident. The defendant was a security company, which had negligently failed to confiscate the access security card of a violent, terminated employee. Finding the Supreme Court's analysis in *Sorrells* and *Gardner* helpful, the Court concluded that the plaintiff's emotional distress was not foreseeable:

> Similarly, in this case we hold that the emotional distress suffered by Shipley was not a reasonably foreseeable consequence of any negligent conduct on Budd's part. Viewed in the light most favorable to plaintiff Shipley as the non-moving party, the evidence shows that Budd provided the temporary access card to Antilak, and negligently failed to retrieve this card from Antilak after his employment at Sumitomo terminated, allowing Antilak to gain entry to the factory where he killed two people and injured several others. The evidence permits a reasonable inference that plaintiff Shipley was at least one of Antilak's targets. Though she did not witness the shootings, she was in close proximity, and heard the shots. She suffered severe emotional distress as a result of the shootings.
>
> These facts are sufficient to support a finding that Budd engaged in negligent conduct, and that plaintiff Shipley suffered severe emotional distress. However, these facts do not support an inference that Shipley's emotional distress was a reasonably foreseeable result of Budd's negligent acts; Budd's negligence in failing to retrieve the access card and Shipley's emotional distress are simply too attenuated to support a finding of reasonable foreseeability. There is no evidence that Budd was told, or had any specific notice of the relationship between Shipley and Antilak which

would support an inference that Budd could have taken actions to prevent this specific injury to Shipley. The possibility that (1) defendant's negligence in failing to retrieve the temporary access card (2) would combine with Antilak's rage against his former employer (3) to result in a workplace shooting (4) which would cause Shipley to suffer emotional distress, was, like the situation in *Sorrells*, "too remote to permit a finding that it was reasonably foreseeable."  *Sorrells*, 334 N.C. at 674, 435 S.E.2d at 323.  Therefore, an essential element of plaintiff's claim is non-existent and summary judgment in favor of Budd must be affirmed.

*Id.* at 797, 525 S.E.2d at 850 (emphasis added).

Here, the Plaintiffs' theory against Defendants is flawed for the same reasons that the plaintiff's claim against the security company failed in *Robblee*.  Assuming that, solely for the sake of argument, Plaintiffs have adequately alleged that these Defendants were negligent in some fashion, they have failed to allege that any emotional distress that they suffered was foreseeable.  As in *Robblee,* Plaintiffs have alleged that they were the potential target of the wrongful conduct of a third party; there, a violent shooter; here, a self-promoting prosecutor.  However, as in *Robblee,* Plaintiffs were not "shot"; rather other players were indicted for the alleged crime.  Similarly, the possibility that (1) Defendants' alleged acquiescence in allowing Nifong, Gottlieb, and Himan to investigate Mangum's allegations, (2) would combine with Nifong's unethically zealous desire to win an election (3) to result in the indictments of other players (4) which would cause Plaintiffs to suffer emotional distress, was, like the situation in *Robblee*, "too remote to permit a finding that it was reasonably foreseeable."  *Sorrells,* 334 N.C. at 674, 435 S.E.2d at 323.  Because any severe emotional distress allegedly suffered by these unindicted Plaintiffs was not foreseeable, this count must be dismissed.

### 2. Negligence

Plaintiffs' thirtieth count is nothing more than a common law claim for simple negligence against public officers. Thus, under the cases cited above, it must be dismissed. *See* section IV(C), *supra*; *see also Layman*, 294 F. Supp. 2d at 795.

### 3. Negligent Hiring, Training, Supervision, Retention and Discipline

In the thirty-first count, Plaintiffs accuse Baker, Chalmers, Council, Hodge, Lamb, Mihaich, Ripberger, and Russ of *negligently* hiring, training, supervising, disciplining, and retaining Addison, Gottlieb and Himan. (Compl. ¶¶ 724-746.) There are no allegations in this count that this conduct was either malicious or corrupt, and thus, this count should be dismissed on the basis of immunity.

Even if Defendants were not immune from liability for claims of negligent hiring, supervision, and retention, this claim should be dismissed, because Defendants are not Gottlieb's, Himan's, or Addison's "employer." North Carolina recognizes the existence of a cause of action for negligent supervision and retention against an employer. *See Braswell v. Braswell*, 330 N.C. 363, 373, 410 S.E.2d 897, 903 (1991). "To support a claim of negligent retention and supervision against an *employer*, the plaintiff must prove that the incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the employer knew or had reason to know of the employee's incompetency." *Smith v. Privette*, 128 N.C. App. 490, 494-95, 495 S.E.2d 395, 398 (1998) (citation and quotations omitted) (emphasis added). Similarly, to support a claim for negligent hiring, the plaintiff must show that the employee "was incompetent at the

time of the hiring, as manifested either by inherent unfitness or previous specific acts of negligence," and that "the employer had notice, either actual or constructive, of this incompetence." *Kinsey v. Spann*, 139 N.C. App. 370, 377, 533 S.E.2d 487, 493 (2000).

Applying this State's law, the Western District of North Carolina has held that any "claim for negligent hiring, retention, and supervision would be actionable only against *employers*," not supervisory employees. *Cox v. Indian Head Indus.* 123 F. Supp. 2d 892, 914 (W.D.N.C. 2000), *also available at*, No. 2:98-CV-175, 2000 U.S. Dist. LEXIS 20118, *27 (W.D.N.C. May 16, 2000) (rejecting a cause of action for negligent supervision as applied to an individual and not an employer). "Absent specific guidance from North Carolina decisions," Magistrate Judge Cogburn, in a recommended decision adopted by the District Court, looked to North Carolina's judicial rejection of a wrongful discharge claim against a supervisor as a basis for predicting North Carolina's response to a negligent retention claim. *Id.* at 915, 2000 U.S. Dist. LEXIS at *27 ("No North Carolina case has been cited for the proposition that a supervisory employee is subject to liability under such a claim.").

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' Motion to Dismiss. Respectfully submitted, this the 30th day of May, 2008.

TROUTMAN SANDERS LLP

By: /s/ Patricia P. Kerner
    Patricia P. Kerner
N.C. State Bar No. 13005
    Hannah G. Styron

N.C. State Bar No. 28824
   D. Martin Warf
N.C. State Bar No. 32982
*Attorneys for Defendants Baker, Chalmers,*
*Council, Hodge, Mihiach, Lamb, Ripberger,*
*and Russ*
434 Fayetteville Street, Suite 1900
Raleigh, North Carolina 27601
Telephone: (919) 835-4100
Facsimile: (919) 829-8714
tricia.kerner@troutmansanders.com
hannah.styron@troutmansanders.com
martin.warf@troutmansanders.com

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DAVID F. EVANS, *et al,*      )
                           )
        Plaintiffs,       )
                           )
v.                        )     Case No. 1:07-CV-00739
                           )
THE CITY OF DURHAM, *et al,*   )
                           )
        Defendants.     )
_____

**CERTIFICATE OF SERVICE**
_____

I hereby certify that the foregoing was electronically filed with the Clerk of the

Court using the CM/ECF system, which will send notification of such filing to the

following:

Charles J. Cooper                William John Thomas, II
David H. Thompson              THOMAS FERGUSON & MULLINS,
COOPER & KIRK, PLLC          LLP
1523 New Hampshire Ave., NW    119 E. Main Street
Washington, DC 20036           Durham, NC 27701
cooper@cooperkirk.com         thomas@tfmattorneys.com
dthompson@cooperkirk.com     *Attorneys for Plaintiffs*
*Attorneys for Plaintiffs*

James D. Cowan, Jr.
Dixie T. Wells
Leslie Cooper Harrell
SMITH MOORE, LLP
Post Office Box 21927
Greensboro, NC 27420
don.cowan@smithmoorelaw.com
dixie.wells@smithmoorelaw.com
cooper.harrell@smithmoorelaw.com
*Attorneys for Defendants Duke
University, Duke University Health System,
Inc., Richard Brodhead,
Peter Lange, Larry Moneta,
John Burness, Tallman Trask,
Suzanne Wasiolek, Matthew
Drummond, Aaron Graves,
Robert Dean, Tara Levicy, Theresa
Arico, Kate Hendricks, Victor Dzau*

James S. Gorelick
Jennifer M. O'Connor
Paul R.Q. Wolfson
William F. Lee
WILMER, CUTLER, PICKERING,
HALE, and DORR, LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
jamie.gorelick@wilmerhale.com
jennifer.oconnor@wilmerhale.com
paul.wolfson@wilmerhale.com
william.lee@wilmerhale.com
*Attorneys for Defendants Duke
University, Duke University Health
System, Inc., Richard Brodhead,
Peter Lange, Larry Moneta,
John Burness, Tallman Trask,
Suzanne Wasiolek, Matthew
Drummond, Aaron Graves,
Robert Dean, Tara Levicy, Theresa
Arico, Kate Hendricks, Victor Dzau*

Dan J. McLamb
Shirley M. Pruitt
T. Carlton Younger, III
YATES, MCLAMB & WEYHER, LLP
P.O. Box 2889
Raleigh, NC 27602-2889
dmclamb@ymwlaw.com
spruitt@ymwlaw.com
cyounger@ymwlaw.com
*Attorneys for Defendants Duke
University Health Systems, Inc.,
Tara Levicy, and Theresa Arico*

Kenneth Kyre, Jr.
PINTO COATES KYRE & BROWN,
PLLC
P.O. Box 4848
Greensboro, NC 27404
kkyre@pckb-law.com
*Attorneys for Defendant J. Wesley
Covington*

Reginald B. Gillespie, Jr.
FAISON & GILLESPIE
Post Office Box 51729
Durham, NC 27717
rgillespie@faison-gillespie.com
*Attorneys for Defendant City of Durham*

Joel M. Craig
Henry W. Sappenfield
KENNON, CRAVER, BELO, CRAIG &
MCKEE, PLLC
Post Office Box 51579
P.O. Box 51579
Durham, NC 27717-1579
*Attorneys for Defendant Himan*

Edwin M. Speas
Eric P. Stevens
POYNER & SPRUILL, LLP
3600 Glenwood Avenue
Raleigh, NC 27612
*Attorneys for Defendant Gottlieb*

James B. Maxwell
MAXWELL, FREEMAN & BOWMAN,
P.A.
Post Office Box 52396
Durham, NC 27717
*Attorneys for Defendant Addison*

I further certify that a copy of the foregoing was served today upon each of the

following non CM/ECF participants by United States mail, postage prepaid, addressed as

follows:

Linwood Wilson
6910 Innesbrook Way
Bahama, NC 27503-9700
*Pro Se*

Roger E. Warrin
Michael A. Vatis
John P. Nolan
Ana H. Voss
STEPTOE & JOHNSON, LLP
1330 Connecticut Ave. N.W.
Washington, DC 20036
*Attorneys for Defendant City of Durham*

This the <u>30th</u> day of May, 2008.

Respectfully submitted,

By: /s/ Patricia P. Kerner
    Patricia P. Kerner
N.C. State Bar No. 13005
*Attorneys for Defendants Baker, Chalmers,*
*Council, Hodge, Lamb, Mihiach, Ripberger,*
*and Russ*
434 Fayetteville Street, Suite 1900

Raleigh, North Carolina 27601
Telephone: (919) 835-4100
Facsimile: (919) 829-8714
tricia.kerner@troutmansanders.com