## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### No 1:08-cv-119

| | |
|---|---|
| EDWARD CARRINGTON, et al. | |
| Plaintiffs, | Brief in Support of "Duke University Defendants'" Motion to Dismiss Complaint |
| v. | |
| DUKE UNIVERSITY, et al., | |
| Defendants. | |

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and Local Rules 7.2 and 7.3, the "Duke University Defendants"—defined by the Court and the parties for purposes of this motion to comprise Duke University, Richard Brodhead, John Burness, Robert Dean, Matthew Drummond, Victor Dzau, Aaron Graves, Kate Hendricks, Peter Lange, Larry Moneta, Tallman Trask, and Suzanne Wasiolek—move to dismiss all claims asserted against them for failure to state a claim on which relief may be granted.[1]

---

[1] (*See* Joint Mot. to Extend Page Limitations and to Establish a Rule 12 Briefing Schedule, Dkt. 50, at 1 (defining "Duke University Defendants"); Order, Dkt. 51 (granting Joint Mot.).)  A separate motion is being filed on behalf of the "Duke SANE Defendants," as defined in the Joint Motion, to dismiss all claims in the Complaint against those Defendants.  The Complaint raises several causes of action against both the Duke University Defendants and the Duke SANE Defendants.  To avoid repetition, this brief addresses those Counts that appear to be directed principally at the Duke University Defendants rather than the Duke SANE Defendants—namely, Counts 6-20.  Where necessary, in addressing those Counts, this brief discusses issues of liability that are related to certain Duke SANE Defendants.  The Duke SANE Defendants address, in their brief, Counts 1-5 and 21-23.  The remaining Counts in the Complaint, Counts 24-31, are brought only against non-Duke defendants.  *See* Exhibit (Ex.) 1.  To the extent the Counts

# I.     NATURE OF PROCEEDINGS

This case was brought by 38 members of the Duke men's lacrosse team (along with some of their parents) who feel aggrieved because they were investigated by the Durham police after a stripper hired by one of them to perform at a party made a false allegation of rape.  The Plaintiffs in this case were never charged or tried for any offense resulting from that allegation.  Nonetheless, they contend that the mere fact that they were *investigated* was unlawful.  Moreover, they contend that Duke and its employees violated their legal rights by providing the police with information about the alleged rape during the investigation.  They also contend that the University had a legal obligation to quell public debate about the alleged rape.  In essence, Plaintiffs argue that the University had a legal duty to stand between themselves and the prosecutor, and to try to prevent the police and prosecutor from investigating them for a very serious crime.

No legal system in this country supports such a claim—whether it be labeled as § 1983, negligence, abuse of process, or contract.  Our system of justice encourages individuals to cooperate with the police, not to hinder them, and to provide information to prosecutors, not to stonewall them.  Nor did Duke have a legal obligation to publicly proclaim Plaintiffs' innocence.  Duke was not in a position to make judgments about the students' guilt or innocence, especially as both the police and prosecutor were publicly stating with great confidence that a rape had taken place.  Duke waited for the

---

addressed in the Duke SANE Defendants' brief are raised against any of the Duke University Defendants, the arguments of the Duke SANE Defendants are incorporated here by reference.

investigation by the police and the prosecutor to run its course, and that is exactly what the criminal justice system expected it to do. Plaintiffs' theory of the case would not only undermine these expectations, but it would fundamentally transform the legal relationship between a university and its students, including student-athletes.

What happened to the three indicted members of the Duke men's lacrosse team in 2006—an unfounded indictment obtained by a prosecutor who apparently was well aware that the accusation could not be supported in a court of law—was indeed shocking. That outrage, however, was not the fault of Duke University or any of its employees. Duke did not investigate the crime; Duke was not privy to the DNA test results; Duke did not seek the indictment. Moreover, *these* Plaintiffs were not arrested or indicted on any charge arising out of the incident. Accordingly, this lawsuit lacks any grounding in fact or law, and the Complaint should be dismissed.

## II.    STATEMENT OF FACTS[2]

On March 13, 2006, three members of the Duke men's lacrosse team living at 610 N. Buchanan Boulevard in Durham hosted a party for their teammates. (Compl. ¶ 90.) The students hired two strippers, Crystal Mangum and Kim Roberts, a.k.a. Kim Pittman, to entertain them at their party. (*Id.* ¶¶ 91-92.) When she arrived at the party, Mangum appeared to be impaired, and as a result, the "exotic … dance performance came to a

---

[2] Solely for the purpose of this Motion, and as required under Federal Rule of Civil Procedure 12(b)(6), the Duke University Defendants assume the truth of the facts asserted by Plaintiffs in their Complaint.

premature end." (*Id.* ¶¶ 91, 94-95.) As the two strippers left the party, Roberts called 911 and reported that she and Mangum had been subjected to "unprovoked racial taunts and harassment." (*Id.* ¶ 96.)

Roberts then drove to a 24-hour grocery store, where she asked a security guard to call 911 because Mangum would not leave her car. (*Id.* ¶ 97.) Durham Police Sergeant Shelton and Officer Barfield responded to Roberts' call (*id.* ¶ 98), and the two officers transported Mangum to Durham Center Access, a mental health and substance abuse center (*id.* ¶¶ 99, 100). While at Durham Center Access, Mangum reported that she had been raped. (*Id.* ¶ 102.) She was taken to Duke Hospital for a sexual assault examination. (*Id.* ¶¶ 103-104.)

Speaking to Durham Police at the hospital, Mangum recanted her rape allegation, but then reasserted it. (*Id.* ¶¶ 105, 106, 110.) She also unequivocally told emergency room medical personnel that she had been raped and complained to nurses that "her pain level was 10 on a scale of 10," including "great pain 'down there.'" (*Id.* ¶ 106.) Dr. Julie Manly, a fourth-year medical resident who had performed many rape examinations in the past, conducted a forensic sexual assault examination on Mangum. (*Id.* ¶¶ 106, 113, 122-128.) Tara Levicy, a newly certified Sexual Assault Nurse Examiner (SANE), assisted Dr. Manly. (*Id.* ¶¶ 114-115, 122-128.) As part of the forensic examination, Dr. Manly conducted a pelvic examination which revealed "diffuse edema"—swelling—of "the vaginal walls." (*Id.* ¶ 126.) Dr. Manly also collected oral, vaginal, and rectal swabs, scrapings of Mangum's clothing, and samples of Mangum's hair, blood, and skin cells as

part of the exam.  (*Id.* ¶ 122.)  Mangum "screamed hysterically" and complained of "severe pain" during this examination.  (*Id*. ¶ 128.)

The Durham Police investigated the alleged rape.  (*Id.* ¶¶ 131, 133, 148, 218.)  On March 16, Durham Police Sergeant Mark Gottlieb and Investigator Benjamin Himan interviewed Mangum.  (*Id.* ¶¶ 150, 155.)  Durham Police also presented Mangum with photographic arrays of possible suspects, but Mangum failed to identify any of the supposed attackers.  (*Id.* ¶¶ 156-159.)  Based on Mangum's statement to the police, however, Durham Police secured a warrant to search 610 N. Buchanan.  (*Id.* ¶ 162.)  Several of Mangum's false fingernails and other personal belongings were found during the search.  (*Id.* ¶ 207.)  Durham Police also questioned the three residents of 610 N. Buchanan, who provided Gottlieb with a list of persons who had attended the party.  (*Id.* ¶¶ 163-165.)

In the course of the Durham Police investigation, Himan and Gottlieb spoke with nurse Tara Levicy.  There are no allegations that Dr. Manly was ever questioned by, or spoke with, any police officer or representative of the District Attorney.  Durham Police obtained a copy of Mangum's sexual assault examination report, pursuant to a lawful subpoena, on March 21, 2006.  (*Id.* ¶¶ 150-152, 184-185, 340.)  Two days later, on March 23, 2006, Judge Ronald Stephens of the Durham County Superior Court issued a Non-Testimonial Order (NTO) for the collection of DNA and photographs from all 46 white members of the lacrosse team.  (*Id.*  ¶¶ 204, 213-214.)  The authorization for the NTO was based on information from Mangum's statement to Durham Police (*id.* ¶¶ 155-

156, 208), items of Mangum's found during the search of 610 N. Buchanan (*id.* ¶ 207), information from Mangum's medical examination and record (*id.* ¶¶ 189, 205), and information obtained by the Durham Police during their interview of the residents of 610 N. Buchanan after the house was searched (*id.* ¶¶ 162-165).

Shortly after Judge Stephens issued the NTO, Durham County District Attorney Mike Nifong took "direct control" of the investigation and began making unequivocal public statements that a rape had occurred. (*Id.* ¶¶ 218-223, 274, 276, 280.) However, on March 27, after being briefed by Gottlieb and Himan on the status of the investigation (*id.* ¶¶ 267-270), Nifong told them, "You know, we're f*cked!" (*id.* ¶ 270 (asterisk in original)). Nifong nonetheless decided to continue with the prosecution. (*Id.* ¶¶ 5, 219, 221, 270, 273, 313.)

By March 30, the State Bureau of Investigation provided Nifong with its final report on the evidence collected by Levicy and Manly for the rape kit and the evidence collected pursuant to the NTO. (*Id.* ¶ 311.) This report concluded that no DNA from any lacrosse player had been found in Mangum's rape kit or on her clothing. (*Id.* ¶¶ 311-312.) Nevertheless, Nifong continued to make public statements that a rape had occurred, and Nifong instructed Gottlieb to conduct another photo identification with Mangum using a procedure that allegedly violated Durham Police protocol. (*Id.* ¶¶ 313, 331, 343, 346, 388.) At this April 4 photo line-up, Mangum identified three lacrosse players as her attackers. (*Id.* ¶ 348.) Nifong also requested that a private laboratory conduct a further examination of the DNA samples. (*Id.* ¶¶ 379-384.) The private

laboratory's results were favorable to the players.  (*Id.* ¶ 383.)  Nifong, Gottlieb, Himan, and officials from the private laboratory decided to conceal the exculpatory aspects of the test results.  (*Id.* ¶¶ 384, 402-404.)

Meanwhile, Duke administrators began to respond to the rape allegations.  On March 25, the University cancelled two lacrosse games as punishment for the underage drinking at the party.  (*Id.* ¶ 236.)  That same day, Duke University President Richard Brodhead issued his first public statement about the allegations, noting the presumption of innocence owed to the lacrosse players and urging everyone involved to cooperate with the ongoing police investigation.  (*Id.* ¶¶ 246-248.)  On April 5, Brodhead announced that the University had cancelled the remainder of the lacrosse season and that the men's lacrosse coach Mike Pressler had resigned.  (*Id.* ¶ 357.)  On May 1, the University released the report of the "Coleman Committee," sponsored by the University, that painted a "largely positive" picture of the lacrosse team "in direct contradiction to the media's portrayal of the players as hooligans."  (*Id.* ¶¶ 360, 410, 412-413.)

On May 31, 2006, Nifong issued subpoenas to Duke University to produce "key card records," which include electronic records of access to student dormitories, for the lacrosse team.  (*Id.* ¶¶ 434-435.)  Duke notified the players of the subpoenas, and some of the players successfully moved to quash them.  (*Id.* ¶ 439.)  Unbeknownst to the players, however, Nifong had received these reports two months earlier, after Duke Police officers had provided them to the Durham Police.  (*Id.* ¶¶ 324-325.)

On April 17, Nifong presented to the grand jury indictments against two lacrosse players, Collin Finnerty and Reade Seligmann, for the rape of Mangum at 610 N. Buchanan. (*Id.* ¶¶ 397, 399.) Nifong presented a third indictment against David Evans on May 15. (*Id.* ¶ 399.) None of the indicted players were ever tried, and no other members of the lacrosse team were ever indicted or arrested for the alleged rape.

On January 12, 2007, Nifong recused himself, and the Attorney General's office took over the case. (*Id.* ¶ 464.) The Attorney General's office then dropped all charges against Finnerty, Seligmann, and Evans, declaring them innocent of the charges. (*Id.* ¶ 468.) Nifong was disbarred on June 16, 2007, and he was subsequently found guilty of criminal contempt and jailed for his misconduct. (*Id.* ¶¶ 6, 161, 471.)

## III. QUESTIONS PRESENTED

**A.** Whether Plaintiffs have failed to state a basis for their contract and other claims based on Duke University policies (Counts 14-17);

**B.** Whether Plaintiffs have failed to state a basis for their negligence claims (Counts 11-13, 19);

**C.** Whether Plaintiffs have failed to state a basis for their emotional distress claims (Counts 6-7);

**D.** Whether Plaintiffs have failed to state a basis for their claims related to the disclosure of key card information (Counts 8-10, 20); and

**E.** Whether Plaintiffs have failed to state a basis for their intrusion upon seclusion claim (Count 18).

## IV.  STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim, the Court should accept well-pleaded factual allegations in the complaint as true, but should give no weight to legal conclusions cast in the form of factual allegations.  *See, e.g., Young v. City of Mount Rainier*, 238 F.3d 567, 577 (4th Cir. 2001).  Nor should the Court give any weight to conclusory allegations ungrounded in any assertion of fact.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986).  In particular, an unsupported allegation of conspiracy—on which several of Plaintiffs' claims depend—is insufficient to survive a motion to dismiss.  *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1966 (2007).  Plaintiffs alleging conspiracy must point to specific facts to show that an agreement was made; neither "a bare assertion of conspiracy" nor "a conclusory allegation of agreement" suffices.  *Id.*  Instead, plaintiffs must allege sufficiently specific facts to "raise a right to relief above the speculative level," *id.* at 1965, such that the "claim … is plausible on its face," *id.* at 1974.

## V.  ARGUMENT

### A.  Plaintiffs Fail To State A Claim On Any Of Their Contract Or Other Claims Based On Duke University Policies (Counts 14-17)

In Counts 14-17, Plaintiffs allege that Duke breached the terms of an anti-harassment policy in its student bulletin (as well as other alleged promises to the lacrosse

team by Duke).  These claims should be dismissed because Plaintiffs have failed to identify any contractual obligation as the basis of their causes of action.[3]

### 1.    Counts 15 And 16: Breach Of Contract And Tortious Breach

Plaintiffs' principal contract claim is that Duke failed to live up to the terms of its student bulletin by allowing its employees and students to harass Plaintiffs.  (*See* Compl. ¶¶ 584-590.)  Plaintiffs fail, however, to allege the essential elements of any valid contract—the mutual manifestation of an intent to be bound.  *See Parker v. Glosson*, 182 N.C. App. 229, 232, 641 S.E.2d 735, 737 (2007).

Plaintiffs do not identify any express contract between themselves and Duke. They assert, in the alternative, an implied contract binding Duke to the terms in the student bulletin, formed when Plaintiffs "enrolled in Duke University" and "paid fees and tuition."  (Compl. ¶ 587.)  The North Carolina courts have consistently held, however, that bulletins of this nature—including Duke's own student bulletin—are not binding contracts.  Indeed, this Court has twice specifically ruled that Duke University's student bulletin is not an enforceable contract.  *See Love v. Duke Univ.*, 776 F. Supp. 1070, 1075 (M.D.N.C. 1991), *aff'd*, 959 F.2d 431 (4th Cir. 1992) (table), 1992 WL 60230; *Mercer v. Duke Univ.*, No. 97-00959, slip. op., at 13 (M.D.N.C. Sept. 28, 2000) (attached as Ex. 2).

---

[3] Where, as here, Plaintiffs have failed to identify a relevant contractual obligation in their complaint, the Court may dismiss the case for failure to state a claim as a matter of law.  *See, e.g.*, *Brewer v. Jefferson-Pilot Standard Life Ins. Co.*, 333 F. Supp. 2d 433, 439 (M.D.N.C. 2004); *Norman v. Tradewinds Airlines, Inc.*, 286 F. Supp. 2d 575, 585-586 (M.D.N.C. 2003); *Johnson v. Mayo Yarns, Inc.*, 126 N.C. App. 292, 297, 484 S.E.2d 840, 843 (1997).

In *Love*, this Court granted Duke University's motion for summary judgment on a plaintiff's claim that Duke's student bulletin entitled him to contractual rights, holding that Duke's "bulletin is not a binding contract." 776 F. Supp. at 1075. The Fourth Circuit affirmed that decision "for the reasons stated by [this] court in its memorandum opinion." 1992 WL 60230, at *1.[4]

Once again, in *Mercer*, this Court ruled that the nondiscrimination policy in Duke's bulletin was not part of a contract between a former student and Duke University. *Mercer*, No. 97-00959, at 13. This Court analogized the student bulletin to an company's employee handbook, and stressed that "[t]he uniform answer" in North Carolina courts is that employee handbooks are not part of a contract between employer and employee unless they are expressly incorporated into such a contract. *See id.* at 15; *see also Johnson v. Mayo Yarns, Inc.*, 126 N.C. App. 292, 297, 484 S.E.2d 840, 843 (1997) (employee handbook not part of contract); *Black v. W. Carolina Univ.*, 109 N.C. App. 209, 213, 426 S.E.2d 733, 736 (1993) (same); *Brewer v. Jefferson-Pilot Standard Life Ins. Co.*, 333 F. Supp. 2d 433, 439 (M.D.N.C. 2004) (same); *Norman v. Tradewinds*

---

[4] The Fourth Circuit has independently ruled that student bulletins are not contracts. In *Tibbetts v. Yale Corp.*, 47 Fed. Appx. 648, 656 (4th Cir. 2002), the Fourth Circuit applied Virginia law and denied a plaintiff's motion to amend his complaint to add a breach of contract claim against Yale University. The plaintiff argued that a chapter in Yale's student bulletin constituted a contract between him and the university. The Fourth Circuit concluded that his claim was "without merit," stating "Chapter 11 of the Student Handbook is not a contract but merely a university policy." *Id.*

*Airlines, Inc.*, 286 F. Supp. 2d 575, 586-587 (M.D.N.C. 2003) (same); *Harter v. Vernon*, 953 F. Supp. 685, 694 (M.D.N.C. 1996) (same).[5]

The reason that the courts have declined to recognize an employee handbook as part of a contract between an employer and an employee—avoiding excessive interference in an employer's internal affairs—apply with even greater force to the university setting, where anti-harassment policies must be balanced against principles of academic freedom, including the right of professors and students to speak out on issues of public concern, and the right of the university to insist that its students and employees observe standards of behavior. Thus, as the Minnesota Court of Appeals explained in rejecting a claim that a student's disciplinary proceeding violated the terms of a student handbook, "rigid importation of contractual doctrine" to the "student-university relationship … has been rejected," because to convert a university bulletin's provisions into contractual clauses "should be regarded as interfering beyond an acceptable degree in the university's discretion to manage its affairs." *Rollins v. Cardinal Strich Univ.*, 626

---

[5] The conclusion that the student bulletin is not part of a contract between Plaintiffs and Duke University is bolstered by the fact that the bulletin expressly reserves Duke's right to change it at any time. *See* Ex. 3, at 2 (relevant pages of bulletin); *see also Abbario v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108, 114 (Minn. 1977) (right-to-change provision undermines student's contract claim based on student bulletin); *Robinson v. Univ. of Miami*, 100 So. 2d 442, 444 (Fla. Dist. Ct. App. 1958) (same); *cf. Love*, 776 F. Supp. at 1072 (rejecting contract claim against Duke even though student bulletin was changed during student's enrollment). Because Plaintiffs have referred to (and quoted from) the bulletin in their Complaint (Compl. ¶¶ 583-584), the Court may consider the bulletin when evaluating Defendants' motion to dismiss. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *Waters v. Bass*, 304 F. Supp. 2d 802, 807 n.8 (E.D. Va. 2004).

N.W.2d 464, 470-471 (Minn. Ct. App. 2001) (internal quotation marks and brackets omitted).[6]

Plaintiffs also claim that they had a binding contract with Duke for the "opportunity to play lacrosse, to compete for the ACC and national championships, and to play lacrosse for Coach Pressler." (Compl. ¶ 591.) Plaintiffs claim that this contract was breached when the lacrosse season was cancelled and Coach Pressler resigned. (*Id*.) This claim fails because Plaintiffs do not allege the elements of an enforceable contract.

Plaintiffs allege that they had an "understanding" that they would have the opportunity to play lacrosse, and to do so for Coach Pressler, and that they were "recruited to enroll at Duke University on that basis." (*Id.*) But Plaintiffs do not allege that Duke actually made any such representations to them; nor do they point to any indication that Duke intended to be bound by any such representations. "No contract is formed without an agreement to which at least two parties manifest an intent to be bound." *Parker*, 182 N.C. App. at 232, 641 S.E.2d at 737. That Plaintiffs might have had an "understanding" that they would play lacrosse is not sufficient; "[w]here one party simply believes that a contract exists, but there is no meeting of the minds, the individual

---

[6] In addition, Plaintiffs allege that Duke breached a provision in the student bulletin guaranteeing them certain procedural rights in student disciplinary proceedings, including the presumption of innocence and the right to an impartial hearing. (*See* Compl. ¶ 593.) But Plaintiffs nowhere allege in the Complaint that any of them was ever subjected to student disciplinary proceedings, arising out of the lacrosse incident or otherwise, or that they ever sought the protections of these procedural safeguards. In any event, this claim—like the claim that Duke breached a contract by failing to adhere to the provisions in the university's anti-harassment policy—fails as a matter of law for the reasons stated in the text: the bulletin is not part of a contract between Plaintiffs and Duke.

seeking to enforce the obligation upon a contract theory is without a remedy." *Elliot v. Duke Univ., Inc.*, 66 N.C. App. 590, 595, 311 S.E. 2d 632, 636 (1984). Moreover, no North Carolina court has ever recognized a breach of contract claim based on a university's cancellation of an extracurricular activity, and courts in other jurisdictions have rejected similar claims. *See, e.g.*, *Hysaw v. Washburn Univ. of Topeka*, 690 F. Supp. 940, 946-947 (D. Kan. 1987) (written scholarship contract did not include an implied provision that plaintiffs would be allowed to play football); *Jackson v. Drake Univ.*, 778 F. Supp. 1490, 1493 (S.D. Iowa 1991) (written financial aid agreement between student-athlete and college did not include implied provision of a right to play); *see also Hendricks v. Clemson Univ.*, 578 S.E.2d 711, 717 (S.C. 2003) (granting summary judgment to university on student's claim that it breached a contract by failing to ensure the student's athletic eligibility).

Given Plaintiffs' failure to identify a contract between themselves and Duke as the basis for their claims, Count 15 (breach of contract) and Count 16 (tortious breach of contract) should be dismissed.[7]

---

[7] Should the court conclude that Plaintiffs have stated a claim for breach of contract, it should nonetheless dismiss Count 16 for tortious breach. To state a claim for tortious breach of contract, a plaintiff must not only plead a breach of contract, but "must also allege a tort which partakes some element of aggravation, along with the breach." *Cash v. State Farm Mut. Auto. Ins. Co*., 137 N.C. App. 192, 200, 528 S.E.2d 372, 377 (2000). "Aggravation includes fraud, malice, such a degree of negligence as indicates a reckless indifference to consequences, oppression, insult, rudeness, caprice, [and] willfulness." *Id*. at 201, 528 S.E.2d at 377 (citation omitted). Plaintiffs' allegation that Duke failed to protect them from harassment does not suggest the type of "malice," "oppression" or "willfulness" that is necessary for a tortious breach of contract claim to survive a motion to dismiss; and as set forth elsewhere in this motion, Plaintiffs have failed to state any tort

### 2. Count 17: Promissory Estoppel

Count 17 alleges that, even if Duke's anti-harassment policy and other supposed representations were not part of a binding contract between Plaintiffs and Duke, Plaintiffs nonetheless acted in reliance to their detriment on that policy and representations, and so Duke should be liable as if it had entered into a contract under a theory of promissory estoppel. This claim faces an insuperable obstacle: North Carolina does not recognize affirmative claims for promissory estoppel. *See Home Elec. Co. of Lenoir, Inc. v. Hall & Underdown Heating & Air Conditioning Co.*, 86 N.C. App. 540, 543, 358 S.E.2d 539, 541 (1987). "Affirmative use [of promissory estoppel] occurs when a promisee attempts to create a contract which would not exist without the application of promissory estoppel." *Dealers Supply Co. v. Cheil Indus.*, 348 F. Supp. 2d 579, 587 (M.D.N.C. 2004). Count 17 is an attempt to do just that; it alleges that Duke "should have reasonably expected to induce action or forebearance on the part of plaintiffs." (Compl. ¶ 603.) This Court has rejected claims based on identical language. *Dealers Supply*, 348 F. Supp. 2d at 586-587.

### 3. Count 14: Breach Of Duty To Protect Students From Harassment

Count 14 is Plaintiffs' contract claim alleged via a theory of negligence. It asserts that, by issuing its Harassment Policy, Duke "voluntarily undertook a duty," actionable in

claim against Duke.

tort, to protect its students from harassment.[8]  (*See* Compl. ¶ 575.)  North Carolina courts

have made clear, however, that a plaintiff who cannot establish a contract claim based on

an internal handbook cannot assert the same claim by relabeling it as a tort.

In *Rucker v. First Union National Bank*, 98 N.C. App. 100, 389 S.E.2d 622

(1990), the Court of Appeals addressed an employee's claims of breach of contract and

negligence based on an employer's alleged misrepresentation of terms and failure to

follow policies in its employment manuals.  The court first affirmed the dismissal of the

employee's breach of contract claim, stating that "[i]t is well settled in North Carolina

that unilaterally promulgated employment manuals or policies do not become part of the

employment contract unless expressly included in it."  *Id.* at 102, 389 S.E.2d at 624

(citations and internal quotation marks omitted).  The court then affirmed the dismissal of

the tort claims as well, stating, "We have concluded above that the employment manuals

cannot be considered as part of plaintiff's employment contract since they were not

expressly included in it ….  Therefore, plaintiff cannot establish a legal claim to having

been misled based on the manuals."  *Id.* at 104, 389 S.E.2d at 625.  In this case, Duke's

---

[8] Count 14 also alleges that Duke's supposed duty to protect Plaintiffs from harassment
was "reinforced" by "duties to plaintiffs as invitees on University property."  (Compl.
¶ 576.)  This argument is a red herring.  Under North Carolina law, a premises liability
claim requires a plaintiff to allege that "a landowner breached his duty to exercise
reasonable care in the maintenance of [his] premises for the protection of lawful visitors."
*See Thomas v. Weddle*, 167 N.C.App. 283, 290, 605 S.E.2d 244, 248 (2004); *Barber v.
Presbyterian Hosp.*, 147 N.C. App. 86, 89, 555 S.E.2d 303, 306 (2001).  Plaintiffs do not
allege that Duke's ownership of any property itself created the opportunity for the alleged
harassment or that the property could have been maintained in a way that prevented the
alleged harassment.

bulletins and handbooks are not binding contracts, and so Plaintiffs "cannot establish a legal claim" based on those bulletins and handbooks.

Even if Duke's internal anti-harassment policy could form the basis of a tort claim in some cases, that cannot avail Plaintiffs here, because Plaintiffs have not alleged that they suffered any physical injury as a result of Duke's alleged failure to enforce that policy. (*See* Compl. ¶ 579 (alleging various kinds of damages, but not physical injury.)) It has long been the black-letter rule that the "voluntary undertaking" doctrine is available only to a plaintiff who has suffered physical injury—or, perhaps, injury to property—as a result of the defendant's failure to use due care in its voluntary undertaking. *See* Restatement (Second) of Torts § 323 (1965) ("One who undertakes … to render services to another … is subject to liability to the other *for physical harm* resulting from his failure to exercise reasonable care.") (emphasis added); Restatement (Third) of Torts: Liability for Physical Harm § 42 (Proposed Final Draft No. 1) (2005) ("An actor who undertakes to render services for another that the actor knows or should know reduce *the risk of physical harm* to another has a duty of reasonable care….") (emphasis added); *id.* cmt. a ("Section 323 [of the Second Restatement] limited liability for breach of the duty it imposed to physical harm, as does this Section, Chapter, and Restatement."). North Carolina cases recognize this limitation,[9] as do cases in other jurisdictions.[10] These cases

_____

[9] Logan & Logan, *North Carolina Torts* § 2.20, at 30 n.19 (voluntary undertaking doctrine requires that "physical harm result from [the defendant's] failure to exercise reasonable care to perform [the voluntary] undertaking") (quoting Restatement (Second) of Torts § 323 (1965)); *see also Firemen's Mut. Ins. Co. v. High Point Sprinkler Co.*, 266 N.C. 134, 140, 146 S.E.2d 53, 60 (1966) ("[T]he law imposes upon every person who

recognize that the limitation to physical injury and property is necessary to prevent the narrow voluntary-undertaking tort doctrine from supplanting claims for breach of contract, which would be the case if every failure to live up to a voluntary undertaking resulting in pecuniary injury were the basis of a tort claim. Here, Plaintiffs have not pleaded any bodily injury, nor any damage to their property. Count 14 therefore fails to state a claim.

### B. Plaintiffs Fail To State A Claim On Any Of Their Negligence Or Other Breach Of Duty Claims (Counts 11-13, 19)

In Counts 11-13, Plaintiffs claim that Duke and its administrators breached duties of care to the members of the lacrosse team by giving them bad advice (allegedly, by advising them not to consult a lawyer and then recommending an unsuitable lawyer). All of these counts share a fatal flaw: the Duke Defendants did not have, and did not assume, a legal duty of care to Plaintiffs.

---

undertakes the performance of an act which, it is apparent, if not done carefully, will be dangerous to other persons or the property of other persons, the duty to exercise his senses and intelligence to avoid injury, and he may be held accountable at law for an injury to person or to property which is directly attributable to a breach of such duty.") (internal quotation marks omitted); *Pinnix v. Toomey*, 242 N.C. 358, 362, 87 S.E.2d 893, 897 (1955) (stating that "the basic rule of the common law … imposes on every person engaged in prosecution of any undertaking an obligation … to so govern his actions as not to endanger the person or property of others"). North Carolina cases do not appear to have directly addressed whether injury to property is sufficient for a claim under this doctrine, but in any event, Plaintiffs have not alleged any injury to their property.

[10] *See Hendricks*, 578 S.E.2d at 715 (voluntary undertaking doctrine does not apply where the plaintiff suffered economic loss, but not physical harm); *Martin v. State Farm Mut. Auto. Ins. Co.*, 808 N.E.2d 47, 54 (Ill. App. Ct. 2004) (same); *Stroud v. Meister*, No 97-0860, 2001 WL 282764, at *16-17 (N.D. Tex. Mar. 16, 2001) (same); *Ivanhoe Fin., Inc. v. Highland Banc Corp.*, No. 03-7336, 2004 WL 2091997, at *2 (N.D. Ill. Sept. 15, 2004) (same).

### 1.    Count 11:  Constructive Fraud

In Count 11, Plaintiffs claim that Duke and its administrators committed "constructive fraud" through their abuse of a supposedly "confidential relationship" with the University's students or student-athletes.  Constructive fraud is a breach of fiduciary duty, whereby the defendant "seek[s] to benefit himself" as a result of the breach. *Toomer v. Branch Banking & Trust Co.*, 171 N.C. App. 58, 67-68, 614 S.E.2d 328, 335-336 (2005) (internal quotation marks omitted).  Plaintiffs' claim fails because the defendants did not have a fiduciary duty to them.[11]

Courts have uniformly rejected the proposition that a fiduciary relationship exists between universities (or their administrators) and the students enrolled there.  *See Davidson v. Univ. of N.C. at Chapel Hill*, 142 N.C. App. 544, 556, 543 S.E.2d 920, 928 (2001) ("the student-university relationship, standing alone, does not constitute a special relationship giving rise to a duty of care").  In *Ryan v. University of North Carolina Hospitals*, 2005 WL 465554, the North Carolina Court of Appeals refused to extend the concept of fiduciary relationship to interactions between educator/supervisors and

---

[11] Where, as here, the question whether a fiduciary duty exists turns on the nature of the relationship rather than disputed facts, the court can decide as a matter of law that no fiduciary duty exists.  *See Dalton v. Camp*, 353 N.C. 647, 652, 548 S.E.2d 704, 708 (2001) (upholding summary judgment ruling that fiduciary relationship did not exist between employer and employee); *Tin Originals, Inc. v. Colonial Tin Works, Inc*., 98 N.C. App. 663, 665-666, 391 S.E.2d 831, 833 (1990) (ruling, as a matter of law, that no fiduciary relationship exists between "mutually interdependent businesses"); *Ryan v. Univ. of N.C. Hosp.*, No. COA04-16, 2005 WL 465554 (N.C. Ct. App. Mar. 1, 2005) (grant of summary judgment for defendants was appropriate, because fiduciary relationship does not exist between educator/supervisors and medical residents).

medical residents. *See id.* at *4. The court stated two rationales for its conclusion that, as a matter of law, no fiduciary relationship existed—both of which apply with equal force here. First, a fiduciary relationship requires that the fiduciary owe undivided loyalty to the beneficiary. *See id.* But these university educators and administrators cannot satisfy that condition, because they always remain charged with carrying out the "rules and regulations" of the university. *Id.* Second, fiduciary relationships have traditionally been confined to the legal and business contexts, where the consequences of assuming such a relationship are well-understood and predictable. *See id.* (stressing that "[h]istorically, this Court has reserved imposition of fiduciary duties to legal or business settings, often in which one person entrusts money to another, such as with lawyers, brokers, corporate directors, and corporate promoters").

The court in *Ryan* relied on decisions of other jurisdictions that have declined to find a fiduciary relationship between college students and their academic advisors and institutions. *See id.* Particularly instructive is *Hendricks v. Clemson University*, 578 S.E.2d 711. The plaintiff (Hendricks), in his junior year of college, transferred to Clemson University to play Division I baseball. At Clemson, the student met with an athletic academic adviser who erroneously advised him on the course load necessary to comply with NCAA eligibility rules. As a result of the adviser's errors, the student failed to comply with NCAA rules and was not able to play college baseball. *See id.* at 713. The South Carolina Supreme Court declined to find a fiduciary relationship between the student and his advisor, stressing the historically limited nature of the fiduciary role. *See*

*id.* at 715. *Hendricks* was an important guidepost for the North Carolina court in *Ryan.*

*See Ryan*, 2005 WL 465554, at *4.[12] This Court should follow *Hendricks* and *Ryan* and

hold that Plaintiffs cannot state a claim for constructive fraud because the Duke

defendants did not owe them a fiduciary duty.

## 2. Count 12: "Voluntary Undertaking"

Plaintiffs claim that, even if Duke did not have a general duty of care to them, it

assumed such a duty by offering them advice about how to respond to the rape

allegations. But providing advice to students about difficulties they face in their personal

lives is not the kind of action that the courts have found sufficient to create an actionable

duty of care, and such a holding would seriously chill communications between students

and educators, to whom students often turn for advice about many issues.[13]

Courts have declined to conclude that a university administrator assumes a duty of

care to a student by giving that student advice, however misguided or inadequate the

advice may turn out to be. *Hendricks v. Clemson University* is again instructive. As

---

[12] Other courts have similarly declined to find a fiduciary relationship between a University and its students. In *Morris v. Brandeis University*, for instance, the plaintiff, a student at Brandeis University, alleged that the college "had a fiduciary relationship with him because of his status as a student," and "that Brandeis breached that fiduciary duty by failing to provide him with true and accurate information and guidance [during] his [college] disciplinary process." No. CA002161, 2001 WL 1470357, at *6 (Mass. Super. Sept. 4, 2001). The Massachusetts court decided that no fiduciary relationship existed between the college and the student. *Id.*; *see also Shapiro v. Butterfield*, 921 S.W. 2d 649, 651 (Mo. Ct. App. 1996) (plaintiff, a graduate student, failed to allege a fiduciary relationship between herself and a faculty advisor).

[13] Whether Defendants owed Plaintiffs a duty of care under this theory is a question of law. *See Davidson*, 142 N.C. App. at 552, 543 S.E.2d at 925.

noted, in *Hendricks*, the adviser assigned to the student-plaintiff, who had transferred to

Clemson to play Division I baseball, mistakenly counseled the student to take a course

load that ultimately rendered the student noncompliant with NCAA eligibility rules. *See*

578 S.E.2d at 711. The South Carolina Supreme Court ruled that Clemson had not

assumed a duty of care by advising the student about the proper course load to maintain

NCAA eligibility. As the court explained, "recognizing a duty flowing from advisors to

students is not required by any precedent and would be unwise," because of "the great

potential for embroiling schools in litigation that such recognition would create." *Id.* at

715; *see also Brown v. Compton Unified Sch. Dist.*, 80 Cal. Rptr. 2d 171, 173 (Cal. Ct.

App. 1998) (similarly rejecting the contention that a high school counselor assumed a

duty of care by advising a student about coursework necessary for eligibility for NCAA

basketball).

These decisions recognize that the instruction and advice that educational

institutions provide their students is not readily susceptible to analysis under tort

standards, and that to expose those institutions and their personnel to tort suits based on

advice that turns out to be mistaken could be destructive of their relationship with their

students. Students constantly seek the guidance and counsel of their teachers and

administrators on innumerable subjects, from coursework to family crises to employment

prospects. What path students should pursue under such circumstances may turn on

countless factors—personal, financial, and even moral ones—and the courts lack a

reliable metric by which to measure whether the advice that was given was "good" or

"bad." "Unlike the activity of the highway or the marketplace," such advice "affords no readily acceptable standards of care, or cause, or injury." *Peter W. v. San Francisco Unified Sch. Dist.*, 131 Cal. Rptr. 854, 861 (Cal. Ct. App. 1978) (declining to recognize claim for "educational malpractice"); *see also Hendricks*, 578 S.E.2d. at 715 (analogizing "bad advice" claim to one for educational malpractice); *Thomas v. Charlotte-Mecklenburg Bd. of Educ.*, No. 06-238, 2006 WL 3257051, at *1 (W.D.N.C. Nov. 9, 2006) (noting that North Carolina does not recognize claim for educational malpractice).[14]

In the few cases in which courts have concluded that a school assumed a duty of care to students, the school made itself responsible for the students' physical safety in a school-related activity, and the alleged negligence contributed to a physical injury to the student.[15] Thus, for example, in *Davidson*, the North Carolina Court of Appeals concluded that a university had voluntarily assumed a duty of care to members of a

_____

[14] Courts in other jurisdictions have declined to recognize educational malpractice claims in light of the public policy concerns raised by such claims. *See, e.g.*, *Gupta v. New Britain Gen. Hosp.*, 687 A.2d 111, 119 (Conn. 1996) ("Because [the] tort principles [of duty, standards of care, and reasonable conduct] are difficult, if not impossible, to apply in the academic environment, courts have almost universally held that claims of educational malpractice are not cognizable.") (footnote omitted); *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 556 (Alaska 1981); *Key v. Coryell*, 185 S.W.3d 98, 106 (Ark. Ct. App. 2004); *Rich v. Kentucky Country Day, Inc.*, 793 S.W.2d 832 (Ky. Ct. App. 1990); *Miller v. Loyola Univ. of New Orleans*, 829 So. 2d 1057, 1060 (La. Ct. App. 2002); *Page v. Klein Tools, Inc.*, 610 N.W.2d 900, 902-906 (Mich. 2000); *Hoffman v. Bd. of Educ.*, 400 N.E.2d 317, 319-320 (N.Y. 1979).

[15] Indeed, as explained *supra* pp. 17-18, the "voluntary undertaking" doctrine is not even available to plaintiffs who, like those here, have not suffered physical injury. That point independently bars Count 12 just as it bars Count 14.

student cheerleading squad who were injured during a school-sponsored event—but only because the university had acknowledged the responsibility to teach the cheerleaders about safety in cheerleading (which was an official student activity), and had failed to do so adequately. *See* 142 N.C. App. at 558-559, 543 S.E.2d at 929-930; *see also Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1365 (3d Cir. 1993) (lacrosse player suffered fatal heart attack during supervised practice); *Furek v. Univ. of Del.*, 594 A.2d 506 (Del. 1991) (through its pervasive regulation of fraternity hazing practices, university voluntarily assumed a duty to protect students from physical injury resulting from such hazing incidents). In this case, by contrast, Plaintiffs seek to hold the University and its administrators liable for offering allegedly bad advice, not about how to participate safely in an official school activity, but about how to respond to accusations that the students committed a grave offense in an off-campus house and in the course of a private activity (the party for which the strippers were hired to perform) in which neither the University nor any of its employees played any part.

Plaintiffs' theory appears to be that providing advice to students is part of a university administrator's job duties, and so the Duke defendants were obligated to carry out those duties with care. This theory has no limits and, if adopted, would engulf university personnel—and many others—with threats of tort litigation. A professor who advises a student on what courses to take to prepare for graduate school, a coach who suggests to a student how she might improve her chances of being drafted to play a professional sport, and a guidance counselor who counsels a student on the best approach

to take in job interviews would be subject to liability under this "bad advice" theory—as would an employee's mentor or supervisor who advises her (mistakenly) about how best to "get ahead" at the company. Inevitably, people will be much less willing to become mentors and counselors, and those who do will limit their advice to a highly formal, bureaucratic realm. Because such mentorship and guidance would be too risky under Plaintiffs' theory of liability, students would be deprived of many important aspects of a university education that occur outside the classroom. The Court should therefore decline to recognize Plaintiffs' novel "bad advice" claim.

### 3. Count 13: "Special Relationship"

Plaintiffs also allege that, by virtue of a "special relationship" between Duke University and the Duke lacrosse team, the University and its President had a duty to protect Plaintiffs from harm resulting from Mangum's false accusation of rape and the rogue criminal investigation that ensued. (*See* Compl. ¶¶ 566-569.) But the alleged omissions fall outside the scope of any special relationship that might have existed between Duke and the members of the lacrosse team.

The "special relationship" doctrine is a limited exception to the general common law rule that one has no duty to protect another from harm caused by a third party. *See Davidson*, 142 N.C. App. at 554, 543 S.E.2d at 926 (noting that the rule applies "to a limited group of relations, in which custom, public sentiment and views of social policy have led the courts to find a duty of affirmative action"). In a special relationship, "the plaintiff is typically in some respect particularly vulnerable and dependent upon the

defendant who, correspondingly, holds considerable power over the plaintiff's welfare. In addition, such relations have often involved some existing or potential economic advantage to the defendant." Logan & Logan, *North Carolina Torts* § 2.20, at 28 (internal quotation marks omitted).

Under North Carolina law, the "student-university relationship, standing alone, does not constitute a special relationship giving rise to a duty of care." *Davidson*, 142 N.C. App. at 556, 543 S.E.2d at 928. In so holding, *Davidson* embraced "the conclusion reached by other jurisdictions addressing this issue that a university should not generally be an insurer of its students' safety." *Id.* This conclusion reflects the fact that, today, university students, the vast majority of which are at least 18 years old, are adults in the eyes of the law and responsible for the consequences of their actions. "College students today are no longer minors; they are regarded as adults in almost every phase of community life." *Bradshaw v. Rawlings*, 612 F.2d 135, 139 (3d Cir. 1979). *Accord Univ. of Denver v. Whitlock*, 744 P.2d 54, 60-61 (Colo. 1987); *Beach v. Univ. of Utah*, 726 P.2d 413, 419 (Utah 1986); *Baldwin v. Zoradi*, 176 Cal. Rptr. 809, 816-817 (Cal. Ct. App. 1981). Thus, "students today demand and receive increased autonomy and decreased regulation on and off campus." *Whitlock*, 744 P.2d at 60.

Plaintiffs seek to avoid this well-settled rule by claiming that a special relationship existed between the University and themselves as members of the lacrosse team (rather than as members of the general student body of the University). (*See* Compl. ¶¶ 566-569.) But, as with the voluntary undertaking doctrine discussed above, courts have

recognized such a special relationship for members of college sports teams only where the activity that led to the injury forming the basis of the claim was an official, school-sponsored activity over which the school exercised considerable control—unlike the case here, where the activity was a private, impromptu, off-campus stripper party not sponsored by the University.  *See* Restatement (Second) of Torts § 314A, cmt. c (1965) (special relationship rule applies only where "the risk of harm … *arises in the course of that relation*" (emphasis added)).  Thus, in *Davidson*, where the North Carolina Court of Appeals found a special relationship between the university and its cheerleading squad, the court "emphasize[d]" that its holding was "based on the fact that [the student plaintiff] was injured while practicing as part of a school-sponsored, intercollegiate team" and cautioned that its holding should not be read to imply that a special relationship exists between a university and "every member of a student group, club, intramural team, or organization."  142 N.C. App. at 556, 543 S.E.2d at 928.

Here, Plaintiffs do not allege that they were injured in the course of playing lacrosse.  Instead, they claim that, because they were members of a varsity sports team that participated in intercollegiate athletics, Duke had a duty to protect them from the repercussions of their decision to attend a private party with hired strippers and underage drinking.  Finding a special relationship in this context would contravene basic equity among students, for it would make the university legally liable for the private, off-campus conduct of varsity sports teams—but not, seemingly, for members of a school

choir, or French club. Such a holding would also discourage students from taking

responsibility for their actions. As the Colorado Supreme Court observed:

> By imposing a duty on the University in this case, the
> University would be encouraged to exercise more control
> over private student recreational choices, thereby effectively
> taking away much of the responsibility recently recognized in
> students for making their own decisions with respect to
> private entertainment and personal safety. Such an allocation
> of responsibility would produce a repressive and inhospitable
> environment, largely inconsistent with the objectives of a
> modern college education.

*Whitlock*, 744 P.2d at 60.

### 4.    Count 19: Negligent Supervision

Plaintiffs have asserted a claim for negligent supervision against Duke University

and university officials Brodhead, Moneta, Lange, and Trask based on their alleged

knowledge of certain "employees' propensity to engage in tortious acts of fraud,

intentional and negligent infliction of emotional distress, harassment, nuisance, intrusion

upon seclusion, defamation and other torts against plaintiffs." (Compl. ¶ 616.) This

count should be dismissed because Plaintiffs cannot state a claim for negligent

supervision. Also, as a matter of law, individual defendants cannot be held liable for

negligent supervision.

To state a claim for negligent supervision, "the plaintiff must prove that the

incompetent employee committed a tortious act resulting in injury to plaintiff and that

prior to the act, the employer knew or had reason to know of the employee's

incompetency." *Smith v. Privette*, 128 N.C. App. 490, 494-495, 495 S.E.2d 395, 398

(1998).  As described elsewhere in this Brief and in the Brief for the Duke SANE

Defendants (incorporated here by reference), as a matter of law Plaintiffs cannot establish

that any Duke employee committed a tort against them.  *See supra* pp. 15-29; *infra* pp.

30-40, 45-48; Br. for Duke SANE Defs. at 7-32, 45-48.[16]  Because Plaintiffs have not

stated a claim against any Duke University employee for committing a tortious act,

Plaintiffs also cannot maintain an action against their employer for negligent supervision.

*See Guthrie v. Conroy*, 152 N.C. App. 15, 26, 567 S.E.2d 403, 411 (2002) ("Absent a

viable tort claim," a plaintiff "cannot maintain an action … for negligent retention and

supervision.").

Even if a Duke University employee had committed a tortious act, Count 19

should be dismissed as to the individuals Brodhead, Moneta, Lange, and Trask; these

individuals cannot, as a matter of law, be liable for negligent supervision because none of

them is the "employer."  (*See* Compl. ¶ 615 (describing Duke University as the

employer).)  Only the employer can be liable for negligent supervision, not individual

defendants.  *See Smith*, 128 N.C. App. at 494, 495 S.E.2d at 398 (negligent supervision is

based on "the *employer's* liability to third parties" (emphasis added)).  In *Cox v. Indian

Head Industries, Inc.*, 123 F. Supp. 2d 892 (W.D.N.C. 2000), the court, applying North

Carolina law, dismissed a claim for negligent hiring, retention, and supervision against an

individual defendant because such a claim is sustainable against only the entity that

---

[16] Indeed, at least two of the torts enumerated by Plaintiffs as the basis for negligent
supervision—nuisance and defamation—are not even raised as tort claims in the
Complaint.

employs the individual tortfeasor.  *Id.* at 903.  Although Count 19 fails to state a claim against any defendant, at a minimum, therefore, it should be dismissed against the individual defendants.

### C. Plaintiffs Fail To State A Claim On Their Emotional Distress Claims (Counts 6-7)

#### 1. Count 6:  Intentional Infliction Of Emotional Distress

In Count 6, Plaintiffs claim that Duke intentionally inflicted emotional distress on them, alleging that the entire "course of conduct adopted by" Duke University and its police and administrators "throughout the rape hoax crisis was extreme and outrageous and exceeded all bounds of decency tolerated in society."  (Compl. ¶ 519.)  In describing this "course of conduct," Plaintiffs cite nurse Levicy's alleged misrepresentations regarding the medical examination, alleged false statements by various Duke administrators regarding the lacrosse players, an alleged "abuse of trust" by Duke officials, and the cancellation of the lacrosse season.  (*Id.* ¶ 521.)

Plaintiffs fail to satisfy the strict requirements for this tort.  Under North Carolina law, "[t]he essential elements of an action for intentional infliction of emotional distress are 1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress."  *Waddle v. Sparks,* 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992) (internal quotation marks omitted).  To satisfy the "extreme and outrageous conduct" requirement, Plaintiffs must allege (and eventually prove) conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community." *Guthrie*, 152 N.C. App. at 22, 567 S.E.2d at 408-409 (internal quotation

marks omitted). Plaintiffs must also allege (and eventually prove) that they suffered

"emotional distress of a *very* serious kind" as a result of the claimed conduct. *Waddle*,

331 N.C. at 82, 414 S.E.2d at 27 (internal quotation marks omitted).[17]

Plaintiffs' claim fails to satisfy the "extremely rigorous standard" for pleading

"extreme and outrageous" conduct. *Thomas v. N. Telecom, Inc.*, 157 F. Supp. 2d 627,

635 (M.D.N.C. 2000). Plaintiffs have alleged as one basis of "extreme and outrageous"

conduct "the defendants' ratification of Levicy's misrepresentations to Durham

Investigators." (Compl. ¶ 521.) As discussed more fully in the Brief for Duke SANE

Defendants at 28-31 (and incorporated here by reference), Levicy's conduct was not, as a

matter of law, "extreme and outrageous" because under North Carolina law reporting a

crime to the police and prosecutors—even if that report is false—is not "extreme and

outrageous conduct." *See also Dobson v. Harris*, 134 N.C. App. 573, 521 S.E.2d 710

(1999), *rev'd on other grounds*, 352 N.C. 77, 530 S.E.2d 829 (2000). Moreover, even if

such conduct *were* extreme and outrageous, Plaintiffs fail to allege any facts that would

---

[17] Both questions are appropriate for resolution on a motion to dismiss. "The determination of whether conduct rises to the level of extreme and outrageous is a question of law." *Johnson v. Colonial Life & Acc. Ins. Co.*, 173 N.C. App. 365, 373, 618 S.E.2d 867, 872-873 (2005); *see Thomas v. N. Telecom, Inc.*, 157 F. Supp. 2d 627, 635 (M.D.N.C. 2000) (holding, on motion to dismiss, that alleged conduct did not satisfy the "extremely rigorous standard" required for "extreme and outrageous" conduct as a matter of law). Similarly, whether Plaintiffs have alleged sufficiently severe emotional distress may be resolved on the basis of the complaint. *See Pruett v. Town of Spindale, N.C.*, 162 F. Supp. 2d 442 (W.D.N.C. 2001) (holding, on motion to dismiss, that plaintiff had not alleged sufficiently severe emotional distress).

suggest that any of the individual defendants *intended* to ratify Levicy's actions.  *See* Brief for SANE Defs. at 31.

The remaining conduct alleged to be "extreme and outrageous" also fails to meet the rigorous standard for this tort.  Plaintiffs allege that the Duke defendants "malign[ed]" the players by "inciting public resentment against them," subjected the players to "humiliating and defamatory public harassment, including racial and gender-motivated harassment," and "acquiesced" in "campus protest and other public harassment of the plaintiffs."  (Compl. ¶ 521.)  But North Carolina courts have made clear that "insults" and "indignities" such as those alleged here are not enough.  *Guthrie*, 152 N.C. App. at 22, 567 S.E.2d at 409; *see also Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 492-493, 340 S.E.2d 116, 122-123 (1986).   Allowing students to engage in protests based on a live controversy and issuing public statements about a matter of urgent public concern is not "utterly intolerable in a civilized community," even if Plaintiffs find the content of those protests and statements offensive.  There "is no occasion for the law to intervene in every case where some one's feelings are hurt … [t]here must still be freedom to express an unflattering opinion, and some safety valve must be left" through which to do so.  *Hogan*, 79 N.C. App. at 493-494, 340 S.E.2d at 123.

Plaintiffs' claim also fails because they have not alleged another necessary element of their claim, that they suffered *severe* emotional distress as a result of the alleged conduct.  *See* Br. for Duke SANE Defs. at 31-32 (discussing lack of factual allegations to state severe emotional distress; incorporated here by reference).

### 2. Count 7: Negligent Infliction Of Emotional Distress

In Count 7, Plaintiffs claim negligent infliction of emotional distress. Plaintiffs allege that the conduct described in the Complaint "involved numerous repeated breaches of the above-named defendants' identified duties of care." (Compl. ¶ 527.) To state a claim for negligent infliction of emotional distress, "a plaintiff must allege that (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause severe emotional distress …, and (3) the conduct did in fact cause severe emotional distress." *McAllister v. Ha*, 347 N.C. 638, 645, 496 S.E.2d 577, 582-583 (1998) (internal quotation marks omitted). Plaintiffs' claim fails to allege any of these elements and should be dismissed.

Plaintiffs cannot satisfy the first element of the tort—negligent conduct. Negligence is the breach of a legal duty, and Plaintiffs have failed to allege a legally cognizable duty, under any of their various negligence theories, that could give rise to an actionable negligence claim. *See infra* pp. 36-37 (discussing lack of duty underlying claim in Count 9); *see supra* pp. 15-30 (discussing lack of legal duty underlying claims in Counts 11-14); *see also* Br. for Duke SANE Defs. at 7-23 (discussing lack of legal duty under theories related to the medical treatment of Mangum in Counts 2-5; incorporated here by reference). Absent a breach of a duty of care, a claim for negligent infliction cannot be maintained. *See Guthrie*, 152 N.C. App. at 25, 567 S.E.2d at 411.

In addition, Plaintiffs' own allegations show that any conduct by the Duke defendants was not the proximate cause of any harm to Plaintiffs. As Plaintiffs concede,

it was the "unprecedented" actions of the District Attorney to pursue the criminal investigation that led to any alleged injuries to these Plaintiffs—actions for which he was disbarred and jailed. *See, e.g.*, Compl. ¶¶ 219-220, 270, 384-385; *see also* Br. for Duke SANE Defs. at 23-26 (discussing intervening acts and lack of proximate cause for Plaintiffs' negligence claims; incorporated here by reference).

Finally, Plaintiffs allege that the defendants' breach of their duties was intentional. (Compl. ¶ 527.)  As this Court has held, intentional acts, alleged to be committed negligently, cannot make out a claim for negligent infliction of emotional distress. *See Sabrowski v. Albani-Bayeux, Inc.*, 02-00728, 2003 WL 23018827, at *5-6 (M.D.N.C. Dec. 19, 2003), *aff'd*, 124 Fed. Appx. 159 (4th Cir. 2005); *see also Barbier v. Durham County Bd. of Educ.*, 225 F. Supp. 2d 617, 631 (M.D.N.C. 2002).

### D.     Plaintiffs Fail To State A Claim On Any Of Their Legal Theories Related To The Release Of Key Card Data (Counts 8-10, 20)

In Counts 8-10 and 20, Plaintiffs raise a variety of claims (fraud, negligent misrepresentation, abuse of process, and civil rights violations) related to their allegation that Duke University, Duke Police, and certain Duke administrators acted improperly by turning over Plaintiffs' "key card" data to Durham Police and later, when the District Attorney issued a subpoena to Duke for the same information, failing to advise Plaintiffs that the information had already been provided to the Durham Police.  (Compl. ¶¶ 324-325, 327, 433-437.)  Plaintiffs fail to allege critical elements of each cause of action.

## 1.    Count 8:  Fraud

In Count 8, Plaintiffs allege that Duke committed fraud by failing to advise them, when Duke received a subpoena from Nifong for the key card data, that the data had already been provided to the Durham Police.  (Compl. ¶¶ 433-437.)  Plaintiffs claim that, because Duke failed to so advise them, they expended time and resources to quash the subpoena.  (*Id.* ¶ 535.)  For several reasons, this claim should be dismissed.

First, Plaintiffs have failed to plead their claim with the particularity required by Federal Rule of Civil Procedure 9(b).  Where, as here, there are multiple defendants to a fraud claim, a plaintiff must state "all claims with particularity as to each of the defendants" and "identif[y] each individual defendant's participation."  *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 250, 251 (D. Md. 2000).  Here, however, Plaintiffs allege only that the "above-named defendants *and/or other senior Duke University ... officials* were aware that Duke had already disclosed this information to the Durham Investigators."  (Compl. ¶ 534 (emphasis added).)  Such pleading is insufficient to state a claim against *these* named defendants.

Second, Plaintiffs have not adequately pleaded a fraud.  Under North Carolina law, the elements of actual fraud are "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party."  *Forbis v. Neal*, 361 N.C. 519, 526-527, 649 S.E.2d 382, 387 (2007) (internal quotation marks and citation omitted).  Here, Plaintiffs allege that the letters sent by Duke administrators

Drummond and Hendricks "did not disclose" that the key card data had already been provided to the Durham Police. (Compl. ¶ 436.) This assertion is solely an allegation of omission, not an allegation of false representation or concealment.[18] Plaintiffs concede as much, alleging that omitting this information from the letters only "implied" that the key card data had not been turned over. (*Id.* ¶ 437.) But nothing in the letter misrepresented or concealed *any* previous actions undertaken by Duke; rather, the letter accurately conveyed that a subpoena was pending which required production of Plaintiffs' key card records. (*Id.* ¶ 435.) Because Plaintiffs have failed to meet the heightened fraud pleading requirements and because nothing in the letter was a misrepresentation or concealment, this claim should be dismissed.

### 2. Count 9: Negligent Misrepresentation

In Count 9, Plaintiffs claim that this same course of events—the alleged misrepresentation that the key card data had not already been turned over to the Durham Police when the subpoena was issued—gives rise to a negligent misrepresentation claim.

---

[18] In some cases, the North Carolina courts have found that material omissions can give rise to fraud claims. When a plaintiff alleges fraud by omission, the plaintiff must plead seven discrete elements, as articulated in *Breeden v. Richmond Community College*, 171 F.R.D. 189, 195 (M.D.N.C. 1997). These seven requirements are: "(1) the relationship [between plaintiff and defendant] giving rise to the duty to speak, (2) the event or events triggering the duty to speak, and/or the general time period over which the relationship arose and the fraudulent conduct occurred, (3) the general content of the information that was withheld and the reason for its materiality, (4) the identity of those under a duty who failed to make such disclosures, (5) what [the defendant] gained by withholding information, (6) why plaintiff's reliance on the omission was both reasonable and detrimental, and (7) the damages proximately flowing from such reliance." *Id.* Plaintiffs have failed to allege that Duke had an affirmative duty to relay information to the plaintiffs or what the defendants gained by withholding the information.

This claim fails as a matter of law because, as this Court has explained, "the tort of negligent misrepresentation applies only to business transactions." *Mercer*, No. 97-cv-00959, at 23-24, 25-27; *see also Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 214, 367 S.E.2d 609, 617 (1988) (adopting position of Restatement (Second) Torts § 522 (1977), which notes that the tort of negligent misrepresentation deals with false commercial information to be used in commercial transactions). An essential element of the tort of negligent misrepresentation is that the "misrepresentation be in the course of both the plaintiff's and the defendant's business." *Mercer*, No. 97-00959, at 26; *see also Ausley v. Bishop*, 133 N.C. App. 210, 218, 515 S.E.2d 72, 78 (1999).

That element is not satisfied here. The alleged misrepresentation did not arise in the course of a business transaction; it occurred in the course of responding to a criminal investigation. Nor is Plaintiffs' relationship to Duke within the university setting "fundamentally a business relationship." *Mercer*, No. 97-00959, at 27 (rejecting negligent misrepresentation claim because even though plaintiff alleged pecuniary loss, her relationship to the defendant with respect to the misrepresentation "was not fundamentally a business relationship"). Moreover, expanding the scope of this tort beyond business transactions, and in particular, expanding it to reach the relationship between a university and its students, would have many of the same deleterious policy

consequences as those identified with respect to recognizing educational malpractice or fiduciary duty claims in the university setting. *See supra* pp. 19-25.[19]

### 3. Count 10: Abuse Of Process And Conspiracy To Abuse Process

In Count 10, Plaintiffs seek to hold Duke liable for abuse of process based on Nifong's issuance of a "sham subpoena" to Duke for the Plaintiffs' key card records, allegedly to conceal the fact that Duke had already illegally disclosed that data. (Compl. ¶¶ 434, 543-544.) Plaintiffs further allege that Duke and Nifong "were collaborating in a charade" to obtain the key card information lawfully, pursuant to the subpoena, in order to "paper over the fact of its prior illegal disclosure." (*Id.* ¶ 434.) These allegations, even if true (which they are not), do not state a claim for abuse of process.

First, it was Nifong who issued the subpoena, not Duke; Duke had no authority to cause the subpoena to be issued (and Plaintiffs do not suggest otherwise). Plaintiffs make a conclusory assertion that Duke and Nifong "were collaborating in a charade" to issue the subpoena, but do not provide a single factual allegation to suggest such "collaboration" (much less an actual conspiracy). Indeed, there are no factual allegations to suggest that Duke ever sought the issuance of the subpoena or took any action to support Nifong's decision to do so.

---

[19] Plaintiffs' claim fails for another, independent reason. As discussed above, Plaintiffs' factual allegations regarding the key card data are allegations of omission. Yet North Carolina does not recognize claims for negligent misrepresentation based on "negligent omission." *See Breeden*, 171 F.R.D. at 202-203 (plaintiff failed to state a claim for negligent misrepresentation because plaintiff alleged negligent omission; "th[is] Court has not been cited to, nor has it located, a case wherein North Carolina has extended the tort of negligent misrepresentation to cover 'negligent omissions'").

Moreover, even if Duke had "collaborated" with Nifong to cause the "sham" subpoena to issue, there is no abuse of process here. "The distinctive nature of an action for abuse of process is the improper use of process *after* it has been issued, and *not* for maliciously causing it to issue." *Ellis v. Wellons*, 224 N.C. 269, 271, 29 S.E.2d 884, 885 (1944) (emphasis added). To establish abuse of process, Plaintiffs must prove two elements: (1) the defendant had an ulterior motive to achieve a collateral purpose not within the normal scope of the process used, and (2) the defendant committed some act that is a "malicious misuse or misapplication of that process *after issuance* to accomplish some purpose not warranted or commanded by the writ." *Pinewood Homes, Inc. v. Harris*, __ N.C. App. __, 646 S.E.2d 826, 831 (2007) (internal quotation marks omitted); *see Beroth Oil Co. v. Whiteheart*, 173 N.C. App. 89, 99-100, 618 S.E.2d 739, 747 (2005).

Plaintiffs do not, and cannot, adequately allege these elements. The North Carolina Supreme Court has held that initiating legal process with "[e]vil purpose alone is not sufficient" to allege abuse of process. *Melton v. Rickman*, 225 N.C. 700, 704, 36 S.E.2d 276, 278 (1945). It has further held that "[r]egular and legitimate use of process, though with a bad intention, is not a malicious abuse of process." *Id.* (internal quotation marks omitted); *see Sara Lee Corp. v. Pro Sports, Inc*., No. 03-CV-00276, 2004 WL 537926, at *4 (M.D.N.C. Mar. 12, 2004). Yet the legitimate use of the subpoena, though with an allegedly evil purpose, is all that Plaintiffs allege in their Complaint. Here, Plaintiffs' allegations are limited to the claim that Defendants sought the subpoena in order to "paper over" and conceal their prior, illegal disclosure of that data. (Compl.

¶ 434.)  But that is merely an allegation about Defendants' motive.  So long as the subpoena was used for its regularly-intended purpose—in this case, to compel the disclosure of key card data—Plaintiffs' allegations of improper motive are not enough to state a claim for abuse of process.

To put the matter another way, "[a]buse of process resembles a form of extortion, by which the defendant invokes legal process to coerce the plaintiff into doing something *other than what the process contemplates*."  *Vista Food Exch., Inc. v. Joyce Foods, Inc.*, No. 96-CIV-0012, 1996 WL 122419, at *5 (S.D.N.Y. Mar. 20, 1999) (Mukasey, J.) (interpreting and applying North Carolina law) (emphasis added); *see generally* W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 121, at 898 (5th ed. 1984) ("There is … a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort" of abuse of process).  Here, however, the subpoenas were used to compel disclosure of Plaintiffs' key card data, and Plaintiffs do not allege that the Duke defendants used these subpoenas, after issuance, for any other purpose, let alone for an extortionate purpose.  Accordingly, Plaintiffs have failed to state a claim for abuse of process.

### 4.    Count 20:  Violation And Conspiracy To Violate Fourth Amendment Rights Under 42 U.S.C. § 1983

In Count 20, Plaintiffs allege a violation of their Fourth Amendment rights under 42 U.S.C. § 1983 based on the allegedly improper disclosure of the key card data.  To state a claim under § 1983, Plaintiffs must, at a minimum, adequately allege two elements: (1) that Defendants "deprived [them] of a right secured by the Constitution and

laws of the United States"; and (2) that Defendants "deprived [them] of this constitutional right under color of any [State] statute, ordinance, regulation, custom, or usage." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970) (internal quotation marks omitted). Plaintiffs fail to allege adequately either of these required elements.

### a.     No Color of State Law

Section 1983 reaches only *state action*—that is, conduct taken "under color of state law." "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (internal quotation marks and citation omitted). The named Duke University defendants are private persons and entities whose actions would normally fall outside the reach of § 1983. Thus, before Plaintiffs can establish liability against these defendants under § 1983, they must first demonstrate that the Duke defendants acted under color of state law. *Id.*

Plaintiffs cannot satisfy § 1983's under-color-of-state-law requirement merely by asserting in conclusory fashion that the Duke University defendants "act[ed] in concert" with Durham Investigators or that "there was a meeting of the minds between these Duke defendants and the defendant Durham Investigators to deprive plaintiffs of their protected rights." (Compl. ¶¶ 622, 630.) A plaintiff alleging conspiracy under § 1983 must "plead *specific facts* in a nonconclusory fashion to survive a motion to dismiss." *Gooden v. Howard County, Md.*, 954 F.2d 960, 969-970 (4th Cir. 1992) (en banc) (emphasis added); *see Howard v. Food Lion, Inc.*, 232 F. Supp. 2d 585, 597 (M.D.N.C. 2002) ("To survive

a motion to dismiss this conspiracy claim under § 1983, a plaintiff must allege both a

mutual understanding to achieve some unconstitutional action reached by the private and

state defendants and some factual assertions suggesting a meeting of the minds."); *see*

*also Ijames v. Murdock*, No. 01-00093, 2003 WL 1533448, at *5 (M.D.N.C. Mar. 21,

2003); *Wolfe v. Bias*, 601 F. Supp. 426, 428 (S.D. W. Va. 1984).  As the Supreme Court

recently made clear, a "bare assertion of conspiracy" is insufficient to state a claim; a

complaint must include "enough factual matter" to "plausibly suggest[]" that an

agreement was made, and factual allegations that are "merely consistent with" an

agreement are insufficient to state a valid claim.  *See Twombly*, 127 S. Ct. at 1955, 1965-

1966.

Plaintiffs do not allege any facts that would support a plausible inference that any

of the Duke defendants entered into any agreement to deprive Plaintiffs of their

constitutional rights by improperly disclosing key card data.  Plaintiffs do allege that

Duke Police officers Smith and Stotsenberg "handed over" to Durham Police Sgt.

Gottlieb a key card report for members of the Duke lacrosse team for March 13-14, 2006

(Compl. ¶ 324), and that Nifong then issued a subpoena for this same information on

May 31, 2006 that "Duke" allegedly knew was a "sham" (*id.* ¶ 434).  But Plaintiffs allege

no facts that would "plausibly suggest[]" that there was a "meeting of the minds"

between any of the individual Duke defendants and Durham Investigators (much less

between Duke University and Durham) to deprive Plaintiffs of their constitutional rights

by disclosing the key card data, as required under *Twombly*.

## b.        No Deprivation of Federal Rights

Even if Plaintiffs had adequately alleged state action by the Duke University defendants, their § 1983 claim would fail for another, independent reason:  Plaintiffs did not suffer any violation of any federal right cognizable under § 1983 when their key card information was disclosed.

First, even if the disclosure of Plaintiffs' key card data violated the Family Educational Records & Privacy Act (FERPA), 20 U.S.C. § 1232g, (Compl. ¶ 436), it is well settled that a violation of FERPA's non-disclosure provisions cannot be enforced under § 1983.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 290-291 (2002).

Second, the disclosure of Plaintiffs' key card data did not violate their Fourth Amendment rights.  Plaintiffs had no constitutionally protected expectation of privacy in that key card data.  Plaintiffs explain that a Duke student's identification card can be "swiped" in key card "slots" at various locations on campus to gain entrance to academic buildings and dormitories, as well as to make purchases from vending and photocopying machines.  (Compl. ¶ 325.)  Because "virtually any exterior door of Duke's dormitories and academic buildings requires the swiping of a Duke key card," the electronic data on these "key cards" contains a record of students' "comings, goings, purchases, and other card-swipe transactions on the Duke campus."  (*Id.* ¶¶ 325, 620.)

The Supreme Court has held, however, that individuals have no constitutionally protected expectation of privacy in their publicly-observable "comings and goings" (such as those observable when accessing "exterior doors" on campus).  *United States v.*

*Knotts*, 460 U.S. 276, 281-282 (1983) (holding that an individual has "no reasonable expectation of privacy" in his publicly observable "movements from one place to another").

Nor do Plaintiffs have a constitutionally protected expectation of privacy in their key card data reflecting purchases, from vending and photocopying machines or elsewhere. Individuals have no constitutional expectation of privacy in financial information or other records that are voluntarily conveyed to a third party. *See United States v. Miller*, 425 U.S. 435, 442-443 (1976) (concluding that a bank depositor had no "legitimate expectation of privacy" in the financial information he "voluntarily conveyed" to the bank); *see also Smith v. Maryland*, 442 U.S. 735, 743-744 (1979) (holding that "a person has no legitimate expectation of privacy in the information he voluntarily turns over to third parties"). As the Supreme Court has explained, an individual takes a risk, when "revealing his affairs to another, that the information will be conveyed by that person to the Government." *Miller*, 425 U.S. at 443. Here, Plaintiffs voluntarily conveyed the financial information on their key cards to Duke University. Therefore, Duke's disclosure of Plaintiffs' key card data containing records of purchases or other financial information did not violate any "interest legitimately protected by the Fourth Amendment." *Id*. at 440.

### E.   Plaintiffs Fail To State A Claim For Their Intrusion On Seclusion Claim (Count 18)

In Count 18, Plaintiffs allege that their seclusion was intruded upon by the Durham Police, the media, and Duke University faculty, employees, and students. (Compl. ¶¶ 607-608.)  This claim should be dismissed for several reasons.

First, none of the facts alleged by Plaintiffs constitutes intrusion upon seclusion. Intrusion upon seclusion "is defined as the intentional intrusion 'physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns… [where] the intrusion would be highly offensive to a reasonable person.'"  *Toomer v. Garrett*, 155 N.C. App. 462, 479, 574 S.E.2d 76, 90 (2002) (quoting *Miller v. Brooks*, 123 N.C. App. 20, 26-27, 472 S.E.2d 350, 354 (1996)); Restatement (Second) of Torts § 652B (1977); *see also Sabrowski v. Albani-Bayeux, Inc.*, No. 02-00728, 2003 WL 23018827, at *12 (M.D.N.C. 2003) (Beaty, J.), *aff'd*, 124 Fed. Appx. 159 (4th Cir. 2005) ("As the name of the claim suggests, the tort of intrusion, protects one against wrongful *intrusions* into his or her private affairs.").  Although Plaintiffs allege a litany of conduct that they claim was offensive to them (Compl. ¶ 608), none of them constituted intrusions on their *private* places or affairs.[20]

Thus, for example, the confrontations on campus and in the classroom alleged by Plaintiffs do not constitute intrusion upon seclusion because neither the campus nor the

---

[20] The search of 610 N. Buchanan, pursuant to a search warrant, the validity of which Plaintiffs do not challenge, does not amount to an intrusion upon seclusion.  *See Warden v. Hayden*, 387 U.S. 294, 321 (1967) ("A policeman in 'hot pursuit' or an officer with a search warrant can enter any house, any room, any building, any office.").

classroom is a "private place" in which the Plaintiffs secluded themselves. Plaintiffs had no expectation of privacy in these public spaces. The tort of intrusion lies only where the defendant "has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs." Restatement (Second) of Torts § 652B, cmt. c (1997).

Similarly, although Plaintiffs allege that Duke "participat[ed] in and incit[ed] loud, obstreperous, threatening, and humiliating protests at plaintiffs' residences" (Compl. ¶ 608), protests occurring *outside* Plaintiffs' residences do not amount to an intrusion in their private home. "[T]here must be something in the nature of prying or intrusion, and … mere noises which disturb … or bad manners, harsh names, and insulting gestures in public, are not enough." W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 117 (5th ed. 1984). Although North Carolina courts have recognized some invasions of privacy, such as surreptitious placement of a video camera in someone's bedroom, *Miller*, 123 N.C. App. at 26, 472 S.E.2d at 354, and "eavesdropping by wiretapping or microphones, [or] peering through windows," *Toomer*, 155 N.C. App. at 479-480, 574 S.E.2d at 90, as intrusions on seclusion, those situations involved some intrusion *into* the

home.  Except for one conclusory assertion untethered to any specific time or place, Plaintiffs make no such allegation.[21]

Second, the great bulk of Plaintiffs' allegations turn on alleged conduct by Duke students, the media, and the Durham Police (although Plaintiffs nowhere identify any specific individual who engaged in the supposed tortious conduct).  Even if some of the actions alleged by Plaintiffs might have constituted intrusion upon seclusion, there is no legal basis by which Duke University or its administrators should be liable for those actions.  Duke's liability under *respondeat superior* hinges upon a principal/agent relationship, *see* Black's Law Dictionary 1338 (8th ed. 2004), and neither students nor the media nor the Durham Police are agents of Duke.[22]  In addition, Plaintiffs have no basis for any claim against individual defendants Brodhead, Trask, Lange, Burness, and Moneta; Plaintiffs do not allege that any of the individual defendants personally engaged in conduct that intruded upon their seclusion, and those individual defendants cannot be held liable for the acts of University employees on the basis of *respondeat superior*

---

[21] Plaintiffs assert in Count 18 that Duke "physical[ly] inva[ded] and incit[ed] physical invasions on the plaintiffs' homes and private residences."  (Compl. ¶ 608.)  But nowhere in the Complaint do the Plaintiffs identify *any* specific physical invasion of their homes or residences by Duke, or any physical invasion that occurred as a result of "incitement" by Duke.  Such a conclusory allegation is insufficient to state a claim.  *See Twombly*, 127 S. Ct. at 1965.

[22] Courts have uniformly rejected the argument that a school may be held liable for the actions of its students on the basis of *respondeat superior.  See, e.g., Brown v. Astron Enter., Inc.*, 989 F. Supp. 1399, 1406 (N.D. Ala. 1997); *Hanson v. Kynast*, 494 N.E.2d 1091, 1094-1095 (Ohio 1986); *Johnson v. Central Aviation Corp.*, 229 P.2d 114, 119-120 (Cal. Ct. App. 1951).

because none of them is the "employer."  *See Hughes v. Rivera-Ortiz*, __ N.C. App. __, 653 S.E.2d 165, 171 (2007).[23]

## VI.  CONCLUSION

For the foregoing reasons, all claims against the Duke University Defendants should be dismissed for failure to state a claim on which relief may be granted.

/s/ Jamie S. Gorelick
_____

Jamie S. Gorelick
District of Columbia Bar No. 101370
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Telephone: (202) 663-6500
Facsimile: (202) 663-6363
Email: jamie.gorelick@wilmerhale.com

/s/ J. Donald Cowan, Jr.
_____

J. Donald Cowan, Jr.
N.C. State Bar No. 0968
Smith Moore LLP
P.O. Box 21927 [27420]
300 N. Green Street, Suite 27401
Telephone: (336) 378-5329
Facsimile: (336) 378-5400
Email: don.cowan@smithmoorelaw.com

---

[23] Plaintiffs allege that their seclusion was intruded on by the alleged "surprise interrogations by the Durham Investigators in their private residences and dorms." (Compl. ¶ 608.)  But Plaintiffs do not allege that any *Duke* employee actually participated in, or was even present for, those alleged interrogations.  Indeed, Plaintiffs acknowledge that the Duke Police did not even "know who [had been] interviewed" during the Durham Police's alleged entry in the dorms.  (*Id.* ¶ 395.)  And even if the Durham Police's activity could somehow be attributed to Duke (which it cannot), Plaintiffs still fail to state a claim.  Plaintiffs do not allege that the Durham Police forced their way into the Plaintiffs' dormitory rooms or entered in the face of objection, as would be required for a physical intrusion upon seclusion.  *See* Restatement (Second) of Torts § 652B, cmt. b. Moreover, Plaintiffs have failed to plead that any of their private affairs or concerns were intruded upon in the course of the alleged interrogation.  The mere asking of questions does not amount to an intrusion upon seclusion absent a showing that the questioner obtained any information about the plaintiff's private affairs.  *See Keyzer v. Amerlink, Ltd.*, 173 N.C. App. 284, 289, 618 S.E.2d 768, 772 (2005); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 702 (4th Cir. 2007).

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 30, 2008, I electronically filed the foregoing Brief in Support of "Duke University Defendants'" Motion to Dismiss Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

*Counsel for the Plaintiffs*
William J. Thomas, II
Email: thomas@tfmattorneys.com

Charles J. Cooper
Email: ccooper@cooperkirk.com

David H. Thompson
Email: dthompson@cooperkirk.com

*Counsel for J. Wesley Covington*
Kenneth Kyre, Jr.
Email: kkyre@pckb-law.com

*Counsel for City of Durham*
Reginald B. Gillespie, Jr.
Email: rgillespie@faison-gillespie.com

*Counsel for Mark Gottlieb*
Edwin M. Speas, Jr.
Email: espeas@poynerspruill.com

Eric P. Stevens
Email: estevens@poyners.com

*Counsel for Benjamin Himan*
Henry W. Sappenfield
Email: hsappenfield@kennoncraver.com

Joel Miller Craig
Email: jcraig@kennoncraver.com

*Counsel for Patrick Baker, Steven Chalmers, Ronald Hodge, Lee Russ, Stephen Mihaich, Beverly Council, Jeff Lamb, Michael Ripberger*

Patricia P. Kerner
Email: tricia.kerner@troutmansanders.com

D. Martin Warf
Email: martin.warf@troutmansanders.com

Hannah Gray Styron
Email: hannah.styron@troutmansanders.com

*Counsel for David Addison*
James B. Maxwell
Email: jmaxwell@mfbpa.com

As of the date of this filing, no attorney has made an appearance on behalf of the following Defendant. I hereby certify that I served the following Defendant by U.S. Mail:

Linwood Wilson
6910 Innesbrook Way
Bahama, NC 27503-9700

This 30th day of May 2008.

/s/ Jamie S. Gorelick
Jamie S. Gorelick

Attorney for Duke University, Duke University Health System, Inc., Richard Brodhead, Peter Lange, Larry Moneta, John Burness, Tallman Trask, Suzanne Wasiolek, Matthew Drummond, Aaron Graves, Robert Dean, Tara Levicy, Theresa Arico, Kate Hendricks, Victor Dzau