# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### No 1:08-cv-119

| | |
|---|---|
| EDWARD CARRINGTON, et al. | |
| Plaintiffs, | Brief in Support of "Duke SANE Defendants'" Motion to Dismiss Complaint |
| v. | |
| DUKE UNIVERSITY, et al., | |
| Defendants. | |

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and Local Rules 7.2 and 7.3, the "Duke SANE Defendants"—defined by the Court and the parties for purposes of this motion to comprise the Duke University Health System, Inc. (DUHS), Theresa Arico, and Tara Levicy—move to dismiss all claims asserted against them for failure to state a claim on which relief may be granted.[1]

---

[1] (*See* Joint Mot. for Leave to File Excess Pages and to Establish a Rule 12 Briefing Schedule, Dkt. 50, at 2 (defining "Duke SANE Defendants"); Order, Dkt. 51 (granting Joint Motion).) A separate motion is being filed on behalf of the "Duke University Defendants," as defined in the Joint Motion, to dismiss all claims in the Complaint as to those Defendants. The Complaint raises many causes of action against both the Duke University Defendants and the Duke SANE Defendants. To avoid repetition, this brief addresses those counts that appear to be directed principally at the Duke SANE Defendants rather than the Duke University Defendants—namely, Counts 1-5 and 21-23. Where necessary, in addressing those Counts, this brief discusses issues of liability that are related to certain Duke University Defendants. The Duke University Defendants address, in their brief, Counts 6-20. The remaining Counts in the Complaint, Counts 24-31, are brought only against non-Duke defendants. *See* Exhibit (Ex.) 1. To the extent the

# I. NATURE OF PROCEEDINGS

This case is one in which Plaintiffs seek to impose novel duties and liabilities against health care providers. Plaintiffs contend that they were injured by (1) medical treatment provided to an unrelated patient at Duke Hospital, and (2) the conduct of an individual nurse who provided, upon request, information about that medical treatment to police officers and the District Attorney in connection with a criminal investigation. According to Plaintiffs, these actions were both torts and violations of their constitutional rights. These theories find no support in precedent, policy, or logic.

The facts relevant to this motion are well known. Members of the Duke men's lacrosse team attended a party hosted by their teammates at which strippers were hired to perform. One of the strippers later made a false accusation that she was raped at the party. The Durham Police investigated the rape allegation. Notwithstanding the lack of incriminating DNA evidence, reliable eyewitness testimony, or legal identification procedures, the Durham County District Attorney, Mike Nifong, decided to pursue the prosecution and eventually obtained the indictment of three lacrosse players. None of the Plaintiffs in this case, however, was ever indicted or tried for any offense arising out of that accusation. The criminal case collapsed after it became clear that Mr. Nifong was well aware that the accusations against the three indicted players could not be supported in court.

---

arguments presented in the Brief for the Duke University Defendants are relevant to the claims against the Duke SANE Defendants, they are incorporated here by reference.

That three young men were indicted on false charges of a grave crime is clearly a disgrace. What is far less clear is why Plaintiffs believe that these defendants—the nurse who assisted the physician in conducting an examination of the accuser, that nurse's supervisor, and the hospital that employed them—should be liable for the fact that the police and the prosecutor investigated an alleged crime (for which these Plaintiffs were never even charged). A patient was brought to the hospital claiming an atrocious deed had been done to her; the hospital staff rendered her assistance, as they should have done; and subsequently when the police officers and prosecutor carrying out the investigation asked a hospital employee for information, the employee cooperated. There is nothing tortious, much less a violation of civil rights, in this conduct.

Plaintiffs' Complaint fails to acknowledge that the decision to investigate the alleged rape and to seek an indictment against three of the players was never in the hands of any health care provider—and certainly not in the hands of the nurse who assisted with the sexual assault examination the night Crystal Mangum showed up at Duke Hospital. Indeed, Plaintiffs themselves allege that it was Mr. Nifong who decided to continue the investigation and prosecution in the face of exculpatory evidence—willful misconduct for which he was disbarred and jailed. In the face of such misconduct, it is hard to understand how Plaintiffs can believe that anything the health care providers did would have altered the course of events. In short, the health care providers did their jobs; they did not commit any tort or invade any of Plaintiffs' legal rights. The claims against them should therefore be dismissed.

## II.    STATEMENT OF FACTS[2]

The Duke SANE Defendants incorporate by reference the Statement of Facts in the Brief of Duke University Defendants in Support of Their Motion to Dismiss.  The following pleadings are relevant to the claims brought against certain health care providers (the "Duke SANE Defendants"):

The Durham police transported Crystal Mangum to Duke University Medical Center Emergency Department after she claimed she had been raped.  (Compl. ¶¶ 103-104.)  Mangum unequivocally told emergency room medical personnel that she had been raped and repeatedly complained to nurses that "her pain level was 10 on a scale of 10," including "great pain 'down there.'"  (*Id.* ¶ 106.)  Dr. Julie Manly, a fourth year medical resident who had performed many rape examinations in the past, conducted a forensic sexual assault examination on Mangum.  (*Id.* ¶¶ 106, 113, 122-128.)  Tara Levicy, a newly certified Sexual Assault Nurse Examiner (SANE), assisted Dr. Manly.  (*Id.* ¶¶ 114-115, 122-128.)  As part of the forensic examination, Dr. Manly conducted a pelvic examination which revealed "diffuse edema"—swelling—of "the vaginal walls."  (*Id.* ¶ 126.)  Dr. Manly also collected oral, vaginal, and rectal swabs, scrapings of Mangum's clothing, and samples of Mangum's hair, blood, and skin cells as part of the exam. (*Id.* ¶ 122.)  Mangum "screamed hysterically" and complained of "severe pain" during this examination.  (*Id.* ¶ 128.)

---

[2] Solely for the purpose of this Motion, and as required under Federal Rule of Civil Procedure 12(b)(6), the Duke SANE Defendants assume the truth of the facts asserted by Plaintiffs in their Complaint.

The Durham Police Department investigated the alleged rape. (*Id.* ¶¶ 131, 133, 148, 218.) On March 16, 2006, Durham Investigator Benjamin Himan contacted nurse Tara Levicy to inquire about Mangum's medical examination. (*Id.* ¶ 150.) Levicy advised Himan that she was unable to divulge patient information because of federal privacy laws, but that Mangum's examination had shown that "there were signs consistent with sexual assault." (*Id.*) Later that same morning, Himan and Durham Police Sergeant Mark Gottlieb interviewed Mangum to take her statement. (*Id.* ¶¶ 150, 155.) Gottlieb and Himan then obtained a search warrant and searched 610 N. Buchanan Blvd., where the party had taken place. (*Id.* ¶ 162.)

On March 21, Gottlieb served Levicy with a subpoena that would permit her to disclose Mangum's medical records. (*Id.* ¶ 151.) In response, Levicy provided Mangum's sexual assault examination report to Gottlieb. (*Id.* ¶ 340.) She also told Gottlieb that the medical examination had revealed "blunt force trauma" and that such trauma was "consistent with the victim's statement." (*Id.* ¶ 185.) There are no allegations that Dr. Manly was ever questioned by, or spoke with, any police officer or representative of the District Attorney.

Two days later, on March 23, 2006, Judge Ronald Stephens of the Durham County Superior Court issued a Non-Testimonial Order (NTO) for the collection of DNA and photographs from all 46 white members of the lacrosse team. (*Id.* ¶¶ 204, 213-214.) The authorization for the NTO was based on information from Mangum's statement to Durham Police (*id.* ¶¶ 155-156, 208), items of Mangum's found during the search of 610

N. Buchanan (*id.* ¶ 207), information from Mangum's medical examination and record (*id.* ¶¶ 189, 205), and information obtained by the Durham Police during their interview of the residents of 610 N. Buchanan after the house was searched (*id.* ¶¶ 162-165).

On April 1, 2006, the Durham Herald-Sun newspaper published a story based on an interview with Theresa Arico. (*Id.* ¶ 334.) In the article, Arico was quoted as explaining that a SANE nurse can diagnose blunt force trauma, which is an injury consistent with sexual assault, through the use of a colposcope. (*Id.*)

The evidence collected by Levicy and Manly for the rape kit, together with the evidence collected pursuant to the NTO, produced the DNA evidence that exonerated the members of the lacrosse team. (*Id.* ¶¶ 212, 383-384.) Nifong concealed this exculpatory evidence. (*Id*. ¶¶ 384, 402-404.) He was later disbarred, found guilty of criminal contempt, and incarcerated for his misconduct. (*Id.* ¶¶ 6, 161, 471.)

## III.    QUESTIONS PRESENTED

**A.**    Whether Plaintiffs have failed to state a basis for their negligence claims (Counts 2-5);

**B.**    Whether Plaintiffs have failed to state a basis for their intentional infliction of emotional distress claim (Count 1);

**C.**    Whether Plaintiffs have failed to state any basis for their claims under 42 U.S.C. § 1983, and in particular, have failed adequately to allege that (1) any of the health care providers or other Duke defendants acted under color of state law, or (2) they were deprived of any constitutional right (Counts 21-22); and

**D.** Whether Plaintiffs have failed to state a basis for their obstruction of justice claim (Count 23).

## IV. STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim, the Court should accept well-pleaded factual allegations in the complaint as true, but should give no weight to legal conclusions cast in the form of factual allegations. *See, e.g.*, *Young v. City of Mount Rainier*, 238 F.3d 567, 577 (4th Cir. 2001). Nor should the Court give any weight to conclusory allegations ungrounded in any assertion of fact. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). In particular, unsupported allegations of conspiracy—as made in all of Plaintiffs' civil rights claims against the health care providers and other Duke defendants—are insufficient to survive a motion to dismiss. *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1966 (2007). Plaintiffs raising conspiracy claims must allege specific facts to show that an agreement was made; neither "a bare assertion of conspiracy" nor "a conclusory allegation of agreement" suffices. *Id.* at 1966. Instead, plaintiffs must allege sufficiently specific facts to "raise a right to relief above the speculative level," *id.* at 1965, such that the "claim … is plausible on its face," *id.* at 1974.

## V. ARGUMENT

### A. Plaintiffs Fail To State A Claim For Negligence (Counts 2-5)

In Counts 2-5, Plaintiffs assert various negligence-based claims grounded on allegations that Duke health care providers breached a duty of care in performing their

forensic medical examination of Mangum on March 14, 2006, and in subsequent conversations with investigators and public statements. These claims are fatally flawed for two independent reasons.

First, the defendants had no actionable duty of care to these Plaintiffs. North Carolina courts have made clear that "[n]egligence presupposes the existence of a legal relationship between the parties by which the injured party is owed a duty which either arises out of a contract or by operation of law." *Prince v. Wright*, 141 N.C. App. 262, 266, 541 S.E.2d 191, 195 (2000) (internal citation and quotation marks omitted); *see* W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 53, at 357 (5th ed. 1984). There is no such relationship here; North Carolina law makes clear that health care personnel examining a patient have a duty of care to, and only to, that patient.

Second, Plaintiffs cannot establish another essential element of their claims—namely, that the actions of the health care providers proximately caused their injuries. Plaintiffs themselves allege that the decision to pursue the investigation into the alleged rape was the willful, deliberate, and indeed criminal act of Mr. Nifong and certain Durham police officers. (*See, e.g.*, Compl. ¶¶ 161, 457.) Where, as here, it is plain on the face of the complaint that the alleged harm was proximately caused by a different party, dismissal is warranted. *See Tise v. Yates Constr. Co.*, 345 N.C. 456, 460, 480 S.E.2d 677, 680 (1997); *Lynn v. Overlook Dev.*, 328 N.C. 689, 697, 403 S.E.2d 469, 473-

474 (1991); *Ford v. Peaches Entm't Corp.*, 83 N.C. App. 155, 156, 349 S.E.2d 82, 83

(1986); *see also Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999).[3]

### 1.    Defendants Did Not Owe Plaintiffs A Duty Of Care

All of Plaintiffs' negligence claims assert a duty related to Mangum's examination

at Duke Hospital:  Count 4 alleges that Duke health care providers breached their duty of

care in the conduct of the "forensic and/or medical examinations of Mangum," a duty

which Plaintiffs assert includes a duty to exercise care in "collecting, assessing,

analyzing, and reporting the physical and medical evidence derived from" this

examination.  (Compl. ¶ 505.)  Count 2 raises a claim of negligent infliction of emotional

distress based on the alleged failure to exercise care in examining Mangum and in

reporting the results of the examination.  (*Id*. ¶¶ 491-492.)  Count 3 alleges that Tara

Levicy, the sexual assault nurse examiner, and Levicy's supervisor, Theresa Arico, were

negligently supervised and thereby allowed to continue their "tortious course of conduct."

(*Id.* ¶ 501.)  Count 5 raises a "breach of duty to warn" claim, asserting that the conduct of

the health care providers in examining Mangum and reporting the results of that

examination created a "hazardous condition" about which the defendants had a duty to

warn Plaintiffs.  (*Id.* ¶¶ 511, 513.)  Plaintiffs include members of the lacrosse team who

---

[3] Plaintiffs' claims in Counts 2-5 are also brought against Duke defendants who are not included in the "Duke SANE Defendants" group—Duke University, Brodhead, and Dzau.  Those defendants join in these arguments.  Because (as explained below) there is no duty owed by the hospital or health care providers to these Plaintiffs, there can be no liability in negligence for any of the named defendants as alleged in Counts 2-5.  For the same reason, there can be no vicarious liability for Duke University, DUHS, Dzau, or Brodhead, and the claims against them should be dismissed.

were investigated (but never indicted or arrested) as well as some of these players'

parents. As detailed below, these claims all fail because the Duke health care providers

had no actionable duty *to these Plaintiffs* under any of these theories.

<blockquote>

**a.** **The Health Care Providers Had No Duty Of Care To These Plaintiffs With Respect To The Forensic Medical Examination Of Mangum**

</blockquote>

Plaintiffs complain about the quality of Duke Hospital's forensic medical

examination of Crystal Mangum. This is, in substance, a medical malpractice claim.

These Plaintiffs cannot bring such a claim because, under North Carolina law, the Duke

health care providers did not owe them (as non-patients) a duty of care. *See Iodice v.*

*United States,* 289 F.3d 270, 275 (4th Cir. 2002).

Plaintiffs assert that the Duke health care providers owed them a duty to use due

care in the "forensic and/or medical examinations of Mangum," and that this duty

included an obligation to use due care in assessing and reporting the results of that

examination. (Compl. ¶ 505.) Plaintiffs further assert that the health care providers

breached these duties by performing these clinical services in a subpar manner. (*Id.*) For

example, Plaintiffs allege that the diagnosis of blunt force trauma was inaccurate, and

that such a diagnosis was "impossible" to make without the use of a colposcope, which

the Duke medical personnel allegedly failed to use in their examination of Mangum. (*Id.*

¶ 185.) Similarly, Plaintiffs allege that Dr. Manly's diagnosis of abnormality in the

pelvic exam (diffuse edema of the vaginal walls) was flawed (*id.* ¶ 126), and that nurse

Levicy "misleadingly exaggerated [the] significance" of this vaginal edema by implying that such edema was evidence of blunt force trauma (*id.* ¶ 187).

Such claims are for medical malpractice, which is defined by North Carolina statute as an action that "aris[es] out of the furnishing [of] … professional services in the performance of medical … or other health care by a health care provider." N.C. Gen. Stat. § 90-21.11. Because Plaintiffs' negligence claims here arise out of the clinical care provided by doctors and nurses, their claims fall within this definition of a medical malpractice claim. *See, e.g.*, *Estate of Waters v. Jarman*, 144 N.C. App. 98, 103-104, 547 S.E.2d 142, 145-146 (2001) (claims arising out of clinical care provided by the hospital to the patient sound in medical malpractice; claims arising out of policy, management, or administrative decisions sound in ordinary negligence).

Plaintiffs cannot bring this claim against any of the health care providers, however, because North Carolina law does not allow medical malpractice claims to be brought by persons other than the patient. "[T]he Supreme Court of North Carolina has unequivocally held that 'the relationship of physician to patient must be established as a prerequisite to an actionable claim for medical malpractice.'" *Iodice*, 289 F.3d at 275 (quoting *Easter v. Lexington Mem'l Hosp.*, 303 N.C. 303, 305-306, 278 S.E.2d 253, 255 (1981)). The Fourth Circuit noted that it had not found "a single North Carolina case permitting unrelated third party victims of a patient to sue the patient's health care providers for medical malpractice, or even suggesting that such claims are possible." *Id.*;

*see also Russell v. Adams*, 125 N.C. App. 637, 640, 482 S.E.2d 30, 33 (1997) (holding that psychologist had no duty of care to patient's mother).[4]

"North Carolina courts have emphasized the policy reasons counseling rejection of such suits: doctors should owe their duty to their patient and not to anyone else so as not to compromise this primary duty." *Iodice*, 289 F.3d at 275-276 (internal citations and quotation marks omitted). If doctors and nurses owed an actionable duty of care to third parties as well as their patients, their focus on the patient's health and welfare could be compromised. Health care personnel must be free to draw conclusions and make recommendations based on the patient's response and best interest, not anyone else's. *Cf. Russell*, 125 N.C. App. at 640, 482 S.E.2d at 32-33 (acknowledging that psychologist's treatment of a patient "may have adverse consequences on … third parties" but nonetheless declining to extend any legal duties to such third parties).[5]

---

[4] Viewed another way, Plaintiffs' negligence-based claims—that the health care providers failed to use due care in the "forensic and/or medical examinations of Mangum" (Compl. ¶ 505)— should be dismissed because Plaintiffs lack standing to raise the legal rights of third parties (Mangum) who are not before the Court. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (holding that attorneys lacked standing to assert the rights of indigent defendants denied appellate counsel and noting "we have not looked favorably upon third party standing"). Any legal right to be free of the negligent provision of health care was held by Mangum, not Plaintiffs. Because Plaintiffs lack standing to raise Mangum's legal rights, their negligence claims should be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

[5] Plaintiffs' negligence claims, which are based on the forensic examination of Mangum and are in substance medical malpractice claims, should also be dismissed because Plaintiffs have failed to comply with North Carolina Rule of Civil Procedure 9(j). Rule 9(j) provides that any complaint alleging medical malpractice by a health care provider as defined in N.C.G.S. § 90-21.11 in failing to comply with the applicable standard of care under N.C.G.S. § 90-21.12 "shall be dismissed" unless the pleading specifically asserts

Even if this negligence claim were somehow distinguishable from a medical malpractice claim, it would still fail for several reasons. First, North Carolina law disallows ordinary negligence claims by third parties against health care providers, just as it disallows third-party medical malpractice claims. *See Iodice*, 289 F.3d at 277. North Carolina cases have discussed ordinary negligence claims against health care providers "as involving a duty that 'a hospital … owes to its patients.'" *Id.* (quoting *Blanton v. Moses H. Cone Mem'l Hosp. Inc.*, 319 N.C. 372, 376, 354 S.E.2d 455, 458 (1987)). In North Carolina, there is (with perhaps one exception) a "total absence of ordinary negligence cases permitting recovery against a health care provider by a third party victim." *Id.* at 279.[6] As Plaintiffs were not patients, the health care providers did not owe them a duty of care.

---

that the medical care has been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care or that the pleading alleges facts establishing negligence under the doctrine of *res ipsa loquitur*. Those requirements are applicable in federal court. *See Estate of Williams-Moore v. Alliance One Receivables Mgmt., Inc.*, 335 F. Supp. 2d 636, 649 (M.D.N.C. 2004); *Frazier v. Angel Med. Ctr.*, 308 F. Supp. 2d 671, 676-677 (W.D.N.C. 2004). Plaintiffs' Complaint makes no such statement. Because the Complaint fails to comply with Rule 9(j), the negligence claims should be dismissed.

[6] As the Fourth Circuit noted, the one case that arguably allowed a third party victim to recover against a health care provider is *Pangburn v. Saad*, 73 N.C. App. 336, 326 S.E.2d 365 (1985). There, a North Carolina appellate court held that third-party victims of a wrongly released mental patient may sue the patient's health care providers for negligent release. *Id.* at 337-338, 326 S.E.2d at 367. That holding, though, was specifically limited to cases of negligent release of mental patients, and subsequent cases have refused to extend the holding to other settings. *See, e.g.*, *Iodice*, 289 F.3d at 277 n.4.

Further, even if health care providers might in certain circumstances owe duties to someone other than their patient, that could not assist Plaintiffs here, where there is, at most, a highly attenuated connection between the alleged negligence and the harm. Plaintiffs allege that the hospital and nurses did not use the due care and professional judgment required of health care professionals in treating a possible sexual assault victim, and that Levicy's statements to the Durham police that the examination of Mangum showed "signs consistent with sexual assault" was a negligent act that "in effect" advised the Durham police that a rape had likely occurred. (Compl. ¶¶ 150, 153.) Allegations of this sort are far removed from the "tight nexus" that North Carolina courts require between the alleged negligence and the harm in a third-party claim. *Iodice*, 289 F.3d at 279.

In *Iodice*, for example, the Fourth Circuit affirmed the dismissal of a negligence claim based on the allegation that a doctor had over-prescribed narcotics to a patient, resulting in injury to a third party. Although the court suggested that North Carolina law *might* in some circumstances recognize a third-party negligence claim against medical providers for over-prescribing narcotics to an intoxicated patient, it stressed that such a claim could lie only when the medical provider knew when dispensing the drugs that the patient was already under the influence of alcohol and would be driving a car shortly thereafter. 289 F.3d at 279-281. Similarly, here, Plaintiffs fail to show how the health care providers could have foreseen—much less that they knew—how their supposed negligence might have resulted in harm to these Plaintiffs, especially since it was the

medical evidence collected by the Duke doctors and nurses that *exonerated* the players. To find a duty in this case would mean that medical professionals have a duty of care to *any person* (and the parents of any person) who might be investigated for a crime for which those professionals collected medical evidence. There is no support in North Carolina law for such an expansive duty.

> **b.** **The Health Care Providers Had No Duty Of Care To These Plaintiffs With Respect To Assessing Or Reporting The Results Of The Forensic Medical Examination Of Mangum**

There is also no support in North Carolina law for Plaintiffs' assertion that the Duke health care providers owed them a duty of care in "assessing" or "reporting" the results of the forensic medical examination of Mangum. (Compl. ¶ 505.) The duty that Plaintiffs are asking this Court to recognize here is the duty to exercise due care whenever one "reports" information to another party. No North Carolina or Fourth Circuit case has ever recognized any such duty, and with good reason. Such a duty would be sweeping in scope, even broader than the tort of defamation. The tort of defamation has strict limits because of its potentially broad scope and effect on free speech rights. One particularly important limitation is that speech cannot be deemed defamatory unless it refers to an identifiable individual. *See Arnold v. Sharpe*, 296 N.C. 533, 539, 251 S.E.2d 452, 456 (1979). Plaintiffs could not satisfy that requirement,

because the health care providers' "reports" of which they complain made no reference to any individual.[7]

Plaintiffs' theory would cast aside this important protection of defamation law, and, if accepted, would have a significantly chilling effect on free speech. Under Plaintiffs' theory, medical personnel who provide information to the police about injuries to possible crime victims would be liable in tort to *any* person who subsequently comes under police suspicion for the crime—indeed, to any person who is publicly associated with or related to those who come under suspicion and therefore might suffer the public humiliation and "obloquy" of which Plaintiffs complain. (*See, e.g.*, Compl. ¶ 511 (citing harm to the reputation and emotional state of the lacrosse players and their *families* (emphasis added)); *see also id.* ¶ 632.) Plaintiffs' theory, moreover, could not be limited to medical personnel who speak with the police; it would allow tort claims against *any* person who discussed a criminal matter with the police. The willingness to cooperate with law enforcement—which courts should encourage, not discourage—would quickly disappear under such a regime. This Court should therefore decline to recognize this novel negligence theory.

---

[7] In addition, the one-year statute of limitations (which has passed) would bar any defamation claim. *See* N.C. Gen. Stat. § 1-54(3); *Iadanza v. Harper*, 169 N.C. App. 776, 782, 611 S.E.2d 217, 222-223 (2005).

### c. The Health Care Providers Had No Duty Of Care To These Plaintiffs That Would Support A Negligent Supervision Claim

Because Plaintiffs have no negligence claim against any hospital employee, they also cannot maintain an action against their employers for negligent supervision. *See Guthrie v. Conroy*, 152 N.C. App. 15, 26, 567 S.E.2d 403, 411 (2002); *Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 496-497, 340 S.E.2d 116, 125 (1986). As explained above, Plaintiffs cannot maintain a negligence claim against any Duke health care provider because the hospital and health care workers owed no actionable duty to Plaintiffs with respect to the clinical care provided in conducting Mangum's sexual assault examination or in "assessing" and "reporting" the results of that examination. Because no hospital *employee* is liable for any tortious act alleged in this complaint, Plaintiffs' claim against their *employers* for negligent supervision should also be dismissed. *See Guthrie*, 152 N.C. App. at 26, 567 S.E.2d at 411 ("[W]here there is no liability on the part of [an employee], plaintiff's claims against [an employer] asserting … negligent retention of [employee] may not be [maintained].") (internal citation and quotation marks omitted).

In any event, Count 3 should be dismissed as to defendant Arico, as well as Brodhead and Dzau, because none of those individuals is the corporate entity that is the "employer," and therefore none of them can, as a matter of law, be held liable for negligent supervision. *Smith v. Privette*, 128 N.C. App. 490, 494, 495 S.E.2d 395, 398 (1998) (negligent supervision is based on "the *employer's* liability to third parties")

(emphasis added); *Cox v. Indian Head Indus., Inc.*, 123 F. Supp. 2d 892, 914 (W.D.N.C. 2000) (negligent supervision claim sustainable only against corporate defendant as employer; individual defendants and supervisory employees were not the employer and could not be liable for negligent supervision).

> ### d. The Health Care Providers Had No Duty Of Care To These Plaintiffs That Would Support A Claim For Negligent Infliction Of Emotional Distress

Count 2 alleges that the sexual assault nurse, Tara Levicy, negligently inflicted emotional distress by "breaching the duty of care and professional judgment required" during the sexual assault examination of Mangum and in assessing and reporting the results of that examination. (Compl. ¶ 491.) Plaintiffs further allege that Levicy's supervisor, Theresa Arico, breached the "duty of care and professional judgment" in her supervision of Levicy and in her "ratification" of Levicy's alleged misrepresentations to the Durham Investigators. (*Id.* ¶ 492.) To state such a claim for negligent infliction of emotional distress, "a plaintiff must allege that (1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress …, and (3) the conduct did in fact cause severe emotional distress." *McAllister v. Ha,* 347 N.C. 638, 645, 496 S.E.2d 577, 582-583 (1998).

Plaintiffs' claim fails because they cannot satisfy the first element of the tort—negligent conduct. *See Guthrie*, 152 N.C. App. at 25, 567 S.E.2d at 410. Negligence is the breach of a legal duty, and as discussed above, Plaintiffs have failed to allege a legally cognizable duty that could give rise to an actionable negligence claim. Absent a

breach of a duty of care, a claim for negligent infliction cannot be maintained.  *See id.*, 567 S.E.2d at 411.

Moreover, North Carolina courts have generally limited claims for emotional distress in medical cases to (1) relatives of a patient who (2) witnessed the negligent act or were in close proximity to it.  *See Johnson v. Ruark Obstetrics & Gynecology Assoc., P.A.*, 327 N.C. 283, 305, 395 S.E.2d 85, 98 (1990).  North Carolina courts have rejected claims where the alleged injury was far less remote from the negligent act than is the case with Plaintiffs' allegations here.  *See, e.g.*, *Gardner v. Gardner*, 334 N.C. 662, 666-667, 435 S.E.2d 324, 328 (1993) (granting summary judgment to defendant father on mother's claim for negligent infliction of emotional distress after father's negligent driving caused death of their son; defendant did not know that plaintiff was subject to mental disorder and plaintiff did not observe the negligent act); *Andersen v. Baccus*, 335 N.C. 526, 532-533, 439 S.E.2d 136, 139-140 (1994) (granting summary judgment to defendant motorist on claim for negligent infliction of emotional distress brought by plaintiff husband for death of his wife and stillborn son in automobile accident).  Here, the Duke health care providers' allegedly negligent examination of Mangum, which allegedly led the police to investigate the rape allegation, which led to an investigation of the lacrosse players, which led to anguish for those players as well as their parents, is too attenuated from Plaintiffs' alleged injuries to support a negligent infliction of emotional distress claim on behalf of those players and parents under North Carolina law.  In this case there is no

allegation, and there obviously could be no allegation, that any Plaintiff is a close family member of the patient who witnessed the allegedly negligent treatment of the patient.

Plaintiffs' claim also fails because they have not alleged another required element of their claim—that they suffered *severe* emotional distress as a result of the alleged conduct. A claim for negligent infliction of emotional distress will lie only if the plaintiff has suffered a "*severe and disabling* emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *McAllister*, 347 N.C. at 645, 496 S.E.2d at 583 (internal citation and quotation marks omitted). Plaintiffs have not alleged that they have a diagnosable "emotional or mental condition." Although Plaintiffs offer the conclusory assertion that they suffered "severe emotional distress" (Compl. ¶ 495), the Court should give no weight to legal conclusions cast in the form of factual allegations. *See Young*, 238 F.3d at 577 (on motion to dismiss, court should give no weight to "conclusory legal terms"). In the absence even of allegations that Plaintiffs have been severely affected by the alleged conduct, the emotional distress claim should not go forward.

> **e.** **The Health Care Providers Had No Duty Of Care To These Plaintiffs That Would Support A Claim For Failure To Warn**

In Count 5, Plaintiffs allege that Duke health care providers "intentionally and/or recklessly created a hazardous condition that foreseeably threatened and injured … the plaintiffs and their families … by intentionally and/or recklessly providing false and misleading information to the Durham Investigators and thereby instigating, encouraging,

and/or prolonging a baseless criminal investigation against the plaintiffs." (Compl. ¶ 511.) By "fail[ing] to exercise due care to warn the plaintiffs" about this hazardous condition, Plaintiffs allege, the health care providers breached their duty to warn and protect against this hazard. (*Id.* ¶¶ 513-515.) Plaintiffs' claim fails for several reasons.

First, the gravamen of Plaintiffs' claim is that, once these health care defendants provided information to law enforcement that (Plaintiffs contend) was mistaken, those health care providers owed Plaintiffs—and any other potential suspects—a legal duty to warn them that they might come under police scrutiny. North Carolina courts have never imposed a "duty to warn" on health care providers in such circumstances, and for good reason: it is not the job of nurses, doctors, or hospitals to determine if a crime has been committed or who should be investigated for possible crimes.[8] That job falls to law enforcement. And law enforcement must rely on information from health care

---

[8] There appear to be only three contexts in which North Carolina courts have recognized a "failure to warn" claim: premises liability, *see, e.g.*, *Grayson v. High Point Dev. Ltd. P'ship*, 175 N.C. App. 786, 625 S.E.2d 591 (2006), strict liability, *see, e.g.*, *City of Thomasville v. Lease-Afex, Inc.*, 300 N.C. 651, 268 S.E.2d 190 (1980)*,* and implied warranty, *see, e.g.*, *Reid v. Eckerds Drugs, Inc.*, 40 N.C. App. 476, 480-481, 253 S.E.2d 344, 347-348 (1979). North Carolina case law is devoid of cases in which a defendant has been held liable for failing to warn when the defendant neither created a physical hazard, nor had the plaintiff on defendant's physical premise. *Cf. Gregory v. Kilbride*, 150 N.C. App. 601, 610, 565 S.E.2d 685, 692 (2002) ("North Carolina does not recognize a psychiatrist's duty to warn third persons" about the possible dangers that a patient might present to others). That North Carolina has never recognized a duty to warn in the circumstances at issue here is not surprising; it is not possible to require individuals to warn all (unknown) potential suspects "and their families" that the police might investigate them based on information that the individual provided to police. (Compl. ¶¶ 511, 513.) Even less feasible is the ability of individuals providing information to the police to "protect" potential suspects from being investigated by the police.

professionals and other citizens—including imperfect and incomplete information—to investigate and solve crimes. Indeed, the Supreme Court has held that the police may reasonably rely on anonymous sources, even those whose veracity or reliability is not known. *See Illinois v. Gates*, 462 U.S. 213, 244 (1983). If Plaintiffs' theory were accepted, health care providers would surely hesitate to cooperate with police investigations; by providing information to the police, those health care providers would face potential liability to *any* possible suspects who came under investigation, unless they *also* told those suspects that they might be investigated. Merely postulating such a regime is sufficient to demonstrate its unworkability.

Second, Plaintiffs complain that the health care providers, by giving information to the police, injured the "plaintiffs and their families" by "instigating, encouraging, and/or prolonging a baseless criminal investigation." (Compl. ¶ 511.) But none of the Duke health care providers had the power or authority to "instigate" any criminal investigation, and on Plaintiffs' own allegations, it was the independent actions of Nifong that "prolonged" the investigation. *See infra* pp. 23-26 (discussing Nifong's intervening acts). In any event, none of these Plaintiffs were ever arrested, indicted or tried for any crime, and no North Carolina court has ever recognized a civil claim in these circumstances for "instigating, encouraging or prolonging" a criminal investigation.

Finally, to the extent that Plaintiffs are alleging that the health care providers injured Plaintiffs through intentional misconduct—by intentionally providing false or misleading information to the police to "aggravate and prolong" Plaintiffs' ordeal

(Compl. ¶¶ 514, 517)—the appropriate claim for such allegations is for an intentional tort. Such allegations cannot support a negligence claim. *Barbier v. Durham County Bd. of Educ.*, 225 F. Supp. 2d 617, 631 (M.D.N.C. 2002) (allegation of intentional acts does not state claim for negligence); *Mitchell v. Lydall, Inc.*, No. 93-1374, 1994 WL 38703, at *3 (4th Cir. Feb. 10, 1994); *Sabrowski v. Albani Bayeux, Inc.*, No. 02-00728, 2003 WL 23018827, at *5-6 (M.D.N.C. Dec. 19, 2003), *aff'd*, 2005 WL 435416 (4th Cir. Feb. 25, 2005); *Ijames v. Murdock*, No. 01-00093, 2003 WL 1533448, at *10 (M.D.N.C. Mar. 21, 2003).

### 2. The Allegedly Willful Acts Of The Durham Police And Nifong Are Intervening Acts Precluding Liability Of The Duke Defendants

Even if the Duke health care providers *had* an actionable duty of care to these Plaintiffs, Plaintiffs' negligence claims in Counts 2-5 still fail because none of their alleged injuries was proximately caused by the alleged actions of any of the health care providers. On Plaintiffs' own pleadings, the allegedly willful actions of Nifong and certain Durham police officers constitute intervening acts.

North Carolina has long adhered to the principle that the "willful and malicious act of a third person" is an intervening cause that precludes liability of the initial negligent actor. *See Ward v. Southern Ry. Co.*, 206 N.C. 530, 530, 174 S.E. 443, 444 (1934); *see also Tise*, 345 N.C. at 460, 480 S.E.2d at 680. That principle controls this case.

Plaintiffs acknowledge in their own pleading that any injury that Plaintiffs might have suffered as a consequence of having been investigated for a crime was directly

caused by the independent and intentional decision of the District Attorney to investigate them. Plaintiffs allege that Nifong and Durham Police Supervisors were "deliberately indifferent to [the accuser's] lack of credibility" (*id.* ¶¶ 160, 377), and that the Durham Police Supervisors intimidated and discredited adverse witnesses (*id.* ¶¶ 110, 422), engaged in witness tampering (*id.* ¶ 182), and acted on Nifong's instructions to design photo arrays that guaranteed the result that the police wanted and that violated standard Durham police protocol (*id.* ¶¶ 208, 343, 346). Moreover, Nifong took "personal control over the investigation" on March 27 and "continued to pursue a prolonged, highly public, and malicious investigation against the lacrosse players" even in the face of "overwhelming" exculpatory evidence (*id.* ¶¶ 268, 270), failed to disclose exculpatory evidence (*id.* ¶¶ 384, 403, 427), and made "fraudulent misrepresentations to the court" to cover up his misconduct (*id.* ¶ 457).

There are no allegations that Duke or any Duke health care provider had *any* part in making or carrying out these decisions. Indeed, the Plaintiffs' own allegations make clear that Nifong could have—and should have—stopped the investigation on March 28, or at the latest, on April 10, when DNA testing excluded the lacrosse players as the source of DNA on the rape kit items. (*Id.* ¶¶ 304-305, 384.) Instead, Nifong chose to conceal the DNA test results and to proceed with indictments, allegedly in conspiracy with certain Durham police officers and the DNA laboratory. (*Id.* ¶ 385.) There is no allegation, nor could there be, that Duke or any Duke health care provider knew of these DNA test results or played any part in their non-disclosure. And it is clear that had

Nifong *not* made these decisions, the investigation would have ended. Thus, on the face

of Plaintiffs' own allegations, any conduct by the health care providers could not have

been the proximate cause of any harms allegedly suffered by Plaintiffs. The intervening

intentional acts of Nifong and Gottlieb broke the chain of causation. *See Ford*, 83 N.C.

App. at 156, 349 S.E.2d at 83; *Tise*, 345 N.C. at 460, 480 S.E.2d at 680; *see also Food

Lion, Inc. v. Capital Cities/ABC, Inc.*, 964 F. Supp. 956, 961 (M.D.N.C. 1997) ("[I]f the

original wrong only becomes injurious in consequence of the intervention of some

distinct wrongful act or omission by another, the injury shall be imputed to the last wrong

as the proximate cause, and not to that which was more remote.") (internal quotation

marks and citation omitted).

In addition, the Complaint itself makes clear that the health care providers could

not have reasonably foreseen the series of events that led to Plaintiffs' alleged injuries.

The unforeseeability of these events is fatal to Plaintiffs' negligence claims against the

Duke health care defendants. *See Ford*, 83 N.C. App. at 156, 349 S.E.2d at 83 ("An

essential element of causation is foreseeability, that which a person of ordinary prudence

would reasonably have foreseen as the probable consequence of his acts. A person is not

required to foresee all results but only those consequences which are reasonable.")

(citation omitted); *Williamson v. Liptzin*, 141 N.C. App. 1, 11, 539 S.E.2d 313, 319

(2000). Plaintiffs acknowledge that Nifong's actions were "unprecedented" and

unforeseeable. (*See, e.g.*, Compl. ¶¶ 219, 220.) Nifong's extraordinary actions—actions

for which he ultimately was disbarred and jailed—could not have been reasonably

foreseen by any health care provider. Under these circumstances, where Plaintiffs' own factual allegations underscore that no one could have anticipated the events that led to their alleged injuries, dismissal is warranted. *See Ford*, 83 N.C. App. at 156, 349 S.E.2d at 83; *Tise*, 345 N.C. at 460-461, 480 S.E.2d at 680-681; *cf. Warrior & Gulf Navigation Co. v. United States*, 864 F.2d 1550, 1554 (11th Cir. 1989) (determining that the defendant's actions were not the proximate cause of the plaintiff's injuries where an "unprecedented" event, unusually heavy rainfall, caused the chain of events that led to the alleged damage).

**B.      Plaintiffs Fail To State A Claim For Intentional Infliction Of Emotional Distress (Count 1)**

Plaintiffs allege that the Duke health care providers intentionally inflicted emotional distress on them when Levicy allegedly provided "Durham Investigators information about the medical and physical evidence of rape that was false and misleading" (Compl. ¶ 483), and when the other defendants "ratified [this] course of conduct" through action and "inaction" (*id.* ¶¶ 486, 487). For several reasons (as described below), this count fails to state a claim: The alleged conduct does not meet the very strict standards for extreme and outrageous behavior that North Carolina law requires to state a claim for intentional infliction of emotional distress; North Carolina law does not support the notion that that tort may be committed through "inaction"; and

Plaintiffs have failed to allege the severe emotional damage that is necessary to support such a claim.[9]

Under North Carolina law, "[t]he essential elements of an action for intentional infliction of emotional distress are: 1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress." *Waddle v. Sparks,* 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992) (internal quotation marks omitted). There are strict requirements to this tort that bar Plaintiffs' claims at the threshold. First, to satisfy the "extreme and outrageous conduct" requirement, Plaintiffs must allege (and eventually prove) conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Guthrie,* 152 N.C. App. at 22, 567 S.E.2d at 408-409 (internal quotation marks omitted). Second, Plaintiffs must allege (and eventually prove) that they suffered "emotional distress of a *very* serious kind" as a result of the claimed conduct. *Waddle,* 331 N.C. at 83, 414 S.E.2d at 27 (internal quotation marks omitted).[10]

---

[9] This claim is also brought against Duke defendants who are not included in the "Duke SANE Defendants" group—Duke University, Brodhead and Dzau. Those defendants join in this argument.

[10] Both questions are appropriate for resolution on a motion to dismiss. *See Thomas v. N. Telecom, Inc.*, 157 F. Supp. 2d 627, 635 (M.D.N.C. 2000) (holding, on motion to dismiss, that alleged conduct did not satisfy the "extremely rigorous standard" required for "extreme and outrageous" conduct as a matter of law); *Pruett v. Town of Spindale, N.C.*, 162 F. Supp. 2d 442, 447 (W.D.N.C. 2001) (holding, on motion to dismiss, that plaintiff had not alleged sufficiently severe emotional distress).

Plaintiffs' claim fails the first element because, under North Carolina law, reporting a crime to the police and prosecutors is not "extreme and outrageous conduct," even if that report is inaccurate—indeed, even if that report is false or fabricated. To the contrary, North Carolina law encourages individuals to report suspicions of crime to the police, and it is the responsibility of public authorities to then determine whether the reports are well-founded. In *Dobson v. Harris*, 134 N.C. App. 573, 521 S.E.2d 710 (1999), *rev'd on other grounds*, 352 N.C. 77, 530 S.E.2d 829 (2000), which involved a claim for making a false report of a serious crime to authorities, the plaintiff sued a department store and its employee for falsely reporting to the County Department of Social Services ("DSS") that the plaintiff abused and neglected her child while in the store. The Court of Appeals concluded that, although the employee might have "exaggerated or *fabricated* the events [of child abuse that] she reported to DSS, the report served only to initiate an investigatory process" by DSS, and therefore was not "extreme" or "outrageous." *Id.* at 578-579, 521 S.E.2d at 715 (emphasis added). The Court thus upheld the trial court's grant of summary judgment on that claim.[11] Here, Levicy's

---

[11] *See also Ausley v. Bishop*, 133 N.C. App. 210, 221, 515 S.E.2d 72, 79-80 (1999) (employer's report to the police that a former employee had embezzled from the company was not "extreme and outrageous," even though the allegation was baseless); *Shillington v. K-Mart Corp.*, 102 N.C. App. 187, 198, 402 S.E.2d 155, 161 (1991) (security guard's reporting of alleged trespass and looting to police, resulting in plaintiff's arrest, was not "extreme and outrageous," even though security guard refused to listen to plaintiff's explanation); *Troxler v. Charter Mandala Center, Inc.*, 89 N.C. App. 268, 274, 365 S.E.2d 665, 669 (1988) (hospital employee's report to his employer that his coworker had had sexual relations with a minor female patient was not "extreme and outrageous" because "[a]ll of the people with whom he spoke were part of the investigative process").

alleged conduct, like that of the employee in *Dobson*, involved making a report to authorities of facts suggesting that a crime had been committed. That a crime had *not* been committed does not transform Levicy's statement into "extreme" or "outrageous" conduct.

The alleged conduct of Theresa Arico is even less susceptible to characterization as "extreme or outrageous." Arico is alleged to have given a newspaper interview, in which she was quoted as saying "that 'blunt force trauma' could be diagnosed in a rape victim 'with a high degree of certainty' through the use of a colposcope," and that, "I can reasonably say these injuries are consistent with the story she told." (Compl. ¶¶ 334, 336.) Nothing about these statements "exceed[s] all bounds of decency tolerated by society," as Plaintiffs assert. (Compl. ¶ 486); *see Guthrie*, 152 N.C. App. at 22, 567 S.E.2d at 408-409.

Second, although Plaintiffs suggest that Levicy's actions can also form the basis of liability for defendants Brodhead (Duke University President) and Dzau (Chancellor for Health Affairs), Plaintiffs' theory of these defendants' liability is unclear. The suggestion that Brodhead or Dzau could be *directly* liable for Levicy's actions based on their own "inaction" does not satisfy an essential element of an intentional infliction of emotional distress claim, namely, that the alleged behavior constitute an extreme or outrageous *act*—not a failure to act. *See, e.g.*, *Matthews v. Johnson Pub. Co., Inc.*, 89 N.C. App. 522, 524, 366 S.E.2d 525, 526 (1988) (dismissing intentional infliction of emotional distress claim because essential element of offense is an extreme or outrageous *act*; "[w]e

29

have before us no such act" because plaintiff alleged "inaction" as the source of the harm); *Foster v. Crandell*, 181 N.C. App. 152, 168, 638 S.E.2d 526, 537 (2007) (defendant's failure to act did not constitute "'extreme and outrageous' behavior" and that plaintiffs cited "no authority—and we have found none—" that would support a contrary conclusion); *see also Riley v. Whybrew*, 185 S.W.3d 393, 399 (Tenn. Ct. App. 2005) (failure to act did not constitute intentional infliction of emotional distress). Plaintiffs make no allegation that Brodhead or Dzau *did* anything. Plaintiffs instead allege only that Brodhead and Dzau "fail[ed] to act," for example, by *not* making "any statement to contradict Nifong's public speculation about condom use to explain the absence of DNA evidence." (Compl. ¶¶ 389, 487.) Such inaction cannot constitute an extreme or outrageous act as a matter of law.

Nor can Brodhead's or Dzau's "inaction" constitute "ratification" of Levicy's statements sufficient to impose *vicarious* liability on Duke or DUHS. For the "wrongful act of an employee" to be ratified by the employer, the plaintiff must allege two elements: that the employer (1) "had knowledge of all material facts and circumstances relative to the wrongful act," and (2) "by words or conduct, shows an intention to ratify the act." *Hogan*, 79 N.C. App. at 492, 340 S.E.2d at 122.

Plaintiffs' claim fails to allege either element. As Plaintiffs themselves concede, those not involved in Mangum's medical treatment (Arico, Brodhead and Dzau) *could not* have had knowledge of all the material facts and circumstances related to Levicy's assessment of Mangum's medical condition, because those facts could not be divulged

under federal medical privacy laws.  (*See* Compl. ¶ 151 (alleging that the provisions of HIPAA, the Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 (1996), a federal statute that includes patient privacy regulations, prevented Levicy from divulging patient information without a subpoena); *id.* ¶ 8 (alleging that Arico had not been involved in Mangum's examination and had not reviewed the relevant medical records).)

And the Complaint fails to allege any facts to show where, when, or how Brodhead's and Dzau's "words or conduct" demonstrated an *intention* to "ratify" Levicy's or Arico's statements.  Not only did federal privacy laws prevent the dissemination of information about Mangum's treatment beyond those who treated her, but even if Duke officials Brodhead and Dzau had been privy to such information, neither of these individuals had any legal duty to "correct" perceived misstatements of fact in the press or by the District Attorney, and therefore their "failure" to do so cannot constitute ratification.  This claim is therefore different than those in which the supervisor had a legal duty to act.  For example, in *Brown v. Burlington Industries, Inc.*, the department manager had an "explicit duty to rectify" sexual harassment of one employee by another. 93 N.C. App. 431, 438, 378 S.E.2d 232, 236 (1989).  But here, Plaintiffs allege only that "Duke stood by silent and did not correct Nifong" when he told the press that condoms might have been used.  (*See* Compl. ¶ 313.)

Finally, Plaintiffs' claim fails because they have not sufficiently alleged that they suffered *severe* emotional distress as a result of the alleged conduct.  As discussed above,

with respect to Plaintiffs' claim for negligent infliction of emotional distress (p. 20), a claim for emotional distress will lie only if the plaintiff has suffered a "*severe and disabling* emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so."  *Waddle*, 331 N.C. at 83, 414 S.E.2d at 27. As with their negligent infliction claim, Plaintiffs have failed to satisfy these requirements.

### C.     Plaintiffs Fail To State A Claim Under 42 U.S.C. § 1983 (Counts 21-22)

In Counts 21-22, Plaintiffs allege violations of their civil rights under 42 U.S.C. § 1983.  To state a claim under § 1983, Plaintiffs must, at a minimum, adequately allege two elements: (1) that Defendants "deprived [them] of a right secured by the Constitution and laws of the United States"; and (2) that Defendants "deprived [them] of this constitutional right under color of any [State] statute, ordinance, regulation, custom, or usage."  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970) (internal quotation marks omitted).  Plaintiffs fail to allege adequately either of these required elements.

### 1.     Count 21:  Fourth Amendment – DNA Samples

Plaintiffs allege that their Fourth Amendment rights were violated when their "DNA samples were compelled … pursuant to a false and overbroad application for a non-testimonial identification order" (NTO).[12]  (Compl. ¶ 629.)  They claim that this

---

[12] Plaintiff Devon Sherwood, the only African-American member of the lacrosse team, who was not subject to the NTO, has no standing to challenge it.  *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 509 (1975); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166-167 (1972); *Minnesota v. Carter*, 525 U.S. 83, 90 (1998).  His claim should be dismissed for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

asserted "overbroad NTO application" was "knowingly premised … on false and misleading information knowingly provided by Duke Hospital and defendant Levicy." (*Id.*)[13]  This claim fails for two independent reasons:  Plaintiffs have not adequately alleged that any of the Duke health care defendants acted under color of law, and Plaintiffs have not pleaded a violation of the Fourth Amendment.

### a.  No State Action

Section 1983 reaches only *state action*—that is, conduct taken "under color of state law."  "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful."  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (internal quotation marks and citation omitted).  Duke University and its health care providers are private persons or entities whose actions would normally fall outside the reach of § 1983.  Thus, before Plaintiffs can

---

[13] Count 21 is explicitly limited to alleged Fourth Amendment violations caused by "misleading information knowingly provided by Duke Hospital and defendant Levicy." (Compl. ¶ 629; *see id.* ¶ 630 ("This violation of plaintiffs' Fourth Amendment rights was perpetrated through the actions of defendant Levicy, acting in concert with the Durham Investigators ….").)  The only information in the NTO application that Plaintiffs attribute to Levicy, however, are the following two sentences:  "Medical records and interviews that were obtained by a subpoena revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally.  Furthermore, the SANE nurse stated the injuries and her behavior were consistent with a traumatic experience." (*Id.* ¶¶ 189, 205.)  Although paragraphs 207 through 209 of the Complaint describe additional statements in the NTO application, none of these statements is attributed to Levicy or Duke Hospital.  Even if they were, for the reasons described below, Plaintiffs fail to state a claim because the NTO application was sufficient to establish probable cause even without these alleged false statements.

establish liability here under § 1983, they must first demonstrate that Duke University and its health care providers were acting under color of state law.  *Id.*

Plaintiffs attempt to allege the required state action by asserting a conspiracy between the health care providers and the Durham Investigators.  (Compl. ¶ 630.)  But Plaintiffs do not allege any specific facts in support of their conclusory assertion that there was an "agreement and meeting of the minds between defendant Levicy and the defendant Durham Investigators."  (*Id.*)[14]  While Plaintiffs allege that Levicy spoke with the Durham Investigators on March 16 and March 21, 2006 (*id.* ¶¶ 152, 185-188) and that her assertedly false statements to them made their way into the March 23 NTO application (*id.* ¶ 189), Plaintiffs offer no facts to support the required connection between those two allegations—namely, an agreement or meeting of the minds.  In place of this connection, Plaintiffs offer only the conclusory assertion that Levicy and the Durham Investigators agreed to violate Plaintiffs' Fourth Amendment rights by including such alleged falsehoods in the application.

To adequately allege a conspiracy under § 1983, however, it is not enough to contend that defendant Levicy's statements proved to be "critical factors in sustaining the ensuing rape investigation" or that they happened to "appear[] prominently in Gottlieb's March 23 application for a non-testimonial order."  (*Id.* ¶¶ 188-189.)  A private citizen

_____

[14] Plaintiffs style Count 21 as a "Violation of and Conspiracy to Violate Fourth Amendment Rights Under 42 U.S.C. § 1983."  (Compl. at 200.)  Their failure to adequately allege conspiracy is fatal to both the state action element of their § 1983 claim *and* any substantive conspiracy claim raised in this cause of action.

does not become a state actor or join a conspiracy by providing information—even crucial information—to the police. *See Melton v. Dermota*, 940 F.2d 652 (table), 1991 WL 147490, at *7 (4th Cir. Aug. 6, 1991) (providing information to police and "pressing" for police action is not sufficient to make a private entity liable under § 1983); *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 271-272 (2d Cir. 1999) (providing information to a police officer did not make private entity a joint participant in state action); *Benavidez v. Gunnell*, 722 F.2d 615, 618 (10th Cir. 1983) ("The mere furnishing of information to police officers does not constitute joint action under color of state law which renders a private citizen liable under § 1983 ...."); *Butler v. Goldblatt Bros.*, 589 F.2d 323, 327 (7th Cir. 1978) (granting summary judgment to private defendant on § 1983 claim because defendant "did [nothing] more than supply information to police officers who then acted on their own initiative in arresting [plaintiff]"); *McNabb v. State of N.C.*, No. 00-203T, 2001 WL 1020041, at *3 (W.D.N.C. Apr. 11, 2001) ("Even where a citizen provides the government with information and *presses* for an investigation, the private citizen does not become a state actor."); *cf. Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 n.21 (1982).

Plaintiffs must instead allege specific facts that support an agreement or meeting of the minds to take action that violates Plaintiffs' constitutional rights. *See Twombly*, 127 S. Ct. at 1965, 1966; *see also Gooden v. Howard County, Md.*, 954 F.2d 960, 970 (4th Cir. 1992) (holding that a plaintiff alleging conspiracy under § 1983 must "plead *specific* facts in a nonconclusory fashion to survive a motion to dismiss" (emphasis

added)); *Howard v. Food Lion, Inc.*, 232 F. Supp. 2d 585, 597 (M.D.N.C. 2002) ("To survive a motion to dismiss this conspiracy claim under § 1983, a plaintiff must allege both a mutual understanding to achieve some unconstitutional action reached by the private and state defendants and some factual assertion suggesting a meeting of the minds.").  Because Plaintiffs offer no factual allegations in support of that required agreement, they fail to adequately allege a conspiracy and therefore fail to allege that Duke University or the health care providers acted under color of law.

### b.  No Fourth Amendment Violation

This claim should also be dismissed for a second, independent reason: Plaintiffs did not suffer any violation of their Fourth Amendment rights.  Even if Levicy had provided "false and misleading information" that was used to support the NTO—which she did not—the affidavit in support of the NTO application was sufficient to establish probable cause *without* that information.

As the Fourth Circuit has held, "even if an affidavit supporting a search warrant is based in part on some illegal evidence, such inclusion of illegal evidence does not taint the entire warrant if it is otherwise properly supported by probable cause."  *Simmons v. Poe*, 47 F.3d 1370, 1378 (4th Cir. 1995) (internal citations and quotation marks omitted). Therefore, "unless the tainted information is so important that probable cause did not exist without it, the warrant will be deemed valid."  *Id.*; *see also Wilkes v. Young*, 28 F.3d 1362, 1365-1366 (4th Cir. 1994) ("It is well-established that a false or misleading statement in a warrant affidavit does not constitute a Fourth Amendment violation unless

the statement is necessary to the finding of probable cause.") (internal quotation marks omitted); *Taylor v. Waters*, 81 F.3d 429, 437 (4th Cir. 1996) ("[T]he failure of an officer to disclose exculpatory evidence after a determination of probable cause has been made by a neutral detached magistrate does not render the continuing pretrial seizure of a criminal suspect unreasonable under the Fourth Amendment.").  The Fourth Circuit, moreover, "has always applied a highly deferential standard of review in considering the sufficiency of a finding of probable cause by a magistrate."  *Simmons*, 47 F.3d at 1378; *United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992) ("Great deference is to be given a magistrate's assessment of the facts when making a determination of probable cause.").

 "Applying this level of deference," the relevant inquiry is "whether the magistrate had a substantial basis for his conclusion that probable cause existed."  *United States v. Jones*, 31 F.3d 1304, 1313 (4th Cir. 1994) (internal quotation marks omitted).  The application for the NTO relied on (1) Mangum's own statement to the Durham Police (Compl. ¶¶ 155-156, 208); (2) items of Mangum's found during the search of 610 N. Buchanan (*id.* ¶ 207); (3) information from Mangum's medical examination and record (*id.* ¶¶ 189, 205); and (4) information obtained by the Durham Police during their interview of the residents of 610 N. Buchanan after the house was searched (*id.* ¶¶ 162-165).  The affidavit supporting the application for the NTO was sufficient to establish

probable cause, and the magistrate had a "substantial basis" for determining that probable cause existed, even *without* the information from Levicy.[15]

First, the affidavit included a lengthy and detailed description of the victim's own statements to the police regarding her alleged sexual assault. (*See id.* ¶¶ 150, 155-158, 162; *see also* Ex. 2.) These statements were sufficient—without anything more—to establish probable cause. *See, e.g.*, *Ahlers v. Schebil*, 188 F.3d 365, 370-371 (6th Cir. 1999) (holding that a victim's accusation that she had been sexually assaulted, "standing alone, was sufficient to establish probable cause, especially when bolstered by Sheriff's Department's records which confirm that there was a window of time within which the alleged sexual assault could have occurred"). In fact, a magistrate had already determined that Mangum's statements alone had adequately established probable cause for the search of 610 N. Buchanan. (Compl. ¶ 162.)

Second, even if that magistrate's independent finding of probable cause were not enough, the new affidavit supporting the NTO application was bolstered by evidence discovered during the search of 610 N. Buchanan, including the fact that "[t]he victim's

---

[15] Plaintiffs have referred to (and quoted from) the NTO application in their Complaint (Compl. ¶ 189), and the Court may therefore consider it when evaluating defendants' motion to dismiss. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *Waters v. Bass*, 304 F. Supp. 2d 802, 807 n.8 (E.D. Va. 2004) (explaining that for purposes of evaluating a motion to dismiss under Rule 12(b)(6) the court is generally limited to a review of the allegations in a complaint; however, the complaint includes any document which is incorporated into it by reference); *see also Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir. 1985). A copy of this application is attached to this brief as Ex. 2. The Complaint also refers to the warrant for the search of 610 N. Buchanan Blvd. (Compl. ¶ 162), and a copy of that document is attached to this brief as Ex. 3.

make up bag, cell phone, and identification were also located inside the residence during the search warrant" and that "a pile of twenty dollar bills were recovered inside the residence totaling $160.00 consistent with the victim claiming $400.000 cash in all twenty dollar bills was taken from her purse immediately after the rape." (*Id*. ¶ 207; Ex. 2.) Finally, the NTO application stated that the three residents of 610 N. Buchanan informed the police during a non-custodial interview that "their fellow Duke Lacrosse Team Members were the ones who attended th[e] party," that the three cooperating residents "knew everyone" who was at the party, and that "there were no strangers who showed up at the event." (Compl. ¶¶ 162-165; Ex. 2.) Even without the allegedly false information attributed to Levicy, therefore, the NTO affidavit provided more than a "substantial basis" for the magistrate's finding of probable cause.[16]

Because Plaintiffs have not adequately alleged state action or the deprivation of a federal right, Count 21 should be dismissed.

---

[16] Although Plaintiffs assert that the NTO affidavit was "premised" or placed "decisive emphasis" on defendant Levicy's statements (Compl. ¶¶ 205, 629), their own allegations contradict that assertion. As noted, Plaintiffs attribute only two sentences in the NTO application to Levicy. (*Id*. ¶ 189 ("Medical records and interviews that were obtained by a subpoena revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally. Furthermore, the SANE nurse stated the injuries and her behavior were consistent with a traumatic experience."); *see also* Ex. 2.) Moreover, the inclusion of the alleged victim's statement, as well as the evidence uncovered during the search of 610 N. Buchanan and the non-custodial statements of the residents of 610 N. Buchanan, belie the conclusory characterization of Levicy's information as "decisive." *See Simmons*, 47 F.3d at 1379 (applying highly deferential standard—whether there was "substantial basis" for the magistrate to find probable cause without the tainted information).

### 2. Count 22: Fourteenth Amendment – "Malicious Investigation"

Styled as a claim under § 1983 for "malicious investigation," Count 22 alleges that all of the Defendants named in the Complaint participated in a "malicious, bad faith criminal investigation" that violated Plaintiffs' "due process rights under the Fourteenth Amendment of the U.S. Constitution." (*Id.* ¶ 636.) To support this claim, Plaintiffs list a series of actions taken by both Durham and Duke University Defendants that allegedly "shock the conscience." (*Id.* ¶¶ 637-638.) But Plaintiffs' substantive due process claim does not state a deprivation of constitutional rights that would support a claim under § 1983, and this Count should therefore be dismissed.[17]

First, Plaintiffs cannot state a substantive due process claim because the Supreme Court has already rejected such claims in this context. The allegations in this Count are expressly limited to actions taken during the course of a *pretrial* criminal investigation. Plaintiffs cannot allege anything else, of course, because they were never indicted, tried, or convicted. But to the extent that Plaintiffs suffered any deprivations of liberty during this pretrial investigation, they may rely only on the Fourth Amendment. As the Supreme Court explained in *Albright v. Oliver*, 510 U.S. 266, 274 (1994), "[t]he Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth

---

[17] This claim is brought against all of the Duke University Defendants as well as the Duke SANE Defendants. The Duke University Defendants join in this argument.

Amendment to address it."[18]  In so doing, the Court rejected a claim, similar to the one alleged in this Count, that there is a "substantive right under the Due Process Clause of the Fourteenth Amendment to be free from criminal prosecution except upon probable cause." *Id.* at 268.  To the contrary, the Court stated, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing the[] claims." *Id.* at 273 (internal quotation marks omitted).  In the case of alleged "pretrial" deprivations, the Court held that "it is the Fourth Amendment, and not substantive due process, under which [a plaintiff's] claims must be judged." *Id.* at 271.

*Albright* makes clear that, because Plaintiffs were never indicted or tried, all of their allegations of improprieties during the investigation go to pretrial conduct that must be examined through the lens of the Fourth Amendment, and not the Fourteenth. Plaintiffs do not even allege a Fourth Amendment violation in Count 22, however.[19]  Nor could they, for the reasons explained *supra* pp. 36-39 (addressing Fourth Amendment claim in Count 21).[20]

---

[18] *See also Riley v. Dorton*, 115 F.3d 1159, 1162 (4th Cir. 1997) (pretrial detention governed exclusively by the Fourth Amendment); *Taylor*, 81 F.3d at 435-436 (same); *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 184 (4th Cir. 1996) (same).

[19] While Plaintiffs twice refer to the Fourth Amendment (Compl. ¶¶ 637-638), the Count is expressly restricted to an alleged violation of "due process rights under the Fourteenth Amendment" (*id.* ¶ 636; *see also id.* ¶ 638).

[20] Even if Plaintiffs had alleged a Fourth Amendment violation in this Count, it would be wholly redundant with Count 21.  The Fourth Amendment is implicated only by searches

Second, even if *Albright* had not foreclosed substantive due process claims for pretrial deprivations, Plaintiffs state no constitutional claim, because there is no substantive due process right against "malicious investigation." Courts that have considered whether there is a substantive due process right against "malicious" or "unreasonable" investigations have consistently rejected such claims.[21] Plaintiffs may not challenge "the reasonableness of the police's targeting [them] for investigation" because "there is no constitutional right to be free from investigation." *United States v. Trayer*, 898 F.2d 805, 808 (D.C. Cir. 1990); *see United States v. Crump*, 934 F.2d 947, 957 (8th Cir. 1991). *See also Labensky v. County of Nassau*, 6 F. Supp. 2d 161, 175

_____

and seizures of individuals. *See, e.g.*, *California v. Hodari D.*, 499 U.S. 621, 626 (1991). The only conceivable search or seizure alleged in this Complaint is related to the NTO, and Count 21 asserts a Fourth Amendment violation in connection with that Order. As such, any Fourth Amendment claim raised here should be dismissed as duplicative of Count 21, and in any event would fail to state a claim for the same reasons as discussed in connection with Count 21. *See supra* pp. 36-39.

[21] *See, e.g.*, *Becker v. Kroll*, 494 F.3d 904, 922, 923 (10th Cir. 2007) (rejecting a substantive due process claim for a "groundless investigation" and stating that "[w]hile the enforcement tactics and absence of professionalism in this case—if true as alleged— fail the most obvious standards of proper conduct, they do not meet the affronts to personal autonomy suggested by our case law.… To rest her claims on the undefined contours of substantive due process would only introduce uncertainty and analytical confusion to an already unwieldy body of law"); *Shields v. Twiss*, 389 F.3d 142, 150-151 (5th Cir. 2004) ("Regarding Shields's 'unreasonable investigation' claim, Shields has pointed to no legal basis for a § 1983 action of this sort, and the court knows of none."); *Burrell v. Adkins*, No. 01-2679, 2007 WL 4699166, at *9 (W.D. La. Oct. 22, 2007) ("[T]here is no constitutional basis for a Section 1983 action based on an 'unreasonable investigation.'"); *Biasella v. City of Naples, Fl.*, 04-320, 2005 WL 1925705, at *4 (M.D. Fla. Aug. 11, 2005) (rejecting a substantive due process right "to be free from maliciously instigated and baseless investigations," especially where "all investigations ended favorably towards plaintiff and he was never arrested or charged with anything").

(E.D.N.Y. 1998) ("[T]he Constitution does not micro-manage criminal investigations."), *aff'd*, 173 F.3d 845 (2d Cir. 1999).

Plaintiffs seek to recover under a generalized substantive due process claim here because they cannot assert any independent constitutional claims for the grievances they allege in this Count.  For example, Plaintiffs cannot allege a constitutional violation for "making, acquiescing in, and ratifying false and inflammatory public statements maligning and defaming [them]" (Compl. ¶ 638), because they cannot demonstrate how these statements deprived them of any legal right or status other than an asserted harm to their reputations.[22]  Similarly, they cannot allege a valid claim for "providing false information to investigators" (*id.* ¶ 638) because providing information (even false information) to the police does not itself violate the Constitution.[23]  And as explained

---

[22] *See Paul v. Davis*, 424 U.S. 693, 711 (1976); *Siegert v. Gilley*, 500 U.S. 226, 234 (1991); *see also Buckley v. Fitzsimmons*, 20 F.3d 789, 798 (7th Cir. 1994) (failing to find "any case in which a prosecutor was ordered to pay damages for statements made at a press conference").

[23] *See Landrigan v. City of Warwick*, 628 F.2d 736, 744-745 (1st Cir. 1980) (noting that "the existence of a false police report" does not "by itself deprive[] a person of a right secured by the Constitution"); *Shock v. Tester*, 405 F.2d 852, 855 (8th Cir. 1969) (same). Moreover, whether viewed as an issue of state action or causation, courts have consistently held that police officers and prosecutors are presumed to exercise independent judgment in conducting criminal investigations and prosecutions.  *See, e.g.*, *Franklin v. Fox*, 312 F.3d 423, 445-446 (9th Cir. 2002); *Ginsberg*, 189 F.3d at 272; *King v. Massarweh*, 782 F.2d 825, 829 (9th Cir. 1986); *Benavidez*, 722 F.2d at 618; *Arnold v. IBM Corp.*, 637 F.2d 1350, 1356-1358 (9th Cir. 1981); *Butler*, 589 F.2d at 327.  These same courts have held that plaintiffs cannot overcome this presumption merely by alleging a conspiracy between private individuals and public authorities.  *See Benavidez*, 722 F.2d at 618 ("The allegations of the … complaint are in conclusory language which is not enough."); *see also Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 436 (7th Cir. 1986) ("A party may not cry 'conspiracy' and throw himself on the jury's mercy.").

above, *see supra* pp. 36-39, Plaintiffs cannot state an independent Fourth Amendment claim for "conspiring to violate … [and] conceal the violation of" their privacy rights in connection with the NTO (*id.* ¶ 638).

Nor can Plaintiffs amalgamate these grievances and assert a new, generalized substantive due process right against "malicious investigation." The Supreme Court has explained that it

> has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.

*Collins v. City of Harker Heights*, *Tex.*, 503 U.S. 115, 125 (1992) (internal citation omitted). *See also Albright*, 510 U.S. at 272 ("The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."); *Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999) (en banc). Yet Plaintiffs' theory would allow all those who are subject to criminal investigation to bring Fourteenth Amendment substantive due process claims under § 1983. This Court should decline to depart from well-settled law and should dismiss Plaintiffs' claim.

---

Here, without any factual allegations to suggest that the police or prosecutors did not exercise their own independent judgment, Plaintiffs' Complaint fails to properly allege state action and therefore fails to state a claim under § 1983.

Plaintiffs' claim also fails because Plaintiffs fail to adequately allege that the Duke health care providers, Duke University or any of the Duke defendants acted under color of state law. *See supra* pp. 33-36. Plaintiffs assert that Duke Hospital, the nurses employed there, the President of Duke University, Duke Police, and Durham Police all agreed to instigate and prolong a criminal investigation of Plaintiffs, while all sharing the same malicious intent to do so. However, not only do Plaintiffs fail to offer any plausible explanation for why the university and its officials would agree to subject their own students to such an investigation, they do not include "enough factual matter" to "plausibly suggest[]" that any agreement was made at all. *Twombly*, 127 S. Ct. at 1959. At most, Plaintiffs allege that certain Duke defendants met with Durham officials at various points during the crisis, (*see, e.g.*, Compl. ¶¶ 190, 306-308), but they provide only conclusory assertions there were any agreements or meeting of the minds to take actions that would violate Plaintiffs' constitutional rights. *See Gooden*, 954 F.2d at 970 (holding that plaintiff alleging conspiracy under § 1983 must "plead specific facts in a nonconclusory fashion to survive a motion to dismiss"). Consequently, their § 1983 claim for malicious investigation should be dismissed.

### D.  Plaintiffs Fail To State A Claim For Obstruction of Justice (Count 23)

In Count 23, Plaintiffs allege a common law tort of obstruction of justice, claiming that all of the Defendants in this case, including all of the Duke defendants, engaged in acts that "attempted to and did prevent, obstruct, impede, and hinder public and legal

justice in the State of North Carolina."[24] (Compl. ¶ 644.) The alleged acts of obstruction consist of a recapitulation of the allegations made elsewhere in the Complaint; for example, allegations that Duke University and its employees "initiat[ed], pursu[ed], and prolong[ed]" the baseless criminal investigation; improperly disclosed key card information, gave false and misleading statements to law enforcement regarding the medical evidence, and made false public statements that injured Plaintiffs' reputations. (*Id.* ¶ 645.) North Carolina's obstruction of justice tort does not reach such actions, however, and Plaintiffs cannot shoehorn their grievances into a cognizable obstruction claim.[25]

---

[24] This claim is brought against the Duke University Defendants and the Duke SANE Defendants. The Duke University Defendants join in this argument.

[25] In this Count, as in several other Counts—including Counts 5 (Breach of Duty to Warn) and 22 (Malicious Investigation)—it appears that Plaintiffs' real grievance is that they were "maliciously prosecuted." They cannot bring such a claim under North Carolina law, however, because they were never arrested, indicted, or tried. In North Carolina, to prove a claim for malicious prosecution, a plaintiff must establish four elements: (1) the defendant instituted, procured, or participated in a criminal proceeding against the plaintiff; (2) without probable cause; (3) with malice; and (4) the criminal proceeding terminated in favor of the plaintiff. *Cook v. Lanier*, 267 N.C. 166, 169, 147 S.E.2d 910, 913 (1966). Here, no criminal proceedings were ever instituted against Plaintiffs, and they therefore have no cognizable claim for malicious prosecution. Foreclosed from pursuing a malicious prosecution claim, Plaintiffs seek to recover under other theories that either do not apply (*e.g.*, common law negligence or obstruction of justice) or do not exist (*e.g.*, malicious investigation). The law has placed careful and narrow restrictions on the malicious prosecution tort for good reason, however, and Plaintiffs' attempt to evade those restrictions are unavailing. *See* W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 119, at 871 (5th ed. 1984) ("The individual interest in freedom from unjustifiable litigation and the social interest in supporting resort to law have traditionally been balanced by the requirement that the plaintiffs must prove four elements to establish a malicious prosecution action.").

The North Carolina case law on the tort of obstruction of justice is extremely sparse, but in every reported North Carolina case involving the tort,[26] the plaintiff claimed that the defendant took some action that impaired its ability to pursue a civil case (usually against the defendant) for redress of an injury.[27]  There are apparently *no* civil obstruction of justice cases in North Carolina involving a criminal suspect as plaintiff who contended that the defendant's actions facilitated a criminal investigation or prosecution.  There is good reason for this absence of criminal-plaintiffs, and even better reason for this Court not to make this cause of action available to aggrieved criminal suspects, in particular those who were never formally charged.  Allowing criminal suspects to assert obstruction of justice claims against witnesses who provide information to the police during criminal investigations could open the floodgates to litigation by a new and sizeable class of plaintiffs—potentially, anyone who had ever been under

---

[26] *See, e.g., Henry v. Deen*, 310 N.C. 75, 310 S.E.2d 326 (1984); *Grant v. High Point Reg'l Health Sys.*, __ N.C. App. __, 645 S.E.2d 851 (2007) (finding that plaintiff had stated a claim for obstruction of justice), *disc. rev. granted*, __ N.C. __, 659 S.E.2d 441 (Mar. 6, 2008); *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 588 S.E.2d 20 (2003); *Burgess v. Busby*, 142 N.C. App. 393, 544 S.E.2d 4 (2001); *see also Reed v. Buckeye Fire Equip.*, 241 Fed. Appx. 917, 928 (4th Cir. 2007).

[27] The only North Carolina case that arguably implicates a criminal case is *In re Kivett*, 309 N.C. 635, 309 S.E.2d 442 (1983).  That case involved a civil disciplinary proceeding of North Carolina's Judicial Standards Commission.  The question before the Commission was whether Judge Kivett had engaged in "willful misconduct in office."  Kivett had attempted to prevent the convening of a grand jury that was going to consider an indictment against him.  That conduct, the North Carolina Supreme Court concluded, could support a *criminal* charge of obstruction of justice, which would thereby constitute "willful misconduct in office."  *Id.* at 670, 462.  The Court did not consider or decide whether criminal suspects could bring civil claims for obstruction of justice for allegedly having been wrongfully investigated for a crime.

investigation by the police (and their relatives). Moreover, expanding this cause of action to include claims by criminal suspects who feel mistreated by the mere fact of their investigation would jeopardize the overriding societal interest in ensuring that alleged crimes are properly investigated.

Extending the cause of action to criminal suspects would also deter witnesses from coming forward with evidence. In *Henry v. Deen*, 310 N.C. 75, 310 S.E.2d 326 (1984), the North Carolina Supreme Court cited this risk as a principal reason that the North Carolina courts have not recognized a civil claim for perjury. By contrast, the Court concluded that this chilling effect did not weigh as heavily in typical obstruction of justice claims because those claims are limited to "potential parties to lawsuits" who commit acts like "falsification or concealment of evidence" in order to "avoid litigation or liability," *id.* at 90, 336—thus recognizing that the cause of action for obstruction of justice has been available only to disappointed *civil* litigants. To expand the obstruction of justice cause of action to criminal suspects, as Plaintiffs ask this Court to do, would upset the delicate balance established by the North Carolina Supreme Court in *Henry*.[28]

_____

[28] This cause of action is also alleged as a "conspiracy to obstruct public justice." (Compl. at 203.) That allegation fails to state a claim for the same reasons discussed above with respect Plaintiffs' claims of § 1983 conspiracy. *See supra* pp. 33-36. Plaintiffs do not allege any facts to support an agreement or a meeting of the minds to obstruct justice. *See Shope v. Boyer*, 268 N.C. 401, 405, 150 S.E.2d 771, 774 (1966) ("We must judge the sufficiency of the complaint by the facts alleged and not by pleader's conclusions. The repeated use of the words combined, conspired, and agreed together to injure the plaintiff, are … insufficient to state a cause of action and cannot survive the demurrer." (internal citation omitted)).

## VI.   CONCLUSION

For the foregoing reasons, all claims against the Duke SANE defendants should be dismissed for failure to state a claim on which relief may be granted.

/s/ Dan J. McLamb
_____
Dan J. McLamb
N.C. State Bar No. 6272
Yates, McLamb & Weyher, LLP
421 Fayetteville Street, Suite 1200
Raleigh, N.C. 27601
Telephone: (919) 835-0900
Facsimile: (919) 835-0910
Email: dmclamb@ymwlaw.com

/s/ Jamie S. Gorelick
_____
Jamie S. Gorelick
District of Columbia Bar No. 101370
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Telephone: (202) 663-6500
Facsimile: (202) 663-6363
Email: jamie.gorelick@wilmerhale.com

# CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2008, I electronically filed the foregoing Brief in Support of "Duke SANE Defendants'" Motion to Dismiss Complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

*Counsel for the Plaintiffs*
William J. Thomas, II
Email: thomas@tfmattorneys.com

Charles J. Cooper
Email: ccooper@cooperkirk.com

David H. Thompson
Email: dthompson@cooperkirk.com

*Counsel for J. Wesley Covington*
Kenneth Kyre, Jr.
Email: kkyre@pckb-law.com

*Counsel for City of Durham*
Reginald B. Gillespie, Jr.
Email: rgillespie@faison-gillespie.com

*Counsel for Mark Gottlieb*
Edwin M. Speas, Jr.
Email: espeas@poynerspruill.com

Eric P. Stevens
Email: estevens@poyners.com

*Counsel for Benjamin Himan*
Henry W. Sappenfield
Email: hsappenfield@kennoncraver.com

Joel Miller Craig
Email: jcraig@kennoncraver.com

*Counsel for Patrick Baker, Steven Chalmers, Ronald Hodge, Lee Russ, Stephen Mihaich, Beverly Council, Jeff Lamb, Michael Ripberger*

Patricia P. Kerner
Email: tricia.kerner@troutmansanders.com

D. Martin Warf
Email: martin.warf@troutmansanders.com

Hannah Gray Styron
Email: hannah.styron@troutmansanders.com

*Counsel for David Addison*

James B. Maxwell
Email: jmaxwell@mfbpa.com

As of the date of this filing, no attorney has made an appearance on behalf of the following Defendant. I hereby certify that I served the following Defendant by U.S. Mail:

Linwood Wilson
6910 Innesbrook Way
Bahama, NC 27503-9700

This 30th day of May 2008.

/s/ Jamie S. Gorelick
Jamie S. Gorelick

Attorney for Duke University, Duke University Health System, Inc., Richard Brodhead, Peter Lange, Larry Moneta, John Burness, Tallman Trask, Suzanne Wasiolek, Matthew Drummond, Aaron Graves, Robert Dean, Tara Levicy, Theresa Arico, Kate Hendricks, Victor Dzau