**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:08-CV-119**

| | | |
|---|---|---|
| **EDWARD CARRINGTON,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | **BRIEF IN SUPPORT** |
| | ) | **OF DEFENDANT** |
| **v.** | ) | **CITY OF DURHAM,** |
| | ) | **NORTH CAROLINA'S** |
| **DUKE UNIVERSITY,** *et al.*, | ) | **MOTION TO DISMISS** |
| | ) | **COMPLAINT** |
| **Defendants.** | ) | |

## I.  STATEMENT OF THE CASE

Plaintiffs in this case were never indicted, arrested, or otherwise subjected to any cognizable deprivation of liberty or property.  The gist of their Complaint is a right to be free from investigation—a right which no court ever has, or ever should, recognize, because it would create a destructive disincentive against investigating allegations of serious criminal conduct.  We respectfully submit that this case should be dismissed on the pleadings.

This lawsuit arises from an investigation into allegations of rape.  A young woman, Crystal Mangum, was hired to perform as an exotic dancer at a party thrown by members of the Duke lacrosse team at a house rented by three members of the team. Compl. ¶¶ 90-92.  Several hours later, Mangum repeatedly claimed to police and to medical personnel that she had been raped at the party.  Compl. ¶¶ 102-06.  Medical personnel repeatedly confirmed to investigators that the medical evidence was consistent with Mangum's claims.  Compl. ¶¶ 7-8, 150-04, 185-87, 333-38.  State Prosecutor

Dockets.Justia.com

Michael Nifong subsequently sought and obtained criminal indictments against three lacrosse players, none of whom is a plaintiff in this case. Compl. ¶¶ 397-99, 432. The indictments were later dismissed and the three players exonerated. Compl. ¶ 468. Those players have previously filed suit in this Court, and the City's motion to dismiss in that case is pending.[1]

None of the 38 players (or 9 players' parents) who joined this lawsuit was ever indicted. Nor was any of them ever arrested or jailed. Yet, Plaintiffs now seek untold damages from the City of Durham, among others, for alleged deprivation of their constitutional rights, harm to their reputation, and loss of athletic and educational opportunities based on a panoply of federal and state law claims. The essence of Plaintiffs' Complaint is that they never should have been investigated: that police should never have taken Mangum's allegations of rape seriously, that they should have disregarded the repeated statements by medical personnel that the medical evidence appeared consistent with rape, and that they should have simply dropped the matter without taking basic investigative steps to confirm the alleged victim's claims and to identify her alleged attackers or potential witnesses. But there is no basis for this claim in law or in logic. Police have a solemn duty to take allegations of rape seriously and to investigate them fully, without regard to the race, gender, or socioeconomic status of the alleged victim or the alleged perpetrator. Rape victims are often both imperfect people and imperfect witnesses—it would turn back the clock on rape prosecutions by decades

_____

[1] *See* Defendant City of Durham, North Carolina's Motion to Dismiss First Amended Complaint, *Evans, et al. v. City of Durham, et al.*, No. 1-07-CV-0039 (M.D.N.C. filed Jan. 15, 2008).

to impose liability on police officers whose only alleged wrong was to investigate accusations of rape leveled by Ms. Mangum.

Many of Plaintiffs' claims also stem from the actions of the State prosecutor, former District Attorney Michael Nifong. Plaintiffs cannot sue Nifong himself (in light of his bankruptcy) or his employer, the State of North Carolina (because of its immunity from suit). So, instead, Plaintiffs attempt to hold the City responsible for Nifong's actions by asserting that it "delegated" municipal authority to him and then failed to supervise him. This attempt also defies both logic and the law. A district attorney in North Carolina acts solely as a *state* official. He has no municipal authority whatsoever as a matter of North Carolina law. Moreover, the City could not lawfully have "delegated" authority to a district attorney, nor could a district attorney lawfully have accepted and executed such authority. Durham thus cannot be held liable for any actions of Nifong as a matter of law.

Plaintiffs' grab bag of claims are legally deficient for numerous other reasons as well. Plaintiffs allege three claims with respect to the receipt by Durham police of "key card" information supplied by Duke University. Plaintiffs' fraud claim (Count 8) against the City fails because no allegations are made as to actions taken by City officials. Plaintiffs' abuse-of-process claim (Count 10) fails for similar reasons: Nifong had sole authority to issue the subpoena, and because legitimate purposes existed for issuing the subpoena, claims of malicious intent cannot support a claim under North Carolina law. Plaintiffs' Fourth Amendment claim (Count 20) fails because they did not have a

reasonable expectation of privacy in key card information that was in the possession of a third party (namely, Duke University).

Plaintiffs' other federal claims fare no better. Plaintiffs' Fourth Amendment claim arising from a nontestimonial order (NTO) for DNA samples (Count 21) fails because the NTO—issued in strict accordance with North Carolina law—was fully consistent with the Fourth Amendment: Investigators at the time had probable cause to believe that a crime had been committed, reasonable grounds to believe that Plaintiffs might have committed the crime, and reason to believe that the evidence obtained would be of material aid in determining whether Plaintiffs in fact committed the offense. *See* N.C. Gen. Stat. § 15A-273. The application for the NTO was based on Mangum's repeated allegations that she had been raped at the lacrosse party and on corroborating statements by medical personnel who had examined Mangum the night of the alleged rape.

Plaintiffs' due process claims likewise do not state a claim as a matter of law. Plaintiffs' "malicious investigation" claim (Count 22) fails for the same reasons that the Supreme Court rejected a "malicious prosecution" due process claim in *Albright v. Oliver*. Their claims of deprivation of property without due process (Counts 24 and 25) fail because the harm alleged—loss of educational, business, intercollegiate sports, or any other opportunities allegedly resulting from reputational harm—are not legally cognizable under the Due Process Clause.

Moreover, even if Plaintiffs' federal claims stated a cognizable claim against any individual defendant, Plaintiffs' "selective enforcement" theory of City liability is deficient under *Monell v. Department of Social Services*. That theory relies on an alleged

pattern of behavior of Sergeant Gottlieb in enforcement of noise and underage drinking regulations that is not sufficiently similar to, or connected with, the deprivations of which Plaintiffs complain, and as a result, Plaintiffs cannot state a *Monell* claim on that basis.[2]

Finally, Plaintiffs' additional state-law claims likewise fail. Plaintiffs have alleged neither the "extreme and outrageous" conduct nor the "severe emotional damages" sufficient to sustain an intentional infliction of emotional distress action. Moreover, the intentional acts alleged by Plaintiffs doom their negligent infliction of emotional distress claim. Finally, Plaintiffs' cause of action for common law obstruction of justice must be dismissed because they have seek an unwarranted extension of the tort beyond its interpretation by the North Carolina courts.

Plaintiffs' claims against the City, as set out below, should be dismissed.

## II.    STATEMENT OF FACTS[3]

On March 13, 2006, Crystal Mangum was hired to perform an exotic dance at a party thrown by Duke lacrosse players at an off-campus residence. Compl. ¶¶ 90, 106. Several hours later, she told workers at Durham Center Access, a local outpatient mental

---

[2] Plaintiffs' claims against various City officials are alleged in both individual and official capacities. Compl. ¶ 80. Taken at face value, this results in a number of duplicative claims. Indeed, each time the City of Durham is explicitly named, it is duplicative of official capacity claims brought against City officials under the same cause of action. *See* Causes of Action 8, 10, 20-22, 28-31. Other claims are similarly duplicative. *Compare* Cause of Action 25 (*Monell* claim against City) *with* Cause of Action 26 ("Durham Supervisor Defendants" sued on same grounds, in both capacities). The duplicative claims should be dismissed. *Kentucky v. Graham*, 473 U.S.159, 165-66 (1985) (federal claims); *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) (same); *Moore v. City of Creedmoor*, 481 S.E.2d 14, 21 (N.C. 1997) (state law claims).

[3] Solely for the purpose of this Motion, the City of Durham assumes the veracity of the allegations in the Complaint.

health clinic, that she had been raped that night and was suffering extreme pain. Compl. ¶¶ 102-09. According to Mangum, the rape occurred at 610 North Buchanan Boulevard, the residence of three Duke lacrosse players. Compl. ¶¶ 90, 106.

When she was taken to Duke Hospital, she repeated the claim. Compl. ¶¶ 106, 119. During questioning by police and hospital personnel, her descriptions of the night's events were not always consistent. Compl. ¶¶ 95, 106, 158. Over the next several days, however—both to hospital personnel and to police investigators—Mangum continued to claim that she was raped during the party. Compl. ¶ 130, 155.

Duke medical personnel performed a rape examination on Mangum on the morning of March 14, 2006. Compl. ¶¶ 122-129. Medical personnel noted diffuse edema of the vaginal walls and scratches on her right knee and right ankle. Compl. ¶ 125-26. Mangum complained of excruciating pain and restated her claim that she had been sexually assaulted by multiple people. Compl. ¶ 119, 128.

On March 15, 2006, Durham Police Sergeant Mark Gottlieb was assigned to investigate. Compl. ¶¶ 133, 136, 148. The following day, Sergeant Gottlieb assigned Investigator Benjamin Himan to assist him, and the two officers interviewed Mangum. Compl. ¶¶ 137, 155. Mangum repeated her earlier allegations, telling the officers that she had been raped and providing physical descriptions of her attackers. Compl. ¶ 155-56.

Later that day, a magistrate issued a search warrant for 610 North Buchanan Boulevard. Compl. ¶ 162. Investigators searched the house and interviewed the players who lived there. Compl. ¶ 162-165. Those three players later submitted to voluntary DNA testing. Compl. ¶¶ 164. Police confirmed that the players had hosted a lacrosse

party that night; that players had consumed alcohol; that the players had hired Mangum and another exotic dancer to perform; and that the dancers did in fact perform. Compl. ¶¶ 90-92, 236.

On March 16, 2006, Himan discussed the case with Tara Levicy, the nurse who had examined Mangum at Duke Hospital. Compl. ¶ 150. Himan had contacted Levicy to inquire about the medical and physical evidence relating to Mangum's rape allegations. Compl. ¶ 150. Levicy told Himan that she could not divulge specific patient information at that time, but told Himan that "*there were signs consistent with sexual assault* during her test." Compl. ¶ 150 (emphasis in Complaint).[4] Plaintiffs allege that "Levicy's statement to Himan was a critical factor in launching, sustaining, and prolonging the rape investigation." Compl. ¶ 153. According to plaintiffs, Levicy "advised Durham police, in effect, that a rape had likely occurred." Compl. ¶ 153.

The Complaint also alleges that Levicy later assured Sergeant Gottlieb that "the examination of Mangum had revealed evidence of 'blunt force trauma' consistent with a vaginal and anal gang rape by three men." Compl. ¶ 8; *see also* Compl. ¶ 185 (findings of "blunt force trauma" were "consistent with the victim's statement"). She told Gottlieb that she had discovered "edema and tenderness to palpitation both anally and especially vaginally." Compl. ¶ 185. Theresa Arico, Levicy's supervisor, subsequently corroborated Levicy's conclusions. Compl. ¶¶ 8, 154. While Plaintiffs complain about

---

[4] Because Levicy stated that there were "signs consistent with sexual assault," she was later served with a subpoena for the complete medical records. Compl. ¶ 151. As of the time the court issued the nontestimonial order for DNA testing, those medical records had not yet been produced. Compl. ¶ 151.

the accuracy of these statements (Compl. ¶¶ 185, 187), these were the statements that medical personnel made to police investigators in the first few days of the investigation.[5]

Plaintiffs were originally scheduled to be interviewed and to provide voluntary DNA samples on March 22. Compl. ¶¶ 197-198. On advice of counsel, however, Plaintiffs cancelled their meeting with police investigators. Compl. ¶¶ 199-202. Accordingly, on March 23, an application for a nontestimonial order (NTO) for DNA testing was prepared and submitted to a court. Compl. ¶ 204. "[T]he NTO application placed decisive emphasis on nurse Levicy's statements, asserting that 'medical records and interviews . . . revealed that the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally,' and that 'the SANE nurse stated that the injuries and her behavior were consistent with a traumatic experience.'" Compl. ¶ 205. On March 23, 2006, finding probable cause that a rape occurred and reasonable grounds to believe that the named Duke lacrosse players were involved, Judge Ronald Stephens signed the NTO, directing that members of the Duke lacrosse team provide DNA samples. Compl. ¶ 213.

At the time of the incident, Michael Nifong was serving as an Interim District Attorney for the State of North Carolina, and was running for election to that office. Compl. ¶¶ 219, 221. On March 24, 2006, Nifong is alleged to have informed Durham police officials that he was taking over the case. Compl. ¶ 218.

---

[5] *See infra* Section IV.C (discussing Plaintiffs' numerous allegations that Levicy misrepresented medical evidence to City investigators).

Three days later, Nifong met with Sergeant Gottlieb and Investigator Himan and was fully briefed on the status of the investigation. Compl. ¶ 268. Meanwhile, Mangum continued to claim that she had been raped. Compl. ¶ 376. Levicy and her supervisor Arico also continued to tell Durham Investigators, and later Nifong, that the medical evidence was consistent with rape. Compl. ¶¶ 333-35.

Based on Mangum's allegations, her identifications of three players from a photo array on May 4, and the statements of medical personnel, the grand jury returned indictments against three players (none of whom are plaintiffs in this case). Compl. ¶ 399, 432. Mangum continued to claim that she had been raped for nine months, until, under follow-up questioning by investigators on December 21, for the first time she stated she was not sure if she had been raped. Compl. ¶¶ 343, 376, 461. Levicy continued to claim that the medical evidence was consistent with rape. In January of 2007, she noted that it was possible that no attack occurred at all. Compl. ¶ 465. On April 11, 2007, the Attorney General of North Carolina dismissed the charges against the three indicted players before any trial was held and declared that they were innocent. Compl. ¶ 469. Nifong was subsequently disbarred for his actions in this case. Compl. ¶ 471.

## III.  QUESTIONS PRESENTED

The questions before the Court are:

- Whether the City may be held liable for receipt of Plaintiffs' "key card" data, either under a fraud, "abuse of process," or Fourth Amendment theory, when (1) the claims allege no involvement in any fraudulent activity by a City official; (2) the "process" (a subpoena) did not involve City personnel, and legitimate grounds existed for its issuance; and (3) Plaintiffs

had no reasonable expectation of privacy in the "key card" data at issue;

- Whether Plaintiffs have stated a cognizable Fourth Amendment claim against the City related to a nontestimonial order for DNA samples when the NTO was sought by a state prosecutor and issued by a court upon a finding of probable cause to believe a crime had been committed and reasonable grounds to believe Plaintiffs committed the crime, and where the NTO was based on repeated allegations of rape by the alleged victim and corroborating statements of medical personnel;

- Whether, despite the Supreme Court's rejection of a substantive due process claim premised on a "malicious prosecution" theory, Plaintiffs may sustain such a claim on a "malicious investigation" theory;

- Whether Plaintiffs' procedural due process claims may rest on claims of lost educational, business, and interscholastic sports opportunities arising from alleged reputational harm which itself is not constitutionally actionable;

- Whether the City of Durham may be held liable for acts of a State Prosecutor over whom the City never exercised control and for whom it was never legally responsible;

- Whether Plaintiffs' *Monell* claim—premised on a City policy or custom of "selective enforcement" of noise and alcohol regulations against Duke students—is sufficiently connected to the constitutional deprivations of which Plaintiffs complain to have been the "moving force" behind those deprivations under *Monell*;

- Whether Plaintiffs' other state claims, under intentional and negligent infliction of emotional distress and obstruction of justice theories, allege viable causes of action; and

- Whether Plaintiffs' Complaint otherwise fails to state a claim under which relief may be granted.

## IV.    ARGUMENT

### A.    <u>Standard of Review.</u>

On a motion to dismiss, a court must construe the complaint in the light most

favorable to the plaintiffs, read the complaint as a whole, and take the facts asserted

therein as true. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, however, a complaint must "sufficiently allege[] each element of the cause of action so as to inform the opposing party of the claim and its general basis." *Chao v. Rivendell Woods, Inc*., 415 F.3d 342, 348 (4th Cir. 2005). Moreover, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Lanier v. Norfolk Southern Corp*., No. 06-1986, 2007 WL 4270847, at *3 (4th Cir. Dec. 5, 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)). Any claim that is not "plausible on its face" must be dismissed. *Lanier*, 2007 WL 4270847, at *3 (quoting *Twombly*, 127 S. Ct. at 1974). Finally, a court is not bound by a plaintiff's legal conclusions. *See, e.g.*, *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001) (noting that the "presence . . . of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6)" when the facts alleged do not support the legal conclusions).

### B. Plaintiffs' Allegations Concerning the City's Receipt of Key Card Information Do Not State Claims Against the City (Causes of Action 8, 10,  & 20)

Plaintiffs allege three claims against the City relating to "key card" information (essentially, data which shows when Duke University students entered or exited university buildings, Compl. ¶ 325). These claims fail as a matter of law. Plaintiffs' fraud claim (Cause of Action 8) fails because Plaintiffs fail to allege sufficient allegations of wrongdoing by any City personnel. Plaintiffs' "abuse of process" claim (Cause of Action 10) similarly fails because the "process" it relies on—a subpoena—was issued and signed by a State prosecutor. Finally, Plaintiffs' Fourth Amendment claim (Cause of

Action 20) fails because Plaintiffs had no reasonable expectation of privacy in the key-card data.  All three causes of action should therefore be dismissed.

     1. *Plaintiffs' Fraud Claim Fails to State Any Allegations Against the City (Cause of Action 8)*

  Plaintiffs allege that Duke University personnel sent letters to the players and their defense counsel indicating that Duke had received a subpoena for key-card information and stating its intention to comply with the subpoena unless the Plaintiffs objected.  Compl. ¶ 435.  Plaintiffs allege that the letters were fraudulent because they concealed that Durham police already were in possession of the key-card information.  Whether or not these letters were fraudulent, this claim fails against the City for the simple reason that no allegation of fraud is made with respect to the City or its personnel and Plaintiffs have not adequately pled the participation of any City official in any conspiracy to defraud.

  Plaintiffs' Complaint does not state a fraud claim against the City.  Under North Carolina law, the first element of a fraud claim is that a defendant made a "false representation or conceal[ed] a material fact."  *RD & J Props. v. Lauralea-Dilton Enters., LLC*, 600 S.E.2d 492, 498 (N.C. Ct. App. 2004).  Here, Plaintiffs do not name any City official who is alleged to have affirmatively misrepresented anything—let alone a material fact—to the Plaintiffs.  Plaintiffs' lone allegation is that Durham defendants "were aware that Duke had already disclosed this information."  Compl. ¶ 534.  To the extent Plaintiffs are seeking to impose fraud liability on the City on the basis of a failure to disclose its alleged knowledge, however, Plaintiffs must alleged facts showing a special relationship between them and the City to justify imposing a duty to disclose on

the City. *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 195 (M.D.N.C. 1997). Plaintiffs allege no facts suggesting a special relationship between the City and the Plaintiffs. Plaintiffs' allegations fall far short of the particularity required to state a fraud claim, and their claim against the City must be dismissed. Fed. R. Civ. P. 9(b); *Perkins v. HealthMarkets, Inc.*, No. 06 CVS 21053, 2007 WL 2570242 (N.C. Super. Ct. July 30, 2007) (allegations based "upon information and belief" are generally insufficient with respect to fraud claims).

Plaintiffs' conspiracy claim against the City is also deficient. To state a claim for conspiracy a plaintiff must allege: "(1) an agreement between two or more individuals (2) to do an unlawful act or to do a lawful act in an unlawful way (3) resulting in injury to the plaintiff inflicted by one or more of the conspirators (4) pursuant to their common scheme." *Iglesias v. Wolford*, 539 F. Supp. 2d 831, 836 (E.D.N.C. 2008). Neither "a bare assertion of conspiracy" nor "a conclusory allegation of agreement" will suffice. *Twombly*, 127 S. Ct. at 1966; *see also Bane v. Norfolk-Southern R.R. Co.*, 130 S.E.2d 406, 407 (N.C. 1963) (rejecting allegations of conspiracy that were "mere conclusions"); *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 659 S.E.2d 442, 449 (N.C. Ct. App. 2008) (dismissing conspiracy claims based on conclusory allegation of conspiracy and agreement that amounted to "no more than a suspicion or conjecture"); *Joyner v. Abbott Labs.*, 674 F. Supp. 185, 191 (E.D.N.C. 1987) ("Bald allegations that the defendants conspired . . . without more specific factual allegations showing the conspiracy and how it violated the plaintiffs' rights simply are not sufficient.").

There is no allegation that any City personnel participated in, encouraged, or even knew about the issuance of these allegedly fraudulent letters. The Complaint offers a naked conclusory statement that all Defendants conspired to send these letters "on information and belief," Compl. ¶ 536, but provides no factual allegation from which such a conclusion can be inferred. For example, it does not allege that City officials helped Duke draft the letters, encouraged Duke to do so, approved the letters prior to distribution, or issued any of their own correspondence to Plaintiffs. Indeed, Plaintiffs do not even clearly allege that it was the named City defendants who allegedly conspired with Duke officials, since they allege that conspiring Defendants may have been either Duke or Durham officials. Compl. ¶ 534. This does not state a conspiracy claim against any City official under North Carolina law.

Moreover, to the extent that Count 8 relies on the issuance of the subpoena as part of the alleged fraud or conspiracy, this Count fails to state a claim against the City because the subpoena was issued by Nifong, not by any City employee. Compl. ¶¶ 434, 535. As discussed in detail below, *see* Section IV.F, Nifong was at all times a *State* employee, with no authority to act on behalf of the City as a matter of law. Accordingly, this Cause of Action cannot be sustained against the City.

> 2. *Plaintiffs' Claim of "Abuse of Process" Based on Issuance of a Subpoena For Key-Card Data Fails Because the Subpoena was Served by Nifong, a State Official (Cause of Action 10).*

Plaintiffs also seek to hold the City liable for "the issuance and service of a sham subpoena" for the key card data. Compl. ¶543. This claim fails as a matter of law because the subpoena was issued and signed by Nifong, a state official, not by any City

employee.  Compl.  ¶¶ 434, 535; *see* Ex. 1.[6]  As discussed in more detail in Section IV.F,

Nifong possessed no authority to act on behalf of the City, and the City had no power to

supervise Nifong's actions.  As a matter of law, then, the City cannot be held liable for

Nifong's conduct.  Plaintiffs' conclusory allegation that Durham supervisors

"participated in, ratified, and condoned" Nifong's actions—even if true—hardly makes

the City responsible for the actions of a State prosecutor.  It was Nifong's sole decision to

serve a subpoena, whether or not Durham officials agreed with that decision.  Under

North Carolina law, the police cannot issue a subpoena *duces tecum*.  N.C. R. Civ. P. 45

(a subpoena may only be issued by the Clerk of Court, or "any judge of the superior

court, judge of the district court, magistrate, or attorney, as officer of the court").[7]

Plaintiffs' allegations also fail to meet the basic requirements for an abuse of

process claim under North Carolina law.  *Barnette v. Woody*, 88 S.E.2d 223, 227-28

(N.C. 1955) (the elements of abuse of process are: "First, the existence of an ulterior

---

[6] All exhibits are attached to the City's Motion to Dismiss.  A Court may consider documents referenced in the Complaint in determining whether to grant a Rule 12(b)(6) motion so long is there is no question about the authenticity of the documents.  *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

[7] Similarly, Plaintiffs' assertion that Durham Investigators "had illegally used the key card reports," Compl. ¶ 544, is not only wrong as a matter of law, but also irrelevant. Plaintiffs never explain in this Count how the Investigators' "use" of the key cards was illegal.  As explained below (*see* Section IV.B.3), the investigators' obtaining of the card data did not violate the Fourth Amendment.  Moreover, even if Duke's provision of the data to the investigators violated the Family Educational Records and Privacy Act, 20 U.S.C. § 1232g(b)(1), *et seq.* ("FERPA"), that statute places limits only on what educational institutions can do with student records, not on what law enforcement can do with it once it possesses the data.  In any case, the alleged use of the data by investigators is irrelevant to the abuse of process claim, since that claim is based solely on Nifong's issuance of the subpoena and not on the use of the key-card data.

purpose and, second, an act in the use of the process not proper in the regular prosecution of the proceeding."). Plaintiffs do not allege any act subsequent to Nifong's issuance of the subpoena that was outside the scope of the regular prosecution of a subpoena.

Plaintiffs essentially claim that because Duke had already disclosed the records, there could be no legitimate purpose for the subpoena, and thus Nifong's "regular prosecution" alone was a perversion of the subpoena power.[8] This is not the law. *Melton v. Rickman,* 36 S.E.2d 276, 278 (N.C. 1945) ("'Regular and legitimate use of process, though with a bad intention, is not a malicious abuse of process.'") (quoting 1 Cooley, Torts (3d Ed.) 354); 72 C.J.S. *Process* § 156 (2005) ("Misapplication [of the process] will not be inferred from a wrongful purpose."); *Vista Food Exch., Inc. v. Joyce Foods, Inc.*, No. 96-CIV-0012, 1996 WL 122419, at *5 (S.D.N.Y. Mar. 20, 1999) (applying North Carolina law and explaining that abuse of process typically involves "a form of extortion, by which the defendant invokes legal process to coerce the plaintiff into doing something other than what the process contemplates").[9] Plaintiffs would improperly render

_____

[8] Plaintiffs ignore the existence of a legitimate purpose for the subpoena: authenticating the documents received from Duke University for their future use at trial. *State v. Richardson*, 297 S.E.2d 921, 924 (1982) ("The person named in the subpoena *duces tecum* merely authenticates the records produced."), *rev'd on other grounds*, 302 S.E.2d 799 (N.C. 1983); *Curcio v. United States*, 354 U.S. 118, 125 (1957) ("The custodian's act of producing books or records in response to a subpoena *duces tecum* is itself a representation that the documents produced are those demanded by the subpoena.").

[9] *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 567 S.E.2d 251, 256-57 (S.C. Ct. App. 2002) (rejecting abuse of process claim based on allegations that defendants pursued a lawsuit to cause economic damage to Food Lion where there were no allegations that the defendant did anything outside of the ordinary steps in the lawsuit); *In re Burzynski*, 989 F.2d 733, 739 (5th Cir. 1993) (rejecting abuse of process claim based on allegation that subpoena was used to intimidate a third party, stating "an

nugatory the second element of the tort and transform the courts into arbiters of the

subjective intent of each attorney that employs legal process. *Melton*, 36 S.E.2d at 278

("Evil purpose alone is not sufficient."). Plaintiffs' claims should be dismissed.

3. *Plaintiffs Cannot State a Fourth Amendment Claim Against the City for Receipt of Key Card Information Because Plaintiffs Do Not Have a Reasonable Expectation of Privacy in That Information (Cause of Action 20)*

Plaintiffs allege that their Fourth Amendment rights were violated when Duke

voluntarily provided key card information to Durham investigators. Plaintiffs fail to state

a Fourth Amendment claim, however, because they did not have a reasonable expectation

of privacy in the key card data as a matter of law. *Smith v. Maryland*, 442 U.S. 735, 743

(1979) (Fourth Amendment protects expectation of privacy only if it is "'one that society

is prepared to recognize as reasonable'") (quoting *Katz v. United States*, 389 U.S. 347,

361 (Harlan, J., concurring)).

The key card information at issue concerned "when and where" Plaintiffs "swiped

their Duke ID cards in slots on locations at Duke's campus," such as at "doors, dining

facilities, vending machines, photocopy machines, and so forth . . . . The key card

information thus allowed the Durham Investigators to roughly track the movements of

lacrosse players on Duke's campus on March 13 and 14." Compl. ¶ 325. But the

Supreme Court and the Fourth Circuit have long held that a person has no reasonable

expectation of privacy regarding activities undertaken in public places— including places

far less open to the public than a university campus. *E.g.*, *California v. Ciraolo*, 476 U.S.

---

ulterior motive does not supplant the [element of improper or illegal use of the process]").

207 (1986) (no reasonable expectation of privacy in a fenced-in yard that police viewed

from a private plane); *United States v. Knotts*, 460 U.S. 276, 281-82 (1983) (an individual

has no reasonable expectation of privacy in his "movements from one place to another"

in public areas); *United States v. Taylor*, 90 F.3d 903, 908-09 (4th Cir. 1996) (no

reasonable expectation in dining room where blinds were partially open at night); *United

States v. Aguilera*, No. 06-CR-336, 2008 U.S. Dist. LEXIS 10103 (E.D. Wis. Feb. 11,

2008) (no warrant required under Fourth Amendment to place video camera on utility

pole outside defendant's home).  Plaintiffs make no allegation that the key card

information transmitted anything regarding their activities in their dorm rooms or other

private spaces.  Rather, the information was limited to Plaintiffs' activities in common

areas of the campus, where any Duke student, employee, or visitor could have seen them.

Compl. ¶325.  They thus had no reasonable expectation of privacy in the key card

information as a matter of law.

Moreover, the Supreme Court has also long held that a person does not possess a

reasonable expectation of privacy in data transmitted to third parties.  *See Smith*, 442 U.S.

at 742-45 (pen register installed on plaintiff's phone line to trace calls was not a "search"

protected under the Fourth Amendment because information about dialed numbers was

transmitted to phone company); *United States v. Miller*, 425 U.S. 435, 442-43 (1976) (no

reasonable expectation of privacy in banking records because those records were

available to bank); *id*. at 443 (an individual takes a risk "when revealing his affairs to

another, that the information will be conveyed by that person to the Government");

*United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) (no reasonable expectation

of privacy in to/from addresses of e-mail messages because that data is transmitted to Internet service providers). In order for Plaintiffs to gain access to campus facilities and for them to be billed for use of campus equipment such as vending machines and photocopiers, Plaintiffs' key card information was regularly transmitted, verified, and recorded by Duke. Plaintiffs thus could not have a socially-recognized, legitimate privacy interest in their whereabouts or the fact that they may have made a vending machine purchase or used a photocopier.

The Family Educational Records and Privacy Act, 20 U.S.C. § 1232g(b)(1), *et seq*. ("FERPA" or "the Act") and Duke's policy implementing FERPA do not help Plaintiffs' cause. That Act simply "condition[s] the receipt of federal funds on certain requirements relating to the access and disclosure of student educational records." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 278 (2002); 20 U. S. C. § 1232g(b)(1) ("No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein . . . ) of students without the written consent of their parents to any individual, agency, or organization."). But the Supreme Court has expressly held that FERPA does *not* confer on students an "enforceable right." *Id*. at 279; *see also id.* at 287 ("[T]here is no question that FERPA's nondisclosure provisions fail to confer enforceable rights."). Nor does FERPA magically transform data about a student's activity in public places into information that can reasonably be considered private under the Fourth Amendment. While an educational institution that has a "policy and practice" of violating FERPA may lose access to federal funds, *id.* at 288, the Act

does not create a constitutionally protected expectation of privacy in information that concerns activities in public places and that is voluntarily transmitted to a third party.

### C. Plaintiffs Cannot State a Fourth Amendment Claim Against the City Based on the Nontestimonial Order for DNA Evidence Because the Order Was Legally Sound (Cause of Action 21)

Plaintiffs allege a Fourth Amendment violation arising from the nontestimonial order for DNA evidence, which was sought by the State prosecutor's office and issued by a North Carolina court. But the allegations in the Complaint themselves show that the NTO was consistent with the Fourth Amendment because it was based on probable cause to believe a crime had been committed, reasonable grounds to suspect that Plaintiffs were involved in the crime, and reason to believe that the evidence obtained would be of material aid in determining whether Plaintiffs in fact committed the offense. *See* N.C. Gen. Stat. § 15A-273 (setting out grounds for issuing NTO); *Hayes v. Florida*, 470 U.S. 811, 815 (1985) (indicating approval of compulsory fingerprinting on same grounds). No Fourth Amendment violation occurred, and this claim fails as a matter of law.

In applying for and issuing the NTO, State prosecutors and a State judge followed the precepts of the North Carolina statute that regulates NTOs. *See* N.C. Gen. Stat. § 15A-273.[10] That statute, and others like it,[11] is modeled on the Supreme Court's language

---

[10] N.C. Gen. Stat. § 15A-273 provides:

**Basis for order.**
An order may issue only on an affidavit or affidavits sworn to before the judge and establishing the following grounds for the order:
  (1)   That there is probable cause to believe that a felony offense, or a Class A1 or Class 1 misdemeanor offense has been committed;
  (2)   That there are reasonable grounds to suspect that the person named or described in the affidavit committed the offense; and

- 20 -

approving such procedures.[12]  It requires that the court find:  probable cause to believe

that a crime occurred; reasonable grounds to suspect that the persons subject to the order

committed the crime; and reason to believe that the NTO will be a material aid in

determining whether the person named in fact committed the offense.  *Id*.  The court

made all three findings.

Moreover, Plaintiffs' own allegations demonstrate the reasonableness of the

court's finding in light of what was known to investigators at the time.  First, Mangum

herself repeatedly claimed to police that she had been raped at the lacrosse party.

Compl. ¶¶ 155-56, 208.  This alone was enough to establish probable cause.[13]  Second,

---

> (3)     That the results of specific nontestimonial identification
> procedures will be of material aid in determining whether the
> person named in the affidavit committed the offense. (1973, c.
> 1286, s. 1; 1997-80, s. 14.)

[11] Such statutes are found in at least eight states.  *See In Re Non-Testimonial Identification Order*, 762 A.2d 1239 (Vt. 2000) (listing state statutes).

[12] *See, e.g.*, *Hayes v. Florida*, 470 U.S. 811, 815 (1985) ("There is thus support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch."); *see also Davis v. Mississippi*, 394 U.S. 721, 727-28 (1969) (noting that detentions for the purpose of fingerprinting "might, under narrowly defined circumstances, be found to comply with the Fourth Amendment even though there is no probable cause in the traditional sense."); *see generally In Re Non-Testimonial Identification*, 762 A.2d 1239 (Vt. 2000) (describing background of constitutional analysis); 4 W. LaFave, Search and Seizure § 9.7(b), at 327 (3d ed. 1996); Comment, DNA "Line-Ups" Based on a Reasonable Suspicion Standard, 71 U. Colo. L. Rev. 221, 253-54 (2000).

[13] *See Ahlers v. Schebil*, 188 F.3d 365, 370-71 (6th Cir. 1999) (victim's accusation that she had been sexually assaulted, "standing alone, was sufficient to establish probable

medical personnel—Levicy and Arico—told police that the medical evidence was consistent with Mangum's claims of rape. Compl. ¶¶ 7-8, 150-54. With the victim claiming to be in pain and to have been raped at the lacrosse party, Compl. ¶ 376, and the medical evidence consistent with that allegation,[14] investigators had probable cause to believe that this woman had been raped.[15] Indeed, "a police officer may rely upon the statements of victims or witnesses to determine the existence of probable cause for the arrest, regardless of the ultimate accurateness or truthfulness of the statements." *Zandhri v. Dortenzio*, 228 F. Supp. 2d 167, 176 (D. Conn. 2002) (citations omitted).[16] Accordingly, City investigators had probable cause to believe that a rape had occurred.

_____

cause" particularly when records "confirm[ed] that there was a window of time within which the alleged assault could have occurred").

[14] In addition to Mangum's repeated assertions and Levicy's corroborating statements that the medical evidence was consistent with rape, investigators encountered other evidence that was consistent with an incident occurring in the house involving Mangum. *See* Ex. 2 (investigators confirmed that "victim's make up bag, cell phone, and identification were also located inside the residence during the search warrant" and "a pile of twenty dollar bills were recovered inside the residence totaling $160.00 consistent with the victim claiming $400.00 cash in all twenty dollar bills was taken from her purse immediately after the rape").

[15] Probable cause exists when "the facts and circumstances within [the officer's] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense had been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949). It is "a standard well short of absolute certainty," *L.A. County v. Rettele*, 127 S. Ct. 1989, 1993-1994 (2007), and indeed "does not require that the officer's belief be more likely true than false," *United States v. Koon Chung Wu*, 217 Fed. Appx. 240, 246 (4th Cir. N.C. 2007) (citing *United States v. Humphries*, 372 F.3d 653, 660 (4th Cir. 2004)).

[16] *See also Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ("[P]olice officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed.") (citations omitted); *Bernard v. United States*, 25 F.3d 98, 103 (2d Cir. 1994) ("[P]robable cause exists even where it is based

Plaintiffs attempt to attack the existence of probable cause by repeatedly stating that Levicy's and Arico's statements to investigators were "false" or "misleading." *E.g.*, Compl. ¶¶ 185, 187. But "'[w]hen determining whether probable cause exists courts must consider those facts *available to the officer* at the time . . . ." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (citations omitted). And when assessing the existence of probable cause after a judge has already issued a warrant or NTO on his own finding of probable cause, the relevant issue to a reviewing court is whether the *affiant* engaged in "deliberate falsehood" or acted with "reckless disregard for the truth." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). The "truthfulness" of the person who provided the government with information is irrelevant. *See id.* ("The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant."). Plaintiffs do not allege that the affidavit misstated Levicy's statements in any way; rather, the affidavit faithfully reported them. Compl. ¶ 189. Plaintiffs squarely allege that Levicy and Arico *misled the investigators. See, e.g.*, Compl. ¶ 8 ("Levicy embellished her misrepresentation, falsely assuring Sergeant Gottlieb that the examination of Mangum had revealed physical evidence of 'blunt force trauma' consistent with a vaginal and anal gang rape by three men."); Compl. ¶ 153 (Levicy's statement was a "critical factor in launching, sustaining, and prolonging the rape investigation."); Compl. ¶ 205 (knowledge of falsity in NTO was in "exclusive

---

upon mistaken information, so long as the arresting officer was reasonable in relying on that information."); *see also S.P. v. City of Takoma Park, MD*, 134 F.3d 260, 273 (4th Cir. 1998) (holding that when plaintiff's statements suggested suicidal thoughts, and husband corroborated that wife was suicidal, officers had probable cause as a matter of law to involuntarily detain her).

possession" of Duke University); Compl. ¶ 210 (false allegations regarding medical evidence "owed its existence entirely to nurse Levicy").[17]

Though Plaintiffs make one bare, conclusory allegation that the investigators "knowingly premised [the NTO application] on information and belief, on false and misleading information knowingly provided by Duke Hospital and defendant Levicy," Compl. ¶ 629, that allegation is squarely inconsistent with the factual allegations made throughout the Complaint. Plaintiffs are not entitled to rely on conclusory allegations that are belied elsewhere by their own factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (court should give no weight to conclusory allegations ungrounded in any assertion of fact).[18]

Plaintiffs do not appear to question that investigators had reasonable grounds for suspecting—if a rape had occurred—that they may have been involved in the crime.[19] In

---

[17] *See also* Compl. ¶ 7 (Levicy's statement to investigators "flatly misrepresented the medical evidence from the examination, and it breathed life-giving credibility into rape allegations"); Compl. ¶ 185 ("Levicy made crucially false and misleading statements to Gottlieb about the nature of the physical and medical evidence."); Compl. ¶ 211 ("If the Durham Police had been advised truthfully by Levicy that the physical and medical evidence was inconsistent with Mangum's [allegations], then the rape investigation . . . would not have been revived and pursued.").

[18] The Federal Rules do not permit plaintiffs to plead inconsistent factual allegations. *SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 617 (E.D. Va. 2005); *see also Aetna Co. & Sur. Co. v. Aniero Concrete Co.,* 404 F.3d 566, 594 (2d Cir. 2005) (dismissing claim when factual allegations required to state elements of claim are "at odds with each other"); *In reLivent, Inc. Noteholders Sec. Lit.*, 151 F. Supp. 2d 371, 407 (S.D.N.Y. 2001) (dismissing claim in light of "internally conflicting factual assertions that constitute integral components of a claim").

[19] "[R]easonable suspicion is a less demanding standard than the probable cause standard . . . [and], fall[s] 'considerably short of satisfying a preponderance of the evidence standard.'" *United States v. McCoy*, 513 F.3d 405, 411 (4th Cir. 2008) (citing

any case, though, such reasonable grounds surely existed at the time of the NTO. Investigators confirmed that Mangum had indeed been present at the party at 610 North Buchanan. Compl. ¶¶ 164-65. They established that she had actually performed at that party, which was attended by Duke lacrosse players. Compl. ¶¶ 164-65. They learned from team captains that "their fellow Duke Lacrosse Team Members were the ones who attended th[e] party, and that "there were no strangers who showed up at the event." Compl. ¶ 162-65; Ex. 2. Finally, when they searched the lacrosse player's house, they found Mangum's "make up bag, cell phone, and identification . . . [and] a pile of twenty dollar bills." Ex. 2. There is no question that—if a rape had occurred—the City investigators had reason to believe that these players were involved.

---

*Alabama v. White*, 496 U.S. 325, 330 (1990) and quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). Courts have consistently applied this lower standard to this aspect of requests for nontestimonial orders and in similar contexts. *See, e.g.*, *State v. Pearson*, 566 S.E.2d 50, 54 (N.C. 2002) ("The sole requirement is a minimal amount of objective justification, something more than an 'unparticularized suspicion or "hunch."'"); *In re Fingerprinting of M.B.*, 309 A.2d 3 (N.J. Super. 1973) (with probable cause of a homicide and fingerprints left on key evidence, court found reasonable an order requiring all twenty-two male members of particular school class to submit to involuntary fingerprinting); *Wise v. Murphy*, 275 A.2d 205 (D.C. 1971) (finding, in context of rape investigation, court-ordered lineup permissible on suspicion short of probable cause to arrest); *see also* 4 W. LaFave, Search and Seizure § 9.7(b), at 327 (3d ed. 1996) (while more than "inchoate and unparticularized suspicion or 'hunch' is required that a particular person committed the crime, "[w]hat is not required . . . is full probable cause that the particular person to be detained committed the offense").

Finally, there is no question that the NTO would provide evidence that would be a material aid in determining whether any of the Plaintiffs had been involved in the assault, since DNA had been collected from Mangum during her medical examination.[20]

In sum, even accepting the allegations in the Complaint as true, City investigators possessed sufficient evidence to establish probable cause to believe a crime had been committed, reasonable grounds to suspect that Plaintiffs were involved, and reason for believing that DNA evidence would help determine whether Plaintiffs were in fact involved. Under these circumstances, and particularly given the highly deferential standard of review to which the judge's findings are entitled,[21] the requirements of the Fourth Amendment were met. The State prosecutor was therefore justified in seeking, and the court in issuing, an NTO. This claim fails as a matter of law.

### D. Plaintiffs Cannot State a Claim for "Malicious Investigation" Under the Due Process Clause (Cause of Action 22).[22]

Plaintiffs allege that the City defendants and others engaged in a "malicious, bad faith criminal investigation" that consisted of such actions as disseminating false information, suppressing exculpatory evidence, tampering with witnesses, manufacturing evidence, and pursuing baseless allegations. Compl. ¶¶ 636-37. This effort to cobble

---

[20] *See* 4 W. LaFave, Search and Seizure § 9.7(b) (3d ed. 1996) (noting that allegations of rape, and perhaps lesser felonies, are appropriate crimes to be investigated under this procedure).

[21] *United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992) ("Great deference is to be given a magistrate's assessment of the facts when making a determination of probable cause.").

[22] To the extent plaintiffs are also making substantive due process claims in Counts 24 and 25, those claims should be dismissed for the reasons discussed in text.

together a due process claim from end pieces and leftovers, however, runs afoul of clear Supreme Court and Fourth Circuit precedent.

In *Albright v. Oliver*, 510 U.S. 266 (1994), the Supreme Court refused to recognize a substantive due process right to be free from "malicious prosecution." *Albright*, 510 U.S. at 275 (plurality opinion) ("Substantive due process with its 'scarce and open-ended guideposts' can afford [petitioner] no relief.") (quoting *Collins v. Harker Heights*, 503 U.S. at 115, 125 (1992)). Rather, complaints about pretrial deprivations of liberty must be judged solely by the standards of the Fourth Amendment. *Id.* at 274 ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it."). Moreover, the Court reiterated that "the accused is not 'entitled to judicial oversight or review of the decision to prosecute.'" *Id.* at 274 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 118-119 (1975)); *see also Taylor v. Waters*, 81 F.3d 429 (4th Cir. 1996) (rejecting claim that investigator's failure to disclose exculpatory evidence to prosecutor "allege[d] a deprivation of any right guaranteed under the Due Process Clause of the Fourteenth Amendment" where plaintiff had not been subjected to trial); *Becker v. Kroll*, 494 F.3d 904, 918 (10th Cir. 2007) ("'[I]t is evident that substantive due process may not furnish the constitutional peg on which to hang' a claim of malicious prosecution.") (quoting *Albright*, 510 U.S. at 270 n.4).

Plaintiffs attempt to circumvent binding Supreme Court and Fourth Circuit law by styling their claim "malicious *investigation*" rather than "malicious *prosecution*." But the different label makes no constitutional difference. The substance of their allegations is no different from those made in the cases rejecting malicious prosecution cases. *See,*

*e.g.*, *Lambert v. Williams*, 223 F.3d 257, 260-61 (4th Cir. 2000) (finding that claims of concealing exculpatory evidence, fabricating evidence, and making false statements failed to state a due process claim). Indeed, the only material difference between Plaintiffs here and the plaintiffs in the "malicious prosecution" cases is that Plaintiffs here were never charged with a crime. Surely Plaintiffs who were not wrongly charged with a crime should not be afforded new substantive due process rights when the Supreme Court and the Fourth Circuit have refused to extend such rights to plaintiffs who had been wrongly charged. *See United States v. Trayer*, 898 F.2d 805, 808 (D.C. Cir. 1990) (rejecting attack on "the reasonableness of the police's targeting [them] for investigation because "there is no constitutional right to be free from investigation"); *see also Labensky v. County of Nassau*, 6 F. Supp. 2d 161, 175 (E.D.N.Y. 1998) ("[T]he Constitution does not micro-manage criminal investigations.").

Under *Albright*, the only constitutional inquiry relevant to unindicted investigatees is whether there was a Fourth Amendment violation during the investigation. As demonstrated above, however, Plaintiffs cannot state a cognizable Fourth Amendment claim based on the key card information or the NTO. *See supra*, Section IV.B.3.

Plaintiffs' other vague and conclusory allegations of misconduct also do not state a claim under the Fourth Amendment or any other constitutional provision. For example, the Complaint alleges that Durham defendants disseminated false information and made public statements asserting Plaintiffs' guilt. But courts have repeatedly held that such allegations do not state a claim. *See, e.g.*, *Paul v. Davis*, 424 U.S. 693 (1976) (disclosing plaintiff's arrest for shoplifting did not violate right to privacy); *Rosenberg v. Martin*, 478

F.2d 520, 524-25 (2d Cir. 1973) (proclaiming plaintiff a murderer in front of TV cameras did not violate right to privacy); *Smith v. Coughlin*, 727 F. Supp. 834, 842-43 (S.D.N.Y. 1989) (disclosing that plaintiff was suspected of sexually abusing his daughter did not violate right to privacy)); *see also Van De Velde v. Wearing*, No. 3:01-CV-2296, 2004 U.S. Dist. LEXIS 4295, at *6*8-9 (D. Conn. Mar. 4, 2004) ("Plaintiff cites no authority for the proposition that identifying a person as a suspect can violate a privacy interest protected by the Fourth Amendment's prohibition against unreasonable seizures. Moreover, this apparently novel claim is generally at odds with the Supreme Court's repeated refusal to recognize a constitutional tort for injury to reputation.").  Similarly, courts have repeatedly held that the suppression of exculpatory evidence does not state a claim absent a trial and conviction.  *Jean v. Collins*, 221 F.3d 656, 659-60 (4th Cir. 2000); *see also Taylor v. Waters*, 81 F.3d 429 (4th Cir. 1996).  The same is true of suggestions that defendants fabricated evidence or tampered with witnesses.  *See, e.g.*, *Antonio v. Moore*, 174 Fed. Appx. 131, 135 (4th Cir. 2006) (suggestive lineup claims actionable under § 1983 only when conduct "impair[s] . . . defendant's core right—i.e., the right to a fair trial"); *see also Albright v. Oliver*, 510 U.S. 266, 273 n.6 (1994) (rejecting theory that due process applies when no trial occurs).

Plaintiffs also attempt to circumvent *Albright* and its progeny by asserting that Defendants' actions "shock the conscience."  Compl. ¶ 636.  But Plaintiffs' allegations fall far short of the high standard set by the Supreme Court for determining what governmental conduct might violate substantive due process.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) ("[O]nly the most egregious official conduct can be

said to be 'arbitrary in the constitutional sense.'") (citation omitted); *Breithaupt* v. *Abram*, 352 U.S. 432, 435 (1957) (conduct that was so "brutal" and "'offensive' that it did not comport with traditional ideas of fair play and decency" would violate substantive due process).[23]  Plaintiffs concede that the Durham investigators relied heavily upon information provided by medical personnel that Mangum had been raped, in addition to Mangum's own repeated allegations.  The investigation into allegations of rape can hardly be considered conscience-shocking.  In fact, given Mangum's repeated insistence that she had been raped, and the medical evidence which (as far as the investigators knew) supported her story, it would have been shocking to the conscience for the Durham investigators to *not* have investigated the allegations.

### E.  Plaintiffs' Procedural Due Process Claims Fail to Pass the Stigma-Plus Test and Must be Dismissed (Causes of Action 24-25).

Two of Plaintiffs' claims are premised on a procedural due process theory, arising from alleged harm to Plaintiffs' reputations.  *See* Cause of Action 24 ("Deprivation of Property Without Due Process of Law"); Cause of Action 25 ("False Public Statements"). Recognizing that interest in reputation alone cannot support a claim under the Due Process Clause, *see Paul v. Davis*, 424 U.S. 693, 712 (1976), Plaintiffs claim that they have also been deprived of "economic and job opportunities," Compl. ¶ 661, as well as

---

[23] *See also Hawkins v. Freeman*, 195 F.3d 732 (4th Cir. 1999) (state parole board's order re-incarcering a convicted felon after mistakenly granting parole did not "shock the conscience"); *Weller v. Dep't of Social Services*, 901 F.2d 387, 392 (4th Cir. 1990) ("It does not shock the conscience to hear that defendants removed a child in emergency action from the custody of a parent suspected of abusing him, based upon some evidence of child abuse."); *Bagley v. Boyte*, No. 94-2526, 1996 U.S. App. LEXIS 20567 (4th Cir. Aug. 16, 1996) (officer's retaining plaintiff's firearms for six days pending investigation into ownership of property did not "shock the conscience").

"lost educational opportunities, including the unique athletic opportunity to participate in the 2006 Division I men's lacrosse season." Compl. ¶ 652. But these deprivations are, as a matter of law, neither liberty nor property interests sufficient to satisfy the "stigma plus" test outlined in *Paul* and its progeny. Because these deprivations amount to no more than the consequences of the very reputational harm which itself lacks constitutional protection, they fail to support Plaintiffs' claims. *Siegert v. Gilley*, 500 U.S. 226, 233 (1991). Plaintiffs' due process claims, as a result, lack any viable property or liberty deprivation—and must be dismissed.

The centerpiece of both of Plaintiffs' procedural due process claims is "grave reputational injuries." Compl. ¶ 650; *see also* Compl. ¶ 661, 663. The Supreme Court has repeatedly stressed that "injury to reputation by itself [is] not a 'liberty' interest protected under the Fourteenth Amendment." *Siegert v. Gilley*, 500 U.S. 226, 233 (1991); *see also Tigrett v. Rector and Visitors of University of Virginia*, 290 F.3d 620, 628 (4th Cir. 2002) ("The [Supreme] Court has plainly and repeatedly recognized that an injury to reputation alone does not deprive an individual of a constitutionally protected liberty interest," and, therefore, injuries to a person's reputation are not actionable under § 1983."). Nor is it a cognizable "property" interest. *Paul v. Davis*, 424 U.S. 693, 712 (1976) (defamatory statements "did not deprive [the plaintiff] of any 'liberty' or 'property' interests protected by the Due Process Clause").

In light of *Paul*, some courts have held that a plaintiff may recover for reputational harm only if he alleges deprivation of a cognizable property or liberty interest in connection with the harm to reputation. This "stigma plus" test is typically met when an

employer not only fires or demotes an employee, but defames him or her in connection with doing so.  *See, e.g.*, *Ridpath v. Board of Governors Marshall University*, 447 F.3d 292, 310-11 (4th Cir. 2006) (significant demotion coupled with defamatory statement may trigger due process protection);  *Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007) (a plaintiff must allege that charges against him both "placed a stigma on his reputation" and "were made in conjunction with his termination or demotion"); *Johnson v. Morris*, 903 F.2d at 999 (when coupled with damage to "'tangible interests such as employment,'" stigmatizing public announcements by employer may implicate liberty interests) (quoting *Paul*, 424 U.S. at 701)).

Plaintiffs' claims do not meet the "stigma plus" test.  Indeed, each deprivation of which Plaintiffs complain—including "educational opportunities" and "lucrative business opportunities, Compl. ¶¶ 477, 652—*flowed from* the alleged damage to reputation. Indeed, Plaintiffs concede as much.  *See* Compl. ¶ 661 (noting that alleged deprivations occurred "[a]s a result of these false public statements").  This bootstrapping approach has been squarely rejected by the Supreme Court:

> Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation.  *But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation*, it may be recoverable under state tort law but it is not recoverable in a [constitutional tort] action.

*Siegert*, 500 U.S. at 234 (emphasis added); *see also Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994) (noting that effects of reputational harm, such as impact on "job prospects, or, for that matter, romantic aspirations, friendships, self-esteem" not sufficient to satisfy "stigma plus" test); *Popovic v. United States*, 997 F. Supp. 672, 680 (D. Md. 1998)

("[H]arm to reputation, to the extent that it creates difficulty in a pending future employment, is insufficient to establish violation of a liberty interest.").

Here, the alleged deprivations at issue arise at the hands of others—Duke University as well as unknown future employers or business partners. Any actions by those third parties would flow directly from the alleged reputational damage of which Plaintiffs claim. But "[t]he 'stigma-plus' test requires that the defamation be accompanied by an injury *directly caused by the Government*, rather than an injury caused by the act of some third party." *WMX Techs. v. Miller*, 80 F.3d 1315, 1320 (9th Cir. Cal. 1996) (emphasis added); *see also Izzo v. City of Syracuse*, 2000 U.S. Dist. LEXIS 19784, 23-24 (N.D.N.Y Aug. 3, 2000) (same); *Univ. Garden Apartments Joint Venture v. Johnson*, 419 F. Supp. 2d 733, 741 (D. Md. 2006) (claim fails when deprivation "appears to be the result of actions taken by third parties who acted upon Defendants' statements"). Accordingly, Plaintiffs' claims cannot be sustained.

Even if the City itself had effected the complained-of deprivations—which it did not—Plaintiffs' claims are still deficient. Plaintiffs do not identify any property interests which merit independent protection under the Constitution. Future "opportunities" are not property interests to which Plaintiffs are entitled. *See Juster Assoc. v. Rutland*, 901 F.2d 266 (2d Cir. 1990) (mall owner has no legitimate property claim in potential future relationships with tenants). Nor are Plaintiffs' lacrosse-related interests of constitutional magnitude. *See, e.g.*, *Davenport v. Randolph County Bd. of Educ.*, 730 F.2d 1395, 1397 (11th Cir. 1984) ("[T]he privilege of participating in interscholastic activities must be deemed to fall . . . outside the protection of due process" (internal punctuation and

citation omitted)); *Walsh v. Louisiana High School Athletic Assoc.*, 616 F.2d 152, 159 (5th Cir. 1980) (same); *Giannattasio v. Stamford Youth Hockey Asso.*, 621 F. Supp. 825, 829 (D. Conn. 1985) ("the privilege of participating in intercollegiate and interscholastic sports competition is without constitutional protection."); *Williams v. Hamilton*, 497 F. Supp. 641, 645 (D.N.H. 1980) ("privilege of participating in intercollegiate sports competition is without such constitutional protection"); *Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338 (3d Cir. 2004) (right of education not constitutionally protected, and "[t]here is no constitutionally protected right to play sports."); *cf. Denis J. O'Connell High School v. Virginia High School League*, 581 F.2d 81, 84 (4th Cir. 1978) (participation in interscholastic athletics is not a fundamental right). For this additional reason, Plaintiffs' procedural due process claims (Causes of Action 25 and 26) must be dismissed.

### F. Plaintiffs Cannot Hold City Liable for Actions of State Prosecutor under *Monell* (Causes of Action 26A, 26B, & 26C)

Much of Plaintiffs' Complaint against the City depends upon re-imagining State Prosecutor Michael Nifong as a "Durham Investigator," subject to the City's direction and supervisory control. *See, e.g.*, Compl. ¶¶ 66, 69 (defining "Durham Investigators" as including Nifong and his assistant Linwood Wilson); Compl. at 210 (alleging that City officials "failed to exercise adequate supervisory authority over Nifong").[24] This strained theory is belied by the facts as alleged, is flatly inconsistent with North Carolina law, and

---

[24] As noted above, though Plaintiffs refer to Nifong as "Defendant," Compl. ¶ 69, they do not actually sue him individually, Compl. ¶ 6.

defies common sense. All claims that depend on the theory that Nifong acted as a City official, or that the City failed to supervise Nifong, therefore fail as a matter of law.

Whether a government entity may be held liable for the acts of a particular official depends on "the definition of the official's functions under relevant state law." *McMillian v. Monroe Co., Ala.*, 520 U.S. 781, 786 (1997); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) ("[A] federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it."). Under North Carolina law, there is no question that District Attorneys act solely on behalf of the State of North Carolina. *See, e.g.*, N.C. Const. art. IV, § 18(1) (District Attorney shall "be responsible for the prosecution *on behalf of the State* of all criminal actions in the Superior Courts of his district" (emphasis added)); N.C.G.S. § 7A-61 (District Attorney shall prosecute "in the name of the State all criminal actions and infractions requiring prosecution").[25]

Plaintiffs' allegation that the City somehow "delegated" authority to Nifong does not alter the legal standard. The focus must remain on how state law defines the scope of authority of the official in question. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 484-85 (1986) (examining Ohio law to determine when and under what conditions a sheriff or prosecutor could establish county policy). North Carolina makes plain that a

---

[25] The fact that Nifong might have been involved in "investigative" rather than "prosecutorial" activity with regard to plaintiffs does not alter the fact that at all times he was acting as a state, not a City, official. *See* N.C.G.S. § 7A-69 (District Attorney is entitled to investigatory assistant whose sole duty is to "investigate cases preparatory to trial and to perform such other Duties as may be assigned by the district attorney"); N.C. Const. art. IV, § 18(1) (office of District Attorney may "perform such other duties *as the General Assembly may prescribe*" (emphasis added)).

District Attorney at all times acts exclusively as a State official. Even if the City had wanted to delegate policymaking authority to Nifong, it had no legal authority to do so, and Nifong had no legal authority to accept such a delegation. N.C. Const. art. IV, § 18(1) (giving only the General Assembly of the State authority to prescribe additional duties for the District Attorneys); *Simeon v. Hardin*, 451 S.E.2d 858, 868 (N.C. 1994) ("The remainder of the district attorney's duties [outside of duties imposed by the state constitution] . . . are derived from statutes promulgated by the General Assembly pursuant to authority granted in Article IV, Section 18 of the North Carolina Constitution." (citation omitted)). Nor did the City have any authority under North Carolina law to supervise Nifong. *State v. Smith*, 607 S.E.2d 607, 625 (N.C. 2005) (State Legislature supervises the District Attorney's exercise of authority to decide who should be criminally charged). Accordingly, Plaintiffs cannot, as a matter of law, hold the City responsible for Nifong's actions, or for failing to supervise Nifong. *See, e.g.*, *Jones v. Ziegler*, 894 F. Supp. 880, 893 & n.12 (D. Md. 1995), *aff'd sub nom. Jones v. Wellham*, 104 F.3d 620 (4th Cir. 1997) (county could not be held liable for alleged acts of state prosecutor because the prosecutor is a state official who acts only pursuant to state mandate).[26]

---

[26] The notion that the City delegated authority to Nifong is also facially implausible. Indeed, Plaintiffs do not claim that Nifong was intending to accomplish anything on behalf of the City, rather, they acknowledge that he was plainly motivated to pursue *State* charges and to win election to a *State* office. *See, e.g.*, Compl. ¶ 5. Nor do they allege that the City asked, encouraged, or even contacted Nifong to act on their behalf; rather, it was Nifong who "contacted Durham officials . . . to take control of the investigation of Mangum's claims," Compl. ¶ 218, doing so because of the media coverage he would likely receive. Compl. ¶ 219. Indeed, Plaintiffs elsewhere essentially concede the point, noting that Nifong was abusing his "prosecutorial powers." Compl. ¶

### G. The Alleged Policy of Targeting Duke Students is Not Sufficiently Related to the Conduct Alleged Here to Support a Claim Against the City (Cause of Action 26D and 26E)

Plaintiffs claim, on information and belief, that the City had a policy or custom of selective enforcement of the criminal laws with respect to Duke students. Compl. ¶¶ 683, 687. This charge is levied in connection with Sergeant Gottlieb, who is alleged to have harbored personal animosity toward Duke students, culminating in discrimination and abusive behavior with respect to enforcement of underage drinking and noise violations. Compl. ¶ 134-35. But in order to state a proper claim under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978),[27] plaintiffs must allege facts from which a factfinder may infer that the policy or custom was the "moving force" behind the violation. *Id.* at 694; *see also Polk County v. Dodson*, 454 U.S. 312, 326 (1981).[28]

_____

391. Plaintiffs' bald conclusion—contrary to these factual allegations—that the City "delegated" its authority to Nifong thus does not attain minimal plausibility. Thus, for this additional reason, under the standards set out in *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007), the claims that rely on this theory must be dismissed.

[27] Under *Monell*:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694.

[28] A policy or custom may be established by showing: (1) an express municipal policy, such as a written ordinance or regulation; (2) affirmative decisions by persons with final policymaking authority for the city; (3) an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) a practice that is so "'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)).

Plaintiffs' allegations demonstrate no such causal connection. Gottlieb's alleged bias with respect to enforcement of alcohol and noise violations against college students is not sufficiently related to the deprivations alleged here, which all arose in connection with a serious felony investigation into an alleged rape. Indeed, Plaintiffs' factual allegations make clear that the "moving force" for any constitutional deprivations arose from other sources, including statements by Duke medical personnel and by Nifong. Accordingly, this claim cannot stand.

A plaintiff may not hold a municipality liable for acts of an employee under a "policy or custom" theory without a close fit between the policy or custom and the harm alleged:

> [A] plaintiff cannot rely upon scattershot accusations of unrelated constitutional violations to prove either that a municipality was indifferent to the risk of her specific injury or that it was the moving force behind her deprivation. Instead, a "plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a *particular* constitutional or statutory right will follow the decision.

*Carter v. Morris*, 164 F.3d 215 (4th Cir. 1999) (quoting *Board of County Commr's v. Brown*, 520 U.S. 397, 405 (1997)); *see also Carter*, 164 F.3d at 218 (alleged policy must "'make the *specific* violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run'" (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1389-91 (4th Cir. 1987))) (emphasis in original).

Yet, here, Plaintiffs have alleged no facts even to suggest such a fit between the alleged policy and the alleged constitutional violations. Plaintiffs focus on Gottlieb's alleged discrimination against Duke students, highlighting the fact that "at least 15 of the Duke students arrested by Gottlieb were taken to jail for alcohol and noise violations

while nonstudents and 'permanent residents' were not taken to jail for more severe offenses." Compl. ¶ 135. But any possible connection of this statistic to this case is remote at best. Even if Gottlieb engaged in abuses in connection with the enforcement of misdemeanor regulations against college students, that says little about his conduct in a serious felony investigation into charges of rape.

Indeed, plaintiffs' allegations make clear that the "moving force" behind any alleged constitutional violations lay elsewhere. For one, the Complaint plainly alleges that Levicy's statements to investigators were "critical factor[s] in launching, sustaining, and prolonging the rape investigation." Compl. ¶ 153. They also allege that, without Levicy's false statements, Gottlieb would have dropped the case. *See* Compl. ¶ 483 (without Levicy's statements, "the rape investigation either would not have occurred or would have been terminated promptly"). This concession highlights that any custom or policy resulting from Gottlieb's previous actions against Duke students could not have been the moving force behind the alleged constitutional violations here.

Moreover, Plaintiffs' Complaint is riddled with allegations of both "unprecedented" behavior by non-City officials, Compl. ¶ 219 (Nifong assuming responsibility for case), and lies and intentional misdeeds by upwards of 30 different defendants and a state prosecutor not named as a defendant. *See* Compl. ¶ 47-80; *see also* Compl. ¶ 4 ("This tragedy has many villains, as the long list of defendants in the caption makes clear . . . ."). Given the scope of misdeeds alleged, plaintiffs cannot simultaneously allege that the personal bias and past acts of one investigator in enforcing noise and alcohol regulations was the moving force behind the harm of which they

complain. Because plaintiffs offer no more than a "nebulous chain" of causation, *Carter*, 164 F.3d at 219, which is itself inconsistent with their own factual allegations, and because the alleged custom or policy is not "closely related to the ultimate injury," *City of Canton v. Harris*, 489 U.S. 378, 391 (1989), this claim must be dismissed.

**H.  Plaintiffs Do Not Properly Allege Intentional Infliction of Emotional Distress (Count 28)**

Plaintiffs allege intentional infliction of emotional distress based on the "course of conduct" of the Durham defendants "throughout the rape investigation." Compl. ¶ 722. Plaintiffs' allegations fail to satisfy the strict requirements of this cause of action, and this claim must be dismissed.

In order to sufficiently claim intentional infliction of emotional distress, a plaintiff must allege: (1) extreme and outrageous conduct (2) which is intended to cause and does cause (3) severe emotional distress. *Dickens v. Puryear*, 276 S.E. 2d 325, 335 (N.C. 1981). Plaintiffs' allegations fail to satisfy at least the first and third elements.

First, Plaintiffs have not sufficiently alleged any behavior by City officials sufficient to constitute "extreme and outrageous" behavior. City officials investigated, and oversaw the investigation of, Mangum's allegations of rape. Plaintiffs claim that they did so maliciously. *See* Compl. ¶ 724 (course of conduct included "instigating, pursuing, and prolonging a malicious criminal investigation," making false statements, suppressing evidence, and "betraying the public trust"). This conduct, even if true, is not "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded at atrocious, and utterly intolerable in a civilized community.'" *Bradley v. Lowe's Cos.*, 3:05CV488-MU, 2007 U.S. Dist. LEXIS 69872,

at *10 (W.D.N.C. Sept. 20, 2007) (quoting *Briggs v. Rosenthal*, 327 S.E.2d 308, 311

(N.C. Ct. App. 1985)). Neither allegations akin to malicious investigation[29] nor claims of

fabrication of evidence,[30] nor alleged false public statements,[31] meet the stringent

standard of "outrageousness" required. This is particularly true when, as Plaintiffs

concede, City investigators were misled by statements made by Duke medical personnel.

See, e.g., Compl. ¶¶ 150-54. Whether conduct meets this "stringent standard is a

question of law." Capouch v. Cook Group, Inc., Civil No. 3:04CV421-H, 2006 U.S.

Dist. LEXIS 36984, at *32 (W.D.N.C. June 5, 2006). Thus it is entirely appropriate for

the court to dismiss this cause of action on this basis alone.[32]

---

[29] *See Darnell v. B.P. Exploration & Oil*, No. 97-2040, 1998 U.S. App. LEXIS 4651, 5-6 (4th Cir. N.C. Mar. 13, 1998) (no extreme or outrageous conduct when plaintiff charged and indicted based on an investigation conducted by agents and pursuant to their employment duties); *Sullivan v. County of Pender*, No. 7:04-CV-26 FL(1), 2006 U.S. Dist. LEXIS 96536 (E.D.N.C. Mar. 28, 2006) (noting that "plaintiff's arrest was supported by probable cause" and "public arrest does not rise to the level of conduct sufficient to shock the conscience"); *Peck v. Lake Lure*, 1:00cv183-T, 2001 U.S. Dist. LEXIS 13179 (W.D.N.C. Feb. 23, 2001) ("Arresting a person at his home, even in front of his family, is not atrocious conduct in a civilized community."); *see also Dillard v. Bedsole*, No. 5:97-CV-381-BO(2), 1998 U.S. Dist. LEXIS 4091, 21-22 (E.D.N.C. Jan. 28, 1998) ("police officers should not fear civil liability when they are behaving reasonably and acting with reasonable suspicions that criminal activity is afoot.").

[30] *See, e.g.*, *Dobson v. Harris*, 134 N.C. App. 573, 578-79 (1999), *rev'd on other grounds*, 352 N.C. 77, 530 S.E.2d 829 (2000) (exaggerated or fabricated report of child abuse that initiated an investigatory process not "extreme" or "outrageous.").

[31] *Guthrie v. Conroy*, 152 N.C. App. 15, 22 (2002) (noting that "insults" and "indignities" do not meet stringent standard); *see also Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 492- 493 (1986).

[32] *See, e.g.*, *Thomas v. N. Telecom, Inc.*, 157 F. Supp. 2d 627, 635 (M.D.N.C. 2000) (holding, on motion to dismiss, that alleged conduct did not satisfy the "extremely rigorous standard" required for "extreme and outrageous" conduct as a matter of law).

Second, Plaintiffs fail to allege that they suffered severe emotional injury. *Waddle v. Sparks,* 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992) (claim dismissed where "there is no forecast of any medical documentation of plaintiff's alleged 'severe emotional distress' nor any other forecast of evidence of 'severe and disabling' psychological problems"); *Pruett v. Town of Spindale, N.C.*, 162 F. Supp. 2d 442 (W.D.N.C. 2001) (holding, on motion to dismiss, that plaintiff had not alleged sufficiently severe emotional distress). On this additional basis, this claim must be dismissed.

I.  **Plaintiffs Fail to State a Claim for Negligent Infliction of Emotional Distress (Count 29)**

Plaintiffs claim that the Durham Supervisors, Durham Investigators, and City of Durham negligently inflicted emotional distress on them, alleging that defendants' conduct involved "numerous repeated breaches of the defendants' identified duties of due care." Compl. ¶ 730. This claim fails as a matter of law.

To state a claim for negligent infliction of emotional distress, Plaintiffs must allege that "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress . . . and (3) the conduct did in fact cause the plaintiff severe emotional distress." *Sheaffer v. County of Chatham*, 337 F. Supp. 2d 709, 733 (M.D.N.C. 2004) (quoting *Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 395 S.E.2d 85, 97 (1990)).

First, Plaintiffs allege that the defendants' breaches of their duties were intentional. Compl. ¶ 730. But as this Court has held, intentional acts do not support a claim for negligent infliction of emotional distress. *See Sheaffer*, 337 F. Supp. 2d at 734 (dismissing plaintiff's claim where she alleged only intentional acts); *see also Barbier v.*

*Durham County Bd. of Educ.*, 225 F. Supp. 2d 617, 631 (M.D.N.C. 2002) ("When the plaintiff's complaint alleges acts . . . that are intentional in nature, and simply concludes that the acts were committed negligently, it is insufficient to state a claim for negligent infliction of emotional distress.").

In addition, Plaintiffs' allegations make clear that the proximate cause of Plaintiffs' alleged injuries was the conduct District Attorney Nifong and Defendant Levicy—not that of the Durham defendants. *See generally* Compl. ¶¶ 6, 161, 220, 280, 384, 471 (Nifong seized control of the investigation; made public statements to inflame the media; and concealed exculpatory evidence—actions for which he was later disbarred, convicted of criminal contempt, and jailed.); Compl. ¶ 153 (Levicy's statements to investigators were "critical factor[s] in launching, sustaining, and prolonging the rape investigation."); *infra* Section IV.F (discussing Nifong's absolute lack of municipal authority under North Carolina law); *infra* Section IV.G (discussing conduct of Duke medical personnel and Nifong as the "moving force" of any constitutional deprivations). For these reasons, this claim must be dismissed.

### J. <u>Plaintiffs Fail to State A Claim for Obstruction of Justice (Count 23)</u>

Plaintiffs allege a common law action for obstruction of justice against all Defendants. Plaintiffs' sweeping allegations of wrongdoing in support of this claim, Compl. ¶ 645, are based on the same predicate allegations underlying their other causes of action (*i.e.*, abuse of process, malicious investigation, fraud, *etc.*). Under Plaintiffs' formulation, the obstruction of justice tort would become a catch-all, add-on claim available to any plaintiff asserting a cause of action related to a criminal investigation.

But such a claim has never been recognized in North Carolina on facts even remotely resembling those alleged here.

North Carolina courts have applied obstruction of justice only in very limited circumstances. The courts have never, to our knowledge, applied the tort of obstruction of justice to complaints involving the conduct of a criminal investigation. Nor should they begin to do so now. Such a broad and amorphous claim would have serious policy ramifications for police departments throughout the State—indeed, it would implicate the bulk of judgment calls made by the police during ongoing investigations, with crippling results. Notably, in the civil context, the typical obstruction of justice case arises when a defendant takes action to interfere with the plaintiff's pursuit of a civil claim. *E.g.*, *Broughton v. McClatchy Newspapers, Inc.*, 588 S.E.2d 20, 30 (N.C. Ct. App. 2003) (the defendants allegedly false statements did not support an obstruction of just claim where there was no evidence that the defendants' actions "in some way judicially prevented, obstructed, impeded or hindered" a separate civil case the plaintiff was pursuing); *see also Burgess v. Busby*, 544 S.E.2d 4, 12 (N.C. Ct. App. 2001). No such obstruction of the plaintiffs' ability to use the civil process or resort to the courts is even alleged here.

Furthermore, Plaintiffs have not even alleged an underlying unlawful act of obstruction of justice, so there can be no conspiracy to obstruct justice. *Iglesias*, 539 F. Supp. 2d at 836 (an underlying unlawful act, or lawful act done in an unlawful way, is a prerequisite to conspiracy liability). In addition, to the extent Plaintiffs rely on their allegation of conspiracy to fill the glaring gaps in their allegations, their claim still falls short since they make no factual allegations to suggest there was a "meeting of the

minds" between any of the parties to obstruct justice. The allegations thus fall woefully short of meeting the pleading standard for conspiracy. *Twombly*, 127 S. Ct. at 1966; *S.N.R. Mgmt. Corp.*, 659 S.E.2d at 449 (dismissing factually deficient conspiracy claim). Plaintiffs' claim must be dismissed.

### K. The Parent Plaintiffs Lack Standing to Assert Claims Vicariously for Alleged Injuries to their Children

The Parent Plaintiffs' claims appear to be entirely derivative of the alleged harm to their adult children. They do not allege that any of their personal rights were violated or that they suffered individualized or particular harm as a result of some action them against them by the City. As to each of the Causes of Action asserted herein against the City (Causes of Action 8, 10, 20-31), they therefore lack standing and their claims must be dismissed. *See*, *e.g.*, *Mullinix v. Mabry*, No. 01-CVS-602, 2005 N.C. Ct. App. LEXIS 2566 (N.C. Ct. App. Dec. 6, 2005) (fraud); *Lewis v. Clegg*, 26 S.E. 772, 774 (N.C. 1897) (it is fundamental that the particular plaintiff asserting abuse of process "must show that he has been injured" by the alleged abusive proceedings); *Martel v. City of Newton*, 6 F. Supp. 2d 1243 (D. Kan. 1998) ("[A]buse of process does not provide or implicate an indiscriminate right of third persons, indirectly affected by a prosecution, to separately advance an abuse of process claim.") (internal citation omitted); *see Minnesota v. Carter*, 525 U.S. 83, 87–88 (1998) (holding the right to be protected from unreasonable searches and seizures is a personal one and cannot be asserted vicariously); *Lawson v. Virginia*, 1:01CV180, 2002 U.S. Dist. LEXIS 13270 (M.D.N.C. Feb. 14, 2002); *Shaw v. Stroud*, 13 F.3d 791, 805 (4th Cir. 1994) (death of a child will not confer standing on a parent to state a claim for violation of due process under the Fourteenth Amendment).

**L.** **Plaintiffs' Claims for Punitive Damages Must Be Dismissed.**

Plaintiffs seek punitive damages against all Defendants. *See* Compl. ¶ 747. The City of Durham, however, is immune from punitive damages under federal and North Carolina law. *See City of Newport v. Fact Concerts, Inc*., 453 U.S. 247, 271 (1981) (municipality immune from punitive damages for § 1983 claims); *Efird v. Riley*, 342 F. Supp. 2d 413, 430 (M.D.N.C. 2004) ("It is well settled that under North Carolina public policy, in the absence of a statute indicating otherwise, a plaintiff may not recover punitive damages against government entities."). Plaintiffs' claims for punitive damages against the City (including any "official capacity" claims against other Defendants[33]) should be dismissed.

---

[33] *See Crain v. Butler*, 419 F. Supp. 2d 785, 793 (E.D.N.C. 2005) (prohibiting claims for punitive damages against officers of local governments in their official capacities); *Houpe v. City of Statesville*, 497 S.E.2d 82, 93 (N.C. 1998) (same).

## V.    CONCLUSION

For the foregoing reasons, to the extent Causes of Action 8, 10, 20-25, 26A, 26C-E, 27-29 are alleged against the City, they should be dismissed, and Plaintiffs' request for punitive damages against the City should be dismissed.

This the 30th day of May, 2008.

FAISON & GILLESPIE

By: /s/ Reginald B. Gillespie, Jr.
Reginald B. Gillespie, Jr.
North Carolina State Bar No. 10895
5517 Chapel Hill Boulevard, Suite 2000
Post Office Box 51729
Durham, North Carolina  27717-1729
Telephone:  (919) 489-9001
Fax: (919) 489-5774
E-Mail: rgillespie@faison-gillespie.com

STEPTOE & JOHNSON LLP

By: /s/ Roger E. Warin
Roger E. Warin*
Michael A. Vatis*
Matthew J. Herrington*
John P. Nolan*
Ana H. Voss*
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
Telephone: (202) 429-3000
Fax: (202) 429-3902
E-Mail: rwarin@steptoe.com
*(Motion for Special Appearance to be filed)

Attorneys for Defendant City of Durham, North Carolina

<u>CERTIFICATE OF ELECTRONIC FILING AND SERVICE</u>

The undersigned hereby certifies that, pursuant to Rule 5 of the Federal Rules of Civil Procedure and LR5.3 and LR5.4, MDNC, the foregoing pleading, motion, affidavit, notice, or other document/paper has been electronically filed with the Clerk of Court using the CM/ECF system, which system will automatically generate and send a Notice of Electronic Filing (NEF) to the undersigned filing user and registered users of record, and that the Court's electronic records show that each party to this action is represented by at least one registered user of record, to each of whom the NEF will be transmitted, except that, with respect to the following party, a copy is being transmitted via first class mail to the address listed below:

Linwood Wilson
*Pro Se*
[Home Address redacted per LR 7.1(b), MDNC and ECF P&P Manual, part J]

This the 30th day of May, 2008.

FAISON & GILLESPIE

By: /s/ Reginald B. Gillespie, Jr.
Reginald B. Gillespie, Jr.
North Carolina State Bar No. 10895