# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### No. 1:08-cv-119

| | |
|---|---|
| _____ | ) |
| | ) |
| **EDWARD CARRINGTON, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| **v.** | ) |
| | ) |
| **DUKE UNIVERSITY, et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

## PLAINTIFFS' OPPOSITION TO DEFENDANT CITY OF DURHAM'S
## MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

Charles J. Cooper
Brian S. Koukoutchos
David H. Thompson
Howard C. Nielson, Jr.
Nicole Jo Moss (N.C. Bar # 31958)
David Lehn
**COOPER & KIRK, PLLC**
1523 New Hampshire Avenue, NW
Washington, DC  20036
Tel. (202) 220-9600

William J. Thomas, II (N.C. Bar # 9004)
**THOMAS, FERGUSON & MULLINS, L.L.P.**
119 East Main Street
Durham, NC  27701
Tel. (919) 682-5648

*Attorneys for Plaintiffs*

August 28, 2008

# TABLE OF CONTENTS

I.      Nature of Proceedings ................................................................................ 1

II.     Statement of Facts ...................................................................................... 2

III.    Questions Presented.................................................................................... 4

IV.     Standard of Review ..................................................................................... 4

V.      Argument ..................................................................................................... 6

        A.      The Complaint Adequately Pleads Conspiracy as to the Durham
                Defendants................................................................................................. 6

        B.      Durham Is Liable for the Misconduct of Nifong
                (Counts 8, 10, 21, 26 A, B & C, 28, and 29)........................................ 11

                1.      The Complaint Alleges that Durham Delegated Control
                        over the Duke Rape Hoax Investigation to Nifong................... 11

                2.      This Issue Must Be Resolved in Favor of Plaintiffs at
                        This Stage, Because Delegation of Municipal Authority
                        Is a Question of Fact Unsuited for Resolution on a
                        Motion to Dismiss .................................................................... 13

                3.      Nothing in North Carolina Law Forecloses Durham's
                        Delegation to Nifong................................................................. 14

        C.      The "Key-Card" Counts – Counts 8, 10 and 20 – Adequately
                Plead Claims Against Durham ............................................................. 19

                1.      Count 8 Adequately Pleads Fraud Against Durham ................. 19

                2.      Count 10 Adequately Pleads Abuse of Process ....................... 22

                3.      Plaintiffs Had a Reasonable Expectation of Privacy in
                        Their Key-Card Data (Count 20 – Fourth Amendment)........... 23

        D.      Count 21 Pleads a Valid Fourth Amendment Claim Based on the
                Nontestimonial Order for DNA Samples ............................................. 25

        E.      Count 23 Adequately Pleads a Claim for Obstruction of Justice......... 32

        F.      Count 22 Adequately Pleads a Due Process Clause for Malicious
                Investigation ....................................................................................... 35

        G.      The Complaint's Allegations Pass the So-Called "Stigma-Plus"
                Standard and Counts 24 and 25 Therefore Adequately Plead
                Causes of Action ................................................................................ 36

        H.      Durham's Policies of Targeting Duke Students for

Harassment and Prematurely Publishing Conclusions of
Criminal Guilt Support Claims Against the City
(Counts 26 D, E and F) ........................................................................ 42

I.  The Complaint Adequately Pleads Claims for Infliction of
Emotional Distress (Counts 28 and 29) ............................................... 47

J.  The Parent Plaintiffs Have Standing to Assert the Claims
They Plead ........................................................................................... 49

VI.  Conclusion ................................................................................................. 50

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### No. 1:08-cv-119

_____

| | |
|---|---|
| | ) |
| **EDWARD CARRINGTON, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| **v.** | ) |
| | ) |
| **DUKE UNIVERSITY, et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

## PLAINTIFFS' OPPOSITION TO DEFENDANT CITY OF DURHAM'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

I. **NATURE OF PROCEEDINGS**

This action for damages is brought by 38 of the 47 members of the 2006 Duke University men's lacrosse team, and by certain members of their families. The tragic tale that gives rise to their claims is known to almost everyone in the United States and to millions more throughout the world. For these Duke students were for 13 months in 2006-07 reviled almost daily in the local and national media as a depraved gang of privileged, white hooligans who had hired a black exotic dancer to perform at a team party, had brutally gang raped and sodomized her in a crowded bathroom, and had joined together in a "wall of silence" to hide the truth of their heinous crimes. But it was a vile and shameful lie, and it caused Plaintiffs tremendous suffering and grievous, lasting

injuries.  *See, e.g.*, Carrington Complaint ("Compl.") ¶ 1.[1]

This brief addresses the motion to dismiss under Rule 12(b)(6) of the City of Durham.

We respectfully request that the Court hear oral argument on all Defendants' motions to dismiss.

## II.    STATEMENT OF FACTS

Most Defendants eventually acknowledge, if only because they have to *arguendo* on this Rule 12 motion, that wrongs were done to Plaintiffs.  But, of course, Defendants disagree on who is to blame.  Durham Police officer Himan points at Nifong, as does the City of Durham.[2]  Durham Police officers Gottlieb and Addison point their fingers at Duke University and Nurse Levicy.[3]  The Duke SANE Defendants point at the Durham police and Nifong.[4]  All of this finger pointing indicates that this case is not suited for resolution on a Rule 12 motion to dismiss, or even a Rule 56 summary judgment motion.

---

[1] We regret to inform the Court of an error in the paragraph numbering in the Complaint.  After paragraph 13, the Complaint repeats numbers 10-13.  The first instances of paragraphs 10-13 are part of the introduction and summary; the second instances of paragraphs 10-13 identify several Plaintiffs.  For purposes of these briefs, the Court should assume that any citation of paragraphs 10-13 refers to the first instances of those paragraphs, in the introduction and summary.

[2] Brief in Support of Defendant Himan's Motion to Dismiss ("Himan Br.") 4, 11; Brief in Support of Defendant City of Durham's Motion to Dismiss ("Durham Br.") 3.

[3] Brief in Support of Defendant Gottlieb's Motion to Dismiss ("Gottlieb Br.") 3; Brief in Support of Defendant Addison's Motion to Dismiss ("Addison Br.") 2-3, 7.

[4] Brief in Support of the Duke SANE Defendants' Motion to Dismiss ("SANE Br.") 2-3, 23-24.

In *Murray v. Chicago*, the Seventh Circuit considered the dismissal of civil rights claims

brought by a woman who was arrested (on a warrant that had already been quashed),

searched by police, and held at the jail for several hours.  634 F.2d 365, 366 (7th Cir.

1980).  The court of appeals noted how the police, the court clerk, and various city

officials all blamed one another, and it reversed and remanded for discovery:

> It seems clear that appellant sustained a violation of constitutional
> rights by being arrested and detained pursuant to an invalid warrant.
> The defendants should not be permitted to "get off the hook" by
> merely pointing the finger at each other.  Someone is surely at fault
> for failing to establish or execute appropriate procedures for
> preventing such serious malfunctionings in the administration of
> justice.  Plaintiff should be entitled to discovery in order to
> determine who is the true culprit responsible for the wrong done her.
> It would be premature to deny appellant relief at the present stage of
> the case, in advance of discovery or trial.  Summary judgment
> should not be granted unless it is clear that upon no conceivable state
> of facts as shown by the proof could a plaintiff recover.

*Id.* at 366; *see also Pennington v. Hobson*, 719 F. Supp. 760, 772 (S.D. Ind. 1989)

(quoting *Murray* at length but dismissing claim because, "Unlike the plaintiff in *Murray*,

plaintiff in the case at bar has had ample discovery.  He has deposed each of the

individual defendants, has received answers to interrogatories, and has prepared affidavits

from independent witnesses.  Even after discovery, plaintiff has presented nothing which

implicates defendant Myers"); *Lehman Bros. v. Minmetals Int'l*, 179 F. Supp. 2d 118,

143 (S.D.N.Y. 2000) (noting " 'a remarkable display of finger pointing' " and denying

summary judgment because sorting out responsibility among the multiple parties "is for

the ultimate fact finder, not the judge on a summary judgment motion").  We provide

more detailed statements of facts elsewhere.[5]

## III.   QUESTIONS PRESENTED

1.  Whether Plaintiffs have adequately pleaded conspiracy.

2.  Whether Durham is liable for the misconduct of Nifong (Counts 8, 10, 21, 26 A, B & C, 28, and 29).

3.  Whether Plaintiffs have stated a claim based on the disclosure of the key card data (Counts 8, 10 and 20).

4.  Whether Plaintiffs have stated claims based on Defendants constitutional violations (Counts 21-22, 24-25).

5.  Whether Plaintiffs have stated a claim for obstruction of justice (Count 23).

6.  Whether Plaintiffs have stated claims for tortious infliction of emotional distress (Counts 28 and 29).

7.  Whether the parent-Plaintiffs have standing.

## IV.   STANDARD OF REVIEW

Dismissals under Rule 12(b)(6) are allowed "only in very limited circumstances." *Rogers v. Jefferson-Pilot Life Ins. Co.,* 883 F.2d 324, 325 (4th Cir. 1989).  The legal standard is familiar:  "a court must view the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded factual allegations" and "draw[ing] all reasonable inferences in favor of the non-moving party."  *Phillips v. Mabe*, 367 F. Supp. 2d 861, 867 (M.D.N.C. 2005) (Beaty, J.); *Faircloth v. National Home Loan Corp.*, 313 F. Supp. 2d 544, 553 n.12 (M.D.N.C. 2003) (Beaty, J.).  Defendants contend that the

---

[5] *See* Plaintiffs' Opposition to Defendant Gottlieb's Motion to Dismiss ("Pls.' Gottlieb Opp.") Part II; Plaintiffs' Opposition to Defendant Addison's Motion to Dismiss ("Pls.' Addison Opp.") Part II; Plaintiffs' Opposition to Defendant Himan's and Defendant Wilson's Motions to Dismiss ("Pls.' Himan-Wilson Opp.") Part II.

4

Supreme Court toughened the pleading standard in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007).[6] This Court knows better. *See Salami v. Monroe*, No. 07-621, 2008 U.S. Dist. LEXIS 59058, at *15-16 (M.D.N.C. Aug. 1, 2008) (Beaty, J.) (discussing *Twombly*). Indeed, *Twombly* disavowed any change to the notice-pleading standard of Rule 8(a). *See* 127 S. Ct. at 1965 & n.3, 1973 n.14. A "complaint does not need detailed factual allegations." *Salami*, 2008 U.S. Dist. LEXIS 59058, at *15. The facts pleaded need only " 'be enough to raise a right to relief above the speculative level.' " *Id.* at *16 (quoting *Twombly*, 127 S. Ct. at 1965). A complaint "may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.' " *Twombly*, 127 S. Ct. at 1965 (citation omitted). Although a "bare assertion of conspiracy will not suffice," *id.* at 1966, a district court may dismiss a conspiracy claim only if "nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy." *Id.* at 1971.

With respect to civil rights complaints such as that here, a court "must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Veney v. Wyche*, 293

------

[6] *See* Durham Br. 10-11; Brief in Support of Durham Supervisor Defendants' Motion to Dismiss ("Supervisor Br.") 8; Addison Br. 5; Gottlieb Br. 8; Himan Br. 12; Brief in Support of Defendant Wilson's Motion to Dismiss ("Wilson Br.") 5-6; Brief in Support of Defendant Covington's Motion to Dismiss ("Covington Br.") 12-13; Brief in Support of the Duke University Defendants' Motion to Dismiss ("University Br.") 9; SANE Br. 7.

F.3d 726, 730 (4th Cir. 2002) (quotation marks omitted). The courts have recognized

that, in civil rights cases in particular, "direct evidence of a conspiracy is rarely available

and … the existence of a conspiracy must usually be inferred from the circumstances."

*Crabtree v. Muchmnore*, 904 F.2d 1475, 148 (10th Cir. 1990); *see also Hinkle v. City of

Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996) (conspiracy under § 1983 may be proven by

"circumstantial evidence"). And while the Federal Rules do require "greater particularity

in pleading certain actions," they "do not include among the enumerated actions any

reference to complaints alleging municipal liability under § 1983. *Expressio unius est

exclusio alterius*. … [F]ederal courts and litigants must rely on summary judgment and

control of discovery to weed out unmeritorious claims sooner rather than later."

*Leatherman v. Tarrant County*, 507 U.S. 163, 168-69 (1993).

## V.   ARGUMENT

Defendant City of Durham advances a variety of challenges to Plaintiffs' claims.

As explained below, none of Defendant's arguments has merit.[7]

### A.   The Complaint Adequately Pleads Conspiracy as to the Durham Defendants

Plaintiffs allege a conspiracy to investigate, harass, and prosecute the lacrosse

players notwithstanding a lack of probable cause to believe that a crime had even taken

---

[7] We incorporate into this opposition all oppositions filed today by Plaintiffs against the motions to dismiss of the Duke University Defendants, the Duke SANE Defendants, Defendant City of Durham, the Durham Supervisor Defendants, Defendant Gottlieb, Defendant Himan, Defendant Wilson, Defendant Addison, and Defendant Covington. Cross references to specific sections of Plaintiffs' other oppositions are provided throughout this brief

place.  Of course, each Defendant is liable for his own wrongful conduct, but each is also

liable for the wrongful conduct of the other Defendants to extent that the others acted in

furtherance of their conspiracy.  *See Fox v. Wilson*, 354 S.E.2d 737, 743 (N.C. Ct. App.

1987) ("all of the conspirators are liable, jointly and severally, for the act of any one of

them done in furtherance of the agreement").  Government officials and police officers

seized upon Mangum's lies to exploit them, and the public outrage and media firestorm

that they spawned, to advance their careers, to gratify their prejudices, or to further their

ideological and sociological agendas.  The Complaint pleads that Defendants worked

together to achieve these ends at Plaintiffs' expense.  And although "[f]ailure to allege

specific meetings, memoranda, and other such communication is not fatal to [a]

conspiracy claim because a conspiracy can arise without verbal communication," *Sara

Lee Corp. v. Kayser-Roth Corp.*, No. 92CV00460, 1995 U.S. Dist. LEXIS 6554, at *16

(M.D.N.C. Apr. 10, 1995), Plaintiffs here have alleged a number of specific meetings:

- On or around March 20 and 21, Himan and Gottlieb communicated with Defendant Covington and Duke officials to ambush the lacrosse players with all-night police interrogations and DNA sampling at which the players would not be represented by counsel, so that Defendants could coerce confessions and incriminating statements from the players.  Compl. ¶¶ 176-79, 197-98, 204.

- Beginning around March 21, Defendant Tara Levicy had multiple meetings with Gottlieb, Wilson, Himan, and Nifong to learn of the new problems that were arising with the case as the evidence against the lacrosse players collapsed and to work with them to change her testimony or to fabricate new details that would prop up the sagging case.  These meetings occurred from March 21, 2006 through at least January 10, 2007, when Levicy met with Wilson and Himan and, despite her own testimony and notes that the supposed victim had explicitly said many times that condoms were not used, Levicy changed her story to say that condoms may have been used during the supposed rape, as a means of explaining away the exculpatory fact that no lacrosse-player DNA was found in the rape kit.  *Id.* ¶¶ 190-92, 311, 313, 462-63.

- On March 27, 2006, Gottlieb and Himan met with Nifong to brief him on the disintegrating case and to discuss how, nevertheless, they might continue hounding the lacrosse players. Nifong reacted to this evidentiary review by remarking, "You know, we're f*cked!" *Id.* ¶¶ 267-70.

- On March 28 or 29, Durham Defendants Nifong, Gottlieb, Himan, Baker, and Chalmers met with Duke Defendants Graves and Dean and discussed the facts that Mangum's accounts of the alleged rape were not credible, that the DNA test results were negative, and that Mangum had failed to identify any attackers in two separate photo arrays. The participants discussed how to bolster the disintegrating case and agreed that the prosecution could continue despite the evidence that no crime had been committed. *Id.* ¶¶ 305-08.

- On April 10, Gottlieb, Himan, and Nifong met with Brian Meehan and Richard Clark of DNA Security, Inc. ("DSI"), at DSI's Burlington office, to review the DNA tests on Mangum's rape kit and learned that DSI's results matched those of the N.C. State Bureau of Investigation ("SBI"): on Mangum's body or in her underwear was DNA from four men, *none* of whom was a Duke lacrosse player. The participants then agreed to suppress this evidence of innocence so that the prosecution could proceed. *Id.* ¶¶ 382-85.

- On April 21, Wilson, Gottlieb, Nifong, and Himan met with Meehan and Clark of DSI in Burlington and agreed that DSI would produce a forensic report that would omit the findings exculpating the lacrosse players. They further agreed, as they had at the prior meeting, not to make written notes that would leave a record of the substance of their discussions. *Id.* ¶¶ 401-03.

- On May 12, Gottlieb, Nifong, Himan, and Wilson met with Meehan and Clark again to discuss the DNA testing, and Meehan provided Nifong with the forensic report they had previously planned, which omitted the exculpatory findings and obfuscated the results so that the lacrosse players and their attorneys, as well as any other readers, would not learn the truth. *Id.* ¶¶ 424-28.

- At each step, the Durham Supervisors learned of the exculpatory evidence but still approved of the continuation of the baseless prosecution. *Id.* ¶¶ 269, 308, 385, 404, 429.

"All that can be required at the pleading stage is that a defendant be given notice

of how he is alleged to have participated in the conspiracy, so that he may intelligently

prepare his answer and defense." *Waller v. Butkovich*, 584 F. Supp. 909, 931 (M.D.N.C.

1984).  The allegations summarized above provide such notice.  It is a fair inference from these meetings and communications that the Durham Defendants were working together to attain the goal of arresting and indicting some Duke lacrosse players, despite the evidence that exonerated them and showed that no crime had even taken place.

Apart from this record of actual meetings, there are additional allegations that raise a reasonable inference of conspiracy:

- Around March 24, the Durham Supervisors ceded control of the investigation to Nifong, despite knowing the irregularity of this move and the conflict of interest it involved, given Nifong's desperate re-election campaign.  Durham Police Commander Lamb instructed Gottlieb and Himan to take direction from Nifong. Compl. ¶¶ 218-23.

- The Durham Supervisors, who had put Nifong in charge of Durham's investigation, let Nifong attempt to railroad the players, even though they knew that there was not even probable cause to think a crime had been committed.  One can reasonably infer from this that they shared Nifong's agenda—otherwise they would have reined him in or gone public with the truth.  And when they reached the point that their actions and inactions made them complicit in this scandal, they continued to go along in the hope that it would blow over before anybody discovered the truth.

- The Durham Supervisors knew of Gottlieb's record of illegitimate and discriminatory enforcement against Duke students, yet they violated their own department procedures and put Gottlieb in charge of the rape investigation, even though he had been transferred to a different district.  *Id.* ¶¶ 135-36.

- Sergeant Shelton's report that Mangum recanted her rape charges on March 13 while still at the hospital presented a problem for the rape hoax, so the Durham Supervisors and the Durham Investigators worked to discredit and intimidate Shelton by subjecting him to an internal investigation and threats of disciplinary action.  *Id.* ¶¶ 110, 422-23.

- Similar efforts were made by Nifong and Duke officials to discredit Duke Police Officer Day's report that Mangum recanted her rape charges, and to induce fabrication of new accounts of Mangum's behavior and statements. *Id.* ¶¶ 139, 276-77, 322-23.

- Nifong and the Durham Investigators made public statements damning the lacrosse team and asserting as fact that a heinous gang rape had taken place—despite knowing this was not true. This is the media campaign savaging presumptively innocent—and actually innocent—players that got Nifong disbarred. *Id.* ¶¶ 271-76.

- Duke secretly and illegally gave key-card information on the lacrosse players to the Durham Investigators so that the latter could rig their photo identification arrays and try to rehabilitate Mangum as a witness. *Id.* ¶¶ 324-30, 332.

- Later, the Duke Defendants and the Durham Investigators used a sham subpoena application to conceal from the players and their parents the fact that Duke had already given the information to Durham illicitly. *Id.* ¶¶ 433-41, 535-36, 543-45.

- One can reasonably infer that the Duke Defendants and the Durham Defendants conspired to hide the improper release of this information, for otherwise Duke would have responded to the subpoena by pointing out that Durham already had the key-card data. Instead, Duke and Durham did their courtroom dance for the players and the public, as if the subpoena mattered.

- When the exculpatory DNA evidence became a problem, the Durham Investigators tried to suppress the information—with the approval of the Durham Supervisors. *Id.* ¶¶ 212, 312-13, 384-85, 403-04, 427-29. Suppressing evidence of innocence is not legitimate government conduct, so one cannot say that this cooperation between the Investigators and the Supervisors took place in the regular course of police business. Concerted action and conspiracy is a reasonable inference.

- With each item of evidence that disintegrated at each step of the investigation, the Durham Investigators and the Durham Supervisors knew that there was no probable cause that there had been a crime and that the rape they were investigating was a hoax, but they pressed on anyway. *Id.* ¶¶ 110-11, 181, 193-95, 212, 312, 376-77.

Plaintiffs have pleaded more than a "formulaic recitation of the elements of a cause of action" or a " 'bare averment that [they want] relief and [are] entitled to it.' " *Twombly,* 127 S. Ct. at 1965 & n.3. The Supreme Court dismissed the conspiracy claim in *Twombly* because the complaint did "not set forth a single fact in a context that suggests an agreement" and "mentioned no specific time, place or person involved in the alleged conspiracies." *Id.* at 1968-69, 1970 n.10. The same cannot be said here. The

meetings and cooperation are extensively detailed in the Complaint. These are not the coincidentally parallel acts of isolated individuals; this was concerted action. Surely none of the Defendant investigators, supervisors, or government officials would have engaged and persisted in or authorized a criminal investigation so heedless of exculpatory evidence, so indifferent to the suffering of innocents, and so dependent upon multiple acts of witness tampering, falsification of evidence, and other obstructions of justice, without confidence that none of the others in the know would blow the whistle. The allegations of the Complaint "invest" the "action or inaction" of the Durham Defendants "with a plausible suggestion of conspiracy." *Id.* at 1971.

## B. Durham Is Liable for the Misconduct of Nifong (Counts 8, 10, 21, 26 A, B & C, 28, and 29)

### 1. The Complaint Alleges that Durham Delegated Control over the Duke Rape Hoax Investigation to Nifong

The centerpiece of Durham's motion to dismiss is the contention that the City cannot be held liable for Nifong's misconduct because, in conducting Durham's criminal investigation of the rape hoax, he was an officer of the State of North Carolina, not of the City of Durham. This theme pervades Durham's arguments against most of the claims leveled against it.[8] Durham concedes that the Complaint adequately alleges "that Nifong might have been involved in 'investigative' rather than 'prosecutorial' activity with

---

[8] *See* Durham Br. 3, 14-15 (Count 8 Fraud and Count 10 Abuse of Process), 20 (Count 21 Fourth Amendment § 1983), 34-36 (Count 26 A, B, C § 1983 claims under *Monell*), 40 (Count 28 Intentional Infliction of Emotional Distress), 43 (Count 29 Negligent Infliction of Emotional Distress).

regard to plaintiffs."  Brief in Support of Defendant City of Durham's Motion to Dismiss

("Durham Br.") 35 n.25.  And Durham does not deny that delegation by the City to

Nifong has been adequately alleged.[9]  Rather, it *disputes the truth* of those allegations,

objecting that such delegation "defies common sense," is "facially implausible" and is

"belied by the facts."  Durham Br. 34-36 & n.26.  But this is a motion to dismiss and

therefore the parties and the Court must accept as true the facts pleaded in the Complaint.

The Complaint pleads, in detail, that Durham officials, including the Supervisory

Defendants, delegated control of the rape hoax investigation to Nifong.  *See* Compl. ¶¶

161, 218-23, 267-70, 667-72, 676-79, 690.[10]  Durham contests only delegation, and does

---

[9] In the Fourth Circuit, "final policymaking authority" lies "ultimately" in the hands of whoever, "in the scheme of things[,] … has the final say-so."  *Riddick*, 238 F.3d at 524.  Pursuant to Durham's delegation, the final say-so in the rape hoax investigation belonged to Nifong.  Compl. ¶¶ 667-68; *see Monistere v. City of Memphis*, 115 Fed. Appx. 845, 852 (6th Cir. 2004) ("Contrary to the City's position on this issue, the facts presented during the trial demonstrate that [Sergeant] Embrey did not merely exercise discretion but rather acted as a final policymaker within the context of this case.  During the trial, Embrey testified that, in his capacity as the lead investigator, he had the right to make decisions regarding his investigation of Monistere and Jones.  His decision was final.  There is no evidence in this record that he received any direction from his supervisors until after the strip search had been completed.").

[10] Durham agrees that Nifong's motivation for wanting control of the rape hoax investigation was to bolster his prospects for election as District Attorney.  Durham Br. 36 n.26 (citing Compl. ¶ 5); *see also* Compl. ¶¶ 219-21.  But his motivation does not change the facts, which Durham does not suggest were inadequately pleaded, that "Durham officials voluntarily ceded complete control of the investigation to Nifong, and subsequently approved and ratified his conduct," ¶ 218, and that on "March 24," "Durham Police Commander Jeff Lamb instructed Gottlieb and Himan that they should take direction from Nifong during the investigation," ¶ 222.  The fact of the City's delegation is unaffected by whether Nifong or the Durham Supervisors placed the first phone call on this topic.

not otherwise dispute that the Complaint adequately pleads that Durham officials approved and ratified the unconstitutional conduct of the Durham Investigators (Count 26 B) and failed to exercise proper supervisory authority over Nifong (Count 26 C).

>    **2.    This Issue Must Be Resolved in Favor of Plaintiffs at This Stage, Because Delegation of Municipal Authority Is a Question of Fact Unsuited for Resolution on a Motion to Dismiss**

Although the "question of who possesses final policymaking authority is one of state law," "final policymaking authority may be delegated" to another individual not named by the state law, and the question of whether it has been delegated is a question of fact. *Riddick v. School Bd.*, 238 F.3d 518, 523 (4th Cir. 2000) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986)); *id*. at 526-28 (Luttig, J., dissenting); *see also Spell v. McDaniel*, 824 F.2d 1380, 1390, 1395 (4th Cir. 1987) ("the evidence was sufficient to support findings by a properly instructed jury that at the critical time in issue, by formal delegation of the City's governing body, Police Chief Dixon was an authorized policymaker for the City"); *Edwards v. City of Goldsboro*, 178 F.3d 231, 238 n.3, 245 (4th Cir. 1999) (§ 1983 suit against city survives 12(b)(6) dismissal predicated on allegations that city delegated policymaking authority to officers whose decisions allegedly injured the plaintiffs).[11]

_____

[11] The other Courts of Appeals concur with the Fourth Circuit on this point. *See, e.g.*, *Kujawski v. Bartholomew County*, 183 F.3d 734, 736-37 & n.1, 739 (7th Cir. 1999) (reversing award of summary judgment to defendant because there was genuine issue of material fact whether city had delegated policy authority); *Gelin v. Housing Auth. of New Orleans*, 456 F.3d 525, 528 n.5 (5th Cir. 2006) (alleged delegation of authority was an "issue of material fact" to be resolved by "sufficient evidence"); *Monistere v. City of*

The question whether Durham delegated control over the rape hoax investigation to D.A. Nifong is a question of fact, which at this stage must be resolved in favor of Plaintiffs.

### 3. Nothing in North Carolina Law Forecloses Durham's Delegation to Nifong

Durham insists that it cannot be held accountable for Nifong's actions because a district attorney is a state officer in North Carolina, and "[w]hether a government entity may be held liable for the acts of a particular official depends on the 'definition of the official's functions under relevant state law.'" Durham Br. 35 (quoting *McMillian v. Monroe County*, 520 U.S. 781, 786 (1997)). There are two fatal flaws in Durham's position.

The first is that Durham confuses the *initial legal question* of where state law lodges policymaking authority with *the subsequent factual* question of whether that policymaker has in turn delegated said authority to another party. Durham cites North Carolina constitutional and statutory provisions indicating that a district attorney performs his prosecutorial functions on behalf of the State. Durham Br. 35. That is true enough, so far as it goes, but it does not go far enough because it answers only the initial legal question. The Fourth Circuit confronted a similar situation in *Riddick, supra*, where Virginia constitutional and statutory provisions "vest[ed] control of the public school

---

*Memphis*, 115 Fed. Appx. 845, 852 (6th Cir. 2004) (holding, on the basis of "sufficient evidence," that defendant "had been delegated the authority to control his own investigations" involving strip searches).

system in the local school boards." 238 F.3d at 523. The Court of Appeals unanimously recognized that the legal question of where state law reposes policymaking power in the first instance is separate from the factual question of whether such power has in turn been delegated to another by the party or body to whom state law granted that power. *See id.* at 523 (majority op.); *id.* at 526-27 (Luttig, J., dissenting).

Durham fails to recognize that whomever Nifong ordinarily works for, he binds the City when he acts pursuant to the City's delegation of its power to him. Nifong may have held his office as a prosecutor by virtue of a statutory grant from the State of North Carolina, but he wielded authority to make policy decisions for Durham's investigation of Mangum's rape charges and to issue orders to Durham police pursuant to the Durham Supervisors' delegation of the City's investigative powers. Durham cannot shirk responsibility for that delegation by protesting that, with respect to his regular job as prosecutor apart from his delegated role as Durham's rape hoax investigator, Nifong is a State officer. As the Fourth Circuit explained in *Dotson v. Chester*, 937 F.2d 920 (4th Cir. 1991), " '[a]lthough the county's *authority* to provide a service may be vested in an official designated as a state official, the county cannot be insulated from liability based on its *responsibilities* with regard to that service by the simple expedient of vesting power in a state official.' " *Id.* at 932 (quoting *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989)) (emphasis by the Fourth Circuit); *see also id.* at 930 ("The County cannot escape liability for its aging jail by slowly transferring the final policymaking authority to an officer who, on occasion, has been considered a state employee."); *id.* at 932 ("Although

the County chose to alter the original delegation of operational authority, the County cannot escape liability for the County Jail.").

The second error in Durham's argument is the simplistic notion that a state officer is always and exclusively a *state* officer exercising *state* power. Durham Br. 36. Durham's proposition is belied not only by the cases discussed above, but by Durham's own authorities and other decisions. In *McMillian,* the Supreme Court took pains to make clear that "the question is not whether Sheriff Tate acts for Alabama or Monroe County in some categorical, 'all or nothing' manner. Our cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue." 520 U.S. at 785. "Thus, we are not seeking to make a characterization of Alabama sheriffs that will hold true for every type of official action they engage in." *Id.* The Fourth Circuit adopted this principle in *Dotson v. Chester*, where a county was held liable under §§ 1983 and 1988 for a sheriff's unreasonable strip-search policy because the county had delegated operation of its jail to the sheriff, a state officer. 937 F.2d at 928 ("Thus, the Sheriff is not always a state employee or always a county employee. He may, on occasion, be both, or sometimes one and sometimes the other. It all depends on the particular function the Sheriff is performing."); *see also Kujawski v. Board of Comm'rs*, 183 F.3d at 738-39 ("If the County Board delegated its authority with respect to personnel to Officer Parker, then he is acting as an agent of the County, not the State" when making personnel decisions, even if he was an agent of the State for other

16

purposes); *Scearce v. Halifax County*, No. 94-0020-D, 1995 U.S. Dist. LEXIS 9216, at *21 (W.D. Va. May 26, 1995) ("Indeed, were the County's position accepted, any cunning governmental entity could avoid § 1983 liability for an unconstitutional discharge simply by having whatever governmental body or official that possessed final policymaking authority completely delegate its authority over the matter to a subordinate, with a wink and the instruction: 'Do as you think best.' The County is liable for the illegal discharge carried out by Lawler because final policymaking authority was delegated to him."); *cf. Goodwin v. Furr*, *Sheriff of the County of Richmond*, 25 F. Supp. 2d 713, 717 (M.D.N.C. 1998) (distinguishing *Dotson* on grounds that there was no allegation that the county "appointed the sheriff to carry out the program").[12]

Durham retreats to the bald assertion that the City had no discretion to delegate its investigative authority to Nifong and that he had no power to accept it. Durham Br. 36. But Durham cites no statute or constitutional provision that supports this claim. And the

---

[12] In *Dotson*, the Fourth Circuit explained that it was good policy to hold a county liable when a state officer such as a sheriff exercises power delegated by the county because even though he holds a state office the sheriff is elected to that office locally. 937 F.2d at 932. Thus the sheriff was "[a]rguably … more accountable to the county electorate than to the county government. A finding of liability against the county translates into compensatory damages against the taxpayers of the county. One thus comes full circle to the electorate's capacity to control the sheriff: 'The compensatory damages that are available against a municipality may themselves induce the public to vote the wrongdoers out of office.' " *Id.* The same is true with respect to North Carolina District Attorneys, state officers who are elected locally. Here the cost of Nifong's investigative misconduct, committed pursuant to Durham's delegation of control over the rape investigation, will fall on the local community that voted Nifong into office in an election in which the Duke rape hoax was his vehicle for re-election. *See* Compl. ¶¶ 218-23.

statutes cited by Durham set forth the District Attorney's powers as a state prosecutor; those provisions do not even address delegations to the District Attorney by cities or counties, let alone categorically forbid them. Durham Br. 35-36. Durham's underlying error is its unstated assumption that the office of District Attorney is purely a creature of statute. It is not. For example, the North Carolina Supreme Court has unanimously held that the District Attorney has common law authority to delegate his prosecutorial powers to others, even to private attorneys, even though this power is nowhere mentioned in North Carolina's Constitution or statutes (including those cited by Durham here). *See State v. Camacho*, 329 N.C. 589, 593-94 (1991); *see also State v. Best*, 280 N.C. 413, 415-17 (1972) (statutory enactments changing state office of solicitor to full time prosecutorial position did not displace common law discretion to consent to participation in the prosecution by private counsel for complaining witnesses or other persons). If the North Carolina Legislature wanted to ensure that the power delegated to municipal corporations or District Attorneys or any other creature of state law was nondelegable, it could simply forbid the designated officer or agency to delegate its power. *Cf., e.g.*, N.C. GEN. STAT. § 162-24 ("The sheriff may not delegate to another person the final responsibility for discharging his official duties."). Durham identifies no law forbidding a municipality from delegating control of a criminal investigation to a District Attorney.[13]

_____

[13] If Durham's delegation of authority over the rape hoax investigation to Nifong were, as the City insists, a preposterous outrage that cannot be countenanced under North Carolina law, it is more than passing strange that Attorney General Roy Cooper did not mention this outrage in his exhaustive review of that investigation's myriad acts of

Durham's supposed authorities are not to the contrary. Durham Br. 36.[14] Durham may

therefore be held liable for wrongs committed by Nifong as the City's delegate, as

alleged in the Complaint.

### C. The "Key-Card" Counts – Counts 8, 10 and 20 – Adequately Plead Claims Against Durham

#### 1. Count 8 Adequately Pleads Fraud Against Durham

The City objects that the Complaint does not allege any misrepresentation or other

fraudulent conduct by any City personnel. Durham Br. 12-14. Durham apparently

concedes that a fraudulent subpoena would meet the elements of the cause of action and

that such a subpoena was issued by Nifong, *id.* at 14 (citing Compl. ¶¶ 434, 535), but it

contends that Nifong was a State officer who "had no authority to act on behalf of the

City." *Id.* As explained in Part V.B, *supra*, this assertion on a question of fact

impermissibly disputes the allegations of the Complaint and is legally incorrect. Nifong

---

lawlessness. General Cooper's report notes how the Durham Police Department's investigation proceeded, even in details such as the conversion of mug shots of Plaintiffs into a PowerPoint display, "at the direction of the District Attorney." Summary of Conclusions at 10; *see also id.* at 11 (describing additional corruptions of the investigative process done at Nifong's behest, such as interviews of the accusing witness and other photo-array irregularities).

[14] *Simeon v. Hardin*, 339 N.C. 358 (1994), neither presented nor addressed any issue of delegation of municipal power to a state officer. *State v. Smith*, 359 N.C. 199 (2005), is not even remotely apposite—it was a criminal case about proportionality review of a death sentence. It neither presented nor addressed the civil liability of a local government for misconduct pursuant to power delegated to a state official. Finally, *Jones v. Ziegler*, 894 F. Supp. 880 (D. Md. 1995), involved the law of Maryland, not North Carolina. Even as to Maryland law, the case presented no question of delegation of local authority to a state officer.

was acting under a delegation of authority from Durham and the City is therefore liable for his misconduct.

The subpoena itself was fraudulent and Durham does not contend otherwise: the Durham Investigators requested "key-card" information from Duke University pertaining to Plaintiffs, which necessarily and falsely implied that they had not already received those data from Duke. That was a misrepresentation because Nifong and his team had already gotten the data illicitly from Duke. *See* Compl. ¶¶ 327-29, 434, 439. The subpoena was also a fraud upon Judge Titus, who presided over the motions to quash the key-card subpoena. *Id.* ¶¶ 441-43. In seeking enforcement of the subpoena, the Durham Investigators concealed from Plaintiffs and the North Carolina court the material fact that they already possessed the requested information and that the subpoena was a sham. The Defendants (according to their own authorities) had a duty to disclose that material fact because: (1) they had already made a partial disclosure of information about their key-card request, which required full disclosure; and (2) the inequalities of condition and knowledge between them and Plaintiffs required disclosure. *See Breeden v. Richmond Community College*, 171 F.R.D. 189, 194 n.4, 195, 196 (M.D.N.C. 1997); Plaintiffs' Opposition to the Duke University Defendants' Motion to Dismiss ("Pls.' University Opp.") Part V.B.1.

Yes, the Complaint pleads on information and belief some aspects of Defendants' fraud, but again Durham's own authorities confirm that this is permissible when the matter is "particularly within the defendants' knowledge and facts are stated upon which

the belief is founded." *Id.* at 197; *see also Perkins v. HealthMarkets, Inc.*, 2007 NCBC LEXIS 25, at *13 (N.C. Super. Ct. July 30, 2007). The fact that the subpoena was a charade to cover up that violation is particularly within the knowledge of the Durham Investigators and the Duke Defendants. *See* Compl. ¶¶ 433-34. What gives rise to this belief is the fact that the Durham Investigators had been given the data weeks before, ¶ 324—indeed, they had already used the key-card data to rig a photo array for Mangum, ¶¶ 326, 330—yet Nifong and the other Durham Investigators nonetheless represented that they did not have that material, ¶¶ 434, 440-43, in order to conceal their illegal possession and use of it, ¶ 535. The Complaint here is more than adequate.

Finally, Durham contends that the Complaint's allegations of conspiracy to cover up Duke's illegal release of the key-card information and the Durham Investigators' illegal use of it is conclusory and inadequate. Durham Br. 13. As noted above, each Defendant is liable for his own misconduct; this conspiracy makes them liable for the misconduct of their co-conspirators. *See Fox*, 354 S.E.2d at 743. And Durham is wrong about Plaintiffs' conspiracy allegations. When they scripted and performed their subpoena charade for Judge Titus and Plaintiffs, Nifong and his team plainly knew that they already had the data. And the Duke Defendants (having improperly given the data to Durham) also knew it. Yet both groups of Defendants acted their part to mislead the lacrosse players and Judge Titus, each side fully aware that if it failed to do so, or if the other side failed to do so, they would both be exposed. *See* Part V.A, *supra* (reviewing the conspiracy allegations). The conspiracy is adequately pleaded and Durham knows

what its agents are alleged to have done.

### 2. Count 10 Adequately Pleads Abuse of Process

Durham concedes that the Complaint adequately alleges an ulterior purpose for the key-card subpoena—covering up the prior illegal release and use of that information. Durham Br. 15-16. Durham also concedes that there are adequate allegations against the Durham Supervisors, but for Durham's continued objection that Nifong was not acting pursuant to power delegated by Durham. *Id.* at 15. That objection has been answered and defeated above.

Durham's only remaining challenge is that the Complaint supposedly fails to allege improper use of the abused process. *Id.* at 16. Defendants misunderstand the nature of this requirement; under North Carolina law, it is satisfied if the process is used "to accomplish some purpose not warranted or commanded by the process." *Pinewood Homes, Inc. v. Harris*, 646 S.E.2d 826, 831 (N.C. Ct. App. 2007) (quotation marks omitted); *see also Melton v. Rickman*, 36 S.E.2d 276, 278 (N.C. 1945) (abuse of process "is the malicious perversion of a legally issued process whereby a result not lawfully or properly obtainable under it is attempted to be secured"). Asking a court to engage in a charade and to issue judicial process so that you can obtain information that you have already gotten illegally, in order to conceal that misconduct from both your opponents and the court, is hardly "regular and legitimate use of process." *Id.* Durham's implicit assertion to the contrary is frivolous. Durham's misconduct was a fraud not just on Plaintiffs, but also on Judge Titus as well. *See* Compl. ¶¶ 440-43, 535. Unsurprisingly,

Durham cites no authority for the dubious proposition that deceitful manipulation of a court or concealment of an unlawful action is a legitimate and regular use of process.

Finally, Durham's argument that its subpoena charade was justified by its need to "authenticate" the key-card documents cannot be taken seriously. Durham concedes that it originally received the Duke key-card report directly "from Duke University" itself. Durham Br. 16 n.8. Durham does not suggest any basis on which the authenticity or provenance of those documents could have been questioned, nor does it even assert that it harbored any such doubts. Indeed, the Durham Investigators' own prior use of the key-card documents to rig one of their photo identification arrays affirmatively negates any doubt about the documents on Defendants' part. Compl. ¶¶ 326, 330.

3.    **Plaintiffs Had a Reasonable Expectation of Privacy in Their Key-Card Data (Count 20 – Fourth Amendment)**

Durham argues that Plaintiffs had no reasonable expectation of privacy—and therefore no Fourth Amendment right—in the key-card data recording their movements and transactions on the Duke University campus. Durham Br. 17-19. But Judge Titus has already ruled otherwise. *See* Compl. ¶¶ 329, 442. The North Carolina court quashed the subpoena (which Defendants issued to cover up their prior covert, illicit receipt from Duke of the key-card data) because the key-card information "is protected by the Family Education Rights and Privacy Act (FERPA)." Order of Superior Court, County of Durham, in *State v. Finnerty*, 06 CRS 4331-4333 (July 21, 2006), at 1 (Titus, J.) (attached as Exhibit 1); *see also id.* at 2 ("The request for key card information for all listed students without any showing of materiality or necessity does not rise to the level

required to overcome the confidentiality of student information assured by FERPA.").

*Gonzaga University v. Doe*, 536 U.S. 273 (2002), is not to the contrary. *Gonzaga* held only that FERPA does not confer enforceable personal rights under 42 U.S.C. § 1983 in and of itself. *See id.* at 276. But student "Doe" had sued Gonzaga, a private university, for damages invoking FERPA alone. *Id.* at 276-77.[15] In stark contrast, Plaintiffs here invoke *not* a statutory right conferred by FERPA, but their right against unreasonable searches under the Constitution's Fourth Amendment. FERPA is merely relied upon (along with Duke University's own privacy policy) as one of several things that creates a reasonable expectation of privacy (as Judge Titus ruled).[16] *See* Compl. ¶¶ 327-29. The Fourth Amendment, which was not implicated in *Gonzaga*, is implicated here because the Durham Defendants are government actors.

Despite having already lost the debate about FERPA's privacy guarantee in the North Carolina court before Judge Titus, Durham devotes a lot of energy to arguing that Plaintiffs could have no expectation of privacy in key-card information that had, by its very nature, already been transmitted to and shared with Duke. Durham Br. 18-19. But

---

[15] Doe also asserted state law claims that are not relevant here. State action for § 1983 purposes was assumed by the Court *arguendo* on the basis of the private university's release to state officials of the student's records pursuant to state-law requirements for teacher certification. 536 U.S. at 277 & n. 1.

[16] *See also Rathie v. Northeastern Wisc. Tech. Inst.*, 419 N.W.2d 296, 300-01 (Wisc. Ct. App. 1987) ("the significant public policy basis for nondisclosure inherent in the federal Act outweighs the interest in disclosure. We decline to render the federal Act superfluous or put the institution in the precarious position of choosing between violating the state open records law or losing presumably essential federal funding. We further recognize the students' expectation of privacy that they may reasonably foster.").

sharing the information with Duke (1) pursuant to a Duke policy that protected the privacy of that information, and (2) under the terms of FERPA, which was enacted specifically to protect *student records held by universities from disclosure to third parties*, *see Gonzaga*, 536 U.S. at 278-79, did not disturb the students' reasonable expectation of privacy from third parties, such as Durham, nor did the students thereby assume a risk of disclosure to third parties that was foreclosed by that policy and that federal statute. *See Doe v. Broderick*, 225 F.3d 440, 450-51 (4th Cir. 2000) (federal statute "making access to the records more difficult for criminal investigation purposes … is a fitting indication that society is willing to recognize [plaintiff's] expectation of privacy as objectively reasonable"). None of the decisions upon which Defendants rely, *see* Durham Br. 17-19; Brief in Support of Duke University Defendants' Motion to Dismiss ("University Br.") 43-44, is to the contrary because none involved a statute that was crafted specifically to ensure that the information at issue be held confidentially, including with respect to law enforcement. *See, e.g.*, *United States v. Miller*, 425 U.S. 435, 442-43 (1976) (no reasonable expectation against disclosure to law enforcement where applicable statute's "expressed purpose [was] to require records to be maintained because they have a high degree of usefulness in criminal, tax, and regulatory investigations and proceedings") (quotation marks omitted).

### D. Count 21 Pleads a Valid Fourth Amendment Claim Based on the Nontestimonial Order for DNA Samples

Durham contends that no Fourth Amendment claim can be predicated on the NTO for DNA evidence because that order was, we are told, legally sound. Durham is wrong

for two independent reasons.

First, Durham defends the NTO with the remarkable assertion that the standard for issuing an NTO satisfied the Fourth Amendment under the circumstances. According to North Carolina law, an NTO may be issued if: (1) "there is probable cause to believe that a felony offense … has been committed"; (2) "there are reasonable grounds to suspect that the person named or described in the affidavit committed the offense"; and (3) "the results of specific nontestimonial identification procedures will be of material aid in determining whether the person named in the affidavit committed the offense." N.C. GEN. STAT. § 15A-273 (citing *Hayes v. Florida*, 470 U.S. 811 (1985)), Durham contends that the Supreme Court has "approv[ed]" issuance of an order requiring individuals to provide DNA on a standard lower than probable cause to believe that the subject of the NTO committed the alleged crime – that is, that the second requirement for issuing an NTO satisfies the Fourth Amendment. Durham Br. 20-21 & n.12.

That is not the law. If Defendants, without probable cause to believe that Plaintiffs had committed the alleged crime, seized Plaintiffs' DNA from inside their mouths, then Defendants violated Plaintiffs' Fourth Amendment rights. *See Kohler v. Englade*, 470 F.3d. 1104, 1107, 1112-13 (5th Cir. 2006) (holding in a § 1983 suit that compulsory DNA cheek swab violated Fourth Amendment because it was not supported by probable cause); *United States v. Purdy*, No. 05CR204, 2005 U.S. Dist. LEXIS 40433, at *11-12, *22, *24 (D. Neb. Dec. 19, 2005) (granting motion to suppress DNA taken from individual's mouth without a court order). *Hayes* is not to the contrary. To begin

with, *Hayes* did not even mention DNA, blood, or any other evidence requiring an invasive collection procedure; the case was about fingerprinting. 470 U.S. at 812. Second, the Supreme Court *reversed* Hayes' conviction, ruling that the state could not detain and transport Hayes to the police station for fingerprinting based only on a "reasonable suspicion" that he had committed a crime. *Id.* at 814-15. Third, the passage Durham quotes is irrelevant *dictum*; the Court merely acknowledged that "reasonable suspicion" *might* be a sufficient threshold for *fingerprinting* in some circumstances "*in the field.*" *Id.* at 816 (emphasis added).[17] But the Court neither held nor even hinted at anything with respect to gathering DNA evidence from the interior of a person's body, and even as to fingerprinting, the Court said only that it was not ready to "abandon the suggestion" that fingerprinting might be possible on less than probable cause. *Id.* at 817.[18]

Durham does not even try to argue that the NTO was supported by probable cause to believe that Plaintiffs had committed the alleged crime. Count 21 therefore states a claim and Defendants' motion to dismiss should be denied.

---

[17] Incidentally, the passage Durham quotes is from page 817 of the *Hayes* opinion; Durham misattributes it to page 815.

[18] The *Hayes* Court noted that some states had adopted procedures for seizures on less than probable cause for the purpose of obtaining fingerprints, but that the lower courts were split on whether this was constitutional. 470 U.S. at 817. Durham's intimation that *Davis v. Mississippi*, 394 U.S. 721 (1969), Durham Br. 21 n.12, somehow approved of fingerprinting seizures without probable cause is equally mistaken. *See* 394 U.S. at 727-28 (reversing a rape conviction because warrantless fingerprinting in absence of either consent or probable cause to arrest violated the Fourth Amendment); *see also Hayes*, 470 U.S. at 816-17 (discussing *Davis*).

Durham's defense of the NTO fails for a second independent reason: even if the standard required for issuance of an NTO in the North Carolina courts were sufficient under the Fourth Amendment, the DNA order did not meet that standard. Defendants would like to hide behind the fact that a magistrate actually issued the NTO here, but deference to a magistrate's finding of probable cause (or even reasonable suspicion) is warranted only where the officers seeking the order did not intentionally or recklessly falsify evidence or conceal a material fact. *Franks v. Delaware,* 438 U.S. 154, 168 (1978). The Durham Investigators did both here and thereby violated the Fourth Amendment. *See id.* at 171 (a Fourth Amendment violation may be established where an officer intentionally, or with reckless disregard for the truth, includes a false statement in a warrant application); *Kohler v. Englade*, 470 F.3d at 1113 ("intentional or reckless omission of material facts from a warrant application may amount to a Fourth Amendment violation").

Durham contends that the NTO was supported by probable cause to believe that a rape had been committed based on Mangum's statements " 'standing alone,' " Durham Br. 21 n.13 (quoting *Ahlers v. Schebil*, 188 F.3d 365, 370-71 (6th Cir. 1999)), and that police " 'may rely upon the statements of victims or witnesses to determine the existence of probable cause for the arrest, regardless of the ultimate accurateness or truthfulness of the statements.' " *Id.* at 22 (quoting *Zandhri v. Dortenzio*, 228 F. Supp. 2d 167, 176 (D. Conn. 2002)). Durham misunderstands the law. Just before the sentence that Durham quotes, the *Ahlers* court said that an eyewitness's identification "will constitute sufficient

probable cause *unless*, at the time of the arrest, *there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken* regarding his recollection of the confrontation." 188 F.3d at 370 (citation and quotation marks omitted) (emphasis added). And the sentence immediately prior to the one Durham quotes from *Zandhri* states that a victim's report provides probable cause "*absent circumstances that raise doubts as to the victim's veracity*." 228 F. Supp. 2d at 176 (citation and quotation marks omitted) (emphasis added).

As of March 23, 2006 when they applied for the NTO, the Durham Investigators had overwhelming reasons to doubt Mangum's credibility:

- Mangum's story was implausible on its face because it changed every time she told it. In her one night at the hospital, she related at least seven wildly different versions of the supposed rape; even the number of male attackers varied from one to twenty. Compl. ¶¶ 7, 106.

- Mangum recanted her rape charges to Sergeant Shelton of the Durham Police, who promptly reported this to his watch commander. *Id.* ¶ 106, 110.

- Mangum also recanted to Officer Sutton that same night. *Id.* ¶ 106.

- Mangum also recanted to a female Durham police investigator, B.S. Jones. *Id.* ¶ 106.

- Investigator Jones concluded that there was no evidence of a rape and that the file should be closed. *Id.* ¶ 131.

- Mangum failed to identify even one of her alleged one to twenty attackers in the first photo array she was shown by the Durham police after her alleged rape, even though they rigged it by exclusively showing her pictures of white Duke lacrosse players. Mangum did identify four individuals as having attended the party "with 100% certainty"—but one of those four, Brad Ross, was known to the Durham Investigators to have been out of town at that time. *Id.* ¶ 158.

- Mangum also failed to identify anyone in the second photo array on March 21, even though that one, too, was rigged by the Durham police. *Id.* ¶¶ 193-95.

- No physical evidence of any crime—nor even evidence of any kind of physical struggle—was found in the physical examination of the three lacrosse co-captains who lived at 610 North Buchanan, even though they had supposedly been involved in a prolonged struggle and brutal gang rape. *Id.* ¶¶ 166-67.

When Nifong took over the investigation a few days after the NTO was issued, Gottlieb and Himan briefed him on this overwhelming mass of exculpatory evidence— precisely the same evidence that was in their possession when they applied for the NTO. Nifong's assessment was an angry complaint: "You know, we're f*cked!" Compl. ¶¶ 267-70.[19] When a prosecutor as cavalier about the truth as Mike Nifong concludes that you have no probable cause that a crime was committed, you know you are in trouble. The Durham Investigators had no probable cause to believe that there had been a crime and therefore the first element of the NTO test was not met.[20]

As for the second requirement for an NTO – that there be "reasonable grounds to

---

[19] The SANE Defendants argue that the discovery of Mangum's makeup bag, cell phone, identification, and a pile of twenty dollar bills at 610 North Buchanan "bolstered" the finding of probable cause. SANE Br. 38-39. But without Mangum's false accusations and Levicy's false characterization of the SANE report, these facts did not amount to a hill of beans, let alone probable cause to believe Mangum had been raped.

[20] Contrary to the SANE Defendants' suggestion, the fact that "a magistrate had already determined that Mangum's statements alone had adequately established probable cause for the search of 610 N. Buchanan" is irrelevant here. SANE Br. 38. Whatever the validity and strength of the evidence known to the Durham investigators and presented to the magistrate on March 16 for that search warrant, *see* Compl. ¶ 162, by the time of the NTO application on March 23 there was, as explained in the text, overwhelming evidence before the investigators to show that Mangum was not credible and that no crime had occurred.

suspect that," *if* a crime has been committed, "the person named or described in the affidavit committed the offense,"10 N.C. Gen. Stat. § 15A-273 – Durham's own authorities concede that this requires "something more than an unparticularized suspicion or hunch." Durham Br. 25 n. 19 (quoting *State v. Pearson*, 566 S.E.2d 50, 54 (N.C. 2002)). Yet the NTO sought the DNA of all 46 white players on the Duke lacrosse team. That is about as far from "particularized" as one can get.

As discussed above, Mangum failed to identify *any* Plaintiffs as her attacker, despite two rigged photo arrays. She even identified one player, Brad Ross, as definitely having been at the party, even though the Durham Investigators knew he had not been in Durham at that time. Compl. ¶ 158. But rather than dropping the investigation, Gottlieb and Himan seized upon Levicy's misrepresentations and made them the centerpiece of the NTO. Gottlieb and Himan thus formed a conspiracy with Levicy by acting in concert to violate Plaintiffs' constitutional rights. In furtherance of this conspiracy, Gottlieb and Himan included application false statements in the NTO:

- The NTO application stated that Mangum had been strangled during the rape (Compl. ¶ 205), even though she did not say that to Gottlieb or Himan.

- The NTO application stated than Mangum had her fake fingernails torn off in the struggle and they were found in the bathroom at 610 N. Buchanan. *Id.* ¶ 207. But the NTO application did not reveal that Mangum herself had told Gottlieb and Himan that she had been affixing and painting her fingernails in the bathroom just before she left the party, and that unpainted nails and nail polishing accessories were found in the bathroom.

- The NTO application said that the lacrosse players had used aliases during the party and the attack to conceal their identities. *Id.* ¶ 208. But Mangum never said that to Gottlieb or Himan; in fact she identified her supposed attackers by name. The NTO application did not reveal that fact, or the fact that the police believed Mangum's

recollection of names and used those names to design the two photo arrays that Mangum flunked (another fact omitted from the NTO application).

- The NTO application accused the players of trying to conceal their affiliation with Duke University athletics. *Id.* ¶ 209. But Himan and Gottlieb had already been to the house at 610 N. Buchanan and they knew it was decorated with lacrosse flags and other Duke regalia.

Defendants therefore violated Plaintiffs' Fourth Amendment right against unreasonable searches.

### E.     Count 23 Adequately Pleads a Claim for Obstruction of Justice

The City argues that North Carolina law recognizes tort claims for obstruction of justice "only in very limited circumstances." Durham Br. 44. That is not true. The North Carolina Supreme Court has held that "obstructing public justice may take a variety of forms" and encompasses "any act which prevents, obstructs, impedes or hinders public or legal justice." *In re Kivett*, 309 S.E.2d 442, 462 (N.C. 1983) (quotation marks and citation omitted). The state courts have refused to narrow the common law offense despite the specification in the North Carolina code of many more particular obstruction-related offenses (such as altering evidence or tampering with witnesses). *See id.*[21]

Durham next asserts that, although North Carolina courts certainly permit a common-law obstruction-of-justice tort for interfering with a civil action, *see* Durham Br.

_____

[21] *Kivett* involved an ethics inquiry into judicial misconduct implicating the common law crime of obstruction of justice. The Fourth Circuit has found the decision to be sound authority when construing the breadth of the common law tort. *See Reed v. Buckeye Fire Equip.*, 241 Fed. Appx. 917, 928 (4th Cir. 2007).

44; SANE Br. 47 n.26, they "have never … applied the tort of obstruction of justice to complaints involving the conduct of a criminal investigation."  Durham Br. 44.  The SANE Defendants attempt to offer an explanation: a common-law obstruction-of-justice tort for interfering with a criminal investigation should not be permitted because it would "jeopardize the overriding societal interest in ensuring that alleged crimes are properly investigated" and would "deter witnesses from coming forward with evidence."  SANE Br. 47-48.  Both of these points are defeated by the fact that North Carolina applies the common-law standard of obstruction of justice in order to hold *criminally liable* anyone who interferes in a criminal investigation.  *See, e.g.*, *State v. Clemmons*, 396 S.E.2d 616, 617-18 (N.C. Ct. App. 1990) (common law obstruction of justice sustained for attempted interference with a criminal investigation); *State v. Preston*, 325 S.E.2d 686, 688 (N.C. Ct. App. 1985) (common law obstruction of justice will lie against defendant who interferes with criminal prosecution and attempts "to deceive and defraud the court") (but vacating judgment for want of jurisdiction); *State v. Eastman*, 438 S.E.2d 460, 463-64 (N.C. Ct. App. 1994) (endorsing legal theory of common law obstruction of justice on allegations of destroying documents in order to obstruct criminal investigation) (but reversing judgment for insufficient evidence).  Thus, North Carolina has determined that whatever interest society has in ensuring that alleged crimes are properly investigated and in not deterring witnesses from coming forward in criminal investigations is insufficient to overcome society's interest in preventing the obstruction of justice by interfering in a criminal investigation.  Indeed, Defendants strain their credibility by suggesting that there

might be a societal interest in conducting a criminal investigation, for example, on the basis of intentionally or recklessly false or misleading evidence, in the face of obviously incredible accusations and intentionally or recklessly suppressed exculpatory evidence, or through fraudulent, abusive, and unconstitutional means. *See* Compl. ¶ 645.[22] There is, therefore, no reason to conclude that North Carolina does not permit the tort of obstruction of justice for interfering with a criminal investigation.[23]

The misconduct pleaded in the Complaint falls well within the ambit of obstruction of justice, as Durham and its counsel know from personal experience. *See Jones v. City of Durham*, 643 S.E.2d 631, 633 (N.C. Ct. App. 2007) (denying Durham's motion for summary judgment on plaintiff's claim that the City obstructed justice by failing to produce evidence); *Clemmons*, 396 S.E.2d at 619 ("*crimen falsi*" includes "any offense involving corrupt deceit, or falsehood by which the public administration of justice may be impeded, such as perjury, subornation of perjury, … and conspiring to

---

[22] Additionally, the concern that witnesses will be deterred from coming forward is largely misplaced because few Defendants here served as witnesses in the investigation and many of the acts through which Defendants obstructed justice did not involve providing false testimony to investigators. *See* Compl. ¶ 645.

[23] Contrary to the SANE Defendants' suggestion, *see* SANE Br. 48, the North Carolina Supreme Court has recognized that "[t]he policy considerations often cited in support of the rule barring civil suits for perjury" – whether the perjury occurred in a civil action or a criminal action – "are inapplicable to" civil claims of obstruction of justice. *See Henry v. Deen*, 310 S.E.2d 326, 335-36 (N.C. 1984). Further, the court in *Henry* spoke in terms of obstructing a civil action only because those were the facts of the case, not because, as the SANE Defendants assert, it thought that a civil claim for obstructing a criminal investigation should not be permitted. *See id.* at 328-30, 334, 336; *cf.* SANE Br. 48.

accuse an innocent person of crime") (quotation marks omitted);[24] *Eastman*, 438 S.E.2d at 463 ("it is an obstruction of justice to suppress, fabricate or destroy physical evidence" or to "alter[], destroy[], conceal[], or remove[] any record, document or thing") (citation and quotation marks omitted); *State v. Rogers,* 315 S.E. 2d 492, 497 (N.C. Ct. App. 1984) ("obstructing justice by intimidating or interfering with a State's witness"); *Jackson v. Blue Dolphin Commc'ns. of N.C.*, 226 F. Supp. 2d 785, 794 (W.D.N.C. 2002) (solicitation of false affidavit); *Henry v. Deen*, 310 S.E.2d 326, 334 (N.C. 1984) (conspiracy to conceal medical diagnosis).[25]

### F.   Count 22 Adequately Pleads a Due Process Clause for Malicious Investigation

Durham, like the other Defendants, argues that Plaintiffs cannot state a claim under the Due Process Clause and must instead proceed exclusively under the Fourth Amendment.  Durham Br. 26.  This argument is addressed elsewhere.  *See* Plaintiffs' Opposition to the Durham Supervisor Defendants' Motion to Dismiss ("Pls.' Supervisor Opp.") Part V.C.

---

[24] Both the Fourth Circuit and the North Carolina Supreme Court deem cases involving the common law crime of obstruction sound authority when resolving civil cases of obstruction.  *See, e.g.*, *Reed v. Buckeye*, 241 Fed. Appx. at 928;  *Kivett*, 309 S.E.2d at 462.

[25] This defeats Durham's assertion that the claim for conspiracy to obstruct justice founders as a matter of law for want of an underlying act of obstruction.  *See* Durham Br. 44.  Finally, Durham asserts—without elaboration—that the claim of conspiracy to obstruct justice is inadequately pleaded.  *Id.* at 44-45.  Bereft of argument or authority, Durham's opaque assertion merits no answer.  In any event, Durham is wrong: the conspiracy allegations are reviewed in detail in Part V.A, *supra*.

**G. The Complaint's Allegations Pass the So-Called "Stigma-Plus" Standard and Counts 24 and 25 Therefore Adequately Plead Causes of Action**

Defendants concede that, although "injury to reputation by itself" is not an interest protected under the Fourteenth Amendment, *Siegert v. Gilley*, 500 U.S. 226, 233 (1991), the courts have held that a plaintiff may recover for reputational injury "if he alleges deprivation of a cognizable property or liberty interest in connection with the harm to reputation." Durham Br. 31; *see Paul v. Davis,* 424 U.S. 693, 701 (1976) (individual's liberty interest in his reputation is sufficient "to invoke the procedural protection of the Due Process Clause" if combined with "some more tangible interest[] such as employment"); *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 573 (1972) (due process claim would lie if "the State, in declining to rehire the respondent, [had made] any charge against him that might seriously damage his standing and associations in his community" or had "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities"); *Ridpath v. Bd. of Governors of Marshall Univ.*, 447 F.3d 292, 307 (4th Cir. 2006) (same). This is commonly known as the "stigma-plus" test, and the Fourth Circuit describes it thus:

> [It] arises from the combination of two distinct rights protected by the Fourteenth Amendment: (1) the liberty " 'to engage in any of the common occupations of life,' " *Roth,* 408 U.S. at 572 (*quoting Meyer v. Nebraska,* 262 U.S. 390, 399 (1923)); and (2) the right to due process "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971).

*Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007).

The "plus" of the stigma-plus need not necessarily be "a protect[a]ble property interest" in and of itself, *Ersek v. Twp. of Springfield,* 102 F.3d 79, 83 n.5 (3d Cir.1996); *Baraka v. McGreevey*; 481 F.3d 187, 208-09 (3d Cir. 2007), but it must be a specific, present injury, not merely the general anticipation of future lost opportunities.[26]  The Fourth Circuit has explained that, "under what is sometimes referred to as its 'stigma plus' test, the *Paul* Court instructed that no deprivation of a liberty interest occurs when, in the course of defaming a person, a public official solely impairs that person's *future* employment opportunities, without subjecting him to a *present* injury," *Ridpath*, 447 F.3d at 309 n.16 (emphasis in original).

Plaintiffs have pleaded just such a present injury:  the loss of the 2006 Duke lacrosse season.  Compl. ¶¶ 11, 83-85, 89, 258, 289, 356-57, 362-63, 652, 662.  Durham objects that this injury does not meet the stigma-plus standard because it is merely one form of damage flowing from the injury that the rape hoax investigation inflicted on Plaintiffs' reputations.  Durham Br. 32.  But that is not what the Complaint alleges, and at this juncture the Court, and Durham, must assume the truth of those allegations.  The loss of the 2006 lacrosse season is not an anticipated effect of an injury to Plaintiffs' reputations; it is the other way around.  The lacrosse season was cancelled because Defendants' malicious and fraudulent investigation and its vilification of the team roiled

---

[26] In *Owen v. City of Independence,* 445 U.S. 622, 630 n.10, 633 n.13 (1980), the Court upheld a court of appeals' decision that a non-tenured employee without a protectable property interest in his job could nevertheless make out a claim for violation of a liberty interest in his reputation.

the Duke and Durham communities and stoked outrage and hostility against the players. *See* Compl. ¶ 258 (Durham demands that season be cancelled to send a message); *see also id.* ¶¶ 11, 233-38, 250, 289, 356-57, 362-63. To be sure, the players' reputations were forever besmirched by the *implications* of that cancellation, but it is the deprivation of the rare and cherished opportunity to play on an elite collegiate athletic team and, indeed, to compete for an NCAA title that Plaintiffs have alleged and that constitutes the "plus" that is required for these causes of action.

The reputational injury and the deprivation that forms the plus in the stigma-plus formula can be imposed by different actors, even if one of them is not a state actor and therefore perhaps is not subject to suit. *See Velez v. Levy*, 401 F.3d 75, 88-89 & n.12 (2d Cir. 2005) ("even where a 'stigma' and 'plus' are not imposed by the same actor, a stigma-plus claim may be valid if the 'stigma' and 'plus' were connected"); *id.* at 89 ("We now hold that perfect parity in the origin of both the 'stigma' and the 'plus' is not required to state the infringement of a 'stigma-plus' liberty interest").[27]

_____

[27] *See also Marrero v. City of Hialeah*, 625 F.2d 499, 519-20 (5th Cir. 1980) (holding, where stigma and plus were imposed by the same actors, that "the defamatory communication need not cause the loss of the protected right, or more tangible interest, in order to satisfy the stigma-plus requirement," because "it is sufficient that the defamation occur in connection with, and be reasonably related to, the alteration of the right or interest"); *id*. (concluding that plaintiff presented valid § 1983 claim since "the fact that the public perceived the defamatory charges to be connected to the discharge was sufficient to give rise to a liberty interest"); *cf. Owen v. City of Independence*, 445 U.S. 622, 626-29 (1980) (upholding stigma-plus claim against municipality, where stigmatizing statements were originally made in private by officials imposing the "plus" and were actually released to the public by another municipal actor who made additional stigmatizing statements); *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 983

Durham contends that the 2006 lacrosse season is not a protectable interest, and that only an economic interest, such as a job, can qualify as the "plus" under the stigma-plus test. Durham Br. 33-34. Although the deprivation most frequently pleaded as the plus element in a stigma-plus claim is "a present injury such as termination of government employment," *Ridpath*, 447 F.3d at 309 n.16 (discussing the Supreme Court's decisions in *Roth* and *Paul*), such claims are clearly not limited to termination of employment. For example, in *Unger v. National Residents Matching Program*, the Third Circuit explained that a student alleging harm to her reputation based on discontinuation of a university's graduate program, to which she had been accepted, would have a claim if she alleged that the university's actions had "imposed upon her a stigma or other disability that generally foreclosed her freedom to take advantage of other *educational* opportunities." 928 F.2d 1392, 1396 (3d Cir. 1991) (emphasis added); *see also Baracka*, 481 F.3d at 209 n.17. Indeed, requiring all stigma-plus claims to fit into a Procrustean bed of job loss would ignore the Supreme Court's original formulation of protectable interests in *Roth* itself. In describing due process as protecting the liberty " 'to engage in any of the common occupations of life,' " *Roth*, 408 U.S. at 572, the Court quoted the capacious definition of liberty in *Meyer v. Nebraska,* 262 U.S. 390, 399 (1923), where

---

(9th Cir. 2002) (holding that the temporal separation of stigma and plus does not bar a stigma-plus claim if the defamatory statements were, in substance, "so closely related to discharge from employment that the discharge itself may become stigmatizing in the public eye") (quotation marks omitted); *Patterson v. City of Utica,* 370 F.3d 322, 335 (2d Cir. 2004*)* (noting that successful stigma-plus claims require rough temporal proximity between stigma and plus, but not actual contemporaneousness).

liberty was held to include not just a school teacher's right to teach as a form of employment, but also his students' right to learn—both vocation and avocation were "privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer*, 262 U.S. at 399. The Duke lacrosse program was considered, by both the University and the young men whom it recruited for that team, to be a vital component of the university's offerings, its collegiate mission, and its standing as an elite university. *See* Compl. ¶¶ 83-89. No one would doubt that Plaintiffs had been deprived of protected interests—the required "stigma-plus"—if, instead of terminating the lacrosse season, Duke University had expelled Plaintiffs and denied them their baccalaureates.

Accordingly, the Fourth Circuit has recognized the protectable value of the " 'liberty to engage in any of the common occupations of life,' " *Sciolino*, 480 F.3d at 646 (quoting *Roth*), even if no economic loss is involved. In *Ridpath*, the Court of Appeals held that an assistant athletic director of a university sports program had a due process claim under § 1983 even though the new job in another department to which the university had transferred him constituted a promotion, insofar as it paid more than the position he had lost and had a more prestigious title. 447 F.3d at 301 & n.4, 310. The Court of Appeals held that Ridpath nevertheless had a stigma-plus claim because, despite the greater financial and other rewards of the new job, he had been "ousted from the University's Department of Athletics and completely excluded from his chosen field of intercollegiate athletics administration." *Id.* at 311. The Fourth Circuit repeatedly

stressed that being involved in university athletics was the plaintiff's "calling," *id.* at 311, 314, and his transfer to a different job as a disciplinary measure during an NCAA investigation, accompanied by negative statements from the university, injured the plaintiff by excluding him from "his field of choice." *Id.* at 313; *see also id.* at 300, 302, 309, 310, 314. The court found that the plaintiff's claim was fleshed out by allegations similar to those in this case: the defendant university tried to make Ridpath the scapegoat for the university's troubles with the NCAA, *id.* at 300-01, 308, 310, while telling him that he did not need his own attorney, *id.* at 301-02.

If being forced out of the college athletic department constitutes a cognizable stigma-plus claim for an administrative staff member, then being ousted from their entire lacrosse season—in a program for which the university had recruited them—*a fortiori* constitutes a stigma-plus claim for Plaintiffs. The cases on which Durham relies for its argument that participation in athletic programs is not a protected interest all involved children participating in high school or even little league sports programs. *See* Durham Br. 33-34.[28] Participation on a championship level team in Division I of the NCAA—a unique opportunity for which Plaintiffs had sacrificed and labored for years, and for which the university specifically recruited them, *see* Compl. ¶¶ 83-84, 591—is in a different category. At this stage, Plaintiffs have pleaded all that is necessary to survive a

---

[28] The sole exception is *Williams v. Hamilton*, 497 F. Supp. 641 (D.N.H. 1980), which did involve interscholastic sports but which is entitled to no weight because its premise that NCAA activity constitutes state action has been overruled. *See NCAA v. Tarkanian*, 488 U.S. 179, 193, 199 (1988).

motion to dismiss.  Durham errs in relying on authorities rejecting stigma-plus claims on the merits for insufficient evidence.  *See, e.g.*, *Tigrett v. Rector and Visitors of the Univ. of Va.*, 290 F.3d 620, 628 (4th Cir. 2002).  Those cases are inapposite because this is a motion to dismiss, not a motion for summary judgment.

**H.     Durham's Policies of Targeting Duke Students for Harassment and Prematurely Publishing Conclusions of Criminal Guilt Support Claims Against the City (Counts 26 D, E and F)**

Durham does not challenge the Complaint's allegations that the Durham Police had a policy or custom of prematurely publishing conclusions of criminal guilt.  Compl. ¶¶ 690-94 (Count 26 F).  Therefore, Count 26 F survives regardless of the disposition of Count 26 E (policy of targeting Duke students).

Durham does *not* contend that Plaintiffs have inadequately pleaded a municipal policy of condoning abusive and fraudulent law enforcement against Duke students.  Rather, the City argues only that Plaintiffs have not adequately pleaded a causal link between that policy and the constitutional violations in this case.  Durham Br. 37-38.  Durham's position is built on (1) misreading of the Complaint and (2) misunderstanding of the law.

The Complaint alleges Gottlieb's practice of "selective and malicious investigation and prosecution" of Duke students by such means as "fabricating evidence, and falsifying police reports."  Compl. ¶¶ 134-35, 681-83.  It also sets forth Durham's policy of condoning this practice and the City's deliberate indifference to the rights of Duke students.  ¶¶ 684-88.  This adequately pleads the factual basis for municipal

liability under § 1983.  *See Board of County Comm'rs v. Brown*, 520 U.S. 397, 411-12 (1997) (municipal liability for subordinate appropriate where the "connection between the background of the particular applicant and the specific constitutional violation alleged [is] strong"); *Shaw v. Stroud*, 13 F.3d 791, 799-801 (4th Cir. 1994) (supervisor liable for "deliberate indifference" because of failure to remove subordinate notwithstanding prior incidents of abuse).

Durham is uncomfortable with these allegations, so it presumes to rewrite them, watering Gottlieb's abuses of power down to a mere "bias … in enforcing noise and alcohol regulations."  Durham Br. 39.  "Even if Gottlieb engaged in abuses in connection with enforcement of misdemeanor regulations against college students," Durham argues, "that says little about his conduct in a serious felony investigation into charges of rape."  *Id.* at 39.  Actually, even after Durham's rewriting, the Complaint says quite a lot: if a policeman is willing to break the law and violate the Constitution to add a piddling alcohol bust to his list of collars of Duke students, who knows how far he would go to get credit for rape and kidnapping arrests in a case that is in the national spotlight?

But far more important is that the Complaint alleges abusive law enforcement by Gottlieb right across the board.  Plaintiffs allege that 71% of *all* of Gottlieb's arrests, for *every* category of crime, were of Duke students, in contrast to a mere 3% of total arrests for the other three officers assigned to the same Trinity Park district.  Compl. ¶ 135.  Gottlieb's use of false arrests, fabricated evidence, and falsified police reports are not alleged to have been limited to minor violations.  ¶¶ 134, 688.  Gottlieb's superiors

consequently transferred him out of Trinity Park and away from Duke students in March of 2006, shortly before the events of this case, yet inexplicably assigned him (in defiance of regulations) to the rape investigation. ¶¶ 135-36. These are the facts alleged and, no matter how earnestly Durham may wish to dispute them, it will have to wait for the trial. On a motion to dismiss, Durham does not get to rewrite the Complaint to its liking.

The causal link between the claims pleaded here and the City's policies of encouraging Gottlieb's targeting of Duke students is manifest. Gottlieb pursued the Duke lacrosse players with a vengeance, despite his knowledge that there was overwhelming evidence that no crime had even been committed. Compl. ¶¶ 106-07, 110-11, 131, 156-60, 166-67, 193-95, 304-08. And Gottlieb's methods in the rape hoax investigation included the same abuses alleged in his prior conduct: falsification and fabrication of evidence. *See* Compl. ¶¶ 180-83 (witness tampering), 190-92 (fabricating evidence), 207-09 (falsifying reports), 330 & 343-47 (rigged photo line-up), 383-85, 401-04 & 426-29 (suppressing exculpatory evidence), XXIII.C (falsifying case notes). In contrast, Durham's cases involved "scattershot accusations of unrelated constitutional violations." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999), *discussed in* Durham Br. 38.

Durham's attempt to distinguish investigations of major versus minor crimes misses the point. What matters is not continuity in which particular crimes Duke students are investigated for, but continuity in "violation of a particular constitutional" right in the course of that investigation. *Brown*, 520 U.S. at 411; *see also Carter*, 164 F.3d at 218 (same). Regardless which provision of the criminal code is involved, the abusive

practices and Fourth and Fourteenth Amendment violations are the same: targeting Duke students, investigating and prosecuting them without probable cause, and rigging the evidence against them.  The only thing that changes when one varies the criminal charge is the quantum of damage inflicted on the hapless, innocent target.  " 'If any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. … Actions taken in contravention of this prohibition necessarily violate due process.' "  *White v. Wright*, 150 Fed. Appx. 193, 198 (4th Cir. 2005) (quoting *Limone v. Condon,* 372 F.3d 39, 44-45 (1st Cir. 2004)).

Durham's second argument is that the policy alleged cannot be "the moving force" behind the constitutional violations because the Complaint also names other defendants and pleads other causes of action.  Durham Br. 39.  The City misapprehends the law.  To impose liability on a municipality, the law does not require that the municipal policy be the one and only cause of the violation.  The courts employs the locution "*a* moving cause" interchangeably with "*the* moving cause"; therefore, no significance can be attributed to the occasional use of the definite article.  *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("a moving force behind the deprivation") (citation and quotation marks omitted); *see also Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) ("a causative factor"); *Hicks v. Halifax County*, 93 F. Supp. 2d 649, 667 (E.D.N.C. 1999) (" 'a moving force' "); *Blair v. County of Davidson*, No. 05CV00011, 2006 U.S. Dist. LEXIS 34253, at *15 (M.D.N.C. May 10, 2006) ("the moving force"); *id.* at *33 ("a causative factor").

None of the cases that Durham invokes holds that the challenged municipal policy must be the solitary and exclusive cause of the constitutional violation. The Supreme Court has explained that all that is required is that "the entity's 'policy or custom' *must have played a part* in the violation of federal law." *Kentucky v. Graham*, 473 U.S. at 166 (emphasis added).

Durham is correct that the Complaint alleges tortious conduct "by upwards of 30 different defendants." Durham Br. 39. But the participation of additional tortfeasors does not mean that Gottlieb's conduct and the city policy encouraging it get a free pass. The Plaintiffs were wronged not by mere private name-calling, but by government investigation and prosecution for a crime—the participation of state actors (including Gottlieb and Durham) was an essential part of the travesty of justice that is the Duke rape hoax. And while there is truth in the City's repeated protests that the injuries suffered by Plaintiffs are also attributable to Duke and Tara Levicy, this point goes, at most, to apportioning damages among Defendants. That is a matter for trial. Durham's authorities dealt not with pleading standards for municipal liability, but with resolution of that issue on the merits, on summary judgment after discovery. *See, e.g., Carter*, 164 F.3d at 217; *Lytle v. Doyle*, 326 F.3d 463, 468 (4th Cir. 2003). Liability of cities and supervisors " 'ultimately is determined by pinpointing the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked' and this determination 'is ordinarily one of fact, not law.' " *Blair*, 2006 U.S. Dist. LEXIS 34253, at *35 (quoting *Shaw*, 13 F.3d at 798-99).

## I. The Complaint Adequately Pleads Claims for Infliction of Emotional Distress (Counts 28 and 29)

Durham contends that the allegations in the Complaint do not, as a matter of law, plead "extreme and outrageous conduct" sufficient to make out claims for intentional infliction of emotional distress. Durham Br. 40. The City insists that falsifying evidence, suborning perjury, tampering with witnesses, and inflaming racial animosity in order to prosecute innocent college students for a crime that never happened is not "extreme and outrageous conduct." Simply stating that proposition is enough to explode it. *See* Parts I-II, V.A, D, H, *supra* (reviewing the allegations in the Complaint). The misconduct pleaded here "may be reasonably regarded as extreme and outrageous [and] it is for the jury to determine, upon proper instructions, whether the conduct complained of is, in fact, sufficiently extreme and outrageous to result in liability." *Hogan v. Forsyth Country Club*, 340 S.E.2d 116, 121 (N.C. Ct. App. 1986) (workplace sexual harassment is "sufficiently outrageous conduct … to entitle [the plaintiff] to go to the jury"); *West v. King's Dept. Store, Inc.*, 365 S.E.2d 621, 625-26 (N.C. 1988) (reasonable jury could find actionable outrageous conduct in store manager's accusations and threats of criminal prosecution for theft against innocent customers who had paid for goods they were carrying and possessed receipt manager refused to examine); *see also* Pls.' University Opp. Part V.A.1.[29]

---

[29] Durham relies on cases holding that there has been no outrageous conduct when the defendant is accused merely of flinging "insults" or imposing "indignities," or where the case involved an arrest or an indictment lacking in probable cause without more.

Durham also argues that the Complaint does not allege "severe" emotional injury. Durham Br. 42. Durham is wrong. As our complaint makes clear, the players and their parents, in the words of President Brodhead, "lived through an ordeal the likes of which few have known" and "there is no undoing the agonies" they suffered. Compl. ¶ 9. As we explain in more detail elsewhere, the complaint adequately alleges that Plaintiffs suffered severe emotional distress as a result. *See* Compl. ¶¶ 430, 474-75, 639, 704, 710, 726; Plaintiffs' Opposition to the Duke SANE Defendants' Motion to Dismiss ("Pls.' SANE Opp.") Part V.A.1.d.

Finally, Defendants predicate their motion to dismiss on inapposite summary judgment cases. Durham Br. 41-42 & n.29; *see, e.g., Waddle v. Sparks*, 414 S.E.2d 22, 23-24, 26-27 (1992) (granting summary judgment for defendant due to lack of evidence after plaintiff had discovery); *Darnell v. B.P. Exploration*, No. 97-2040, 1998 U.S. App. LEXIS 4651, at **5-6 (4th Cir. Mar. 13, 1998) (granting summary judgment due to lack of evidence).[30]

---

Durham Br. 41 nn.29-31. The Complaint here alleges far worse on the part of the City's employees and officials, including Mike Nifong, to whom the City delegated control of the rape hoax investigation. *See* Part V.B, *supra*. The Durham Supervisors' effort to escape responsibility for the injuries inflicted by their malicious and knowingly baseless investigation (Supervisor Br. 37-38), is equally unavailing. *See* Part V.D, *supra*. The objection that this claim is really a time-barred defamation action (Supervisor Br. 39) ignores Plaintiffs' right to plead alternative theories of recovery and the North Carolina courts' recognition of emotional distress claims even when the same allegations would not sustain a defamation claim. *See West*, 365 S.E.2d at 624-26; *Stanley v. Moore*, 454 S.E.2d 225, 228-29 (N.C. 1995); Pls.' SANE Opp. Part V.A.1.b.

[30] Durham and the Durham Supervisors argue that Count 29 fails to state a claim

**J.     The Parent Plaintiffs Have Standing to Assert the Claims They Plead**

Durham contends that those Plaintiffs who are the parents of members of the lacrosse team lack standing to assert claims for injuries to their children. Durham Br. 45. The Parent Plaintiffs bring claims for Intentional Infliction of Emotional Distress ("IIED") (Count 28) and Negligent Infliction of Emotional Distress ("NIED") (Count 29). Parents have standing to sue for their emotional injuries resulting from a defendant's misconduct toward their children. *See, e.g.*, *Johnson v. Ruark Obstetrics*, 395 S.E.2d 85, 97 (N.C. 1990). Plaintiffs bringing IIED claims on the basis of injuries to their family members have been a standard feature of North Carolina law for almost a century. *See, e.g.*, *id.* at 92-94 (discussing *Bailey v. Long*, 90 S.E. 809 (N.C. 1916)).

Durham is correct that parents would not have standing to bring claims for violation of their children's Fourth Amendment or Due Process rights, but we do not plead such constitutional claims on behalf of the Parent Plaintiffs.[31]

---

for negligent infliction of emotional distress because the Complaint pleads only actions that are intentional in nature, which North Carolina law holds are insufficient for a negligence claim. Durham Br. 42-43; Supervisor Br. 42-43. As we explain elsewhere, this rule exists to prevent plaintiffs from circumventing the requirement to plead "extreme and outrageous" conduct and thereby rendering the intentional form of the emotional-distress tort a practical nullity. Pls.' SANE Opp. Part V.A.1.e. & n.11. Plaintiffs' particular negligent-infliction claim does not implicate this concern because, as explained in the text above, the facts pleaded in the Complaint in fact amount to extreme and outrageous conduct and Plaintiffs therefore have no need to evade that requirement. *See* Compl. ¶ 729 (incorporating preceding allegations into negligent infliction claim); *see also* Pls.' University Opp. Part V.A.1. Defendants' objections about foreseeability are addressed elsewhere. *See* Pls.' SANE Opp. Parts V.A.1.d. & V.B.

[31] Durham raises no objection, argument, or authority as to possible parent

## VI.    CONCLUSION

For the foregoing reasons, Defendant City of Durham's motion to dismiss should

be denied.

Dated:  August 28, 2008                    Respectfully submitted,

**THOMAS, FERGUSON**                      **COOPER & KIRK, PLLC**
**& MULLINS,  L.L.P.**

/s/ William J. Thomas                      /s/ Charles J. Cooper
William J. Thomas, II                      Charles J. Cooper
(N.C. Bar # 9004)                          Brian S. Koukoutchos
119 East Main Street                       David H. Thompson
Durham, NC  27701                          Howard C. Nielson, Jr.
Tel. (919) 682-5648                        Nicole Jo Moss
Email: thomas@tfmattorneys.com             (N.C. Bar # 31958)
                                           David Lehn*
                                           1523 New Hampshire Avenue, NW
                                           Washington, DC  20036
                                           Tel. (202) 220-9600
                                           Email: ccooper@cooperkirk.com
                                           Email: dthompson@cooperkirk.com
                                           Email: nmoss@cooperkirk.com

                                           (* motion for special appearance has been filed)

                                           *Attorneys for Plaintiffs*

---

standing with respect to Count 23 (obstruction of justice), Count 30 (negligence), or
Count 31 (negligent supervision).  Durham appears to challenge the Parent Plaintiffs'
standing with respect to Count 8 (fraud), but the only authority it cites is a trust case
where the family members (the heirs) were held to have standing.  *See Mullinix v. Mabry*,
2005 N.C. App. LEXIS 2566, at *6-7 (N.C. Ct. App. Dec. 6, 2005), *cited in* Durham Br.
45.  Its authorities on abuse of process are equally inapposite, the first because no
plaintiff was a third party to the underlying legal wrong, *see Lewis v. Clegg*, 26 S.E. 772,
774 (N.C. 1897), and the second because the plaintiff was not a parent of the injured
party, but an arms-length business contractor, *see Martel v. City of Newton*, 6 F. Supp. 2d
1243, 1247 (D. Kan. 1998).

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 28, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel:

**TROUTMAN SANDERS LLP**
Patricia P. Kerner
N.C. State Bar No. 13005
Hannah Gray Styron
D. Martin Warf
434 Fayetteville Street, Suite 1900
Raleigh, North Carolina 27601
Phone: (919) 835-4117
Fax: (919) 829-8714
Email: tricia.kerner@troutmansanders.com
Email: hannah.styron@troutmansanders.com
Email: martin.warf@troutmansanders.com
*Counsel for Defendants Steven Chalmers,*
*Patrick Baker, Beverly Council, Ronald*
*Hodge, Jeff Lamb, Stephen Mihaich, Michael*
*Ripberger, and Lee Russ*

**FAISON & GILLESPIE**
Reginald B. Gillespie, Jr.
N.C. State Bar No. 10895
5517 Durham Chapel Hill Boulevard
Suite 2000
Durham, North Carolina 27727-1729
Phone: (919) 489-9001
Fax: (919) 489-5774
Email: rgillespie@faison-gillespie.com
*Counsel for Defendants City of Durham,*
*North Carolina and Steven Chalmers*

**STEPTOE & JOHNSON LLP**
Roger E. Warin*
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000

Fax: (202) 429-3902
Email: rwarin@steptoe.com
*(Motion for Special Appearance to be filed)
***Counsel for Defendant City of Durham, North
Carolina***

**ELLIS & WINTERS LLP**
J. Donald Cowan, Jr.
N.C. State Bar No. 0968
Dixie T. Wells
N.C. State Bar No. 26816
P.O. Box 21927 [27420]
100 N. Greene Street, Suite 102
Greensboro, North Carolina 27401
Phone: (336) 217-4197
Fax: (336) 217-4198
Email: don.cowan@elliswinters.com
Email: dixie.wells@elliswinters.com

**WILMER CUTLER PICKERING HALE
AND DORR LLP**
Jamie Gorelick*
D.C. Bar No. 101370
Jennifer M. O'Connor
William F. Lee
Paul R.Q. Wolfson
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6500
Facsimile: (202) 663-6363
Email: Jamie.gorelick@wilmerhale.com
Email: Jennifer.oconnor@wilmerhale.com
Email: William.lee@wilmerhale.com
Email: Paul.Wolfson@wilmerhale.com
***Counsel for Defendants Duke University,
Aaron Graves, Robert Dean, Richard H.
Brodhead, Peter Lange, Tallman Trask, III,
John Burness, Larry Moneta, Victor J. Dzau,
M.D., Allison Halton, Kemel Dawkins,
Suzanne Wasiolek, Matthew Drummond,***

***Counsel for Duke University Health Systems,***

2

***Inc., Theresa Arico, and Tara Levicy***
(*motion for special appearance filed)

**YATES, McLAMB &WEYHER, L.L.P**
Dan Johnson McLamb
N.C. State Bar No. 6272
T. Carlton Younger, III
Shirley Marring Pruitt
POB 2889
Email: cyounger@ymwlaw.com
Email: spruitt@ymwlaw.com
***Counsel for Duke University Health Systems,***
***Inc., Theresa Arico, and Tara Levicy***

**POYNER & SPRUILL LLP**
Edwin M. Speas, Jr.
N.C. State Bar No. 4112
P.O. Box 10096
Raleigh, North Carolina 27605-0096
Phone: (919) 783-6400
Fax: (919) 783-1075
Email: espeas@poynerspruill.com
***Counsel for Defendant Mark Gottlieb***

**KENNON, CRAVER, BELO, CRAIG &**
**MCKEE, PLLC**
Joel M. Craig
N.C. State Bar No. 9179
Henry W. Sappenfield
P.O. Box 51579
4011 University Drive, Suite 300
Durham, North Carolina 27717-1579
Phone: (919) 490-0500
Fax: (919) 490-0873
Email: jcraig@kennoncraver.com
Email: hsappenfield@kennoncraver.com
***Counsel for Defendant Benjamin Himan***

**MAXWELL FREEMAN & BOWMAN, P.A.**
James B. Maxwell
N.C. State Bar No. 2933
P.O. Box 52396

Raleigh, North Carolina 27717-2396
Phone: (919) 493-6464
Fax: (919) 493-1218
Email: jmaxwell@mfbpa.com
*Counsel for Defendant David Addison*

**PINTO COATES KYRE & BROWN, PLLC**
Kenneth Kyre Jr. (N.C. Bar # 7848)
Paul D. Coates (N.C. Bar # 9753)
P.O. Box 4848
Greensboro, NC 27404
Email: kkyre@pckb-law.com
Email: pcoates@pckb-law.com
*Counsel for J. Wesley Covington*

As of the date of this filing, no attorney has made an appearance on behalf of the following Defendant.

Linwood Wilson
6910 Innesbrook Way
Bahama, NC 27503-9700
Email: linwoodw@aol.com

/s/ Nicole Jo Moss