# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### No. 1:08-cv-119

EDWARD CARRINGTON, et al.,     )
             )
             **Plaintiffs,**     )
    **v.**             )
             )
DUKE UNIVERSITY, et al.,     )
             )
    **Defendants.**     )

## PLAINTIFFS' OPPOSITION TO THE DUKE UNIVERSITY DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

Charles J. Cooper
Brian S. Koukoutchos
David H. Thompson
Howard C. Nielson, Jr.
Nicole Jo Moss (N.C. Bar # 31958)
David Lehn
**COOPER & KIRK, PLLC**
1523 New Hampshire Avenue, NW
Washington, DC 20036
Tel. (202) 220-9600

William J. Thomas, II (N.C. Bar # 9004)
**THOMAS, FERGUSON & MULLINS, L.L.P.**
119 East Main Street
Durham, NC 27701
Tel. (919) 682-5648

*Attorneys for Plaintiffs*

August 28, 2008

# TABLE OF CONTENTS

I.      Nature of Proceedings ........................................................................ 1

II.     Statement of Facts ............................................................................ 1

III.    Questions Presented........................................................................... 5

IV.     Standard of Review .......................................................................... 5

V.      Argument.......................................................................................... 6

        A.      The Defendants Tortiously Inflicted Emotional Distress
                (Counts 6-7).......................................................................... 6

                1.      Intentional Infliction of Emotional Distress (Count 6) ............. 6

                2.      Negligent Infliction of Emotional Distress (Count 7)............... 10

        B.      The Defendants' Release of Key Card Data Was Tortious
                (Counts 8-10)........................................................................ 10

                1.      Fraud (Count 8) ........................................................... 11

                2.      Negligent Misrepresentation (Count 9)..................................... 15

                3.      Abuse of Process and Conspiracy to Abuse Process
                        (Count 10) ................................................................. 16

        C.      The Defendants' Advice to Plaintiffs Was Wrongful
                (Counts 11-13)...................................................................... 18

                1.      Constructive Fraud (Count 11).................................................. 19

                2.      Voluntary Undertaking (Count 12) ........................................... 23

                3.      Special Relationship (Count 13) ............................................. 25

        D.      The Defendants' Failure to Protect Plaintiffs from Harassment
                Was Tortious (Count 14)....................................................... 29

        E.      The Defendants Breached Their Contractual Duties
                (Counts 15-17)...................................................................... 32

        F.      The Defendants Intruded upon Plaintiffs' Seclusion (Count 18)......... 45

        G.      Negligent Supervision (Count 19)........................................... 47

        H.      Violation of and Conspiracy To Violate the Fourth Amendment
                Under Section 1983 – Key Card Reports (Count 20) ........................ 47

                1.      The Defendants Acted Under Color of State Law .................... 48

                2.      The Defendants Violated Plaintiffs' Rights Under

the Fourth Amendment ................................................................. 50

VI.    Conclusion ................................................................................... 50

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
No. 1:08-cv-119**

_____

EDWARD CARRINGTON, et al.,

                              **Plaintiffs,**

v.

DUKE UNIVERSITY, et al.,

                              **Defendants.**
_____

**PLAINTIFFS' OPPOSITION TO THE DUKE UNIVERSITY DEFENDANTS'
MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

## I.    NATURE OF PROCEEDINGS

We state the nature of the proceedings elsewhere. Plaintiffs Opposition to City of Durham's Motion to Dismiss ("Pls.' Durham Opp.") Part I.[1]

## II.    STATEMENT OF FACTS

Among the defendants are Duke University and its administrators with direct involvement in furthering and prolonging the rape hoax. These Duke officials possessed from the outset convincing evidence of the players' innocence and had a responsibility to their students to speak out; but not only did they steadfastly remain silent, they also lent

---

[1] This brief addresses the motion to dismiss under Rule 12(b)(6) of Duke University, Richard Brodhead, John Burness, Robert Dean, Matthew Drummond, Victor Dzau, Aaron Graves, Kate Hendricks, Peter Lange, Larry Moneta, Tallman Trask, and Suzanne Wasiolek ("University Defendants"), which is joined by Duke University Health System ("DUHS"), Theresa Arico, and Tara Levicy ("SANE Defendants") (collectively for purposes of this brief, "Defendants" or "Duke Defendants").

Duke's credibility to the rape allegations by repeatedly capitulating to the demands of an angry mob—a mob led by members of Duke's own faculty and student body—to condemn and punish the innocent players and their blameless coach. *See, e.g.*, Carrington Complaint ("Compl.") ¶ 3.[2]

Throughout the crisis, Richard Brodhead (the President of the University) and other Duke officials consistently sacrificed the rights and interests of the accused Duke students in an effort to avoid embarrassment to Duke and to minimize criticism of its administration. Mangum's explosive allegations had created an angry mob led primarily by activist Duke faculty members, student protestors, and a hostile media, and the mob immediately rushed to condemn the lacrosse players, to intimidate and denounce the team's defenders, and to demand the team's swift and severe punishment. Brodhead repeatedly succumbed to the mob's demands, and he effectively condoned its actions. *See, e.g.*, ¶ 10.

Brodhead, who acknowledged after the players had been publicly exonerated that he was fully responsible for Duke's statements and actions throughout the rape hoax crisis, violated the players' rights and interests in three principal ways, *see, e.g.*, ¶ 11:

*First*, Brodhead and Duke failed to disclose, and actively suppressed, material exculpatory evidence in Duke's exclusive possession; discredited exculpatory evidence that had been publicly disclosed; and refused to review exculpatory evidence compiled by

_____

[2] The individual Duke University Defendants and Duke SANE Defendants acted both in their personal capacities and in their official capacities on behalf of their employers, Duke University and DUHS. *See, e.g.*, Compl. ¶ 3.

the players' defense counsel.  For example:

- When Nifong, the media, and others asserted as fact that Mangum had been raped and sodomized by three Duke lacrosse players, Brodhead and Duke did not disclose Duke police officer Christopher Day's contemporaneous incident report stating that Mangum's rape allegations had been so wildly inconsistent that they had been disregarded as incredible by the Durham police.  And when Officer Day's report was publicly disclosed, Duke took steps to discredit it.

- When Nifong and his investigators repeatedly relied on nurse Levicy's statements that the medical and physical evidence collected by Duke Hospital corroborated Mangum's accusations, Brodhead and Duke failed to disclose that the records of Duke's forensic exam contained no such evidence.

- When Nifong publicly speculated that condom use might explain the negative DNA test results for all players, Brodhead and Duke failed to disclose that Mangum had *thrice* told doctors and nurses at Duke Hospital that her attackers had not used condoms.

- When Nifong repeatedly charged that the lacrosse players were hiding behind a conspiratorial "wall of silence," Brodhead and Duke failed to disclose that the team's co-captains, who had hosted the party at their off-campus residence, had voluntarily assisted police in searching the residence, had voluntarily submitted to an all-night interrogation, had voluntarily provided DNA samples and submitted to physical examinations, and had volunteered to take lie detector tests.  Instead, Brodhead deliberately reinforced the "wall of silence" lie by repeatedly calling on the players to cooperate with police, knowing full well that they had done just that throughout the investigation.

Brodhead and Duke remained silent and passively looked on while a politically ambitious and plainly unethical prosecutor, abetted by a mob led by activist Duke professors and student protestors, put 47 innocent Duke students through what Brodhead himself later admitted was "an ordeal the likes of which few have known."

*Second*, Brodhead and the University looked on passively as activist members of the Duke faculty and student protestors waged an extraordinarily vitriolic public campaign of abuse and harassment against the innocent lacrosse players.  This campaign

3

included public condemnations of the players as guilty of rape, racism, and a wall of silence; candlelight vigils and "pot-banging" protests on campus and at the players' residences; display of banners emblazoned with "castrate"; distribution throughout campus of WANTED-style posters displaying photos of the players and proclaiming their guilt; and in-class harassment of the players by openly hostile faculty members. Perhaps the most egregious of the attacks on the players was the infamous advertisement placed in the campus newspaper by the so-called "Group of 88" Duke professors. The ad made unmistakably clear that its faculty sponsors believed that the rape had occurred, and it thanked the student protestors "for not waiting" to "mak[e] your selves heard" and exhorted them "to turn up the volume." The ad was paid for with University funds and listed fifteen academic departments and programs as its sponsors. Brodhead took no steps to enforce Duke's applicable anti-harassment policy; nor did he criticize, let alone discipline, the activist professors and student protestors; nor did he even disassociate the University from their shameful actions and statements. Accordingly, he implicitly condoned these actions and statements and made Duke responsible for them.

*Third*, Brodhead issued a series of carefully timed public statements and imposed a series of increasingly severe disciplinary measures on the team in an effort to satisfy the mob's demands for immediate and severe sanctions against the team and to distance Duke and its administrators from the intense public hostility that had been focused on the innocent lacrosse players. The intended and inevitable effect of Brodhead's statements and actions was to impute guilt to the players and to further inflame public opinion

against them.

Brodhead's wrongful conduct on behalf of Duke was assisted by the wrongful conduct of several of his subordinates and other agents and representatives of Duke University, including the Duke University Police. *See, e.g.*, Compl. ¶ 12, 342. The Duke Police: (1) suppressed and then tried to discredit exculpatory evidence; (2) without a subpoena or warrant, provided the Durham Investigators with confidential key card data and photos of the players for a rigged lineup; (3) helped the Durham Investigators gain entry to the players' residences to conduct warrantless searches; and (4) arranged for the players to give the Durham Investigators uncounseled interrogations and DNA samples. *See* Compl. ¶¶ 63-64, 139, 149, 162, 165, 176, 231, 306-08, 322-24, 327, 394-95, 414-20. In taking these actions, the University and its police were exercising their powers as state law-enforcement agencies and officials. *See* ¶¶ 62-64, 291.

## III.   QUESTIONS PRESENTED

1. Whether Plaintiffs have stated claims for infliction of emotional distress (Counts 6-7).

2. Whether Plaintiffs have stated claims related to the disclosure of key card information (Counts 8-10, 20).

3. Whether Plaintiffs have stated claims for breach of duty (Counts 11-13, 19).

4. Whether Plaintiffs have stated claims based on contract and other promises (Counts 14-17).

5. Whether Plaintiffs have stated a claim for intrusion upon seclusion (Count 18).

## IV.   STANDARD OF REVIEW

We state the standard of review elsewhere. *See* Plaintiffs' Opposition to Defendant City of Durham's Motion to Dismiss ("Pls.' Durham Opp.") Part IV.

## V. ARGUMENT

The Duke University Defendants advance a number of challenges to Plaintiffs' claims. As explained below, none of Defendants' arguments has merit, except with respect to the promissory estoppel claim. Defendants have addressed the counts out of sequence; consistent with the Complaint and with the other Defendants' motions to dismiss, we here address the counts in sequence.[3]

### A. The Defendants Tortiously Inflicted Emotional Distress (Counts 6-7)

The Duke University Defendants present a variety of arguments against Counts 6 and 7, which relate to their infliction of emotional distress upon Plaintiffs. Building on our brief in response to the SANE Defendants' motion to dismiss, we further address why Defendants' arguments lack merit.

#### 1. Intentional Infliction of Emotional Distress (Count 6)

The Defendants contend that Count 6, which charges Defendants University, DUHS, Brodhead, Moneta, Lange, Burness, Trask, Wasiolek, Dzau, Hendricks, Drummond, and the Duke Police with intentionally inflicting emotional distress, fails to state a claim for several reasons. Brief in Support of the Duke University Defendants' Motion to Dismiss ("University Br.") 30-32. None of them has merit.

---

[3] We incorporate into this opposition all oppositions filed today by Plaintiffs against the motions to dismiss of the Duke University Defendants, the Duke SANE Defendants, Defendant City of Durham, the Durham Supervisor Defendants, Defendant Gottlieb, Defendant Himan, Defendant Wilson, Defendant Addison, and Defendant Covington. Cross references to specific sections of Plaintiffs' other oppositions are provided throughout this brief

First, they argue that they did not engage in "extreme and outrageous" conduct with respect to the false statements of Tara Levicy, a Duke nurse, to the Durham Investigators because her statements were not extreme and outrageous and because Defendants did not intend to ratify those statements. University Br. 31-32; *see* Compl. ¶ 521. The short answer is that "it is for the jury to determine … whether the conduct complained of is, in fact, sufficiently extreme and outrageous to result in liability." *Hogan v. Forsyth Country Club Co.*, 340 S.E.2d 116, 121 (N.C. 1986).

Whether Levicy's misstatements were extreme and outrageous is relevant only insofar as Plaintiffs seek to hold Defendants vicariously liable for Levicy's false statements; that question is irrelevant insofar as Plaintiffs contend that Defendants' ratifications of those statements were themselves extreme and outrageous. We have elsewhere shown that Levicy's false statements were extreme and outrageous, that the University, Brodhead, DUHS, and Dzau ratified those statements, and that their ratifications were independently extreme and outrageous under the circumstances. *See* Plaintiffs' Opposition to the Duke SANE Defendants' Motion to Dismiss ("Pls.' SANE Opp.") Part V.B; *see also* Compl. ¶¶ 50-57, 61-64, 224, 234-35.

Second, Defendants contend that the other conduct upon which Count 6 is based was not extreme and outrageous because " 'insults' and 'indignities' such as those alleged here are not enough." University Br. 32. Because "the factual basis of each [claim of IIED] is unique, each claim must be decided on its own merits." *Guthrie v. Conroy*, 567 S.E.2d 403, 409 (N.C. Ct. App. 2002) (quotations omitted) (alteration in

original).  Contrary to Defendants' suggestion, their conduct went far beyond a little

" 'rough language' " that might get a rise out of someone.  *Id.* (quoting *Hogan*, 340

S.E.2d at 123).  Consider some of Defendants' outrageous acts:

- Through local and national media, Defendants repeatedly maligned Plaintiffs alternately as racially motivated gang-rapists or accomplices who had built a "wall of silence" to protect those rapists.  Brodhead called the alleged criminal acts "brutal[]," "dehumaniz[ing]," and "crude[]."  *See* Compl. ¶¶ 11, 216, 224-25, 231-32, 236-38, 246-48, 259-61, 279, 281, 289, 296-98, 306-08, 312, 356-58, 362, 365, 400, 430.

- Defendants repeatedly suppressed conclusively exculpatory evidence.  In general, Defendants sat silently as investigators, Levicy, and Arico mischaracterized the evidence in Defendants' possession.  Not only did they not disclose the Day Report, which documented that the Durham Police found Mangum not credible, they coerced Duke Police Officer Day to amend his report in order to undermine its force.  Defendants delayed their production of medical records that showed that none of the three doctors and four nurses who examined Mangum at Duke Hospital found any medical or physical evidence of sexual assault.  They did not disclose the facts that, as Nifong and the Durham Investigators had told them, the rape-kit test results were negative and Mangum had twice failed to identify her attackers in a photo lineup.  Brodhead publicly tried to justify the silence of the Duke Police on the false ground that they lacked the authority to conduct an investigation.  Defendants also refused to consider exculpatory evidence from the players.  *See* ¶¶ 11, 106, 110-11, 138-47, 149, 225, 263, 277, 279, 290-91, 306-08, 322-23, 340, 378, 421, 423; Part V.B.3, H.1, *infra*.

- They watched passively as Duke professors, students, and others in the Duke community viciously harassed and violently threatened Plaintiffs – harassment and threats that Defendants helped incite through their public misstatements and suppression of exculpatory evidence just noted – while ignoring Plaintiffs' requests for protection from the harassment and threats.  Among other things, protestors displayed "Wanted"-style posters and "castrate" signs, held "pot-banging" protests at the players' homes, and, in an ad sponsored by professors and academic departments and programs, the "Group of 88" urged students to "turn up the volume" on their attacks.  *See* ¶¶ 11, 217, 225, 229-30, 240-45, 254, 256, 264, 266, 282-85, 314-15, 319-20, 356-58, 366-75, 444-55.

- Defendants punished Plaintiffs.  They deprived them of important educational and athletic opportunities, such as by firing the coach and cancelling the season, and they subjected them to an investigation into their past disciplinary records.  Defendants did

so even though they thought the punishment was "not fair" and was "not about the truth." *See* ¶¶ 3, 10-11, 225, 236-38, 289, 356-59, 361-65, 414-16, 418-20.

- As discussed elsewhere, Defendants violated and conspired with the Durham Investigators and others to violate Plaintiffs' common-law rights and federal statutory and constitutional rights. For example, the Duke Police arranged for Plaintiffs to submit to uncounseled interrogations by the Durham Investigators, helped the Durham Investigators search residences without a warrant, and turned over to the Durham Investigators key card data and photos of Plaintiffs to create a rigged lineup. *See* Part V.B.1, 3, H, *infra*; Pls.' SANE Opp. Part V.C-D.

Any one of these actions alone would be extreme and outrageous. Together, they constitute a shocking, deeply offensive, and utterly indefensible attack on Plaintiffs that could not but cause Plaintiffs severe emotional distress. *See Dixon v. Stuart*, 354 S.E.2d 757, 759 (N.C. Ct. App. 1987) (allegation that "defendants … 'ridicul[ed]' and 'harass[ed]' [plaintiff] in the workplace" sufficed to show extreme and outrageous conduct); *Woodruff v. Miller*, 307 S.E.2d 176, 176-78 (N.C. Ct. App. 1983) (extreme and outrageous to post on "Wanted" board in post office and to show to teachers and students copies of arrest warrant, indictment, and judgment arising out of current school superintendent's participation in prank break-in when he was in college); *English v. Gen. Elec. Co.*, 683 F. Supp. 1006, 1017 (E.D.N.C. 1988) (extreme and outrageous to "remove[] [plaintiff] from [her job] under guard as if she were a criminal, … assign[] her to a degrading 'make work' job, … deride[] her as paranoid, … bar[] her from employment in controlled areas, … subject[] her to constant surveillance in the workplace, isolate[] her from fellow workers … and, … conspire[] to fraudulently charge her with violations of safety and criminal statutes"), *rev'd on other grounds*, 496 U.S. 72, 77 (1990). Defendants' actions are even more extreme and outrageous in light of (1) the

fact that they either knew that the rape allegation was false, or were recklessly indifferent to the players' innocence, *see* Pls.' SANE Opp. Part V.A.1.a, e, B, and (2) the fact that they were bound to protect Plaintiffs from such harms because of, among other things, their control over Plaintiffs and Plaintiffs' dependence on them, *see* Part V.C-E, G, *infra*. *See Guthrie*, 567 S.E.2d at 409 ("unfair power relationship between defendant and plaintiff" is factor in whether conduct was extreme and outrageous).

Finally, Defendants maintain that Plaintiffs have not alleged that they "suffered *severe* emotional distress as a result of the alleged conduct." University Br. 32. As explained elsewhere, this argument lacks merit. *See* Pls.' SANE Opp. Part V.A.1.d.

### 2. Negligent Infliction of Emotional Distress (Count 7)

Count 7 seeks to hold the University, DUHS, Brodhead, Moneta, Lange, Wasiolek, Burness, Trask, Dzau, Hendricks, Drummond, and the Duke Police responsible for negligently inflicting emotional distress upon Plaintiffs. Compl. ¶¶ 527-30. Against this count, Defendants advance the same arguments they advance against Count 2. University Br. 33-34. We refer the Court to our rebuttal of those arguments in the context of Count 2. *See* Pls.' SANE Opp. Part V.A.1.d.

### B. The Defendants' Release of Key Card Data Was Tortious (Counts 8-10)

In violation of the Family Educational Records & Privacy Act ("FERPA"), Duke turned over confidential key card reports to the Durham Investigators in the absence of a subpoena and without notifying Plaintiffs of any request for the reports, obtaining Plaintiffs' consent to disclose the reports, or informing Plaintiffs that Duke had disclosed

the reports  *See* Compl. ¶ 324-27, 433; 20 U.S.C. § 1232g(b)(1), (b)(2)(A), (d).[4]  Two

months later, Nifong subpoenaed the key card records that Duke had already turned over.

Compl. ¶ 434.  Knowing that they had already disclosed the reports, Duke nonetheless

responded to Nifong's subpoena in a manner intended to conceal from Plaintiffs their

prior, illegal disclosure.  *See* ¶¶ 433-43.

### 1.   Fraud (Count 8)

Count 8 seeks to hold Defendants Duke University, Hendricks, Drummond, the

Duke Police, the Durham Investigators, and the City of Durham liable as principals and

as co-conspirators for the fraud they perpetrated on Plaintiffs.   ¶¶ 532-38.  Defendants'

arguments for dismissal of this count lack merit.

First, Defendants argue that Plaintiffs have failed to identify each individual

defendant's participation in the fraud as required by Rule 9(b).  University Br. 35.  In

particular, Defendants claim that the Complaint does not sufficiently identify the

defrauders because it alleges that, as Defendants emphasize, "[t]he above named

defendants, *and/or other senior Duke University . . . officials* were aware that Duke had

already disclosed this information to the Durham Investigators."  University Br. 35

(quoting Compl. ¶ 534).  But the Complaint is indisputably sufficiently particular with

respect to the *named* defendants.  Plaintiffs allege expressly that Defendants Hendricks,

Drummond, the Duke Police, and the University falsely represented to Plaintiffs that the

---

[4] Key cards are used by Duke students to enter dormitories and other campus
buildings, as well as at vending machines.  Compl. ¶ 325.   Key card data thus reveal the
whereabouts and activities of students.

key card data had not already been disclosed to the Durham Investigators.  *See* Compl. ¶¶ 57, 61-64, 324-28, 434-43, 532.  Because the "other senior Duke University … officials" are not named defendants, their participation in the fraud is relevant only insofar as the University is liable for their actions.  Those officials' conduct is not critical to Plaintiffs' claim against the University because the University is already liable for this fraud by virtue of the acts of Hendricks, Drummond, and the Duke Police.  *See* ¶¶ 57, 61-64.  In any event, the Complaint explicitly identifies one non-defendant senior official who participated in the fraud: Kermel Dawkins.  ¶¶ 438, 531.  Especially given that Plaintiffs have not yet "been afforded an opportunity to undertake discovery to investigate all of [their] concealment claims," the Complaint plainly satisfies Rule 9(b).  *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 250-51, 253 (D. Md. 2000).

Second, Defendants argue that the allegation that "Drummond and Hendricks 'did not disclose' that the key card data had already been provided to the Durham Police … is solely an allegation of omission, not an allegation of false representation or concealment."  University  Br. 35-36.  According to Defendants, their omission would be fraudulent only if they had a duty to disclose, but, they say, they had no such duty.  *See* University Br. 36 & n.18.  Defendants have misread both the Complaint and the law in several ways.

Foremost, it does not matter whether Defendants had a duty to disclose because the Complaint alleges that Defendants made affirmative misrepresentations, not just misleading omissions.  In letters to Plaintiffs and their attorneys, Duke officials stated

that the University "intend[ed] to comply with … the subpoenas," unless Plaintiffs objected. Compl. ¶¶ 435-36. For Defendants to say that they *intended* to produce what they *had already* produced was an affirmative misrepresentation. Similarly, for Defendants to say that, if Plaintiffs objected, they *would refrain* from producing what they *had already* produced, was an affirmative misrepresentation. *See State v. Almond*, 435 S.E.2d 91, 97 (N.C. Ct. App. 1993) ("we cannot see how the submission of invoices for goods not received would not amount to a misrepresentation"); *Mapp v. Toyota World, Inc.*, 344 S.E.2d 297, 300 (N.C. Ct. App. 1986) ("the statement of an intention to perform an act, when no such intention exists, constitutes misrepresentation").

Moreover, Defendants' omission of the fact that they had already produced the reports was fraudulent. Defendants had a duty to disclose that fact by virtue of their fiduciary relationship with Plaintiffs, as discussed below. *See* Part V.C.1, *infra*. And even if Defendants were not in a fiduciary relationship with Plaintiffs, their omission was still fraudulent. A duty to disclose can arise under North Carolina law in several situations even if there is no fiduciary relationship, as Defendants' own authority recognizes. Specifically, there is such a duty if: (1) "defendants knowingly misled plaintiff by speaking without full disclosure"; (2) a "party acquires superior knowledge not readily available to the other and knows that the other is acting on the basis of the misinformation "; (3) "one party has taken affirmative steps to conceal material facts from the other"; *or* (4) a statute imposes a duty of disclosure. *Breeden v. Rich. Comm.*

*Coll.*, 171 F.R.D. 189, 194-96 (M.D.N.C 1997); *see* Pls.' Durham Opp. Part V.C.1.[5]

Plaintiffs' allegations establish each of these situations:

(1)    Through the letters discussed above, Defendants spoke about the status of the reports without disclosing that they had already produced them. They knew that those letters would mislead Plaintiffs into thinking a motion to quash might stop production of the information – indeed, some of the fraudulent communications were directed to Plaintiffs' counsel. Compl. ¶ 436.

(2)    Defendants must have known that Plaintiffs had no way of knowing that they had already produced the reports – particularly because Defendants had violated FERPA's notification duty and Defendant Hendricks, who sent one of the letters, was the University's Deputy General Counsel. Yet, Defendants not only sent the highly misleading letters, they also stood by silently as Plaintiffs acted on the basis of Defendants' disinformation campaign, by moving to quash the subpoena and participating in a court hearing on that motion. *See* ¶¶ 61, 327-28, 437-44.

(3)    Defendants' letters informing Plaintiffs of the subpoena and Defendants' subsequent silence in the face of Plaintiffs' motion to quash were affirmative steps by which Defendants intended to conceal their earlier, illegal production of the reports. ¶ 434.

(4)    By requiring Defendants to notify Plaintiffs of their production and indeed to obtain their consent to the production, FERPA imposed upon

---

[5] *See also, e.g., Shaver v. N.C. Monroe Constr. Co.*, 306 S.E.2d 519, 525 (N.C. Ct. App. 1983) ("Defendants were under no duty to speak, but once the Company spoke, it was required to make a full and fair disclosure as to the matters discussed."); *Wicker v. Worthy*, 51 N.C. 500, 502 (1856) (defendant liable if "he says or does anything intended and calculated to create [a false] impression"); *Harton v. Harton*, 344 S.E.2d 117, 119 (N.C. Ct. App. 1986) (duty to disclose arises "when a party has taken affirmative steps to conceal material facts from the other"); *Brooks v. Ervin Construction Co.*, 116 S.E.2d 454, 458 (N.C. 1960) (defendant "was under a duty to disclose" information "not apparent to plaintiffs and not within the reach of their diligent attention and observation"); *Williams v. East Coast Sales, Inc.*, 298 S.E.2d 80, 82 (N.C. Ct. App. 1982) ("defendant's duty to speak, which rendered its silence actionable fraud, is a legal duty imposed by statute").

Defendants a statutory duty to disclose the production. The University breached this statutory duty and then committed fraud to cover up its misconduct.

In sum, no matter how one looks at it, Defendants' conduct was fraudulent.[6]

### 2. Negligent Misrepresentation (Count 9)

In Count 9, Plaintiffs claim that, through their actions described above in connection with Count 8, Defendants Duke University, Hendricks, and Drummond are liable for negligent misrepresentation. ¶¶ 540-41. Defendants contend that their misrepresentations "did not arise in the course of a business transaction," and therefore the tort of negligent misrepresentation does not apply. University Br. 36-37.

In truth, the circumstances here fit the tort quite well. Plaintiffs' dealings with Duke were founded on a very traditional business transaction: Plaintiffs paid tuition and fees in exchange for the education and other services furnished by the University. Defendants' misrepresentations did not occur on the athletic field. *Cf. Mercer v. Duke Univ.*, No. 97-959 (M.D.N.C. Sept. 28, 2000), slip op. 23-28 (statements about whether plaintiff was qualified to play on football team were not made in course of business transaction) (attached to University Br. as Exh. 2). The misrepresentations were made by the University in the course of informing its students of their legal right to call upon counsel for the purpose of quashing a subpoena seeking their protected records. Indeed,

---

[6] Contrary to Defendants' assertion that "Plaintiffs have failed to allege … what the defendants gained by withholding the information," University Br. 36 & n.18, the Complaint clearly alleges what Defendants stood to gain: they tried to use their fraud "to paper over the fact of [their] prior illegal disclosure" of the key card data and thus avoid the penalties for violating FERPA. Compl. ¶ 434.

some of the false representations were made directly to Plaintiffs' legal counsel. Compl. ¶ 436. *See* Restatement (Second) of Torts § 552 cmt. *d* (identifying "pecuniary interest" in a particular transaction as element of the tort, and making clear that such interest may "be of a more indirect character" than direct consideration furnished by plaintiff for the representation); *Mercer*, No. 97-959, Slip op. at 24-26 (North Carolina has adopted § 552). That, of course, is what Defendants were required by law to do (but did not do) before they gave the records to the Durham police the first time.

### 3. Abuse of Process and Conspiracy to Abuse Process (Count 10)

Defendants contend that Count 10, which seeks to hold the University, Hendricks, Drummond, the Duke Police, the Durham Investigators, and the City of Durham liable for abusing and conspiring to abuse legal process by issuing a sham subpoena for Plaintiffs' key card reports, Compl. ¶¶ 543-48, fails for two reasons.

First, they argue that they cannot be liable for Nifong's decision to issue the subpoena because they did not collaborate or conspire with him to do so. University Br. 38. This quintessentially factual defense will be for the jury to decide; at this stage, the allegations more than suffice. *Dickens v. Puryear*, 276 S.E.2d 325, 337 (N.C. 1981). By the time of the subpoena, the Duke Defendants knew that the Duke Police had already turned over the key card report prepared by Drummond's Card Office and knew or should have known that they had violated FERPA by doing so. *See* Compl. ¶¶ 57, 61-64, 324-28, 434, 436, 438, 441. Armed with that report, the Durham Investigators presented a third rigged photo identification array to Mangum. *See* ¶¶ 324-26. And yet, through

letters that Drummond and Hendricks, the University's Deputy General Counsel, sent to all the players and through the silence of the University's lawyers at the state-court hearing on the players' motion to quash the subpoena, the Duke Defendants performed an elaborate charade, acting as if they had not already turned over the key card information. *See* ¶¶ 435-37, 439-43; Part B.1, *supra*.

More generally, the Duke Police and the University (through its police department and other officials) coordinated their actions during the rape investigation in bad faith and to the detriment of Plaintiffs. Exercising its law enforcement authority, the Duke Police Department met with and spoke with the Durham Investigators several times during the investigation in order to bolster the case against the players in the face of the disintegrating incriminating evidence and the mounting exculpatory evidence. *See* ¶¶ 306-08, 342. Through the Day Report and conversations with the Durham Investigators, the Duke Police and other University officials were well aware that Mangum's accusations were not credible and that there was no evidence incriminating the lacrosse players in the alleged rape, *see* ¶¶ 111, 139, 415; rather than disclose the Day Report to explode the investigation, however, the Duke Police and other University officials, at Nifong's request and with the agreement of the Durham Investigators and Supervisors, suppressed that report and even actively worked to discredit it, *see* ¶¶ 11, 231, 276-77, 322-23, 414-20, 423. That was not the only exculpatory evidence the Duke Police suppressed; they never revealed that, as the Durham Investigators had told them at the end of March, the rape-kit lab results were negative and Mangum had twice failed to

identify any attackers. *See, e.g.*, ¶ 306-08. The Duke Police supplied the Durham Investigators with photos of the players to conduct rigged photo lineups. *See* ¶¶ 149, 157-58, 165, 193-95, 343-51. The Duke Police and other Duke officials worked with the Durham Investigators to arrange for the players to submit to uncounseled police interrogations and to provide DNA. *See* ¶¶ 176-78, 196-98. And Duke officials helped the Durham Investigators conduct warrantless searches of student residences, including 610 North Buchanan, in connection with the rape investigation. ¶¶ 152, 394-95.

In light of these allegations, the conclusion is reasonable and plausible that the Duke Defendants agreed with Nifong and the Durham Investigators to issue the sham subpoena in the hope that doing so would conceal their prior unlawful disclosure of the key card information; if there had been no conspiracy to conceal the earlier, illegal disclosure, Nifong and the Durham Investigators would not have subpoenaed the key card information, and the Duke Defendants would have responded to any such subpoena by pointing out that they had already given Nifong and the Durham Investigators the requested information. *See* ¶¶ 543-45; *see also* Part V.B.1-2, *supra*; Pls.' Durham Opp. Parts IV, V.A, C.1-2.

Second, Defendants argue that Plaintiffs have not "adequately alleged [the] elements" of the claim of abuse of process. University Br. 39-40. We rebut this argument elsewhere. *See* Pls.' Durham Opp. Part V.C.2.

### C. The Defendants' Advice to Plaintiffs Was Wrongful (Counts 11-13)

Counts 11-13 arise out of Defendants' self-serving and detrimental advice to

18

Plaintiffs regarding how to respond to Mangum's allegation of rape and the consequent criminal investigation. Defendants contend that these counts fail because they "did not have, and did not assume, a legal duty of care to Plaintiffs." University Br. 18. Addressing each count in turn, we show that Defendants' arguments are incorrect. We note that Defendants do not dispute that, if they were subject to these duties, they breached these duties or that their breaches caused Plaintiffs injury.

### 1.    Constructive Fraud (Count 11)

In Count 11, Plaintiffs claim that the University, Brodhead, Trask, Wasiolek, and Covington abused and exploited their confidential relationships with Plaintiffs in order to serve and protect their own interests. Compl. ¶¶ 550-57. An action for constructive fraud "arises where a confidential or fiduciary relationship exists, which has led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." *Forbis v. Neal*, 649 S.E.2d 382, 388 (N.C. 2007) (quotations omitted). Defendants deny that they were in a fiduciary relationship with Plaintiffs, but their argument lacks merit. University Br. 19.

Defendants assert that courts "have uniformly rejected the proposition that a fiduciary relationship exists between universities (or their administrators) and the students enrolled there." University Br. 19. Not only is that assertion incorrect, but it is in fact belied by the very decision Defendants cite to support it: in *Davidson v. University of North Carolina*, the court remarked that "the student-university relationship, *standing alone*, does not constitute a special relationship giving rise to a duty of care," but "the

factual circumstances and policy considerations in [that] case warrant[ed]" imposing upon the university a duty of care toward its junior-varsity cheerleading squad. 543 S.E.2d 920, 927-28 (N.C. Ct. App. 2001) (emphasis added)[7]; *cf. Madey v. Duke Univ.*, No. 97-1170, 1999 U.S. Dist. LEXIS 21379, at 25, 28-31 (M.D.N.C. Dec. 1, 1999) (Beaty, J.) (rejecting Duke's argument that fiduciary relationship can never exist between university and professor), *aff'd in part and rev'd in part on other grounds*, 307 F.3d 1351 (Fed. Cir. 2002). Rather, "a fiduciary relationship may exist under a variety of circumstances, and exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Madey*, 1999 U.S. Dist. LEXIS 21379, at 25, 28-31 (Beaty, J.) (citation and quotations omitted). Put another way, a fiduciary relationship exists if "there is confidence reposed on one side, and resulting domination and influence on the other." *Strickland v. Lawrence*, 627 S.E.2d 301, 305 (N.C. Ct. App. 2006) (quotations and emphasis omitted). Accordingly, "the existence of a fiduciary relationship is determined by specific facts and circumstances, and is thus a question of fact for the jury." *Id.* (quotations omitted).

Citing the unpublished decision in *Ryan v. University of North Carolina Hospitals*, No. COA04-16, 2005 N.C. App. LEXIS 402 (N.C. Ct. App. Mar. 1, 2005), and the South Carolina Supreme Court's decision in *Hendricks v. Clemson University*, 578 S.E.2d 711

---

7 To be precise, *Davidson* involved a duty based on a "special relationship" rather than a "fiduciary relationship." We therefore discuss *Davidson* further in the context of Count 13. *See* Part V.C.3, *infra*.

(S.C. 2003), Defendants argue that two reasons weigh against finding a fiduciary relationship between a university and a student: (1) "university educators and administrators cannot" owe students "undivided loyalty … because they always remain charged with carrying out the 'rules and regulations' of the university"; and (2) "fiduciary relationships have traditionally been confined to the legal and business contexts." University Br. 20. In this case, however, these very considerations, along with others, demonstrate that there was a confidential relationship between Defendants and Plaintiffs.

First, Defendants voluntarily assumed a special role of trust. Defendants deliberately and affirmatively attempted to – and for a time did – displace the people who would ordinarily have advised the players in this situation pursuant to a confidential relationship – namely, the players' parents and lawyers. Defendant Wasiolek, Duke's Assistant Vice President for Student Affairs and Dean of Students, advised Plaintiffs not to hire a lawyer and not to tell their parents about the allegations. Compl. ¶¶ 143, 147. She and other Duke officials then referred the players to Defendant Covington, a lawyer who had Defendants' interests, not Plaintiffs', at heart. ¶¶ 169-71, 175-76, 200-01. Second, Defendants were "superior part[ies]" who possessed and asserted day-to-day authority over the players, both individually and collectively as a varsity athletic team: Dean of Students Wasiolek was a lawyer and a revered and trusted advisor to students, ¶¶ 138, 144; in contrast, Plaintiffs were young college students facing very serious, sensational charges. *See Forbis*, 649 S.E.2d at 384, 388-89 (where elderly aunts designated their nephew their "attorney-in-fact," nephew owed aunts fiduciary duty).

Defendants enhanced their superior position relative to the players by acting through Coach Pressler and Athletic Director Kennedy, whose son had been a captain of the 2005 lacrosse team. Compl. ¶¶ 141, 147, 168-69, 179, 200.

Third, the advice given by Defendants to Plaintiffs was legal in character, not academic or athletic. Defendants advised Plaintiffs not to hire a lawyer to represent them in an ongoing criminal investigation (violating Wasiolek's duties under North Carolina Rule of Professional Conduct 4.3). They instructed Plaintiffs to cooperate with the police and then directed Plaintiffs to meet with a particular lawyer, Covington, who, purporting to act as "the unofficial legal advisor to everyone," discouraged Plaintiffs from hiring a lawyer and then arranged for and encouraged Plaintiffs to give uncounseled interviews and DNA to the Durham Investigators. *See* ¶¶ 143, 146, 173, 175-77, 179, 196-97, 200-01, 203. Fourth, Defendants exploited their superior position in order to solicit and obtain confidential information from Plaintiffs. For example, invoking the fictitious "student-administrator privilege," Executive Vice President Trask demanded that the co-captains tell him the details of the party. *See* ¶¶ 141-42, 171, 225-28, 286-88. Fifth, Defendants were not carrying out or enforcing University rules in advising Plaintiffs, nor were their self-serving actions compelled by any University rule or regulation.

In sum, Plaintiffs reposed their trust and confidence in Defendants, and Defendants in return dominated and influenced Plaintiffs. Under these circumstances, therefore, Defendants had a confidential and fiduciary relationship with Plaintiffs. In contrast, *Ryan* and *Hendricks*, as well as the other decisions cited by Defendants, *see*

22

University Br. 21 n.12, involved everyday consultations with school officials about academic performance and requirements.[8]

### 2. Voluntary Undertaking (Count 12)

Defendants advance a number of objections to Count 12, which would hold the University, Brodhead, Trask, Wasiolek, and Covington liable for breaching their duty to conduct a voluntary undertaking with care. Compl. ¶¶ 559-64.

First, Defendants attempt to paint their actions as a typical instance of "providing advice to students about difficulties they face in their personal lives" or "educational malpractice," as if Plaintiffs were dissatisfied with guidance they received about which courses to take. University Br. 21-23 & n.14 (citing, among other decisions, *Hendricks*, 578 S.E.2d at 711, 715 (advising about academic credits for athletic eligibility); *Peter W. v. San Francisco Unified Sch. Dist.*, 131 Cal. Rptr. 854, 857-61 (Cal. Ct. App. 1978) (teaching of reading and writing)). From this premise, Defendants argue that there is no "readily acceptable standard[] of care" and that imposing a duty of care would expose schools to unlimited liability and thus discourage them from providing needed services.

---

[8] *See Ryan*, 2005 N.C. App. LEXIS 402, at 8-12 (doctors who served as medical resident's "teachers" and faculty "advisors" did not have fiduciary relationship with resident); *Hendricks*, 578 S.E.2d at 713, 715-16 (student's consultation with "athletic academic advisor" about credits necessary to be eligible to play baseball did not create fiduciary relationship); *Shapiro v. Butterfield*, 921 S.W.2d 649, 651 (Mo. Ct. App. 1996) ("bare allegations" insufficient to show "faculty advisor" had fiduciary relationship with graduate student); *Morris v. Brandeis Univ.*, No. CA 00-2161, 2001 Mass. Super. LEXIS 518, at 18-19 (Mass. Sup. Ct. Sept. 4, 2001) (plaintiff's mere "status as a student" insufficient to create fiduciary relationship with college).

University Br. 22-24.  But, as explained above, this is not an accurate description of Defendants' conduct.  Rather, Defendants deliberately displaced those who would be the players' most trusted advisors – their parents and lawyers – and then guided the players about matters that were legal in nature.  *See* Part V.C.1, *supra*.  Accordingly, there are readily acceptable standards of care here, including North Carolina Rule of Professional Conduct 4.3.  *See* Compl. ¶ 146.  And the scope of Defendants' potential liability was entirely within their control.  Defendants worry specifically about "tort suits based on advice that turns out to be mistaken."  University Br. 22, 24.  But here, Defendants intentionally or recklessly gave advice at war with the players' interest because they intended to protect Duke, even at the expense of Plaintiffs.  *See* Part V.C.1, *supra*.  Having assumed the role of confidential counselor, including legal advisor, Dean Wasiolek and the other Defendants were bound by a duty of care.

Second, Defendants claim that the duty to perform a voluntary undertaking with care applies only if the resulting harm is physical.  University Br. 23-24.  As shown below, that is not North Carolina law; the better view is that Defendants are liable at least for the type of harm from which they undertook to protect Plaintiffs.  *See* Part V.D, *infra*.  Defendants undertook to protect Plaintiffs from the ordeal of a criminal investigation for rape and the predictable consequences of that investigation: reputational harm, severe emotional distress, economic loss, and deprivation of educational, athletic, and professional opportunities.  *See* Compl. ¶¶ 141-47, 168-79, 196-204, 225-28, 562.  They are, therefore, liable for those harms, which resulted from their failure to provide

reasonable protection against such harms. *See, e.g.*, ¶ 562. In any event, Plaintiffs suffered harms that were physical or that were tied to a physical harm: they were subjected to threats of violence, had to flee their homes, and lost their opportunity in 2006 to play for a national lacrosse championship. *See* ¶¶ 217, 284-85, 316-21, 357, 475, 562.

Third, Defendants contend that they had no duty because they did not "play[] any part" in the party at which the bogus rape allegedly occurred. University Br. 24. That is irrelevant because the duty at issue does not relate to the school's oversight of the party (Plaintiffs do not contend, *e.g.*, that they were injured during the party). Rather, the duty at issue relates to Defendants' voluntary advice about how Plaintiffs should respond to the rape allegations.

### 3. Special Relationship (Count 13)

In Count 13, Plaintiffs claim that the University and Brodhead breached their duty to protect Plaintiffs from the harms they suffered, which Defendants owed because of the special relationship of mutual benefit and control between them and Plaintiffs. Compl. ¶¶ 566-73. Defendants contend incorrectly that "the alleged omissions fall outside the scope of any special relationship that might have existed." University Br. 25.

First, Defendants stress that " 'the student-university relationship, standing alone, does not constitute a special relationship giving rise to a duty of care.' " University Br. 26 (quoting *Davidson*, 543 S.E.2d at 928). This point is irrelevant because, as Defendants then recognize, Plaintiffs contend that the special relationship is specific to

their status as players on the University's varsity lacrosse team.  *See* Compl. ¶¶ 566-68; University Br. 26-27.

Second, relying on the Second Restatement and *Davidson*, Defendants maintain that, if they owed a duty because of a special relationship, then it extended only to protecting Plaintiffs from injuries suffered during "an official, school-sponsored activity over which the school exercised considerable control."  University Br. 27.  As Defendants see it, they are liable only for injuries Plaintiffs suffer "in the course of playing lacrosse."  Defendants further posit that the relevant activity for purposes of Count 13 was the party at which the rape allegedly occurred.  University Br. 27.  As we explained in the context of Count 12, however, the status of the party is irrelevant because Plaintiffs do not claim that they were injured at the party.  *See* Part V.C.2, *supra*.

More fundamentally, neither the Second Restatement nor *Davidson* restricts Defendants' special relationship with, and therefore duty to, the players to the lacrosse field.  The cited comment from the Restatement does limit the duty to risks of harm that "arise[] in the course of [the special] relation," RESTATEMENT (SECOND) TORTS § 314A cmt. *c*, but Defendants have too narrow of a view of what that standard means.  That comment explains, for example, that the duty of a common carrier ends when the person "has left the vehicle and ceased to be a passenger" and that the duty of a possessor of land ends when the person "has ceased to be an invitee."  *Id*.  Analogously, Plaintiffs' injuries would have been outside Defendants' duty if Plaintiffs had ceased to be Duke lacrosse players or if Plaintiffs were injured while engaged in an activity unrelated to their status

as lacrosse players.  But Plaintiffs were injured while they were Duke lacrosse players and specifically because they were Duke lacrosse players: they were vilified as criminals, harassed, and threatened because they were members of the Duke lacrosse team, s*ee* Compl. ¶¶ 138, 141-43, 149, 155-59, 165, 168-69, 176-79, 189, 193-94, 204-06, 210, 212-13, 216-17, 230-34, 242-66, 271-73, 278, 280-85, 299-03, 308, 314-21, 324-26, 343-46, 366-75, 383-84, 399, 405-07, 430-32, 473-75, 478; and the University punished them as lacrosse players by launching an investigation into the entire team's past behavior, by firing the team's coach, and by suspending and then cancelling the team's season, *see* ¶¶ 141-43, 224-26, 229, 235-38, 289, 355-56, 360, 362-63, 408, 476-77.

That Plaintiffs' injuries were not suffered "in the course of playing lacrosse," University Br. 27, does not place them outside their special relationship with Defendants. Some of the harms Plaintiffs suffered involved their on-field activities, namely, the suspension and then cancellation of the season.  And the other harms Plaintiffs suffered arose in the course of their special relationship with Defendants.  The court in *Davidson* did, as Defendants note, "emphasize that [its] holding is based on the fact that plaintiff was injured while practicing as part of a school-sponsored, intercollegiate team."  543 S.E.2d at 928.  The context of that remark, however, makes clear that the court did not mean to require that the injury occur during a school-sponsored team event; rather, the court meant only to explain that "the student-university relationship, standing alone, does not constitute a special relationship giving rise to a duty of care."  *Id*.

Like the plaintiff in *Davidson*, the special relationship between Plaintiffs and

Defendants here was built on Defendants' control of the lacrosse team's conduct off the field, including its control of the team's academic performance and public behavior and image, in order to garner prestige and economic advantage for the University – indeed, the University treated the team as ambassadors and representatives of the University to other students, the local community, the nation, and the world at large. *See, e.g.*, Compl. ¶¶ 83-89; *Davidson*, 543 S.E.2d at 923, 927 (special relationship where school imposed special academic requirements on cheerleaders, used them as representatives at trade show as well as athletic events, and regulated their public conduct). By exerting control and authority over the players' conduct both on and off the field, and in particular over the team's public image, Defendants had a duty to attempt to protect Plaintiffs from public vitriol, harassments, threats, and similar harms. *See id.* at 927 ("Fairness in such cases thus may require the defendant to use his power to help the plaintiff, based upon the plaintiff's expectation of protection, which itself may be based upon the defendant's expectation of financial gain."); LOGAN & LOGAN, NORTH CAROLINA TORTS § 2.20, at 28 (2d ed. 2004) (In a special relationship, "the plaintiff is typically in some respect particularly vulnerable and dependent upon the defendant who, correspondingly, holds considerable power over the plaintiff's welfare. In addition, such relations have often involved some existing or potential economic advantage to the defendant.").

Finally, Defendants posit that holding them liable would "discourage students from taking responsibility for their actions." University Br. 28. But the threats, harassment, reputational harm, emotional distress, economic loss, and loss of educational

and athletic opportunities suffered by Plaintiffs were not the natural, foreseeable, and justified "repercussions" of Plaintiffs' decision to attend the party or anything they did at that party. *See* University Br. 27. Rather, they were the natural and foreseeable repercussions specifically of the wrongful acts of the Duke and Durham Defendants, as alleged in detail in the Complaint. Justifying these harms as a kind of punishment for the players' party, as Defendants suggest, would not teach them to take responsibility for their actions; it would teach them that they have been victimized by the laws and the court no less than by Mangum, Nifong, Levicy, Gottlieb, and the other Defendants.

### D. The Defendants' Failure to Protect Plaintiffs from Harassment Was Tortious (Count 14)

In Count 14, Plaintiffs claim that Defendants breached their duty to protect Plaintiffs from harassment. Compl. ¶¶ 575-81. None of Defendants' objections has merit. First, Defendants argue that, because the University's "bulletins and handbooks are not binding contracts," the bulletins and handbooks cannot be the basis of a duty of care. University Br. 16-17. We refute this argument at length below. *See* Part V.E, *infra*. Moreover, *Rucker v. First Union National Bank*, 389 S.E.2d 622, 624-25 (N.C. Ct. App. 1990), upon which Defendants rely, is inapposite because it involved an employee manual: as explained below, the rule that employee handbooks are not contractually binding would be undermined if a claim of negligence could be based on an employee handbook; because student bulletins, handbooks, and other university publications may bind the school contractually, however, resting a duty of care upon such publications does not raise a similar problem. *See* Part V.E, *infra*.

Second, Defendants maintain that Count 14 fails because "the 'voluntary undertaking' doctrine is available only to a plaintiff who has suffered physical injury – or, perhaps, injury to property." University Br. 17. As shown above, however, Defendants' breach of their duty caused Plaintiffs harms that were physical or that were tied to a physical harm. *See* Part V.C.2, *supra*. (Defendants do not dispute that their conduct breached their duty if they had one, or that their breach injured Plaintiffs.)

In any event, Defendants have not described North Carolina law accurately. The two North Carolina decisions cited by Defendants spoke in terms of physical harm to person or property because that was all that was at issue, and the treatise cited by Defendants merely quotes the Second Restatement, which, as discussed presently, does not establish Defendants' position. *See* University Br. 17 n.9; *Firemen's Mut. Ins. Co. v. High Point Sprinkler Co.*, 146 S.E.2d 53, 60-62 (N.C. 1966) (pipe burst, damaging building); *Pinnix v. Toomey*, 87 S.E.2d 893, 897-901 (N.C. 1955) (damage to building from construction activity); NORTH CAROLINA TORTS § 2.20, at 30 n.19. The North Carolina courts have in fact not resolved this issue, but the better rule is that the liability of a defendant who voluntarily undertook to protect a plaintiff from a particular type of harm should encompass at least the resulting harm of that type. If a defendant does not want to be liable for that type of harm, he can decline the undertaking.[9] *Cf. Johnson v.*

---

[9] Both versions of the Restatement of Torts cited by Defendants are consistent with the rule that liability may be limited to physical harm only if the harm against which the defendant sought to protect the plaintiff was solely physical. *See* University Br. 17; RESTATEMENT (SECOND) OF TORTS § 323 ("One who undertakes … to render services to

*Ruark Obstetrics & Gynecology Assocs., P.A.*, 395 S.E.2d 85, 97 (N.C. 1990) ("Where …

a plaintiff … has suffered severe emotional distress as a proximate result of the

defendant's negligence, the plaintiff need not allege or prove any physical impact,

physical injury, or physical manifestation of emotional distress in order to recover on a

claim for negligent infliction of emotional distress.").  Here, Defendants, by adopting,

promulgating, and enforcing anti-harassment policies, voluntarily undertook to protect

Plaintiffs from harassment by Duke professors, students, and employees.  *See, e.g.*,

Compl. ¶¶ 575; Part V.E., *infra*.  Defendants are therefore liable for their failure to

protect Plaintiffs from that type of harm.

    Moreover, the limitation of liability to physical harm would not apply here

because Defendants' undertaking to protect Plaintiffs from harassment was reinforced by

the University's contractual duties to protect Plaintiffs from harassment, as discussed

below.  *See* Compl. ¶ 576; *Chew v. Paul D. Meyer M.D., P.A.*, 527 A.2d 828, 831-33

(Md. Ct. Spec. App. 1987) ("[E]ven if the doctor's initial contractual duty to provide

---

another which he should recognize as necessary for the protection of the other's person or
things, is subject to liability to the other for physical harm resulting from his failure to
exercise reasonable care to perform his undertaking …."); RESTATEMENT (THIRD) OF
TORTS § 42 & cmt. *a* (Proposed Final Draft No. 1) (2005) ("An actor who undertakes to
render services to another that the actor knows or should know reduce the risk of physical
harm to the other has a duty of reasonable care to the other in conducting the undertaking
…" and accordingly the actor's liability for the breach is "limited … to physical harm").
As the Third Restatement's subtitle – "Liability for Physical Harm" – indicates, the entire
Third Restatement "is limited to liability for physical harm"; the conditions under which
one may be liable for nonphysical harm are "left to the Restatement Second of Torts … ,
the developing case law, and future Third Restatement efforts."  *Id*. § 4 cmt. *d* (Proposed
Final Draft No. 1).

medical and surgical treatment did not include the obligation to complete and submit the insurance form, it established a sufficiently 'intimate nexus' to support a tort claim if Dr. Meyer gratuitously undertook that obligation and then performed it in such a negligent manner that economic loss to [the plaintiff] resulted."); Part V.E, *infra*.

### E. The Defendants Breached Their Contractual Duties (Counts 15-17)

Counts 15-17 alleged that Defendants' breached various contractual duties owed to Plaintiffs. Defendants primarily dispute that they were subject to any contractual duties. We concede that Count 17 fails as a matter of law for the reason identified by Defendants. *See* University Br. 15; *Home Elec. Co. of Lenoir, Inc. v. Hall and Underdown Heating and Air Conditioning Co.*, 358 S.E.2d 539, 542-45 (N.C. Ct. App. 1987), *aff'd without opinion*, 366 S.E.2d 441 (N.C. 1988). But Defendants' objections to Counts 15 and 16 are without merit.

Count 15 seeks to hold the University liable for breaching several contractual promises it made to Plaintiffs: the University failed to implement and enforce its anti-harassment commitment as set forth in its 2005-06 Undergraduate Bulletin, the Faculty Handbook, and other documents, by making no effort to stop, and at times even fostering, the protests, condemnation, and vilification that Duke students, faculty, and staff directed toward Plaintiffs; the University failed to afford Plaintiffs various procedural rights as set forth in the Bulletin, by condemning, punishing, and otherwise treating Plaintiffs, both publicly and privately, as guilty of the alleged gang rape or the alleged conspiracy to cover it up, despite the overwhelming exculpatory evidence in the University's

possession or reasonably available to the University; and the University cancelled the lacrosse team's season and fired its coach in bad faith and for illegitimate reasons. Compl. ¶¶ 583-96. Defendants contend that this claim fails because Plaintiffs have not alleged "the mutual manifestation of an intent to be bound," that is, an agreement. University Br. 10. Defendants are wrong.

There is a national consensus that "the basic legal relation between a student and a private university or college is contractual in nature. The catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the contract," as does a duty to act in good faith. *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992) (quotation marks omitted); *see, e.g.*, *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998); *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 472-74 (Minn. Ct. App. 1999); *Bleicher v. University of Cincinnati College of Med.*, 604 N.E.2d 783, 787-88 (Ohio Ct. App. 1992); *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206-07 (S.D.N.Y. 1998); *see also Gallimore v. Daniels Constr. Co.*, 338 S.E.2d 317, 319 (N.C. Ct. App. 1986) ("Every contract or agreement implies good faith and fair dealing between the parties to it ….").[10] In North Carolina, as in most other jurisdictions, courts disfavor claims that require "inquiry into the nuances of educational processes and theories" or into whether the education provided "was not good enough," but courts in North Carolina

---

[10] Contrary to Defendants' suggestion, the Fourth Circuit did not hold in *Tibbetts v. Yale Corp.* that "student bulletins are not contracts," University Br. 11 n.4; rather, applying Virginia law, it held only that, under the circumstances, a particular section of the student handbook was not binding. 47 Fed. Appx. 648, 656 (4th Cir. 2002).

will make "an objective assessment of whether the institution made a good faith effort to perform on its promise" if that promise is "specific." *Ryan v. University of N.C. Hosps.*, 494 S.E.2d 789, 791 (N.C. Ct. App. 1998) (quotation marks omitted); *see also Alsides*, 592 N.W.2d at 472-74; *Ross*, 957 F.2d at 416-17; *Gally*, 22 F. Supp. 2d at 207.   More generally, "[t]he proper standard for interpreting the contractual terms is that of reasonable expectation – what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." *Mangla*, 135 F.3d at 83 (quotation marks omitted).  Whether a school made a specific and therefore enforceable promise is a question of fact.  *See Ryan*, 494 S.E.2d at 791; *Ross*, 957 F.2d at 417; *Mangla*, 135 F.3d at 83-84.

Under these principles, the University was contractually bound to provide an environment for Plaintiffs in which harassment by fellow students, faculty, and staff was not tolerated; to afford Plaintiffs various procedural rights in disciplinary matters; and to provide Plaintiffs with the opportunity to play lacrosse for Coach Pressler (or at least not to deny that opportunity in bad faith and for illegitimate reasons).  Plaintiffs do not claim that the University failed to provide an education – or, for that matter, procedural protections or athletic opportunities – that were "good enough."  Rather, Plaintiffs claim that Defendants failed to follow through on at least three specific non-academic promises. *First*, the Bulletin sets forth a specific anti-harassment policy, to which University faculty, staff, and students are subject: "Harassment" – which is defined as "verbal or physical conduct … that, because of its severity and/or persistence, interferes

significantly with an individual's work or education, or adversely affects an individual's living conditions" – "of any individual for any reason is not acceptable at Duke University."  Compl. ¶¶ 584-85; *see also Bulletin of Duke University 2005-2006: Information and Regulations* at 2 ("The university ... does not tolerate harassment of any kind") [hereinafter *Bulletin*], *available at* http://registrar.duke.edu/bulletins/inforeg/2005-06/inforegsbulletin2005-06.pdf.  *Second*, the Bulletin contains a similarly express guarantee of procedural rights in disciplinary matters, including that "[a]ccused students can expect a presumption of innocence throughout the disciplinary process unless found responsible through a fair and impartial hearing, and will be treated with respect throughout the process."  Compl. ¶ 593.  *Third*, the players had a contractual right to complete the 2006 season, and to do so under Coach Pressler.  Many of the players were recruited to Duke specifically on the basis of Duke's promise that they would have the opportunity to play on a Division I varsity lacrosse team and to compete for conference and national championships under Coach Pressler, who had gained a national reputation after turning Duke's lacrosse team into one of the most successful programs in the country.  ¶¶ 83-84, 591.  Under the circumstances, then, the University should reasonably have expected that Plaintiffs would understand that it had made the promises at issue.  *See* ¶¶ 589-91, 593-94; *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 35 (1st Cir. 2007) (under Rhode Island law, "the [student] handbook designates the rudimentary contractual terms between the parties *vis-a-vis* the appeal process" in disciplinary matters); *Atria v. Vanderbilt Univ.*, 142 Fed. Appx. 246, 255 (6th Cir. 2005) (under Tennessee law,

"disciplinary action by the university" is not "academic" and therefore disciplinary procedures specified in handbook bound university).

Defendants' objections are meritless. First, with respect to the anti-harassment policy and the procedural rights, they argue that "this Court has twice specifically ruled that Duke University's student bulletin is not an enforceable contract." University Br. 10-11, 13 n.6. To the extent that Defendants mean to suggest that North Carolina law categorically bars contract actions based on the Bulletin or similar documents, their position must be rejected in light of, among other decisions, *Ryan*, in which the North Carolina Court of Appeals held that the "Essentials of Accredited Residencies" contractually bound the University of North Carolina "to provide a one month rotation in gynecology" to a graduate medical student. *Ryan*, 494 S.E.2d at 791 (quotations omitted). Indeed, the court in one of the two decisions cited by Defendants – *Mercer v. Duke Univ.*, No. 97-959 (M.D.N.C. Sept. 28, 2000) (slip op. attached to University Brief as Exhibit 2) – noted *Ryan* and concluded it was "beyond cavil that the relationship between a university and its students is fundamentally 'contractual in nature.' " Slip op. 13.

But even without *Ryan*, neither decision cited by Defendants would compel dismissal of Plaintiffs' claim. In *Love v. Duke University*, which was decided long before the North Carolina Court of Appeals' decision in *Ryan*, the court adverted to two grounds to justify its decision that the University did not breach the terms of the Bulletin by dismissing Love from a graduate program after he received two failing grades: (1) the

court found that Love had not fulfilled a condition precedent to the University's

obligation; and (2) consistent with *Ryan*'s reluctance to inquire into the nuances of

educational processes and theories, the court thought that "great deference must be given

to" the University's decision because "academic dismissals are wholly discretionary."

776 F. Supp. 1070, 1075 (M.D.N.C. 1991), *aff'd*, No. 91-2263, 1992 U.S. App. LEXIS

5802 (4th Cir. Mar. 30, 1992) (per curiam) (unpublished).  Here, the University does not

contend that it was discharged of its contractual duties by Plaintiffs' failure to fulfill a

condition precedent, and as just noted, none of the breached promises at issue relates to

the University's academic policies and prerogatives.

And in *Mercer*, the court erroneously analogized the University's student

handbook to an employee handbook.  *See* Slip op. at 14-15.  The cases addressing the

enforceability of an employee handbook that were cited in *Mercer*, and by Defendants,

*see* University Br. 11-12, involved a claim that the employer terminated an employee in

violation of rules specified in a handbook (or elsewhere outside the primary written

employment contract).  In that context, the rule that an employee handbook is not

enforceable unless expressly incorporated into the employment contract ensures that a

unilaterally promulgated handbook does not disrupt the express agreement of the parties

or an important default rule against which the parties are presumed to have acted.  More

specifically, if the parties' written employment contract specifies that the employer may

terminate the employee only for cause pursuant to certain procedures, then basic

principles of contract law dictate that a separate, unilaterally promulgated document may

not vary that agreement.  *See Black v. Western Carolina Univ.*, 426 S.E.2d 733, 736

(N.C. Ct. App. 1993).  And if the parties have not reached such an express agreement,

then North Carolina law provides the default rule – the employment relationship is

"terminable by either party at will."  *E.g.*, *Griffin v. Housing Auth. of Durham*, 303

S.E.2d 200, 201 (N.C. Ct. App. 1983).  Express incorporation of an employee handbook

shows that the parties intended to override this default rule of at-will employment.  In

contrast, in the context of the university-student relationship, as here, there is no separate

express agreement or default rule that would be disrupted by the enforcement of bulletins,

catalogues, circulars, or similar school publications.  In fact, as *Ryan*, *Ross*, and other

decisions (some of which were just cited) show, the specific terms of the bulletins and

other such documents are the very terms of the agreement that bind the University.

Defendants argue that decisions from the employment context are instructive

because they show that courts should refrain from enforcing the terms of the University's

Bulletin and other written commitments in order to "avoid[] excessive interference in [the

University's] affairs."  University Br. 12.  As Defendants see it, "anti-harassment policies

must be balanced against principles of academic freedom … and the right of the

university to insist that its students and employees observe standards of behavior."

University Br. 12.  But "insist[ing] that its students and employees observe standards of

behavior" is the very purpose of establishing such standards expressly in the University

Bulletin and other written commitments.  By creating and promulgating those written

policies, the University already struck the balance it deemed appropriate; Plaintiffs

merely ask the court to hold the University to its express promises.  Moreover, the severe

and prolonged harassment to which Plaintiffs were subjected can hardly be considered a

legitimate expression of academic thought or an appropriate punishment for acts the

University knew or should have known Plaintiffs did not do.[11]

Second, Defendants argue that their view that the Bulletin was not binding "is

bolstered by the fact that [it] expressly reserves Duke's right to change it at any time."

University Br. 12 n.5.  But in general, "[w]hile [the University] could disclaim the

existence of a specific promise through the use of such a disclaimer, it could not

unilaterally disclaim all contractual relations between the parties."  *Gally*, 22 F. Supp. 2d

at 206 n.7 (citation omitted); *see also Atria*, 142 Fed. Appx. at 255 (under Tennessee law,

student handbook's terms enforceable as implied contract even though handbook stated

that its policies "do not constitute a contract").  In any event, even if the University could

have reserved the right to modify any terms unilaterally, it did not do so.  Rather, the

Bulletin expressly reserves the right to change only matters relating to academics:

"programs of study, academic requirements, teaching staff, the calendar, and other

matters described herein."  *Bulletin* at 2.  This language contrasts with the expansive

language in the cases cited by Duke.  *Cf. Abbariao v. Hamline Univ. Sch. of L.*, 258

---

[11] In *Rollins v. Cardinal Stritch Univ.*, which Defendants quote, *see* University Br.
12-13, the Minnesota Court of Appeals held that requiring "strict compliance with every
provision" of a student handbook might "interfer[e] beyond an acceptable degree in [the
university's] discretion to manage its affairs," where the school had "substantially
complied with" the handbook's terms.  626 N.W.2d 464, 471 (2001) (quotations
omitted).  Even if *Rollins* reflected North Carolina law, it would not bar Plaintiffs' claim
because Defendants utterly failed to perform the promises at issue.

N.W.2d 108, 114 (Minn. 1977) (bulletin stated, "all provisions within this bulletin are subject to change without notice"); *Robinson v. Univ. of Miami*, 100 So. 2d 442, 443 (Fla. Dist. Ct. App. 1958) (bulletin stated, "The University reserves the right to change any provision or requirement at any time within the student's term of residence.").[12]  The reservation, therefore, is irrelevant because, as noted above, Plaintiffs do not challenge the University's conduct of academic matters.  More importantly, even if the University could and did reserve the right to alter unilaterally the Bulletin's anti-harassment policy and procedural protections *prospectively*, it surely could not have altered these policies *retrospectively*.  Nor could Duke reasonably have expected that Plaintiffs would believe that the University could dispense entirely with such fundamental protections, as it in effect did in the course of the rape hoax.  No prospective student or parent would select a school that reserved the power to permit and even foster the harassment of the student or to vilify and punish the student for acts the school knew or should have known the student did not do.

Third, Defendants maintain that the University did not break the Bulletin's promise of procedural rights because Plaintiffs "nowhere allege … that any of them was ever subjected to student disciplinary proceedings, arising out of the lacrosse incident or otherwise, or that they ever sought the protections of these procedural safeguards."

---

[12] Pursuant to the principle of *ejusdem generis*, the general term "other matters" should be understood to reach only matters of the same type as those specifically mentioned – *i.e.*, academic matters, *see John L. Roper Lumber Co. v. Lawson*, 143 S.E. 847, 850 (N.C. 1928) – not to reach all matters discussed in the Bulletin.

University Br. 13 n.6.  (Notably, Defendants do not dispute that, if they were bound by the anti-harassment policy or the promises relating to the lacrosse season and Coach Pressler, they breached those promises.)  But that is precisely our point – the University did not initiate formal disciplinary proceedings against Plaintiffs; yet it plainly did, as detailed in the Complaint, take disciplinary actions against them, including: cancelling games, Compl. ¶¶ 11, 228, 236-38; suspending the season, ¶ 289; cancelling the season, ¶¶ 258, 355-56, 358, 363, 591; firing Coach Pressler, ¶¶ 355-58, 361-63, 591; publicly implying – through affirmative statements as well as tolerance and even fostering of condemnatory and harassing protests, posters, and statements by Duke faculty, students, and staff – that Plaintiffs were rapists or accomplices, *see* ¶¶ 106, 111, 138-40, 142, 174, 225, 231-32, 234-38, 245-49, 258, 260-63, 274-77, 279, 289, 296-98, 306, 308, 312, 322-23, 355-58, 361-65, 386, 392, 414-16, 420,  446, 449-55; and investigating the team's past disciplinary records, *see* ¶¶ 360, 408-11, 446.  Even the implied covenant of good faith and fair dealing precluded the University from summarily punishing Plaintiffs without first initiating a formal disciplinary proceeding and according them basic procedural protections.

Fourth, Defendants argue that there was no enforceable promise to provide Plaintiffs with the opportunity to play lacrosse or to do so under Coach Pressler because Plaintiffs' own, one-sided " 'understanding' that they would play lacrosse is not sufficient" to establish a "meeting of the minds."  University Br. 13-14.  In fact, Plaintiffs allege that they were recruited to Duke on the basis that they would have those

opportunities, which is to say, the University induced Plaintiffs to enroll by making such a promise.  Compl. ¶ 591.  Accordingly, the University shared Plaintiffs' understanding, and therefore that mutual understanding was binding.

Fifth, Defendants suggest that North Carolina law does not "recognize[] a breach of contract claim based on a university's cancellation of an extracurricular activity." University Br. 14.  Defendants cite no North Carolina decisions to support that proposition.  And the decisions from other jurisdictions cited by Defendants establish that whether the cancellation of an extracurricular activity constitutes a breach of contract depends on the terms of the contract and the circumstances of the school's action.  *See Hysaw v. Washburn Univ. of Topeka*, 690 F. Supp. 940, 946-47 (D. Kan. 1987) (school did not breach scholarship agreement by dismissing players from team because agreement promised only that school would pay students money); *Jackson v. Drake Univ.*, 778 F. Supp. 1490, 1493 (S.D. Iowa 1991) (school did not breach financial aid agreements by, in effect, forcing plaintiff off basketball team because agreements contained no explicit or implicit promise that plaintiff would play basketball); *Hendricks v. Clemson Univ.*, 578 S.E.2d 711, 717 (S.C. 2003) (school never promised expressly or impliedly to ensure plaintiff's academic eligibility to play baseball).  Here, as discussed above, the University recruited the players on the basis that they would have the opportunity to play varsity lacrosse, and to do so for Coach Pressler.  Perhaps the University retained the right to cancel the season and fire the coach in good faith and for legitimate reasons, but the University could not reasonably have expected Plaintiffs to

select Duke if the University could wipe out their season when the University knew or should have known that the allegations that the players committed or concealed a rape were false, or if the University could fire their coach when the University knew or should have known that the players did not commit the crimes the coach ostensibly failed to prevent and when the coach in fact had adequately overseen the team's conduct. *See, e.g.*, Compl. ¶¶ 355-65. Duke's admission that its cancellation of the season and firing of the coach were "not about the truth," ¶ 361, highlights its failure to abide by its covenant of good faith and fair dealing with the students.

Finally, Defendants contend that Count 16, which claims that these contractual breaches were tortious, fails because Plaintiffs have not alleged "a tort which partakes some element of aggravation" that accompanies the breaches of contract. University Br. 14 n.7 (quotation marks omitted). In order to state a claim for tortious breach of contract such that the plaintiff is entitled to punitive damages, "there must be an identifiable tort" – either the breach of contract itself or an "accompan[ying]" act – "which is accompanied by or partakes of some element of aggravation." *Cash v. State Farm Mut. Auto. Ins. Co.*, 528 S.E.2d 372, 377 (N.C. Ct. App. 2000) (quotation marks omitted). "Aggravation includes fraud, malice, such a degree of negligence as indicates a reckless indifference to consequences, oppression, insult, rudeness, caprice, [and] willfulness." *Id.* (quotation marks omitted). The Complaint more than satisfies these requirements. The University's contractual breaches – failing to enforce the anti-harassment promise; failing to accord Plaintiffs their rightful procedural protections by, for example, summarily punishing and

otherwise treating Plaintiffs as guilty of rape or concealing rape even though the University knew or should have known they were innocent and by refusing to consider Plaintiffs' proffers of exculpatory evidence; and, in bad faith and or illegitimate reasons, denying Plaintiffs the opportunity to play lacrosse and to do so under Coach Pressler – were tortious themselves and were accompanied by tortious acts. *See* Compl. ¶¶ 486-87, 493, 501, 506, 514, 520-21, 527, 551-52, 559-61, 570, 577-78, 608, 616, 645 (Counts 1-7, 10-14, 18-19, 23).

Further, these tortious acts were aggravated in various ways. *See ¶¶* 486-87, 493, 503, 506, 509, 514, 517, 520, 525, 530, 557, 564, 573, 581, 612, 618, 648. For example, the University was intentionally or recklessly indifferent to the severely and obviously harmful consequences of its contractual breaches – indeed, the University ignored the repeated pleas of players' parents that the University try to prevent further harassment, and it contemporaneously acknowledged that cancelling the season and firing the coach were "not fair." *See ¶¶* 83-87, 89, 243-47, 251-66, 282-85, 289, 299-303, 316, 362-63, 366-75, 392, 405-407, 444-55, 474-79. The University also intentionally or recklessly added insult to injury by fomenting the harassment of the students; by publicly implying that Plaintiffs were guilty of gang rape or conspiring to conceal a gang rape, even though it knew or should have known those allegations were false; by singling out the lacrosse team for an investigation into their past disciplinary records; and by refusing to consider Plaintiffs' proffers of exculpatory evidence or even to meet with Plaintiffs despite meeting with those who openly condemned Plaintiffs, *see ¶¶* 240-41, 266, 290-91, 300,

357-59, 393. And the University fraudulently impeded Plaintiffs' ability to obtain advice from people who served their interests rather than the University's. *See* Part V.C.

## F. The Defendants Intruded upon Plaintiffs' Seclusion (Count 18)

Count 18 claims that Defendants Duke University, Brodhead, Trask, Lange, Burness, and Moneta intruded on Plaintiffs' seclusion. Compl. ¶¶ 607-12. Duke concedes that "intrusion upon seclusion 'is defined as the intentional intrusion physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns … [where] the intrusion would be highly offensive to a reasonable person.' " Duke Br. 45 (quoting *Toomer v. Garrett*, 574 S.E.2d 76, 90 (N.C. Ct. App. 2002) (quotation marks omitted)). Nevertheless, Duke maintains that Plaintiffs have failed to make sufficient allegations to state such a claim. This is yet another attempt by Duke to rewrite the Complaint and wish away allegations that amply support Plaintiffs' counts. The Complaint alleges at least three different examples of intrusion on seclusion.

First, the Complaint alleges "physical invasions on the Plaintiffs' homes." Compl. ¶ 608. For example, on March 16, "Duke officials had given Gottlieb keys to the house, which Duke owned and rented to three of the four lacrosse co-captains." ¶ 162. By providing a key to a private residence to a police officer known for his biased and abusive law enforcement practices against students, *see* ¶¶ 134-35, Duke intruded on the privacy of Plaintiffs. Duke simply ignores this allegation.

Second, Duke subjected the Plaintiffs to "uncounseled, surprise interrogations by the Durham Investigators in their private residences and dorms." ¶ 608. Duke argues that

there was no allegation that any Duke employee participated in this scheme. Not so. The Complaint alleges that the warrantless searches of the dormitories and the uncounseled interrogations "were facilitated by Duke's cooperation." ¶ 394. Duke further objects that surprise interrogations in a dormitory room do not intrude on private affairs, but the decisions Duke cites do not support such a counterintuitive result. In *Jennings v. University of N.C.*, a sexual harassment suit against UNC's soccer coach, the Fourth Circuit dismissed a common law privacy claim because "none of the defendants either required [the plaintiff] to disclose personal information or invaded her records to discover such information." 482 F.3d 686, 702 (4th Cir. 2007). The decision says nothing about police interrogations in dormitory rooms, and, if anything, strongly suggests that Duke's provision of key card data in violation of FERPA was itself an intrusion on seclusion. In *Keyver v. Amerlink*, the plaintiff merely challenged questioning imposed by private actors in a "law office" and a "flower shop," not police interrogations in a dormitory room. 618 S.E.2d 768, 772 (N.C. Ct. App. 2005). Here again, it is hard to imagine a more profound intrusion on privacy than unleashing biased police officers to conduct uncounseled interrogations of students in their dormitories.

Third, the Complaint alleges that Duke faculty organized protests at Plaintiffs' residences. Compl. ¶¶ 217, 250-54. These protests included "bang[ing] on the windows" of the homes and forced players to flee from their homes. *See, e.g.*, ¶ 254. Plainly, this constitutes "physically invading a person's home or other private place." *Toomer*, 574 S.E.2d at 90 (quotation marks omitted). Duke nevertheless seeks to evade liability by

suggesting it is not responsible for the conduct of its students and the Durham police. But as the Complaint makes clear, many of the protests that invaded the privacy rights of Plaintiffs were organized and encouraged by members of Duke's faculty, for whose conduct the University is liable. Compl. ¶¶ 250-54.

### G. Negligent Supervision (Count 19)

Count 19 seeks to hold the University, Brodhead, Moneta, Lange, and Trask responsible for negligently supervising various Duke officers, professors, and employees. Compl. ¶¶ 614-18. Against this count, Defendants advance the same arguments they advance against Count 3 (negligent supervision). University Br. 28-30. We have fully rebutted those arguments in the context of Count 3, *see* Pls.' SANE Opp. Part V.A.1.c, but we note here that, as explained elsewhere in this brief and our brief in response to the SANE Defendants' brief, Duke officers, professors, and employees acted tortiously toward Plaintiffs and violated Plaintiffs' federal and constitutional rights in numerous ways. *See also* Compl. ¶ 616.

### H. Violation of and Conspiracy To Violate the Fourth Amendment Under Section 1983 – Key Card Reports (Count 20)

Count 20 charges the University, Hendricks, Drummond, the Duke Police, the Durham Investigators, and the City of Durham with violating and conspiring to violate Plaintiffs' Fourth Amendment rights by disclosing and using the key card reports and by abusing judicial process to conceal that disclosure. ¶¶ 620-25. "To state a claim for relief in an action brought under § 1983, [Plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the

47

alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999).  Defendants contest both elements.  University Br. 40-44.  They are wrong on both points.

### 1.    The Defendants Acted Under Color of State Law

A private person acts "under color" of state law if he conspires with a state official or participates in a joint activity with a state official to deprive a person of his Constitutional rights.  *Jackson v. Pantazes*, 810 F.2d 426, 429-30 (4th Cir. 1987).  Whether Defendants formed such an agreement or participated in such a joint activity is a question of fact for the jury.  *See* Pls.' Durham Opp. Br. Parts IV & V.A (discussing standards for pleading conspiracy).  Defendants argue that they did not act under color of state law because Plaintiffs "do not allege any facts that would support a plausible inference that any of the Duke Defendants entered into any agreement to deprive Plaintiffs of their constitutional rights by improperly disclosing key card data." University Br. 42.  As explained above in the discussion of Count 10 (abuse of process), however, the allegations in the Complaint make it plausible that the Duke Defendants conspired with Nifong and the Durham Investigators to disclose the key card data and then to conceal that disclosure in violation of Plaintiffs' Fourth Amendment rights.  Part V.B.3, *supra*.

Moreover, the Duke Police and the University were state actors when they disclosed the key card data and then worked to conceal that disclosure, even if they did not specifically agree with Nifong and the Durham Investigators to do so.  A private actor

acts under color of state law if his act was "in pursuit of … obligations" that "the state delegate[d]" to him or "if the function performed [by the private actor] is traditionally the exclusive prerogative of the State." *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 342 (4th Cir. 2000) (alteration and quotation marks omitted).  Both of those standards are satisfied here.  Pursuant to a statutorily authorized agreement, the City of Durham delegated to the University (and thus to the Duke Police), which is a "law enforcement agency" under state law, the "authority and primary responsibility to investigate all offenses [including rape] committed on Campus," which included 610 North Buchanan.  *See* Compl. ¶¶ 62-64, 291; Ex. 1 (Agreement for Police Cooperation, Mutual Aid, and Campus Law Enforcement Agency Extended Jurisdiction (Apr. 21, 2004))[13]; Ex. 2 (N.C. GEN. STAT. § 116-40.5(b) (as amended by Session Law 2003-329, House Bill 736, § 2, 2003 N.C. ALS 329)); N.C. GEN. STAT. § 160A-288.  Consistent with this statutory authorization, the agreement further provided that the University (and thus the Duke Police) "shall have the same powers, rights, privileges, and immunities … as those of the City Law Enforcement Agency."  Compl. ¶¶ 62-64, 291; Ex. 1.  As detailed above, the Duke Police exercised their delegated law-enforcement powers by disclosing the key card data and then covering up that disclosure.  *See* Part V.B.3, *supra*. And as this statutory scheme reflects, the power that the Duke Police were exercising was a traditional state power.  *See Knapp v. Schweitzer*, 357 U.S. 371, 374-75 (1958) ("the

---

[13] This agreement was also attached as Exhibit 3 to the First Amended Complaint in *McFadyen v. Duke Univ.* (M.D.N.C. No. 07-953).

States [possess a] traditional power to investigate in aid of prosecuting conventional state crimes").

### 2. The Defendants Violated Plaintiffs' Rights Under the Fourth Amendment

Defendants contend that Plaintiffs "did not suffer any violation … under § 1983 when their key card information was disclosed" because "FERPA's non-disclosure provisions cannot be enforced under § 1983" and because Plaintiffs "had no constitutionally protected expectation of privacy in [their] key card data." University Br. 43-44. As we explain elsewhere, Defendants' first argument is irrelevant and their second one is plainly incorrect. *See* Pls.' Durham Opp. Part V.C.3.

## VI. CONCLUSION

For the foregoing reasons, the University Defendants' motion to dismiss should be denied, except that it may be granted with respect to Count 17 (promissory estoppel).

Dated: August 28, 2008                              Respectfully submitted,

**THOMAS, FERGUSON**                      **COOPER & KIRK, PLLC**
**& MULLINS, L.L.P.**

                                                            /s/ Charles J. Cooper
/s/ William J. Thomas                          Charles J. Cooper
William J. Thomas, II                            Brian S. Koukoutchos
(N.C. Bar # 9004)                                David H. Thompson
119 East Main Street                            Howard C. Nielson, Jr.
Durham, NC  27701                             Nicole Jo Moss
Tel. (919) 682-5648                               (N.C. Bar # 31958)
Email: thomas@tfmattorneys.com       David Lehn*
                                                            1523 New Hampshire Avenue, NW
                                                            Washington, DC  20036
                                                            Tel. (202) 220-9600

Email: ccooper@cooperkirk.com
Email: dthompson@cooperkirk.com
Email: nmoss@cooperkirk.com

(* motion for special appearance has been filed)

***Attorneys for Plaintiffs***

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 28, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel:

**TROUTMAN SANDERS LLP**
Patricia P. Kerner
N.C. State Bar No. 13005
Hannah Gray Styron
D. Martin Warf
434 Fayetteville Street, Suite 1900
Raleigh, North Carolina 27601
Phone: (919) 835-4117
Fax: (919) 829-8714
Email: tricia.kerner@troutmansanders.com
Email: hannah.styron@troutmansanders.com
Email: martin.warf@troutmansanders.com
*Counsel for Defendants Steven Chalmers,*
*Patrick Baker, Beverly Council, Ronald*
*Hodge, Jeff Lamb, Stephen Mihaich, Michael*
*Ripberger, and Lee Russ*

**FAISON & GILLESPIE**
Reginald B. Gillespie, Jr.
N.C. State Bar No. 10895
5517 Durham Chapel Hill Boulevard
Suite 2000
Durham, North Carolina 27727-1729
Phone: (919) 489-9001
Fax: (919) 489-5774
Email: rgillespie@faison-gillespie.com
*Counsel for Defendants City of Durham,*
*North Carolina and Steven Chalmers*

**STEPTOE & JOHNSON LLP**
Roger E. Warin*
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000

Fax: (202) 429-3902
Email: rwarin@steptoe.com
*(Motion for Special Appearance to be filed)
***Counsel for Defendant City of Durham, North Carolina***

**ELLIS & WINTERS LLP**
J. Donald Cowan, Jr.
N.C. State Bar No. 0968
Dixie T. Wells
N.C. State Bar No. 26816
P.O. Box 21927 [27420]
100 N. Greene Street, Suite 102
Greensboro, North Carolina 27401
Phone: (336) 217-4197
Fax: (336) 217-4198
Email: don.cowan@elliswinters.com
Email: dixie.wells@elliswinters.com

**WILMER CUTLER PICKERING HALE AND DORR LLP**
Jamie Gorelick*
D.C. Bar No. 101370
Jennifer M. O'Connor
William F. Lee
Paul R.Q. Wolfson
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6500
Facsimile: (202) 663-6363
Email: Jamie.gorelick@wilmerhale.com
Email: Jennifer.oconnor@wilmerhale.com
Email: William.lee@wilmerhale.com
Email: Paul.Wolfson@wilmerhale.com
***Counsel for Defendants Duke University, Aaron Graves, Robert Dean, Richard H. Brodhead, Peter Lange, Tallman Trask, III, John Burness, Larry Moneta, Victor J. Dzau, M.D., Allison Halton, Kemel Dawkins, Suzanne Wasiolek, Matthew Drummond,***

***Counsel for Duke University Health Systems,***

*Inc., Theresa Arico, and Tara Levicy*
(*motion for special appearance filed)

**YATES, McLAMB &WEYHER, L.L.P**
Dan Johnson McLamb
N.C. State Bar No. 6272
T. Carlton Younger, III
Shirley Marring Pruitt
POB 2889
Email: cyounger@ymwlaw.com
Email: spruitt@ymwlaw.com
*Counsel for Duke University Health Systems,*
*Inc., Theresa Arico, and Tara Levicy*

**POYNER & SPRUILL LLP**
Edwin M. Speas, Jr.
N.C. State Bar No. 4112
P.O. Box 10096
Raleigh, North Carolina 27605-0096
Phone: (919) 783-6400
Fax: (919) 783-1075
Email: espeas@poynerspruill.com
*Counsel for Defendant Mark Gottlieb*

**KENNON, CRAVER, BELO, CRAIG &**
**MCKEE, PLLC**
Joel M. Craig
N.C. State Bar No. 9179
Henry W. Sappenfield
P.O. Box 51579
4011 University Drive, Suite 300
Durham, North Carolina 27717-1579
Phone: (919) 490-0500
Fax: (919) 490-0873
Email: jcraig@kennoncraver.com
Email: hsappenfield@kennoncraver.com
*Counsel for Defendant Benjamin Himan*

**MAXWELL FREEMAN & BOWMAN, P.A.**
James B. Maxwell
N.C. State Bar No. 2933
P.O. Box 52396

3

Raleigh, North Carolina 27717-2396
Phone: (919) 493-6464
Fax: (919) 493-1218
Email: jmaxwell@mfbpa.com
***Counsel for Defendant David Addison***

**PINTO COATES KYRE & BROWN, PLLC**
Kenneth Kyre Jr. (N.C. Bar # 7848)
Paul D. Coates (N.C. Bar # 9753)
P.O. Box 4848
Greensboro, NC 27404
Email: kkyre@pckb-law.com
Email: pcoates@pckb-law.com
***Counsel for J. Wesley Covington***

As of the date of this filing, no attorney has made an appearance on behalf of the following Defendant.

Linwood Wilson
6910 Innesbrook Way
Bahama, NC 27503-9700
Email: linwoodw@aol.com

/s/ Nicole Jo Moss