# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### No. 1:08-cv-119

_____  )
)
**EDWARD CARRINGTON, et al.,**              )
)
       **Plaintiffs,**     )
**v.**                                      )
)
**DUKE UNIVERSITY, et al.,**               )
)
       **Defendants.**     )
_____ )


## PLAINTIFFS' OPPOSITION TO THE DUKE SANE DEFENDANTS'
## MOTION TO DISMISS PURSUANT TO RULE 12(b)(1) and (6)

Charles J. Cooper
Brian S. Koukoutchos
David H. Thompson
Howard C. Nielson, Jr.
Nicole Jo Moss (N.C. Bar # 31958)
David Lehn
**COOPER & KIRK, PLLC**
1523 New Hampshire Avenue, NW
Washington, DC  20036
Tel. (202) 220-9600

William J. Thomas, II (N.C. Bar # 9004)
**THOMAS, FERGUSON & MULLINS, L.L.P.**
119 East Main Street
Durham, NC  27701
Tel. (919) 682-5648

*Attorneys for Plaintiffs*

August 28, 2008

Dockets.Justia.com

# TABLE OF CONTENTS

I.     Nature of Proceedings ........................................................................ 1

II.    Statement of Facts ............................................................................. 1

III.   Questions Presented............................................................................ 3

IV.   Standard of Review ............................................................................ 3

V.    Argument    .......................................................................... 3

     A.      Counts 2-5 State Valid Claims ............................................. 4

         1.      Defendants Owed Plaintiffs a Duty of Care........................... 4

             a.      Defendants Owed Plaintiffs a Duty of Care with Respect to the Forensic Examination of Mangum (Count 4) ...................................................... 4

             b.      Defendants Owed Plaintiffs a Duty of Care when Assessing and Reporting the Results of the Forensic Examination of Mangum (Count 4) .............................. 13

             c.      Defendants Owed Plaintiffs a Duty To Supervise Levicy and Arico with Care (Count 3)........................... 15

             d.      Defendants Owed Plaintiffs a Duty Not To Inflict Emotional Distress (Count 2)........................................ 17

             e.      Defendants Had a Duty To Warn and Protect Plaintiffs Against Hazards Created by Defendants (Count 5) ...................................................... 21

         2.      The Actions of the Durham Police and Nifong Do Not Preclude the Liability of Defendants........................................ 25

     B.      Defendants Intentionally Inflicted Emotional Distress (Count 1)........ 31

     C.      Plaintiffs Have Stated a Claim Under Section 1983 (Counts 21-22)...................................................................... 41

         1.      Violation of Plaintiffs' Fourth Amendment Rights – DNA Samples (Count 21) ........................................................ 41

             a.      Defendants Acted Under Color of State Law ............... 42

             b.      Defendants Violated Plaintiffs' Rights Under the Fourth Amendment .................................................. 45

         2.      Violation of Plaintiffs' Fourteenth Amendment Rights – Malicious Investigation (Count 22) ......................................... 45

     D.     Plaintiffs Have Stated a Claim for Obstruction of Justice
          (Count 23).............................................................................................49

VI.   Conclusion  .....................................................................................................50

_____

)
**EDWARD CARRINGTON, et al.,** )
                          )
                  **Plaintiffs,** )
**v.** )
                          )
**DUKE UNIVERSITY, et al.,** )
                          )
                  **Defendants.** )
_____ )

### PLAINTIFFS' OPPOSITION TO THE DUKE SANE DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(1) and (6)

**I.    NATURE OF PROCEEDINGS**

We state the nature of the proceedings elsewhere. Plaintiffs Opposition to City of Durham's Motion to Dismiss ("Pls.' Durham Opp.") Part I. This brief addresses the motion to dismiss under Rule 12(b)(1) and (6) of Duke University Health System ("DUHS"), Theresa Arico, and Tara Levicy ("SANE Defendants"), which is joined by Duke University, Richard Brodhead, John Burness, Robert Dean, Matthew Drummond, Victor Dzau, Aaron Graves, Kate Hendricks, Peter Lange, Larry Moneta, Tallman Trask, and Suzanne Wasiolek ("University Defendants") (collectively for purposes of this brief, "Defendants" or "Duke Defendants").

**II.    STATEMENT OF FACTS**

We address here only facts relating to the SANE Defendants wrongful actions. *See also* Pls.' University Opp. Part II (Statement of Facts). Duke Hospital nurse Tara

Levicy and her supervisor, Theresa Arico, played pivotal roles in causing and enabling the corrupt rape investigation and the harm that Plaintiffs suffered as a result. Defendant Levicy was the inexperienced, recently certified sexual assault nurse who assisted in the forensic medical examination of Mangum a few hours after the fictitious rape was alleged to have occurred. As North Carolina Attorney General Roy Cooper stated after his independent investigation established the players' innocence, there was "no medical evidence" supporting Mangum's claim of sexual assault. Yet Levicy assured Nifong's investigators on March 16, two days after the alleged rape, that Duke Hospital's forensic examination had yielded evidence "consistent with sexual assault." This statement flatly misrepresented the medical evidence from the exam and breathed life-giving credibility into rape allegations that were so contradictory – Mangum had variously claimed, and recanted, being raped by three, five, and twenty players – that Duke and Durham police had dismissed them as a transparent hoax. *See, e.g.*, Compl. ¶ 7.

A few days later, Levicy embellished her misrepresentation, falsely assuring Sergeant Gottlieb that the examination of Mangum had revealed physical evidence of "blunt force trauma" consistent with a vaginal and anal gang rape by three men. Levicy's report of Mangum's pelvic examination, however, stated there was no tearing, bleeding, bruising, or other signs of blunt force trauma and that the "anal exam" showed "nothing notable." Levicy's supervisor, Defendant Arico, publicly corroborated Levicy's false account of the medical evidence. Although she had not been involved in the forensic examination of Mangum or reviewed the medical records, Arico misinformed the media

that the accuser's "injuries are consistent with the story she told."  *See, e.g.*, ¶ 8.

Throughout Nifong's corrupt investigation, Levicy conspired with Nifong and his investigators, tailoring her testimony to meet their evolving evidentiary needs.  For example, when the results of DNA testing were negative for all 46 white lacrosse players, Levicy assured Nifong's investigators that Mangum had been uncertain whether her "attackers" had used condoms, despite Levicy's own exam report's unequivocal statement that Mangum had reported that condoms had not been used.  Nifong and his investigators consistently emphasized, both in court filings and in public statements, Levicy's false descriptions of the medical evidence to justify their investigatory actions and their feigned belief that a rape had occurred.  *See, e.g.*, ¶ 9.  Levicy's participation in the rape hoax continued up until Nifong's last days on the case.  *See, e.g.*, ¶ 192.

## III.  QUESTIONS PRESENTED

1.  Whether Plaintiffs have stated a claim for their breach-of-duty (Counts 2-5).

2.  Whether Plaintiffs have stated a claim for intentional infliction of emotional distress claim (Count 1).

3.  Whether Plaintiffs have stated claims under 42 U.S.C. § 1983 (Counts 21-22).

4.  Whether Plaintiffs have stated a claim for their obstruction of justice (Count 23).

## IV.  STANDARD OF REVIEW

We state the standard of review elsewhere.  *See* Pls.' Durham Opp. Part IV.

## V.  ARGUMENT

The Duke SANE Defendants advance a variety of challenges to Plaintiffs' claims.  As explained below, none of Defendants' arguments has merit.  Defendants have

addressed the counts of the Complaint out of sequence, but, because of the substantial interrelation among the counts' analyses, we think adherence to Defendants' organization will, at this point, be more convenient for the Court.[1]

## A. Counts 2-5 State Valid Claims

Grouping together Counts 2-5 as similar "negligence-based claims grounded on allegations that Duke health care providers breached a duty of care,"[2] Defendants contend that these Counts "are fatally flawed for two independent reasons": first, Defendants "had no actionable duty of care to" Plaintiffs; and second, "the actions of the health care providers [did not] proximately cause[] their injuries." SANE Br. 7-8. We rebut each.

### 1. Defendants Owed Plaintiffs a Duty of Care

Defendants contend, for a variety of reasons, that they were not subject to the duties of care identified in Counts 2-5. They are wrong.

#### a. Defendants Owed Plaintiffs a Duty of Care with Respect to the Forensic Examination of Mangum (Count 4)

Count 4 charges that the SANE Defendants, the University, Brodhead, and Dzau breached their duty of care in conducting and reporting the forensic medical examination of Mangum. Defendants offer several reasons why they did not owe Plaintiffs this duty

---

[1] We incorporate into this opposition all oppositions filed today by Plaintiffs against the motions to dismiss of the Duke University Defendants, the Duke SANE Defendants, Defendant City of Durham, the Durham Supervisor Defendants, Defendant Gottlieb, Defendant Himan, Defendant Wilson, Defendant Addison, and Defendant Covington. Cross references to specific sections of Plaintiffs' other oppositions are provided throughout this brief

[2] These Counts are also based on intentional or reckless conduct. *See* Compl. ¶¶ 490-93, 503, 506, 509, 511, 517.

of care.  None of them has merit.

First, Defendants argue that only the patient of a health care provider may bring a medical malpractice claim against that provider.  SANE Br. 10-12.  But Count 4 is not "in substance a medical malpractice claim."  SANE Br. 10.  "[O]nly those claims … which arise out of the provision of clinical patient care constitute medical malpractice actions."  *Estate of Waters v. Jarman*, 547 S.E.2d 142, 145 (N.C. Ct. App. 2001).  If the action arises out of any other conduct by the health-care provider for example, "policy, management or administrative decisions, such as granting or continuing hospital privileges, failing to monitor or oversee performance of the physicians, credentialing, and failing to follow hospital policies, the claim is instead derived from ordinary negligence principles."  *Id*. at 144-45 (collecting decisions); *see Iodice v. United States*, 289 F.3d 270, 276-77 (4th Cir. 2002) ("State courts have held that when a negligence claim against a health care provider does not 'arise out' of the 'furnishing' of 'professional services,' it is not a medical malpractice claim, but rather may be brought as an ordinary negligence claim."); *Pangburn v. Saad*, 326 S.E.2d 365, 367 (N.C. Ct. App. 1985) (plaintiff's claim that doctor had negligently released dangerous mental patient sounded in ordinary negligence); N.C. Gen. Stat. § 90-21.11 (term "medical malpractice action" means "a civil action … arising out of the furnishing or failure to furnish professional services in the performance of medical … or other health care by a health care provider").

Count 4 rests on a litany of wrongful actions that fall into three groups: (1) Levicy's false statements about the medical and physical evidence to the Durham

Investigators and others; (2) the other Defendants' express and implied ratifications of those false statements and their failure to correct those false statements; and (3) the other Defendants' failure to train and supervise Levicy properly. Compl. ¶ 506. None of these actions sounds in medical malpractice because none relates directly to the quality of the professional *clinical* care Mangum received. The statements and actions in the first and second groups relate to Plaintiffs no less than to Mangum and were made by Defendants to criminal investigators and the public; these actions would be tortious even assuming that Duke Hospital gave Mangum the finest medical care available. *Cf. Acosta v. Byrum*, 638 S.E.2d 246, 253 (N.C. Ct. App. 2006) (claim that doctor negligently permitted access to patient's medical files sounded in ordinary negligence because it did not "involve[e] direct patient care"). And the actions in the third group are quintessential examples of what *Waters* termed "management or administrative decisions."[3]

Defendants conspicuously ignore most of these actions and instead suggest that Count 4 rests on the allegations that "the diagnosis of blunt force trauma was inaccurate [and] 'impossible' to make without the use of a colposcope," and that "Dr. Manly's diagnosis of … diffuse edema of the vaginal walls[] was flawed." SANE Br. 10. Neither of those allegations, however, is among the numerous wrongful actions expressly identified as a breach of duty in Count 4. *See* Compl. ¶ 506. In any event, even if Count

---

[3] Similarly, Plaintiffs have standing to assert Counts 2-5: they seek to vindicate injuries they personally suffered as a result of Defendants' breaches of duties owed to them; they do not assert " 'the legal rights and interests' " of others (such as Mangum). *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004); *cf*. SANE Br. 12 n.4.

4 rested on Defendants' wrongful performance of the examination, it would not sound in medical malpractice because that forensic examination was performed for the purpose of collecting evidence of an alleged crime, not to treat Mangum for a possible medical condition—six other Duke medical personnel had already tended to her medical condition. *See Gunter v. Laboratory Corp. of Am.*, 121 S.W.3d 636, 641 (Tenn. 2003) ("when [blood] analysis is performed to obtain a DNA profile for purposes of paternity determination, no rendition of medical treatment is involved" and therefore claim that paternity test was performed negligently does not sound in medical malpractice); *see* Compl. ¶¶ 102-04, 112, 114, 118, 122-23.[4]

Second, citing *Iodice*, Defendants argue that they did not owe Plaintiffs a duty of care even under ordinary negligence principles because "North Carolina law disallows ordinary negligence claims by third parties against health care providers." SANE Br. 13. Even if *Iodice* had found such a principle in North Carolina law, it would not bar Count 4. That case involved a claim that the provider's negligence in dispensing narcotics to an addicted and drunken patient caused the patient to crash his car, injuring the plaintiff. Accordingly, the Fourth Circuit was concerned that a duty toward a third party might be "in tension with" the health-care provider's duty toward the patient. 289 F.3d at 278-79. In contrast, here Defendants harmed Plaintiffs directly and did so outside the course of providing Mangum with clinical care. There is, therefore, no risk that Count 4 will cause

---

[4] Because Count 4 does not sound in medical malpractice, North Carolina Rule of Civil Procedure 9(j) is irrelevant. *See* SANE Br. 12 n.5.

health-care providers to breach the duties of care they owe their patients. Plaintiffs submit that Defendants are simply required to (1) accurately report information to law enforcement authorities, (2) correct misinformation provided to such authorities, and (3) properly train and supervise their employees. Such responsibilities serve rather than undermine the interests of patients.

Further, *Iodice* in fact cuts against Defendants' argument. Although the Fourth Circuit conceded that it had not found "any case in which the North Carolina courts have permitted a third party victim of a patient to bring an ordinary negligence action against a hospital," it stressed that "no North Carolina case states (or suggests) that hospitals owe such duties *only* to patients." *Id.* at 277-78. After examining several relevant North Carolina decisions, the court determined that it was "unlikely" that a North Carolina court would bar a third party's claim against a health-care provider arising out of its wrongful conduct in dealing with a patient. *Id.* at 278-79. Rather, the court thought that North Carolina courts would "apply general principles of negligence in determining whether a plaintiff has alleged a claim of ordinary negligence against a health care provider," and that under those general principles, "*every person who enters upon an active course of conduct [is subject to a duty] to exercise ordinary care to protect others from harm.*" *Id.* at 278 (emphasis added) (quotation marks omitted).[5] By training Levicy and then having

<hr />

[5] If anything, the Fourth Circuit was unduly cautious in reading North Carolina case law. In *Pangburn*, the Court of Appeals held that a doctor owed a duty of care to a non-patient who claimed she was injured as a result of the doctor's wrongful decision to release a dangerous mental patient. 326 S.E.2d at 367, 372-73. The Fourth Circuit did

her perform the forensic sexual assault exam, by conducting and then reporting the results of the forensic sexual assault exam, and by speaking publicly about the results of the exam, Defendants entered upon active courses of conduct that foreseeably posed substantial risks of harm to Plaintiffs; therefore, Defendants were bound to act with reasonable care. *See Estate of Mullis by Dixon v. Monroe Oil Co.*, 505 S.E.2d 131, 137 (N.C. 1998) ("Risk-creation behavior … triggers duty where the risk is both unreasonable and foreseeable.") (citing *Palsgraf v. Long Island R. Co.*, 162 N.E. 99, 100 (N.Y. 1928)).

Third, Defendants argue that Plaintiffs have not alleged a "tight nexus" between Defendants' wrongful conduct and Plaintiffs' injuries, which the Fourth Circuit, according to Defendants, concluded would be required under North Carolina law for a third-party claim against a provider for harm caused by a patient. *See Iodice*, 289 F.3d at 279-80. Defendants argue that Plaintiffs have not shown "how the health care providers could have foreseen – much less … knew – how their supposed negligence might have

---

not consider *Pangburn* a "case in which [a] North Carolina court[] ha[s] permitted a third party victim of a patient to bring an ordinary negligence action against a hospital" because it had held that such a claim "would only be cognizable for ' "wil[l]ful, wanton or recklessly" negligent acts or . . . intentional acts.' " *Iodice*, 289 F.3d at 277 n.4 (quoting *Pangburn*, 326 S.E.2d at 368 (citation omitted)). But *Pangburn*'s exclusion of a simple negligence claim was driven by its interpretation of an immunity statute that does not apply to Defendants here. *See* 326 S.E.2d at 372-73; *Iodice*, 289 F.3d at 277 n.4. Indeed, as the Fourth Circuit recognized, the court in *Pangburn* expressly "rel[ied] on ordinary principles of negligence" to impose a duty of care. *Id*. at 277 n.4, 278; *see Pangburn*, 326 S.E.2d at 367. Even if *Pangburn* would not permit a simple negligence claim here, it would not bar Count 4 to the extent that Defendants' wrongful conduct was intentional or reckless. *See* Compl. ¶¶ 506, 509. Nothing in *Pangburn* or *Iodice* suggests *Pangburn*'s analysis "was specifically limited to cases of negligent release of mental patients." *See* SANE Br. 13 n.6.

resulted in harm to these Plaintiffs." SANE Br. 14. In fact, *Iodice*'s "tight nexus" requirement is nothing more than the ordinary foreseeability standard applied to the particular facts of the case. Under North Carolina law, the plaintiff need not show that the defendant "should have been able to foresee the injury in the precise form in which it actually occurred. All that the plaintiff is required to prove on the question of foreseeability … is that in the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected." *Hairston v. Alexander Tank & Equip. Co.*, 311 S.E.2d 559, 565 (N.C. 1984) (quotation marks omitted); *see also Chastain v. Litton Sys., Inc.*, 694 F.2d 957, 962 (4th Cir. 1982); *Sutton v. Duke*, 176 S.E.2d 161, 168-69 (N.C. 1970). Consistently with these principles, the Fourth Circuit found that there would be "tight nexus" if "the hospital 'knew or should have known,' when dispensing the drugs, that the patient was 'under the influence of alcohol' or narcotics and 'would shortly thereafter drive an automobile." *Iodice*, 289 F.3d at 279-80.

Thus, the "tight nexus" standard is no more demanding than the ordinary foreseeability standard. But even if it were, Plaintiffs have alleged facts sufficient to satisfy it. With respect to every act of misconduct alleged in the Complaint, Defendants should have known and frequently knew or must have known that their actions would cause Plaintiffs injuries such as those they suffered. With respect to the inadequacy of the supervision and training of SANEs, Defendants knew or should have known that having an inadequately trained SANE, such as Levicy, examine Mangum could

foreseeably result in an erroneous criminal investigation of alleged rapists in light of the

role that SANEs play in collecting forensic evidence of sexual assaults. As for the false

statements Levicy made to the Durham Investigators, any reasonable person can foresee

that a person erroneously implicated in a criminal rape investigation might suffer a

variety of injuries, including humiliation, severe emotional distress, harassment, threats,

financial costs, disruption, and lost reputation and opportunities. Levicy made some of

her false statements about the medical and physical evidence to the Durham

Investigators, in part pursuant to their subpoena, which she had induced; she therefore

knew or should have known she was speaking about an incipient criminal rape

investigation of Duke lacrosse players and therefore that Plaintiffs could be harmed by

her statements. *See* Compl. ¶¶ 114-18, 150-54, 185-88, 507; *cf. Mosby v. Harrell*, 909

So. 2d 323, 326-27 (Fla. Ct. App. 2005) (one who "conduct[s] and report[s] the [DNA]

testing" to determine whether police officer "had forced [a woman] to submit to a sexual

relationship" "owed [that officer] a duty to exercise reasonable care in doing so, because

it was reasonably foreseeable that negligent testing and reporting would imperil the

[officer's] continued employment"). As the corrupt investigation progressed, the players

suffered grievous harm in very public fashion, and Mangum's credibility continued to

erode. *See* Compl. ¶¶ 106, 111, 139, 142, 157-58, 174, 193-95, 206, 210-11, 217, 231,

259, 274, 233, 236-37, 250-61, 265, 271-72, 274, 277-78, 283-84, 301-03, 306, 310, 313,

315, 331, 333-37, 376, 386, 449, 405-07. Levicy knew or should have known that her

subsequent false statements to the Durham Investigators would cause Plaintiffs new harm

and prolong and enhance existing harm because the investigators repeatedly and publicly placed great weight on her statements – coming from a nurse ostensibly "specially trained in sexual assault" at "the best trauma center in the area," Duke University Hospital – to justify the investigation. *See* Compl. ¶¶ 154, 188-92, 205, 210-11, 274, 310, 390, 462.

Similarly, Defendants Arico, Brodhead, Dzau, the University, and DUHS knew or should have known the foreseeable consequences of their express and implied ratifications of Levicy's false statements about the medical and physical evidence. *See* ¶¶ 233, 236-37, 245-48, 250, 252-62, 265, 283-84, 289, 299, 310, 333-37, 357-58, 362, 386. Further, Defendants Arico, Brodhead, Dzau, the University, and DUHS knew or should have known that Mangum's credibility was eroding and that the exculpatory evidence was mounting, and so they knew or should have known that their ratifications of Levicy's false statements would have increasing significance in prolonging the investigation and therefore the harm. *See* ¶¶ 106, 111, 139-40, 142, 150-54, 231, 240-41, 266, 277, 300, 304-06, 311-13, 331-32, 335, 355, 378, 383, 386, 402, 415. And the failure of these Defendants to correct Levicy's false statements foreseeably injured Plaintiffs. Defendants' assertion that "medical evidence … *exonerated* the players," SANE Br. 14-15, is irrelevant and incorrect. Levicy's false statements and the other Defendants' ratifications thereof helped create, and then stoked, the fire.[6]

---

[6] Defendants Brodhead, Dzau, and the University contend that they cannot be liable for Count 4 because their liability depends upon the liability of the SANE Defendants, who owed Plaintiffs no duty. SANE Br. 9 n.3. As just shown, however, the SANE Defendants owed Plaintiffs a duty. Further, the liability Count 4 would impose on

### b. Defendants Owed Plaintiffs a Duty of Care when Assessing and Reporting the Results of the Forensic Examination of Mangum (Count 4)

Attempting to engraft the law of defamation onto Count 4, Defendants contend that they owed Plaintiffs no duty of care when "assessing" and "reporting" the results of the forensic medical examination of Mangum because their reports "made no reference to any individual." SANE Br. 15-16; *see Arnold v. Sharpe*, 251 S.E.2d 452, 456 (N.C. 1979) ("In order for defamatory words to be actionable, they must refer to some ascertained or ascertainable person and that person must be the plaintiff."). The rules of defamation, however, are not a valid guide here because Count 4 claims far more than that Defendants' wrongful actions "impair[ed] [Plaintiffs'] reputation." *Flake v. Greensboro News Co.*, 195 S.E. 55, 59 (N.C. 1937); *see Tyson v. L'Eggs Prods., Inc.*, 351 S.E.2d 834, 840 (N.C. Ct. App. 1987). Specifically, Plaintiffs claim that their wrongful actions also caused them "severe emotional distress, economic injuries, and loss of educational and athletic opportunities, as well as enhancement of injuries caused by other actors." Compl. ¶¶ 474-78, 507; *see Chapman v. Byrd*, 475 S.E.2d 734, 739 (N.C. Ct. App. 1996) (plaintiffs stated claim for intentional infliction of emotional distress by

---

Brodhead, Dzau, and the University is not entirely derivative of the SANE Defendants' liability; Brodhead's and Dzau's suppression of exculpatory evidence and failures to correct Levicy's false statements would be wrongful even if Levicy had misspoken innocently, and the University is vicariously liable for Brodhead's and Dzau's wrongful actions, as well as the wrongful actions of other agents in suppressing exculpatory evidence and failing to correct Levicy's false statements. *See* Compl. ¶¶ 225, 231-32, 235-36, 246-48, 262, 275-77, 279, 289, 301-03, 313, 322-23, 331, 356-58, 362, 366-75, 389-91, 405-07, 415-16, 418-20, 423, 506, 508.

alleging that defendants repeated false rumors without investigating rumors' truth).

In any event, this defamation standard, even if applicable, would not defeat Count 4. Whether it could have been ascertained that Defendants' wrongful statements and ratifications thereof referred to Plaintiffs is a question of fact. *See Chapman*, 475 S.E.2d at 738. Mangum claimed that three (or five or approximately twenty) men had raped her at the lacrosse party but she did not know who in particular. *See* Compl. ¶¶ 106, 155-59, 193-94, 376. Accordingly, from the beginning of the investigation, the Durham Investigators publicly and privately treated all the white Duke lacrosse players and only the white Duke lacrosse players as possible rapists.[7] And throughout the investigation – even after Nifong claimed there would be no further principal indictments – Nifong and the Durham Investigators threatened all the lacrosse players with prosecution as criminal accomplices to the alleged rape. *See* ¶¶ 271-72, 278, 399, 432.

Consequently, the Durham Investigators, members of the Duke community, the general public, and Plaintiffs understood that Defendants' false and misleading statements and ratifications thereof referred to Plaintiffs, either as rapists or as accomplices. This is shown clearly by everyone's actions: the investigators kept their focus on the players; Duke officials disparaged, investigated, and punished Plaintiffs; members of the Duke community harassed and threatened Plaintiffs; a media frenzy

---

[7] *See* Compl. ¶¶ 111, 139, 149-50, 156-57, 160, 162-65, 174, 176-78, 189-90, 194, 205, 212-13, 271-74, 278, 280, 306-08, 310, 324-26, 343-46, 351, 383-84, 390, 397, 430.

swirled around Plaintiffs; and Plaintiffs suffered the burdens of all this.[8] *See Chapman*, 475 S.E.2d at 737 (recognizing all members of group may have action in defamation if statement "refer[s] to some, most or all of the group"); *Farrell v. Triangle Publ'ns, Inc.*, 159 A.2d 734, 736-37 (Pa. 1960) ("Where … a defamatory publication or utterance is directed toward a comparatively small class or group all of whose constituent members may be readily identified and the recipients of the defamatory matter are likely to identify some, if not all, of them as intended objects of the defamation, an individual member of the group may sue for the damages done his reputation thereby.").

### c. Defendants Owed Plaintiffs a Duty To Supervise Levicy and Arico with Care (Count 3)

Defendants contend that Count 3, which seeks to hold Defendants University, DUHS, Brodhead, Dzau, and Arico liable for failing to supervise Levicy and Arico with care, fails for two reasons. First, they argue that the claim fails because neither Levicy nor Arico is liable for any tortious act. SANE Br. 17. As explained above and below, however, Levicy and Arico acted tortiously toward Plaintiffs and also violated Plaintiffs' federal and constitutional rights in numerous ways. *See Barbier v. Durham County Bd. of Educ.*, 225 F. Supp. 2d 617, 630 n.11 (M.D.N.C. 2002) (Beaty, J.) (rejecting argument that violation of federal statute "cannot serve as the underlying tort for a negligent supervision/retention claim").

---

[8] Compl. ¶¶ 141-43, 150-54, 162, 168-69, 174-76, 185-92, 205-06, 210, 216-17, 225-26, 229-38, 246-49, 250-66, 278, 282-85, 289, 299-303, 317-21, 324, 333-36, 341, 355-56, 360, 363, 366-75, 393, 405-08, 414, 462, 472-78.

Second, they argue that Defendants Brodhead, Dzau, and Arico cannot be liable for their negligent supervision of Levicy or Arico because Brodhead, Dzau, and Arico were not "the corporate entity that is the 'employer' " of Levicy or Arico. SANE Br. 17-18. But under North Carolina law, an individual supervisor, like any other agent, "is personally liable for all torts committed by him, notwithstanding that he may have acted as an agent for another or as an officer for a corporation." *Baker v. Rushing*, 409 S.E.2d 108, 112 (N.C. Ct. App. 1991); *see also Mozingo v. Pitt County Mem'l Hosp., Inc.*, 415 S.E.2d 341, 344-47 (N.C. 1992) (physician may be liable for negligently supervising resident); *Gamble v. Barnette*, No. 06-0104, 2007 U.S. Dist. LEXIS 48815, at *12 (W.D. N.C. July 5, 2007) (negligent supervision claim requires "the defendant to be an employer *or have supervisory duties* over other employees") (emphasis added); *Medlin v. Bass*, 398 S.E.2d 460, 461-63 (N.C. 1990) (recognizing claim for negligent hiring against individual supervisor but rejecting it for insufficient evidence); RESTATEMENT (THIRD) OF AGENCY § 7.01 cmt. *d* ("an agent whose assigned function within an organization includes the supervision of others may be subject to liability when a failure by the agent properly to supervise breaches a duty that the agent owes to a third party").

None of the decisions upon which Defendants rely holds or even suggests that, as a matter of North Carolina law, only the employer may be liable for negligent supervision. In the three cited North Carolina decisions, the court did not consider this

question because the claims were not brought against individual supervisors.[9]  And the magistrate judge's "*Erie* guess" in *Cox v. Indian Head Industries, Inc.*, was based on a mistaken analogy to a claim of wrongful discharge, which arises under a contract with the employer or under a special statutory or public-policy duty to which the employer is uniquely subject (*e.g.*, Title VII).  123 F. Supp. 2d 892, 914-15 (citing *Lorbacher v. Housing Auth. of City of Raleigh*, 493 S.E.2d 74, 79 (N.C. Ct. App. 1997) (citing *Sides v. Duke Univ.*, 328 S.E.2d 818, 824-27 (N.C. Ct. App. 1985))), *adopted in relevant part without discussion*, 123 F. Supp. 2d 892 (W.D.N.C. 2000); *see Baker*, 409 S.E.2d at 112 ("An authorized agent who enters into a contract on behalf of a disclosed principal generally is not personally liable to third parties since the contract is with the principal.").[10]  In contrast, Count 3 arises under ordinary principles of negligence, which, as noted above, impose a duty of care on anyone who creates a risk of harm to another.

> **d.**    **Defendants Owed Plaintiffs a Duty Not To Inflict Emotional Distress (Count 2)**

Defendants advance three challenges to Count 2, which seeks to hold Defendants University, DUHS, Brodhead, Dzau, Arico, and Levicy liable for negligently inflicting emotional distress.  First, they contend that they owed no duty because Counts 3 and 4 fail for lack of a duty.  SANE Br. 18-19.  But as explained above, they indeed owed and

---

[9] *See Guthrie v. Conroy*, 567 S.E.2d 403, 411 (N.C. Ct. App. 2002); *Smith v. Privette*, 495 S.E.2d 395, 396, 398 (N.C. Ct. App. 1998); *Hogan v. Forsyth Country Club Co.*, 340 S.E.2d 116, 124-25 (N.C. Ct. App. 1986).

[10] Had *Hogan* addressed this question, the magistrate judge in *Cox*, who was aware of *Hogan*, *see* 123 F. Supp. 2d at 914 n.2, would not have needed to do this analysis.

breached the duties upon which Counts 3 and 4 are founded. Moreover, Count 2 does not depend upon the duties in Counts 3 and 4; the duty not to negligently inflict emotional distress is an independent tort duty to which all are subject. *See Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 395 S.E.2d 85, 94 (N.C. 1990) (overruling decision "[t]o the extent that it may be read as barring claims for negligent infliction of emotional distress when such claims are unrelated to any other cause of action").

Second, Defendants argue that their wrongful conduct "is too attenuated from Plaintiffs' alleged injuries," which is to say, unforeseeable. SANE Br. 19-20. As with Count 4, Defendants try to shoehorn Count 2 into the category of "medical cases" by focusing exclusively on the "the Duke health care providers' allegedly negligent examination of Mangum." SANE Br. 19. But like Count 4, Count 2 goes beyond Levicy's performance of the forensic exam; it encompasses Levicy's false statements about the medical and physical evidence to Nifong and the Durham Investigators, Arico's and the other Defendants' ratifications thereof, Arico's negligent supervision of Levicy, and the other Defendants' negligent supervision of Levicy and Arico. Compl. ¶¶ 491-94.

In any event, Plaintiffs' injuries are not "too attenuated" from Defendants' wrongful conduct to have been foreseen and caused by that conduct. Questions of foreseeability and causation are quintessentially factual issues for juries to resolve. *Chastain*, 694 F.2d at 962. The Supreme Court of North Carolina has "expressly disavowed mechanical application of any arbitrary factors, stating that the issue of reasonable foreseeability must be determined under all the facts and resolved on a case-

by-case basis." *Andersen v. Baccus*, 335 N.C. 526, 531 (N.C. 1994) (quotation marks omitted). As explained above, Defendants should have foreseen and indeed must have foreseen that their actions would implicate the players in an alleged rape and subject them to the ensuing criminal investigation. *See* Part V.A.1.a, *supra*. As the investigation became public, the Duke community convulsed, and the media became frenzied – and as the players were publicly, repeatedly, and maliciously condemned, harassed, threatened with violence, denied educational, athletic, and professional opportunities to which they had long aspired, and forced to confront the unyielding possibility of very serious felony charges that Defendants knew or should have known were unfounded, and as their parents witnessed these events as they happened and even tried to prevent some of them – Defendants knew or should have known that their continued public and private false and misleading statements about the physical and medical evidence and their ratifications thereof would cause and enhance Plaintiffs' severe emotional distress.[11]

---

[11] *See supra* Part V.A.1.a-b (collecting allegations); *see also* Compl. ¶¶ 199-203, 231-32, 242-44, 275-76, 280, 316, 354, 390-92, 445, 448-55; *see Chapman*, 475 S.E.2d at 740 ("reasonably foreseeable that plaintiffs would suffer severe emotional distress as a result of public statements by defendants, given [defendants'] positions as public health officials, that 'someone' at [plaintiffs' building] has AIDs or is HIV positive"); *Buser v. S. Food Serv.*, 73 F. Supp. 2d 556, 575 (M.D.N.C. 1999) (Beaty, J.) (allegation that "Defendants knew or should have known that the discharge 'would inflict severe emotional distress upon' " plaintiff was sufficient to establish foreseeability); *McAllister v. Ha*, 496 S.E.2d 577, 579-80, 583 (N.C. 1998) (reasonably foreseeable that doctor's failure to inform couple that wife had sickle-cell disease, which she could pass to children, would cause couple severe emotional distress); *Johnson*, 395 S.E.2d at 98 (allegation that plaintiffs "were the parents of the fetus which allegedly died as a result of the defendants' negligence and were in close proximity to and observed many of the events surrounding the death of the fetus and its stillbirth" enough to show forseeability).

Third, Defendants argue that, other than a "conclusory assertion," plaintiffs have not alleged "that they suffered *severe* emotional distress as a result of the alleged conduct." SANE Br. 20; *see, e.g.*, Compl. ¶ 474. This is a question of fact. *See McAllister*, 496 S.E.2d at 583. The Complaint alleges that, as a direct result of Defendants' wrongful conduct, the players became *national pariahs*; they were presumed guilty and suffered months of vitriolic condemnation in the local and national media; they endured open protests, harassment, threats of violence, and punitive denials of important educational, athletic, and professional opportunities at the hands of Duke's administrators, faculty, and students; and they lived with persistent and debilitating anxiety resulting from the constant prospect of being wrongly charged, convicted, and imprisoned for very serious crimes that never happened. Defendants' contention that Plaintiffs did not suffer severe emotional distress simply cannot be squared with the allegations in the complaint. Indeed, as Defendant Brodhead himself has openly conceded, the players "lived through an ordeal the likes of which few have known …. There is no undoing the agonies of the last months." Compl. ¶ 474. Beyond the explicit allegations of severe emotional distress and mental anguish, *see* ¶¶ 430, 474-75, 495, the requisite emotional injury can reasonably be inferred when the complaint is viewed in the light most favorable to Plaintiffs. *See McAllister*, 496 S.E.2d at 583 (allegation of "plaintiff-wife's fears regarding her son's health and her resultant sleeplessness" sufficient to support finding of severe emotional distress); *Buser*, 73 F. Supp. 2d at 576 (guided by *McAllister*, holding that allegation that defendant "inflicted severe emotional

distress upon" plaintiff, though possibly "limited," was "sufficient for the purposes of stating a claim"); *see also Pacheco v. Rogers & Breece, Inc.*, 579 S.E.2d 505, 508 (N.C. Ct. App. 2003) ("Proof of 'severe emotional distress' does not necessarily require medical evidence or testimony.").[12]

e.      **Defendants Had a Duty To Warn and Protect Plaintiffs Against Hazards Created by Defendants (Count 5)**

Count 5 states (1) that Defendants owed Plaintiffs a duty to warn about and protect from the harm that would foreseeably result from Defendants' false statements and ratifications thereof, and (2) that Defendants breached that duty by taking "affirmative steps to maximize the plaintiffs' exposure to the danger by concealing and suppressing exculpatory information, defrauding and harassing the plaintiffs, and actively conspiring and collaborating with the Durham Supervisors and Durham Investigators to aggravate and prolong the ordeal." Compl. ¶ 511, 514. Defendants' offer three responses.

First, asserting that the "gravamen" of Count 5 is that Defendants had a "duty to warn [Plaintiffs] they might come under police scrutiny," Defendants argue that the "job" of "determin[ing] if a crime has been committed or who should be investigated for possible crimes … falls to law enforcement." SANE Br. 21. That the police decide whom to investigate is irrelevant; as discussed in the context of Count 4, not only was it eminently foreseeable, it was all but certain that the police would investigate and would

_____

[12] Even if the Complaint's allegations concerning Plaintiffs' emotional distress were deemed inadequate, the appropriate remedy would not be to dismiss the claim but rather to afford Plaintiffs an opportunity to amend their Complaint to describe their severe emotional distress in greater detail.

continue to investigate the players as a result of Defendants' wrongful statements corroborating Mangum's false rape accusations. Moreover, the real gravamen of Count 5 is that Defendants failed to protect Plaintiffs from a range of foreseeable harms, not merely police investigation, that Defendants helped create or amplified. "The law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm and calls a violation of that duty negligence." *Quail Hollow East Condo. Ass'n. v. Donald J. Scholz Co.*, 268 S.E.2d 12, 15-16 (N.C. Ct. App. 1980) (quotation marks omitted); *see also Estate of Mullis by Dixon v. Monroe Oil Co.*, 505 S.E.2d 131, 137 (N.C. 1998).[13] Contrary to Defendants' suggestion, *see* SANE Br. 21 n.8, Defendants could easily have acted to protect Plaintiffs because they knew or should have known their false statements and ratifications thereof would harm Plaintiffs, they had ample time to intervene as the investigation unfolded, and they had in their possession the information necessary to discredit Levicy's false statements and Arico's ratification. *See supra* Part V.A.1.a, d (collecting allegations); *infra* Part V.B; *see also* Compl. ¶¶ 106, 111-12, 119-20, 122-29, 139, 140, 142, 154, 190, 206, 210, 231, 240, 245, 274-77, 306, 310-12, 322, 331, 333-37, 355, 359, 386, 415, 420, 454-55.[14] Yet, when Nifong repeatedly went to the media and invoked Duke Hospital's

---

[13] Accordingly, *Gregory v. Kilbride*, in which the court held that a psychiatrist had no duty to warn third parties about danger his patient might present, 565 S.E.2d 685, 692 (N.C. Ct. App. 2002), *cited in* SANE Br. 21 n.8, is irrelevant because the psychiatrist did not create or amplify the risk of harm.

[14] Defendants suggest that imposing a duty here will interfere with the police's ability to collect anonymous tips. *See* SANE Br. 22. With the possible exception of

statements as the principal basis for his prosecution, Defendants stood silently by.

Second, Defendants argue that, in effect, their wrongful actions did not cause Plaintiffs harm because "it was the independent actions of Nifong that 'prolonged' the investigation." SANE Br. 22. We rebut this argument below. *See infra* Part V.A.2. Defendants add that Plaintiffs were never "arrested, indicted or tried for any crime." SANE Br. 22. That is true but irrelevant – Plaintiffs suffered many harms because of Defendants' wrongful actions, and formal criminal consequences are not a predicate of liability. Defendants argue, in effect, that they should not be held liable for playing Russian roulette with Plaintiffs because the loaded revolver did not fire.

Third, Defendants argue that Plaintiffs cannot rely upon Defendants' intentional conduct (*e.g.*, concealing and suppressing exculpatory evidence) to establish that they acted negligently in failing to warn and protect Plaintiffs. SANE Br. 22-23; *see* Compl. ¶ 517.[15] To the extent Defendants' conduct was careless rather than intentional, this point is irrelevant. In any event, Defendants cite no decision, and we have found none, holding that negligent failure to warn and protect cannot be demonstrated through intentional conduct. In fact, it is irrelevant whether Defendants' failure to warn and protect was

---

Levicy's false statements, most of Defendants' false and misleading statements and ratifications thereof were made publicly. In any event, an anonymous tipster who wrongfully provided a misleading statement to the police could protect the alleged culprit simply by anonymously telling the police he was mistaken; Levicy did the opposite. *See* Compl. ¶¶ 185-88, 190-92, 311, 313, 340-41, 462-63.

[15] Contrary to Defendants' suggestion, their initial "provi[sion of] false and misleading information to the police" was the risk-creating conduct that brought into existence the duty to warn and protect, not the breach of that duty. *Compare* SANE Br. 22 *with* Compl. ¶¶ 511-14.

negligent, reckless, or intentional, for "[t]he breach of duty can be and frequently is intentional and willful, and yet the act may be negligent." *Jackson v. Scheiber*, 184 S.E. 17, 20 (N.C. 1935). Defendants cite several "*Erie* guesses" rejecting a plaintiff's attempt to use intentional conduct to show negligence, but all of those decisions (and all the other decisions to have reached a similar result) tellingly involve the tort of negligent infliction of emotional distress – that tort presents a special case because of its interrelationship to the distinct tort of intentional infliction of emotional distress.[16] The tort of intentional infliction of emotional distress requires that the defendant's intentional conduct have been "extreme and outrageous." *See Waddle v. Sparks*, 414 S.E.2d 22, 27 (N.C. 1992). The tort of negligent infliction of emotional distress, in contrast, does not require that the defendant's conduct have been extreme and outrageous; it requires only that the defendant have failed to take a reasonable precaution to avoid inflicting emotional distress. *See McAllister*, 496 S.E.2d at 582-83. Consequently, if any intentional conduct could be deemed "negligence" for purposes of the tort of negligent infliction of emotional distress, Plaintiffs could circumvent the special "extreme and outrageous" requirement of

---

[16] *See Sabrowski v. Albani-Bayeux, Inc.*, No. 02-0728, 2003 WL 23018827, at *3-6 (M.D.N.C. Dec. 19, 2003) (Beaty, J.), *aff'd*, No. 04-1114, 124 Fed. App. 159, 160-61 & n.* (4th Cir. Feb. 25, 2005); *Ijames v. Murdock*, No. 01-0093, 2003 WL 1533448, at 8-10 (M.D.N.C. Mar. 21, 2003); *Mitchell v. Lydall, Inc.*, No. 93-1374, 16 F.3d 410 (Table), 1994 WL 38703, at 3 (4th Cir. Feb. 10, 1994); *Barbier*, 225 F. Supp. 2d at 631 (Beaty, J.); *see also Magidson v. Wachovia Bank, NA*, No. 07-0505, 2007 U.S. Dist. LEXIS 95084, at 9-14 (M.D.N.C. Dec. 27, 2007); *Gourley v. Ken Wilson Ford, Inc.*, No. 06-0141, 2006 U.S. Dist. LEXIS 62107, at 2-3 (W.D.N.C. Aug. 15, 2006); *Locklear v. Person County Bd. of Educ.*, No. 05-0255, 2006 U.S. Dist. LEXIS 42203, at 47-53 (M.D.N.C. June 22, 2006); *Richardson v. Branch Banking & Trust Co.*, No. 05-0947, 2006 U.S. Dist. LEXIS 17122, at 4-5 (M.D.N.C. Feb. 28, 2006) (Beaty, J.).

the tort of intentional infliction of the emotional distress, in effect rendering the intentional form of the emotional-distress tort a practical nullity. In contrast, there is no intentional version of the warn-and-protect tort that requires that the defendant's intentional conduct have a special character, such as that it be "extreme and outrageous," not required by the negligent version of the warn-and-protect tort. In sum, permitting Plaintiffs to prove that Defendants breached their duty to warn and protect Plaintiffs against harm does not enable Plaintiffs to circumvent an element of an intentional tort, and therefore it does not matter whether Defendants' wrongful conduct was intentional, reckless, or negligent for purposes of Count 5.

### 2. The Actions of the Durham Police and Nifong Do Not Preclude the Liability of Defendants

Defendants argue that Counts 2-5 fail because "the allegedly willful actions of Nifong and certain Durham police officers" were "intervening cause[s] that preclude[] liability." SANE Br. 23. Defendants misunderstand both the law and the allegations. Causation is a question of fact for the jury, to "be resolved on a case-by-case basis." *McAllister*, 496 S.E.2d at 583; *Andersen*, 335 N.C. at 531; *Chastain*, 694 F.2d at 962.

Defendants begin by asserting that there "is no allegation that Duke or any Duke health care provider had *any* part in making or carrying out" Nifong's and the Durham Investigators' decisions to pursue the investigation in the face of overwhelming exculpatory evidence and the absence of genuine inculpatory evidence. But for those wrongful decisions, say Defendants, "the investigation would have ended." SANE Br. 24-25. We agree that but for the wrongful actions of Nifong and the Durham

Investigators, the investigation would have ended sooner than it did, but we disagree that Nifong and the Durham Investigators acted independently of Defendants. Rather, Levicy's false statements about the medical and physical evidence breathed life-giving credibility into Mangum's otherwise facially implausible rape allegations, and Levicy repeatedly coordinated with Nifong and the Durham Investigators, altering medical records and continually changing her story to fit Nifong's and the Durham Investigators' evolving theory of the case. *See* Part V.C.1.a, *infra*. The other Defendants also worked with Nifong and the Durham Investigators to further and prop up the investigation.[17]

In any event, the wrongful conduct of Nifong and the Durham Investigators was, at most, an independent but-for cause of Plaintiffs' injuries. That is not sufficient to break the causal chain between Defendants' conduct and Plaintiffs' injuries. *See Hairston v. Alexander Tank & Equip. Co.*, 311 S.E.2d 559, 566 (the N.C. 1984) (The fact that later wrongdoer's conduct "quite properly may be found to be a proximate cause of the injury and death in this case … [did] not of [itself] absolve [earlier wrongdoer] from his liability"); *Hayes v. Wilmington*, 91 S.E.2d 673, 685 (N.C. 1956) ("It is immaterial how many new events or forces have been introduced if the original cause remains operative and in force."). "The test by which the negligent conduct of one is to be insulated as a matter of law by the independent negligent act of another, is reasonable unforeseeability on the part of the original actor of the subsequent intervening act and

---

[17] *See* Compl. ¶¶ 150-54, 176-79, 185, 190-92, 196-98, 200, 203, 225, 277, 286, 306-08, 311, 313, 322-30, 332, 340-41, 394-95, 415, 420, 423, 434-43, 462.

resultant injury." *Chastain*, 694 F.2d at 962 (quotation marks omitted).[18]  The same test

applies even if the later misconduct was intentional or criminal.[19]

Defendants maintain that Nifong's and the Durham Investigators' wrongful

actions "could not have been reasonably foreseen" because they were " 'unprecedented' "

and "extraordinary"  SANE Br. 25-26.[20]  Although extraordinary, the wrongful actions of

Nifong and the Durham Investigators were nonetheless reasonably foreseeable to

Defendants under the circumstances.  It was foreseeable that Nifong and the Durham

Investigators would investigate allegations of criminal conduct, especially allegations as

sensational as those made by Mangum, when those allegations were corroborated by

nurses and officials of such prestigious institutions as Duke University and Duke

Hospital.  *See, e.g.*, Compl. ¶ 390.  Again, Mangum's facially implausible, inconsistent

rape allegations were discredited by the police until Levicy's false statements about the

---

[18] *See Tise v. Yates Constr. Co.*, 480 S.E.2d 677, 680-81 (N.C. 1997); *Adams v. Mills*, 322 S.E.2d 164, 172-73 (N.C. 1984); RESTATEMENT (SECOND) OF TORTS § 302A.

[19] *See Tise*, 480 S.E.2d at 680-81; *Williams v. Mickens*, 100 S.E.2d 511, 511, 511 (N.C. 1957); *Ward v. S. R. Co.*, 174 S.E. 443, 444 (N.C. 1934); *see also* RESTATEMENT (SECOND) OF TORTS § 302B.  To the extent that the *Erie* guess in *Food Lion v. Capital Cities/ABC, Inc.*, might have suggested the "last wrong" necessarily absolves an earlier wrongdoer even if the last wrong was foreseeable to the earlier wrongdoer, it is plainly inconsistent with controlling North Carolina decisions, as well as itself.  964 F. Supp. 956, 961 (M.D.N.C. 1997), *cited in* SANE Br. 25.  Moreover, the decision it cited to support the "last wrong" rule pertained to the doctrine of "last clear chance," which has no relevance to this case; that doctrine imposes on the last wrongdoer a special duty of care to avoid the consequences of both his and the plaintiff's earlier negligence.  *See Presnell v. Payne*, 157 S.E.2d 601, 602 (N.C. 1967).

[20] Defendants suggest that Plaintiffs have characterized Nifong's wrongful actions as "unprecedented."  In fact, Plaintiffs alleged only that "it was unprecedented for a district attorney to take direct control of a police investigation."  Compl. ¶ 220.

medical and physical evidence gave credence to Mangum's claims. None of the police initially believed Mangum until Duke Hospital backed her story up. *See* ¶¶ 99, 106, 110-11, 131-32, 180-81, 211. Throughout the investigation, Defendants were confronted with ever-increasing evidence that Nifong and the Durham Investigators would disregard the mounting exculpatory evidence, even after it became overwhelming, so long as they had a credible inculpatory piece of evidence on which to justify their continued investigation, even if they knew or should have known that evidence was not genuine. *See, e.g.*, ¶¶ 332, 391. Indeed, Brodhead conceded that during the investigation "evidence mounted that the prosecutor was not acting in accordance with the standards of his profession." ¶ 393. Consider the following examples:

- Duke officials and Duke police were aware that Gottlieb, the lead Durham investigator, had previously displayed a "biased attitude and rogue tactics against Duke students." ¶¶ 134-35, 178.

- By March 15, high-level Duke officials and Duke police knew or should have known, based upon the Day Report and conversations with Durham police, that the Durham Investigators did not find Mangum's claims credible. ¶¶ 106, 111, 139, 142, 276-77, 323, 332, 415.

- Throughout the investigation, Nifong and the Durham Investigators rested their investigation on Levicy's March 16 and March 21 false statements about the medical and physical evidence, even though her SANE report, which Gottlieb obtained on March 21, and the full medical record of Mangum's numerous examinations at Duke Hospital, which he obtained on April 5, documented no objective medical or physical evidence of sexual assault, as Levicy, Arico, and the other Defendants knew or should have known. ¶¶ 112, 121-29, 152, 185-89, 205-06, 210, 274-75, 332, 340, 390.

- At the end of March, Nifong and the Durham Investigators told Duke officials that Mangum's accounts of the attack were patently inconsistent, that the results from the analysis of the rape-kit evidence and the DNA samples were negative with respect to all lacrosse players, and that Mangum had twice failed to identify any alleged attackers in photo line-ups. ¶¶ 305-06, 308, 311-12, 355. Yet, Nifong pursued his

investigation as zealously as ever, even after it became public on April 10 that the DNA results were negative. *See, e.g.*, ¶ 386.

- In order to discredit the negative rape-kit and DNA results, Nifong suggested repeatedly that the alleged rapists had used condoms. But, as Levicy and the other Defendants knew or should have known, Mangum had consistently told Duke doctors and nurses that her alleged attackers had not used condoms and had ejaculated into her mouth and vagina or anus. ¶¶ 106, 108, 119, 155, 212, 311-13, 331-32, 388-89.

- Levicy actively cooperated with Nifong and the Durham Investigators throughout the investigation to mitigate Mangum's lack of credibility and to rebut the mounting exculpatory evidence – in particular the negative rape-kit and DNA test results – such as by stating falsely that Mangum had offered "consistent response" during the examination, by stating falsely that Mangum was unsure whether her alleged attackers had used condoms, and by altering her SANE report to state falsely that the alleged attackers had wiped Mangum off with a towel. ¶¶ 189-92, 311, 341, 462.

- On March 31, Nifong requested that Duke police officers write deliberately misleading accounts of what they saw at the hospital on March 14. ¶¶ 323, 416, 423.

- By the end of March, Nifong had claimed Mangum had been choked during the assault even though, as Levicy and the other Defendants knew or should have known, Mangum had denied during her examination at Duke Hospital that she had been choked and the examination revealed no physical evidence of choking. ¶¶ 119, 205-06, 275, 332.

- Nifong and the Durham Investigators repeatedly accused the players of refusing to cooperate with the investigation, even though, as Duke officials were well aware, the players had consented to searches, interviews, and DNA tests. ¶¶ 163-66, 168, 171, 214, 248, 271, 273, 278-79.

And yet, Defendants repeatedly mischaracterized the evidence anyway. Levicy

mischaracterized the medical and physical evidence to Nifong and the Durham

Investigators on March 16, on March 21, on April 5, in early May, on January 10, 2007,

and on other occasions after March 21. ¶¶ 150, 152, 185-88, 190-92, 311, 313, 340-41,

462. Arico publicly confirmed Levicy's false statements on April 1. ¶¶ 310, 333-37.

And by their express and implied assertions of guilt, their suppression of exculpatory

evidence, and their failure to dispute the many false and misleading statements about the medical and physical evidence throughout the investigation, Defendants confirmed and ratified Levicy's and Arico's false statements.[21] The foreseeable result of Defendants' continuing public support for Nifong was prolonged and deepened injury to Plaintiffs.

Thus, although the wrongful conduct of Nifong and the Durham Investigators was necessary to bring about the full extent of Plaintiffs' injuries, so too was the wrongful conduct of the SANE Defendants. But for Levicy's telling Gottlieb on March 16 that "there were signs consistent with sexual assault during [Mangum's] test" and similar false statements about the medical and physical evidence by her to investigators, the investigation would never have gotten off the ground, given that Mangum's statements were not believable, as Durham police and Duke police had recognized, and there was no other incriminating evidence. *See* ¶¶ 106-10, 112, 121-29, 150-54, 210-11, 274-75. As Mangum's credibility continued to erode and the exculpatory evidence continued to mount, Levicy's false statements and Arico's and the other Defendants' ratifications thereof sustained the investigation of, and public hostility toward, Plaintiffs. Indeed, their false statements were the only ostensibly inculpatory evidence that Nifong and the Durham Investigators had, and they carried the weight of a nurse ostensibly "specially trained in sexual assault" at "the best trauma center in the area." *See* ¶¶ 119, 154, 185-95, 205-06, 274, 276-77, 310-13, 331-38, 341, 354, 388-91, 414-20, 462. Therefore, had

---

[21] *See* ¶¶ 142, 225, 232-37, 240-41, 246-48, 250, 252-61, 263-66, 274-75, 277, 279, 282-91, 290-91, 300-03, 322, 315, 331, 338, 356-60, 362, 365-75, 386, 388-90, 393, 405-11, 420, 449-52, 454-55; *infra* Part V.B.

Levicy or Arico not made these false or misleading statements or had the other
Defendants disclosed that the medical and physical evidence contradicted Levicy's and
Arico's false statements, Nifong and his investigators would have had no fig leaf to cover
their lack of genuinely inculpatory evidence, and accordingly the investigation would
have quickly died, sparing Plaintiffs from all the harms they suffered. *See also* ¶¶ 99,
106, 110-11, 131-32, 151, 157-58, 180-81, 193-95, 211, 304-06, 311, 340-41, 383, 402.

### B. Defendants Intentionally Inflicted Emotional Distress (Count 1)

Defendants contend that Count 1, which charges Duke University, Brodhead,
Dzau, and the SANE Defendants with intentional infliction of emotional distress, fails to
state a claim. SANE Br. 26-32. Their arguments are without merit.

First, they argue that "reporting a crime to the police and prosecutors is not
'extreme and outrageous conduct,' even if that report is inaccurate – indeed, even if that
report is false or fabricated." SANE Br. 28-29. "[I]t is for the jury to determine …
whether the conduct complained of is, in fact, sufficiently extreme and outrageous to
result in liability." *Hogan*, 340 S.E.2d at 121. Courts in many jurisdictions have held
that wrongfully reporting false information to the police may constitute extreme and
outrageous conduct. *See Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 255-57 & n.4 (D.C.
Cir. 2008) (collecting decisions); *Kurschus v. PaineWebber, Inc.*, 16 F. Supp. 2d 386,
390-91, 395 (S.D.N.Y. 1998) (jury could find defendants' conduct extreme and
outrageous where plaintiff alleged defendants plotted to falsely accuse plaintiff of
coercing sex from one defendant, which "exacted a devastating toll on [plaintiffs'] life");

*Banyas v. Lower Bucks Hospital*, 437 A.2d 1236, 1238-39 (Pa. Super. Ct. 1981) (hospital employees' giving false reports to cause someone to be indicted for homicide gave rise to claim for intentional infliction of emotional distress). Here, Defendants' actions were extreme and outrageous under the circumstances since they breathed life-giving credibility into Mangum's false and malicious rape accusations and thus provided a justification for the ensuing investigation.

None of the cases cited by Defendants is to the contrary. In all four cases, the defendant's statement was made pursuant to confidential or low-profile investigations and had some legitimate basis, even if the statement was ultimately mistaken or exaggerated.[22] In three of the four cases, the defendant attributed to the plaintiff an action that, though wrong, was not as morally depraved and injurious to reputation as a vicious gang rape.[23] And in two of those cases, the defendant made an isolated charge of misconduct, which merely initiated an investigation.[24]

Those cases differ fundamentally from this case. Again, Levicy's false statements about the medical and physical evidence, along with Arico's and the other Defendants' ratifications thereof, gave credence to the charge that Plaintiffs had committed, in the

---

[22] *See Dobson v. Harris*, 521 S.E.2d 710, 713 (1999); *Ausley v. Bishop*, 515 S.E.2d 72, 75-76, 80 (N.C. App. 1999); *Shillington v. K-Mart*, 402 S.E.2d 155, 159, 161 (N.C. App. 1991); *Troxler v. Charter Mandala Ctr.*, 365 S.E.2d 665, 665-69 (N.C. App. 1988).

[23] *See Dobson*, 521 S.E.2d at 713 (in attempt to discipline her "restive" child, woman "set [child] … down hard" on a counter); *Ausley*, 515 S.E.2d at 75-76, 80 (embezzlement and fraud); *Shillington*, 402 S.E.2d at 159, 161 ("trespass and looting").

[24] *See Dobson*, 521 S.E.2d at 715 (defendant's "report [to the Department of Social Services (DSS)] served only to initiate an investigatory process"); *Ausley*, 515 S.E.2d at 80 (plaintiff, who was counterclaim defendant, "caused … charges to be filed").

words of Brodhead and Nifong, an act that "is, by nature, one of the most offensive and invasive," an "evil," "brutal[]," "dehumaniz[ing]" act, which was made "totally abhorrent" by "the combination of gang-like rape activity accompanied by racial slurs and general racial hostility." Compl. ¶¶ 280. 357. Not only did Levicy's initial false statements give life to an investigation that otherwise would have died quickly, but also her subsequent false statements and Arico's and the other Defendants' ratifications kept the investigation going in the face of overwhelming exculpatory evidence – Levicy even altered her characterization of the evidence in order to prop up the dying investigation. *See supra* Part V.A.1.a, V.A.2 (collecting allegations). Defendants made these false and misleading statements in the course of a criminal investigation that had attracted intense local and national interest, *see* Compl. ¶¶ 210-211, 217, 219, 225, 231, 233, 248, 263-64, 271-74, 292, 331, 333-34, 363, 405, 411 – and Defendants were well aware of the horrible consequences the investigation was having for Plaintiffs. Defendants' intentionally false statements prolonged and enhanced those consequences and the attendant severe emotional distress. And all this was unnecessary because Defendants knew or should have known not only that their own statements were false or misleading, but that there was no legitimate basis for the criminal investigation. *See supra* Part V.A.1.a-b, d-e (collecting allegations).

In sum, Defendants' unconscionable disregard for the truth and for the severe emotional distress they were inflicting upon Plaintiffs "exceed[ed] all bounds usually tolerated by decent society," and therefore their actions were "extreme and outrageous."

*Dickens v. Puryear*, 276 S.E.2d 325, 331, 333 (N.C. 1981) (quotation marks omitted) (intent to inflict emotional distress may be shown by "reckless indifference to the likelihood that emotional distress may result").[25]

Second, Defendants argue that Defendants Brodhead and Dzau cannot be held personally liable for intentional infliction of emotional distress because a "failure to act" cannot "constitute an extreme or outrageous *act*." SANE Br. 29-30. There is no such rule under North Carolina law; the three decisions they cite held only that the Defendant's particular inaction was not extreme and outrageous under the circumstances.[26] Brodhead's and Dzau's actions here were extreme and outrageous: either they *knew* the players to be innocent of the rape allegations or they were recklessly

---

[25] Contrary to Defendants' suggestion, holding them liable for their intentionally and recklessly false and misleading statements about the medical and physical evidence and ratifications thereof will not interfere with the need for people "to report suspicions of crime to the police." *See* SANE Br. 28. Under North Carolina law, it is a crime to "willfully make or cause to be made to a law enforcement agency or officer any false, misleading or unfounded report, for the purpose of interfering with the operation of a law enforcement agency, or to hinder or obstruct any law enforcement officer in the performance of his duty." N.C. GEN. STAT. § 14-225. Likewise, it may be tortious to give false or misleading information to the police in order to procure the prosecution of a defendant. *See Hung Nguyen v. Burgerbusters, Inc.*, 642 S.E.2d 502, 505-07 (N.C. App. 2007). Similarly, North Carolina law gives safe harbor to those who make a false report to the DSS (as in *Dobson*), but only if "acting in good faith." N.C. GEN. STAT. § 7B-309.

[26] *See Matthews v. Johnson Pub. Co., Inc.*, 366 S.E.2d 525, 526 (N.C. Ct. App. 1988) (after noting that plaintiff must allege "extreme and outrageous act," finding "no *such* act") (emphasis added); *Foster v. Crandell*, 638 S.E.2d 526, 537 (N.C. Ct. App. 2007) (concluding that defendant's failure to disclose that licensing board had ordered third party to "cease the practice of counseling" was not extreme and outrageous "under the circumstances," but suggesting that failure to disclose third party's sexual misconduct toward patients might have been); *Riley v. Whybrew*, 185 S.W.3d 393, 399 (Tenn. Ct. App. 2005) (plaintiff failed to state claim for intentional infliction of emotional distress because defendant's "failure … can only be characterized as negligence").

indifferent to the players' innocence; and yet they allowed the players to be the victims of intensely hostile, world-wide media coverage, prolonged public outrage and obloquy, and sustained faculty and student harassment, including threats of violence and incarceration. And they did so even though it was Duke Hospital's own employees that had kick started the baseless criminal investigation.

Third, Defendants contend that the actions of Defendants Arico, Brodhead, and Dzau cannot "constitute 'ratification' of Levicy's statements sufficient to impose *vicarious* liability on Duke or DUHS" for Levicy's false statements about the medical and physical evidence.  SANE Br. 30.[27]  But ratification is not necessary where, as here, the tortfeasor was acting within the scope of employment.  Plaintiffs have sufficiently alleged, and Defendants do not dispute, that Levicy's false statements were made within the scope of her employment and in furtherance of the University's and DUHS' official business.  *See* Compl. ¶¶ 58, 106, 108, 113-29, 150-54, 185-92, 210-11, 275, 311, 313, 340-41, 462, 483, 485.  That is an adequate alternative basis for holding Levicy's employers vicariously liable.  "[B]ecause scope-of-employment determinations are so fact-intensive, even in cases of intentional torts, the scope-of-employment question is ordinarily one for the jury in North Carolina."  *Lee v. United States*, 171 F. Supp. 2d 566, 574-77 (M.D.N.C. 2001) (Beaty, J.) (quotation marks omitted) (finding "that, to the extent that [defendant's employee] assaulted Plaintiff, [defendant's employee] did so …

---

[27] Defendants initially refer only to Brodhead's and Dzau's actions, but then they include Arico when discussing the first reason why there can be no vicarious liability. *See* SANE Br. 30.  In an abundance of caution, we address her in our response.

while acting within the scope of his employment").[28]

In any event, the University and DUHS ratified Levicy's false statements through the actions of Defendants Arico, Brodhead, and Dzau. "To establish that an employer has ratified an employee's actions, it must be shown that the employer had full knowledge of all the material facts or had knowledge of facts which would lead a person of ordinary prudence to investigate further, [and the] course of conduct on the part of the principal … reasonably tends to show an intention on his part to ratify the agent's unauthorized acts. … [S]uch course of conduct may involve an omission to act." *Guthrie v. Conroy*, 567 S.E.2d 403, 412 (N.C. Ct. App. 2002) (quotation marks and citations omitted). The elements of ratification have thus been adequately alleged in the Complaint, and ratification presents a question of fact. *Id.*

Defendants contend that Defendants "Arico, Brodhead, and Dzau[] *could not* have had knowledge of all the material facts and circumstances related to Levicy's assessment of Mangum's medical condition, because those facts could not be divulged under" the Health Insurance Portability and Accountability Act ("HIPAA"). SANE Br. 30-31. *First*, contrary to Defendants' characterization, *see* SANE Br. 30-31, Plaintiffs do *not* assert the bizarre and insupportable allegation that HIPAA prevented Levicy from

---

[28] *See also Phillips v. Rest. Mgmt. of Carolina, L.P.*, 552 S.E.2d 686, 690-91 (2001) (concluding that an employer is " 'not absolved from liability by reason of the fact that the employee was also motivated by malice or ill will toward the person injured,' " and finding genuine issue as to whether employee acted within scope of employment and in furtherance of defendant's business "when he spat into [police officer-customer's] food" in retaliation for officer's prior "harassment" of employee for skateboarding) (quoting *Wegner v. Delicatessen*, 153 S.E.2d 804, 807-08 (N.C. 1967)).

allowing Arico and her other superiors at Duke Hospital to have internal access to the medical records created and held by Duke Hospital. Nothing in HIPAA prevents supervisors from receiving the records of patients. *See* 45 C.F.R. § 164.506(c)(1) (permitting use of protected health information by a covered entity for its own health care operations); *see also id.* § 164.501 (defining health care operations); Compl. ¶¶ 47-50, 55, 59. We allege only that Levicy insisted upon, and Gottlieb procured, a subpoena before Levicy would divulge the records *to the Durham Police*. ¶¶ 150-51.

*Second*, it is clear that much of the exculpatory information obtained by Levicy and others at Duke Hospital had nothing whatever to do with Mangum's "physical or mental health or condition," and therefore was plainly not protected by HIPAA. 45 C.F.R. § 160.103. For example, Mangum's consistent statements that her alleged attackers had not used condoms and had ejaculated were not protected by HIPAA; nor were her inconsistent statements about the number of attackers who allegedly raped her. Nothing in HIPAA even arguably prevented Defendants from accessing and disclosing publicly this critical exculpatory information.

*Third*, quite apart from information obtained by Duke Hospital from the medical and forensic exams of Mangum, Arico, Dzau, and Brodhead knew facts that would have led a person of ordinary prudence to investigate the truth of Levicy's statements before explicitly or implicitly ratifying them:

- Through the Day Report, conversations with investigators and police, and regular conferences among top-level Duke officials, Brodhead and Dzau knew early on that Mangum's allegations were not credible. *See* Compl. ¶¶ 106, 111, 138-40, 142, 174, 231, 234-35, 245, 277, 306, 322-23, 414-16.

- Brodhead, Dzau, and other top-level Duke officials were assured repeatedly by the players that Mangum's allegations were false. *See* ¶¶ 142, 234-35, 286-88.

- The players' parents and lawyers repeatedly attempted to present Brodhead with a lot of exculpatory evidence. *See* ¶¶ 240-41, 266, 300, 359.

- Top-level Duke officials, possibly including Brodhead and Dzau, learned as early as March 28 or April 5 (even the public learned on April 10) that the rape-kit and DNA test results were negative with respect to all the players, thereby negating Levicy's false statements. *See* ¶¶ 234-35, 305-06, 308, 312, 355, 386.

Defendants also argue that neither Brodhead nor Dzau "had any legal duty to 'correct' perceived misstatements of fact in the press or by the District Attorney, and therefore their 'failure' to do so" does not demonstrate the requisite intent to ratify Levicy's or Arico's false statements. SANE Br. 31. Notably, Defendants do not dispute that Arico intended to ratify Levicy's false statements when she publicly and expressly confirmed those statements. *See* Compl. ¶¶ 310, 333-37. As for Brodhead and Dzau, they clearly had a duty to correct harmful false statements about Duke students that were made by or derived from Duke personnel. *See supra* Part V.A.1.e (discussing Defendants' duty to warn and protect against risks they created). In any event, however, Defendants are wrong that a duty must be breached – as long as the "omission to act" shows an intention to ratify, it suffices. *See Guthrie*, 567 S.E.2d at 412. Regardless whether Brodhead and Dzau breached a duty, their conduct – affirmative acts and failures to act – demonstrates their intention to ratify Levicy's and Arico's false statements:

- Brodhead made a series of public statements implying that the players were guilty (either as rapists or as accomplices protecting the rapists behind a "wall of silence"), and he thereby ratified Levicy's statements to the same effect. *See* Compl. ¶¶ 225, 246-48, 260, 357-58, 362, 365.

- Brodhead repeatedly refused to meet with players' parents or lawyers, to consider the substantial exculpatory evidence they proffered, or to have Duke police investigate the rape charge independently even though they had authority to do so, *see* ¶¶ 290-91, 359, 393; Pls.' University Opp. Part V.H.1.

- Brodhead repeatedly sanctioned the players for their alleged wrongdoing, by suspending and then cancelling the season, by firing the coach, and by launching an investigation into team misconduct over the years. *See* Compl. ¶¶ 225, 233, 236-37, 289, 356, 360, 366, 408-11.

- Brodhead looked the other way when Duke professors and students harassed and threatened Plaintiffs in class, in campus publications, and at home. *See* ¶¶ 225, 250, 252-59, 263-65, 282-85, 301-03, 315, 366-75, 405-08, 449-52, 454-55.

- And Brodhead never indicated to the public or to investigators that Levicy's statements about the medical and physical evidence were even doubtful, let alone false. Like Brodhead, other Duke officials ratified Levicy's false statements by, for example, suppressing the exculpatory Day Report, by stating or implying publicly that some players had raped Mangum while others were protecting the rapists behind a wall of silence, and by permitting students and professors to harass and threaten Plaintiffs. *See* ¶¶ 225, 232, 236, 259-61, 263-65, 277, 279, 282-85, 315, 322-23, 366-75, 405-08, 420, 449-52, 454-55.

- Dzau also stood by silently as the baseless investigation, founded on Levicy's and Arico's false statements, proceeded. *See* ¶¶ 55, 234-35.

Because Brodhead, Dzau, and these other Duke officials possessed but did not exercise the authority to counter, on behalf of the University and DUHS, Levicy's and Arico's false and misleading statements, their actions, under the circumstances, show their intention to ratify those statements.[29] Indeed, Brodhead admitted that he "had

---

[29] Even if information concerning Mangum's physical health and condition in Levicy's SANE report and the other medical records was protected by HIPAA, these Defendants could have blunted the force of Levicy's and Arico's false statements. At a minimum, they could have stated publicly that Levicy and Arico had not characterized the medical records accurately, and perhaps also that the evidence was *not* consistent with sexual assault or trauma. Even such a generic statement would have carried great weight

responsibility for the statements the university made and the actions the university took" throughout the rape investigation, and Steel, Duke's Chairman, affirmed that Brodhead's failings were also the failings of the Board. ¶ 224; *see Watson v. Dixon*, 502 S.E.2d 15, 20-21 (N.C. App. 1998) (finding "ample evidence which tends to show that Duke ratified the conduct of Dixon through its failure to act after it knew facts which would have led a person of ordinary prudence to investigate and remedy the conduct"; namely, that plaintiff had fruitlessly told supervisors of harassment repeatedly).[30]

Finally, Defendants say Plaintiffs "have not sufficiently alleged that they suffered severe emotional distress as a result of the alleged conduct." SANE Br. 31-32 (emphasis

---

when coming from a hospital as esteemed as Duke's. (If such a statement were not permitted, then neither was Arico's public ratification of Levicy's characterization of the medical evidence.) Further, because Arico voluntarily spoke falsely and publicly, she, DUHS, and the University were bound to speak with care, *see* Part V.A.1.a-b, d-e, *supra*, and HIPAA's protections would have yielded to that duty. *See* 45 C.F.R. § 164.512(a)(1) (disclosure and use permitted if "required by law"). Similarly, once Arico spoke publicly, Defendants would have been estopped from invoking HIPAA to justify their refusal to publicly correct her false statement. *See Tapley v. Collins*, 41 F. Supp. 2d 1366, 1376 (S.D. Ga. 1999). Moreover, as the Duke lacrosse rape case became a story of strong local and national public interest, any restriction that HIPAA might have imposed on the Duke Defendants' ability to correct the public record regarding the results of their examination may have violated the First Amendment. *See Florida Star v. B.J.F.*, 491 U.S. 524 (1989); *see also id.* at 541-42 (Scalia, J., concurring in part).

[30] *See Denning-Boyles v. WCES, Inc.*, 473 S.E.2d 38, 43 (N.C. Ct. App. 1996) ("a jury could find the requisite element of intent … to ratify [employee's] actions … in declining to hear complaints from plaintiff or intervene on her behalf, or in retaining [employee] in the face of plaintiff's insistence she could no longer work with sexual harassment from" employee); *Hogan v. Forsyth Country Club Co.*, 340 S.E.2d 116, 122 (N.C. Ct. App. 1986) ("Whether [manager's] actions, consisting of retaining [offending employee] in defendant's employ, declining to intervene to prevent his further offensive behavior toward [plaintiff], and ultimately terminating [plaintiff] from employment, amount to a course of conduct signifying an intention to acquiesce in, approve and ratify [offending employee's] acts is a question for the jury.").

omitted).  As explained above, this argument lacks merit.  *See* Part V.A.1.d, *supra*.

**C.  Plaintiffs Have Stated a Claim Under Section 1983 (Counts 21-22)**

In Counts 21 and 22, Plaintiffs claim that Defendants violated their civil rights under 42 U.S.C. § 1983.  "To state a claim for relief in an action brought under § 1983, [Plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law."  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999).  A private actor acts "under color" of state law if it conspires with a state official or participates in a joint activity with a state official to deprive a person of his Constitutional rights.  *Jackson v. Pantazes*, 810 F.2d 426, 429-30 (4th Cir. 1987).  Whether Defendants formed such an agreement or participated in such a joint activity is a question of fact for the jury.  *See* Pls.' Durham Opp. Parts IV & V.A (discussing standards for pleading conspiracy).  Below, we rebut Defendants' various objections.[31]

**1.  Violation of Plaintiffs' Fourth Amendment Rights – DNA Samples (Count 21)**

Count 21 claims the University, DUHS, Arico, Levicy, the Durham Investigators, and the City of Durham violated and conspired to violate Plaintiffs' Fourth Amendment rights by collecting DNA samples from Plaintiffs pursuant to a false and overbroad application for a non-testimonial identification order (NTO).  Compl. ¶¶ 628-34.

--------

[31] Defendants are correct that Plaintiff Sherwood lacks standing to bring Count 21 because he was not subject to the NTO.  *See* SANE Br. 32 n.12.

### a.    Defendants Acted Under Color of State Law

As Defendants see it, they did not act under color of state law because Levicy merely provided to the investigators statements that "proved to be 'critical factors in sustaining the … rape investigation' or that … happened to 'appear[] prominently in Gottlieb's March 23 application for a non-testimonial order.' "  SANE Br. 34-35.  Citing several decisions, Defendants argue that providing information to the police and even pressing for an investigation are insufficient to show an "agreement or meeting of the minds" between Levicy (whose actions were ratified by the other Duke Defendants) and the Durham Investigators (whose actions were ratified by the City).  SANE Br. 34.

But Levicy did much more than that.  At her first meeting with the Durham Investigators, she told them, falsely, that the medical and physical evidence supported Mangum's gang rape accusations.  Levicy, as the NTO states, said that "there were signs consistent with sexual assault during her test," even there were no such signs.  Compl. ¶¶ 150, 152.  That false statement enabled investigators to obtain a subpoena compelling production of the SANE report and Mangum's other medical records.  ¶¶ 150-51.  Pursuant to that subpoena, Levicy gave Gottlieb her SANE report, which in fact showed no evidence of the brutal sexual assault alleged by Mangum.  ¶¶ 189, 340.  At that time, however, Levicy also made to Gottlieb several statements about the medical and physical evidence that were not only false or misleading, they were also patently contradicted by the SANE report: she said there was evidence of "blunt force trauma" "consistent with" Mangum's allegation of forcible gang rape, but neither Levicy nor Dr. Manly had noted

42

any such evidence in the SANE report, ¶¶ 123-26, 129, 185; and she said that Mangum "had edema and tenderness to palpitation both anally and especially vaginally," but the SANE report stated that there was "nothing notable" discovered during Mangum's anal exam and the vaginal "edema" was nothing more than commonplace swelling, ¶¶ 120-21, 124, 186-87.  In his subsequent application for an NTO, Gottlieb recited Levicy's oral statements: "Medical records and interviews [with Levicy] revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally … [and] the SANE nurse stated the injuries and her behavior were consistent with a traumatic experience."  ¶ 189 (emphasis omitted).  Although he mentioned "[m]edical records" in his NTO application, none of the medical "evidence" Gottlieb included in that application came from the only medical record he had, the SANE report, presumably because that report contained no such evidence.  *See* ¶ 189.  In other words, Levicy's false statements provided the Durham Investigators with a justification for obtaining the NTO and continuing the rape investigation, despite the SANE report's evident lack of support for Mangum's claim.  These events strongly suggest that Levicy and the Durham Investigators acted in concert.

Other evidence confirms this conclusion.  Both Gottlieb and Levicy had a motive for conspiring against Plaintiffs.  As Duke officials well knew, Gottlieb had earned a reputation for being biased against Duke students and for employing against them many abusive tactics, including pursuing selective and malicious investigations and prosecutions, making false arrests, fabricating evidence, and falsifying police reports.

43

¶¶ 134-35. Levicy had biases of her own, as revealed by her remark that, although Mangum had consistently claimed that the alleged rapists had not worn condoms and had ejaculated, "she wasn't surprised … no DNA was found because rape is not about passion or ejaculation but about power." ¶ 463. Further, Levicy met with Nifong and the Durham Investigators repeatedly over the next weeks and months. During those meetings, she confirmed her initial statements even though the investigators by then had the complete medical records, which showed that there was no medical or physical evidence supporting Mangum's claim. ¶¶ 106-09, 112, 129, 191, 340-41. She also repeatedly adjusted or elaborated her testimony to rebut mounting evidence of innocence as it emerged; for example, in order to undermine the negative rape-kit and DNA test results, Levicy produced to investigators on April 5 an altered the version of her SANE report stating that the alleged rapists had "wiped [Mangum] off with a rag" and she told investigators, contrary to her SANE report and Mangum's consistent statements, that Mangum not had been sure whether condoms had been used. ¶¶ 154, 190, 192, 311, 313, 341, 462. The Durham Investigators again readily accepted the cover Levicy offered, publicly invoking her false statements repeatedly in order to justify the continuing investigation in the face of the overwhelming exculpatory evidence. *See* ¶¶ 270, 274-75, 310, 313, 331, 388, 390, 398.

These facts are more than enough to make Plaintiffs' allegation that Levicy conspired with the Durham Investigators "plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007); *see* Pls.' Durham Opp. Parts IV & V.A

(discussing standards for pleading conspiracy).

> **b.** **Defendants Violated Plaintiffs' Rights Under the Fourth Amendment**

Defendants argue that the NTO did not violate Plaintiffs' Fourth Amendment rights because, "[e]ven if Levicy had provided 'false and misleading information' that was used to support the NTO …[, Gottlieb's] affidavit in support of the NTO application was sufficient to establish probable cause *without* that information." SANE Br. 36. As we show elsewhere, this argument lacks merit because the Durham Investigators intentionally or recklessly falsified the application. *See* Pls.' Durham Opp. Part IV.D.[32]

> **2.** **Violation of Plaintiffs' Fourteenth Amendment Rights – Malicious Investigation (Count 22)**

Count 22 charges all the SANE and University Defendants (as well as all the other defendants named in this case) with violating and conspiring to violate Plaintiffs' due process rights under the Fourteenth Amendment by instigating, facilitating, and prolonging a malicious criminal investigation of Plaintiffs. Compl. ¶¶ 636-41. The Duke Defendants assert several objections, all of which lack merit.

We rebut three of their arguments elsewhere: (1) that, "because Plaintiffs were never indicted or tried, all of their allegations of improprieties during the investigation go

---

[32] Defendants dispute that the NTO application placed "decisive emphasis" on Levicy's mischaracterization of the medical and physical evidence. SANE Br. 39 n.16. Because Mangum's statements were not credible, because other evidence included in the application was a fiction apparently concocted by the Investigators, and because what remained did not suggest rape, the evidence ostensibly taken from Levicy's examination of Mangum was critical to the NTO's issuance. *See* Pls.' Durham Opp. Part V.D.

to pretrial conduct that must be examined through the lens of the Fourth Amendment, and not the Fourteenth" Amendment; (2) that, even if this claim is not subsumed by the Fourth Amendment, it fails because "there is no substantive due process right against 'malicious investigation' "; and (3) that the court should not create a "new" substantive due process right. *See* Pls.' Supervisor Opp. Part V.C; SANE Br. 40-44.

Defendants also maintain that "Plaintiffs seek to recover under a generalized substantive due process claim here because they cannot assert any independent constitutional claims for the grievances they allege in this Count." SANE Br. 43. In fact, Plaintiffs make this claim simply because they have substantive due process rights and Defendants violated those rights. In any event, as we show elsewhere, Defendants have violated other constitutional rights held by Plaintiffs. *See supra* Part V.C.1 (Fourth Amendment – DNA Samples); Pls.' University Opp. Part V.H (Fourth Amendment – Key Card Reports). Insofar as Defendants suggest that Plaintiffs have no constitutional claim for injury to their reputation, *see* University Br. 43 & n.22, Defendants' suggestion is wrong: as we explain elsewhere, the Complaint satisfies the "stigma-plus" standard. *See* Pls.' Durham Opp Part V.G.

Finally, focusing on the allegation of a conspiracy, Defendants argue that Plaintiffs have not adequately alleged that Defendants acted under color of state law. SANE Br. 45. But the existence of a conspiracy with Nifong, the Durham Investigators, the City, and the Supervisors is unnecessary under § 1983 to hold liable the Duke Police (and the University, on whose behalf the Duke Police acted) because the Duke Police

were state actors. As we show elsewhere, pursuant to state law and an agreement with the City of Durham, the University is a law-enforcement agency whose police officers have the same police powers as the Durham Police. *See* Pls.' University Opp. Part V.H.1. Through their wrongful exercise of that law-enforcement power, the Duke Police played a central role in initiating, prolonging, and exacerbating the malicious investigation of Plaintiffs, as we detail elsewhere. *See* Pls.' University Opp. Part V.B.3. Even if the other Duke Defendants did not conspire with the Durham Defendants to subject Plaintiffs to a malicious, unconstitutional investigation, they agreed with the Duke Police to do so, *see* Compl. ¶¶ 138-47, 168-69, 174, 176, 224-28, 231-32, 234-35, 242-45, 277, 286-87, 289, 306-08, 324, 339, 435-38, 441, and therefore acted under color of state law. In any event, we have collected elsewhere the extensive specific facts alleged in the Complaint showing that the Duke Defendants, including the Duke Police, conspired with Nifong, the Durham Investigators, the City of Durham, and the Supervisors to violate Plaintiffs' due process right against malicious investigation, and therefore acted under color of state law. *See* Part V.A.1.a, 2, C.1.a; Pls.' University Resp. Br. Part V.B.3; *see also* Compl. ¶¶ 70-80, 248, 260, 306, 308, 312, 353, 416-20, 423.

Defendants nonetheless object to the allegation of conspiracy on the ground that Plaintiffs have "fail[ed] to offer any plausible explanation for why the university and its officials would agree to subject their own students to such an investigation." Pls.' SANE Opp. 45. But in the face of such extensive and detailed allegations establishing that the Duke Defendants agreed with the Duke Police (who were, as just noted, state actors) and

the Durham Defendants to deprive Plaintiffs of their federal rights through a malicious investigation, allegations about Defendants' motives are superfluous. In any event, as Plaintiffs have alleged, the Duke Defendants had their motives to so conspire. We discussed Levicy's motive above. *See* Part V.C.1.a, *supra*. And the University and its Defendant officials had a powerful motive to capitulate to the demands of an angry mob and to sacrifice the rights and interests of their innocent students, too: avoiding embarrassment to Duke and minimizing criticism of Duke and its officials. Compl. ¶¶ 10-11. For example, University officials candidly admitted that their decision to punish Plaintiffs by canceling lacrosse games, suspending and then canceling the season, and firing the coach was "not about the truth" or doing what was "fair," but rather about keeping their and the University's reputation lustrous. ¶¶ 3, 10-11, 225, 236-38, 258-59, 289, 356-59, 361-65; *see also* ¶¶ 11, 360, 414-16, 418-20 (investigating players' disciplinary history); Part V.D (obstruction of justice), *supra*. After the investigation was over, Brodhead himself conceded that the players had "lived through an ordeal the likes of which few have known," including "publicity … project[ing] a very high certainty that the alleged crime had actually occurred" and "a barrage of negative and hostile comments, from inside the Duke community as well as outside." Compl. ¶ 13. Brodhead also acknowledged Duke faculty members and student protestors "were quick to speak as if the [rape] charges were true" and that "the public as well as the accused students and their families could have thought that those were expressions of the university." ¶ 11.b

Perhaps nothing betrays the Duke Defendants' true motives more pointedly than

their fraudulent conduct: they attempted to railroad Plaintiffs by advising the players not to tell their parents about the accusations, by discouraging the players from retaining a lawyer, and then by referring the players to a lawyer (Covington) who had only Duke's and his own interests at heart, *see* Part V.C, *supra*; and they unlawfully disclosed the key card data to the Investigators and then, in response to a subpoena for that same data, hid from Plaintiffs that they had already disclosed it, *see* Pls.' University Opp. Part V.B, H.[33]

### D. Plaintiffs Have Stated a Claim for Obstruction of Justice (Count 23)

In Count 23, Plaintiffs claim that all the SANE and University Defendants (as well

---

[33] Defendants also contend that there is no state action or causation because "courts have consistently held that police officers and prosecutors are presumed to exercise independent judgment in conducting criminal investigations and prosecutions." SANE Br. 43 n.23. Even if correct, that would not matter with respect to the Duke Police and the University because they were, as just discussed, state actors. Anyway, the Durham Investigators did not exercise independent judgment; as just shown, they acted pursuant to a conspiracy with the Duke Defendants. Further, because Defendants conspired with the Durham Investigators, the question of superseding causation does not arise; Defendants are liable for the Durham Investigators actions as co-conspirators. *See Landrigan v. Warwick*, 628 F.2d 736, 742 (1st Cir. 1980) ("Conspiracy is … the mechanism by which to obtain the necessary state action or to impose liability on one defendant for the acts of the others performed in pursuance of the conspiracy.") (citation omitted). In any event, the Durham Investigators' conduct did not break the causal chain: Defendants' conduct was a but-for cause of Plaintiffs' injuries, and the Durham Investigators' conduct was neither independent of nor unforeseeable to the Duke Defendants at the time. *See* Part V.A.1.a, 2, C.1.a; Pls.' University Opp. Part V.B.3; *see also* Compl. ¶¶ 70-80, 248, 260, 306, 308, 312, 353, 416-20, 423, *supra*; 42 U.S.C. § 1983 ("Every person who, under color of [law], *subjects, or causes to be subjected*, any … person … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party") (emphasis added); *Monroe v. Pape*, 365 U.S. 167, 187 (1961) (§ 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions"); *Shaw v. Stroud*, 13 F.3d 791, 800 (4th Cir. 1994) ("the causal link in § 1983 cases is analogous to proximate cause"); *Zahrey v. Coffey*, 221 F.3d 342, 349-52 (2d Cir. 2000) (discussing § 1983 causation standard).

as all the other defendants named in this case) obstructed and conspired to obstruct justice by, among other things: making false statements that initiated and prolonged a baseless criminal investigation: fraudulently and by abusing judicial process concealing their illegal disclosure of key card data; eliciting an NTO for DNA samples in violation of the Fourth Amendment; and suppressing exculpatory evidence.  Compl. ¶¶ 645-47.

Defendants argue that this claim fails because North Carolina does not recognize a civil claim for obstructing a criminal investigation.  SANE Br. 46-48.[34]  We show elsewhere that Defendants' argument is incorrect.  Pls.' Durham Opp. Part V.E.[35]

## VI.   CONCLUSION

For the foregoing reasons, the SANE Defendants' motion should be denied.

---

[34] Defendants' assertion that Plaintiffs' "real grievance" in bringing this count and Counts 5 and 22 is that they were "maliciously prosecuted," SANE Br. 46 n.25, is patently wrong; it is obvious from the Complaint that none of Plaintiffs' claims against the SANE or University Defendants is for malicious prosecution.

[35] Defendants also argue that the Complaint's allegations are inadequate to show that the Duke Defendants conspired with others to commit this tortious act.  SANE Br. 48 n.28.  Whether Defendants conspired to obstruct justice, however, is irrelevant insofar as they personally commit such acts, which each of them did; the conspiracy is significant only for the purpose of holding liable those Defendants who did not personally commit such acts.  *See Fox v. Wilson*, 354 S.E.2d 737, 743 (N.C. Ct. App. 1987) ("all of the conspirators are liable, jointly and severally, for the act of any one of them done in furtherance of the agreement").  In any event, we have catalogued the extensive and detailed allegations establishing that the Duke Defendants agreed with Nifong, the Durham Investigators, the City, and the Supervisors to obstruct justice.  *See* Part V.A.1.a, 2, C.1.a, C.2; Pls.' University Opp. Part V.B.3; *see also* Compl. ¶¶ 3, 10-11, 225, 236-38, 289, 356-59, 361-65.  The Complaint also contains numerous specific allegations showing that the Duke Defendants conspired among themselves and with Defendant Covington to obstruct justice.  Part V.C.2, *supra*.  These allegations are more than enough to survive Defendants' motion to dismiss.  *See Dickens v. Puryear*, 276 S.E.2d 325, 337 (N.C. 1981) (existence of agreement is question of fact for jury); Pls.' Durham Opp. Parts IV & V.A (discussing standards for pleading conspiracy).

Dated:  August 28, 2008

**THOMAS, FERGUSON
& MULLINS,  L.L.P.**


/s/ William J. Thomas
William J. Thomas, II
(N.C. Bar # 9004)
119 East Main Street
Durham, NC  27701
Tel. (919) 682-5648
Email: thomas@tfmattorneys.com

Respectfully submitted,

**COOPER & KIRK, PLLC**

/s/ Charles J. Cooper
Charles J. Cooper
Brian S. Koukoutchos
David H. Thompson
Howard C. Nielson, Jr.
Nicole Jo Moss
(N.C. Bar # 31958)
David Lehn*
1523 New Hampshire Avenue, NW
Washington, DC  20036
Tel. (202) 220-9600
Email: ccooper@cooperkirk.com
Email: dthompson@cooperkirk.com
Email: nmoss@cooperkirk.com

(* motion for special appearance has been filed)

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 28, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel:

**TROUTMAN SANDERS LLP**
Patricia P. Kerner
N.C. State Bar No. 13005
Hannah Gray Styron
D. Martin Warf
434 Fayetteville Street, Suite 1900
Raleigh, North Carolina 27601
Phone: (919) 835-4117
Fax: (919) 829-8714
Email: tricia.kerner@troutmansanders.com
Email: hannah.styron@troutmansanders.com
Email: martin.warf@troutmansanders.com
*Counsel for Defendants Steven Chalmers,*
*Patrick Baker, Beverly Council, Ronald*
*Hodge, Jeff Lamb, Stephen Mihaich, Michael*
*Ripberger, and Lee Russ*

**FAISON & GILLESPIE**
Reginald B. Gillespie, Jr.
N.C. State Bar No. 10895
5517 Durham Chapel Hill Boulevard
Suite 2000
Durham, North Carolina 27727-1729
Phone: (919) 489-9001
Fax: (919) 489-5774
Email: rgillespie@faison-gillespie.com
*Counsel for Defendants City of Durham,*
*North Carolina and Steven Chalmers*

**STEPTOE & JOHNSON LLP**
Roger E. Warin*
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000

Fax: (202) 429-3902
Email: rwarin@steptoe.com
*(Motion for Special Appearance to be filed)
***Counsel for Defendant City of Durham, North Carolina***

**ELLIS & WINTERS LLP**
J. Donald Cowan, Jr.
N.C. State Bar No. 0968
Dixie T. Wells
N.C. State Bar No. 26816
P.O. Box 21927 [27420]
100 N. Greene Street, Suite 102
Greensboro, North Carolina 27401
Phone: (336) 217-4197
Fax: (336) 217-4198
Email: don.cowan@elliswinters.com
Email: dixie.wells@elliswinters.com

**WILMER CUTLER PICKERING HALE AND DORR LLP**
Jamie Gorelick*
D.C. Bar No. 101370
Jennifer M. O'Connor
William F. Lee
Paul R.Q. Wolfson
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6500
Facsimile: (202) 663-6363
Email: Jamie.gorelick@wilmerhale.com
Email: Jennifer.oconnor@wilmerhale.com
Email: William.lee@wilmerhale.com
Email: Paul.Wolfson@wilmerhale.com
***Counsel for Defendants Duke University, Aaron Graves, Robert Dean, Richard H. Brodhead, Peter Lange, Tallman Trask, III, John Burness, Larry Moneta, Victor J. Dzau, M.D., Allison Halton, Kemel Dawkins, Suzanne Wasiolek, Matthew Drummond,***

***Counsel for Duke University Health Systems,***

2

***Inc., Theresa Arico, and Tara Levicy***
(*motion for special appearance filed)

**YATES, McLAMB &WEYHER, L.L.P**
Dan Johnson McLamb
N.C. State Bar No. 6272
T. Carlton Younger, III
Shirley Marring Pruitt
POB 2889
Email: cyounger@ymwlaw.com
Email: spruitt@ymwlaw.com
***Counsel for Duke University Health Systems,***
***Inc., Theresa Arico, and Tara Levicy***

**POYNER & SPRUILL LLP**
Edwin M. Speas, Jr.
N.C. State Bar No. 4112
P.O. Box 10096
Raleigh, North Carolina 27605-0096
Phone: (919) 783-6400
Fax: (919) 783-1075
Email: espeas@poynerspruill.com
***Counsel for Defendant Mark Gottlieb***

**KENNON, CRAVER, BELO, CRAIG &**
**MCKEE, PLLC**
Joel M. Craig
N.C. State Bar No. 9179
Henry W. Sappenfield
P.O. Box 51579
4011 University Drive, Suite 300
Durham, North Carolina 27717-1579
Phone: (919) 490-0500
Fax: (919) 490-0873
Email: jcraig@kennoncraver.com
Email: hsappenfield@kennoncraver.com
***Counsel for Defendant Benjamin Himan***

**MAXWELL FREEMAN & BOWMAN, P.A.**
James B. Maxwell
N.C. State Bar No. 2933
P.O. Box 52396

Raleigh, North Carolina 27717-2396
Phone: (919) 493-6464
Fax: (919) 493-1218
Email: jmaxwell@mfbpa.com
*Counsel for Defendant David Addison*

**PINTO COATES KYRE & BROWN, PLLC**
Kenneth Kyre Jr. (N.C. Bar # 7848)
Paul D. Coates (N.C. Bar # 9753)
P.O. Box 4848
Greensboro, NC 27404
Email: kkyre@pckb-law.com
Email: pcoates@pckb-law.com
*Counsel for J. Wesley Covington*

As of the date of this filing, no attorney has made an appearance on behalf of the following Defendant.

Linwood Wilson
6910 Innesbrook Way
Bahama, NC 27503-9700
Email: linwoodw@aol.com

/s/ Nicole Jo Moss