## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### No 1:08-cv-119

| | |
|---|---|
| EDWARD CARRINGTON, et al., | |
| Plaintiffs, | Reply Brief in Support of "Duke University Defendants'" Motion to Dismiss Complaint |
| v. | |
| DUKE UNIVERSITY, et al., | |
| Defendants. | |

Plaintiffs assert numerous claims against Duke University, its President, and various administrators under theories of tort, contract, and constitutional law. The premise of all of these claims is that the University and its administrators had a legal obligation to protect Plaintiffs from the consequences of a police investigation—by quelling media coverage of the case, preventing campus protests, and even interceding to stop the investigation. That premise is invalid, and the Complaint should be dismissed.[1]

## I.     PLAINTIFFS FAIL TO STATE A CONTRACT CLAIM (COUNTS 14-16)

In Counts 14-16, Plaintiffs allege that Duke breached contracts with Plaintiffs by: (1) failing to enforce its "anti-harassment" commitment set out in the Duke student bulletin; (2) failing to afford Plaintiffs procedural rights set forth in that bulletin; and (3) cancelling the lacrosse season and firing Coach Pressler. All of these claims fail,

---

[1] We incorporate here by reference the arguments in the Reply Brief in Support of the "Duke SANE Defendants'" Motion to Dismiss.

however, because none of them is premised on a valid contract. (Duke Br. 10-14.)

The first two of Plaintiffs' contract claims are based on Duke's student bulletin. As explained in Duke's opening brief (at 10-12), this Court has twice held that the very same Duke bulletin is not a binding contract. *See Love v. Duke Univ.*, 776 F. Supp. 1070, 1075 (M.D.N.C. 1991), *aff'd* 959 F.2d 431 (4th Cir. 1992) (table), 1992 WL 60230; *Mercer v. Duke Univ.*, No. 97-00959, slip op., at 15 (M.D.N.C. Sept. 28, 2000) (attached to Duke Br. as Ex. 2). Plaintiffs do not dispute that *Love* and *Mercer* hold that Duke's student bulletin is not a valid contract. They contend, however, that *Love* can be distinguished and *Mercer* was wrongly decided. Their arguments are unavailing.[2]

Plaintiffs argue that *Love*'s holding that the Duke bulletin is not a binding contract was contingent on two factors: (1) the plaintiff did not fulfill his own obligations under the bulletin; and (2) certain disciplinary actions, such as "academic dismissals," should be given "great deference." (Pl. Duke Opp. 36-37.) *Love*'s clear holding that Duke's "academic bulletin is not a binding contract" was in no way contingent on those two observations. *Love*, 776 F. Supp. at 1075. The court flatly held that there was no "binding contract between Love and the university." *Id*; *see Mercer*, slip op., at 14 n.8 (noting *Love*'s holding that Duke's bulletin is not a binding contract). The court's additional observations addressed the distinct question whether, even if there was a valid

---

[2] Plaintiffs also rely on the existence of a "national consensus" that the relationship between a student and a university is contractual in nature. (Pl. Duke Opp. 33.) But as *Mercer* acknowledged, even if "[i]t is beyond cavil" that the student-university relationship is "'contractual in nature,'" the Duke student bulletin is not a valid contract. Slip op., at 13, 15.

contract, Duke obstructed "plaintiff's rights to enforce a contract" in violation of 42 U.S.C. § 1981.  *Love*, 776 F. Supp. at 1075.

Plaintiffs do not even try to distinguish *Mercer*, but instead argue that it was wrongly decided.  (Pl. Duke Opp. 37.)  Plaintiffs maintain that *Mercer* was wrong to rely on the analogous rule that employee handbooks are not binding contracts unless they are explicitly included by reference in the employment contract.  (*Id.*)  They insist that, because there is no separate agreement into which the student handbook could be incorporated or any default rule in the student context akin to the rule of "at-will" employment, "the specific terms of the bulletins and other such documents" must necessarily serve as a contract that "bind[s] the University."  (*Id.* at 38.)  But this argument merely presumes that the bulletin is a contract without explaining how it evinces the essential elements of a valid contract:  an "identifiable contractual promise" and a "manifestation of an intent to be bound" by that promise.  *Mercer*, slip op. at 13; *Parker v. Glosson*, 182 N.C. App. 229, 232, 641 S.E.2d 735, 737 (2007).  As *Love* held, because the student bulletin does not include these elements, it cannot constitute a binding contract between Plaintiffs and Duke University.

The holdings of *Love* and *Mercer* are bolstered by Duke's reservation of its right to change the bulletin at any time.  (*See* Duke Br. 12 n.5.)[3]  Plaintiffs contend that Duke's

---

[3] *See, e.g.*, *Southwell v. Univ. of the Incarnate Word*, 974 S.W.2d 351, 356 (Tex. Ct. App. 1998) (student bulletin not a contract where university "reserve[d] the right to change or alter any statement herein without prior notice"); *Millien v. Colby College*, 874 A.2d 397, 401-402 (Me. 2005) (student handbook was not a binding contract where college "reserve[d] the right to make changes at any time without prior notice" to the handbook);

reservation of rights is of no legal import. First, they argue that Duke only reserves the right to change those parts of the bulletin relating to academic matters. But this argument ignores the unambiguous language of the provision, which states: "The university reserves the right to change programs of study, academic requirements, teaching staff, the calendar, *and other matters described herein* without prior notice[.]" (Ex. 3 to Duke Br. at 2 (emphasis added).) Next, Plaintiffs argue that this language is irrelevant because Duke could not change the bulletin retroactively. This too misses the point; Duke does not argue that it retroactively changed any of the provisions of the bulletin that Plaintiffs seek to invoke, but rather that the fact that Duke *could* unilaterally change those policies demonstrates that the bulletin did not create a contract in the first place.

The last of Plaintiffs' breach of contract claims is based on their asserted "contractual right to complete the 2006 season, and to do so under Coach Pressler." (Pl. Duke Opp. 35.) With this claim, Plaintiffs maintain that Duke contracted away—to its students—its authority to make employment decisions and to decide whether to offer a lacrosse program. And Duke granted these student-athletes veto power over these decisions, Plaintiffs maintain, simply by recruiting them to play for Duke. (*Id.* at 41-42.) As explained in Duke's opening brief (at 13), however, Plaintiffs do not, and cannot, allege that Duke specifically promised the players that they would "complete the 2006 season and do so under Coach Pressler," or that Duke intended to be bound by any such

---

*cf. Lilly v. Overnite Transp. Co.*, 995 F.2d 521, 523-524 (4th Cir. 1993) (employment handbook not contract where the company had "reserve[d] the right at all times to alter, amend, add to, or revoke any provision of this handbook").

representations.[4]  Plaintiffs' only response is to assert that they were recruited to Duke based on their own perceived understanding that they would have certain opportunities. (*See* Pl. Duke Opp. 35.)  But that is no answer to the well-settled rule that "[w]here one party simply believes that a contract exists, but there is no meeting of the minds, the individual seeking to enforce the obligation upon a contract theory is without a remedy." *Elliot v. Duke Univ., Inc.*, 66 N.C. App. 590, 595, 311 S.E.2d 632, 636 (1984).[5]

Because Plaintiffs have failed to allege the existence of a valid contract, Counts 15-16 should be dismissed.  Plaintiffs' argument (in Count 14) that Defendants voluntarily assumed a duty to protect them from harassment by setting forth an anti-harassment policy in various University bulletins and handbooks is also without merit. As just discussed, these bulletins and handbooks are not binding contracts.  A plaintiff who cannot establish a contract claim based on a handbook cannot assert the same claim via a theory of negligence.  *See Rucker v. First Union Nat'l Bank*, 98 N.C. App. 100, 104, 389 S.E.2d 622, 625 (1990).  And even if the bulletins and handbooks were binding

---

[4] As noted in Duke's opening brief (at 14), moreover, no North Carolina court has ever recognized a breach of contract claim based on a university's cancellation of an extracurricular activity such as participation in a sports team, and Plaintiffs cite no case from North Carolina or elsewhere recognizing such a claim.  Nor do they cite any case in which a university agreed to give its students veto power over decisions to hire or fire coaches or other employees.

[5] Because Plaintiffs cannot allege that Duke specifically promised the players that they would complete the 2006 season for Coach Pressler, they argue that Duke should have understood that Plaintiffs would be "induced" to enroll at Duke based on their own perceived understanding that they would play for Coach Pressler.  But that argument is, at best, a recapitulation of Plaintiffs' promissory estoppel theory in Count 17 (Compl. ¶ 603), which they have conceded should be dismissed.  (Pl. Duke Opp. 32.)

contracts, Count 14, which is based on the "voluntary undertaking" negligence doctrine, fails because Plaintiffs have not alleged physical injury.  *See infra* pp. 10-11.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM ON ANY OF THEIR NEGLIGENCE OR BREACH OF DUTY CLAIMS (COUNTS 11-13, 19)

### A.   Count 11:  Constructive Fraud

Plaintiffs agree that a claim for constructive fraud can arise *only* where a fiduciary relationship exists.  (*See* Pl. Duke Opp. 19.)  But courts have declined to find a fiduciary relationship between universities and their students for at least two reasons:  first, the student-university relationship is not conducive to the undivided loyalty required of fiduciaries because university officials are always required to uphold the rules and regulations of the university; and second, fiduciary relationships have been confined to legal and business settings.[6]  (*See* Duke Br. 19-21.)  Plaintiffs make two responses, neither of which has merit.

Plaintiffs first contend that Defendants' loyalties could not have been divided because they were not carrying out or enforcing University rules when allegedly advising Plaintiffs about how to respond to the rape allegations.  (*See* Pl. Duke Opp. 22.)  This

---

[6] Plaintiffs attempt (Pl. Duke Opp. 19-20) to rebut the substantial weight of authority declining to find a fiduciary relationship between universities and students by invoking the portion of *Davidson v. University of North Carolina*, 142 N.C. App. 544, 555, 543 S.E.2d 920, 927-928 (2001), that identified a "special relationship" between a university and a student athlete under certain conditions.  That argument fails for the reasons discussed *infra* pp. 12-14.  Plaintiffs also cite (at 20) *Madey v. Duke Univ.*, No. 97-1170, 1999 U.S. Dist. LEXIS 21379, at *25, *28-31 (M.D.N.C. Dec. 1, 1999), *rev'd in part on other grounds*, 307 F.3d 1351 (Fed. Cir. 2002), but that case is inapposite.  *Madey* considered whether a fiduciary relationship existed between a university and a professor—not its students.  *See* 1999 U.S. Dist. LEXIS 21379, at *30.

argument misapprehends the undivided loyalty requirement.  Courts have held that a fiduciary relationship cannot exist between university administrators and students because those officials *always* have a loyalty to the university and a duty to enforce its rules, whether or not they were enforcing those rules in a particular instance.  A fiduciary relationship cannot arise where, as here, the university and its administrators *cannot* promise undivided loyalty to the students.[7]

Next, Plaintiffs insist that a fiduciary relationship arose because the advice that University administrators allegedly gave them was "legal in character" and Suzanne Wasiolek, the Dean of Students, had prior training as a lawyer.  There is no allegation, however, that any of the Duke defendants gave Plaintiffs advice in the context of a lawyer-client relationship.  The fact that Wasiolek has a law degree does nothing to change the nature of her relationship to the students: she was the dean, not their lawyer. *See* Restatement (Third) of Law Governing Lawyers § 48 cmt. d  (2000) (lawyer acting exclusively in capacity of non-lawyer, such as trustee, escrow agent, or expert witness, is only subject to fiduciary obligations that applicable law assigns *that* capacity); *see also id.* § 49, cmt. a.  And there is nothing distinctly "legal" about advice about what to tell one's parents or whether (or from whom) to seek legal advice.  Those statements could

---

[7] *See* Duke Br. 19 n.11; *see also Ryan v. Univ. of N.C. Hosps.*, No. 04-16, 2005 WL 465554, at *4 (N.C. Ct. App. Mar. 1, 2005) ("Because defendants had divided loyalties, this case is unlike other fiduciary relationships in which the fiduciary must act primarily for the benefit of another."); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998) ("[a] fiduciary bears the extraordinary obligation … *never* [to] place his personal interest over that of the persons for whom he is obliged to act") (emphasis added; internal quotation marks omitted; second alteration in original).

just as easily have been made by Coach Pressler, the students' parents, or any other non-lawyer.

Finally, Plaintiffs argue that the Duke Defendants "voluntarily assumed a special role of trust" that gave rise to a fiduciary duty by "displac[ing] the people who would ordinarily have advised" them.  (Pl. Duke Opp. 21.)  But Plaintiffs cite no case to support this "displacement" theory, nor do they explain how it could give rise to a fiduciary duty.[8]  Moreover, "[o]nly when one party figuratively holds *all the cards*—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen."  *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, __ N.C. App. __, __, 659 S.E.2d 442, 451 (2008) (internal quotation marks omitted; emphasis added).  Plaintiffs' own pleadings make clear that no such situation occurred in this case; at the same time Wasiolek was supposedly "displacing" others, Plaintiffs were confiding in their trusted coach (Pressler), the associate athletic director (Chris Kennedy), and, at Kennedy's urging, their parents.  (*See* Compl. ¶¶ 141, 147, 168-169.)  As such, Plaintiffs have not alleged "the amount of control and domination required to form a fiduciary relationship outside that of the normal relationships recognized by law."  *S.N.R. Mgmt.*, __, N.C. App. at __, 659 S.E.2d at 451-452 (internal quotation marks omitted).

---

[8] The sole authority Plaintiffs cite—*Forbis v. Neal*, 361 N.C. 519, 649 S.E.2d 382 (2007)—affords them no help.  In *Forbis*, it was "undisputed" that the defendant-nephew and the plaintiff, an elderly aunt in an assisted living facility, "were in a fiduciary relationship created by the power of attorney [that the aunt had] vested in defendant."  *Id.* at 529-530, 649 S.E.2d at 389.  Plaintiffs do not claim any university administrator had their power of attorney.

**B.      Count 12: "Voluntary Undertaking"**

Plaintiffs contend that Defendants voluntarily undertook a duty to protect them "from the ordeal of a criminal investigation" by offering allegedly mistaken advice about how to respond to the rape accusations.  (Pl. Duke Opp. 24.)  Duke's opening brief pointed out (at 24-25) that this "bad advice" theory has no limits and would subject universities, employers, and many other institutions to unwarranted liability.

Plaintiffs suggest that there is such a limit here because Defendants "guided the players about matters that were legal in nature."  (Pl. Duke Opp. 24.)  But as discussed *supra* at 7-8,  the advice that Dean Wasiolek allegedly gave to the players was not "legal in nature."  Her alleged statements about whether the players should tell their parents about the accusations and whether they should retain a lawyer—advice that any mentor, or even any friend, might have given the players—did not convert her to the players' "legal advisor."  (*Id*.)  Because Dean Wasiolek was not acting as a lawyer when she allegedly provided this advice, Plaintiffs' argument that Rule 4.3 of the North Carolina Rules of Professional Conduct could provide a "readily acceptable standard[] of care" (Pl. Duke Opp. 24) for their voluntary undertaking claim is misplaced.[9]

Plaintiffs' claim also fails because recovery under the "voluntary undertaking" doctrine requires physical injury to person (or perhaps property), and Plaintiffs have

---

[9] Moreover, Rule 4.3 is applicable only to lawyers giving legal advice to unrepresented individuals "on behalf of a client," and Plaintiffs nowhere allege that Duke (or anyone else) was Wasiolek's client.  (Pl. Duke Opp. 24.)

made no such allegations. (Duke Br. 17-18, 23-24.)[10] Plaintiffs argue that physical harm is not required because "the better rule is that the liability of a defendant who voluntarily undertook to protect a plaintiff from a particular type of harm should encompass at least the resulting harm of that type." (Pl. Duke Opp. 30.) But case law and the Restatement of Torts make clear that the voluntary undertaking doctrine is available only to plaintiffs who have suffered injury to person or property as a result of the defendant's failure to use due care in a voluntary undertaking. (Duke Br. 17-18 & n.9, 23-24.)[11]

The potential consequences of Plaintiffs' rule also demonstrate that it is hardly the "better" one. The physical injury requirement provides an important limit to voluntary undertaking claims, which would otherwise be extraordinarily expansive in scope. Without that limit, every individual rendering advice would potentially expose himself to liability if the advice turned out in hindsight to be unhelpful and if the plaintiff who took that advice experienced pecuniary loss or inconvenience. Plaintiffs' rule would surely

---

[10] Plaintiffs suggest that they did "suffer[] harms that were physical or that were tied to physical harm." (Pl. Duke Opp. 25, 30.) They contend that they "were subjected to threats of violence, had to flee their homes, and lost their opportunity in 2006 to play for a national lacrosse championship." (*Id.* at 25.) They fail to provide any explanation of how such alleged harms amount to physical injuries. Absent even a credible allegation of physical injury, Plaintiffs' voluntary undertaking claims warrant dismissal.

[11] *See also TNT Logistics North America, Inc. v. Bailly Ridge TNT, LLC*, No. 05-7219, 2006 WL 2726224, at *9 (N.D. Ill. Sept. 21, 2006) ("Thus, the doctrine generally allows recovery only when the injury has been of a bodily or physical nature."); *Fieldwork Boston, Inc. v. United States*, 344 F. Supp. 2d 257, 264 (D. Mass. 2004) (rejecting a voluntary undertaking claim because "[t]here is no physical injury at issue in the case at bar"). Plaintiffs cite *Johnson v. Ruark Obstetrics and Gynecology Associates, P.A.*, 327 N.C. 283, 395 S.E.2d 85 (1990), but that case involved a claim for negligent infliction of emotional distress claim, which is a distinct cause of action from the voluntary undertaking doctrine.

deter individuals from giving advice or assistance to others. In fact, Plaintiffs appear to embrace such a chilling effect; as they say, "[i]f a defendant does not want to be liable for that type of harm, he can decline the undertaking." (Pl. Duke Opp. 30.) In the university context, this rule would be particularly pernicious, because students routinely seek, and benefit from, the advice and assistance of teachers and administrators on many subjects.

Moreover, strict limits on the voluntary undertaking doctrine are necessary to prevent plaintiffs from converting routine contract cases into tort suits (with the threat of punitive damages). Every contract is in some sense a voluntary undertaking; but if Plaintiffs were correct that physical injury is not required for tort liability, then every breach of contract could give rise to a tort action. As the Fourth Circuit has explained (examining North Carolina law): "The distinction between tort and contract possesses more than mere theoretical significance. Parties contract partly to minimize their future risks. Importing tort law principles of punishment into contract undermines their ability to do so." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 346 (4th Cir. 1998).[12]

---

[12] Plaintiffs rely on *Chew v. Paul D. Meyer M.D., P.A.*, 527 A.2d 828 (Md. Ct. Spec. App. 1987), to argue that liability under the voluntary undertaking doctrine is not limited to physical harm. (*See* Pl. Duke Opp. 31-32.) *Chew*, however, is clearly not consonant with North Carolina law and reflects a minority view. Relying on an earlier Maryland decision that had rejected Section 323 of the Restatement (Second) of Torts in certain circumstances (*i.e.*, with respect to contractual relations), *Chew* held that a defendant who had negligently performed a voluntary undertaking could be liable in tort, even though the plaintiff had only sustained economic injuries. *Id.* at 832. But *Chew* suggested that the parties' contractual relationship was a reason to *impose* tort liability (527 A.2d at 832)—exactly the opposite of the Fourth Circuit's reading of North Carolina law in *Broussard*. *Chew* therefore does not reflect North Carolina's concern that every breach

**C.     Count 13:  "Special Relationship"**

Plaintiffs argue that they had a "special relationship" with Duke, such that the University and its officials had a duty to protect them from "harm, including threats to their liberty, personal safety, and reputation due to [Mangum's] false allegations of rape, harassment, and a rogue criminal investigation."  (Compl. ¶ 569.)  Plaintiffs do not dispute that their injuries were *not* sustained in the course of playing lacrosse.  (*See* Pl. Duke Opp. 26; Duke Br. 27.)  Nor do they contest that liability under the special relationship doctrine lies only where the risk of harm arises in the course of that relationship.  (Duke Br. 27.)  They nevertheless contend that "they were injured while they were Duke lacrosse players and specifically because they were Duke lacrosse players," and their "status as lacrosse players" on the University's varsity team entitles them to relief.  (Pl. Duke Opp. 26-27.)

Plaintiffs' status-based theory of the special relationship doctrine finds no support in the law.  To the contrary, courts have recognized special relationships between universities and college athletes only where the athlete's injury occurred in the course of a school-sponsored athletic activity.  For example, the court in *Davidson*, 142 N.C. App. at 555, 543 S.E.2d at 927, found a special relationship between a university and its cheerleaders, but explicitly emphasized that its holding was "based on the fact that plaintiff was injured while practicing her sport as a part of a school-sponsored,

---

of contract should not give rise to a tort claim.

intercollegiate team."[13]  Plaintiffs suggest that the court "meant only to explain that 'the student-university relationship, standing alone, does not constitute a special relationship giving rise to a duty of care.'"  (Pl. Duke Opp. 27 (quoting *Davidson*, 142 N.C. App. at 556, 543 S.E.2d at 928).)  In fact, that decision clearly emphasized that (1) the plaintiff was injured while actually playing or practicing her sport, and (2) the injury occurred during a school-sponsored activity.  Based on those two facts, the Court drew a clear line separating the narrow circumstances in which a university-athlete relationship will give rise to a "special relationship" from the general university-student relationship, which will not (and which applies to this case).

Plaintiffs' theory would greatly expand the special relationship doctrine.  Under Plaintiffs' theory, a university would be obligated to protect student athletes from any foreseeable injury that might in some sense be related to their status as athletes—be it in the classroom, the dining hall, the fraternity house, or the dormitory.  Such a rule would vastly increase the duties that a university owes to its student athletes (and invite more

---

[13] Similarly, in a case relied upon by *Davidson*, the Third Circuit recognized a narrow special relationship between a university and a student "in his capacity as an intercollegiate athlete engaged in school-sponsored collegiate activity for which he had been recruited."  *Kleinknecht v. Gettysburg Col.*, 989 F.2d 1360, 1369 (3d Cir. 1993) (cited in *Davidson*, 142 N.C. App. at 556, 543 S.E.2d at 928).  Essential to the court's reasoning was the "distinction between a student injured *while participating* as an intercollegiate athlete in a sport for which he was recruited and a student injured at a college while pursuing his private interests, scholastic or otherwise," such as an injury sustained during that athlete's "fraternity football game."  *Id*. at 1368 (emphasis added).  The Third Circuit emphasized that the athlete was not "acting in his capacity as a private student when he collapsed," and that a duty of care under the special relationship doctrine arose because his "cardiac arrest occurred during an athletic event involving an intercollegiate team of which he was a member."  *Id*.

lawsuits from them) and would introduce significant inequality among students not justified by precedent, policy, or logic.[14]

### D.     Count 19:  Negligent Supervision

Count 19 seeks to hold the University, Brodhead, Moneta, Lange, and Trask responsible for allegedly negligently supervising various Duke officers, professors, and employees.  (Compl.¶¶ 614-618.)  Because Plaintiffs have not stated a claim against any Duke University employee for committing a tortious act, Plaintiffs cannot maintain an action against their employer for negligent supervision.  *See Guthrie v. Conroy*, 152 N.C. App. 15, 26, 567 S.E.2d 403, 411 (2002).  Independently, Count 19 should be dismissed as to Brodhead, Moneta, Lange, and Trask because under North Carolina law only the employer, not individual defendants, can be liable for negligent supervision.[15]  Plaintiffs' arguments to the contrary (Pl. SANE Opp. 15-17; Pl. Duke Opp. 47) are unavailing for the reasons discussed in the Reply Brief for Duke SANE Defendants at pp. 10-11.

### III.    PLAINTIFFS FAIL TO STATE A CLAIM ON THEIR EMOTIONAL DISTRESS CLAIMS (COUNTS 6-7)

### A.     Count 6:  Intentional Infliction Of Emotional Distress

Plaintiffs assert that the entire "course of conduct adopted by" Duke University

---

[14] Contrary to Plaintiffs' claim (Pl. Duke Opp. 19), Duke does not concede that any Duke Defendants breached any duties that caused injury under Counts 11-13.  Rather, Plaintiffs' claims all fail at the threshold because no such duties arise here.

[15] *See Foster v. Crandell*, 181 N.C. App. 152, 171, 638 S.E.2d 526, 539 (2007); *Smith v. Privette*, 128 N.C. App. 490, 494-495, 495 S.E.2d 395, 398 (1998); *Cox v. Indian Head Indus., Inc.* 123 F. Supp. 2d 892, 914-915 (W.D.N.C. 2000); Duke SANE Br. 17-18.

and its employees "throughout the rape hoax crisis" was extreme and outrageous.[16] (Compl. ¶ 519.) Plaintiffs' brief makes clear, however, that the core of their complaint is what Duke allegedly did *not* do: Duke did not conduct its own investigation into the rape charges; did not intercede in the police investigation to correct mischaracterizations of the evidence; did not investigate exculpatory evidence offered by the players; and did not protect the players from the media or from protestors on campus. (Pl. Duke Opp. 8-9.) None of these alleged actions (or, rather, inactions) constitutes extreme and outrageous conduct. It is not "utterly intolerable in a civilized community" (*Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 493, 340 S.E.2d 116, 123 (1986)) for Duke University to decline to intervene in an ongoing criminal proceeding, to decline to conduct its own "investigation" into criminal allegations against its students, or to decline to stop media coverage or protests. The failure to act—"watch[ing] passively" or "s[itting] silently" (Pl. Duke Opp. at 8)—as *others* engage in offensive conduct does not constitute extreme and outrageous conduct. *See Walker v. Sullair Corp.*, Nos. 90-2124, 90-2132, 1991 WL 195754, at *3 (4th Cir. Oct. 3, 1991) (holding that "non-action, no matter how blameworthy, … does not approach the level of 'outrageousness' which is the crux of this tort under North Carolina law").

Allegations that the Duke Defendants "maligned" the players fare no better. Even if the alleged public statements constituted more than "insults" or "indignities," *Guthrie*,

---

[16] Contrary to Plaintiffs' contention (Pl. Duke Opp. 7), a court may decide on a motion to dismiss whether the alleged conduct meets the stringent test under North Carolina law for "extreme and outrageous" conduct. *See Buser v. S. Food Serv., Inc*., 73 F. Supp. 2d 556, 572-573 (M.D.N.C. 1999) (Beaty, J.); *see also* Duke Br. 31 & n.17.

152 N.C. App. at 22, 567 S.E.2d at 409, and even if the Defendants' alleged statements could be construed as accusing the players of a crime, North Carolina courts have rejected claims that such accusations, even false accusations, constitute extreme and outrageous conduct. *See* Duke SANE Br. 28-29; Duke SANE Reply Br. 13-17; *see also Sabrowski v. Albani-Bayeux, Inc.*, No. 02-00728, 2003 WL 23018827, at *3-*4 (M.D.N.C. Dec. 19, 2003) (Beaty, J.) (defamatory statements about plaintiff not "extreme and outrageous"). Finally, Duke's alleged "punishment" of the players—by canceling the lacrosse season and firing the coach—does not remotely approach the legal standard for extreme and outrageous conduct, even if those actions were, as Plaintiffs allege, unfair. *See, e.g.*, *Swaim v. Westchester Acad.*, 208 F. Supp. 2d 579, 589-590 (M.D.N.C. 2002) (holding that boss's treatment of employee was not "extreme and outrageous" even if it was "completely unjustified" and "capricious or unfair," and citing cases with similar results); *Buser v. S. Food Serv., Inc.*, 73 F. Supp. 2d 556, 573 (M.D.N.C. 1999) (Beaty, J.) (firing a worker was not "extreme and outrageous" even when doing so violated federal law and the plaintiff's family was in dire financial and medical straits); *see also Yaron v. Township of Northampton*, No. 88-9144, 1989 WL 100920, at *9 (E.D. Pa. Aug. 29, 1989) (cutting player from traveling basketball team not extreme and outrageous even if motivated by "personal animosity or vindictiveness").[17] Because nothing that any

---

[17] Plaintiffs also allege that the Duke Defendants conspired with various Durham officials to deprive the players of their rights. (Pl. Duke Opp. 9.) But the specific allegations here—that Duke Police "arranged for" uncounseled interrogations (which never took place), "helped" Durham search residences without a warrant, and turned over key card data in violation of FERPA—do not constitute extreme and outrageous conduct. *See*

Duke Defendant is alleged to have done constitutes extreme and outrageous conduct (and because Plaintiffs have not made any factual allegations that they have suffered severe emotional distress), this claim should be dismissed.[18]

### B.    Count 7:  Negligent Infliction Of Emotional Distress

Plaintiffs cannot state a claim under Count 7 for negligent infliction of emotional distress for the reasons discussed in Duke's opening brief (Duke Br. 33-34) and in the Reply Brief for Duke SANE Defendants at 11-12.

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM ON ANY OF THEIR LEGAL THEORIES RELATED TO THE RELEASE OF THE KEY CARD DATA (COUNTS 8-10, 20)

### A.    Count 8:  Fraud

As explained in Duke's opening brief (at 35-36), Plaintiffs have not alleged the elements of fraud.  Plaintiffs' response, moreover, points out yet another defect in their claim.  Plaintiffs continue to insist that they were injured by having to expend time and resources to quash the subpoena for their key card records after Defendants informed

---

*Hardin v. Champion Intern. Corp.*, 685 F. Supp. 527, 531-532 (W.D.N.C. 1987) ("It has not been enough [to show extreme and outrageous conduct] that the defendant has acted with an intent which is tortious or even criminal…." (quoting and adopting Restatement (Second) of Torts § 46 cmt. d (1965))); *Buser*, 73 F. Supp. 2d at 573 (firing a worker was not "extreme and outrageous" even though firing violated federal law).

[18] This claim should be dismissed as to the parent-Plaintiffs for another reason: the Complaint nowhere alleges that any Duke Defendant recklessly or intentionally inflicted harm specifically directed at the parents.  *See Briggs v. Rosenthal*, 73 N.C. App. 672, 678, 327 S.E.2d 308, 312 (1985) (affirming dismissal of parents' intentional infliction of emotional distress claim where "defendants' action … was not specifically directed toward" the parents but rather toward their deceased son; recovery to third parties "is clearly limited to the most extreme cases of violent attack").

them by letter of this subpoena without disclosing that the records had allegedly been turned over to the prosecutors already. (*See* Pl. Duke Opp. 14; Compl. ¶ 535.) But had those letters informed Plaintiffs that the key card records had already been turned over, Plaintiffs surely would have filed a motion to quash the subpoena or to obtain some other form of relief from the Court. Plaintiffs have thus failed to allege an essential element of fraud: that they acted differently because of Defendants' alleged misrepresentations or that they relied to their detriment on these misrepresentations. *See Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C. App. 650, 663, 464 S.E.2d 47, 57 (1995); *Feibus & Co., Inc. v. Godley Const. Co., Inc.*, 44 N.C. App. 133, 139, 260 S.E.2d 665, 669 (1979), *rev'd on other grounds*, 301 N.C. 294, 271 S.E.2d 385 (1980).

## B.  Count 9:  Negligent Misrepresentation

Plaintiffs do not dispute that an essential element of negligent misrepresentation is that the misrepresentation must arise in the course of a business transaction. (Pl. Duke Opp. 15.) They nevertheless contend that this element is satisfied because their "dealings with Duke were founded on a very traditional business transaction," namely, that they paid tuition in exchange for "education and other services" from the University. (*Id*.) But the same was true of the plaintiff in *Mercer v. Duke University*, No. 97-959, slip op. at 28 (M.D.N.C. Sept. 28, 2000) (attached to Duke Br. as Ex. 2), and the Court held that plaintiff's relationship to the university was not "fundamentally a business relationship." In fact, the Court explicitly rejected plaintiff's argument that a commercial relationship existed simply because "she paid tuition to Duke." *Id*. at 27. Moreover, Plaintiffs'

theory would greatly expand the scope of the negligent misrepresentation tort by allowing every student who pays tuition to a university—which is to say *all* students—to bring such claims. That theory was rejected in *Mercer*, and it should be rejected here.

### C.     Count 10:  Abuse Of Process

Plaintiffs misstate the requirements of abuse of process. They contend that "[a]sking a court to engage in a charade and to issue judicial process so that you can obtain information that you have already gotten illegally, in order to conceal that misconduct from both your opponents and the court" satisfies the elements of abuse of process. (Pl. Durham Opp. 22.) But an allegedly "[e]vil purpose alone is not sufficient" to state a claim for abuse of process. *Melton v. Rickman*, 225 N.C. 700, 704, 36 S.E.2d 276, 278 (1945); *see* Duke Br. 39. Rather, the "distinctive nature of an action for abuse of process is the improper use of process *after* it has been issued, and *not* for maliciously causing it to issue." *Ellis v. Wellons*, 224 N.C. 269, 271, 29 S.E.2d 884, 885 (1944) (emphasis added); *see Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 602, 646 S.E.2d 826, 831 (2007) (defendant must commit an act that is a "malicious misuse or application of that process *after issuance* to accomplish some purpose not warranted or commanded by the writ") (internal quotation marks omitted). Plaintiffs make no allegations in their Complaint that could satisfy this requirement. Their entire argument is based on Defendants' allegedly improper motive for asking the Durham authorities to issue the subpoena—not on any irregular use of the subpoena *after* its issuance. Even if it were true that Duke sought the subpoena and did so for the purpose of concealing its

purported prior misconduct (which it is not), Plaintiffs nowhere allege that the subpoena was improperly used by the Defendants *after* it was issued, as required by North Carolina law.

### D.    Count 20:  Violation Of Fourth Amendment Rights Under § 1983

Duke's opening brief showed (at 43-44) that Plaintiffs did not suffer a violation of any federal right cognizable under 42 U.S.C. § 1983 when their key card information was disclosed.  Plaintiffs concede that FERPA does not create rights enforceable under § 1983.  (Pl. Durham Opp. 24.)  Plaintiffs contend, however, that FERPA created an expectation of privacy such that the unauthorized disclosure of FERPA-protected information by state actors constitutes a Fourth Amendment violation.  (*Id.* at 24-25.) That contention lacks substance.

Plaintiffs do not contest that, under Supreme Court precedent, there is no constitutionally protected privacy interest in the information that might have been revealed in the key card information—namely, (1) Plaintiffs' publicly-observable "comings and goings," such as their entering dormitories or other campus buildings, *see United States v. Knotts*, 460 U.S. 276, 281-282 (1983), and (2) information (such as purchases from vending machines) that Plaintiffs voluntarily provided to third parties, including Duke, *see Georgia v. Randolph*, 547 U.S. 103, 132 (2006); *United States v. Jacobsen*, 466 U.S. 109, 117 (1984); *Smith v. Maryland*, 442 U.S. 735, 744 (1979); *United States v. Miller*, 425 U.S. 435, 443 (1976).  Plaintiffs suggest, however, that even though the Fourth Amendment itself does not recognize a protected privacy interest in

this information, FERPA created a privacy interest that is protected by the Constitution. (Pl. Durham Opp. 24.) This argument is doubly misguided.

First, as the Supreme Court explained in *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287-288 (2002), "FERPA's nondisclosure provisions fail to confer enforceable rights." *Id.* Indeed, FERPA's nondisclosure rules do not create or confer *individual* rights at all. *See id.* (FERPA's provisions "are not concerned with whether the needs of any particular person have been satisfied, and they cannot give rise to individual rights"). FERPA therefore does not create a reasonable expectation of privacy that would warrant protection under the Constitution—as courts have held.[19] *See Falvo v. Owasso Indep. Sch. Dist. No. I-011*, 233 F.3d 1203, 1209-1210 (10th Cir. 2000) (holding that FERPA does not create an expectation of privacy under the Constitution), *rev'd on other grounds*, 534 U.S. 426 (2002); *see also Risica ex rel. Risica v. Dumas*, 466 F. Supp. 2d 434, 443 (D. Conn. 2006) ("Plaintiff's theory that FERPA can create a reasonable expectation of privacy is extremely tenuous in light of *Gonzaga* ….").[20]

---

[19] Plaintiffs' contention that Superior Court Judge Titus "already ruled" that Plaintiffs had a "reasonable expectation of privacy" and a "Fourth Amendment right" in this data (Pl. Durham Opp. 23, 24) mischaracterizes that ruling. The order quashing the subpoena explained that the key card data was protected by FERPA and that the District Attorney had not made the required showing of materiality or necessity to overcome that protection. The order did not address the Fourth Amendment or reasonable expectations of privacy under the Constitution. (*See* Pl. Durham Opp. Ex. 1.)

[20] In addition, recognizing such a statutorily-created, but constitutionally-protected, privacy right would interfere with the enforcement mechanism Congress placed in FERPA. Congress intended that the Department of Education (DOE) be the sole arbiter of violations of the disclosure provisions of FERPA. As *Gonzaga* made clear, the recourse for students and parents who feel aggrieved by a school's FERPA violation is to complain to DOE, which can then initiate an investigation of the University that might

Second, Plaintiffs fail to explain how a statute could create a constitutional right in information that the Supreme Court has already held is not protected by the Constitution itself. Plaintiffs suggest that constitutional rights can be created by statutes that are "crafted specifically to ensure that the information" is protected from disclosure. But courts have *refused* to find expectations of privacy under the Fourth Amendment based in statutes "crafted specifically" to ensure privacy protections. *See United States v. Hambrick*, 225 F.3d 656 (table), 2000 WL 1062039, at *2-3 & n.2 (4th Cir. Aug. 3, 2000) (finding no Fourth Amendment expectation of privacy in certain electronic information provided to a third party even if it was protected by the Electronic Communications Privacy Act); *see also United States v. Kington*, 801 F.2d 733, 737 (5th Cir. 1986) (no Fourth Amendment reasonable expectation of privacy in third party banking information even if it is protected by the federal Right to Financial Privacy Act); *State v.*

---

eventually result in the withdrawal of federal funding to the institution if the institution has a practice of violating FERPA. 536 U.S. at 289 (citing 34 CFR §§ 99.60 *et seq.*). The *Gonzaga* Court found it "implausible to presume" that Congress, in enacting FERPA and setting up its administrative enforcement mechanism, "nonetheless intended private suits to be brought before thousands of federal- and state-court judges." *Id.* at 290. A holding that FERPA creates Fourth Amendment rights would do just that. *See also Guilford County Cmty. Action Program, Inc. v. Wilson*, 348 F. Supp. 2d 548, 555 (M.D.N.C. 2004) (Beaty, J.) (citing *Gonzaga*'s contrast of cases involving statutes that "conferred an 'objective' monetary entitlement upon plaintiffs, and [had] no sufficient administrative means of enforcing the requirements against defendants that failed to comply"); *Wiggins v. Martin County Bd. of Educ.*, No. 04-17, 2004 WL 3312156, at *3 (E.D.N.C. Aug.18, 2004) ("[E]nforcement of FERPA is left solely to the Secretary of Health, Education and Welfare. No private remedy is granted under the statute.").

*Melvin*, 86 N.C. App. 291, 295-296, 357 S.E.2d 379, 382 (1987) (same).[21]  Plaintiffs

provide no reason for following a different rule here.

## V. PLAINTIFFS FAIL TO STATE A CLAIM FOR INTRUSION ON SECLUSION (COUNT 18)

Plaintiffs argue that the Complaint alleges "at least" three examples of intrusion

into seclusion.  (Pl. Duke Opp. 45.)  None of these examples states a valid claim.[22]

Plaintiffs' first example is the "physical invasions on the Plaintiffs' homes" that

occurred when Duke allegedly "provid[ed] a key" to 610 N. Buchanan, the residence of

three of the four lacrosse captains, to Durham police officers on March 16.  (Pl. Duke

Opp. 45; Compl. ¶ 162.)  The only allegation, however, is that Durham police officers

"arrived at 610 N. Buchanan with keys and a search warrant."  (Compl. ¶ 162.)  Entry

into a private residence pursuant to a warrant does not constitute an intrusion on

---

[21] The pre-*Gonzaga* case, *Doe v. Broderick*, 225 F.3d 440 (4th Cir. 2000), cited by the Plaintiffs (Pl. Durham Opp. 25), is not to the contrary.  First, the information in *Broderick* involved medical records related to drug-addiction treatment, which the Fourth Circuit explained contained "intimate and private details that people do not wish to have disclosed." 225 F.3d at 445, 451.  By contrast, Plaintiffs concede that the only information at issue here is key card data that reveals their publicly-observable activities and vending machine transactions.  (Pl. Duke Opp. 11. n.4.)  Second, the statute at issue in *Broderick* (42 U.S.C. § 290dd-2 (2003)) was a criminal statute that lacked an administrative enforcement system like FERPA's—a system that the Supreme Court held would be undermined by private suits.  *See supra* p. 21 n.19.  Finally, the language that Plaintiffs cite from *Broderick* is *dicta* because the defendant had already "conceded" that the plaintiff had "stated a claim under the Fourth Amendment." 225 F.3d at 450.

[22] Plaintiffs have no basis for any claim against individual defendants Brodhead, Trask, Lange, Burness, and Moneta; Plaintiffs do not allege that any of the individual defendants personally engaged in conduct that intruded upon their seclusion, and those individual Defendants cannot be held liable for the acts of other University employees on the basis of *respondeat superior*.  *See supra* p. 14; Duke SANE Reply Br. 10-11.  Plaintiffs concede this point by failing to respond to it in their opposition.

seclusion. *See Warden v. Hayden*, 387 U.S. 294, 321 (1967) ("[A]n officer with a search warrant can enter any house, any room, any building, any office.").

Plaintiffs' second example is their allegation that the Duke Defendants "subjected" them to "uncounseled, surprise interrogations by the Durham Investigators in their private residences and dorms." (Compl. ¶ 608.) This claim fails because Plaintiffs do not allege that any Duke Defendant, in so doing, entered the private places or examined the private affairs of any Plaintiff, as required to state a claim. *See* Restatement (Second) of Torts § 652B cmt. c (1997) (tort of intrusion lies only where the defendant "has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs"). Nor do they allege that any Duke Defendant participated in any police "interrogations" in the dormitory rooms. As explained in Duke's opening brief (at 47), Plaintiffs cannot hold Duke liable for intrusion on seclusion based on the alleged actions of the Durham Police. In any event, there are no allegations that even the Durham Investigators forced their way into the Plaintiffs' dormitory rooms or entered in the face of objection, as would be required for a physical intrusion upon seclusion. *See* Restatement (Second) of Torts § 652B cmt. B (1997). Nor do Plaintiffs allege that the Durham Investigators intruded on their private affairs in the course of the alleged interrogation. (*See* Duke Br. 47-48 & n.23.)

Finally, Plaintiffs contend that Duke faculty "organized protests at Plaintiffs' residences." (Pl. Duke Opp. 46.) Protests occurring outside Plaintiffs' residences do not amount to an intrusion into their private home, however. *See* W. Page Keeton, et al.,

Prosser and Keeton on the Law of Torts § 117 (5th ed. 1984) ("[T]here must be something in the nature of prying or intrusion, and … mere noises which disturb … or bad manners, harsh names, and insulting gestures in public, are not enough.").  While Plaintiffs allege that these protests might have "included 'bang[ing] on the windows' of the homes" of the players (Pl. Duke Opp. at 46), there is no allegation that any Duke employee did any of the banging on the window or intruded on Plaintiffs' private space.

## VI.    CONCLUSION

For the foregoing reasons, all claims against the Duke University Defendants should be dismissed for failure to state a claim on which relief may be granted.

/s/ Jamie S. Gorelick

—————————————————

Jamie S. Gorelick
District of Columbia Bar No. 101370
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
Telephone: (202) 663-6500
Facsimile: (202) 663-6363
Email: jamie.gorelick@wilmerhale.com

/s/ J. Donald Cowan, Jr.

—————————————————

J. Donald Cowan, Jr.
N.C. State Bar No. 0968
Ellis & Winters LLP
100 N. Greene Street, Suite 102
Greensboro, North Carolina 27401
Telephone:  (336) 217-4193
Facsimile:  (336) 217-4198
Email:  don.cowan@elliswinters.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 29, 2008, I electronically filed the foregoing

Reply Brief in Support of "Duke University Defendants'" Motion to Dismiss Complaint

with the Clerk of the Court using the CM/ECF system which will send notification of

such filing to the following:

> *Counsel for the Plaintiffs*
> William J. Thomas, II
> Email: thomas@tfmattorneys.com
>
> Charles J. Cooper
> Email: ccooper@cooperkirk.com
>
> David H. Thompson
> Email: dthompson@cooperkirk.com
>
> *Counsel for J. Wesley Covington*
> Kenneth Kyre, Jr.
> Email: kkyre@pckb-law.com
>
> *Counsel for City of Durham*
> Reginald B. Gillespie, Jr.
> Email: rgillespie@faison-gillespie.com
>
> *Counsel for Mark Gottlieb*
> Edwin M. Speas, Jr.
> Email: espeas@poynerspruill.com
>
> Eric P. Stevens
> Email: estevens@poyners.com
>
> *Counsel for Benjamin Himan*
> Henry W. Sappenfield
> Email: hsappenfield@kennoncraver.com
>
> Joel Miller Craig
> Email: jcraig@kennoncraver.com

*Counsel for Patrick Baker, Steven Chalmers, Ronald Hodge, Lee Russ, Stephen Mihaich, Beverly Council, Jeff Lamb, Michael Ripberger*

Patricia P. Kerner
Email: tricia.kerner@troutmansanders.com

D. Martin Warf
Email: martin.warf@troutmansanders.com

Hannah Gray Styron
Email: hannah.styron@troutmansanders.com

*Counsel for David Addison*
James B. Maxwell
Email: jmaxwell@mfbpa.com

*Counsel for Duke SANE Defendants*
Dan McLamb
Email: dmclamb@ymwlaw.com

Shirley Pruitt
Email: spruitt@ymwlaw.com

As of the date of this filing, no attorney has made an appearance on behalf of the following Defendant. I hereby certify that I served the following Defendant by U.S. Mail:

Linwood Wilson
6910 Innesbrook Way
Bahama, NC 27503-9700

This 29th day of September 2008.

/s/ Jamie S. Gorelick
Jamie S. Gorelick

Attorney for Duke University, Duke University Health System, Inc., Richard Brodhead, Peter

Lange, Larry Moneta, John Burness, Tallman Trask, Suzanne Wasiolek, Matthew Drummond, Aaron Graves, Robert Dean, Tara Levicy, Theresa Arico, Kate Hendricks, Victor Dzau