## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### No 1:08-cv-119

EDWARD CARRINGTON, et al.,

        Plaintiffs,

    v.

DUKE UNIVERSITY, et al.,

        Defendants.

Reply Brief in Support of "Duke SANE Defendants'" Motion to Dismiss Complaint

Plaintiffs seek to hold Duke University and its President, the Duke University Health System and its Chief Executive, and individual nurses at Duke Hospital liable for the harms they allegedly suffered as a result of the criminal investigation into allegations of rape by Crystal Mangum. These Plaintiffs, students who were never arrested, indicted, or charged for any crime (and some of their parents), cannot do so under North Carolina or federal law. In their brief, Plaintiffs candidly identify the remarkably expansive legal duties that they are asking this Court to recognize: they assert that the Defendants owed Plaintiffs a legal duty not only to accurately report information to the police and the public about possible crimes, but also to "intervene" in any criminal investigation to affirmatively "correct" any information that had been inaccurately reported. There is no basis in law or logic for such duties, which would undermine the proper functioning of

the criminal justice system.  The claims here should be dismissed.[1]

## I.    PLAINTIFFS FAIL TO STATE A CLAIM FOR NEGLIGENCE (COUNTS 2-5)

In Counts 2-5, Plaintiffs assert negligence-based claims arising out of the sexual assault examination of Crystal Mangum at Duke Hospital, the evaluation by hospital personnel of that examination, their report on that examination to the Durham Police, and other statements (or failure to make statements) by other Duke and DUHS personnel about Mangum's medical records.  Our opening brief showed (at 7-23) that these allegations all fail as a matter of law for two reasons:  first, they would impose unprecedented legal duties on health care providers and their employers to an indeterminate class of third persons not their patients; and second, the allegedly willful misconduct of certain Durham police officers and District Attorney Nifong to pursue the investigation despite clear exculpatory evidence was an intervening cause of any injuries Plaintiffs purportedly suffered.  Plaintiffs seek to avoid these conclusions by recharacterizing their negligence claims and minimizing their own allegations about the conduct of the police officers and Nifong.  These efforts fail.

### A.    Defendants Did Not Owe Plaintiffs A Duty Of Care (Counts 2-5)

#### 1.    The Health Care Providers Had No Duty To Plaintiffs With Respect To Their Examination Of Mangum (Count 4)

Our opening brief showed (at 10-12) that North Carolina law disallows any claim for medical negligence by persons other than patients.  This established rule precludes

---

[1] We incorporate by reference the arguments in the Reply Brief in Support of the "Duke Defendants'" Motion to Dismiss.

any claim by Plaintiffs that they were injured by the way that Duke hospital personnel examined Mangum and came to medical conclusions based on their examination.[2] Seeking to avoid that conclusion, Plaintiffs disavow any claims sounding in medical malpractice and instead argue (Pl. SANE Opp. 7) that they are merely bringing "ordinary" negligence claims. But the claims under a new label fare no better.

North Carolina law is scarcely more hospitable to "ordinary" negligence claims brought by nonpatients against hospitals than it is to "medical" negligence claims. In *Iodice v. United States*, 289 F.3d 270 (4th Cir. 2002), the Fourth Circuit concluded that, "*if* [North Carolina] permitted third party plaintiffs to recover at all" on "ordinary

---

[2] Although Plaintiffs state that they are *not* alleging that hospital personnel negligently conducted the sexual assault examination, they also seek to hedge their bets, arguing that, even if Count 4 rested on "wrongful performance of the examination," that claim would not sound in medical malpractice because forensic examinations "performed for the purpose of collecting evidence of an alleged crime" do not sound in medical malpractice. (Pl. SANE Opp. 6-7.) Plaintiffs cite no North Carolina law for this proposition, and their one cite to a Tennessee case provides no support, for that case did not involve an examination by health care providers "performed for the purpose of collecting evidence" but instead involved allegations of negligent testing by a DNA lab. In any event, Tennessee law is not governed by North Carolina's specific statute defining medical malpractice. Moreover, Count 4 (and also Counts 2, 3, and 5) allege that Duke health care providers were negligent in "assessing" Mangum's injuries (and then reporting that alleged mistaken assessment to the police). (*See* Compl. Count 4 ("Breach of Duty of Care in Conducting" Examination), ¶ 491 ("disregard[ing] standards of professional judgment in the examination"), ¶ 505 (duty of care in "assessing, analyzing, and reporting" medical evidence from the examination); *see also* ¶¶ 501, 511.) A medical professional's "assessment" of an injury—whether it is a SANE nurse examining a possible rape victim or a doctor assessing a possible gunshot wound—requires the kind of "highly specialized knowledge" that distinguishes the treatment of medical malpractice claims from ordinary negligence claims. *See Estate of Waters v. Jarman*, 144 N.C. App. 98, 100, 547 S.E.2d 142, 144 (2001). Therefore, far from being "irrelevant" (Pl. SANE Opp. 7 n.4), Plaintiffs' failure to file a Rule 9(j) certification (Duke SANE Br. 12 n.5) bars any such claim here.

negligence" claims against health care providers, such claims would be limited *only* to those situations where there was a "tight nexus" between the alleged negligence and the alleged harm. *Id.* at 279 (emphasis added). The court stressed "North Carolina's apparent wariness of health care claims by third parties," as "evidenced by [North Carolina's] flat ban on medical malpractice suits by third party victims, and the total absence of ordinary negligence cases permitting recovery against a health care provider by a third party victim." *Id.*

We explained in the opening brief (at 14-15) that Plaintiffs cannot meet this demanding "tight nexus standard," for it was unforeseeable to Duke health care personnel conducting a sexual assault examination that their actions would result in injuries to persons such as these plaintiffs. Plaintiffs argue that this "tight nexus" standard "is no more demanding than the ordinary foreseeability standard." (Pl. SANE Opp. 10.) That is incorrect, as *Iodice* itself makes clear. 289 F.3d at 279; *see also* Logan & Logan, *North Carolina Torts* § 12.10[6], at 335 (2d ed. 2004) (concluding that *Iodice* considered expanding a health care provider's duty to a nonpatient to be problematic and therefore limited any such claims to situations where there was a tight nexus between the provision of narcotics to the patient and the harm to the victim). The "tight nexus" limit on duties of care was clearly intended to reflect North Carolina's "wariness" of third-party claims against health care providers, and therefore to *limit* any such claims.[3]

_____

[3] Plaintiffs recite general principles of tort law—that every person owes every other person a duty to exercise ordinary care in their conduct to protect others from harm—to argue that Defendants owe them a legal duty under *Iodice*. (Pl. SANE Opp. 8.) But such

But even if "foreseeability" and "tight nexus" were the same standard, Plaintiffs' claims would still fail. The Fourth Circuit affirmed dismissal on the pleadings in *Iodice* because it found *no* "tight nexus" (or "foreseeability" in Plaintiffs' terms) between the doctor's over-prescription of narcotics to a patient with known drug and alcohol addictions and the risk that the patient, in an impaired state, would harm someone. 289 F.3d at 279. But the liability that Plaintiffs would impose on health care providers in this case would be even broader than that rejected in *Iodice* (where the negligently treated patient caused the harm); Plaintiffs' theory would make hospital personnel potentially liable to an unknowable number of unidentified persons (and their *parents*) who might at some point in the future be swept into a criminal investigation carried out by the police.

Plaintiffs further argue that Duke University, President Richard Brodhead, DUHS CEO Victor Dzau, and hospital personnel all had a legal duty to "(1) accurately report information to law enforcement, (2) correct misinformation provided to such authorities,

---

general principles do not answer the question whether a particular defendant owes a duty to a particular plaintiff. Whether a defendant owes a duty of care to the plaintiff "depends on the relationship between them." *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 225 (4th Cir. 2002) (holding, under North Carolina law, that a bank does not owe a duty of care to a noncustomer with whom the bank does not have a direct relationship) (citing W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 53, at 356 (5th ed. 1984) ("It is better to reserve 'duty' for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other ….")). The relationship between the health care providers who examined Mangum and the players investigated by the police is far less direct than the relationship found *insufficient* to give rise to a legal duty in *Eisenberg* (*i.e.*, the relationship between the bank and a noncustomer who was defrauded by a bank customer through the use of the bank's services)—and the relationship to the players' *parents* is even more attenuated. The relationship between Plaintiffs and the other Defendants here—the CEO of the Health System and the University President—is further removed still.

and (3) properly train and supervise their employees." (Pl. SANE Opp. 8.) For Brodhead and Dzau, Plaintiffs argue that they had a legal duty "to correct Levicy's misrepresentations concerning the medical and physical evidence from Duke's examination of Mangum."[4] The implications of this supposed duty would be staggering. In Plaintiffs' view, the CEO of a hospital that treats a possible crime victim—and the President of the university with which that hospital is affiliated—have legal obligations, enforceable in an action for damages, to insert themselves into a criminal investigation, to conduct their own investigation by reviewing the medical evidence relevant to the allegations, and then to publicly "correct" any flaws they might uncover in any information that has been given to the police. (Pl. SANE Opp. 12, 22-23.)

In practical effect, Plaintiffs assert that Brodhead (who has no medical training) and Dzau (who does not specialize in sexual assault diagnosis) should have (1) examined the medical report from Mangum's sexual assault examination; (2) determined whether the information in that report was consistent with what the health care providers had told the police (*i.e.*, Dzau and Brodhead should have noted that the sexual assault report indicated that no condoms were used and ejaculation occurred, and therefore Dzau and Brodhead should have known that DNA would have been found on the rape kit items if the accuser were being truthful, they should have known that no DNA *was* found on the rape kit items, and therefore they should have known the accuser was lying); (3) determined whether the nurse's assessment of the patient's injuries was medically

_____

[4] (Compl. ¶ 506; Pl. SANE Opp. 8; Pl. SANE Opp. 12 & n.6; *id.* at 38.)

accurate or not, including whether vaginal edema is consistent with blunt force trauma or sexual assault; (4) monitored the police investigation to determine if the police had other information that could cast doubt on the health care providers' assessments; and then, (5) if they concluded that the nurse had misspoken to the police, publicly disclosed their investigative "findings" to discredit the nurse's information and stop the investigation.[5] No hospital or university could function under such a legal regime.

Plaintiffs' asserted duties against Levicy and Arico are similarly expansive and unsupported in the law. Plaintiffs argue that, when Levicy responded to police questioning about her examination of a possible crime victim, she assumed a legal duty to whomever the police might investigate to provide information to the police that was correct and accurate. (Pl. SANE Opp. 8.) Under Plaintiffs theory, a health care provider who provides information to the police about injuries to possible crime victims would be liable in tort to *any* person who subsequently comes under police suspicion for the crime.[6]

---

[5] (*See, e.g*., Pl. SANE Opp. 12 & n.6 (Brodhead and Dzau should have known that Mangum's credibility was "eroding and that the exculpatory evidence was mounting"); *id.* at 22-23 (Brodhead, Dzau and other Duke Defendants should have "protect[ed] Plaintiffs" by "interven[ing] as the investigation unfolded" in order "to discredit Levicy's false statements"); *id.* at 29, 37 (Brodhead and Dzau "should have known" that Mangum consistently stated that "her attackers had not used condoms and had ejaculated" and Brodhead and Dzau were required to "disclose[] publicly this critical exculpatory evidence").)

[6] Plaintiffs also assert that Arico (Levicy's supervisor) had a duty to speak "accurately" to law enforcement *and to the general public*, and a duty to "correct" any "misinformation provided to [law enforcement] authorities." (Pl. SANE Opp. 8, 12.) Plaintiffs contend that Arico breached this duty when she failed to "correct" a newspaper story that quoted her as agreeing that Mangum's injuries were consistent with sexual assault. This

Given the sweep of this asserted duty, and the deleterious effect it would have on the willingness of citizens to cooperate with law enforcement, it is not surprising that Plaintiffs cite no support for it under North Carolina law. Plaintiffs cite one case—a *cf.* cite to a Florida appeals court case—that involves negligent testing by a DNA lab. This absence speaks volumes about the lack of support for the broad duties Plaintiffs postulate: to "accurately report information" to law enforcement and the public about a possible crime, and to affirmatively "correct" any inaccurately reported information.[7]

2.    **The Health Care Providers Had No Duty To Plaintiffs That Would Support A Claim For Failure To Warn (Count 5)**

Count 5 raises a "duty to warn" claim that is similar (if not identical) to the claim asserted in Count 4. Plaintiffs make no response to the point (Duke SANE Br. 21-22) that North Carolina law recognizes "duty to warn" claims only in certain narrow contexts not presented here. Moreover, North Carolina has rejected a psychiatrist's duty to warn

---

supposed duty could well be even more chilling, for it would make persons who speak to the press potentially liable for every possible mistake in their statements *as quoted (or misquoted) by the media*—a cause of action that would reach far beyond even defamation. No precedent of which we are aware supports the existence of such a legal duty.

[7] Plaintiffs misconstrue our argument with respect to defamation. (Pl. SANE Opp. 13-15; Duke SANE Br. 15-16.) Plaintiffs characterize the duty underlying Count 4 (and Count 5) as the duty to exercise due care in "reporting" information to another party, *i.e.*, in making public statements. (Compl. ¶¶ 505, 511.) The tort for the breach of *that* duty, however, is defamation. *See Jolly v. Academy Collection Serv., Inc.*, 400 F. Supp. 2d 851, 867, 869 (M.D.N.C. 2005). Plaintiffs do not dispute that any defamation claim here is time-barred. (*See* Duke SANE Br. 16 n.7.) Plaintiffs cannot bring an otherwise barred defamation claim simply by relabeling it the breach of a duty to "accurately report information" or to "correct misinformation" (Count 4) or as the "duty to warn" a suspect that allegedly arises from "provi[ding] false and misleading information to the police" (Count 5).

third persons about a possibly dangerous patient. *See Gregory v. Kilbride*, 150 N.C. App. 601, 610, 565 S.E.2d 685, 692 (2002). Plaintiffs argue that *Gregory* is "irrelevant" because the psychiatrist in that case did not "create or amplify the risk of harm." (Pl. SANE Opp. 22 n.13.) But the court in *Gregory* found that there was no duty to warn the patient's spouse when the psychiatrist evaluated the patient for involuntary commitment (based on threats to kill his wife) and then *released him from the hospital*. *Gregory*, 150 N.C. App. at 610, 565 S.E.2d at 692. The decision to release a dangerous mental patient certainly "created" or "amplified" the risk that that patient would harm the person he had just threatened. Yet the North Carolina court rejected any duty to warn. Far from being "irrelevant," *Gregory* demonstrates how remote Plaintiffs' asserted duties are from any duty that the North Carolina courts have recognized.

Moreover, Plaintiffs' brief makes clear how sweeping this "duty to warn" would be. Plaintiffs contend that Levicy's "provi[sion of ] false and misleading information to the police" constituted the risk-creating conduct that gave rise to the "duty to warn and protect" (Pl. SANE Opp. 23 n.15), and that these Defendants thereby had a duty to protect Plaintiffs by *"interven[ing] as the investigation unfolded"* and "*discredit[ing] Levicy's false statements and Arico's ratification*" of those statements. (Pl. SANE Opp. 22 (emphasis added).) As in Count 4, Plaintiffs would require health care workers, the CEO of the health system, and the University President to somehow figure out whether the forensic evidence was accurately characterized to the police, to "discredit" any such

information they think might be incorrect, and to actively intervene in a criminal investigation to do so. (*See* Pl. SANE Opp. 38-39 & n.29.)

It is not the legal duty of a university president, a health care provider employed by the university, or indeed anyone outside the criminal justice system to attempt to bring a criminal investigation to a halt. Any other ruling would have grave implications for the investigation and prosecution of criminal misconduct. Because Plaintiffs have not alleged a cognizable legal duty, Count 5 should be dismissed.

### 3. The Health Care Providers Had No Duty To Plaintiffs That Would Support A Negligent Supervision Claim (Count 3)

Count 3 seeks to hold the University, DUHS, Brodhead, and Dzau liable for negligently supervising Arico and Levicy, and Arico for negligently supervising Levicy. (Compl. ¶¶ 497-503.) Our opening brief explained (at 17-18) that (a) because Plaintiffs have not stated a claim against *any* Duke University or DUHS employee for committing a tortious act, they cannot maintain an action against their employers for negligent supervision, and (b) even if a Duke or DUHS employee had committed a tortious act, Count 3 should be dismissed as to Brodhead, Dzau, and Arico because, under North Carolina law, only the employer, not individual defendants, can be liable for negligent supervision.

Plaintiffs argue that nothing in North Carolina law precludes a negligent supervision claim against individuals. (Pl. SANE Opp. 16-17.) To the contrary, in *Cox v. Indian Head Industries, Inc.*, 123 F. Supp. 2d 892 (W.D.N.C. 2000), the Court rejected a negligent supervision claim against an individual supervisor, holding that, under North

Carolina law, "a claim for negligent hiring, retention, and supervision would be *actionable only against employers*." *Id.* at 914-915 (emphasis added). Plaintiffs' only response is that the Court's holding was merely an "*Erie* guess" that was "mistaken." (Pl. SANE Opp. 17.) But North Carolina courts have confirmed *Cox* by rejecting negligent supervision claims brought against an individual who was not the employer. *See Foster v. Crandell*, 181 N.C. App. 152, 171, 638 S.E.2d 529, 539 (2007) (holding that "there [could] be no" legal basis for a negligent supervision claim against medical director because medical director was "a co-employee" and not the employer).

Nor do the other cases cited by Plaintiffs support their position. Plaintiffs assert that *Medlin v. Bass*, 327 N.C. 587, 590-591, 398 S.E.2d 460, 461-463 (1990) "recognize[d a] claim for negligent hiring against [an] individual supervisor." (Pl. SANE Opp. 16.) But as the North Carolina Court of Appeals has explained, "the *Medlin* theory of liability" is "a basis for imposing liability *upon an employer* for negligently hiring or retaining an employee." *Foster*, 181 N.C. App. at 171, 638 S.E.2d at 539 (emphasis added).[8]

### 4. The Health Care Providers Had No Duty To Plaintiffs Sounding In Negligent Infliction of Emotional Distress (Count 2)

Plaintiffs cannot state a claim under Count 2 for negligent infliction of emotional

---

[8] Plaintiffs' reliance on *Mozingo v. Pitt County Mem'l Hosp., Inc.*, 331 N.C. 182, 189, 415 S.E.2d 341, 345 (1992), is also unavailing. That case holds that a doctor who "undertake[s] to care for a patient" by supervising the treating resident owes a duty of care to the patient and can be directly liable to that patient for medical malpractice. *Mozingo* does not suggest that negligent supervision claims can be brought against a nurse-supervisor who is not the employer.

distress because they fail to allege the first element of the tort:  negligent conduct.  (Duke SANE Br. 18.)  Plaintiffs observe (Pl. SANE Opp. 18) that negligent infliction of emotional distress is an independent cause of action, but that does not relieve them of the need to plead the elements of that cause.  Plaintiffs have not identified any cognizable legal duty that these Defendants owed to these Plaintiffs.  (*See id*. at 17-18.)  Absent a breach of a duty of care, a claim for negligent infliction cannot be maintained.  *See Guthrie v. Conroy*, 152 N.C. App. 15, 26, 567 S.E.2d 403, 411 (2002). [9]

**B.     The Allegedly Willful Acts Of The Durham Police And Nifong Are Intervening Acts Precluding Liability Of The Duke Defendants**

Even if Defendants had a duty of care to these Plaintiffs, Counts 2-5 would still require dismissal because, on Plaintiffs' own pleadings, the allegedly willful actions of Nifong and certain Durham police officers constitute intervening acts.  (*See* Duke SANE Br. 23-26.)  Plaintiffs focus on issues of but-for causation but do not address the principle that controls this case:  the "willful and malicious act of a third person" is an intervening cause that precludes liability of the initial negligent actor.  (*See id.* at 23.)  Rather, Plaintiffs cite two cases that address an entirely different issue:  whether one actor, though negligent, will be immunized from liability because of the intervening *reasonably foreseeable negligence* of another actor.  (*See* Pl. SANE Opp. 26.)  That issue has no relevance here, where Plaintiffs themselves allege that the conduct of Nifong and a few

---

[9] Plaintiffs also assert that DUHS and Duke University are vicariously liable under Counts 2-5.  (*See, e.g.*, Pl. SANE Opp. 12 n.6.)  Because Plaintiffs fail to state any underlying negligence claim, they cannot state a claim for vicarious liability against the University or DUHS.

Durham police officers was both intentional and unprecedented. For example, Plaintiffs allege that it was Nifong who chose to conceal the DNA test results of the private-sector DNA laboratory, allegedly in conspiracy with certain Durham police officers and that laboratory (Compl. ¶ 385), and that the investigation would have ended but for these intentionally wrongful actions (Pl. SANE Opp. 25-26.) But nowhere in Plaintiffs' complaint is there an allegation (nor could there be) that any Duke Defendant knew of these results or played any part in their non-disclosure. This intervening act therefore broke the causal chain as to any Duke Defendant. *See Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 964 F. Supp. 956, 961 (M.D.N.C. 1997).

## II. PLAINTIFFS FAIL TO STATE A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT 1)

Plaintiffs assert intentional infliction of emotional distress claims against Duke, the Duke health care providers, Brodhead, and Dzau based on the asserted "extreme and outrageous" nature of the following alleged conduct: (1) Levicy provided false and misleading information to the police about the medical and physical evidence, including the statement that such evidence was consistent with sexual assault; (2) Arico was quoted in a local newspaper corroborating Levicy's misleading statements; and (3) Dzau and Brodhead failed to "investigate the truth of Levicy's statements" or to "publicly" refute Levicy's statements. (*See* Pl. SANE Opp. 34-35, 37.) Plaintiffs fail to state a claim on any of these theories.[10]

---

[10] Other assertedly extreme and outrageous conduct by Brodhead, Dzau and others that is not related to the actions of any Duke health care provider is raised in Count 6 and is

As for Levicy's alleged conduct, Plaintiffs contend that in "many jurisdictions" reporting false information to the police "may" be extreme and outrageous. (Pl. SANE Opp. 31.) But the North Carolina courts have repeatedly rejected intentional infliction claims based on false crime reports.[11] Plaintiffs cannot distinguish these cases. Plaintiffs first argue that some of the cases involve crimes that were "low[er]-profile" or less "morally depraved" than rape. (Pl. SANE Opp. 32.) But Plaintiffs cite no legal basis for such a distinction, and one of those cases involved false accusations that an employee of a mental health hospital had sex with a minor female patient, an offense that can carry a life sentence without parole. *Troxler v. Charter Mandala Ctr., Inc*., 89 N.C. App. 268, 269, 365 S.E.2d 665, 666 (1988); N.C. Gen. Stat. §§ 14-27.2, 27.7A(a), 15A-1340.16B, 1340.17(c). Plaintiffs next contend that in some of the cited cases the false accusations at issue "merely initiated an investigation." (Pl. SANE Opp. 32.) But Levicy's statements did even less than that; the Durham Police initiated the investigation before talking to Levicy. (Compl. ¶¶ 148-149.) Finally, Plaintiffs assert that the accusations in each of these cases "had some legitimate basis." (Pl. SANE Opp. 32.) Plaintiffs misread the cases; in *Troxler*, the plaintiff alleged that the only evidence against him (his supposed

---

addressed in Duke's opening brief (Duke Br. 30-32) and in the Reply Brief for Duke University Defendants at 15-17.

[11] *See Dobson v. Harris*, 134 N.C. App. 573, 578-579, 521 S.E.2d 710, 715 (1999), *rev'd on other grounds*, 352 N.C. 77, 530 S.E.2d 829 (2000) (false accusation of child abuse and neglect); *Ausley v. Bishop*, 133 N.C. App. 210, 221, 515 S.E.2d 72, 79-80 (1999) (false accusation of embezzlement); *Shillington v. K-Mart Corp*., 102 N.C. App. 187, 198, 402 S.E.2d 155, 161 (1991) (false accusation of trespass and looting); *Troxler v. Charter Mandala Ctr., Inc*., 89 N.C. App. 268, 274, 365 S.E.2d 665, 669 (1988) (false accusation of sex with a minor).

confession to a coworker) was a lie motivated by racism. 89 N.C. App. at 269-270, 365 S.E.2d at 667.[12]

Because Levicy's alleged conduct was not extreme and outrageous, she cannot be liable for intentional infliction of emotional distress; and absent liability on the part of Levicy, neither Duke nor DUHS can be vicariously liable. *See Guthrie*, 152 N.C. App. at 26, 567 S.E.2d at 411.[13]

Plaintiffs further contend that "Brodhead's and Dzau's actions here were extreme and outrageous" because they "stood by silently" and "allowed" Plaintiffs to be subjected to hostile media coverage, a criminal investigation, and consequent harms, even though the investigation had allegedly been "kick-started" by the actions of Duke health care providers. (Pl. SANE Opp. 34-35, 39; *see also* Pl. Duke Opp. 7.) That contention lacks merit. The failure to intervene with the police to "correct" another person's statements is not extreme and outrageous, and that conclusion cannot be avoided by labeling the non-action as "ratification." Ratification, as that concept has been used in emotional distress cases, requires "knowledge of all material facts and circumstances relative to the

---

[12] Contrary to Plaintiffs' contention (Pl. SANE Opp. 31), a court may decide on a motion to dismiss whether the alleged conduct meets the rigorous test under North Carolina law for "extreme and outrageous" conduct. *See Buser v. S. Food Serv., Inc*., 73 F. Supp. 2d 556, 572-573 (M.D.N.C. 1999) (Beaty, J.); (*see also* Duke SANE Br. 27 n.10.)

[13] Plaintiffs' complaint against Arico is that she told a newspaper (or failed to correct a newspaper's report) that Mangum's injuries were consistent with the story she told. (Pl. SANE Opp. 38.) Even if this accurately characterized the report of Arico's statement— which it does not—it does not come close to the standard of intentional infliction of emotional distress, *i.e.*, "beyond all possible bounds of decency, and ... utterly intolerable in a civilized community." *Dobson*, 134 N.C. App. at 579, 521 S.E.2d at 715.

wrongful act" and an "intention" to ratify. *Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 492, 340 S.E.2d 116, 122 (1986); (*see* Duke SANE Br. 30-32.) Although Plaintiffs make many unfounded allegations against Brodhead, Dzau, and Arico, they do not go so far as to allege that these Defendants actually *knew* that Levicy had (supposedly) lied to the police but nonetheless gave that supposed lie their silent approval.

Plaintiffs suggest that HIPAA, the Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 (1996), the federal law protecting privacy in medical records, did not restrict Brodhead and Dzau from looking through Mangum's medical files for the purpose of investigating the accuracy of Levicy's statements and then publicly refuting those statements because (1) "some" aspects of the forensic examination were not HIPAA-protected, and (2) because the First Amendment "may" render HIPAA unconstitutional with respect to cases that arouse "strong local and national public interest." (Pl. SANE Opp. 37, 39 n.29.) Even if some aspects of the examination records might be disclosed to some persons for some purposes without violating HIPAA, it does not follow that anyone may leaf through those records to make an independent judgment about their accuracy. And the health system CEO, much less the University President, could hardly be said to have acted in an "extreme and outrageous" fashion by not reviewing Mangum's medical records, merely because a court might some day later decide that HIPAA's restrictions were unconstitutional.

This case is quite different from those ratification cases cited by Plaintiffs, in

which supervisors charged with an "explicit duty to rectify" mistreatment of one employee by another failed to do so despite specific complaints about the harassment. (*See* Duke SANE Br. 31.)  Here, no Duke official or supervisor had a duty to intervene in a criminal investigation.  *See supra* Section I.  Count 1 should therefore be dismissed.

## III.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER 42 U.S.C. § 1983 (COUNTS 21-22)

### A.  Count 21:  Fourth Amendment—DNA Samples

Plaintiffs contend that their Fourth Amendment rights were violated by the issuance and enforcement of the Non-Testimonial Order (NTO) for DNA samples— samples that exonerated the Plaintiffs—because the Durham Police lacked probable cause to obtain the NTO.[14]  Because the NTO application was sufficient to establish probable cause even without Levicy's statements, the NTO was supported by probable cause and did not violate the Fourth Amendment.  (*See* Duke SANE Br. 36-39.)  Plaintiffs now

---

[14] The only basis for possibly holding these Defendants liable under 42 U.S.C. § 1983 for that alleged Fourth Amendment violation is Plaintiffs' conclusory allegation that Duke and its employees conspired with Durham authorities to have the NTO issued without probable cause.  The opening brief explains (at 33-36) that Plaintiffs have failed even plausibly to allege a conspiracy between Defendants and any Durham official.  Plaintiffs highlight their allegations that Levicy's "false statements provided the Durham investigators with a justification for obtaining the NTO" and that the "Durham investigators … readily accepted the cover Levicy offered" (Pl. SANE Opp. 43, 44), but this says nothing about whether Levicy *conspired* with Durham police officers; it merely suggests that certain officers took advantage of her statements for their own purposes. Levicy's alleged statement about the general motivation for rape (*id*. at 44), does not suggest she conspired to frame these Plaintiffs.  And the fact that a forensic nurse who examined the alleged victim had meetings with the police and prosecutor during the course of their investigation—all but one of which occurred after the NTO was obtained (Compl. ¶ 190)—does not suggest that she conspired with them; such meetings are customary in a rape investigation.

contend, however, that the affidavit in support of the application for the NTO failed to establish probable cause because the Durham Police intentionally or recklessly omitted exculpatory information.  (Pl. SANE Opp. 45.)  This argument fails to establish a Fourth Amendment violation.

Plaintiffs maintain that the "Durham Investigators had no probable cause to believe that there had been a crime" because they had reason to question the credibility of Crystal Mangum.  (Pl. Durham Opp. 29-30.)  In essence, Plaintiffs argue that the police improperly omitted from their affidavit facts that would have cast doubt on Mangum's credibility.  But "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation…. The mere fact that the affiant did not list every conceivable conclusion does not taint the validity of the affidavit." *United States v. Colkley*, 899 F.2d 297, 300-301 (4th Cir. 1990) (internal quotation marks and citations omitted).[15]  Indeed, the Fourth Circuit has held that

> the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory.  This latter situation potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit.

*Colkley*, 899 F.2d at 301.[16]  Accordingly, "intent or recklessness" may not be inferred

---

[15] *See Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991) (an officer is not required to "exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established"); *cf. United States v. Williams*, 504 U.S. 36, 38 (1992) (holding that prosecutors are not obligated to disclose "substantial exculpatory evidence" to a grand jury).

[16] Plaintiffs made only one allegation of an affirmative falsehood by Durham Police in

"from the fact of omission itself." *Id.* And Plaintiffs make no other allegations that these asserted omissions were "designed to mislead, or [were] made in reckless disregard of whether they would mislead, the magistrate." *Id.* (emphasis omitted).

Plaintiffs notably do not dispute that the March 16 search warrant for 610 N. Buchanan was supported by probable cause (*see* Pl. Durham Opp. 30 n.20; Compl. ¶162), and the application for *that* warrant was based on the same statements from Mangum that Plaintiffs now claim the police should have doubted.[17] Plaintiffs nonetheless maintain that information learned after March 16 and before the NTO application on March 23, such as Mangum's failure to identify her attackers in photo arrays, should have shown the police that she was not credible. (*See* Pl. Durham Opp. 30 n.20.) The Fourth Amendment, however, does not require a police officer to disregard a putative rape victim's account merely because she gives inconsistent accounts of the event or is unable to remember details about the rape or her attackers. Indeed, the courts have recognized that "it would be reasonable for an officer … to not place great emphasis on [a rape]

---

the probable cause section of the NTO affidavit: that Mangum claimed she was strangled or choked during the alleged rape. (*See* Compl. ¶ 205; Pl. Durham Opp. 31.) They have since conceded that this allegation was incorrect and have now withdrawn it. (Pl. Statement Correcting Their Durham Opp. 1.) In any event, even if this statement had been an affirmative falsehood, it could not have been necessary to the probable cause finding because Mangum also said she was "hit" and "kicked." (Duke SANE Br. Ex. 2.)

[17] The Durham Police's reliance on the earlier affidavit when applying for the subsequent NTO likely reflects the twin realities that "[a]ffidavits are normally drafted by nonlawyers and in the haste of a criminal investigation," *Colkley*, 899 F.2d at 300 (internal quotation marks and citation omitted), and "once probable cause … is established, an officer is not required to continue to investigate for exculpatory evidence," *United States v. Galloway*, 274 F. App'x 241, 249 (4th Cir. 2008).

victim's … inability to recall the details of the crime clearly," especially in states like North Carolina where evidence of "rape trauma syndrome" is admissible to "assist the jury in understanding a victim's behavior before, during, and after a rape." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 745 (7th Cir. 2003); *see State v. Stallings*, 107 N.C. App. 241, 250 419 S.E.2d 586, 592 (1992) ("Testimony concerning rape trauma syndrome, however, may be useful to the jury in explaining the victim's post assault behavior….").

Moreover, between March 16 and 23, the police discovered other evidence that strengthened the credibility of Mangum's rape accusations. During the search of 610 N. Buchanan, Durham officers found physical evidence that corroborated Mangum's story. (Compl. ¶ 207; Duke SANE Br. 38 & Ex. 2.) Plaintiffs dismiss the significance of this evidence in a footnote, arguing that "without Mangum's false accusations …, these facts did not amount to a hill of beans." (Pl. Durham Opp. 30 n.19.) But Plaintiffs' reasoning is precisely backwards: Mangum's accusations were not needed to provide support for the physical evidence; rather, the evidence obtained at 610 N. Buchanan provided the Durham Police with even more reason to believe that a crime had occurred at 610 N. Buchanan, as Mangum had alleged.

Finally, Plaintiffs argue that there were no reasonable grounds to suspect that the those named in the NTO application had committed the alleged rape. But the NTO application made clear, and Plaintiffs do not contest, that the three residents of 610 N. Buchanan told the police that *only* "their fellow Duke Lacrosse Team Members …

attended the party" at which the alleged rape occurred.  (Duke SANE Br. Ex. 2 at 8.)

These eyewitness statements provide more than the "minimal amount of objective

justification" required for issuance of an NTO.  *State v. Pearson*, 356 N.C. 22, 29 566

S.E.2d 50, 54 (2002).  The Durham Police knew the limited and complete universe of

suspects and included only those individuals in the NTO application.[18]  In sum, the NTO

did not violate the Fourth Amendment with or without Levicy's alleged statements.

### B.    Count 22:  14th Amendment—"Malicious Investigation"

Plaintiffs maintain that, because they were never arrested, indicted, or tried for any

crime, the substantive due process component of the Fourteenth Amendment must

necessarily serve as a catch-all remedy for a variety of alleged actions taken during their

criminal investigation.  (Compl. ¶ 637; Pl. Durham Supervisor Opp. 13-14.)  According

to Plaintiffs' theory of this novel constitutional right against "malicious investigation,"

the life-disrupting consequences of a criminal investigation alone—untethered to any

deprivation of liberty such as arrest, indictment, trial, or conviction—are themselves

protected interests that give rise to substantive due process claims.  But merely engaging

in a criminal investigation, no matter how groundless or malicious it may be, does not

"rise to the level of a substantive due process violation."  *Becker v. Kroll*, 494 F.3d 904,

---

[18] Plaintiffs also challenge certain statements made in the reasonable grounds section of
the NTO affidavit.  (*See* Pl. Durham Opp. 31-32.)  Even if these statements were false,
however, they were not necessary to the magistrate judge's finding of reasonable
suspicion.  The Durham Police had reasonable grounds to believe that those lacrosse
players named in the affidavit were suspects based on the eyewitness statements of the
three residents of 610 N. Buchanan, who identified the particular players that attended the
stripper party and informed the police that no one else had attended.

922 (10th Cir. 2007); *see Biasella v. City of Naples, Fl.*, No. 04-320, 2005 WL 1925705, at *4 (M.D. Fla. Aug. 11, 2005); Duke SANE Br. 42-43.  To establish a substantive due process violation, Plaintiffs must show that the malicious investigation itself deprived them of "life, liberty, or property."  *See Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997).  Although criminal investigations can seriously disrupt the lives of suspects, not all disruptions are protected by the Constitution, *see County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998), and Plaintiffs cite no case in which a court has held that criminal investigations alone generate a sufficient liberty interest to support a substantive due process claim.[19]

Plaintiffs contend that the Fourth Circuit's unpublished decision in *White v. Wright*, 150 F. App'x 193, 198 (4th Cir. 2005), recognized a broad substantive due process right against the deliberate use of false or fabricated evidence in a criminal investigation.  The plaintiff in *White*, however, was not merely investigated, but also indicted, prosecuted, and stripped of his government-issued certificate authorizing him to conduct vehicle salvage inspections.  *Id.* at 194, 199.  Indeed, the focus of the Court's analysis was how the allegedly falsified evidence was used in the administrative

---

[19] Plaintiffs cite two Supreme Court cases for the proposition that investigations can have adverse impacts on the lives of criminal suspects.  (*See* Pl. Durham Supervisor Opp. 16 (citing *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 814 (1987) and *United States v. Marion*, 404 U.S. 307, 320 (1971).))  Neither case, however, held that these adverse impacts give rise to a liberty interest protected by the Fourteenth Amendment; indeed, neither case involved a substantive due process claim at all.  And *Marion* did not even mention criminal investigations; Plaintiffs stretch the Court's statements about the consequences of "arrest," an obvious deprivation of liberty, to cover criminal investigations.  *See Marion*, 404 U.S. at 320.

proceedings that led to the suspension of plaintiff's certificate. *See id*. at 199-200.[20] The

*White* Court gave no suggestion that the plaintiff's investigation, without anything more,

could have given rise to a substantive due process claim. *Id*. at 198-200; *see also*

*Washington v. Wilmore*, 407 F.3d 274, 283 (4th Cir. 2005) (considering an alleged

fabrication of evidence that resulted in a "loss of liberty, *i.e.*, Washington's conviction …

and subsequent incarceration," not the mere investigation of that murder). And none of

the other cases that Plaintiffs cite in support of their asserted right against "malicious

investigation" holds that investigations alone give rise to a substantive due process

claim. *See Moran v. Clarke*, 296 F.3d 638, 645 (8th Cir. 2002) ("Moran offers evidence

that he was investigated, *prosecuted, suspended without pay, demoted* and stigmatized by

falsely-created evidence and other defamatory actions of the defendants." (emphasis

added)); *Hirsch v. Otsego Cty. Dep't of Soc. Servs.*, No. 89-954, 1992 WL 59178, at *1-2

(N.D.N.Y. Mar. 12, 2002) (explaining that plaintiff was "arraigned on criminal child

abuse charges" and had her child removed from her custody and placed with the child's

paternal grandparents for the duration of the proceedings).[21]

---

[20] The only judicial or administrative proceeding involving these Plaintiffs was related to the NTO. To the extent that Plaintiffs allege deprivations of liberty associated with that proceeding, their claim is covered by the Fourth Amendment, *see Albright v. Oliver,* 510 U.S. 266, 271 (1994); *Riley v. Dorton*, 115 F.3d 1159, 1162 (4th Cir. 1997), is duplicative of Count 21, and should be dismissed for the reasons discussed *supra* pp. 17-21 and in the Brief for the Duke SANE Defendants at 32-39.

[21] The remaining cases cited by Plaintiffs also do not recognize a substantive due process right against malicious investigations. *See Orem v. Rephann*, 523 F.3d 442, 446 (4th Cir. 2008) (excessive force claim); *Kottmeyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006) (alleged deprivation of the due process right to "familial association"); *Omni Behavioral Health v. Miller*, 285 F.3d 646, 651 (8th Cir. 2002) (alleged interference with plaintiff's

Ultimately, Plaintiffs cannot answer the point that their novel "malicious investigation" claim would enable all those who are subject to criminal investigation alone to bring substantive due process claims under § 1983. The consequences of recognizing such a right are far-reaching: courts would be inundated with claims by criminal suspects (who were never indicted, tried, or convicted) who can assert that their lives were disrupted by allegedly malicious criminal investigators. The hodgepodge of grievances that Plaintiffs attempt to sweep into this novel right (Compl. ¶ 637) would only further expose the courts to the kind of open-ended substantive due process claims that the Supreme Court has cautioned against. *See, e.g.*, *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992).

## IV. PLAINTIFFS FAIL TO STATE A CLAIM FOR OBSTRUCTION OF JUSTICE (COUNT 23)

Plaintiffs have no answer to our argument that there have been no *civil* obstruction of justice cases in North Carolina involving a criminal suspect as a plaintiff who alleged that the defendant's actions facilitated a criminal investigation. (Duke SANE Br. 47.) While it may be true, as Plaintiffs contend, that there have been *criminal* obstruction of justice cases involving defendants who interfered with a criminal investigation (Pl. Durham Opp. 33), that contention misses the point. A criminal prosecution for

---

"right to operate a legitimate business without unreasonable governmental inference"; suggesting in *dicta* that it was "possible" that an investigation conducted to harass employees "because of their race" would give rise to a due process claim); *Ward v. Anderson*, 494 F.3d 929, 938 n.10 (10th Cir. 2007) (declining to "address whether the Wards have alleged the type of interest that triggers a substantive due process claim").

obstruction of justice is always subject to the careful discretion of the State.[22] There are

no such constraints to civil actions, however, and expanding liability for civil obstruction

as Plaintiffs suggest would seriously deter witnesses from cooperating with police and

prosecutors, as anyone whose statements to the police turned out to be mistaken could

face a lawsuit. These potentially grave consequences counsel against Plaintiffs' claim.

## V.    CONCLUSION

All claims against the Duke SANE defendants should be dismissed for failure to

state a claim on which relief may be granted.

/s/ Jamie S. Gorelick                        /s/ Dan J. McLamb
_____                     _____
Jamie S. Gorelick                             Dan J. McLamb
District of Columbia Bar No. 101370          N.C. State Bar No. 6272
Wilmer Cutler Pickering Hale and Dorr LLP    Yates, McLamb & Weyher, LLP
1875 Pennsylvania Ave., N.W.                  421 Fayetteville Street, Suite 1200
Washington, D.C. 20006                        Raleigh, N.C. 27601
Telephone: (202) 663-6500                     Telephone: (919) 835-0900
Facsimile: (202) 663-6363                     Facsimile: (919) 835-0910
Email: jamie.gorelick@wilmerhale.com          Email: dmclamb@ymwlaw.com

---

[22] Plaintiffs claim (Pl. Durham Opp. 34 n.23) that *Henry v. Deen*, 310 N.C. 75, 310 S.E.2d 326 (1984), held that the policy considerations for not recognizing a civil tort for perjury "'are inapplicable to' civil claims for obstruction of justice." But Plaintiffs misquote that case and misstate the Court's reasoning. In *Deen*, the Court merely explained that those policy considerations were inapplicable "*to this case*," *id.* at 90, 310 S.E.2d at 335 (emphasis added), which did not involve a criminal suspect as plaintiff or any alleged obstruction of a criminal investigation.

# CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2008, I electronically filed the foregoing

Reply Brief in Support of "Duke SANE Defendants'" Motion to Dismiss Complaint with

the Clerk of the Court using the CM/ECF system which will send notification of such

filing to the following:

> *Counsel for the Plaintiffs*
> William J. Thomas, II
> Email: thomas@tfmattorneys.com
>
> Charles J. Cooper
> Email: ccooper@cooperkirk.com
>
> David H. Thompson
> Email: dthompson@cooperkirk.com
>
> *Counsel for J. Wesley Covington*
> Kenneth Kyre, Jr.
> Email: kkyre@pckb-law.com
>
> *Counsel for City of Durham*
> Reginald B. Gillespie, Jr.
> Email: rgillespie@faison-gillespie.com
>
> *Counsel for Mark Gottlieb*
> Edwin M. Speas, Jr.
> Email: espeas@poynerspruill.com
>
> Eric P. Stevens
> Email: estevens@poyners.com
>
> *Counsel for Benjamin Himan*
> Henry W. Sappenfield
> Email: hsappenfield@kennoncraver.com
>
> Joel Miller Craig
> Email: jcraig@kennoncraver.com

*Counsel for Patrick Baker, Steven Chalmers, Ronald Hodge, Lee Russ, Stephen Mihaich, Beverly Council, Jeff Lamb, Michael Ripberger*
        Patricia P. Kerner
        Email: tricia.kerner@troutmansanders.com

        D. Martin Warf
        Email: martin.warf@troutmansanders.com

        Hannah Gray Styron
        Email: hannah.styron@troutmansanders.com

*Counsel for David Addison*
        James B. Maxwell
        Email: jmaxwell@mfbpa.com

*Counsel for Duke University Defendants*
        J. Donald Cowan, Jr.
        Email: don.cowan@elliswinters.com

        Dixie Wells
        Email: Dixie.wells@elliswinters.com


As of the date of this filing, no attorney has made an appearance on behalf of the

following Defendant.  I hereby certify that I served the following Defendant by U.S.

Mail:

    Linwood Wilson
    6910 Innesbrook Way
    Bahama, NC 27503-9700

    This 29th day of September 2008.

                /s/ Jamie S. Gorelick
                Jamie S. Gorelick

                Attorney for Duke University, Duke University
                Health System, Inc., Richard Brodhead, Peter

Lange, Larry Moneta, John Burness, Tallman Trask, Suzanne Wasiolek, Matthew Drummond, Aaron Graves, Robert Dean, Tara Levicy, Theresa Arico, Kate Hendricks, Victor Dzau