IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:08-CV-119

| | |
|---|---|
| EDWARD CARRINGTON, *et al.*, )<br><br>Plaintiffs, )<br>)<br>v. )<br>)<br>DUKE UNIVERSITY, *et al.*, )<br><br>Defendants. ) | REPLY BRIEF IN SUPPORT OF<br>DEFENDANT CITY OF DURHAM,<br>NORTH CAROLINA'S MOTION<br>TO DISMISS COMPLAINT |

The way is now clear for the Court to dismiss Plaintiffs' deficient claims against

the City of Durham.

## I.  PLAINTIFFS FAIL TO ALLEGE ANY CITY KNOWLEDGE OF, INVOLVEMENT WITH, OR CONSPIRACY INVOLVING, THE ALLEGEDLY FRAUDULENT LETTERS THEY RECEIVED (COUNT 8)

Plaintiffs' fraud claim concerns allegedly fraudulent letters that Duke University

sent to Plaintiffs concerning the release of key-card records.  Compl. ¶¶ 532-37.  But

Plaintiffs do not allege, as they must, that any City official encouraged, or even knew

about, those letters.[1]  In their Opposition (at 19), Plaintiffs attempt to recast their claim

around the subpoena that preceded the letters.  But a plaintiff cannot save a deficient

---

[1]  Nor can Plaintiffs' general conspiracy allegations—leveled, without elaboration, "on information and belief," Compl. ¶ 536—save this claim.  *See Perkins v. HealthMarkets, Inc.*, No. 06-CVS-21053, 2007 WL 2570242, at *5 (N.C. Super. Ct. July 30, 2007) (fraud claims must rely on more than allegations "on information and belief").

complaint by rewriting it in an opposition to a motion to dismiss.[2] Even if they could, the

new horse to which Plaintiffs switch midstream is as lame as the first. Unable to identify

any misleading statement in the subpoena, Plaintiffs resort to asserting that by concealing

the "improper purpose" behind the subpoena, Defendants *implied* it was issued for

legitimate reasons. Opp. at 20. But this is nothing more than a repackaging of an abuse

of process claim (which, as the City explains below, fails for independent reasons).[3] Nor

do Plaintiffs allege any "special relationship" with the City that would heighten the City's

duties to them in this regard. *See Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 195

(M.D.N.C. 1997) (liability based on failure to disclose requires special relationship).

Because this claim lacks the heightened particularity required for a fraud claim, *see* Fed.

R. Civ. P. 9(b), and for the other reasons discussed in the City's Opening Brief, this claim

must be dismissed.

## II. PLAINTIFFS FAIL TO ALLEGE FACTS TO MEET THE "IMPROPER SUBSEQUENT USE" ELEMENT OF ABUSE OF PROCESS (COUNT 10)

Plaintiffs have alleged that the subpoena for their key-card data was issued to

conceal an alleged prior "illegal use" of the data. But as explained elsewhere (*see infra*

---

[2] *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

[3] If a plaintiff could state a *fraud* claim by merely alleging a hidden "improper motive" in initiating legal process—as Plaintiffs attempt here—it would obviate the abuse of process tort, which requires allegations of both (1) "improper motive" and (2) misuse of the process after issuance to accomplish some collateral purpose. *See infra* Section II. Such circumvention should not be countenanced by this Court.

Section III; *see also* Open. Br. Section IV.B.2), there was nothing "illegal" in the City's obtaining key-card data in a criminal investigation.  Moreover, Plaintiffs' allegation of an "ulterior motive" is insufficient to make out the second element of the abuse of process tort—improper subsequent use of the process itself "to coerce the plaintiff into doing something other than what the process contemplates."  *Vista Food Exch., Inc. v. Joyce Foods, Inc.*, No. 96-CIV-0012 (MBM), 1996 WL 122419, at *5 (S.D.N.Y. Mar. 20, 1999) (applying North Carolina law).  Plaintiffs fail to allege that Defendants used the subpoena to coerce them into doing something not contemplated on the face of the subpoena.  Plaintiffs' characterizations of the subpoena as a "sham," Opp. at 20, and a "charade," Opp. at 21, are merely re-statements of the ulterior motive allegations.  They do not allege facts to support the required second element of the tort.

The D.C. Circuit's decision in *Scott v. District of Columbia*, 101 F.3d 748, 755-56 (D.C. Cir. 1996) is instructive.  There, the plaintiffs alleged that officers charged them with DUI in order to cover up the excessive force they used at the scene of an accident.  *Id*.  But the court found that this was insufficient to make out an abuse of process claim:

> The fact that the officers expected to realize some benefit by covering up their own alleged wrongdoing simply points to an ulterior motive, not the kind of perversion of the judicial process that gives rise to a cause of action for abuse of process. . . .  [T]he officers instituted the criminal charge for precisely the purpose for which it was intended: establishing that [the plaintiff] was guilty of a criminal offense.  [The plaintiff] does not contend that the filing of criminal charges was intended to pressure him into taking any action or prevent him from taking action, or to achieve any other collateral purpose.

*Id*. at 756 (citation omitted).[4]

Similarly, here, Plaintiffs make no allegation that Defendants used the subpoena to coerce them into doing anything other than what the subpoena required: to turn over the key-card data. Accordingly, the second element of the tort is not met, and the claim must be dismissed.

## III. PLAINTIFFS HAD NO REASONABLE EXPECTATION OF PRIVACY IN THE KEY-CARD DATA (COUNT 20)

Plaintiffs' Fourth Amendment claim with respect to the key-card data fails because Plaintiffs had no reasonable expectation of privacy in the data at issue. Plaintiffs do not dispute that the key-card data concerned their activities in common areas of the campus, activities for which a person clearly does not enjoy an objectively reasonable expectation of privacy. *See, e.g.*, *United States v. Knotts*, 460 U.S. 276, 281 (1983) (no reasonable expectation of privacy in one's "movements from one place to another" in public areas). Nor do they dispute that such data was shared with a third party, Duke. *Smith v. Maryland*, 442 U.S. 735, 744 (1979) ("This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.") (citation and quotations omitted).

---

[4] *See also Pottinger v. City of Miami*, 810 F. Supp. 1551, 1565, 1566 (S.D. Fla. 1992) (even though evidence supported plaintiffs' claim that officer arrested homeless persons for ulterior purpose of harassing them, abuse of process claim still failed because plaintiffs did not show that defendant misused process after its issuance).

Plaintiffs now argue, though, that FERPA creates a reasonable expectation of privacy where none otherwise exists. *See* Opp. at 23. This argument is utterly without merit. FERPA is a federal funding statute, which simply provides that educational institutions can receive federal funding so long as they "comply substantially" with the Act's requirements. 20 U.S.C. § 1234c(a). It does not create enforceable rights on its own. *Gonzaga University v. Doe*, 536 U.S. 273, 288 (2002) ("FERPA's nondisclosure provisions further speak only in terms of institutional policy and practice, not individual instances of disclosure . . . and they cannot 'give rise to individual rights'") (citations omitted). Nor does it somehow create a reasonable expectation of privacy protected by the Fourth Amendment. *See, e.g.*, *Falvo v. Owasso Independent School Dist. No. I-011*, 233 F.3d 1203, 1209-10 (10th Cir. 2000) ( FERPA does not create constitutionally protected expectation of privacy in student records), *rev'd on other grounds*, *Gonzaga University*, 534 U.S. at 288; *Risica v. Dumas*, 466 F. Supp. 2d 434, 441 (D. Conn. 2006) ("The Court doubts that any provision of FERPA can be said to create a reasonable expectation of privacy in an individual after *Gonzaga University*.").

*Doe v. Broderick*, 225 F.3d 440 (4th Cir. 2000), is not to the contrary. In that case, the issue was whether a plaintiff had a legitimate expectation of privacy in medical records kept at a local methadone clinic, including "dosage sheets," "urine screen history," and "confidences [the plaintiff] shared with his counselors at the clinic." *Id.* at 445. In order to protect the anonymity of people seeking treatment for drug abuse, Congress enacted a statute imposing strict confidentiality provisions on such information,

including an explicit prohibition against using such information "to initiate or substantiate any criminal charges against a patient or to conduct any investigation of a patient" except as authorized by a court order.  *See* 42 U.S.C. § 290dd-2(c).  While the court found this statute "relevant" to its Fourth Amendment analysis, *see* 225 F.3d at 450, it was not dispositive.  Rather, the court also examined the nature of the information at issue, focusing on the fact that "medical treatment records contain *intimate and private details* that people do not wish to have disclosed . . . ."  *Id.* at 451 (emphasis added).[5]

Even if FERPA has some relevance to the inquiry, a court must assess the particular records at issue to determine whether a claimed privacy interest in them is "one that society is prepared to recognize as 'reasonable.'"  *Katz v. United States*, 389 U.S. 347, 361 (1967).  In contrast to the extremely sensitive medical treatment records at issue in *Broderick*, the key-card data here concerned activities in common areas of the campus.[6]  Regardless of the limits FERPA places on educational institutions, Plaintiffs do

_____

[5] The Supreme Court cases cited by *Broderick* confirm that a statute is not determinative of whether a person's expectation of privacy is objectively reasonable; rather, courts must examine the nature of the information itself and how society regards it.  *See, e.g., California v. Greenwood*, 486 U.S. 35, 43 (1988) (rejecting argument that defendant had reasonable expectation of privacy in contents of his garbage based on California law prohibiting warrantless garbage searches).

[6] The statutory protections at issue in *Doe v. Broderick* were also very different from FERPA's.  Whereas 42 U.S.C. § 290dd-2(c) specifically prohibits law enforcement from using covered medical records to initiate an investigation except as authorized by court order, FERPA does not address law enforcement's use of educational records at all, but simply provides for the cessation of federal funding to institutions that have a "policy or practice" of violating the statute's disclosure requirements. 20 U. S. C. § 1232g(b)(1).  Indeed, it does not even prohibit disclosure of student records, but simply allows the federal government to cut off aid to institutions that make a policy or practice of

not have a reasonable expectation of privacy in such information. *See Falvo*, 233 F.3d at 1209-10 (neither FERPA on its own nor the nature of the information at issue created a constitutionally protected privacy interest in student grades); *see also United States v. Hambrick*, No. 99-4793, 2000 WL 1062039 (4th Cir. Aug. 3, 2000) (Electronic Communications Privacy Act "does not represent a legislative determination of a reasonable expectation of privacy in non-content information released by ISPs"). This claim must be dismissed.

## IV.    THE NONTESTIMONIAL ORDER WAS VALID (COUNT 21)

Plaintiffs' argument that the NTO was invalid under the Fourth Amendment rests on the bald assertion that the North Carolina NTO statute is unconstitutional. That statute requires probable cause to believe a felony was committed, but only "reasonable grounds to suspect that the person named or described in the affidavit committed the offense. . . ." N.C. Gen. Stat. § 15A-273. Plaintiffs assert, however, that the taking of DNA samples "without probable cause to believe that Plaintiffs had committed the alleged crime" violates the Fourth Amendment. Opp. at 26. Yet, Plaintiffs can point to no decision in support of this bold claim. This is unsurprising, given that the NTO statutes of North Carolina and other states have been consistently upheld. 4 Wayne R. LaFave, *Search &*

---

disclosing records without parental consent. *See Gonzaga*, 536 U.S. at 288; *Bauer v. Kincaid*, 759 F. Supp. 575, 590 (W.D. Mo. 1991) ("FERPA is not a law which prohibits disclosure of educational records. It is a provision which imposes a [federal funding] penalty for the disclosure of educational records.") (citing *Student Bar Ass'n v. Byrd*, 239 S.E.2d 415, 419 (N.C.1977)). Thus, FERPA hardly reflects the same societal regard for the privacy of educational records that 42 U.S.C. § 290dd does for medical records.

*Seizure* § 9.8, at 4-12 (2007). The Supreme Court itself has said "[t]here is thus support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act. . . ." *Hayes v. Florida*, 470 U.S. 811, 817 (1985). Plaintiffs protest that *Hayes* applied to fingerprinting, and this case involves DNA collected via a saliva swab. But this is a distinction without a difference, as the case law makes clear. *See, e.g.*, *Bousman v. Iowa Dist. Court*, 630 N.W.2d 789, 798 (Iowa 2001) ("[W]e do not think that saliva sampling involves a significant intrusion into a person's bodily security."); *In re R.H.*, 762 A.2d 1239, 1244 (Vt. 2000) (DNA saliva swab on reasonable suspicion upheld). Moreover, the reasoning in *Davis v. Mississippi*, 394 U.S. 721 (1969), applies equally to DNA saliva swabs. *See id.* at 727 (noting that fingerprinting is "inherently more reliable and effective" than other identification procedures and "involves none of the probing into an individual's private life or thoughts that marks an interrogation or search").

Plaintiffs also argue that *Hayes* is irrelevant because the court there ruled that the state could not detain and transport a suspect to the police station for fingerprinting based only on a "reasonable suspicion." Opp. 27. Plaintiffs fail to mention the key point of *Hayes*, however: the Court's explicit statement that "under circumscribed procedures, the Fourth Amendment might permit *the judiciary* to authorize the seizure of a person on less than probable cause and his removal to the police station for the purpose of fingerprinting." 470 U.S. at 817 (emphasis added). It is this suggestion by the Court that

led many states, including North Carolina, to pass NTO statutes like the one at issue here, and which has led numerous courts to uphold the use of such statutes to obtain DNA samples. *See, e.g.*, *State v. Pearson*, 566 S.E.2d 50, 60 (N.C. 2002) (applying North Carolina NTO statute, including "reasonable suspicion" standard, to DNA tests); *In re R.H.*, 762 A.2d at 1244. Plaintiffs can choose to ignore this critical part of *Hayes* and the cases following it in the DNA context, but this Court should not.

Plaintiffs also claim that, even under the standards of the North Carolina statute, there was not probable cause to believe that a crime had been committed. Plaintiffs premise their argument on the alleged inconsistencies in Mangum's account of the night she was allegedly raped. *See* Opp. at 28-32. But such inconsistencies in an alleged attack are neither uncommon nor a reason to find probable cause lacking. *Torchinsky v. Siwinski*, 942 F.2d 257, 263 (4th Cir. 1991) (rejecting argument that probable cause was lacking because putative attack victim had given conflicting accounts of how he had been injured). Moreover, the Complaint itself alleges that the medical evidence supported Mangum's allegations. *See, e.g.*, Compl. ¶ 185 ("[Levicy] told Gottlieb that the examination of Mangum had revealed physical evidence of 'blunt force trauma' . . . consistent with the victim's statement"); *see also* Compl. ¶¶ 123, 150, 152-54, 186-92. As Plaintiffs themselves assert, the medical evidence lent Mangum's allegations "a powerful aura of credibility," Compl. ¶ 210, without which "the rape investigation either would not have occurred or would have been terminated promptly." Compl. ¶ 483.

Finally, Plaintiffs argue that even if there was probable cause to believe a crime had been committed, there were no reasonable grounds to suspect them, even though investigators had confirmed that Mangum had performed at a party attended by lacrosse players at 610 North Buchanan. Compl. ¶¶ 162-65; *see also* Open. Br. at Ex. 2 (NTO Order). Plaintiffs suggest that reasonable suspicion exists only if an alleged victim can identify her attacker in a lineup. Opp. at 31. But this is not the law. "Reasonable suspicion" is not a demanding standard, *United States v. McCoy*, 513 F.3d 405, 411 (4th Cir. 2008), and requires only "a minimal amount of objective justification." *Pearson*, 566 S.E.2d at 54. Plaintiffs' own allegations about the lacrosse party, Mangum's statements, and the medical evidence provide ample "objective justification" for suspecting that, if Mangum had been raped, a member of the Duke lacrosse team was a perpetrator. For these reasons, Count 21 should be dismissed.

## V.  PLAINTIFFS FAIL TO STATE A SUBSTANTIVE DUE PROCESS CLAIM FOR MALICIOUS INVESTIGATION (COUNT 22)

The City explained in its Opening Brief how the Supreme Court in *Albright v. Oliver* refused to recognize a substantive due process right to be free from "malicious prosecution," and held that any complaints about pretrial deprivations of liberty must be judged under the Fourth Amendment. Plaintiffs attempt to circumvent *Albright* by claiming that it does not foreclose a claim for malicious *investigation*. Pls.' Opp. to Def. Durham Supervisors Mot. to Dismiss ("Opp. Super.") at 12-14. Plaintiffs assert, in other words, that the very fact that they were never arrested, indicted, or tried somehow gives

them the right to bring a due process claim that clearly would be barred if they *had* been arrested, indicted, and tried. This *Alice in Wonderland* logic has no support in the law.[7]

Ultimately, Plaintiffs' "malicious investigation" claim rests on the "shocks the conscience" theory of liability, a theory normally invoked in cases involving police brutality, torture, or other wanton physical harm. *See, e.g.*, *Rochin v. California*, 342 U.S. 165 (1952) (forced stomach pumping); *Orem v. Rephann*, 523 F.3d 442, 447 (4th Cir. 2008) ("sadistic" use of taser gun on defendant); *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553 (1st Cir. 1989) (plain clothes police officers conducting "preventive rounds" in neighborhood began shooting without warning at car driving away, hitting driver and rendering him a paraplegic). But Plaintiffs allege no physical touching other than a brief DNA saliva swab. What they allege is that they were investigated even though Defendants knew that Mangum's claims could not be true. *See* Opp. Super. at 18. But such conduct does not come close to the shocks-the-conscience standard, especially since Plaintiffs were never indicted or arrested.[8] In fact, Fourth Circuit precedent makes

---

[7] Plaintiffs note that they also allege false public statements, suppression of evidence, and coercion of witnesses during the investigation, which they assert "do not arguably sound in the Fourth Amendment[]." Opp. Super. at 13-14. This is true. But as the City showed in its opening brief (at 28-29), and Plaintiffs do not dispute, such allegations also do not state a due process claim.

[8] The only cases Plaintiffs cite in which courts have suggested that the "shocks-the-conscience" standard might be met by conduct not involving violence are ones in which the plaintiffs had *at least* been arrested and/or tried. *See White v. Wright*, 150 F. App'x 193, 195 (4th Cir. 2005) (plaintiff indicted and tried); *Moran v. Clarke*, 296 F.3d 638, 641 (8th Cir. 2002) (indicted and tried); *Omni Behavioral Health v. Miller*, 285 F.3d 646, 649 (8th Cir. 2002) (arrested); *Hirsch v. Otsego County Dep't Social Servs.*, No. 89-CV-954, 1992 U.S. Dist. LEXIS 3052, at *3 (N.D.N.Y. Mar. 11, 1992) (criminal

clear that Plaintiffs' allegations do not state a due process claim.  *See, e.g.*, *Brooks v. City of Winston-Salem*, 85 F.3d 178, 184 (4th Cir. 1996) ("[Plaintiff's] claim that [the law enforcement officer] failed to attempt to have the criminal proceedings terminated after it became apparent that [plaintiff] was not the perpetrator fails to state a claim upon which relief may be granted.") (citations omitted).  Accordingly, this claim must be dismissed.

## VI.   THE OBSTRUCTION-OF-JUSTICE CIVIL TORT HAS BEEN APPLIED NARROWLY AND NEVER IN THIS CONTEXT (COUNT 23)

The City pointed out in its opening brief that North Carolina's obstruction-of-justice tort has never been recognized in any context remotely similar to that presented here: a plaintiff seeking damages for actions by law enforcement during a criminal investigation.  Plaintiffs do not dispute this; instead, they highlight the breadth of the *criminal statute* under which a *state prosecutor* may bring an action for "obstructing justice."  *See* Opp. at 32-33; N.C. Gen. Stat. §§ 14-221–27.[9]  Prosecution for the crime of obstructing justice is, of course, an entirely different matter from the case here.[10]

_____

complaint filed and hearing held).  Without at least an arrest or prosecution, it is clear that even a "bad faith" investigation does not violate due process.  *See Biasella v. City of Naples*, No. 2:04-cv-320-FTM- 29DNF, 2005 U.S. Dist. LEXIS 20211, at *12 (M.D. Fla. Aug. 11, 2005) (no "'right' to be free from maliciously instigated and baseless investigations" under substantive due process theory).  Moreover, *White v. Wright* states that any substantive due process claim must also allege that the acts resulted in a deprivation of a cognizable liberty or property interest.  150 F. App'x at 198.  But as the City points out in Section VII, *infra*, the only alleged liberty or property interest at issue—the cancelled lacrosse season—cannot support a due process claim.  This count fails for this additional reason.

[9] Plaintiffs parenthetically describe each of these cases as involving "common law obstruction of justice," *see* Opp. at 33, suggesting that they have something to say about the civil common-law tort.  This is not so.  Those cases describe the common law

Moreover, if a court were to permit an obstruction of justice claim in circumstances such as those in this case, it would essentially nullify the strict and measured requirements of North Carolina's malicious prosecution tort, which, among other things, requires that a person have been *at least* subject to prosecution before he may haul law enforcement personnel into court. *See Nguyen v. Burgerbusters, Inc.*, 642 S.E.2d 502, 506-07 (N.C. Ct. App. 2007). It is no surprise, then, that no North Carolina court has recognized the obstruction tort in this context. Nor should this Court.

## VII. THE OPPORTUNITY TO PLAY LACROSSE IS NOT A CONSTITUTIONALLY COGNIZABLE INTEREST (COUNTS 24-25)

In their Complaint, Plaintiffs premised their procedural due process claims on reputational harm which allegedly caused lost economic, job, and educational opportunities. *See* Compl. ¶¶ 652, 661. Plaintiffs now retreat to claiming but one property deprivation: loss of the 2006 Duke lacrosse season. *See* Opp. at 37. But even this narrowed allegation fails for the reasons the City has already explained: First, the loss of the lacrosse season was caused by the alleged reputational harm itself, and

---

*criminal misdemeanor* of obstruction, which predated the promulgation of the statutory crime. *See, e.g.*, *State v. Preston*, 325 S.E.2d 686, 688 (N.C. Ct. App. 1985).

[10] Moreover, none of the criminal cases on which Plaintiffs so heavily rely, *see* Opp. at 33, involves prosecution of a law enforcement official for engaging in the sort of conduct alleged here. Rather, each involves a criminal prosecution of a private citizen for interfering with a criminal investigation or proceeding. Thus, even if one accepts Plaintiffs' premise that criminal obstruction cases are somehow instructive in the civil context, they actually prove the City's point: that obstruction of justice means interfering with (i.e., obstructing) an investigation or pursuit of a civil claim. It has never meant *conducting* an ill-founded investigation or pursuing a baseless civil claim.

therefore cannot serve as the required "plus" in the "stigma plus" test. *See Siegert v. Gilley*, 500 U.S. 226, 234 (1991) ("[S]o long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a [constitutional tort] action."). While Plaintiffs now try to argue that the reputational harm did not cause Duke to cancel the lacrosse season, *see* Opp. at 37 ("loss of the 2006 lacrosse season is not an anticipated effect of an injury to Plaintiffs' reputations"), their Complaint explicitly—and repeatedly—states otherwise. *See* Compl. ¶ 652 ("*As a direct and foreseeable consequence* of these actions inflaming community and university passions against the plaintiffs, plaintiffs suffered the loss of liberty and/or property interests . . . including the loss of the unique athletic opportunity to participate in the 2006 Division I men's lacrosse season") (emphasis added).[11] Since loss of the lacrosse season is alleged to result "direct[ly] and foreseeab[ly]" from the reputational harm, it cannot support a procedural due process claim.

Nor, in any event, do Plaintiffs dispute that Duke, not the City, was responsible for cancelling the lacrosse season. *See* Compl. ¶ 289 (alleging that lacrosse season was cancelled for "purpose of . . . distanc[ing] Duke and its administrators from the lacrosse

---

[11] *See also* Compl. ¶¶ 654-62 (alleging plaintiffs deprived of lacrosse season "as a result of" public statements and reputational injury). Indeed, as hard as Plaintiffs now try to run away from their own allegations, even their brief asserts that "[t]he lacrosse season was cancelled *because* Defendants' . . . *vilification* of the team roiled the Duke and Durham communities and stoked outrage and hostility against the players." Opp. at 37-38 (emphasis added). But alleging that the season was cancelled because of *vilification* is the same as saying it was cancelled because of *defamation*—*i.e.*, because of harm to Plaintiffs' reputations. *See* The American Heritage Dictionary 1348 (2d College Ed. 1982) (defining "vilify" as "[t]o defame, denigrate").

players and to appease faculty, student, and community activists").  Plaintiffs instead

maintain that this makes no difference, and that they may premise their due process claim

on a deprivation of property by a private actor.  This theory, however, runs afoul of a

fundamental requirement of the Fourteenth Amendment: that the *state* was responsible

for the deprivation of liberty or property.  *See Paul v. Davis*, 424 U.S. 693, 711 (1976)

("the procedural guarantees of the Fourteenth Amendment apply whenever the State

seeks to remove or significantly alter [a] protected status" outside of reputation).  For this

reason, the cases Plaintiffs cite for support, *see* Opp. at 38 & n.27, do not help them:  In

each case, the deprivation was done by a state actor, not a private actor.[12]

Finally, the loss of a sport season does not implicate the "common occupations of

life," as it must in order to ground any properly pleaded "stigma plus" claim under *Davis*

and *Siegert*.  Indeed, the "plus" has nearly always been found only within the

employment realm, or in contexts with similar lasting consequences for one's choice of,

or success in, his or her career.  *See, e.g.*, *Ridpath v. Bd. of Governors Marshall Univ.*,

---

[12] *See Velez v. Levy*, 401 F.3d 75 (2d Cir. 2005) (city official removed plaintiff from the board); *Owen v. City of Independence*, 445 U.S. 622, 629 (1980) (city manager discharged plaintiff); *Ulrich v. City of San Francisco*, 308 F.3d 968, 982-83 (9th Cir. 2002) (city hospital refused to rehire plaintiff); *Patterson v. City of Utica*, 370 F.3d 322, 327 (2d Cir. 2004) (city mayor terminated plaintiff's employment). Plaintiffs also cite *Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir. 1980), for the proposition that "the defamatory communication need not cause the loss of the protected right, or more tangible interest, in order to satisfy the stigma-plus test." *Id.* at 519-20.  In *Marrero*, however, the same actor imposed both the "stigma" and the "plus," *see id.*, which is not what is alleged here.  Moreover, after *Marrero*, the Supreme Court clarified that "damage flow[ing] from injury caused . . . to a plaintiff's reputation . . . is not recoverable" under a due process theory.  *Siegert*, 500 U.S. at 234; *see also Cypress Ins. Co. v. Clark*, 144 F.3d 1435, 1437 (11th Cir. Fla. 1998) (limiting *Marrero* in light of *Siegert*).

447 F.3d 292, 308 (4th Cir. 2006) ("'corrective action'" label on the plaintiffs'

reassignment "foreclosed his career opportunities in his chosen field").[13] Even in the

employment context, moreover, indefinite cancellations of programs or activities, as here,

do not give rise to constitutionally cognizable interests. *See Van De Velde v. Wearing*,

No. 3:01-CV-2296 (RNC), 2004 WL 546661, at *2 n.3 (D. Conn. Mar. 12, 2004) (finding

no "plus" where school cancelled plaintiff's classes pending a murder investigation). It is

not surprising, then, that courts have consistently held that the loss of an opportunity to

participate in extracurricular activities does not support a "stigma plus" claim, no matter

how keen the sense of loss to the affected student, and no matter whether participation is

at the collegiate level or not.[14] Accordingly, the claim must be dismissed.

---

[13] Plaintiffs cite *Unger v. National Residents Matching Program*, 928 F.2d 1392 (3d Cir. 1991), for the proposition that the due process clause covers "educational opportunities." Opp. at 39. But that case involved an alleged deprivation of an interest in "pursuit and continuance of [one's] graduate medical education," 928 F.2d at 1396, with obvious longstanding career consequences. Plaintiffs allege no such career impact arising from cancellation of the lacrosse season.

[14] "[T]he overwhelming majority of courts have held that participation in interscholastic athletics or other extracurricular activities is not a constitutionally protected liberty or property interest." *Bailey v. Truby*, 321 S.E.2d 302, 314-15 (W. Va. 1984) (citing over 40 cases spanning federal and state courts); *see also Colorado Seminary (University of Denver) v. NCAA*, 570 F.2d 320, 321 (10th Cir. 1978) (finding no constitutional right to participate in intercollegiate sports and rejecting plaintiffs' argument that their status as college athletes, rather than high school athletes, affects the due process analysis); *Hawkins v. NCAA*, 652 F. Supp. 602, 610 (N.D. Ill. 1987) (rejecting basketball players' argument that they possessed "a constitutionally protected property interest in participation in intercollegiate athletic post-season competition" and "constitutionally protected right in gaining tournament experience, which includes the national exposure and the associated business contacts"); *Karmanos v. Baker*, 617 F. Supp. 809, 815 (E.D. Mich. 1985) (no actionable claim where plaintiff barred from playing intercollegiate hockey because "the law is clear in this circuit that a person does

## VIII. THE CITY CANNOT BE HELD LIABLE FOR THE INDEPENDENT ACTIONS OF THE STATE PROSECUTOR (COUNTS 26A, 26B, AND 26C)

Recognizing that they cannot sue the State of North Carolina for the actions of its employee, Mike Nifong, because of sovereign immunity, Plaintiffs have gone to great lengths to try to characterize Nifong as a City actor on the theory that the City "delegated" its authority to him. But Plaintiffs cannot overcome an insuperable obstacle: North Carolina law clearly makes Nifong exclusively a state actor.

Plaintiffs concede (Opp. at 14) that the Supreme Court has made clear that determining whether an official can be regarded as a final policymaker for a particular governmental entity "will necessarily be dependent on the definition of the official's functions under relevant state law." *McMillian v. Monroe Co., Ala,* 520 U.S. 781, 786 (1997); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) ("[A] federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it."); *Dotson v. Chester*, 937 F.2d 920, 924 (4th Cir. 1991) ("'whether an official acts on behalf of the county or the state is similarly a question of state law'") (citation omitted).

Plaintiffs also concede that North Carolina's Constitution and statutes specify that a district attorney at all times acts as a State official. *See* Opp. at 14. But Plaintiffs try to evade the obvious logical implications of these concessions by arguing that the "legal

---

not have a liberty interest subject to due process protection to participate in interscholastic athletics.").

.

question" of what entity Nifong worked for—the State or Durham—is irrelevant because, as a "factual" matter, the City delegated its authority to him. *Id.* The problem with this inventive theory, though, is that it would make *McMillian* a dead letter, since it renders utterly meaningless the analysis of state law that the Supreme Court found to be so crucial. Under Plaintiffs' approach, if City officials cooperate with a State official— whether a state prosecutor, the Attorney General, or the Governor—the city could be liable for decisions taken by the state official on the theory that the city had "delegated" its municipal policymaking authority to him. This makes no sense. If the official is, under state law, purely a creature of the State, with no municipal functions, the City cannot have "delegated" its policymaking authority to him, because the actions he takes are, by definition, actions taken on behalf of the State, and because the City has no authority over him. *See Turquitt v. Jefferson County*, 137 F.3d 1285, 1292 (11th Cir. 1998) ("[L]ocal governments can never be liable under § 1983 for the acts of those whom the local government has no authority to control."); *see also id*. ("A local government can only be liable under § 1983 for injuries which the government itself caused . . . and causation necessarily implies control.").

In the context of law enforcement investigations, adopting Plaintiffs' theory would have extremely deleterious effects. It would, at the least, create a powerful disincentive on the part of city police officials to coordinate with state prosecutors, out of concern that cities would otherwise be held liable for the prosecutors' actions. Police would undertake investigations without the legal advice of prosecutors, running a greater risk of violating

citizens' civil liberties and jeopardizing prosecutions. This would grossly disserve the vital interests of public safety, effective law enforcement, and good government.

Of course, a city policymaker can delegate final policymaking authority to a *subordinate city official. See Riddick v. School Bd.*, 238 F.3d 518, 523 (4th Cir. 2000) (noting that policymaking authority could be delegated by city school board to school officials, but finding no delegation since board retained the authority to review officials' conduct for conformance with city policy). A city policymaker can also delegate final policymaking authority to an official who, *under state law*, has both municipal and state functions, and is empowered by state law to make city policy in certain circumstances.[15] But in every case in which a court has found such delegation by a municipality to a "dual-hatted" official, the court looked to state law to determine whether that official played any municipal function, and so was legally *capable* of receiving delegated authority from a municipality. In *no* case that we know of—and in none of the cases Plaintiffs cite—did a court do what the Plaintiffs urge this court to do: ignore state law

---

[15] *See, e.g.*, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 498 (1976) (finding delegation of county policymaking authority to county prosecutor where Ohio law allowed prosecutor to "'establish county policy under appropriate circumstances'") (citation omitted); *Kujawski v. Comm'rs*, 183 F.3d 734, 738 (7th Cir. 1999) (finding delegation by county to community corrections officer where, "[u]nder state law, 'employees of a community corrections program are county employees'") (citation omitted). Plaintiffs' assertion (Opp. at 16) that the City argues "that a state officer is always and exclusively a state officer exercising state power" is a red herring. *Of course* there are some officials who have both state and municipal functions, as we discuss in text. But *whether* a *particular* official has such dual functions, or instead serves solely as a state official, is entirely dependent on state law under the Supreme Court's decisions in *McMillian*, *Pembaur*, and *Praprotnik*.

and focus only on whether delegation is adequately alleged as a "factual" matter. And in

no case did a court find delegation possible when state law defined an official solely as a

state actor, as North Carolina law does for district attorneys.

Finally, Plaintiffs' argument that there is no law *forbidding* delegation of city

policymaking authority to district attorneys is beside the point. The question under

*McMillian*, *Pembaur*, and *Prapotnik* is whether state law defines a district attorney as a

city official for *any* purpose. Plaintiffs concede that North Carolina does not.

Accordingly, the City could not delegate any final policymaking authority to Nifong.

## IX. THE ALLEGATIONS ABOUT GOTTLIEB'S RECORD ARE INSUFFICIENT TO ESTABLISH A CITY POLICY OR CUSTOM (COUNTS 26D & 26E)

Plaintiffs attempt to characterize their allegations as part of a larger, dramatic

narrative, namely, the story of a longstanding campaign of discrimination by the City

against Duke students. Compl. ¶¶ 687-89. But even if the story is taken at face value,

the factual allegations on which it is premised do not support it.

Plaintiffs' entire "policy or custom" argument hinges on allegations about the bias

of one police officer—Sergeant Gottlieb—against Duke students. Their argument can

best be summarized as a "who knows?" argument—as they put it, "if a policeman is

willing to break the law and violate the Constitution to add a piddling alcohol bust to his

list of collars of Duke students, who knows how far he would go to get credit for rape and

kidnapping arrests in a case that is in the national spotlight?" Opp. at 43. But "who

knows?" is not the question that *Monell* asks. Rather, under *Monell*, a City is liable for

the acts of its subordinates only if it has created a policy that makes the alleged constitutional deprivation almost *inevitable*. Any notion of "inevitability" here is manifestly lacking.

Plaintiffs highlight a statistic: "71 percent of Gottlieb's formal arrests were Duke students (20 out of 28)" whereas "[o]nly three percent of the formal arrests made by the other three officers who patrol the same district were Duke students." Compl. ¶ 135; *see also* Opp. at 43. But this statistic is utterly irrelevant here, since this case arose in an entirely different context. In the prior instances Gottlieb had allegedly "false[ly] arrested" students, used "excessive force," or "taken [them] to jail for alcohol and noise violations." *See* Compl. ¶¶ 134-35. Yet, here, Gottlieb did not arrest Plaintiffs, use any force, or even seek an arrest warrant for any of them. Nor do Plaintiffs allege that some plausible non-student suspect was passed over simply because he was not affiliated with Duke. Plaintiffs' allegations of Gottlieb's previous actions, even if true, therefore do not bear sufficient relation to the allegations regarding this case to show that a policy or custom of targeting Duke students caused the alleged violations here.

Moreover, the Complaint itself *concedes* that Gottlieb *would have dropped the case entirely* if the medical evidence had not supported Mangum's rape claims. Compl. ¶ 211 ("If the Durham Police had been advised truthfully by Levicy that the physical and medical evidence was inconsistent with Mangum's [allegations], then the rape investigation . . . would not have been revived and pursued."). This allegation alone directly contradicts what Plaintiffs now argue—that the harm they suffered was

*inevitable* as a result of Gottlieb's alleged personal bias. Thus, Plaintiffs' quibbling about whether the policy/custom must be "*a* moving force" or "*the* moving force," Opp. at 45-46, is beside the point. The allegations are simply insufficient to show that the alleged policy of "targeting" Duke students made this investigation—and the injuries Plaintiffs claim to have suffered as a result of it—"'bound to happen . . . rather than merely likely to happen in the long run.'" *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (citation omitted). These allegations therefore cannot support Plaintiffs' claims.

## X. THE ALLEGATIONS OF CITY ACTORS' CONDUCT ARE NOT SUFFICIENT TO MEET THE HIGH STANDARD OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT 28)

In its Opening Brief (at 40-41 & nn. 29-32) the City cited a plethora of cases showing that the types of allegations recited by Plaintiffs fail to meet the stringent standard of "outrageous" conduct required to make out a claim of intentional infliction of emotional distress in North Carolina. Plaintiffs offer nothing in response other than to insist that the alleged conduct *was* outrageous, and that in any case it should be up to the jury. Opp. at 47. But the two cases Plaintiffs cite to support their claim of "outrageousness" are totally inapposite.[16] And despite Plaintiffs' suggestion to the

---

[16] The first, *Hogan v. Forsyth Country Club*, 340 S.E.2d 116 (N.C. Ct. App. 1986), simply held that workplace sexual harassment may be sufficiently outrageous so as to state a claim. *See id.* The second, *West v. King's Dept. Store, Inc.*, 365 S.E.2d 621, 625-26 (N.C. 1988), involved baseless claims of shoplifting by a store manager against a married couple. The court's decision rested on a finding that the husband explicitly warned the manager of his wife's dire medical condition, explaining that she was receiving outpatient treatment and could not withstand the confrontation—yet, the manager continued unabated, exacerbating the wife's condition and forcing both husband and wife to seek medical treatment. *Id.* No such allegations are made here.

contrary, whether allegations meet the standard of outrageousness "is a question of law." *Capouch v. Cook Group, Inc.*, Civil No. 3:04CV421-H, 2006 U.S. Dist. LEXIS 36984, at *32 (W.D.N.C. June 5, 2006).[17]

## XI.    PLAINTIFFS FAIL TO STATE A CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (COUNT 29)

As the City has pointed out in its Opening Brief (at 42), Plaintiffs allege only *intentional* acts by City Defendants, not negligent ones.  But this Court has made clear that allegations of intentional conduct cannot support a claim for negligent infliction of emotional distress.  *See, e.g.*, *Sheaffer v. County of Chatham*, 337 F. Supp. 2d 709, 734 (M.D.N.C. 2004).  Plaintiffs suggest that this rule should not apply to them because of the supposed strength of their intentional infliction claim.  *See* Opp. at 49 n.30.  This argument makes no sense.  Since Plaintiffs do not allege any negligent conduct by City actors, this claim must be dismissed.[18]

---

[17] Moreover, while Plaintiffs now quote Duke President Brodhead's description of the impact of these events on Plaintiffs, Opp. 48, this hardly suffices to meet the standard for pleading severe emotional distress.  *See Peck v. Lake Lure*, No. 1:00cv183-T, 2001 U.S. Dist. LEXIS 13179, at *15 (W.D.N.C. Feb. 23, 2001) (dismissing emotional distress claim because plaintiffs "failed to allege any diagnosed mental illness or professional care attributable to defendants' alleged conduct") (citation omitted).

[18] As the City explained in its Opening Brief, this claim also fails because City officials were not the proximate cause of Plaintiffs' alleged injuries.  In response, Plaintiffs simply refer to their Opposition to the SANE Defendants.  *See* Opp. at 49 n.30. But the cited sections of that brief do not discuss the City Defendants at all or why they might be regarded as the proximate cause of Plaintiffs' alleged injuries.  Plaintiffs have thus left this argument completely unrebutted.

## XII. PARENT PLAINTIFFS LACK STANDING TO ASSERT EMOTIONAL DISTRESS CLAIMS

Although not at all clear from the face of the Complaint, Plaintiffs now limit their claims on behalf of the Parent Plaintiffs to only two of the thirty-one counts.  Opp. at 49. But even after this narrowing of Parents' claims, the Parents lack standing.

Despite Plaintiffs' suggestion to the contrary, a parent cannot bring an emotional distress claim based on the mere *existence* of a parent/child relationship.  As the sole case cited by Plaintiffs makes clear, such claims may proceed only when the severe emotional distress is a *foreseeable result* of the complained-of action.  *See Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A*, 395 S.E.2d 85, 97 (N.C. 1990).  Under this inquiry, courts evaluate several factors, including the parent's proximity to the incident and whether he or she observed the defendant's actions.  *Id*.; *see also Sorrells v. M.Y.B. Hospitality Ventures*, 435 S.E.2d 320, 321-23 (N.C. 1993) (finding that severe emotional distress to parents was not foreseeable on part of defendant who served their minor child alcohol, where child drove intoxicated and was killed in an accident).

Plaintiffs do not allege that severe emotional distress to the parents, in particular, was foreseeable.  Nor do they identify any particular parent as having suffered particularized injury, having been in close proximity to the alleged events, or even having been known to any City Defendant.  For that reason, in addition to the arguments addressed in Sections X & XI, *supra*, Plaintiff Parents' emotional distress claims must be dismissed.

## XIII.  CONCLUSION

For the foregoing reasons, and those stated in the City's Opening Brief and the

briefs of other Defendants, to the extent Causes of Action 8, 10, 20-25, 26A, 26C-E, 27-

29 are alleged against the City, they should be dismissed.

This the 29th day of September, 2008.

| FAISON & GILLESPIE | STEPTOE & JOHNSON LLP |
|---|---|
| By: /s/ Reginald B. Gillespie, Jr. | By: /s/ Roger E. Warin |
| Reginald B. Gillespie, Jr. | Roger E. Warin* |
| North Carolina State Bar No. 10895 | Michael A. Vatis* |
| 5517 Chapel Hill Boulevard, Suite 2000 | Matthew J. Herrington* |
| Post Office Box 51729 | John P. Nolan* |
| Durham, North Carolina  27717-1729 | Steptoe & Johnson LLP |
| Telephone:  (919) 489-9001 | 1330 Connecticut Avenue, NW |
| Fax: (919) 489-5774 | Washington, DC  20036 |
| E-Mail: rgillespie@faison-gillespie.com | Telephone: (202) 429-3000 |
| | Fax: (202) 429-3902 |
| | E-Mail: rwarin@steptoe.com |
| | *(Motion for Special Appearance to be filed) |

Attorneys for Defendant City of Durham, North Carolina

## CERTIFICATE OF ELECTRONIC FILING AND SERVICE

The undersigned hereby certifies that, pursuant to Rule 5 of the Federal Rules of Civil Procedure and LR5.3 and LR5.4, MDNC, the foregoing pleading, motion, affidavit, notice, or other document/paper has been electronically filed with the Clerk of Court using the CM/ECF system, which system will automatically generate and send a Notice of Electronic Filing (NEF) to the undersigned filing user and registered users of record, and that the Court's electronic records show that each party to this action is represented by at least one registered user of record, to each of whom the NEF will be transmitted.

This the 29th day of September, 2008.

FAISON & GILLESPIE

By: /s/ Reginald B. Gillespie, Jr.
    Reginald B. Gillespie, Jr.
    North Carolina State Bar No. 10895