# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
# CIVIL ACTION NO. 1:08-CV-119

| | |
|---|---|
| **EDWARD CARRINGTON,** *et al.*, ) <br> ) <br> **Plaintiffs,** ) <br> ) <br> v.    ) <br> ) <br> **DUKE UNIVERSITY,** *et al.*, ) <br> ) <br> **Defendants.** ) <br> ) | **SUPPLEMENTAL BRIEF IN SUPPORT OF MOTIONS TO DISMISS OF DEFENDANTS GOTTLIEB, HIMAN, AND THE CITY OF DURHAM, NORTH CAROLINA** |

      Defendants Mark Gottlieb, Benjamin Himan, and the City of Durham, North Carolina ("City") (collectively, "City Defendants"), pursuant to this Court's order (Doc. No. 131), submit this supplemental brief in support of their motions to dismiss. This brief addresses the effect of the Supreme Court's recent decision, *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

      *Iqbal* underscores the fatal deficiencies in Plaintiffs' Complaint. In *Iqbal*, the Supreme Court made clear that a claim must be dismissed if the factual allegations are merely *consistent with*, rather than actually *suggesting*, the required elements of the claim. But Plaintiffs' claims here are based on factual allegations that, even if true, are *at best* only consistent with the required elements of the claims, and do not cross the threshold into suggesting those elements. While Plaintiffs assert the required elements in conclusory fashion, their factual allegations fail to support those assertions.

Plaintiffs describe a broad conspiracy involving not only the City Defendants and the State Prosecutor but also numerous Duke University administrators and Duke University Medical Center nurses. Plaintiffs characterize the defendants as collectively intent on conducting a baseless and malicious investigation of the Duke lacrosse players. But Plaintiffs' factual allegations fail to support these conclusory characterizations. With regard to the City Defendants, *Iqbal* makes clear that even if their investigative actions might be *consistent with* a nefarious conspiracy to convict innocent people, those actions were also consistent with a far more obvious and innocent scenario: police doing the best they could to faithfully execute their investigatory duties under trying circumstances. Under *Iqbal*, then, Plaintiffs have failed to establish the plausibility of their allegations and their claims must be dismissed.

## I. *IQBAL* CONFIRMS THE REQUIREMENTS OF FRCP 8 FOR ALL CLAIMS BROUGHT IN FEDERAL COURT

The City Defendants discuss the central points of the *Iqbal* decision in their supplemental brief in the *Evans* matter.[1] To avoid repetition, the Defendants incorporate that discussion here and simply summarize the four key points of *Iqbal* that should guide the Court in assessing Plaintiffs' claims:

- Pleadings in federal district court must be plausible, no matter what the cause of action. This includes state law claims.

- The plausibility requirement cannot be circumvented even if a court intends to limit discovery. Adherence to the plausibility inquiry is "especially important" in suits against Government defendants because

---

[1] *See* Supplemental Brief in Support of Motions to Dismiss of Defendants Gottlieb, Himan, and the City of Durham at 3-6, *Evans v. City of Durham*, No. 1:07-CV-00739 (M.D.N.C. June 24, 2008) (Doc. No. 100).

- 2 -

of the " heavy costs" litigation extracts "in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government."[2]

- Conclusory allegations couched as factual allegations are not entitled to the assumption that they are true, and thus provide no support for a claim.

- Behavior that is merely consistent with alleged bad intent—but also consistent with an "'obvious alternative explanation,'" *Iqbal*, 129 S. Ct. at 1951 (citation omitted)—is not suggestive of such bad intent. When such an alternative explanation for defendants' conduct exists, the allegations cannot be said to plausibly establish bad intent.

Each of these points demonstrates the fatal defects in Plaintiffs' claims here, as explained below.[3]

## II. PLAINTIFFS' COMPLAINT FAILS TO MEET *IQBAL*'S STANDARDS

In Plaintiffs' Complaint, every aspect of the City's investigation is characterized as initiating, supporting, facilitating, or prolonging an effort led by the State Prosecutor to convict innocent people. But as between the purposeful, invidious conspiracy alleged by Plaintiffs, and the "obvious alternative explanation" of good-faith efforts to identify

---

[2] *Iqbal*, 129 S. Ct. at 1953. The importance of adherence to the plausibility standards is consistent with the principles underlying qualified immunity—immunity to which Defendants Gottlieb and Himan are entitled. *See* Memorandum in Support of Defendant Mark Gottlieb's Motion to Dismiss at 5-6, 13-14, 17-18, 20, 29 (Doc No. 54) ("Gottlieb Open. Br."); Defendant Benjamin Himan's Brief in Support of His Motion to Dismiss at 11, 20, 28-31 (Doc. No. 52) ("Himan Open. Br.").

[3] A fifth point made by *Iqbal* involves the standard for personal liability for supervisors in claims under Section 1983 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). When such suits involve causes of action requiring specific intent (such as intent to discriminate on the basis of race), Plaintiffs must plausibly allege more than simple acquiescence in the discriminatory conduct of subordinates. *See Iqbal*, 129 S. Ct. at 1948-49. Plaintiffs' claims with respect to the Durham Supervisory Defendants utterly fail in this regard. *See* Supplemental Brief of Defendants Baker, Chalmers, Council, Hodge, Lamb, Ripberger, Russ, and Addison, which is hereby incorporated by reference.

perpetrators of a serious violent crime, the conspiratorial actions and malicious intent alleged by Plaintiffs are "not a plausible conclusion." *Iqbal*, 129 S. Ct. at 1951-52 (citation omitted). The Supreme Court in *Iqbal* found the conclusory allegations of discriminatory purpose on the part of the defendants implausible because the factual allegations were consistent with an obvious alternative explanation—the legitimate desire to arrest and detain individuals because of their suspected link to the 9/11 attacks. Similarly, here, the conclusory allegations of malicious intent by the defendants are implausible because Plaintiffs' actions can be explained by the legitimate desire to investigate the alleged rape of Crystal Mangum.

This deficiency pervades Plaintiffs' Complaint—but is most notable in three areas: allegations of conspiracy, allegations of malicious intent, and allegations regarding City "policies and customs."

### A. Allegations of Conspiracy

The gist of Plaintiffs' Complaint is an overarching conspiracy among all manner of government and private persons to convict Plaintiffs and their teammates of crimes they "knew" never happened. *See* Compl. ¶¶ 636-37. But such conclusory allegations of conspiracy are entitled to no weight. *Iqbal*, 129 S. Ct. at 1949. Moreover, these conclusory allegations are not supported by any factual allegations suggestive of such a conspiracy.

For example, Plaintiffs allege that City investigators conspired with Nurse Tara Levicy for the purpose of concocting false affidavits to support the nontestimonial order. *See* Compl. ¶¶ 629-34. But no factual allegations suggest any such conspiracy; indeed,

the factual allegations belie such a conclusion. Plaintiffs themselves allege that City investigators were *duped by* Nurse Levicy. When investigators contacted Nurse Levicy about the case, she informed them that Crystal Mangum's physical condition was consistent with that of a woman who had, in fact, been raped. Indeed, she "embellished her misrepresentation, falsely assuring Sergeant Gottlieb that the examination of Mangum had revealed physical evidence of 'blunt force trauma' consistent with a vaginal and anal gang rape by three men." Compl. ¶ 8; *see also* Compl. ¶ 210 (false allegations regarding medical evidence "owed its existence entirely to Nurse Levicy"). Nor, according to the factual allegations, did investigators have any reason to doubt Levicy's statements. Compl. ¶¶ 205-06 (knowledge of falsity in NTO was in "exclusive possession" of Duke University). These allegations are not even facially consistent with a conspiracy, let alone suggestive of one. Accordingly, they are even less plausible than the claims presented (and found wanting) in *Iqbal*.[4]

Plaintiffs' other allegations of conspiracy fare no better. For example, they allege "on information and belief" that City investigators conspired with DSI representatives and Nifong to hide exculpatory DNA results and fabricate inculpatory DNA reports. *See* Compl. ¶¶ 384, 403, 457. Plaintiffs attempt to support this conclusory assertion by

---

[4] With the unsupported claims of conspiracy entitled to no weight under *Iqbal*, the factual allegations provide a clear picture of the situation the City investigators faced: (1) a woman who repeatedly claimed to have been raped at the lacrosse party; (2) undisputed physical and testimonial evidence that she had, in fact, been at the lacrosse party; and (3) medical evidence corroborating her version of events. This evidence, taken together, more than justified the request for a nontestimonial order. *See* Brief in Support of the City of Durham, North Carolina's Motion to Dismiss at 20-26 (Doc. No. 73) ("City Open. Br.").

alleging that the City investigators sat in meetings with the State Prosecutor and representatives of DSI. *See* Compl. ¶¶ 383, 402. But simply alleging that people attended meetings is insufficient to plausibly suggest a meeting of the minds, let alone a conspiracy to convict innocent people. *See Iqbal*, 129 S. Ct. at 1951 (even though the complaint alleged that Mueller and Ashcroft met shortly after 9/11 to discuss the policy at issue, the complaint nevertheless did not support conclusory allegations as to intent).

Moreover, *Iqbal* requires that the pleadings must be assessed with the underlying context in mind. Here, Plaintiffs do not allege that either of the City investigators knew anything at all about DNA testing or the proper reporting format for the results of that testing. In any event, Plaintiffs' allegations make clear that it was Nifong—not the City investigators—who decided not only who would test the DNA, but how those results would be explained to the public and shared with the defense. *See* Compl. ¶¶ 379, 428; *see also id.* § XXIV ("Nifong Conspires With DNA Testing Firm To Produce A Fraudulent DNA Report"); *id.* § XX ("Nifong's Conspiracy To Conceal Private DNA Firm's Exculpatory Test Results Continues"). No factual allegations suggest that Nifong sought or needed City investigators' agreement in making these decisions.

Plaintiffs' "conspiracy to defraud" claim (Cause of Action 8) is equally ungrounded in any supporting factual allegations. The Complaint alleges that Duke University personnel sent letters to the players and their defense counsel indicating that Duke had received a subpoena for key-card information and stating its intention to comply with the subpoena unless Plaintiffs objected. Compl. ¶ 435. Plaintiffs allege the letters were fraudulent because they concealed that the Durham police already were in

alleging that the City investigators sat in meetings with the State Prosecutor and representatives of DSI. *See* Compl. ¶¶ 383, 402. But simply alleging that people attended meetings is insufficient to plausibly suggest a meeting of the minds, let alone a conspiracy to convict innocent people. *See Iqbal*, 129 S. Ct. at 1951 (even though the complaint alleged that Mueller and Ashcroft met shortly after 9/11 to discuss the policy at issue, the complaint nevertheless did not support conclusory allegations as to intent).

Moreover, *Iqbal* requires that the pleadings must be assessed with the underlying context in mind. Here, Plaintiffs do not allege that either of the City investigators knew anything at all about DNA testing or the proper reporting format for the results of that testing. In any event, Plaintiffs' allegations make clear that it was Nifong—not the City investigators—who decided not only who would test the DNA, but how those results would be explained to the public and shared with the defense. *See* Compl. ¶¶ 379, 428; *see also id.* § XXIV ("Nifong Conspires With DNA Testing Firm To Produce A Fraudulent DNA Report"); *id.* § XX ("Nifong's Conspiracy To Conceal Private DNA Firm's Exculpatory Test Results Continues"). No factual allegations suggest that Nifong sought or needed City investigators' agreement in making these decisions.

Plaintiffs' "conspiracy to defraud" claim (Cause of Action 8) is equally ungrounded in any supporting factual allegations. The Complaint alleges that Duke University personnel sent letters to the players and their defense counsel indicating that Duke had received a subpoena for key-card information and stating its intention to comply with the subpoena unless Plaintiffs objected. Compl. ¶ 435. Plaintiffs allege the letters were fraudulent because they concealed that the Durham police already were in

possession of the key-card information. But any allegation of City involvement with the letters is manifestly absent. There is no allegation that any City Defendant participated in, encouraged, or even knew about the issuance of these allegedly fraudulent letters. It is true that Plaintiffs generally allege conspiracy "on information and belief." Compl. ¶ 536. But *Iqbal* makes clear beyond peradventure that such a bald conclusion is entitled to no weight.

Finally, the various meetings between Nifong and the City investigators do not plausibly suggest a conspiracy in light of the "obvious alternative explanation" for such meetings—that police routinely coordinate with prosecutors when conducting a criminal investigation, particularly where the underlying crime is a serious felony. Moreover, to the extent that Nifong was motivated by personal considerations having nothing to do with the evidence, no factual allegation plausibly suggests that City Defendants were acting to advance any of Nifong's goals. In any event, Nifong was allegedly committed to his course of conduct before he even spoke to the investigators, *see* Compl. ¶¶ 219, 221. Thus, Plaintiffs' claims against the City Defendants that depend on assertions of a conspiracy, *see, e.g.*, Causes of Action 8, 10, & 20-23, must be dismissed.

### B. Malicious Intent

As a basis for a number of their claims, Plaintiffs summarily conclude that the City's investigation into Crystal Mangum's rape claims was malicious.[5] But the Complaint lacks sufficient factual allegations to suggest such a conclusion. Plaintiffs

---

[5] Of course, for reasons separate and apart from pleading standards, these claims are deficient. *See, e.g.*, City Open. Br. at 26-30 (no federal right against "malicious investigation").

- 7 -

attempt to support their assertion of malice by leveling allegations against one man—Mark Gottlieb—who, they assert, over a certain period of time arrested a higher percentage of Duke students than his police counterparts. *See* Compl. ¶ 135. But this allegation does not plausibly suggest malice on the part of Gottlieb, let alone the other City defendants. There are at least several obvious alternative explanations for different arrest records by different officers that have nothing to do with malice: different levels of experience on the part of the officers, different areas of expertise or focus, or different "beats" within the same district, or even simply different views about how strictly to enforce laws against public nuisances. Moreover, here, Sergeant Gottlieb did not arrest Plaintiffs, falsely or otherwise, so his previous track record on arrests lacks any plausible tie to Plaintiffs' conclusion that Gottlieb acted maliciously in investigating this case.[6] In addition, many of the actions taken by Sergeant Gottlieb are patently inconsistent with the evil motives that Plaintiffs imagine. *See, e.g.*, Compl. ¶¶ 205-15 (DNA collected during NTO sent to state laboratory for testing); *id.* ¶ 268 (investigators provided new prosecutor with a full and accurate picture of the case upon first meeting him).[7]

---

[6] Plaintiffs' other allegations regarding Sergeant Gottlieb simply couch Plaintiffs' ultimate conclusions of malicious intent in the guise of factual allegations. *See, e.g.*, Compl. ¶ 134 (alleging Sergeant Gottlieb had "acquired a widely known reputation" for malicious abuse of Duke students).

[7] Indeed, Plaintiffs characterize all manner of routine investigatory activity in the most ominous light, without any factual support for those characterizations. For example, it is quite routine and legitimate for investigators to seek voluntary statements from eyewitnesses, which is precisely what Sergeant Gottlieb attempted to do in this case. *See* Compl. ¶ 176. Yet, in Plaintiffs' minds, this amounts to collusion to maliciously "arrange for uncounseled interrogations" where Plaintiffs would be coached "not to assert their constitutional right to representation." *Id.* Plaintiffs go so far as to conclude that Sergeant Gottlieb intended to "engage in coercive interrogations . . . as he

Most critically, Plaintiffs' own factual allegations suggest that Sergeant Gottlieb faithfully followed the evidence where it led him—and thus did not act with malice. For example, the Complaint states that Nurse Levicy told investigators that the medical evidence was consistent with Mangum's rape claims; it further asserts that the investigators were misled by these statements. Compl. ¶ 153 (noting that while investigators were initially skeptical of Mangum's claims, this was turned around when Levicy "advised Durham police, in effect, that a rape had likely occurred"). Indeed, Plaintiffs even allege that if Sergeant Gottlieb had not been deceived about this evidence, he *would have dropped the case entirely*. Compl. ¶ 211 ("If the Durham Police had been advised truthfully by Levicy that the physical and medical evidence was inconsistent with Mangum's [allegations], then the rape investigation . . . would not have been revived and pursued."); *see also* City Open. Br. at 21-25.[8] These factual allegations are not even *consistent* with malice, let alone *suggestive* of that conclusion. Under *Iqbal*, then, the conclusory assertions of malice cannot support claims for which malice is a required element. Such claims, *see, e.g.*, Causes of Action 8, 10, 20-23, 25, & 28, must be dismissed.

Moreover, in underscoring the deficiencies of Plaintiffs' Complaint in this regard, *Iqbal* confirms Sergeant Gottlieb's and Investigator Himan's rights to public officer

---

had done with co-captains Evans, Zash, and Flannery"—an allegation that makes no sense since Plaintiffs tout those earlier interviews as entirely voluntary. *See id.* ¶¶ 164, 177. Stripped of Plaintiffs' ominous, dramatic, and entirely conclusory characterizations, what is left is nothing more than a routine attempt to talk to witnesses.

[8] As to Investigator Himan, the Complaint offers even less. No factual allegations even remotely suggest the slightest ill-will towards Duke students, lacrosse players, these particular Plaintiffs, or anyone else.

immunity: Under North Carolina law, public officials acting within the scope of their authority may be liable in tort only if their conduct is intentionally harmful, malicious, or corrupt. *See Moore v. Evans*, 476 S.E.2d 415, 421 (N.C. Ct. App. 1996). In the absence of plausible allegations of such intent under *Iqbal*, Defendants Gottlieb and Himan are immune from all state law claims. *See* Causes of Action 8, 10, 23, & 28-30; *see also* Gottlieb Open. Br. at 26-29; Himan Open. Br. at 31-34.

### C. City Policy

Plaintiffs allege two types of City policy: (1) actual approval and/or ratification of the allegedly malicious conduct of its investigators and spokespersons; and (2) longstanding customs that made the alleged constitutional violations inevitable under *Monell*. Plaintiffs' factual allegations, however, do not support either theory.

Plaintiffs allege, in conclusory fashion, that the Supervisory Defendants participated in, had knowledge of, and acquiesced in the actions by the investigators. *See, e.g.*, Compl. ¶ 404 (alleging that "Durham Supervisors" were aware of conspiracy to hide DNA test results and allowed it to take place). They make such allegations not only in a vain effort to hold the Supervisory Defendants individually liable, but also to establish a City policy or custom sufficient for *Monell* liability. But these allegations are precisely the sort of threadbare recitation of elements which *Iqbal* held is not entitled to the presumption of truth. And there are simply no factual allegations that suggest approval or ratification of unconstitutional conduct by investigators, or the purposeful establishment of City policy to engage in such conduct. Moreover, Plaintiffs fail even to identify *which* Supervisory Defendant approved or ratified the investigators' conduct,

thus falling even further short of the *Iqbal* standards than the plaintiff in *Iqbal* itself—who at least specified the two policymakers who allegedly authorized and approved the alleged unconstitutional conduct. *See Iqbal*, 129 S. Ct. at 1951. Allegations that the undifferentiated Supervisory Defendants collectively knew of and ratified the underlying malicious and conspiratorial actions of Durham investigators are conclusory at best. And *Iqbal* demands that, whether the cause of action applies to a government official or a municipality, *see id*. at 1948 (citing *Monell*), the allegations must be at least be minimally plausible to survive a motion to dismiss. These allegations fall woefully short of that standard.

Plaintiffs also refer to preexisting "policies and customs" of the City. But these "policies and customs" are alleged in precisely the same conclusory way as the policies at issue in *Iqbal*, which the Supreme Court found insufficient to state a claim. For example, Plaintiffs allege that the City had a policy or custom of selective enforcement of the criminal laws with respect to Duke students. Compl. ¶¶ 683, 687. But no specific factual allegations support this bare assertion. The vague allegations with respect to Sergeant Gottlieb certainly are not sufficient to establish a City policy or custom. Moreover, *Iqbal* demands that the context of the allegations be considered. Any targeting of Duke students regarding underage drinking and public disturbance complaints hardly suggests an opprobrious policy of "selective enforcement." Rather, it is more readily explained as an understandable response to complaints from neighboring residents about the behavior of Duke students living nearby. Just as the disparate impact on Muslims arising from law enforcement efforts following the September 11 attacks was found by the Supreme Court

not to be suggestive of discriminatory intent, so too any disparate impact on Duke students arising from enforcement efforts to counter underage drinking and noise complaints is hardly suggestive of a City policy to maliciously and selectively enforce the laws against Duke students. Again, while it may be *possible* that such a policy underlies the conduct of police investigators, there are no factual allegations that make the existence of such a policy *plausible* under the analysis required by *Iqbal*.

Moreover, the Complaint lacks any factual allegation suggesting the requisite causal link between the alleged policy and the alleged unconstitutional actions in the investigation of Mangum's alleged rape. That is, even if the City had a policy of unfairly targeting Duke students for underage drinking, noise complaints, and public urination, there is no allegation suggesting such a policy made inevitable the alleged constitutional violations in this case—which involved the investigation of a serious violent crime alleged by the purported victim. *See* Reply Brief in Support of Defendant City of Durham, North Carolina's Motion to Dismiss Second Am. Compl. at 18-19, *McFadyen v. Duke University*, Case No. 1:07-CV-00953 (M.D.N.C. Nov. 26, 2008) (Doc. No. 107) (outlining fundamental differences between so-called "Zero Tolerance" enforcement efforts and the investigation of Mangum's rape claims).[9]

*Iqbal* makes clear that allegations that simply mimic elements of causes of action, such as the ones Plaintiffs employ to recite the required elements of *Monell* claims, are

---

[9] Other alleged "customs," such as "publish[ing] premature official conclusions of criminality and guilt," Compl. ¶ 694, enjoy even less support, since no previous examples of such conduct are even hinted at by Plaintiffs anywhere in their Complaint.

entitled to no weight. And with no underlying factual allegations to support them, the claims against the City must be dismissed.

>    D.  **Damages**

Plaintiffs make bare allegations of various harms they have suffered as a result of the alleged conduct of Defendants. *See, e.g.*, Compl. ¶ 663 (alleging "reputational injury, emotional harm, economic losses, prolonged subjection to the ordeal of criminal investigation, and other harms"). But, again, *Iqbal* makes clear that unsupported recitation of the required elements of the claims at issue is insufficient to survive a motion to dismiss. Plaintiffs have not provided any specific factual allegations to support their conclusory assertions of harm, let alone described the severe emotional distress required for several of their claims. *See* Causes of Action 28-29 (intentional and negligent emotional distress claims); *see also Oshop v. Tenn. Dept. of Children's Servs.*, No. 3:09-CV-0063, 2009 WL 1651479, at *9 (M.D. Tenn. June 10, 2009) (dismissing claim for negligent infliction of emotional distress because allegation of "infliction of severe emotional harm" and similar unspecified harms were simply "[t]hreadbare recitals of the elements of a cause of action" and could not state a claim under *Iqbal* (citations omitted)); *DiPietro v. N.J. Family Support Payment Center*, No. 08-4761, 2009 WL 1635568, at *8 (D.N.J. June 10, 2009) (same); City Open. Br. at 40-43. This deficiency is particularly glaring here, where Plaintiffs acknowledge that the Attorney General of North Carolina has publicly cleared the indicted players of any wrongdoing and declared that no attack occurred. Compl. ¶¶ 467-70. For this additional reason, Plaintiffs' Complaint is deficient.

## III. CONCLUSION

Plaintiffs' claims must be dismissed.[10]

---

[10] Plaintiffs should not be permitted to amend their Complaint at this stage of the proceedings. First, this matter has already undergone extensive briefing; re-pleading would entail significant additional burden on all parties, including many defendants entitled to qualified immunity; second, Plaintiffs cannot claim unfair surprise, since *Iqbal* merely clarified the pleading standards previously set out in *Twombly*; and third, given the length of Plaintiffs' Complaint, it is unlikely that Plaintiffs can muster more factual material in an attempt to cure their pleading deficiencies.

This the 24th day of June, 2009.

| | |
|---|---|
| FAISON & GILLESPIE | STEPTOE & JOHNSON LLP |
| By: /s/ Reginald B. Gillespie, Jr.<br>Reginald B. Gillespie, Jr.<br>North Carolina State Bar No. 10895<br>5517 Chapel Hill Boulevard, Suite 2000<br>Post Office Box 51729<br>Durham, North Carolina 27717-1729<br>Telephone: (919) 489-9001<br>Fax: (919) 489-5774<br>E-Mail: rgillespie@faison-gillespie.com | By: /s/ Roger E. Warin<br>Roger E. Warin*<br>Michael A. Vatis*<br>Matthew J. Herrington*<br>John P. Nolan*<br>Leah M. Quadrino*<br>Steptoe & Johnson LLP<br>1330 Connecticut Avenue, NW<br>Washington, DC 20036<br>Telephone: (202) 429-3000<br>Fax: (202) 429-3902<br>E-Mail: rwarin@steptoe.com<br>*(Motion for Special Appearance to be filed) |

*Attorneys for Defendant City of Durham, North Carolina*

| | |
|---|---|
| POYNER & SPRUILL LLP | KENNON, CRAVER, BELO, CRAIG & MCKEE, PLLC |
| By: /s/ Eric P. Stevens<br>David W. Long<br>North Carolina State Bar No. 2779<br>Eric P. Stevens<br>North Carolina State Bar No. 17609<br>Post Office Box 1801<br>Raleigh, North Carolina 27602-1801<br>Telephone: (919) 783-6400<br>Fax: (919) 783-1075<br>E-Mail: estevens@poynerspruill.com | By: /s/ Joel M. Craig<br>Joel M. Craig<br>North Carolina State Bar No. 9179<br>Henry W. Sappenfield<br>North Carolina State Bar No. 37419<br>4011 University Drive<br>Post Office Box 51579<br>Durham, North Carolina 27717-1579<br>Telephone: (919) 490-0500<br>Fax: (919) 490-0873<br>E-mail: jcraig@kennoncraver.com |
| *Attorneys for Defendant Mark Gottlieb* | *Attorneys for Defendant Benjamin Himan* |

CERTIFICATE OF ELECTRONIC FILING AND SERVICE

The undersigned hereby certifies that, pursuant to Rule 5 of the Federal Rules of Civil Procedure and LR5.3 and LR5.4, MDNC, the foregoing pleading, motion, affidavit, notice, or other document/paper has been electronically filed with the Clerk of Court using the CM/ECF system, which system will automatically generate and send a Notice of Electronic Filing (NEF) to the undersigned filing user and registered users of record, and that the Court's electronic records show that each party to this action is represented by at least one registered user of record (or that the party is a registered user of record), to each of whom the NEF will be transmitted.

This the 24th day of June, 2009.

FAISON & GILLESPIE

By: /s/ Reginald B. Gillespie, Jr.
    Reginald B. Gillespie, Jr.
    North Carolina State Bar No. 10895

*Attorneys for Defendant the City of Durham, North Carolina*