**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
No. 1:08-cv-119**

| | |
|---|---|
| **EDWARD CARRINGTON, et al.,** | ) <br> ) <br> ) |
| **Plaintiffs,** | ) <br> ) |
| v. | ) <br> ) |
| **DUKE UNIVERSITY, et al.,** | ) <br> ) |
| **Defendants.** | ) <br> ) |

**PLAINTIFFS' COMBINED RESPONSE TO DEFENDANTS'
SUPPLEMENTAL BRIEFS REGARDING *ASHCROFT v. IQBAL***

### I.   UNDERSTANDING *ASHCROFT V. IQBAL*

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), does not set forth any new rules or pleading standards for this Court to apply.  Although the length at which the Defendants reiterate their arguments in their supplemental briefs might suggest otherwise, the Defendants in fact *expressly* concede that "*Iqbal* did not create new pleading standards; it confirmed the pleading standards of Rule 8 that the Supreme Court had already articulated in" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  Joint Supplemental Brief of Duke University Defendants and Duke SANE Defendants Regarding *Ashcroft v. Iqbal,* ("Duke Supp. Br.") 11 n.6; *see also id.* at 2 n.1, 3 n.2; Supplemental Brief in Support of Motions to Dismiss of Defendants Gottleib, Himan, and the City of Durham, North Carolina ("Durham Supp. Br.") 2, 14 n.10; Defendant J. Wesley Covington's Supplemental Brief in Support of his Motion to Dismiss Pursuant to Rule 12(b)(6) ("Covington Supp. Br.") 1; Supplemental Brief of Defendants Baker, Chalmers, Council, Hodge, Lamb, Mihaich, Ripberger, Russ, and Addison ("Supervisors Supp. Br.") 3.[1]  And, of course, the

---

[1] Defendant Wilson joined the Durham, Supervisors, and Duke Supplemental Briefs. *See* Supplemental Brief in Support of Linwood Wilson's Motion to Dismiss at 1.

application of *Twombly* to the pleadings in this case has already been exhaustively briefed by both sides. One might then ask what is the point of all of Defendants' supplemental briefing, and the answer is obvious: Defendants simply use the occasion to rehash the arguments that they have already made and that we have already answered. Rather than dragging the Court at length through the pleadings against each Defendant one more time, Plaintiffs offer several observations that apply to all of the Defendants' supplemental briefing and that demonstrate that the contrasts between *Iqbal* and this case actually confirm the adequacy of the pleadings here. After that, a few specific responses to the various supplemental briefs will follow.

      **A.     *Iqbal* and *Twombly* Prescribe a "Plausibility," Not a "Probability," Standard**

In arguing that Plaintiffs' claims fail because Defendants' various alternative, innocent explanations are "more plausible" than the tortious explanation pleaded in the Complaint, Defendants try to rewrite the pleading threshold articulated in *Twombly* and *Iqbal*. *See* Duke Supp. Br. 6-8; Durham Supp. Br. 5, 7-8, 12; Supervisors Supp. Br. 5, 8, 10. Defendants contend that a claim survives at the pleading stage only if it is *more likely* than any innocent alternative explanation—that is, only if it is *probable*. But in both *Twombly* and *Iqbal*, the Supreme Court could not have been more emphatic that it was "not impos[ing] a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556; *Iqbal*, 129 S.Ct. at 1949 (pleading standard is "not akin to a 'probability requirement'") (quoting *Twombly*, 550 U.S. at 556). Rather, the Court imposed a "'plausibility standard,'" which asks only "for more than a sheer possibility that a defendant acted unlawfully." *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556). Thus the plausibility standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal" conduct. *Twombly*, 550 U.S. at 556.

### B. *Iqbal* Confirms That Rule 8 Requires Only That There Be More "Than a Sheer Possibility That a Defendant Has Acted Unlawfully"

Defendants misunderstand the Supreme Court's use of the phrase "merely consistent with." *See* Duke Supp. Br. 7-10; Durham Supp. Br. 1-2. The Court used that phrase to mean that the only ground for believing the claim was that "its factual impossibility [could not] be shown from the face of the pleadings" – it was a "sheer possibility." *Twombly*, 550 U.S. at 561; *Iqbal*, 129 S.Ct. at 1949. As the Court observed in *Twombly*, the oft-cited "no set of facts" language in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), "can be read" to mean that such claims—claims that are factually unsupported but not patently impossible—survive a motion to dismiss. 550 U.S. at 561. In overruling this aspect of *Conley* and restating the pleading standard in *Twombly* and *Iqbal*, the Court explained that, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557); *Twombly*, 550 U.S. at 561. Under this standard, the allegations must "'nudge[] [the] claims' … 'across the line from conceivable to plausible.'" *Id*. at 1951 (quoting *Twombly*, 550 U.S. at 570); *see also id*. at 1950 (claim fails "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct").

Indeed, if correct, the Defendants' conceit that a claim fails if the factual allegations are "consistent with" both the claim and an hypothesized lawful explanation would mean that a claim could survive a motion to dismiss only if there were *no possible* innocent alternative explanation. Put another way, Defendants' analysis of the Complaint assumes that a claim survives a motion to dismiss stage only if the allegations show that the claim is factually *certain*. As shown above, however, the Court in *Twombly* and *Iqbal* unequivocally rejected a "probability requirement" in favor of a "plausibility standard." *Iqbal*, 129 S.Ct. at 1949; *Twombly*, 550 U.S.

at 556. *A fortiori*, the Court rejected a "certainty" requirement.

In short, that the allegations are logically consistent with both the claimed wrongful explanation and the hypothesized lawful explanation is not grounds for dismissal. Indeed, virtually any claim that a plaintiff might plead would be logically consistent both with the claimed wrong and with some innocent explanation. All that matters is that a claim have more going for it "than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949.

### C. The Context of the Complaint Here Negates, Rather Than Supports, Defendants' Alternative Explanations of the Pleaded Facts

Defendants place a lot of reliance on *Iqbal*'s reference to the "context" of a pleading. *See, e.g.,* Duke Supp. Br. 6; Durham Supp. Br. 6, 11; Supervisors Supp. Br. 14. *Iqbal* read *Twombly* to require consideration of a complaint's context, and to "oblige[] a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." 129 S. Ct. at 1944 (emphasis omitted). This "context-specific task … requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. In *Iqbal*, the context was the September 11 massacre of more than three thousand Americans by Arab Muslim terrorists and the subsequent arrest and detention of anybody suspected of involvement in those attacks—arrests that, unsurprisingly, "produce[d] a disparate, incidental impact on Arab Muslims." 129 S. Ct. at 1951; *see also id.* at 1945 (quoting lower court's description of "'a national and international security emergency unprecedented in the history of the American Republic'"). Iqbal's subsequent civil complaint, which "challenge[d] neither the constitutionality of his arrest nor his initial detention," but only his confinement in a particular jail facility with other suspects of particular interest in the federal investigation, had to be assessed against this background. *Id.* at 1952. That context suggested an innocent, alternative

4

explanation for the disparate number of Arab Muslims who were arrested (arrests Iqbal did not even challenge), and therefore a claim of intentional discrimination in assigning detainees to a particular facility would require more than a bare assertion of discrimination.

The context of Plaintiffs' Complaint should likewise be considered here, just as Defendants urge, but it does not help them because it is radically different from *Iqbal*. The Duke rape hoax is the most infamous investigation of a non-existent crime in American history. It convulsed the State of North Carolina and dominated the national news media for a year. The misconduct was so pervasive and so toxic that the Attorney General of North Carolina took the case away from the Durham Defendants. Defendants themselves continue to invoke Attorney General Cooper's exoneration of the lacrosse players, *see, e.g.,* Durham Supp. Br. 13, but his report provides a very favorable context for the claims pleaded in the Plaintiffs' Complaint. Attorney General Cooper repudiated both the investigation conducted by the Durham Police and, specifically, the analysis of physical evidence conducted by Duke University Hospital. He concluded that there was no evidence whatsoever of a crime and that the Defendants knew it, that the complaining witness, whom the Durham authorities coached and credited, could not possibly be believed, and that the lacrosse players whom the Durham and Duke Defendants persecuted by fabricating evidence and suborning perjury were, in truth, innocent. The district attorney whom Durham appointed to direct the rape investigation has been disgraced, disbarred and jailed.[2] In *this* context, it is the Defendants' mind-numbing repetition that they were all "just doing their jobs" that is totally implausible as an alternative explanation for the wrongs pleaded in the Complaint.

---

[2] The findings of Attorney General Cooper are discussed, *inter alia*, in Complaint ¶¶ 7, 123, 241, 272, 275, 464-70.

5

### D. The Narrow Limits of the Questions Resolved by the Court in *Iqbal*

The Defendants fail to understand the narrow focus of the decision in *Iqbal*. The plaintiffs tried to impose liability for alleged constitutional violations by low-level jail officers not merely on their lieutenants and other supervisors, but on the Attorney General of the United States and the Director of the FBI. Accordingly, the Questions Presented, on which the Court granted certiorari, asked whether the allegations in Iqbal's complaint were sufficient to plead a claim against "a cabinet-level officer." 129 S. Ct. at 1955-56 (Souter, J., dissenting) (reprinting Questions Presented). What the Supreme Court reviewed, and what it rejected, was the plaintiff's extraordinary leap from alleged abuse by a jailhouse employee to vicarious liability for the two men at the very apex of the federal law enforcement pyramid. The Supreme Court took pains in *Iqbal* to limit its review of the pleadings solely to the allegations against the FBI Director and the Attorney General, who were "charged with responding to 'a national and international security emergency unprecedented in the history of the American Republic.'" 129 S. Ct. at 1942-43, 1945. The Court went out of its way to note "that we express no opinion concerning the sufficiency of respondent's complaint against the defendants who are not before us. Respondent's account of his prison ordeal alleges serious official misconduct that we need not address here." *Id.* at 1952. Indeed, earlier in its opinion the Court stated that Iqbal's "account of his prison ordeal could, if proved, demonstrate unconstitutional conduct by some government actors." 129 S. Ct. at 1942; *see also id.* at 1952. The other "government actors" to whom the Court referred in *Iqbal*—who were not dismissed from the lawsuit—were the same sort of law enforcement officers and supervisory officials whom Plaintiffs have sued here. *See* First Amended Complaint in *Iqbal v. Ashcroft* (submitted here as an exhibit by Defendants, D.E. 134-2) at ¶ 15 (naming as a defendant the Director, Northeast Region, Bureau of Prisons); ¶¶ 17-20 (warden and associate warden of the detention center); ¶¶ 21-30 (captain and lieutenants in

6

federal corrections service); ¶¶ 31-42 (federal corrections officers).[3]

Therefore, it is evident that the Supreme Court did not rewrite—or even restrict—supervisory liability for lower-level officials in *Iqbal*. Indeed, the Court reiterated the long-established rule that a government "official's liability 'will only result from his own neglect in not properly superintending the discharge' of his subordinates' duties." *Iqbal*, 129 S. Ct. at 1948 (quoting with approval from *Dunlop v. Munroe*, 11 U.S. 242, 269 (1812)). That rule continues to govern this case: "The principle is firmly entrenched that supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Supervisory liability "is not premised upon *respondeat superior* but upon 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict.'" *Id.* at 798 (citation omitted). Indeed, despite all their supplemental briefing about *Iqbal*, the Defendants expressly concede that the rule stated by the Fourth Circuit in *Shaw* controls this case. *See* Supervisors Supp. Br. 3 n.2 (quoting the formulation of supervisory liability in *Shaw*); Durham Supp. Br. 3 n.3 (incorporating Supervisors' brief in this regard).

### E. Merely Labeling Allegations "Conclusory" Is Insufficient to Justify Dismissal Under *Iqbal* and *Twombly*

Defendants salt their briefs liberally with the accusation that the allegations in the Complaint are "conclusory." They apply this epithet to any declarative sentence whose

---

[3] The Durham Supervisors cite a large number of allegations in the *Iqbal* complaint and assert that "the Court disregarded" them as "sweeping allegations that all of the defendants, including the petitioners, had engaged in unlawful conduct." Supervisors Supp. Br. 4 (citing *Iqbal*, 129 S.Ct. at 1951). This is incorrect. Of the paragraphs the Supervisors cite, the Supreme Court actually mentioned only one (¶ 96). The other paragraphs that the Supervisors cite allege acts of abuse and brutality perpetrated by other government actors (corrections officers and lieutenants). *See, e.g.*, *Iqbal* Complaint (D.E. 134-2) ¶¶ 247, 250. These were the allegations that, the Court said, "could, if proved, demonstrate unconstitutional misconduct by some government actors." 129 S. Ct. at 1942.

7

substance they do not like. But a motion to dismiss requires analysis, not mere name-calling. The claims in *Iqbal* against Ashcroft and Miller—but not those against other defendants—were dismissed because, although the "pleading standard Rule 8 announces does not require 'detailed factual allegations,' it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555). A "'formulaic recitation of the elements of a cause of action will not do.'" *Id.* Such an allegation is a mere legal conclusion that is not entitled to the presumption of truth. *Id.* at 1949-50. Then the remaining allegations in the complaint are taken as true and examined to determine if they plead a facially plausible claim. *Id.* at 1949.

In *Iqbal*, the Court rejected as formulaic legal conclusions the allegations that Ashcroft was "the architect" of a discrimination policy and that Mueller was "instrumental" in adopting it. *Id.* at 1951. Those averments were not entitled to the assumption of truth. Then turning to the search for factual allegations showing that Ashcroft and Mueller had purposefully adopted a policy of discrimination, it could find none: "Though respondent alleges that various other defendants, who are not before us, may have labeled him a person 'of high interest' for impermissible reasons," he makes no such allegation against the petitioners, Attorney General Ashcroft and Director Mueller, and "the complaint does not show, or even intimate, that petitioners purposefully housed detainees in [a particular facility] due to their race, religion, or national origin." *Id.* at 1952. The claim therefore failed, because such purposeful discrimination was an element of the plaintiff prisoner's *Bivens* claim for denial of equal protection. *Id.* at 1948.

## II. APPLYING RULE 8'S PLEADING STANDARDS TO THIS CASE

### A. The Complaint Alleges Facts Showing More Than a "Sheer Possibility" That the Durham Supervisors Acted Unlawfully

The Supervisors list some five dozen paragraphs from the Complaint and dismiss them all as conclusory and unacceptable, just like the allegations in *Iqbal*. Supervisors Supp. Br. 2-3.[4] But *Iqbal* involved a claim of intentional discrimination by cabinet officers based on nothing more than allegations that *other*, lower-level officials had discriminated on the basis of race and religion. 129 S. Ct. at 1952. The claims here are against lower officers and supervisors—the sort of defendants who were not dismissed in *Iqbal*—and here the claim does not require proof of intentional discrimination. Plaintiffs plead claims of supervisory liability, and the Durham Supervisors expressly concede that these claims continue to be governed by the Fourth Circuit's recitation of their elements in *Shaw*: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices[]'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw*, 13 F.3d at 799 (quoted in Supervisors Supp. Br. 3 n.2).

The Complaint alleges precisely such indifference and tacit—sometimes express—authorization here. To take just a few examples: (1) the Supervisors picked Nifong to run the investigation, despite knowledge of his dangerous conflict of interest, and they left him in charge

---

[4] The Supervisors also continue to gripe that the Complaint pleads some of their collective actions using the term "Supervisory Defendants" rather than repeating their individual names in each separate allegation. Supervisors Supp. Br. 2-4. As explained in Plaintiffs' Opposition to the Durham Supervisors (D.E. 93) at 4-6 & n.5, using this form of abbreviation to refer to subsets of defendants is routine and entirely proper.

9

while they watched the case descend into a witch hunt after the Investigators disclosed to the Supervisors that there was no evidence of a crime, Complaint ¶¶ 160-67, 181, 218-23, 667-79, 682-89, 697-701; (2) they picked Gottlieb as lead investigator, despite his record of falsifying police reports and fabricating evidence against Duke students, ¶¶ 682-89—that alone raises a triable issue of material fact about whether the Supervisors were "deliberately indifferent or acquiesced in" the misconduct of their subordinate, *Shaw*, 13 F.3d at 800 (quotation marks omitted) (supervisor liable for failure to stop abuses by subordinate because "the statistical evidence" on the officer's arrest pattern and practices "speaks for itself"); (3) the Supervisors were briefed on the deteriorating case against the lacrosse players—they even had meetings with Duke officials to review the overwhelming exculpatory evidence—yet they directed Gottlieb and Himan to expedite arrests and indictments nonetheless, ¶¶ 308, 699-702; (4) they directed the Investigators to discredit and discipline Sgt. Shelton and other officers whose evidence exonerated the Plaintiffs, ¶¶ 110, 422-23, and they sanctioned Gottlieb's and Himan's witness tampering with Pittman/Roberts, ¶¶181-83; (5) they tacitly approved Nifong's efforts (in concert with Duke officials) to discredit Duke Police Officer Day's exonerating evidence and to induce fabrication of new incriminating evidence, ¶¶ 139, 276-77, 322-23; (6) when the exculpatory DNA evidence became a problem, the Durham Investigators tried to suppress the information with the approval of the Durham Supervisors, ¶¶ 212, 312-13, 384-85, 403-04, 427-29; and (7) the Supervisors (Hodge in particular) authorized and ratified Addison's and Nifong's inflammatory media jihad (complete with "wanted" posters) against the players—the very media campaign that later got Nifong disbarred, ¶¶ 271-76, 690-93, 717.

There is a wealth of detail here. These are not conclusory allegations that merely mimic the elements of a claim, nor are these allegations consistent with the Defendants' alternative

explanation that they were just engaged in vigorous, routine police work. If that were all the Duke rape hoax amounted to, Attorney General Cooper would not have had to seize the case from Durham and he would not have exonerated the players and castigated Durham's investigation. These allegations are also sufficient to establish the causal link between the Durham Supervisors and the wrongs visited on the Plaintiffs. *See, e.g., Padilla v. Yoo*, No. 08-35, 2009 U.S. Dist. LEXIS 50154 at *64-65 (N.D.Cal. June 12, 2009) (decided after *Iqbal*) ("causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by which the actors knows or reasonably should know would cause others to inflict the constitutional injury"); *Spell v. McDaniel*, 591 F. Supp. 1090, 1110 (E.D.N.C. 1984) (same); *Tyree v. Zenk*, No. 05-2998, 2009 U.S. Dist. LEXIS 43872, at *20-21 (E.D.N.Y. May 22, 2009) (single factual allegation against one defendant policeman—that he stopped videotaping an incident of brutality in response to another officer's signal—was sufficient for civil rights conspiracy claim to survive dismissal).

### B. The Complaint Alleges Facts Showing More Than a "Sheer Possibility" That Durham Acted Unlawfully

Durham's principal defense, just like before, is that it is not responsible for Nifong's nefarious deeds. *See, e.g.,* Durham Supp. Br. 6. But (1) such delegation by a city is familiar and permissible under North Carolina law, (2) the Complaint thoroughly alleges the City's delegation of the investigation to Nifong, and (3) that allegation is a question of fact for the jury. *See* Plaintiffs' Opposition to Durham (D.E. 100) 11-19. This issue alone requires denial of Durham's motion to dismiss the claims against it.

Durham objects to the allegations of conspiracy between city Investigators and either nurse Levicy or the DSI laboratory by applying its favorite labels: "conclusory" and "implausible." Durham Supp. Br. 4-6. Neither label is apt. The Complaint details a series of

11

meetings between Levicy and Gottlieb, Himan, Wilson and Nifong where they worked together to change her testimony or fabricate new details to adapt to the needs of the prosecution as other evidence (*e.g.,* the evidence that none of the players' DNA was in or on Mangum) threatened to torpedo the case. *See* Pl. Opp. to Durham (D.E. 100) 7, 10-11 (citing Complaint); Pl. Opp. to Gottlieb (D.E. 101) 4-6, 10-11; Pl. Opp. to Himan & Wilson (D.E. 102) 4-6.[5] Similarly, the Complaint also details meetings, with specific dates and lists of participants, among the Durham Investigators and DSI to discuss the exculpatory DNA evidence and how to suppress it. *See* Pl. Opp. to Durham (D.E. 100) 8, 10 (citing Complaint); Pl. Opp. to Gottlieb (D.E. 101) 5-6. Finally, Durham was complicit in the plan to defraud the Plaintiffs with respect to Duke's key-card data because the City (through Nifong and the Investigators) had to play its role in the charade performed for Judge Titus to convince him, and the Plaintiffs, that Duke had not already violated the Plaintiffs' rights by turning over the data to Durham so that the Investigators could rig the photo-ID arrays. It takes two to tango, and if Durham had missed a step the truth would have been exposed. *See* Pl. Opp. to Durham (D.E. 100) 10, 19-23 (citing Complaint); Pl. Opp. to Gottlieb (D.E. 101) 7-8.

Durham insists that malice has not been adequately pleaded because the allegations against its Investigators are merely "routine investigatory activity." Durham Supp. Br. 7-8 &

---

[5] These discussions in Plaintiffs' Oppositions briefs (and the portions of the Complaint they cite) likewise dispense with the tired argument that Gottlieb and Himan were merely passive pawns. Durham Supp. Br. 8-9, 11; *see* Complaint ¶¶ 190-92, 311, 313, 462-63. Finally, Durham's decision to recall Gottlieb from another division and to put him in charge of the rape investigation, despite his documented record of fabricating evidence and falsifying police reports against Duke students, is more than sufficient to hold his superiors liable under the Fourth Circuit's decision in *Shaw*, which the Defendants concede still governs after *Iqbal. See* Complaint, ¶¶ 134-35, 681-88; Pl. Opp. to Durham 43-45; *Shaw v. Stroud*, 13 F.3d at 795-96, 800 (supervisor held liable for policeman's misconduct where "statistical evidence" of subordinate's disproportionate arrest practices "speaks for itself"); Supervisors Supp. Br. 3 n.2 (agreeing that *Shaw* still controls supervisory liability).

n.7. This defense cannot be taken seriously: falsifying evidence, intimidating and tampering with witnesses, suppressing exculpatory evidence, and vilifying suspects in the media and by disseminating "wanted" posters are hardly routine government acts—and they are certainly not legitimate government acts. And of course the allegations should be examined in the context of Attorney General Cooper's excoriation of Durham's investigation. That Durham's misconduct was outrageous does not make it implausible. What *is* implausible is Durham's alternative, innocent explanation that its agents were simply doing their jobs in good faith.

### C. The Complaint Alleges Facts Showing More Than a "Sheer Possibility" That Duke Acted Unlawfully

The Duke University Defendants and the Duke SANE Defendants (together, "Duke Defendants" or "Duke") contend that Counts 1, 2, 6, and 7 should be dismissed because "Plaintiffs have failed to plead in plausible and non-conclusory terms that they have suffered severe emotional distress." Duke Supp. Br. 9-11. According to the Duke Defendants, the fact that a Duke professor has already recognized the "physiological toll from waking up every day with a pit in your stomach" is insufficient because it is "merely consistent with a diagnosable mental condition, but it is also consistent with someone who is experiencing garden variety anxiety or concern." *Id.* at 10 (quotation marks omitted). As explained above in Parts I.A. and I.B., Duke misapprehends the Supreme Court's "merely consistent" and "plausibility" analysis. Furthermore, as in their prior briefs, the Duke Defendants simply ignore most of the extensive pertinent factual allegations of injury, which Plaintiffs have already collected and reviewed. *See* Pls.' SANE Opp. (D.E. 97) 20-21, 40-41; Pls.' University Opp. (D.E. 96) 10.

Duke also argues that the Complaint is inadequate because of "its unlikely suggestion that the exact same emotional condition was afflicting every single one of the player-plaintiffs." Duke Supp. Br. 10 n.5 (emphasis omitted). Duke is especially skeptical of the claim that the

13

"*parent*-plaintiffs" suffered severe emotional distress. Duke Supp. Br. 10-11. The Complaint's factual allegations adequately suggest that all Plaintiffs suffered severe emotional distress— which is hardly surprising, given the way the Plaintiffs were vilified on the national stage for months on end.[6] But if the Court concludes that Plaintiffs must allege "each plaintiff's individualized mental condition," Duke Supp. Br. 10 n.5, then Plaintiffs respectfully reiterate their request for an opportunity to amend the Complaint in order to provide such individualized allegations, particularly for the parents, some of whom suffered the most severe emotional distress of all. *See* Pls.' SANE Opp. at 21 n.12.[7]

The Duke Defendants urge that Counts 20, 21, and 22 be dismissed because the Complaint "allege[s] only in conclusory terms that Duke employees acted under color of state law and 'in concert with' Durham officials." Duke Supp. Br. 4-9. They claim that the "more plausible explanation" of their actions is that they were doing nothing more than innocently "provid[ing] information to Durham investigators as any private citizen might do." *Id.* at 6-8. These arguments, which add nothing material to Duke's prior briefs, fail for the same reasons as before.

---

[6] Durham makes a similar argument, which fails for the same reasons. Durham Supp. Br. 13.
[7] Defendants oppose giving Plaintiffs an opportunity to amend the Complaint. Duke Supp. Br. 11 n.6; Durham Supp. Br. 14 n.10. First, they contend that "*Iqbal* did not create new pleading standards." Duke Supp. Br. 11 n.6. Plaintiffs agree – *Iqbal* adds nothing to *Twombly* – but that does not mean that Plaintiffs should be denied the chance to revise the Complaint in light of the Court's application of Rule 8 pleading standards to it. Second, Defendants note that "Plaintiffs' complaint is already 224 pages long." *Id.* That is irrelevant. The length of the Complaint does not indicate that all potentially relevant facts have been pleaded; rather, it reflects the enormity of the catalog of Defendants' wrongs. It is odd for a Defendant to object to *too much* detail. As long as there are additional factual allegations that would enhance Plaintiffs' claims, Plaintiffs should have the opportunity to make those allegations. Finally, Defendants insist that "allow[ing] [Plaintiffs] to amend their complaint, after extensive briefing has already been completed, would be a waste of both the parties' and the court's resources." *Id.* That is ironic: Defendants themselves initiated this round of supplemental briefing to bring to the Court's attention a decision (*Iqbal*) that, they concede, "did not create new pleading standards," and then they filed supplemental briefs that merely rehash their prior arguments. *Id.*; D.E. 130 (May 27, 2009).

First – as Plaintiffs have shown and as Duke has not disputed – it is unnecessary for purposes of Counts 20 and 22 to establish a conspiracy between the Duke Defendants and the Durham Investigators and Nifong. Duke University and the Duke Police were state actors by virtue of a statutorily authorized agreement by which the City of Durham delegated to them state law-enforcement power, and the other Duke Defendants were state actors by virtue of their conspiring with the University and the Duke Police. Pls.' University Opp. (D.E. 96) 48-50 (Count 20); Pls.' SANE Opp. (D.E. 97) 46-47 (Count 22).[8] Second, and more broadly, the Duke Defendants ignore the vast bulk of the Complaint's extensive specific factual allegations, which – as Plaintiffs have previously shown – when taken together easily "allow[] the court to draw the reasonable inference that the defendant[s]" formed the relevant agreements. *Iqbal*, 129 S.Ct. at 1949; Pls.' University Opp. (D.E. 96) 48 (Count 20); *see* Pls.' SANE Opp. (D.E. 97) 42-45 (Count 21); *Id*. at 47-49 (Count 22).[9]

There is, therefore, no need to decide which explanation is "more plausible" because the claims in Counts 20-22 are undoubtedly facially plausible. The Complaint contains more than "enough factual matter (taken as true) to suggest" that the Duke Defendants acted under color of law. *Iqbal*, 129 S.Ct. at 1948-49; *Twombly*, 550 U.S. at 556. In any event, the claims in Counts 20-22 are more plausible than Duke's refrain of pure, pedestrian innocence, which, in fact, is implausible.[10]

---

[8] The only Duke Defendants named in Count 20 are the Duke University, the Duke Police, Kate Hendricks, and Matthew Drummond.

[9] The only Duke Defendants named in Count 21 are Duke University, DUHS, Theresa Arico, and Tara Levicy.

[10] The Duke Defendants also contend that "Count 21 should be dismissed against Theresa Arico because … [t]he *Iqbal* decision established that a plaintiff in a § 1983 action cannot hold supervising employees vicariously liable for the wrongful actions of their subordinates." Duke Supp. Br. 8 n.4. As explained above, the Duke Defendants, like other Defendants, have confused

15

## CONCLUSION

For the reasons stated above and in Plaintiffs' prior briefs, Defendants' motions to dismiss should be denied.

July 14, 2009                                              Respectfully submitted,

**THOMAS, FERGUSON**                    **COOPER & KIRK, PLLC**
**& MULLINS, L.L.P.**

/s/ William J. Thomas                     /s/ Charles J. Cooper

William J. Thomas, II                    Charles J. Cooper
(N.C. Bar # 9004)                       ccooper@cooperkirk.com
thomas@tfmattorneys.com           David H. Thompson
119 East Main Street                   dthompson@cooperkirk.com
Durham, NC 27701                  Brian S. Koukoutchos
Tel. (919) 682-5648                    bkoukoutchos@ cooperkirk.com
                                                  Nicole Jo Moss
                                                  (N.C. Bar # 31958)
                                                  nmoss@cooperkirk.com
                                                  David Lehn
                                                  dlehn@cooperkirk.com
                                                  1523 New Hampshire Avenue, NW
                                                  Washington, DC 20036
                                                  Tel. (202) 220-9600

---

genuine supervisory liability and vicarious liability for supervisors, that is, liability premised upon *respondeat superior*. *Iqbal* closed the door only on the latter. 129 S.Ct. at 1948-49.

# **CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following counsel:

*Counsel for J. Wesley Covington*
    Kenneth Kyre, Jr.
    Email: kkyre@pckb-law.com

*Counsel for City of Durham*
    Reginald B. Gillespie, Jr.
    Email: rgillespie@faison-gillespie.com

*Counsel for Mark Gottlieb*
    David William Long
    Email: dwlong@poynerspruill.com

*Counsel for Benjamin Himan*
    Joel Miller Craig
    Email: jcraig@kennoncraver.com

*Counsel for Patrick Baker, Steven Chalmers, Ronald Hodge, Lee Russ, Stephen Mihaich, Beverly Council, Jeff Lamb, Michael Ripberger*
    Patricia P. Kerner
    Email: tricia.kerner@troutmansanders.com

*Counsel for David Addison*
    James B. Maxwell
    Email: jmaxwell@mfbpa.com

*Linwood Wilson, pro se*
    Email: LinwoodW@aol.com

*Counsel for Duke University Defendants and Duke SANE Defendants*
    Jamie S. Gorelick
    Email: jamie.gorelick@wilmerhale.com

                                                /s/ David Lehn