# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

No. 1:08-cv-119

_____
)
EDWARD CARRINGTON *et al.*,                      )
)
      Plaintiffs,                      )
)   CIVIL COMPLAINT
          v.                      )
)   JURY TRIAL
DUKE UNIVERSITY *et al.*,                        )   DEMANDED
)
      Defendants.                      )
_____ )

## FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF THE ACTION ................................................. 1

PARTIES ........................................................................................................... 10

I.    The Plaintiffs. ............................................................................................. 10

II.   The Defendants. .......................................................................................... 16

      A.    The Duke Defendants. ........................................................................ 16

      B.    The Durham Defendants. .................................................................... 22

            1.    The Durham Investigators. ......................................................... 22

            2.    The Durham Supervisors ............................................................ 23

JURISDICTION AND VENUE ............................................................................. 26

FACTS ............................................................................................................... 26

I.    Background. ................................................................................................. 26

      A.    Duke University's Championship Men's Lacrosse Team .......................... 26

      B.    The Party On March 13, 2006 ............................................................. 29

II.   Mangum Alleges She Was Raped And Is Examined At Duke Hospital ............... 32

      A.    Mangum's Rape Allegations At Duke Hospital Are Wildly Inconsistent
            And Facially Implausible .................................................................... 34

      B.    Durham And Duke Police Were Fully Aware That Mangum's Rape
            Allegations Were Not Credible ............................................................ 37

      C.    Duke's Forensic Exam Reveals No Objective Medical Or Physical
            Evidence Of Rape ............................................................................... 38

III.  Durham Police Sergeant Gottlieb Takes Over The Rape Investigation ............... 43

i

A.     Duke Advises Lacrosse Players Not To Seek Legal Counsel ..................... 45

B.     Duke Nurse Tara Levicy Lends Credibility to Mangum's False Rape Allegations ................................................................................. 48

C.     Mangum Fails To Identify Any Of The Lacrosse Players In Photo Lineup .......................................................................................... 50

D.     Police Search 610 N. Buchanan and Interrogate Team Captains ................ 52

E.     Duke Steers Players To Duke's Lawyer -- Wes Covington ........................ 54

F.     Duke Colludes With Gottlieb Against The Players .................................... 57

G.     Roberts Tells Police That Mangum's Rape Allegations Are "A Crock" .... 58

H.     Duke Nurse Levicy Again Falsely Corroborates Rape Allegations ............ 60

I.     Mangum Fails Second Attempt At Photo Identification ............................. 63

J.     Players' Parents Learn Of Rape Allegations .............................................. 64

K.     Parents Reject Advice Of Duke Lawyer Covington ................................... 65

L.     Relying On Levicy's Misrepresentations Of The Medical Evidence, Gottlieb Obtains A Non-Testimonial Order For DNA Samples From The Players ................................................................................. 66

IV.     The Media Frenzy Begins, And District Attorney Nifong Takes Control Of The Rape Investigation ............................................................................ 69

V.     Duke Reacts To The Rape Charge, Closing Its Eyes To The Truth And Condemning, Punishing, Harassing, And Betraying The Lacrosse Players ......... 72

A.     Duke Administration Capitulates To The Demands Of The Media, Activist Faculty, And Student Protestors .................................................... 72

B.     Duke Publicly Maligns The Players ........................................................... 75

C.     Duke Cancels Two Lacrosse Games To Punish Team For The Party ........ 76

D.     President Brodhead Refuses To Meet With Lacrosse Parents ................... 79

ii

E.  Duke Refuses Parents' Request To Stop Faculty Harassment .................... 80

F.  Brodhead Publicly Maligns The Players And Fosters "Wall of Silence" Myth ............................................................................................... 81

G.  Duke Faculty Encourage Campus Protests Against Lacrosse Players ........ 83

H.  Duke's Campus Atmosphere Becomes Hostile And Perilous For Players . 87

VI.  District Attorney Nifong Pursues Investigation Despite Overwhelming Exculpatory Evidence ................................................................................ 90

VII.  Nifong Launches False And Unethical Media Campaign Against Players, And Duke Withholds The Truth ............................................................. 90

A.  Nifong Repeatedly Emphasizes That Duke Hospital's Forensic Exam Supported Mangum's Rape Charge, And Duke Says Nothing .................. 91

B.  Nifong Falsely Implies That Mangum's Rape Allegations Were Consistent And Credible, And Duke Suppresses Officer Day's Contrary Police Report ................................................................. 94

C.  Nifong Falsely Accuses Team Of "Wall of Silence," And Duke Falsely Concurs ................................................................................................. 95

VIII.  Duke's Hostility To The Lacrosse Team Intensifies ................................. 97

A.  Duke Campus Is Flooded With WANTED Posters ..................................... 97

B.  Brodhead Provides False Assurances To The Players ................................ 99

C.  Brodhead Suspends The Lacrosse Season ................................................. 100

D.  Brodhead Credits Exotic Dancer's Claims In 911 Tape ............................ 101

E.  Professor Baker Defames The Lacrosse Players As Racist, Violent, Privileged Rapists ..................................................................... 103

IX.  DNA Evidence Dispositively Exonerates The Lacrosse Players But Is Ignored By Defendants ................................................................................................ 106

A.  The State Bureau Of Investigation's DNA Testing Results Are Negative 106

B.   Nifong Suggests That Rapists May Have Used Condoms, And Duke Says Nothing .............................................................................. 109

X.   Players Fear For Their Safety As Campus Hostility Spawns Threats Of Violence......................................................................................... 109

A.   Duke's Faculty Members Attack Team ...................................... 109

B.   Duke Players Are Threatened With Racial Violence................. 111

XI.  Duke Improperly Assists Nifong's Patently Corrupt Investigation ..................... 112

A.   Duke Suppresses Officer Day's Exculpatory Police Report.................... 112

B.   Duke Illegally Gives Nifong Key Card Reports On Lacrosse Players ..... 113

C.   Duke Withholds Exculpatory Information That Directly Contradicts Nifong's Public Claims and Accusations.................................... 115

D.   Duke Hospital Again Falsely Corroborates Mangum's Rape Charges..... 117

E.   Duke Breaks Its Promises Of Confidentiality To The Players ................. 119

F.   Duke Hospital Turns Over Falsified Medical Records To Durham Investigators ............................................................................... 120

XII.  Mangum Selects Players Seligmann And Finnerty As Two Of Her Attackers In Third Rigged Photo Identification Procedure .................................... 121

XIII. Duke Cancels The Lacrosse Season And Fires Coach Pressler To Appease Activist Faculty And Students................................................................ 124

XIV. The "Group Of 88" Members Of The Duke Faculty Publish An Ad Condemning The Lacrosse Players As Guilty And Encouraging Public Protests Against Them........................................................................ 129

XV.  Mangum's Story Changes Yet Again In Written Statement To Durham Investigators ......................................................................................... 133

iv

XVI. Nifong Hires A Private DNA Testing Firm And Then Conspires To Suppress Its Exculpatory Test Results ................................................................................. 134

XVII. The SBI's Negative DNA Test Results Become Public ...................................... 136

    A.    Nifong Suggests That Rapists May Have Used Condoms, And Duke Says Nothing ........................................................................................... 137

    B.    Nifong Justifies Continued Investigation On Medical Evidence From Duke Hospital, And Duke Says Nothing .................................................. 138

XVIII. Duke Assists Durham Investigators In Making Warrantless Entries Of Dorm Rooms And Uncounseled Interrogations Of Players ........................................... 139

XIX. Lacrosse Players Seligmann And Finnerty Are Indicted ..................................... 141

XX. Nifong's Conspiracy To Conceal Private DNA Firm's Exculpatory Test Results Continues ................................................................................................. 142

XXI. The New Black Panthers March Against The Lacrosse Team ............................. 143

XXII. Duke Releases Study Of Lacrosse Team's Disciplinary Records ....................... 144

XXIII. The Duke And Durham Defendants Discredit Exculpatory Evidence ................ 147

    A.    Duke Discredits Officer Day's Exculpatory Police Report ...................... 147

    B.    Durham Destroys And Discredits Evidence That Mangum Not Credible ................................................................................................... 149

    C.    Gottlieb Produces "Supplemental Case Notes" ........................................ 150

XXIV. Nifong Conspires With DNA Testing Firm To Produce A Fraudulent DNA Report ......................................................................................................... 151

XXV. Lacrosse Player Evans Is Indicted ...................................................................... 152

XXVI. Duke Conspires With The Durham Investigators To Fraudulently Conceal Duke's FERPA Violations ................................................................................... 153

XXVII. Duke Violates Its Own Anti-Harassment Policy ............................................... 156

v

XXVIII. The Lacrosse Team Is Exonerated ................................................................. 161

    A.    Mangum Recants Rape Charge And Nifong's Corruption Is Exposed..... 161

    B.    The Attorney General Takes Over The Investigation, Finds "No Credible Evidence" Of Rape, And Declares The Lacrosse Players "Innocent" ...... 163

    C.    Nifong Is Disbarred ................................................................................ 165

XXIX. Defendants' Misconduct Severely Injured The Plaintiffs ................................... 165

COUNT ONE ............................................................................................................ 167
 INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS -- I
    (Against Defendants Duke University, DUHS, Richard Brodhead,
    Theresa Arico, Tara Levicy)

COUNT TWO ............................................................................................................ 169
NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – I
    (Against Defendants Duke University, DUHS, Richard Brodhead,
    Victor Dzau, Theresa Arico, Tara Levicy)

COUNT THREE ......................................................................................................... 170
NEGLIGENT SUPERVISION OF EMPLOYEES ARICO AND LEVICY
    (Against Defendants Duke University, DUHS, Richard Brodhead,
    Victor Dzau, Theresa Arico)

COUNT FOUR ........................................................................................................... 172
BREACH OF DUTY OF CARE IN CONDUCTING AND REPORTING
    OF FORENSIC MEDICAL EXAMINATION
    (Against Defendants Duke University, DUHS, Richard Brodhead,
    Victor Dzau, Theresa Arico, and Tara Levicy)

COUNT FIVE ............................................................................................................. 173
BREACH OF DUTY TO WARN AND PROTECT AGAINST HAZARD
    CREATED BY DEFENDANTS
    (Against Defendants Duke University, DUHS, Richard Brodhead,
    Victor Dzau, Theresa Arico, Tara Levicy)

COUNT SIX ........................................................................................................ 175
    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS -- II
    (Against Defendants Duke University, DUHS, Richard Brodhead, Larry Moneta,
    Peter Lange, John Burness, Tallman Trask, Sue Wasiolek, Victor Dzau,
    Kate Hendricks, Matthew Drummond, the Duke Police)

COUNT SEVEN...................................................................................................... 177
    NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – II
    (Against Defendants Duke University, DUHS, Richard Brodhead, Larry Moneta,
    Peter Lange, Sue Wasiolek, John Burness, Tallman Trask, Victor Dzau,
    Kate Hendricks, Matthew Drummond, Duke Police)

COUNT EIGHT ....................................................................................................... 178
    FRAUD AND CONSPIRACY TO DEFRAUD
    (Against Defendants Duke University, Kate Hendricks, Matthew Drummond,
    the Duke Police, the Durham Investigators, the City of Durham)

COUNT NINE.......................................................................................................... 180
    NEGLIGENT MISREPRESENTATION
    (Duke University, Kate Hendricks, Matthew Drummond)

COUNT TEN............................................................................................................ 180
    ABUSE OF PROCESS AND CONSPIRACY TO ABUSE PROCESS
    (Against Defendants Duke University, Kate Hendricks, Matthew Drummond,
    the Duke Police, the Durham Investigators, the City of Durham)

COUNT ELEVEN...................................................................................................... 182
    CONSTRUCTIVE FRAUD THROUGH ABUSE OF
    CONFIDENTIAL RELATIONSHIP
    (Against Defendants Duke University, Richard Brodhead, Tallman Trask,
    Sue Wasiolek, J. Wesley Covington)

COUNT TWELVE..................................................................................................... 185
    BREACH OF DUTY OF CARE IN THE CONDUCT OF
    A VOLUNTARY UNDERTAKING
    (Against Defendants Duke University, Richard Brodhead,
    Tallman Trask, Sue Wasiolek, Wes Covington)

COUNT THIRTEEN.................................................................................................. 186
    BREACH OF DUTY BASED ON SPECIAL
    RELATIONSHIP OF MUTUAL BENEFIT
    (Against Defendants Duke University, Richard Brodhead)

COUNT FOURTEEN..................................................................................................188
    BREACH OF DUTY TO PROTECT STUDENTS FROM KNOWN
    DANGERS AND HARASSMENT
    (Against Defendant Duke University)

COUNT FIFTEEN ....................................................................................................189
    BREACH OF CONTRACT
    (Against Defendant Duke University)

COUNT SIXTEEN....................................................................................................193
    TORTIOUS BREACH OF CONTRACT
    (Against Defendant Duke University)

COUNT SEVENTEEN [WITHDRAWN]..................................................................194
    PROMISSORY ESTOPPEL
    (Against Defendant Duke University)

COUNT EIGHTEEN..................................................................................................195
    INTRUSION UPON SECLUSION, SOLITUDE, AND PRIVATE AFFAIRS
    (Against Defendants Duke University, Richard Brodhead,
    Tallman Trask, Peter Lange, John Burness, Larry Moneta)

COUNT NINETEEN..................................................................................................197
    NEGLIGENT SUPERVISION OF DUKE PROFESSORS AND EMPLOYEES
    (Against Defendants Duke University, Richard Brodhead,
    Larry Moneta, Peter Lange, Tallman Trask)

COUNT TWENTY......................................................................................................198
    VIOLATION OF AND CONSPIRACY TO VIOLATE FOURTH AMENDMENT
    RIGHTS UNDER 42 U.S.C. § 1983 -- KEY CARD REPORTS
(Against Defendants Duke University, Kate Hendricks, Matthew Drummond,
    the Duke Police, the Durham Investigators, City of Durham)

COUNT TWENTY-ONE............................................................................................200
    VIOLATION OF AND CONSPIRACY TO VIOLATE FOURTH AMENDMENT
    RIGHTS UNDER 42 U.S.C. § 1983 -- DNA SAMPLES
    (Against Defendants Duke University, DUHS, Theresa Arico, Tara Levicy, the
    Durham Investigators, City of Durham)

COUNT TWENTY-TWO ............................................................................... 201
    VIOLATION OF AND CONSPIRACY TO VIOLATE FOURTEENTH
    AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983 -- MALICIOUS
    INVESTIGATION
    (Against All Defendants)

COUNT TWENTY-THREE ........................................................................... 203
    OBSTRUCTION OF AND CONSPIRACY TO OBSTRUCT PUBLIC JUSTICE
    (Against All Defendants)

COUNT TWENTY-FOUR ............................................................................ 205
    DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW
    IN VIOLATION OF 42 U.S.C. § 1983
    (Against Durham Investigators, Durham Supervisors, City of Durham)

COUNT TWENTY-FIVE .............................................................................. 206
    FALSE PUBLIC STATEMENTS IN VIOLATION OF 42 U.S.C. § 1983
    (Against the Durham Investigators, David Addison, City of Durham)

COUNT TWENTY-SIX................................................................................. 208
    VIOLATIONS OF 42 U.S.C. § 1983 UNDER *MONELL v. DEP'T OF SOC. SERVS.*
    (Against the City of Durham; Durham Investigators in their official capacities;
    Durham Supervisors in their official capacities)

        A.    While Exercising Delegated Final Policymaking Authority For
                The City Of Durham, Nifong Implemented Policies That
                Violated Plaintiffs' Constitutional Rights. ................................................ 208

        B.    Durham Officials With Final Policymaking Authority
                Approved And Ratified The Unconstitutional Conduct
                Of Their Subordinates. ............................................................................ 209

        C.    Durham Officials With Final Policymaking Authority Failed
                To Exercise Adequate Supervisory Authority Over Nifong. .................... 210

        D.    Durham Officials With Final Policymaking Authority Failed
                To Exercise Adequate Supervisory Authority Over Gottlieb. ................. 211

        E.    Durham Police Had An Established Policy Or Custom
                Of Targeting Duke Students For Harassment Through
                Selective And Improper Criminal Law Enforcement. .............................. 212

F.     Durham Police Had An Established Policy Or Custom Of
Prematurely Publishing Conclusions Of Criminality Or Guilt. ................ 213

COUNT TWENTY-SEVEN ......................................................................... 214
NEGLIGENT SUPERVISION OF THE DURHAM INVESTIGATORS
IN VIOLATION OF 42 U.S.C. § 1983
(Against the Durham Supervisors)

A.     The Durham Supervisors' Failure To Supervise The Investigation
Resulted In Violations Of Plaintiffs' Constitutional Rights. .................... 215

B.     The Durham Supervisors' Failure To Control And Supervise
Gottlieb Resulted In Violations Of Plaintiffs' Constitutional Rights. ...... 216

C.     The Durham Supervisors' Failure To Train, Control, And Supervise
Addison Resulted In Violations Of Plaintiffs' Constitutional Rights. ...... 217

COUNT TWENTY-EIGHT ............................................................................ 219
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS -- III
(Against Durham Investigators, Durham Supervisors, City of Durham)

COUNT TWENTY-NINE ............................................................................... 220
NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – III
(Against Durham Supervisors, Durham Investigators, City of Durham)

COUNT THIRTY ........................................................................................... 221
NEGLIGENCE BY DURHAM POLICE
(Against Durham Investigators, Durham Supervisors, City of Durham)

COUNT THIRTY-ONE .................................................................................. 222
NEGLIGENT HIRING, TRAINING, SUPERVISION, RETENTION,
AND DISCIPLINE BY DURHAM POLICE
(Against Durham Supervisors, City of Durham)

COUNT THIRTY-TWO .................................................................................. 223
VIOLATION OF ARTICLE I, SECTION 19 OF THE NORTH CAROLINA
CONSTITUTION.
(Against the City of Durham directly and by way of the actions of the Durham
Supervisors and the Durham Investigators in their official capacities)

PRAYER FOR RELIEF .................................................................................. 224

JURY TRIAL DEMAND ................................................................................................ 225

Case 1:08-cv-00119-JAB-WWD   Document 145   Filed 02/22/10   Page 12 of 237

## INTRODUCTION AND SUMMARY OF THE ACTION

1.     This action for damages is brought by 38 of the 47 members of the 2006 Duke University men's lacrosse team, and by certain members of their families.  The tragic tale that gives rise to their claims is known to almost everyone in the United States and to millions more throughout the world.  For these Duke students were for 13 months in 2006-2007 reviled almost daily in the local and national media as a depraved gang of privileged, white hooligans who had hired a black exotic dancer to perform at a team party, had brutally gang raped and sodomized her in a crowded bathroom, and had joined together in a "wall of silence" to hide the truth of their heinous crimes.  But it was a vile and shameful lie, and it caused the plaintiffs tremendous suffering and grievous, lasting injuries.

2.     The individual defendants named in this action do not include Crystal Mangum, whose allegations of a gang rape by three white lacrosse players shocked and outraged the Duke University campus, the Durham community, and the Nation.  She is a deeply mentally disturbed, drug-dependent young woman, as was readily apparent from her bizarre behavior and her wildly inconsistent, patently incredible stories on the night of the alleged rape.

3.     The individual defendants in this suit are chiefly (1) Durham officials who corruptly seized upon and exploited Mangum's lie, and the intense media firestorm that it generated, to advance their own career ambitions, to further their own ideological agendas, and/or to gratify their own personal prejudices; and (2) Duke officials who

1

possessed convincing evidence of the players' innocence and who had a responsibility to their students to speak out, but who not only steadfastly remained silent, but also lent Duke's credibility to the rape allegations by capitulating to an angry mob's demands to condemn and punish the innocent players and their blameless coach. The individual defendants acted both in their personal capacities and in their official capacities on behalf of their employers—defendants Duke University and its healthcare affiliates, and the City of Durham.

4.     This tragedy has many villains, as the long list of defendants in the caption makes clear. But the basic nature and contours of this case can be discerned from a brief outline of the actions, and inactions, of three principal wrongdoers.

5.     Chief among them is former Durham District Attorney Michael Nifong, whose name shall forever be inextricably linked to the concept of prosecutorial corruption in the annals of American criminal justice. He and his equally corrupt police investigators -- especially Durham Police Sergeant Mark Gottlieb, whose consuming prejudice against Duke University students was notorious long before the events of this case -- concealed exculpatory evidence, manufactured inculpatory evidence, rigged photo line-ups, tampered with and intimidated witnesses, and blatantly lied to the Court and to the public in a determined effort to indict, try, convict, and ultimately imprison three lacrosse players -- any three would do -- for a crime that the prosecutor and investigators knew had never happened. And Nifong did all this in order to stoke and harness community outrage for the benefit of his election campaign.

6.     Nifong's corruption was plainly evident early on to those, such as Duke University President Richard Brodhead and other Duke officials, with access to the objective and overwhelming evidence of the players' innocence, but they kept the truth to themselves while Nifong turned the innocent lacrosse players into national pariahs.  Not until defense lawyers and responsible journalists gradually brought forward that exculpatory evidence was Nifong's corruption publicly exposed.  Nifong's wrongdoing ultimately resulted in his firing, disbarment, incarceration, and bankruptcy.  Because of the automatic stay provisions of federal bankruptcy law, Nifong cannot be named individually as a defendant herein, but his wrongful actions were taken on behalf of, and are attributable to, the City of Durham.

7.     Duke Hospital nurse Tara Levicy and her supervisor, Teresa Arico, played pivotal roles in causing and enabling Nifong and Gottlieb's corrupt rape investigation. Defendant Levicy was the inexperienced, recently certified sexual assault nurse who assisted in the forensic medical examination of Mangum a few hours after the fictitious rape was alleged to have occurred.  As North Carolina Attorney General Roy Cooper stated after his independent investigation established the players' innocence, there was "no medical evidence" supporting Mangum's claim of sexual assault.  Yet nurse Levicy assured Nifong's investigators on March 16, two days after the alleged rape, that Duke Hospital's forensic examination had yielded evidence "consistent with sexual assault." This statement flatly misrepresented the medical evidence from the examination, and it breathed life-giving credibility into rape allegations that were so openly contradictory --

Mangum had variously claimed, and recanted, being raped by one, three, five, and twenty players -- that Duke and Durham police had dismissed them as a transparent hoax.

8.      A few days later, Levicy embellished her misrepresentation, falsely assuring Sergeant Gottlieb that the examination of Mangum had revealed physical evidence of "blunt force trauma" consistent with a vaginal and anal gang rape by three men.  Levicy's own report of Mangum's pelvic examination, however, specified that there was no tearing, bleeding, bruising, or other signs of blunt force trauma and that the "anal exam" showed "nothing notable."  Levicy's supervisor, defendant Arico, publicly reinforced and corroborated Levicy's false account of the medical evidence.  Although she had not been involved in the forensic examination of Mangum, nor had she reviewed the medical records, Arico misinformed the media that the accuser's "injuries are consistent with the story she told."

9.      Throughout Nifong's corrupt investigation, Levicy tailored her statements to suit Nifong's evidentiary needs.  For example, when the results of DNA testing were negative for all 46 white lacrosse players, Levicy assured Nifong's investigators that Mangum had been uncertain whether her "attackers" had used condoms, despite Levicy's own exam report's unequivocal statements, thrice, that condoms had not been used.  Nifong and his investigators consistently emphasized, both in court filings and in public statements, Levicy's false descriptions of the medical evidence to justify their investigatory actions and their feigned belief that a rape had occurred.

4

10.     Duke University's official statements, actions, and inactions in response to the rape hoax crisis were tightly managed and controlled by President Richard Brodhead himself, with the active oversight of Robert Steel, Chairman of Duke's Board of Trustees. As Steel acknowledged months after Nifong's corruption had been publicly exposed, Brodhead "had consulted regularly with the Trustees" and that "anyone critical of President Brodhead should be similarly critical of the entire Board." Throughout the crisis, Brodhead and Duke consistently sacrificed the rights and interests of the accused Duke students in an effort to avoid embarrassment to Duke and to minimize criticism of Brodhead's administration. Mangum's explosive allegations had created an angry mob led primarily by activist Duke faculty members, student protestors, and a hostile media, and the mob immediately rushed to condemn the lacrosse players, to intimate and denounce the team's defenders, and to demand the team's swift and severe punishment. Brodhead repeatedly succumbed to the mob's intimidation and demands, and he effectively condoned its actions.

11.     Brodhead, who acknowledged after the players had been publicly exonerated that he was fully responsible for Duke's statements and actions throughout the rape hoax crisis, violated the players' rights and interests in three principal ways.

a.     Brodhead and Duke failed to disclose, and actively suppressed, material exculpatory evidence in Duke's exclusive possession; discredited exculpatory evidence that had been publicly disclosed; and refused to review exculpatory evidence compiled by the players' defense counsel. For example:

5

- When Nifong, the media, and others asserted as fact that Mangum had been raped and sodomized by three Duke lacrosse players, Brodhead and Duke did not disclose Duke police officer Christopher Day's contemporaneous incident report stating that Mangum's rape allegations had been so wildly inconsistent that they had been disregarded as incredible by the Durham police. And when Officer Day's report was publicly disclosed, Duke took steps to discredit it.

- When Nifong and his investigators repeatedly relied on nurse Levicy's statements that the medical and physical evidence collected by Duke Hospital corroborated Mangum's accusations, Brodhead and Duke failed to disclose that the records of Duke's forensic exam contained no such evidence.

- When Nifong publicly speculated that condom use might explain the negative DNA test results for all players, Brodhead and Duke failed to disclose that Mangum had *thrice* told doctors and nurses at Duke Hospital that her attackers had not used condoms.

- When Nifong and his investigators repeatedly charged that the lacrosse players were hiding behind a conspiratorial "wall of silence," Brodhead and Duke failed to disclose that the team's co-captains, who had hosted the party at their off-campus residence, had voluntarily assisted police in searching the residence, had voluntarily submitted to an all-night interrogation, had voluntarily provided DNA samples and submitted to physical examinations, and had volunteered to take lie detector tests (which the Durham investigators declined). To the contrary, Brodhead deliberately reinforced the "wall of silence" lie by repeatedly calling on the players to cooperate with police, knowing full well that they had done just that throughout the investigation.

- When defense lawyers for the players repeatedly sought to present Brodhead with convincing evidence of the players' innocence, he repeatedly refused to review it.

Months after the rape allegations and Nifong's investigation had been exposed as a

malicious and tragic hoax, Brodhead attempted to defend his refusal to speak out, even as

it became increasingly clear to everyone that the Duke students were the victims of a

cruel and malicious hoax. He did not want to risk creating the perception "that a well-connected institution was improperly attempting to influence the judicial process." And so Brodhead and Duke remained silent and passively looked on while a politically ambitious and plainly unethical prosecutor, abetted by a mob led by activist Duke professors and student protestors, put 47 innocent Duke students through what Brodhead himself later admitted was "an ordeal the likes of which few have known." The only "wall of silence" erected in this tragedy was Brodhead's.

   b.  Brodhead also looked on passively as activist members of the Duke faculty and student protestors waged an extraordinary public campaign of abuse and harassment against the innocent lacrosse players. This campaign included public condemnations of the players as guilty of rape, racism, and a wall of silence; candlelight vigils and "pot-banging" protests on campus and at the players' residences; display of banners emblazoned with "castrate" and other hostile slogans; distribution throughout campus of WANTED-style posters displaying photos of the players and proclaiming their guilt; and in-class harassment of the players by openly hostile faculty members. Perhaps the most egregious of the attacks on the players was the infamous advertisement placed in the campus newspaper by the so-called "Group of 88" Duke professors. The ad made unmistakably clear that its faculty sponsors believed that the rape had occurred, and it thanked the student protestors "for not waiting" to "mak[e] your selves heard" and exhorted them "to turn up the volume." The ad was paid for with University funds and listed fifteen academic departments and programs as its sponsors. Brodhead took no

steps to enforce Duke's plainly applicable anti-harassment policy; nor did he criticize, let alone discipline, the activist professors and student protestors; nor did he even disassociate the University from their shameful actions and statements. Accordingly, he implicitly condoned these actions and statements and made Duke responsible for them. Indeed, months after the rape hoax had been publicly exposed, Brodhead conceded that activist faculty members and student protestors "were quick to speak as if the [rape] charges were true" and that "the public as well as the accused students and their families could have thought that those were expressions of the university as a whole."

c.       Finally, Brodhead issued a series of carefully timed public statements and imposed a series of increasingly severe disciplinary measures on the team in an effort to satisfy the mob's demands for immediately and severe sanctions against the team and to distance Duke and its administrators from the intense public hostility that had been focused on the innocent lacrosse players. The inevitable effect of Brodhead's statements and actions was to impute guilt to the players and to further inflame public opinion against them. For example:

- Brodhead opened many of his public statements by stating: "Physical coercion and sexual assault are unacceptable in any setting and will not be tolerated at Duke."

- As noted above, Brodhead repeatedly urged "everyone with information pertinent to the events of March 13 to cooperate with authorities." Again, he knew full well that the lacrosse players had cooperated fully with the investigation from the beginning, and he likewise knew that his statements would imply falsely that the players were attempting to hide the truth.

- Brodhead initially cancelled two lacrosse games for the specific purpose of punishing the team for holding a party with exotic dancers and underage drinking. Shortly thereafter, he cancelled the entire lacrosse season and fired the team's coach, just as the activist professors and student protestors had demanded. In announcing these actions, Brodhead noted that "the outpouring of outrage" against the lacrosse players on the campus and within the community was not surprising, thus making clear that he understood and sympathized with those who had rushed to condemn the innocent lacrosse players for committing a heinous crime and then conspiring to cover it up.

- He also effectively apologized for not imposing these severe sanctions on the team sooner, explaining that Duke "learned the full magnitude of the allegations only gradually, as police and other information was reported in the media . . . ." At no time did Brodhead even hint at the existence of substantial exculpatory evidence in Duke's possession indicating that the alleged rape had never occurred.

12.     Brodhead's wrongful conduct on behalf of Duke and Nifong's wrongful conduct on behalf of Durham were assisted and supported by the wrongful and/or negligent conduct of several of their subordinates and other agents and representatives of Duke and Durham. Many of these individuals are known, and they are named as defendants and their roles in injuring the plaintiffs are described herein; those wrongdoers who are not yet known will be added as defendants as their roles are disclosed through the discovery process.

13.     As a direct and foreseeable result of defendants' actions, plaintiffs have suffered serious deprivations of their rights and interests both under North Carolina law and under federal law, including the United States Constitution, and they have endured grievous, lasting injuries. These injuries include economic costs, invasions of privacy, wholesale deprivations of constitutional rights, and burdensome legal fees. They also

9

include lost educational opportunities, not the least of which was their opportunity to compete for the 2006 NCAA Division I National Championship in men's lacrosse, a goal toward which all the players had strived for most of their lives. And their injuries include, especially, irreparable harm to their reputations and severe emotional anguish. As President Brodhead himself conceded to a lacrosse parent:

> [T]he members of the Duke men's lacrosse team have lived through an ordeal the likes of which few have known. I recognize that, especially in the early days, when the publicity about the case projected a very high certainty that the alleged crime had actually occurred, team members had to deal with a barrage of negative and hostile comments, from inside the Duke community as well as outside. I regret that . . . . There is no undoing the agonies of the last months.

None of the plaintiffs will ever be the same again.

## PARTIES

I.    **The Plaintiffs.**

10.    Plaintiff Edward Carrington is a resident of the State of Virginia. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2008.

11.    Plaintiff Casey J. Carroll is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2007.

12.    Plaintiff Michael P. Catalino is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2009. Plaintiff Gale

Catalino is a resident of the State of New York. She is the mother of Plaintiff Michael Catalino.

13.     Plaintiff Thomas Clute is a resident of the State of Maryland. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2009.

14.     Plaintiff Kevin Coleman is a resident of the State of New Jersey. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2006.

15.     Plaintiff Joshua R. Coveleski is a resident of the State of Delaware. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2008.

16.     Plaintiff Edward J. Crotty is a resident of the State of New Jersey. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2009.

17.     Plaintiff Edward S. Douglas is a resident of the State of Maryland. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2006.

18.     Plaintiff Kyle Dowd is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2006. Plaintiff Patricia Dowd is a resident of the State of New York. She is the mother of Plaintiff Kyle Dowd.

19.     Plaintiff Daniel Flannery is a resident of the State of New York.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He was a member of the Duke class of 2006.

20.     Plaintiff Richard Gibbs Fogarty is a resident of the State of Maryland.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2009.

21.     Plaintiff Zachary Greer is a resident of Canada.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2008.  Plaintiff Irene Greer is a resident of Canada.  She is the mother of Plaintiff Zachary Greer.

22.     Plaintiff Erik S. Henkelman is a resident of the State of New York.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He was a member of the Duke class of 2006.  Plaintiff Steven Henkelman is a resident of Pennsylvania.  He is the father of Plaintiff Erik S. Henkelman.

23.     Plaintiff John E. Jennison is a resident of the State of Virginia.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2008.

24.     Plaintiff Ben Koesterer is a resident of the State of New York.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He was a member of the Duke class of 2007.  Plaintiffs Mark and

Joyce Koesterer are residents of the State of New York. They are the parents of Plaintiff Ben Koesterer.

25. Plaintiff Fred Krom is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2007.

26. Plaintiff Peter J. Lamade is a resident of the State of Maryland. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2007.

27. Plaintiff Adam Langley is a resident of the State of Illinois. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He is a member of the Duke class of 2008.

28. Plaintiff Christopher Loftus is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2007. Plaintiff Daniel Loftus is a resident of the State of New York. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2007. Plaintiff Barbara Loftus is a resident of the State of New York. She is the mother of Plaintiffs Christopher and Daniel Loftus.

29. Plaintiff Anthony McDevitt is a resident of the State of New Jersey. He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006. He was a member of the Duke class of 2007.

13

30.     Plaintiff Glenn Nick is a resident of the State of New York.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He was a member of the Duke class of 2006.

31.     Plaintiff Nicholas O'Hara is a resident of the State of New York.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He was a member of the Duke class of 2007.  Plaintiff Lynnda O'Hara is a resident of the State of New York.  She is the mother of Plaintiff Nicholas O'Hara.

32.     Plaintiff Daniel Oppedisano is a resident of the State of New York.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He was a member of the Duke class of 2007.

33.     Plaintiff Sam Payton is resident of the State of Connecticut.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2009.

34.     Plaintiff John Bradley Ross is a resident of the State of Maryland.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2008.

35.     Plaintiff Kenneth J. Sauer, III is a resident of the State of New Jersey.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He was a member of the class of 2006.

14

36.     Plaintiff Steve Schoeffel is a resident of the State of Virginia.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is member of the Duke class of 2009.

37.     Plaintiff Robert Schroeder is a resident of the State of New Jersey.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2008.

38.     Plaintiff Devon Sherwood is a resident of the State of New York.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2009.

39.     Plaintiff Daniel Theodoridis is a resident of the State of Connecticut.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2009.

40.     Plaintiff Brett Thompson is a resident of the State of Maryland.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He was a member of the Duke class of 2006.

41.     Plaintiff Christopher Tkac is a resident of the State of Maryland.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2009.  Plaintiff Tracy Tkac is a resident of the State of Maryland.  She is the mother of Plaintiff Christopher Tkac.

42.     Plaintiff John Walsh, Jr., is a resident of the State of Maryland.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He was a member of the Duke class of 2007.

43.     Plaintiff Michael Ward is a resident of the State of New York.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He was a member of the Duke class of 2007.

44.     Plaintiff Robert Wellington is a resident of the State of Texas.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2008.

45.     Plaintiff William Wolcott is a resident of the State of New York.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He was a member of the Duke class of 2006.

46.     Plaintiff Michael Young is a resident of the State of New York.  He was a Duke undergraduate and a member of the Duke men's lacrosse team during the spring semester of 2006.  He is a member of the Duke class of 2008.

## II.     The Defendants.

### A.     The Duke Defendants.

47.     Defendant Duke University is a private, nonprofit organization incorporated in North Carolina, which owns and operates educational and research facilities as well as a health care system.  Duke University is governed by a board of trustees with 37 members, consisting of the President of Duke and 36 members drawn

16

from private, public, and community interests.  At all relevant times herein, Defendant Richard Brodhead was the President of Duke University and Robert Steel was the Chairman of its Board of Trustees.  As described below, Duke University organized and controls Defendant Duke University Health System, Inc. ("DUHS"), a North Carolina nonprofit corporation that operates health care facilities including Duke University Hospital, Durham Regional Hospital, Duke Health Raleigh Hospital, and related health care clinics.  Duke University's control extends to all divisions of DUHS.  As used hereinafter, "Duke" refers to Duke University; DUHS and its divisions; and/or their officers, employees, and agents.

48.     Duke University Medical Center ("DUMC") is a name commonly used to refer to a group of health care facilities on the campus of Duke University, including Duke Hospital, Duke Children's Hospital and Health Center, and Duke Clinic. Hereinafter, "Duke Hospital" is used to refer to the institution to which Crystal Mangum was taken and at which she was examined in the early morning hours of March 14, 2006.

49.     Duke Hospital and DUMC are owned and operated by Defendant Duke University Health System, Inc. ("DUHS").  Duke University Health System, Inc., is a separate, controlled, affiliated nonprofit corporation which was formed by Duke University to own and operate the integrated health system which includes Duke University Hospital and its affiliated health care clinics and other health care activities. The Executive Committee of the Board of Trustees of Duke University has principal responsibility for oversight and control of DUHS, including absolute control over

17

appointments to the Board of Directors, oversight of its operational and financial reports, review and submission to the full Board of Trustees of any proposed changes to its articles of incorporation or bylaws, oversight of its operations, and any other activities which may be required to carry out the responsibilities of Duke University with respect to DUHS. In addition, the President of Duke University, who was Defendant Richard Brodhead at all relevant times herein, shares oversight responsibility with the Board of Directors of DUHS for supervising the activities of the President and Chief Executive Officer of DUHS.

50. Defendant Richard Brodhead was, at all relevant times herein, the President of Duke University. As President, Brodhead was the Chief Administrative Officer of the University. In that capacity, Brodhead served in a supervisory and policymaking role for Duke and all of its employees, agents and constituent entities. Brodhead is responsible to the Board of Trustees. His responsibilities include supervising, managing, and governing the University; interpreting and carrying out the policies of the Board; and presiding at meetings of the University faculty. On information and belief, Brodhead is a citizen and resident of Durham County in the State of North Carolina.

51. Defendant Peter Lange was, at all times relevant to this action, the University's Provost. In that capacity, Lange served in a supervisory and policymaking role for Duke University and all of its employees, agents, and constituent entities. Lange is the University's Chief Academic Officer; his duties include directing the University's

18

academic operations and overseeing the University's teaching and research missions. Upon information and belief, Lange is a citizen and resident of North Carolina.

52.  Defendant Tallman Trask was, at all relevant times herein, Executive Vice President of Duke University.  In that capacity, Trask served in a supervisory and policymaking role for Duke University and all of its employees, agents, and constituent entities.  Trask is the University's Chief Financial and Administrative Officer; his duties include directing the University's financial operations and overseeing the University's central administrative services and capital projects.  On information and belief, Trask is a citizen and resident of Durham County in the State of North Carolina.

53.  Defendant Larry Moneta was, at all relevant times herein, Vice President for Student Affairs at Duke University.  In that capacity, Moneta served in a supervisory and policymaking role for Duke University and all of the public relations employees, agents and constituent entities.  Moneta's duties include supporting undergraduate students in their academic, social, personal, physical and emotional  needs.  Moneta was responsible for the welfare of all students, and for coordinating the University's emergency responses.  On information and belief, Moneta is a citizen and resident of Durham County in the State of North Carolina.

54.  Defendant John Burness was, at all relevant times herein, Senior Vice President for Public Affairs and Government Relations at Duke University  In that capacity, Burness served in a supervisory and policymaking role for Duke University and all of the public relations employees, agents, and constituent entities.  Burness' duties

include acting as the Official Spokesperson for the University, and as the University's primary liaison to the City of Durham and the Durham Police Department. On information and belief, Burness is a citizen and resident of Durham County in the State of North Carolina.

55. Defendant Victor Dzau was, at all relevant times herein, the Chancellor for Health Affairs, and President and Chief Executive Officer of Defendant Duke University Health System, Inc. In that capacity, Dzau served in a supervisory and policymaking role for DUHS, all of its employees, agents, and constituent entities. Dzau's duties include administrative oversight of all DUHS entities, including Duke Hospital. On information and belief, Dzau is a citizen and resident of the State of North Carolina.

56. Defendant Suzanne Wasiolek was, at all times relevant herein, the Assistant Vice President for Student Affairs and Dean of Students. Wasiolek is or has been a member of the North Carolina bar and has worked as a practicing attorney. Her duties include administering to the needs of Duke students and assisting Vice President Moneta in carrying out his obligations to coordinate the University's emergency responses. In that capacity, Wasiolek served in a supervisory and policy-making role for Duke University. On information and belief, Wasiolek is a citizen and resident of the State of North Carolina.

57. Defendant Matthew Drummond was, at all times relevant herein, the Head of the University's Duke Card office. On information and belief, Drummond is a citizen and resident of the State of North Carolina.

58.  Defendant Tara Levicy was, at all relevant times herein, a sexual assault nurse examiner ("SANE") at Duke University Hospital. On information and belief, Levicy is a citizen and resident of the State of New Hampshire.

59.  Defendant Theresa Arico was, at all relevant times herein, the Coordinator of the Sexual Assault Nurse Examiner Program at Duke University Hospital. On information and belief, Arico is a citizen and resident of the State of North Carolina.

60.  Defendant J. Wesley Covington was, at all relevant times herein, an attorney in Durham, North Carolina. On information and belief, Covington is a citizen and resident of the State of North Carolina.

61.  Defendant Kate Hendricks was, at all relevant times herein, Deputy General Counsel in the Office of University Counsel at Duke University.  On information and belief, Hendricks is a citizen and resident of Durham County in the State of North Carolina.

62.  Defendant Aaron Graves was, at all times relevant herein, Duke University's Associate Vice President for Campus Safety and Security.  In that capacity, Graves served in a supervisory and policymaking role for Duke University.  At all relevant times to this action, Graves' duties included supervising the Duke Police Department.  The Duke Police Department is a North Carolina law enforcement agency authorized and existing under the North Carolina General statutes.  Duke Police officers are commissioned under North Carolina General Statutes without limitation; they have the full range of police authority that the State grants to all other municipal law enforcement

officers in their respective jurisdictions.  The Duke Police Department has primary police jurisdiction over, among other things, crimes reported to have occurred on its campus and on property owned or controlled by Duke University, including adjacent streets and roadways, within the Durham city limits.  Upon information and belief, Graves is a citizen and resident of North Carolina.

63.   Defendant Robert Dean was, and at all times relevant herein, the Director and Chief of the Duke Police Department.  Dean reported directly to Duke University's Associate Vice President for Campus Safety and Security, Defendant Graves.  In his capacity as Director and Chief of Police, Dean served in a supervisory and policymaking role for the Duke Police Department.  Dean's primary responsibilities include directing and supervising the day-to-day management of the Duke Police Department.  Upon information and belief, Dean is a resident of North Carolina.

64.   Defendant Graves and Dean, as well as other defendant supervisors and officers of the Duke Police Department not yet known, are referred to herein collectively as the "Duke Police."  The Duke Police are "persons" acting under color of law as that term is used in 28 U.S.C. § 1983.

**B.      The Durham Defendants.**

**1.      The Durham Investigators.**

65.   Defendant City of Durham is a municipal corporation formed under the laws of North Carolina.  On information and belief, the City of Durham has purchased liability insurance and/or participates in a municipal risk-pooling scheme sufficient under

22

N.C.G.S. § 160A-485 to waive its immunity against civil liability. The City of Durham operates the Durham Police Department ("Durham Police"), which is the city department with law enforcement authority in the City of Durham.

66. Defendant Linwood Wilson was, at all times relevant to this action, an investigator employed by the District Attorney for the Fourteenth Prosecutorial District in North Carolina. Wilson was fired from the District Attorney's office on or around June 25, 2007. On information and belief, Wilson is a citizen and resident of North Carolina.

67. Defendant Mark Gottlieb was, at all times relevant to this action, a detective employed by the Durham Police Department. On information and belief, Gottlieb is a citizen and resident of North Carolina.

68. Defendant Benjamin Himan was, at all times relevant to this action, an investigator employed by the Durham Police Department. On information and belief, Himan is a citizen and resident of North Carolina.

69. Defendants Wilson, Gottlieb and Himan are referred to herein collectively as the "Durham Investigators."

### 2. The Durham Supervisors.

70. Defendant Patrick Baker was, at all times relevant to this action, the City Manager for the City of Durham. In that capacity, Baker served in a supervisory and policymaking role for the City of Durham and all of its constituent entities, including the Durham Police Department. Upon information and belief, on or shortly after March 14, 2006, Baker assumed the duties of the Chief of Police for the Durham Police Department

23

and retained those duties during the extended period of time in which Defendant Chalmers was on leave during the police investigation of Mangum's false allegations. Upon information and belief, Baker is a citizen and resident of North Carolina.

71.  Defendant Steven Chalmers was, at all times relevant to this action, the Chief of Police for the Durham Police Department. In this capacity, Chalmers served in a supervisory and policymaking role for the Durham Police Department. On information and belief, Chalmers is a citizen and resident of North Carolina.

72.  Defendant Ronald Hodge was, at all times relevant to this action, the Deputy Chief of Police for the Durham Police Department. In this capacity, Hodge served in a supervisory and policymaking role for the Durham Police Department. On information and belief, Hodge is a citizen and resident of North Carolina.

73.  Defendant Lee Russ was, at all times relevant to this action, Executive Officer to the Chief of Police for the Durham Police Department. In this capacity, Russ served in a supervisory and policymaking role for the Durham Police Department. On information and belief, Russ is a citizen and resident of North Carolina.

74.  Defendant Stephen Mihaich was, at all times relevant to this action, Commander of Investigative Services for the Durham Police Department. In this capacity, Mihaich served in a supervisory and policymaking role for the Durham Police Department. On information and belief, Mihaich is a citizen and resident of North Carolina.

75. Defendant Beverly Council was, at all times relevant to this action, Commander of the Uniform Patrol Bureau for the Durham Police Department. In this capacity, Council served in a supervisory and policymaking role for the Durham Police Department. On information and belief, Council is a citizen and resident of North Carolina.

76. Defendant Jeff Lamb was, at all times relevant to this action, Commander of the District Two Uniform Patrol of the Durham Police Department. In this capacity, Lamb served in a supervisory and policymaking role for the Durham Police Department. On information and belief, Lamb is a citizen and resident of North Carolina.

77. Defendant Michael Ripberger was, at all times relevant to this action, a Lieutenant in the Durham Police Department. On information and belief, Ripberger served in a supervisory and policymaking role for the Durham Police Department. On information and belief, Ripberger is a citizen and resident of North Carolina.

78. Defendant David Addison was, at all times relevant to this action, a corporal employed by the Durham Police Department. On information and belief, Addison's duties included serving as official spokesman for the Durham Police Department. On information and belief, Addison is a citizen and resident of North Carolina.

79. Defendants Baker, Chalmers, Hodge, Russ, Mihaich, Council, Lamb, Ripberger, and Addison are referred to collectively herein as the "Durham Supervisors."

80.  The Durham Supervisors and the Durham Investigators are "persons" acting under color of law within the meaning of 28 U.S.C. § 1983.  They are sued in both their individual and official capacities, unless otherwise indicated herein.

## JURISDICTION AND VENUE

81.  This action for damages arises under the Constitution and laws of the United States as well as the law of the State of North Carolina.  In addition, complete diversity of citizenship exists between the parties, and the matter in controversy exceeds the sum of $75,000 exclusive of costs and interests.  This Court has original jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over Plaintiffs' state claims pursuant to 28 U.S.C. § 1367.  In addition, this Court has independent original jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332.

82.  Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C. § 1391.  Nearly all defendants reside and may be found in the Middle District of North Carolina and a substantial part of the events giving rise to these claims occurred in this district.

## FACTS

I.  **Background**

A.  **Duke University's Championship Men's Lacrosse Team**

83.  From 1977 to 1990, the Duke University men's lacrosse team amassed a win-loss record of 2-45 in Atlantic Coast Conference ("ACC") play.  In 1991, Duke

26

Case 1:08-cv-00119-JAB-WWD   Document 145   Filed 02/22/10   Page 38 of 237

recruited a new men's lacrosse coach, Mike Pressler, to reverse the team's lackluster performance. Over the next sixteen years, Coach Pressler developed the Duke men's lacrosse program into one of the most successful and celebrated college programs in the nation, and earned for himself a national reputation as one of the best college lacrosse coaches in the country. In those sixteen seasons, Coach Pressler's teams compiled a 153-82 overall record and won three ACC championships; ten NCAA tournament berths; and an appearance in the 2005 Division I men's lacrosse championship game, which the team lost by one goal to Johns Hopkins University. Coach Pressler is a three-time "ACC Coach of the Year" and the 2005 recipient of the U.S. Intercollegiate Lacrosse Association's "F. Morris Touchstone Award" as the National Coach of the Year. Heading into the 2006 season, the Duke men's lacrosse team was uniformly ranked by the media as among the top men's lacrosse teams in the nation and was widely favored to achieve every college athlete's dream -- a Division I national championship title. Many of the lacrosse players had dreamed of achieving this goal for most of their lives.

84.     Many of the players on the Duke men's lacrosse team in 2005-2006 had chosen to attend Duke because they wanted the opportunity to play for Coach Pressler and to compete for a national championship. Many turned down offers from other prestigious schools in order to pursue this dream.

85.     Duke University derived significant benefits from its championship lacrosse program and the national prestige associated with it. The success of the men's lacrosse team helped Duke join an elite handful of schools as a perennial contender for

the Sears Cup, awarded for the cumulative performance of all of a school's NCAA sports teams. Duke's athletic success at the national level and the associated prestige boosted Duke's ability to recruit top student athletes and top academic students as well, since it gave Duke a combination of athletic and academic excellence that is largely unrivaled by competing elite colleges and universities, including the Ivy League schools, and is nearly unique among the nation's private universities.

86.     The success of Duke's varsity athletic teams such as its championship men's lacrosse team is also a significant factor in University fundraising. Duke's prestige as a national Division I athletic powerhouse has boosted its ability to attract the many millions of dollars in alumni and other donations that it receives every year.

87.     Duke viewed and treated its varsity men's lacrosse team, as well as other athletic teams, as ambassadors and representatives of the University to other students, to the local community, and to the nation and world at large. In the words of Duke's Dean of Students, Suzanne Wasiolek, the men's lacrosse players and other varsity athletes "lead a more high-profile life on campus than the other students, [in] that they represent their team and represent Duke University in all they do on and off campus." Likewise, the Duke University Student-Athlete Handbook, *available at* http://www.goduke.com, states that a student-athlete participating in athletic competition is "acting as an official representative of the University."

88.     In order to ensure that its athletes appropriately "represent Duke University in all they do on and off campus," Duke exercises significant authority and control over

28

the members of its varsity athletic teams, including the men's lacrosse team. This authority and control significantly exceeds the authority and control Duke seeks to exercise over students who are not varsity athletes. For example, according to Duke's Student-Athlete Handbook, this control includes, among other things: mandatory study halls for designated student-athletes; enhanced expectations of class attendance for student-athletes; additional restrictions, over and above University-wide policies, on the use of alcohol, tobacco products, and illegal drugs by student-athletes; and subjection of student-athletes to unannounced drug testing.

89.     In March of 2006,[1] as noted above, the Duke men's lacrosse team was universally recognized as well positioned to compete for the national championship title. Returning many starters from the 2005 team, the team opened the season with a 5-1 record (their sole loss was a one-goal overtime loss to fourth-ranked ACC rival Maryland), and the players, the coaches, and their supporters were looking forward to another shot at the national championship.

**B.     The Party On March 13, 2006**

90.     As is now widely known throughout the country, on Monday, March 13, 2006, many players on the Duke men's lacrosse team attended an off-campus party at a house located in Durham at 610 North Buchanan Avenue, across the street from Duke's East Campus, in a Durham neighborhood known as Trinity Park. The house, like many houses in the Trinity Park neighborhood and other neighborhoods adjacent to the Duke

---

[1] Unless otherwise specified or indicated by context, dates referred to in this Complaint should be presumed to refer to the year 2006.

campus, is owned by Duke and rented to Duke students. At the time of the March 13 party, the house was rented and inhabited by three of the lacrosse team's four senior co-captains, Dave Evans, Matt Zash, and Dan Flannery.

91.     On March 13, two female exotic dancers were hired to perform at the party at 610 North Buchanan. Hiring male and female exotic dancers was a relatively common practice at parties thrown by Duke student groups, such as fraternities, sororities, athletic teams, and clubs. The University had no rule or policy with respect to the hiring of exotic dancers to perform at student parties. In the 2005-2006 school year alone, at least 20 such organizations, including the men's basketball team and several sororities, had thrown exotic dancer parties without punishment.

92.     The exotic dancers who arrived at the party were named Crystal Mangum and Kim Roberts, a.k.a. Pittman (hereinafter "Roberts").

93.     On information and belief, one of the dancers, Mangum, was a severely mentally and emotionally disturbed woman, and had a long history of alcohol and drug abuse. She had previously been involuntarily committed to a state mental hospital for mental disturbances. She had also previously made false allegations that she had been raped by a group of three men—allegations of which defendants herein subsequently became aware. In the aftermath of the party, she would tell a similar false story -- with many materially conflicting variations -- about the Duke men's lacrosse players.

94.     On information and belief, Mangum was under the influence of alcohol and/or drugs before, during, and after her attendance at the party at 610 North Buchanan

Street.  She had had sexual intercourse with several different men during the days

immediately prior to the party, including at least one earlier that very evening.  She had

also been hired earlier that same evening to perform with a vibrator for a couple in a hotel

room.  Moreover, DNA tests would later show that when she arrived at the party, she was

carrying in her genital and/or rectal regions the DNA traces of recent sexual activity with

at least four other males -- none of whom was a member of the Duke lacrosse team.

95.     At the party on the night of March 13-14, Mangum staggered and collapsed

during the dance performance.  The dance performance came to a premature end at about

12:04 a.m., after four minutes.  Mangum and Roberts eventually departed from 610 North

Buchanan at about 12:50 a.m.  During this interim, Mangum was alternatively yelling and

muttering incoherently, tripping, and stumbling into walls; it was very difficult for

Roberts and the lacrosse players to get Mangum into the car to drive away.  Mangum

repeatedly tried to re-enter the house after the inhabitants had locked her out.  For a short

period, she and Roberts had locked themselves in the bathroom; at no point was Mangum

in the bathroom, or anywhere else inside the house, alone with any lacrosse players.

Lacrosse players and Roberts finally assisted Mangum, in her apparently intoxicated

state, into Roberts' car at about 12:41 a.m.  As late as 12:41 a.m., Mangum was

protesting Roberts' attempt to leave 610 North Buchanan, insisting that they should go

back inside because "there was more money to be made."

## II.   Mangum Alleges She Was Raped And Is Examined At Duke Hospital

96.     At 12:53 a.m., as the dancers were leaving, Roberts made a 911 call to Durham police.  As detailed below, Roberts made an internally contradictory report that she and "her black girlfriend" had been subjected to unprovoked racial taunts and harassment outside 610 North Buchanan.  Roberts said nothing about a sexual assault; to the contrary, she assured the police dispatcher that she (and by implication her friend) were not "hurt in any way."  On information and belief, Duke police officials became aware later that evening that Roberts had placed this 911 call.

97.     After they left the party, while in Roberts' car, Mangum became belligerent and accused Roberts of stealing her purse and money, and refused to leave Roberts' car.  When Roberts tried to remove Mangum from her car in a Kroger grocery store parking lot, Mangum told Roberts to "go ahead . . . put marks on me . . . that's what I want . . . put marks on me."  Roberts asked a Kroger security guard to intervene.  The security guard made the immediate assessment that Mangum was intoxicated and made a 911 call to Durham Police.  On information and belief, the security guard later expressed great skepticism of the claim that Mangum had been sexually assaulted, because nothing about Mangum's appearance or behavior indicated sexual assault.

98.     Sergeant Shelton and Officer Barfield of the Durham police force responded.  On information and belief, Roberts advised them that she had placed the 911 call accusing the residents of 610 North Buchanan of racial harassment, and Durham

32

police officers subsequently advised Duke police officials that Roberts had placed the call.

99.     Sergeant Shelton tried to induce Mangum to leave Roberts' car, but Mangum feigned unconsciousness.  Shelton determined that Mangum was feigning her unconsciousness by breaking an ammonia capsule beneath her nostrils, whereupon she promptly began to breathe through her mouth.  On information and belief, throughout the hoax investigation, the Durham Investigators and other Durham officials were aware of Mangum's bizarre behavior and feigned unconsciousness.

100.    With difficulty due to Mangum's feigned unconsciousness, the Durham police officers managed to convey Mangum in their squad car to the Durham Access Center, a facility for mentally ill patients and people under the influence of drugs.

101.    As Mangum was aware, if she were to be admitted at Durham Access Center, she would be involuntarily confined for at least 24 hours, and risked losing custody of her two children to the Department of Social Services.  On information and belief, Mangum overheard comments from Officer Shelton indicating that she would likely be involuntarily committed by the Center.

102.    During the intake procedures at Durham Access Center, a nurse asked Mangum directly if she had been raped.  This direct prompting was a violation of the Center's policies.  Mangum nodded yes.  This was the first mention of sexual assault that she had made that evening.  On information and belief, in making her claim of rape,

33

Mangum was seizing on the intake nurse's suggestion in order to avoid involuntary commitment.

103.    Because she had claimed sexual assault, Mangum was relieved of the threat of involuntary commitment and was taken to Duke Hospital for a forensic rape examination.

### A.    Mangum's Rape Allegations At Duke Hospital Are Wildly Inconsistent And Facially Implausible

104.    At 2:40 a.m. on Tuesday, March 14, Mangum arrived with Officer Barfield of the Durham Police Department at the emergency room of Duke Hospital, where Mangum would be examined for sexual assault.

105.    Upon her arrival at Duke Hospital, Mangum told Durham police officer Gwendolen Sutton that she had been dancing in a group of four women and that she had been raped by five men in a bathroom.

106.    This initial rape allegation was the first of a series of patently implausible, wildly inconsistent, ever-changing stories that Mangum would tell to Duke medical personnel and police officers during the hours she spent at Duke Hospital on March 14. All told, her tissue of lies at Duke Hospital included at least seven different conflicting accounts of the events:

- Soon after 2:40 a.m., Mangum told Officer Sutton that she and "three girls, Nikki, Angel, and Tammy, had performed at a bachelor party on 610 North Buchanan." After "Nikki" had attempted to persuade her to have sex with a man against her will, she "ended up in the bathroom with five guys who forced her to have intercourse and perform sexual acts" and "she was penetrated by all five." Mangum stated that one assailant had penetrated her vagina with his hands and penis. Sutton's report noted that "while

34

being interviewed at Duke, her story changed several times. At one point she said that she had not been raped." On information and belief, Mangum also told Officer Sutton that she was bleeding vaginally, a claim which turned out to be plainly untrue.

- A few minutes later, after 2:40 a.m., Mangum told Sergeant Shelton that she had not been raped. Instead, she stated that "some of the guys from the party pulled her out of the vehicle and groped her," but "nobody forced her to have sex." But someone had, Mangum told Shelton, taken her money. Shelton went outside to call his watch commander to report that the accuser had recanted the rape allegation.

- Just moments later, while Shelton was outside, Mangum changed her story again, telling a doctor at Duke Hospital that she had been raped after all. She then refused to respond to a direct question from Shelton about whether she had been raped.

- Around 3:00 a.m., Duke Police Officer Christopher Day reported that Mangum "was claiming that she was raped by approximately 20 white males at 610 N. Buchanan," and that she had "changed her story several times." He reported that "Durham police stated that charges would not exceed misdemeanor simple assault against the occupants of 610 N. Buchanan," indicating that Durham police did not find her rape allegation credible or worthy of any further investigation.

- Around 3:50 a.m., Mangum apparently recanted the rape allegation again, in a conversation with a female Durham police investigator, B.S. Jones. Jones asked Mangum what had happened, and Mangum gave no clear indication that she had been raped. Rather, Jones reported, Mangum stated that someone "knew the deal" and "the guys weren't with it." She then expressed a desire to go back to sleep or to go home.

- Mangum was seen by a total of seven doctors and nurses at Duke Hospital. To these doctors and nurses, she stated that she had been raped vaginally by three men and had great pain "down there." According to medical records, Mangum also repeatedly told Duke doctors and nurses that the assailants had not used condoms and that ejaculation had occurred. But she specifically denied that she had been raped anally or orally, and denied any other physical assault. She denied any tenderness in the abdomen, chest, back, head, neck, or extremities. These three doctors and four nurses discovered no medical evidence of any rape or physical assault. On

35

information and belief, though Mangum repeatedly told nurses that her pain level was 10 on a scale of 10, multiple nurses tested her for symptoms associated with pain and found none. On the contrary, Mangum was in no apparent discomfort.

- Beginning at around 7:00 a.m., Mangum told yet another story to Duke nurse Tara Levicy, who interviewed Mangum as a sexual assault examiner and played an ancillary role in the physical examination of Mangum conducted by Dr. Julie Manly. Mangum initially told Levicy that she had been raped by three men not only vaginally, but orally and anally as well, and she said that their names were Adam, Brett, and Matt. She complained that she had been pushed, pinched, kicked "in my butt," and had lost fake fingernails in a violent struggle with her assailants. She asserted that no condoms had been used, and that ejaculation had occurred in her mouth and her vagina or anus. She complained, not only of vaginal pain, but pain in her anus, face, shoulders, chest, abdomen, back, buttocks, and legs. But she denied that she had been choked and denied that she had been hit by hand or fist -- statements she would later contradict.

107.    Mangum's stories also variously included other false and implausible details, including that Roberts had assisted the rapists, that Roberts had driven her to an unfamiliar location after the party to beat her and steal her money, and that Roberts had rolled Mangum over glass when she pushed her out of the car.

108.    The only consistent features of each version of Mangum's protean rape allegations were her repeated claims to Levicy and to the other Duke doctors and nurses that (1) the assailants had not used condoms, and (2) ejaculation had occurred. If the statements had been true, it would have been virtually inconceivable that *none* of her assailants had left DNA traces on or in her.

109.    In addition, there was one consistent claim in Mangum's allegations at Duke Hospital—that she had been the victim, not of a rape, but of petty larceny, at the hands of Roberts. Mangum told Officer Sutton, for example, that "Nikki" had stolen her

money and cell phone.  And she insisted to Officer Jones that Nikki had taken her purse and phone.  Unlike the rape allegation Mangum did not recant this allegation at Duke Hospital or thereafter.

**B.     Durham and Duke Police Were Fully Aware that Mangum's Rape Allegations Were Not Credible**

110.    On information and belief, the Durham Investigators and the Durham Supervisors were aware of the contradictory nature of Mangum's allegations, including her outright recantation of the rape allegation to Sergeant Shelton.  On information and belief, the Durham Investigators, acting at the direction of Durham Supervisors, subsequently attempted to intimidate and discredit Shelton by subjecting him to an internal investigation, accusations of unprofessional conduct, and threats of disciplinary action for reporting Mangum's recantation.

111.    On information and belief, at around 3:00 a.m. on the loading dock at Duke Hospital, Durham police officers engaged in an extensive briefing of the case to Duke police officials.  This briefing included, on information and belief, identifying Roberts as the person who placed the 911 call at 610 N. Buchanan at 12:53 a.m., and recounting the conflicting allegations of rape that Mangum had made and recanted to various Durham police officials.  Duke police and, on information and belief, top-level Duke administrators thus became aware of these facts.

### C. Duke's Forensic Exam Reveals No Objective Medical or Physical Evidence of Rape

112. On information and belief, all seven doctors and nurses who examined Mangum at Duke Hospital between 2:00 a.m. and 7:00 a.m. found no objective medical or physical evidence of sexual assault.

113. On information and belief, Mangum did not take a shower, use the bathroom, brush her teeth, change her clothes, or have anything to eat or drink between the time she left the party and her examination by Levicy and Manly.

114. Duke Hospital policy requires at least one fully-trained sexual assault nurse examiner ("SANE") to be on duty at all times. Hospital policy requires every woman who alleges sexual assault to have a forensic medical and physical exam by a SANE nurse to prepare a so-called "rape kit" of items for later forensic analysis. As of November 2004, Duke Hospital employed 14 fully-trained SANE nurses on a full-time basis.

115. Levicy joined the staff of Duke Hospital as an emergency-room nurse in February 2005. On information and belief, she had no prior experience in nursing. In August 2005, she began work on her SANE certification. At the time of Mangum's exam on March 14, Levicy had been certified for less than two weeks, and had scarcely a year's experience as a nurse in any capacity.

116. On information and belief, in certifying SANE nurses, North Carolina employers ordinarily abide by the standards of the International Association of Forensic Nurses, which require a nurse to have at least three years of active practice before

pursuing a SANE certification. Duke Hospital permitted Levicy to apply and receive training for certification as a SANE nurse after only five months of nursing practice.

117.  At all relevant times and events described herein, Levicy was a full-time employee of Duke Hospital. Her statements and actions described herein were performed within the scope of her employment for Duke University and Duke Hospital, and they have been ratified by her employer.

118.  According to the U.S. Department of Justice, "[b]y profession, SANEs are not victim advocates." Rather, the Attorney General's National Protocol for Sexual Assault Medical Forensic Examinations, *available at* http://www.ncjrs.gov/pdffiles1/ovw/206554.pdf, repeatedly emphasizes "the importance of examiner *neutrality and objectivity* during the examination." (Emphasis added.) As she examined Mangum, however, Levicy was neither "objective" nor "neutral."

119.  As detailed above, Mangum told Levicy that she had been raped by three attackers, not only vaginally, but orally and anally as well. She complained that she had been pushed, pinched, and kicked; and that she had lost fake fingernails in struggling with her assailants. She asserted that no condoms had been used and that the men had ejaculated. She complained, not only of vaginal pain, but pain in her anus, face, shoulders, chest, abdomen, back, buttocks, and legs. But she denied that she had been choked and denied that she had been hit by hand or fist.

120.  Notably, Mangum told Levicy that she had been anally raped by at least one assailant. This allegation of anal rape was unique to the version of events Mangum

39

told Levicy. It was absent from the other versions of the alleged rape that Mangum told at Duke Hospital that night.

121. The allegation of anal rape was especially at odds with the medical and physical evidence. The medical personnel who examined Mangum saw no anal tearing, bleeding, injury, or other evidence of anal rape. Levicy's own report of Mangum's physical examination specifically stated "nothing notable" in the section for "Anal Exam."

122. In addition to eliciting the latest version of Mangum's story, Levicy participated in a forensic exam of Mangum. However, because Levicy was not qualified to perform the pelvic examination -- the critical portion of the exam -- it was performed by Dr. Julie Manly, a fourth-year resident at Duke Hospital who had performed many rape examinations in the past. It was Dr. Manly who examined and took scrapings of Mangum's clothes; took oral, vaginal, and rectal swabs; and collected samples of Mangum's hair, blood, and skin cells for later forensic analysis.

123. Like the examinations by the other doctors and nurses who examined Mangum at Duke Hospital, the forensic exam conducted by Manly and Levicy uncovered no objective medical or physical evidence to corroborate her allegations of rape or traumatic sexual assault. As North Carolina Attorney General Roy Cooper later unequivocally stated after an exhaustive review of the medical and physical evidence: "No medical evidence confirmed [Mangum's] stories."

124.    Levicy took notes during Dr. Manly's pelvic examination.  According to Levicy's notes, Mangum had no vaginal or anal tearing, bleeding, or bruising, no grimacing, no sweating, no changes in vital signs, and no other symptoms ordinarily associated with the serious pain of which she complained.  Her head, back, neck, chest, breasts, nose, throat, abdomen, and extremities were all unbruised and normal.  There was no sign of rectal penetration; as noted above, Levicy recorded "nothing notable" in the section of the SANE form labeled "Anal Exam."  There was no evidence of bruising or other effects of beating, kicking, or choking on Mangum's head or neck, or elsewhere on her body.

125.    In the section of the SANE form labeled "Describe all signs of physical trauma," Levicy recorded only that Mangum had three small scratches on her right knee and right ankle.  Thus, after a thorough forensic sexual assault examination, the only "physical trauma" noted by Dr. Manly and nurse Levicy were three small scratches on Mangum's lower right leg.

126.    Dr. Manly's only diagnosis of any abnormality in the pelvic examination was "diffuse edema [i.e. swelling] of the vaginal walls."  The basis for this diagnosis is unclear, because, on information and belief, it is difficult or impossible to diagnose edema or swelling without observing the vaginal walls in their normal or unswollen state, which Manly had never done.  In any event, this condition can be caused by smoking, sex within 24 hours prior to the vaginal exam, frequent sex, antidepressants, or taking Flexeril.  Mangum satisfied all these conditions, including taking Flexeril.  "Diffuse

edema of the vaginal walls" is also consistent with Mangum's admission to Durham Police that she had performed, using a vibrator, for a couple in a hotel room shortly before the lacrosse party. It was also consistent with the statement to Durham police of Jarriel Johnson, Mangum's driver, who stated that he had personally had sexual intercourse with Mangum in the days before the party, and that he had driven her to multiple locations so that she could have sex with other men in the hours and days before the party. Upon information and belief, the observation of "diffuse edema of the vaginal walls" is also consistent with a yeast infection.

127. Dr. Manly later (October 2006) told defense lawyers for the indicted lacrosse players that she had never seen vaginal swelling in any of her previous sexual assault exams; she had seen it in other routine pelvic exams, but there were other reasons for it.

128. During the examination, Mangum screamed hysterically, and complained of severe pain when Dr. Manly inserted a speculum for vaginal examination. This behavior was highly atypical for a rape victim who lacked any bruising, bleeding, tearing or other visible physical injury.

129. In fact, medical records indicate that Mangum did not exhibit any of the symptoms normally associated with the severe pain she suffered. Medical records "indicate[] that she had no facial distress indicating pain, that she was not sweating (a common response to intense pain), that she did not change her body position in any way to indicate that she was uncomfortable, and that she had no changes in her vital signs

42

(pulse, breathing, blood pressure) that would have corroborated her complaints of pain. Indeed, she was noted to be in 'No Obvious Discomfort.'" Dec. 14, 2006 Defense Motion To Suppress, at 5.

### III. Durham Police Sergeant Gottlieb Takes Over The Rape Investigation

130. Mangum was discharged from Duke Hospital after her forensic examination. The next day, Wednesday March 15, Mangum went to her usual hospital, the University of North Carolina Hospital, where she repeated her complaints of pain in an attempt to procure pain-controlling narcotics. A physician at UNC wrote of Mangum: "Due to the patient's long psychological history she is at very high risk of narcotic abuse, and at clinic, we have recommended not to prescribe the patient any narcotics." On information and belief, that long history included severe psychological disorders, prescribed anti-psychotic drugs, and a continual practice of complaining about pain to obtain narcotics.

131. Responsibility within the Durham Police Department for investigating Mangum's rape claim was initially assigned to Investigator B.S. Jones. On or about March 14, 2006, Jones concluded that there was no evidence to proceed with a rape investigation and that the file would be closed.

132. In the afternoon of March 14, the day after the party, Mangum telephoned Investigator B.S. Jones, requesting, on information and belief, only that the police retrieve Mangum's allegedly stolen property from Roberts; she did not mention that she had allegedly been the victim of a savage gang rape only 12 hours before.

43

133. In response to this phone call from Mangum, Jones referred Mangum's case to Sergeant Mark Gottlieb, who was in charge of Property Crimes for District 2 of the Durham police.

134. During years of policing the Trinity Park neighborhood around Duke University, Gottlieb had acquired a widely known reputation for vindictive and abusive law enforcement practices toward Duke students. These abuses included selective and malicious investigation and prosecution, excessive force, false arrest, fabricating evidence, and falsifying police reports. Duke officials and students, Duke Police, and Durham officials were aware of Gottlieb's biased attitude and rogue tactics against Duke students.

135. In February 2006, Durham and Duke officials (including, on information and belief, Burness and Trask, among others) were notified of the extent of Gottlieb's history of chronic abuses of law enforcement power against Duke students. For example, research done by the *News & Observer* revealed that during the 10 month period from May 2005 to February 2006, 71 percent of Gottlieb's formal arrests were Duke students (20 out of 28). Only three percent of the formal arrests made by the other three officers who patrol the same district were Duke students (2 out of 64). Further, at least 15 of the Duke students arrested b Gottlieb were taken to jail for alcohol and noise violations while nonstudents and "permanent residents" were not taken to jail for more severe offenses. As a result, shortly before March 13, Gottlieb had been transferred from the Trinity Park neighborhood after many years of policing there. Gottlieb's Durham superiors assigned

44

the Mangum case to him despite knowing of his history of abuse and vindictive behavior toward Duke students. On information and belief, Duke Police also were aware of, and approved, the decision to allow Gottlieb to take charge of the initial investigation.

136. On information and belief, the assignment of the case to Gottlieb violated Durham police internal procedures, under which the investigation of an alleged sexual assault is to be conducted by a specialized Violent Crimes Unit.

137. Soon after being assigned the case, on or around March 16, Gottlieb assigned defendant Benjamin Himan to assist him in the investigation of Mangum's rape allegations. Himan was a rookie investigator with only two months' experience.

### A. Duke Advises Lacrosse Players Not To Seek Legal Counsel

138. On or about March 15, Robert Dean, Director of the Duke University Police, notified Dean Suzanne Wasiolek, Duke's Dean of Students, of Mangum's rape allegations. Dean Wasiolek is a lawyer and a member of the bar of the State of North Carolina. She had also been a revered and trusted advisor to students in difficulty, and enjoyed a special relationship of authority, trust, and confidence with students, including the lacrosse players.

139. Police Director Dean notified Dean Wasiolek that "the accuser was not credible" and that "this would go away." He advised Dean Wasiolek that neither Duke nor Durham police officers believed the accuser's allegations. This advice reflected Duke Police Officer Christopher Day's March 14 report ("the Day report"), prepared at Duke Hospital, which stated that the accuser "changed her story several times," and that

"Durham police stated that charges would not exceed misdemeanor simple assault against the occupants of 610 N. Buchanan." On information and belief, Dean and other Duke Police reviewed and approved the Day report on March 14, the date it was filed.

140.   Dean Wasiolek and other senior Duke officials to whom she spoke thus had reason to believe, from the very outset of the hoax, that the accused lacrosse players were innocent and the accuser was not credible. Dean Wasiolek was advised, specifically, that the number of alleged attackers varied between 20 and 3 in the accuser's accounts. Moreover, Dean Wasiolek later recalled that "it did not appear that this case was really going to go very far, because there were some real inconsistencies in some of the information that the alleged victim was providing." She also stated of the Duke police, "I've relied on what they have told me more times than I can count. Their judgment has always proven to be something I could depend on."

141.   During the afternoon of March 15, Dean Wasiolek contacted Coach Pressler on his cell phone to notify him of the allegations. Coach Pressler was at a bowling alley with the entire lacrosse team at the time. He confronted the four team co-captains, Flannery, Zash, Evans, and Thompson, and they promptly called Dean Wasiolek back. The co-captains spoke directly to Dean Wasiolek on Coach Pressler's cell phone.

142.   The co-captains admitted that two exotic dancers had been hired for the party, but emphatically and unequivocally denied Mangum's rape allegations and assured Dean Wasiolek that nothing of the kind had occurred at the party. Dean Wasiolek

46

assured the players that she believed them, and that the police had determined that Mangum's rape allegations were inconsistent and not credible.

143.    Dean Wasiolek advised the players that they should not hire lawyers and that they should not tell anyone, *including their parents*, about the rape allegations.  As one player recalls, Dean Wasiolek said:  "[R]ight now *you don't need an attorney*.  Just don't tell anyone, *including your teammates or parents*, and cooperate with police if they contact you."  (Emphasis added.)

144.    Because she was a lawyer, and because of her special relationship of authority, trust, and confidence with the players, the players trusted Dean Wasiolek's advice.

145.    Dean Wasiolek knew or should have known that her advice that the players should not tell their parents, and that they should not seek legal counsel and representation, was not in the players' best interest.

146.    In advising the players not to procure legal representation, Dean Wasiolek, who is an attorney, violated Rule 4.3 of the North Carolina Rules of Professional Conduct.

147.    Coach Pressler passed Dean Wasiolek's advice along to the entire lacrosse team.  In reliance upon this advice, the players did not procure legal representation or tell their parents about the allegations for the next several days, while the rape investigation against them continued.

### B. Duke Nurse Tara Levicy Lends Credibility to Mangum's False Rape Allegations

148. Meanwhile, later in the afternoon of March 15, as alleged above, Sergeant Gottlieb of the Durham Police Department assumed personal responsibility over the case from Investigator Jones. Gottlieb would be the lead investigator, with Investigator Benjamin Himan of the Durham Police as chief assistant.

149. The next day, March 16, Gottlieb and Himan procured photos of all the Duke lacrosse players from the Duke Police. The Duke Police also gave Gottlieb and Himan a copy of Officer Day's report from the incident.

150. On Thursday, March 16, Gottlieb and Himan interviewed Mangum at 11:47 a.m. that morning. Just prior to this interview with Mangum, however, a critical conversation occurred at 11:01 a.m. between Himan and Tara Levicy, the newly qualified SANE nurse who had participated in the forensic medical examination of Mangum at Duke Hospital. Himan had contacted Levicy to inquire about the medical and physical evidence relating to Mangum's rape allegations. Levicy told Himan that "due to HIPAA laws she was unable to divulge patient information," but that "*there were signs consistent with sexual assault* during her test." (Emphasis added.)

151. Because Levicy stated that there were "signs consistent with sexual assault," Gottlieb later (on March 21) served her with a subpoena, which would permit her to disclose patient information to them notwithstanding HIPAA, the Health Insurance Portability and Accountability Act, a federal statute that includes patient privacy

48

regulations. (As discussed below, Mangum's complete medical records were not produced by Duke Hospital to Gottlieb until April 5, almost three weeks later.)

152. There was no objective medical or physical evidence supporting Levicy's statement that "there were signs consistent with sexual assault." It was asserted with an intentional, or at least reckless, disregard for the truth.

153. On information and belief, Levicy's statement to Himan was a critical factor in launching, sustaining, and prolonging the rape investigation. As noted above, neither Duke nor Durham police had attached any credibility to Mangum's ever-changing, contradictory, patently implausible rape allegations on March 14. Yet on March 16, Duke Hospital's sexual assault examiner advised Durham police, in effect, that a rape had likely occurred.

154. At every stage of the investigation and prosecution, the case against the lacrosse team always rested primarily on two, and only two, pillars of evidentiary support: (1) Mangum's rape allegations, and (2) the opinion of Duke Hospital's SANE nurse that the medical and physical evidence was "consistent with sexual assault." The prestige and credibility of Duke University Hospital thus provided the core support for the investigation (and later, the prosecution) against the lacrosse players. And as detailed below, nurse Levicy's opinion took on even greater importance in justifying and prolonging the investigation in the ensuing weeks, because (1) Mangum's credibility eroded even further as she continued to tell inconsistent versions of her story and repeatedly made similarly inconsistent "identifications" of her alleged assailants from

49

multiple photo arrays; (2) Levicy's statement to the Durham police was later corroborated, falsely, in public statements by Levicy's supervisor, Theresa Arico, who was the director of Duke Hospital's SANE program; and (3) Levicy later provided additional statements to Durham police, also inconsistent with the record of Mangum's examination at Duke Hospital, designed to rebut mounting exculpatory evidence, including DNA evidence.

### C.    Mangum Fails To Identify Any Of The Lacrosse Players In Photo Lineup

155.    Gottlieb and Himan interviewed Mangum at 11:47 a.m.  As noted above, Mangum stated, consistent with her statements at Duke Hospital, that ejaculation had occurred into her mouth and anus, and that she "did not take a shower, use the bathroom, brush her teeth, change her clothes, or have anything to eat or drink post attack." (Gottlieb notes, at 3.)

156.    To Gottlieb and Himan, Mangum identified her attackers as "Adam," "Matt," and "Brett."  Mangum also gave Gottlieb and Himan vague descriptions of "Adam," "Matt," and "Brett."  She described "Matt" as "heavy set" with a "short hair cut," and weighing 260-270 pounds.  She described "Adam" as "short," "white male," with "red cheeks," "fluffy" brown hair, and "a chubby face."  She also described "Brett" as "chubby."  Neither the names nor the descriptions matched any of the players upon whom the investigation focused or who were eventually indicted.  On information and belief, Mangum did not allege that she had any reason to believe that the players had used aliases.

50

157.    Later that same day, Durham Police conducted their first photo identification procedure for Mangum to identify suspects.  Investigators Soucie and Clayton of the Durham Police showed her 4 arrays of 6 photos each, consisting solely of photos of Duke lacrosse players.

158.    Mangum's immediate reaction to the photo arrays was that "they all look alike."  Mangum did not identify any of the photos as her attackers, including Reade Seligmann (who was later indicted for raping her), whom she identified with only "70% certainty" as having attended the party.  Nor did she pick out any of the "Adams," "Matts," or "Bretts" included in the photo arrays.  She did, however, identify four faces with "100% certainty" as having attended the party.  One of these players was Brad Ross, who had not attended the party, and whom Mangum had never seen before.

159.    As Mangum's "100% certain" misidentification demonstrated, in order to elicit from Mangum a plausible identification of her "attackers," Gottlieb and Himan would first have to find out which players had and which players had not attended the party.  Gottlieb and Himan immediately set out to compile a list of party attendees.

160.    On information and belief, District Attorney Nifong and the Durham Supervisors were informed of Mangum's inability to make a plausible identification of any lacrosse player, but were deliberately indifferent to her lack of credibility.

161.    Michael Nifong was at times relevant to this action the acting District Attorney for the Fourteenth Prosecutorial District in North Carolina (which comprises the City of Durham and Durham County).  From March 24, 2006 through January 12, 2007,

51

Nifong also directed the Durham Police Department's investigation of the allegations of rape against the Duke lacrosse team. In that capacity, he served in a supervising or policymaking role for the City of Durham and the Durham Police with respect to this investigation. Nifong was disbarred by the North Carolina bar on June 16, 2007, for his conduct in his investigation of the lacrosse team. On June 18, 2007, he was suspended from his position as District Attorney, and he resigned from that position on July 2, 2007. On August 31, 2007, Nifong was found guilty of criminal contempt by the Superior Court of Durham County for actions relating to his investigation of the lacrosse team. Nifong has filed a petition under Chapter 7 of the federal bankruptcy code and is therefore protected from being named as an individual defendant in this action.

**D.      Police Search 610 N. Buchanan And Interrogate Team Captains**

162.    In the evening of March 16, not long after Mangum's photo identification procedure, Gottlieb, Himan, and other Durham Police arrived at 610 North Buchanan with keys and a search warrant. Earlier that day unidentified Duke officials had given Gottlieb keys to the house, which Duke owned and rented to three of the four lacrosse co-captains.

163.    Two co-captains were home at the time, Zash and Evans, but were asleep when the police entered the house; the third co-captain, Flannery, returned to the house while the search was occurring. All three residents of 610 North Buchanan cooperated fully with, and voluntarily assisted, the police during the March 16 search.

Case 1:08-cv-00119-JAB-WWD   Document 145   Filed 02/22/10   Page 64 of 237

164.     When the search ended, all three co-captains voluntarily accompanied

Durham police to the police station for a lengthy interrogation in the absence of counsel,

which lasted throughout the night, until about 4:00 a.m. on Friday morning.  After being

placed in separate rooms for individualized interviews, the co-captains were consistently

cooperative, and their accounts of what occurred at the party were both truthful and

consistent with each other.  Among other things, during this interrogation, the co-captains

voluntarily submitted to physical inspections for signs of scratches or other injuries, and

provided samples of their DNA.  They also volunteered to take polygraph tests, but

Gottlieb and Himan declined.

165.     During these interrogations, Gottlieb elicited from the co-captains a list of

the lacrosse players who had attended the party.  He showed the co-captains, individually

and separately, photographs of the entire lacrosse team supplied by Duke police.  He

instructed them to list every team member who had attended the party, but not to include

anyone unless they recollected with certainty that that person had attended.  The co-

captains complied, providing Gottlieb with a list of party attendees as possible suspects.

As discussed below, this list would later be corroborated and supplemented with

information from Duke key card reports illegally supplied by Duke University to the

Durham police on March 31.

166.     The physical examinations of the three co-captains on the night of March

16-17 were performed at Duke Medical Center.  Duke personnel examined the co-

captains for evidence of scratches or other injuries consistent with an attack and collected

DNA and hair samples from them. The Duke medical investigators who examined the three co-captains found no physical evidence to support Mangum's allegations.

167. On information and belief, Nifong and the Durham Supervisors were informed of these facts relating to the March 16 interrogations, and of the fact that the co-captains had been completely and voluntarily cooperative with police during them.

### E. Duke Steers Players To Duke's Lawyer -- Wes Covington

168. On Friday, March 17, after all-night interrogations at the Durham police station, the team co-captains met with Coach Pressler and associate athletic director Chris Kennedy, whose son had been co-captain of the 2005 lacrosse team. Contrary to Dean Wasiolek's advice, Kennedy said that the co-captains needed to tell their parents about the allegations and that they would need legal counsel. The co-captains contacted their parents from Kennedy's office.

169. Soon after instructing the players not to tell their parents and not to consult a lawyer, Dean Wasiolek and/or other Duke officials had contacted a Durham lawyer named J. Wesley ("Wes") Covington about the case. Dean Wasiolek had a close relationship with Covington, and Covington had often been engaged by Duke to handle potentially embarrassing or controversial legal problems. Dean Wasiolek later described Covington as "a wonderful lawyer" who "has a lot of experience with this kind of situation." In fact, Covington had little or no experience in criminal defense work. Dean Wasiolek had advised or instructed Kennedy to tell the co-captains to seek Covington's

advice.  In reliance on Dean Wasiolek's advice, Kennedy recommended Covington to the co-captains.

170.    Unbeknownst to Kennedy or the lacrosse players, Covington's law license had been suspended for three years in 2000 by the North Carolina Bar for ethical violations.  In addition, just a month and a half before these events, Covington had again been disciplined by the North Carolina Bar.  On February 2, 2006, Covington was censured for the following violations:  "Durham lawyer J. Wesley Covington was censured by the Grievance Committee for engaging in a conflict of interest, failing to provide his clients with adequate information to make informed decisions, permitting a third party who paid his fee to make decisions regarding the clients' representation and thereby engaging in conduct prejudicial to the administration of justice."

171.    The next day, Saturday, March 18, co-captains Evans, Zash, and Flannery, acting on Dean Wasiolek's and Kennedy's recommendation, met with Covington to seek his advice and counsel.  The co-captains told Covington their account of events, including their all-night interrogation by Gottlieb.  Referring to his close relationship with Dean Wasiolek, Covington assured the co-captains that he had dealt with similar matters in the past and that he would make the problem "go away."  Like Dean Wasiolek, he emphasized that they should not mention this matter to anyone.  He left it unclear, however, whom exactly he was representing in the case.

172.    Later that same day, in a phone conversation with co-captain Dave Evans' parents, Covington stated that his friends in the Durham police department had advised

him that everything would be okay. He added that they should not retain anyone -- including himself -- as Evan's lawyer. Again, he emphasized that they should not mention the matter to anyone.

173. Covington was careful never to enter into a formal attorney-client relationship with most or all of the players or their parents, while repeatedly advising them and urging them to allow him to work on their behalf, and not to retain other counsel. As Dean Wasiolek had done, Covington held himself out as an advisor to the players, dissuading them from retaining other counsel, while secretly acting on behalf of Duke and its administrators.

174. On Monday morning, March 20, Duke University President Richard Brodhead learned of the rape allegations for the first time by reading a terse account of them in the student newspaper. The newspaper account simply stated that a rape had allegedly occurred at 610 N. Buchanan, a house recently acquired by the University adjacent to Duke's East Campus, over spring break. Brodhead called Duke's Vice President for Student Affairs, Larry Moneta, who told him that "the accusations were not credible and were unlikely to amount to anything."

175. Also on the morning of March 20, Bruce Thompson, father of lacrosse team co-captain, Bret Thompson, contacted Wes Covington. Covington advised Thompson, "I do this all the time for Duke," and that, through Covington's contacts within the Durham police, "we're going to get this swept under the rug." Covington advised Bruce Thompson that his son should not hire a lawyer. When Thompson pressed him on the

56

question of whom he represented -- Duke or the lacrosse players -- he responded that he was not representing anyone officially, but that he was acting as "the unofficial legal adviser to everyone."

### F.     Duke Colludes With Gottlieb Against The Players

176.     Meanwhile, on March 20, Gottlieb's rape investigation was proceeding apace.  On or before that day, Gottlieb began attempting with Duke Police to arrange for uncounseled interrogations of *all* the lacrosse players, like those he had conducted with co-captains Evans, Zash, and Flannery during the night of March 16-17.  According to Gottlieb's later testimony, "investigator Himan was working with people at Duke to get the players to come in under the radar, sit down and talk with us if they wanted to." Gottlieb's "supplemental case notes" recorded that, on March 20, "Inv[estigator] Himan advised me he spoke to Duke Police Det. Stotsenberg to set up a voluntary meeting for the players to speak to Durham PD and give photographs, and DNA."  At the same time, "people at Duke" (notably Dean Wasiolek) were exploiting their position of authority, trust, and confidence to encourage the players not to retain counsel and not to assert their constitutional right to representation in any such interviews.

177.     On information and belief, Gottlieb sought to interview the players without legal counsel in order to engage in coercive interrogations with some or all of the players, as he had done with co-captains Evans, Zash, and Flannery during the night of March 16-17.  Moreover, on information and belief, Gottlieb wished to procure DNA samples from

the players through voluntary agreement, because by voluntarily providing the samples, the players would forfeit their right to receive prompt reporting of DNA test results.

178.    Covington later took the lead in encouraging the players and their parents to participate in these uncounseled interrogations.  On information and belief, during this time, and perhaps as early as Monday, March 20, he was engaged in covert discussions both with Duke officials and with Gottlieb, Himan, and/or other Durham officials to arrange for Durham police to interrogate the lacrosse players *en masse* without the benefit of counsel.  Covington did not disclose these communications to the players or their parents.  Covington was well aware of Gottlieb's reputation and record of biased and harsh treatment of Duke students.

179.    On March 20, Himan also called Coach Pressler to set up an appointment for these interrogations of all players who had attended the party, to occur on Wednesday, March 22.  No lawyers would be present during these interviews.  Covington advised Coach Pressler that this was a good plan and that the players should accede to it.

### G.    Roberts Tells Police That Mangum's Rape Allegations Are "A Crock"

180.    Also on Monday, March 20, Himan made the Durham Police Department's first contact with the other dancer at the party, Kim Roberts.  Roberts told Himan that Mangum's rape charges were "a crock," and that Mangum had not been out of Roberts' company for more than five minutes during their entire time at 610 N. Buchanan -- during which time, Mangum had been trying to get back into the house.  According to

Roberts, "the only time [Mangum] was alone was when she would not leave and that time period was less than five minutes."

181.    On information and belief, the Durham Investigators and the Durham Supervisors were informed of Roberts' opinion that Mangum was lying and were aware of the subsequent attempts to intimidate her into changing her story.

182.    On information and belief, between March 20 and March 22, Himan located an outstanding arrest warrant for Roberts for an alleged probation violation. Gottlieb arrested Roberts on this warrant. On information and belief, Gottlieb and Himan then induced Roberts, on March 22, to provide a formal written statement in which she recanted her initial statement that the allegations were "a crock." They induced this written statement by offering her a deal on the probation violation. On information and belief, the Durham Supervisors knew or should have known about this witness tampering.

183.    In addition to this written statement, moreover, they induced Roberts to write a false addendum altering her account of the events at the party to create a fictional window of opportunity, when she was separated from Mangum, during which the rape might have occurred. In the addendum, Roberts wrote: "I forgot to mention that the first time Precious [i.e. Mangum] came to the car, she left because she felt there was more money to be made. It was after then, that the boys helped her to the car."

184.    On March 20, Durham police obtained a subpoena to Duke Hospital for medical records associated with the forensic examination of Mangum.

### H. Duke Nurse Levicy Again Falsely Corroborates Rape Allegations

185.    The next morning, Tuesday, March 21, Gottlieb went to Duke Hospital and served the subpoena on nurse Levicy. Levicy made crucially false and misleading statements to Gottlieb about the nature of the physical and medical evidence. She told Gottlieb that the examination of Mangum had revealed physical evidence of "blunt force trauma," and that the blunt force trauma was "consistent with the victim's statement" alleging a forcible gang rape by three men. Neither Levicy nor Manly had reported any evidence of "blunt force trauma" indicating sexual assault in their forensic examination report. To the contrary, as noted above, the only evidence of "physical trauma" found by Manly and Levicy in their forensic exam of Mangum were three small scratches on her lower right leg. In fact, on information and belief, it would be impossible to diagnose blunt force trauma without the use of a colposcope to view the interior of the victim's vagina—but no colposcope had been used in the examination of Mangum. Levicy's claim of evidence of "blunt force trauma" was thus false and contrary to the physical and medical evidence in Levicy's and Duke Hospital's possession.

186.    Levicy also advised Gottlieb that the evidence corroborated Mangum's claims of both vaginal and anal rape. She stated that Mangum "had edema and tenderness to palpitation both anally and especially vaginally." The reference to anal edema and tenderness was entirely fabricated. As noted above, Levicy's own report from the examination of Mangum had recorded "nothing notable" in the subsection for "Anal Exam."

60

187. Levicy's reference in the March 21 interview to vaginal edema, moreover, misleadingly exaggerated its significance. Dr. Manly had diagnosed "diffuse" swelling that could have been explained by any of several commonplace causes, all of which applied to Mangum. Levicy's statement implied, rather, that the vaginal edema provided solid physical evidence of "blunt force trauma" from a violent sexual assault. This implication was false and contrary to medical and physical evidence in Levicy's and Duke Hospital's possession.

188. Like her March 16 statement to officer Himan that "there were signs consistent with sexual assault," Levicy's March 21 statements to Gottlieb -- that the victim had suffered "blunt force trauma" that was "consistent with the victim's statement," and "edema and tenderness to palpitation both vaginally and anally" -- were critical factors in sustaining the ensuing rape investigation. Mangum's rape allegations were manifestly contradictory and incredible; Levicy's statements falsely asserting medical and physical evidence of rape were therefore the only evidence on which further investigation could plausibly be based.

189. Levicy's false statements therefore appeared prominently in Gottlieb's March 23 application for a non-testimonial order ("NTO") seeking DNA evidence from all 46 white members of the lacrosse team. The NTO application stated (emphasis added):

> The victim was treated and evaluated at Duke University Medical Center Emergency Room shortly after the attack took place. A Forensic Sexual Assault Nurse and Physician conducted the examination. *Medical records and interviews that were obtained by a subpoena revealed the victim had*

61

*signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally.* Furthermore, the SANE nurse stated the injuries and her behavior were consistent with a traumatic experience.

190. As detailed below, subsequent to her March 21 interview with Gottlieb, Levicy actively conspired with the Durham Investigators to prop up and to prolong the investigation. She met or conversed multiple times with the Durham Investigators in the ensuing weeks and months, repeatedly adjusting or elaborating her testimony to rebut mounting evidence of innocence as it emerged. Upon information and belief, she conferred with prosecutors and/or police at least seven times during the course of the rape hoax crisis.

191. At an unknown date later during the crisis, Levicy spoke directly with Nifong. On Nifong's recollection, this conversation occurred in early May, after the indictments of Seligmann and Finnerty. Nifong's notes of this conversation, which refer to Levicy as "Tara," state that Levicy advised him that Mangum's symptoms and behavior were "*consistent with sexual assault emotionally and physically*" and with "rape trauma syndrome." (Emphasis added.) Nifong recorded that Levicy advised him that Mangum showed no signs of intoxication, and that Mangum offered "consistent responses."

192. Indeed, as late as January 10, 2007, Levicy spoke with Durham Investigators Wilson and Himan. Contrary to her own March 14 written report, she falsely stated to the officers that Mangum had been unsure whether condoms had been used in the alleged attack. Levicy's false statement was designed to dissipate the

62

dispositive exculpatory significance (discussed below) of the results of DNA tests utterly disproving Mangum's rape allegations against the lacrosse players.

## I.     Mangum Fails Second Attempt At Photo Identification

193.     On Tuesday, March 21, Mangum was interviewed by Durham police officers in a second failed attempt to elicit a plausible identification of her "attackers." On information and belief, Mangum's immediate concern, which she expressed to the Durham officers, was not to bring her "rapists" to justice, but to retrieve her allegedly stolen property from Roberts.

194.     Investigator Clayton of the Durham Police presented Mangum with two photo arrays, comprising six photographs each.  Again, these photo arrays contained only pictures of members of the Duke lacrosse team.  One of the arrays included Dave Evans, who would later be indicted by Nifong for rape.  Clayton twice showed Mangum the array containing Evans's photograph.  Each time, Mangum failed to identify anyone in the array.  Notably, Mangum did *not* identify Evans at all, and she certainly did not claim that Evans was one of the men who purportedly assaulted her.  Once again, Mangum stated that the players all looked the same.

195.     On information and belief, the Durham Investigators and the Durham Supervisors were informed of Mangum's inability to identify her "attackers" during both the March 16 and the March 21 photo arrays.

**J.      Players' Parents Learn of Rape Allegations**

196.    The same day, March 21, Covington met with several parents of lacrosse team members.  Covington suggested that "a few key players" give interviews to Durham police in the absence of counsel.  No lawyers would be necessary, Covington stated, because he himself would attend.

197.    On information and belief, Covington was already in direct communication with Gottlieb and had scheduled the entire lacrosse team for police interrogations, including providing DNA samples, for the next day, Wednesday, March 22.  Covington also acknowledged that he had spent the morning of March 21 in extensive discussions with Wasiolek and Kennedy.

198.    Pursuant to this Duke-Durham plan for uncounseled interrogations, at 7:00 p.m. on March 21, the players were instructed to report to the Duke Police Department the next day, March 22, at 3:00 p.m.  Thus they had only 20 hours' advance notice of the proposed interrogations.

199.    Durham attorney Robert C. Ekstrand independently learned of the Covington-Gottlieb plan for uncounseled interrogations on the evening of March 21.  Working through the night, he managed to get in contact with many of the lacrosse team members to advise them not to agree to uncounseled interrogations.  Many parents were awoken in the middle of the night to hear of the rape allegations against their sons for the first time, because Duke had instructed the students to keep quiet about the allegations.

### K.      Parents Reject Advice of Duke Lawyer Covington

200.    Larry Lamade, father of player Peter Lamade, was one of the parents who heard of the allegations for the first time during the night of March 21-22.  The next morning, Wednesday, March 22, Lamade and other parents, acting on the advice of Ekstrand, advised Coach Pressler that the scheduled interrogations would have to be delayed so that the players could consult their parents and lawyers first.  Coach Pressler referred Lamade to Covington, who had arranged for the interview.

201.    Lamade, a lawyer, met with Covington on March 22.  Lamade asked Covington:  "Whom do you represent?"  Covington replied:  "I'm not really representing anyone.  I'm here to kind of fix this.  And I'm advising Duke."

202.    Overruling Covington's protests, Lamade insisted that the police interrogations scheduled for that day be postponed.  At the last minute, Covington's office advised Gottlieb by email that the lacrosse players would not be available for interviews that day, and rescheduled for Wednesday, March 29.

203.    Later that afternoon, Covington met again with Lamade and another lacrosse parent, Tricia Dowd.  Again Covington urged that some or all of the players submit to uncounseled interviews with Gottlieb.

204.    Though Covington had never advised the players of this, Gottlieb, Himan, and the Durham police had planned to procure DNA samples from the players at the scheduled interrogations.  When the interrogations were postponed on March 22, Himan

began to prepare an application for a non-testimonial order ("NTO") from a judge to compel the lacrosse players to produce DNA samples.

### L. Relying On Levicy's Misrepresentations Of The Medical Evidence, Gottlieb Obtains A Non-Testimonial Order For DNA Samples From The Players

205. The NTO application was filed with the court the next morning, Thursday, March 23. As noted above, the NTO application placed decisive emphasis on nurse Levicy's statements, asserting that "medical records and interviews … revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally," and that "the SANE nurse stated the injuries and her behavior were consistent with a traumatic experience." The NTO application also stated that Mangum had been "strangled," a claim that had not been included in any of the seven stories she had told at Duke Hospital on March 14.

206. These statements in the NTO application, publicly available and widely reported, were false. Moreover, Duke knew or should have known that they were demonstrably false, on the basis of medical evidence in Duke's exclusive possession. Duke took no action to rebut or correct these public charges.

207. The inflammatory allegations in the NTO application included the allegation that Mangum had lost fake fingernails in a desperate struggle to resist the alleged attack. To be sure, fake fingernails had been found in the bathroom during the March 16 search of 610 North Buchanan. The application did not mention, however, that other unpainted nails and nail polishing accessories had been found with the painted fake

66

fingernails mentioned in the NTO application, or that Mangum had told Gottlieb and Himan that she had been affixing and painting her fake nails just before leaving the party.

208. The NTO also falsely accused the occupants of 610 North Buchanan of using "aliases" to conceal their identities during the alleged attack. On information and belief, Mangum never made such an allegation to the police. On the contrary, she named her attackers as "Adam," "Matt," and "Brett" without any indication that these were aliases. And, belying any suggestion that they thought these were aliases, the Durham police designed both the March 16 and the March 21 photo arrays to include photographs of players with those names.

209. The NTO application also falsely accused the players of attempting to conceal their sports affiliation as members of the Duke lacrosse team. On information and belief, Himan and Gottlieb were aware from their March 16 raid of 610 North Buchanan that the house was liberally decorated with Duke lacrosse flags and other paraphernalia.

210. The filing of this NTO application triggered intense local media and press coverage of the rape allegations, thus ensuring a lengthy public ordeal for all the lacrosse players. Once the explosive allegations became public, nationwide media attention was a completely foreseeable certainty. By March 23 -- before Nifong took an active role in the case -- Levicy's false and misleading statements to the Durham police had ensured that the hoax would become, at the very least, a humiliating public spectacle for all the players. Moreover, the NTO application's allegation that the rape complaint was

supported by medical evidence collected by Duke Hospital -- an allegation that owed its existence entirely to nurse Levicy -- gave the spurious rape allegations a powerful aura of credibility to the media and the public. Nifong would later repeatedly exploit this credibility to full advantage by invoking the authority of Duke Hospital to prop up his public charges of rape.

211.   Without Levicy's false and misleading statements to the Duke Investigators, therefore, the false rape charges would never have become public. If the Durham Police had been advised truthfully by Levicy that the physical and medical evidence was inconsistent with Mangum's multiple, ever-changing, conflicting stories, then the rape investigation, which had been dropped by Durham Police Investigator B.S. Jones, would not have been revived and pursued.

212.   The NTO application also stipulated that any players whose DNA was not found on the rape-kit items would be immediately exonerated. It stated that "[t]he DNA evidence requested will immediately rule out any innocent persons, and show conclusive evidence as to who the suspect(s) are in the alleged violent attack upon this person." This statement was plainly correct, given Mangum's claims to Duke medical personnel that she had been orally, vaginally, and anally gang raped, that condoms had not been used, and that there had been ejaculation. Later, however, when the DNA evidence came back and *did*, in fact, rule out *all* the lacrosse players as possible suspects, the Durham Investigators promptly dismissed its exculpatory significance and began falsely

68

suggesting, with the knowledge and approval of the Durham Supervisors, that condoms might have been used by the fictional rapists.

213.    In the afternoon of March 23, Judge Ronald Stephens signed the NTO application, ordering all 46 white members of the lacrosse team to provide DNA samples to the police.

214.    The team members fully and immediately complied with the court's order without objection, providing DNA samples, submitting to examinations for injuries, and sitting for photographs.

215.    When the order was issued, many team members consulted with Ekstrand, leading Covington to complain that Ekstrand was trying to take over his position on the case.  But when one player asked Covington directly, "Are you my lawyer?" Covington refused to answer directly.

216.    The press was tipped off about the NTO order.  When the team members arrived to provide DNA samples in the late afternoon of March 23, therefore, newspaper and television reporters were awaiting them.  The first prominent press coverage of the rape hoax would begin the next morning, with a front-page article in the *Raleigh News & Observer*.  From March 24 onward, a national media frenzy continued for months, fueled in large part by Duke University administrators, officers, professors, and students.

## IV.    The Media Frenzy Begins, And District Attorney Nifong Takes Control Of The Rape Investigation

217.    In the ensuing days and weeks, the combination of faculty animosity, faculty and student protests, community outrage, and a massive invasion of the Duke

69

campus by local and national media, transformed Duke into what CBS News described as a "Campus Under Siege." The atmosphere was intensely hostile, even dangerous, for the lacrosse players. They were accosted and intimidated at their homes and on campus by large groups of angry, pot-banging faculty and student protestors carrying "castrate" signs and yelling threats. Their faces appeared on "Wanted"-style posters that flooded the campus and Durham. Some players were publicly singled out in class by their professors for harassment and condemnation. They were besieged by news reporters and camera crews. They lived in fear of physical attacks, under threats of drive-by shootings and racial violence. Increased police patrols were required in the neighborhood where many of them lived. They were forced to flee from town during their final exams when a menacing radical hate group called the New Black Panthers descended on the campus. And in the midst of this intense community outrage and national media attention, 88 Duke professors took out a full-page ad in the campus newspaper publicly thanking student protestors for "not waiting and for making yourselves heard."

218. On or around March 24, on information and belief, Nifong contacted Durham officials, including the Durham Supervisors, to take control of the investigation of Mangum's claims. On information and belief, these Durham officials voluntarily ceded complete control of the investigation to Nifong, and subsequently approved and ratified his conduct.

219. The extensive and negative media coverage of the lacrosse team that began on March 24 was not caused by District Attorney Nifong. To the contrary, Nifong took

an active role in the investigation *because of* the media coverage; not vice versa. In April 2005, the Governor had appointed Nifong to become interim District Attorney for the Fourteenth Prosecutorial District of North Carolina, which includes Durham and Duke. By March 2006, Nifong was engaged in a hotly contested political campaign for election to the position of District Attorney. He faced formidable competition in the Democratic primary from a well-regarded former prosecutor whom he had fired upon his appointment as interim District Attorney. Trailing badly in the polls on March 24, when the case exploded in the media, he viewed the Duke lacrosse prosecution as a golden opportunity to garner, in his own words, "a million dollars of free advertisements." On March 24, he took the unprecedented step of assuming personal charge of the Durham police's rape investigation.

220. On information and belief, the Durham Supervisors knew that it was unprecedented for a district attorney to take direct control of a police investigation, especially when the district attorney was engaged in an obvious conflict of interest due to his hotly contested re-election campaign. It was clear that Nifong would be able to exploit Mangum's high-profile, racially charged rape allegations for personal political gain, and it quickly became obvious that that was exactly what he was doing.

221. On information and belief, Nifong was determined to win the election for district attorney in order to enhance his retirement fund. He had fired the main challenger, Freda Black, when he had become interim district attorney. If she won the

election, she would undoubtedly fire him in return, two years before his service would have qualified his pension for the maximum monthly benefits.

222.    On or around March 24, on information and belief, Durham Police Commander Jeff Lamb instructed Gottlieb and Himan that they should take direction from Nifong during the investigation, but that they should also report regularly to Durham police senior staff regarding the investigation.

223.    On information and belief, Nifong remained in direct and final control of the investigation and prosecution until January 12, 2007, when he was forced to recuse himself due to ethical charges filed against him by the North Carolina bar.

## V.    Duke Reacts To The Rape Charge, Closing Its Eyes To The Truth And Condemning, Punishing, Harassing, And Betraying The Lacrosse Players

### A.    Duke Administration Capitulates To The Demands Of The Media, Activist Faculty, And Student Protestors

224.    At the same time Nifong was seizing control of the investigation, Duke administrators began to chart their own response to the false rape allegations.  Duke University President Richard Brodhead and the Chairman of Duke University's Board of Trustees, Robert Steel, devised Duke's official response to virtually every major event in the rape hoax crisis after March 24.  Months later, after Mangum's rape allegations had been publicly exposed as a malicious and tragic hoax, Brodhead admitted that he "had responsibility for the statements the university made and the actions the university took" throughout the rape hoax crisis.  Chairman Steel, who had taken an active role in collaborating with President Brodhead throughout the crisis, likewise later acknowledged

72

that Brodhead "had consulted regularly with the Trustees" and that "the board agreed with the . . . actions he took." Steel affirmed that "anyone critical of President Brodhead should be similarly critical of the entire board." Under Brodhead's and Steel's direction, Duke capitulated to the various demands and pressures from the media, activist faculty members, and student protestors with a calculated, skillfully executed strategy of statements, actions, and omissions designed to protect Duke's and their own interests by publicly maligning and punishing the players and distancing Duke from them.

225. This strategy was implemented both in Duke's actions and in Duke's silent failures to act. Throughout the rape hoax crisis, as Nifong, Durham police and city officials, activist Duke professors and student protestors, the media, and others repeatedly publicly declared the players guilty of a savage gang rape and a "wall of silence" designed to conceal the truth, Duke took no action to disclose the exculpatory evidence in Duke's exclusive possession, or to confirm the players' full cooperation with the investigation. Rather, Duke took active steps to *suppress* exculpatory evidence in its possession and to silence its employees who knew of it. Duke also implicitly condoned and approved of, and thereby encouraged, the efforts of Duke faculty members, academic departments, and students to harass and condemn the lacrosse players, even conferring its official imprimatur upon the most inflammatory of faculty statements against the lacrosse team -- the so-called "Group of 88" ad of April 6, discussed below. At the same time, the Brodhead administration executed a series of carefully timed reprimands and other disciplinary actions against the lacrosse team that were based on Mangum's rape

73

allegations and that generated a public impression of the players' guilt. In addition, key members of the Brodhead administration, such as Senior Vice President and media spokesman John Burness and Vice President for Student Affairs Larry Moneta, publicly and privately condemned and maligned the lacrosse players to the media, and deliberately exacerbated the effects of Duke's actions against the players. Other key Duke officials, such as Dean of Students Wasiolek and Executive Vice President Tallman Trask, used their positions of trust and authority with the lacrosse players, as well as express promises of confidentiality, to solicit and obtain from the players confidential information, and then promptly offered to disclose, and did disclose, that information to Durham police.

226. Duke implemented its campaign against the lacrosse players without delay. On March 24, Coach Pressler and the four lacrosse co-captains met with Executive Vice President Trask, Athletic Director Joe Alleva, and Kennedy. At this meeting, Trask and Alleva asked the co-captains to tell them every detail about the party. (Of course, the Duke administration had known of the players' adamant denials of Mangum's rape allegations for at least nine days.) When the co-captains told Trask that they had been advised not to speak of the events by their lawyer, Trask became angry and demanded to speak with Covington. When advised that Ekstrand, not Covington, had given the advice, Trask told the co-captains that anything they told him would be protected from disclosure by "student-administrator privilege."

227. There is, of course, no such "student-administrator privilege." Rather, Trask, acting on Duke's behalf, was intentionally or recklessly misleading the players to elicit statements that were contrary to their attorney's advice.

228. Contrary to Ekstrand's advice, the co-captains told Trask, Alleva, and Kennedy what happened at the party, again denying the allegations of rape in the strongest possible terms, while admitting the hiring of the exotic dancers and the underage drinking. Alleva told the players that he believed them. Trask also told the co-captains that he believed them, that they should not worry about the allegations, and that they should focus on beating Georgetown the next day. (Promptly thereafter, Trask participated in Brodhead's decision to cancel the Georgetown game. He also later offered to and did disclose to Durham police the communications he had received on the basis of his false assurance of confidentiality.)

## B. Duke Publicly Maligns the Players

229. Also, on March 24, Brodhead attended a meeting with faculty members that was dominated by a cadre of Duke's activist professors. These activist faculty members were already demanding that Brodhead immediately disband the lacrosse team and sanction its coach and players.

230. Animus against the lacrosse players spilled over into public in-class harassment of some of the players by some of their teachers. Already on Friday, March 24, at least one lacrosse player, Peter Lamade, was subjected to in-class harassment by his professor before his peers. This would be the first of many such incidents in the

ensuing weeks, as the campus atmosphere, exacerbated by the vitriolic harassment by the activist professors and student protestors, became hostile and intolerable to the lacrosse team.

231.    That evening, March 24, Duke's Senior Vice President and media spokesman John Burness was featured on local news programs deploring the rape allegations, without placing any emphasis on the possibility that the allegations were false.  Either that very day or the day before, Burness had met with Robert Dean, the Director of the Duke Police, and Dean had once again stated that the Durham police had not considered the rape allegations to be credible.  Dean and Burness had Officer Day's March 14 report noting the inconsistencies in Mangum's stories, but they did not disclose the Day report to the players, their parents, or the public.

232.    Throughout the rape hoax crisis, Burness repeatedly made not-for-attribution comments to reporters maligning the Duke lacrosse team as a gang of hooligans that included "two or three really bad actors."  Burness's comments became a constant theme of the hostile media coverage of the team throughout the rape hoax crisis.  Burness's consistently negative comments to the media about the lacrosse team were designed to give credibility to the charges of rape and a team-wide cover-up, by portraying the lacrosse players as capable of committing the crimes alleged against them.

**C.    Duke Cancels Two Lacrosse Games To Punish Team For The Party**

233.    The next morning, Saturday, March 25, the *Raleigh News & Observer* published a front-page story about the rape allegations that was one-sided and highly

sympathetic to Mangum. The headline read, "DANCER GIVES DETAILS OF ORDEAL," and the story falsely portrayed Mangum as a hard-working single mother and student at North Carolina Central University, a historically black college, who had recently been driven to exotic dancing by her struggle to support her children. This highly misleading account was the only interview that Mangum provided to the media throughout the rape hoax.

234. The same morning, President Brodhead convened a meeting of top Duke officials at his official residence. The participants included Brodhead, Burness, Trask, Wasiolek, Duke attorney Kate Hendricks, Athletic Director Joe Alleva, Duke Academic Council Chairman Paul Haagen, and other officials.

235. On information and belief, Defendants Brodhead, Trask, Moneta, Burness, and other Duke officials established regular conferences to address Duke's response to the rape hoax. On information and belief, Defendant Victor Dzau, CEO of DUHS, was included in such communications.

236. At the March 25 meeting, as Burness later acknowledged, the assembled officials decided that they "needed to send a signal that [they] took seriously *what happened in the house*." (Emphasis added.) Many of these administrators had been aware of the allegations for many days; this newfound "need[] to send a signal" had only arisen in light of the recent torrent of negative publicity. The truth or falsity of the allegations was immaterial to this decision. Brodhead and his top advisors decided to cancel the next two lacrosse games. Later that day, 90 minutes before the Georgetown

game was to begin, and after the Georgetown team was fully suited up and ready to play, Athletic Director Joe Alleva notified Coach Pressler of Brodhead's decision to cancel the next two games as punishment for the underage drinking at the party (which the players had admitted). Alleva assured Coach Pressler and the team (falsely, as it turned out) that there would be no further punishment of the lacrosse team unless criminal charges were brought.

237. Duke claimed that the punishment was not for the rape allegations, but rather was for the underage drinking and hiring exotic dancers at the March 13 party, which the administrators falsely characterized as a "a team-sanctioned event." The reasons given for this punishment were plainly pretextual. In fact, as the Duke officials knew, the March 13 party was not a "team-sanctioned event," and underage drinking and the hiring of exotic dancers were common features of student parties at Duke and at colleges throughout the country. Other Duke athletic teams, including the men's basketball and baseball teams, had engaged in off-campus underage drinking and had hired exotic dancers at their parties, without similar punishment. In fact, at least 20 other Duke athletic teams, fraternities, and sororities had held such parties, with exotic dancers, during the 2005-2006 school year alone. Moreover, Duke officials had been aware, long before the day of the Georgetown game, that underage drinking and exotic dancing had occurred at the party, yet they awaited until the last minute (after the Georgetown team had traveled to Durham and was actually suited up to play) before canceling the game.

238.   The purpose and effect of the punishment of the lacrosse team was to distance and insulate Duke and its administrators from the controversy and its negative publicity by sending a public signal that Duke sympathized with the accuser, credited the rape allegations, and condemned the lacrosse players.

239.   Duke recently provided a vivid illustration of the double standard that Duke applied to the lacrosse team and its coach when a group of University organizations and programs sponsored, with University approval and funds, an event on campus called the "Sex Workers Art Show."  The performance occurred at the Reynolds Theater in February 2008 and featured semi-nude "sex workers" in a series of vignettes, including a dominatrix who simulated masturbation while whipping a dog collar-clad "slave" kneeling beside her, an exotic dancer extracting a string of dollar bills from her rectum, a transvestite displaying an "anal sparkler show" from his rectum, and similar vulgar perversions.

**D.   President Brodhead Refuses To Meet With Lacrosse Parents**

240.   About 50 parents of the lacrosse players -- many of whom had learned of Mangum's rape allegations only two days before -- had traveled to Durham to watch the Georgetown game.  These parents requested a meeting with Brodhead.  Although Brodhead repeatedly agreed throughout the rape hoax crisis to meet with protestors, activist faculty members, Durham officials, journalists, non-lacrosse parents, and students, he refused to meet with the lacrosse parents on March 25.  He refused similar requests for a meeting with parents on March 26 and 27.  In addition, he would later

refuse repeated requests from the players' defense attorneys, who wanted to present to him overwhelming evidence of the lacrosse players' innocence.

241.    Later, after North Carolina Attorney General Cooper had exonerated the lacrosse players and effectively declared the rape allegations a tragic hoax, Brodhead admitted his responsibility for "fail[ing] to reach out to the lacrosse players and their families in this time of extraordinary peril," and thereby "causing them to feel abandoned when they most needed support."

### E.    Duke Refuses Parents' Request To Stop Faculty Harassment

242.    Instead, on the afternoon of March 25, the parents were allowed to meet with Alleva, Dean Wasiolek, Moneta, and Trask.  The parents confronted Dean Wasiolek with her directive (which had been echoed by Coach Pressler, under her guidance) that the lacrosse players should not tell their parents that they faced a criminal investigation for rape, and with her decision to bring Covington into the case as the players' legal adviser.  Dean Wasiolek insisted that Covington was a "wonderful" lawyer with significant criminal defense experience.  In fact, Covington had little or no experience in criminal defense work.

243.    At the March 25 meeting, the players' parents demanded that Duke remove their sons' photos from its website.  The parents were both concerned for their sons' safety and afraid that the accuser might study publicly available photos in order to falsely pick out lacrosse players from a photo line-up.  Although Moneta promised to have the photos removed that day, Duke inexplicably delayed in taking such action.  This allowed

80

enough time for bloggers to download the players' pictures and to post them on websites devoted to attacks on the players. Duke's delay also allowed the photos of 43 players to be downloaded and used on a Wanted-style "Vigilante" poster that was widely distributed on the campus a few days later.

244. At the same meeting, the parents asked Moneta to remind professors of Duke's policy (discussed below) prohibiting harassment of students, including in-class harassment of students by professors. Moneta refused, even though, as noted above, at least one lacrosse player had been the subject of such in-class harassment the day before.

245. Alleva, Trask, and Dean Wasiolek assured the parents that they believed that the players were innocent and that the rape allegations were false. But when asked if they would make a public statement to that effect, they refused. In fact, Trask falsely advised the parents that Duke would make no more statements that day -- even as Brodhead, with whom Trask was in contact, was preparing his first public statement.

## F. Brodhead Publicly Maligns The Players And Fosters "Wall of Silence" Myth

246. The same day, March 25, Brodhead issued his first public statement as University President about the rape hoax crisis. Brodhead's public statement asserted: "Physical coercion and sexual assault are unacceptable in any setting and will not be tolerated at Duke. As none of us would choose to be the object of such conduct, so none of us has the right to subject another person to such behavior. Since they run counter to such fundamental values, the claims against our players, if verified, will warrant very serious penalties, both from the university and in the courts."

81

247.   Though Brodhead's statement made fleeting reference to the presumption of innocence, it was foreseeably and predictably received as strongly implying the students' guilt.  Headlines in news media in Durham and across the country blared Brodhead's reference to "[p]hysical coercion and sexual assault."  Few reports made much, if anything, of Brodhead's passing reference to the presumption of innocence in the criminal justice system.  Especially in connection with Duke's simultaneous cancellation of the lacrosse games, Brodhead's statement was well calibrated to malign the players in the national media spotlight.

248.   Brodhead's statement also said:  "I urge everyone to cooperate to the fullest with the police inquiry while we wait to learn the truth."  Brodhead and other Duke officials were fully aware that the lacrosse players had emphatically denied Mangum's allegations and had been fully cooperative with the police investigation.  As noted above, the co-captains had waived their constitutional right to counsel and had voluntarily assisted Durham police in the search of 610 North Buchanan, voluntarily provided full and truthful accounts of the events at the March 13 party, voluntarily submitted to an all-night police interrogation, voluntarily provided DNA samples, and volunteered for lie-detector tests.  The day before, Durham Police Corporal Addison had falsely told numerous news media, in widely quoted comments, that all forty-six white lacrosse players had refused to cooperate with police.  Most notably, this allegation had been featured that morning in the *News & Observer*'s article, "DANCER GIVES DETAILS OF ORDEAL," which quoted Corporal Addison and stated that "authorities vowed to

crack the team's wall of solidarity." In this context, Brodhead's statement could only be taken as reinforcing this false and defamatory allegation of the players' concerted non-cooperation. Brodhead and Duke knew or should have known this insinuation to be false.

249. The same day, Burness sent an email to Duke's Board of Trustees about the allegations, revealing the administration's participation in the rush to judgment. He stated that the situation was "complicated by the behavior of the lacrosse team over many years which for those predisposed to be angry with them, *presumes their guilt*." (Emphasis added.)

### G. Duke Faculty Encourage Campus Protests Against Lacrosse Players

250. As the Duke administration was thus rebuffing the parents' requests for support for their sons, a large number of Duke faculty members, other Duke employees, and students immediately rushed to condemn the lacrosse team. Over the weekend of March 25-26, they began a prolonged public campaign of harassment and organized protests falsely condemning the lacrosse players both for committing a heinous crime and for attempting to cover it up. They also called upon the Duke administration immediately to condemn the lacrosse team, to cancel the lacrosse season, and to impose disciplinary sanctions on the team, its coach, and its members.

251. On the evening of March 24, Duke English professor Faulkner Fox sent an email to numerous persons associated with Duke, calling for a protest at the lacrosse game. Other Duke professors attended the protest as well. Fox later told the media: "The students need to realize they live in a community, and people are going to talk back if

83

they do something, or potentially do something, that is disrespectful to women."
Protestors holding "DON'T BE A FAN OF RAPISTS" signs arrived at the lacrosse field
prior to the scheduled Georgetown game. The game, as noted above, was canceled by
Brodhead shortly before it was scheduled to begin.

252. Professor Fox, in addition to calling for the "DON'T BE A FAN OF
RAPISTS" protest at the Georgetown game, also helped organize a "candlelight vigil" at
610 North Buchanan on the night of March 25. On the night of Saturday, March 25, over
250 people—including Duke faculty members, staff, and students—gathered outside the
house at 610 North Buchanan.

253. Gathered in front of the house, the crowd chanted "shame," and "you can't
run, you can't hide," and other hostile slogans. Members of the crowd told local media
that every attendee of the March 13 party should be expelled from the university.

254. The same night, the protestors moved from 610 North Buchanan to a
nearby duplex located at 1105 and 1103 Urban Avenue. This house, owned by Duke
University, was occupied by lacrosse team members William Wolcott, K.J. Sauer, and
Erik Henkelman. The protestors surrounded the front of the house and banged on the
windows, screaming "Shame!" Wolcott called Larry Moneta, Duke's Vice President for
Student Affairs, and asked for help. Moneta said there was nothing he could do.

255. At approximately 6:10 a.m. the next morning, Sunday, March 26, Duke
personnel and students, gathered outside the lacrosse team's residences and engaged in a
so-called "pot-banging" protest. They banged on pots and pans, trash bins, water jugs,

and empty beer cans. The crowd wielded signs reading "CASTRATE!!", "You can't rape and run," and "It's Sunday morning, time to confess." Other signs stated: "Real men don't protect rapists," "Don't rape and run," "Give Them Equal Measure" and "Get a Conscience, Not a Lawyer." Sam Hummel, Duke University's Environmental Sustainability Coordinator, shouted into a megaphone: "The community consequences for this action, I guarantee, will range far beyond the legal consequences you will face." The crowd chanted: "Who's protecting rapists? They're protecting rapists! So who are the rapists? They must be the rapists!" The protest lasted at least two and a half hours.

256. Upon information and belief, Hummel played an instrumental role in the protests, helping to organize them by, among other things: sending one or more emails calling for a protest, creating and distributing a slanted and harassing "fact sheet," attending the protest and directing multiple signs (including "Get a Conscience, Not a Lawyer") at the lacrosse house and at television cameras, shouting into a megaphone during the protest, and setting up a speaker system for the protest. Hummel also posted harassing and inflammatory messages on the "Durham Responds" Yahoo Group. In one message, Hummel implored readers to attend an event "geared toward educating the larger Duke community about the sexual assault that occurred two weeks ago in a house just off East Campus that is rented by Duke students." In another message, Hummel referenced a protest in which he had recently participated, and then discussed "planning an on-going response to the March 13th sexual assault that addresses root cause issues such as racism, sexism, misogyny, alcohol culture, paternalism, economic exploitation,

85

athlete impunity, and Duke's (lack of) accountability to the community." On information and belief, Hummel was also involved in creating and/or distributing the WANTED posters, described below.

257. In addition to Hummel, the participation of Duke faculty members in both organizing and attending the protests was extensive. As noted above, on information and belief, professor Faulkner Fox was one of the organizers of the "DON'T BE A FAN OF RAPISTS" and "CASTRATE!!" protests. Likewise, Duke professor Tim Tyson publicly admitted in a National Public Radio interview to participating in the protests, as well as the "candlelight vigil." Duke professor Kim Curtis also participated in protests targeting the lacrosse players.

258. On March 26, Brodhead had a telephone conversation with Durham Mayor Bill Bell. The next day, Bell complained publicly about the team's silence and urged Duke to cancel the whole season to "send a strong message to the community."

259. In the face of these menacing protests, the players reasonably feared for their physical safety. Players Evans, Zash, Flannery, Wolcott, Sauer, and Henkelman were driven from their homes. On or around March 28, Player Bo Carrington was accosted and surrounded on campus by a jostling crowd of students who shouted "Tell the police what you know! Why are you protecting these rapists?" On Sunday, March 26, when pressed by defense counsel to provide more security or at least excused absences from class for the players, Moneta refused, stating "well, frankly, I don't believe them."

**H.    Duke's Campus Atmosphere Becomes Hostile And Perilous For Players**

260.    By Monday, March 27, Duke's campus bristled with prejudice and hostility against the lacrosse players.  This animus was fed by the perception, created and reinforced by Durham Police Corporal Addison, President Brodhead, and other Duke and Durham officials, that the entire team was concealing evidence of the rape in a conspiratorial "wall of silence."

261.    Also on March 27, columnist Ruth Sheehan of the *News & Observer* wrote a column about the lacrosse team, powerfully indicting them for their "blue wall of silence."  Entitled, "Team's Silence Is Sickening," the column stated, "Members of the lacrosse team: You know.  We know you know.…  And one of you needs to come forward and tell the police."  (Later, after compelling evidence of innocence finally emerged, Sheehan provided a partial explanation for her and other journalists' rush to judgment:  "No one was telling us that players had been cooperative.  I now know that was not true.  If I'd known that then, I would've never written what I did."  She stated that Duke's press spokesman John Burness "could have helped us, that's for sure.")

262.    The "wall of silence" myth was wholly false -- as previously detailed, the lacrosse co-captains had been fully cooperative with Duke and the Durham police, voluntarily assisting in the police search of 610 North Buchanan, providing full and truthful statements concerning the relevant events, providing DNA samples, offering to take polygraph tests, and otherwise attempting to prove their innocence.  Duke knew all

87

these facts, yet Duke said nothing to dispel or rebut the "wall of silence" myth, but rather only reinforced it.

263.    In this poisonous atmosphere, activist Duke professors participated in the organization of a massive public protest on the campus quad against the lacrosse players, with Duke's permission and approval, on March 27.  This so-called "open mike" protest was attended by at least 200 persons, including Duke faculty members.  A contemporaneous account in *The Chronicle*, Duke's student newspaper, described this protest as follows (emphases added):

> Racial tensions ran high across campus on the first day of classes after a weekend of national attention directed at the incident.
>
> More than 200 students, faculty and community members gathered for a "speak-out" in front of the Allen Building Monday morning. Participants stepped to the microphone to express outrage about the issues of gender, race and class surrounding the incident. *The event marked the fourth demonstration in 48 hours.*
>
> "*This is a matter of white privilege*," senior Tiana Mack said. "When I read what was going on, it made me think about Jim Crow.... *If these three culprits get away with it, it will prove to me that Duke does not honor the black woman's body*." ....
>
> Senior Jay McKenna alluded to the widespread belief that the lacrosse players are not fully cooperating with the investigation.
>
> "The fact that this wall of silence has been constructed only adds to the mystery, which adds to the speculation," he said ....
>
> Near the end of the speak-out, several participants called for an administrator to address the crowd. "Is no one going to come out here and say something?" junior Malik Burnett asked, gesturing toward the Allen Building, where many administrators work. "We've been here for an hour.  I know you hear us."
>
> Several administrators, including Vice President for Student Affairs Larry Moneta

and Assistant Vice President for Student Affairs and Dean of Students Sue Wasiolek, observed at least part of the demonstration.

264.    Duke professor Tim Tyson, who participated in the quad protest, stated that day on National Public Radio:  "I'm not content with Duke's response partly because one of the really terrible things about this is that these young men are banding together and refusing to cooperate with the police investigation.  I think that may be illegal.  It's certainly a violation of the spirit of the honor code of the university.  It's a terrible moral miscalculation that I think you have to be utterly blind to pursue."  Tyson also stated:  "I think the spirit of the lynch mob lived in that house on Buchanan Street, frankly, and I think that we prefer to think of white supremacists as ignorant, pot-bellied, tobacco-chewing sheriffs and Ku Klux Klan members from Mississippi, but here we have the sons of power and privilege, the wealthy and well-educated among us, who are acting out this history."  As Duke knew, all of Tyson's hate-filled comments about the lacrosse players were false.

265.    Further protests against the lacrosse team were held on campus on Tuesday, Wednesday, and Thursday of that week (March 28-30).  The largest of these occurred on Wednesday, March 29.

266.    In the midst of this campus atmosphere of hostility to and condemnation of the lacrosse players, on March 27 Brodhead refused the first of many requests for a meeting with the lacrosse players' counsel, who had already amassed powerful evidence corroborating their claims of innocence using date-stamped photos and electronic records from the night of March 13-14.

89

**VI.    District Attorney Nifong Pursues Investigation Despite Overwhelming Exculpatory Evidence**

267.    On Monday morning, March 27, Nifong met with Gottlieb and Himan to receive a briefing on the investigation to date.

268.    On information and belief, at this March 27 briefing, Gottlieb and Himan detailed the overwhelming exculpatory evidence that they had discovered so far.  They told Nifong the numerous material contradictions in Mangum's allegations, and recounted that Roberts had denounced Mangum's claim as "a crock," that Mangum had failed to identify any attackers in photo line-ups, that the three co-captains had voluntarily cooperated with the police and had vehemently denied that any attack occurred, and that Mangum was not credible.

269.    On information and belief, the Durham Supervisors were informed of this exculpatory information as well.

270.    Nifong angrily reacted to this mass of exculpatory evidence by stating, "You know, we're f*cked!"  Nevertheless, the Durham Investigators continued to pursue a prolonged, highly public, and malicious investigation against the lacrosse players.

**VII.    Nifong Launches False And Unethical Media Campaign Against Players, And Duke Withholds The Truth**

271.    On March 27, District Attorney Nifong launched his notorious and, as the North Carolina Bar authorities later confirmed, unethical media campaign against the lacrosse team.  Announcing publicly that he had taken personal control over the investigation, he threatened that he was prepared to indict *every member* of the team who

90

attended the party as accessories to rape: "You tell all your clients I will remember their lack of cooperation at sentencing. I hope you know if they didn't do it, they are all aiders and abettors, and that carries the same punishment as rape." Nifong would make the same threat publicly that day on ABC-11 news, which reported that "Nifong may also consider charging other players for not coming forward with information," and quoted Nifong as saying, "My guess is that some of this stone wall of silence that we have seen may tend to crumble once charges start to come out." He repeated the threat in similar terms on March 28 to NBC-17 news.

272.    This threat of indictment overshadowed the lacrosse players and their families until January 12, 2007, when Nifong, facing pending ethics charges based on his prosecutorial misconduct, was forced to withdraw from the case and to request the North Carolina Attorney General to take responsibility for the prosecution.

273.    Having placed all the players under the public cloud of possible indictment, Nifong then built his political campaign for election as Durham District Attorney on inflammatory and unethical public comments on the case in over 70 media interviews during the week of March 27-31 alone. Nifong's national media offensive centered repeatedly on three main themes. For each of these themes, Duke knew or should have known that Nifong's statements were based entirely on false information.

### A.    Nifong Repeatedly Emphasizes that Duke Hospital's Forensic Exam Supported Mangum's Rape Charge, And Duke Says Nothing

274.    Most importantly, Nifong and his investigators emphasized the medical and physical evidence from Duke Hospital's forensic examination of Mangum as establishing

91

that a rape had occurred. Nifong repeatedly based his public condemnations of the

lacrosse players on the March 14 exam at the Duke Hospital. In fact, among the most

persistent themes in the media coverage of the crisis were the repeated public invocations

by Nifong and the other Durham Investigators of the medical and physical evidence

provided by Duke Hospital, its SANE nurse, and the forensic medical exam. For

example:

- The application for a non-testimonial order filed Thursday, March 23, stated that "medical records and interviews … revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally."

- On March 24, Corporal David Addison of the Durham police told the *Durham Herald-Sun* that there was "really, really strong physical evidence of rape."

- On March 27, Durham police officer Himan filed an affidavit in court stating that Mangum's medical records from Duke Hospital and interviews with "the SANE nurse" "revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally."

- On March 29, Nifong stated on MSNBC's *Abrams Report*: "I am convinced that there was a rape. Yes, sir.… *There is evidence of trauma in the victim's vaginal area that was noted when she was examined by a nurse at the hospital*." (Emphasis added.)

- On March 30, Nifong told *The Chronicle*, Duke's student newspaper, that "the statements that [the team] makes [claiming innocence] are *inconsistent with the physical evidence in this case*." (Emphasis added.)

- At an April 11 public forum, after the negative results of the DNA tests became public, Nifong stated: "Duke University Hospital is the best trauma center in the area. This nurse was specially trained in sexual assault and I would just point out that my conviction that a sexual assault actually took place is based on the examination that was done at Duke Hospital." (This statement was repeated and reported on MSNBC and other cable news channels.)

- On April 11, Duke's own newspaper, *The Chronicle*, reported on April 11 that "[s]everal" Duke students said that they did not view negative DNA results as exculpatory because of "the strong assertions of guilt made by District Attorney Mike Nifong and the alleged victim's medical results."

- At a candidate forum on April 12, Nifong stated: "The only thing I've really said about this case publicly is that, based on the medical evidence, I believed that the woman was raped." (This statement was nationally broadcast on cable news networks.)

- On April 17, the day that Nifong procured indictments of two innocent players from the grand jury, the Associated Press reported: "Nifong has repeatedly cited a medical exam of the alleged victim as the reason why he believes a rape occurred."

- On April 18, officers Gottlieb and Himan filed an affidavit in court stating that Mangum's medical records from Duke Hospital and interviews with "the SANE nurse" "revealed the victim had signs, symptoms, and injuries consistent with being raped and sexually assaulted vaginally and anally."

- On April 21, Nifong stated to the *Raleigh News & Observer*: "I did not accuse anybody of any crime. The only detail I revealed was that based on the medical exam, the woman was the victim of a sexual assault."

- On April 27, another news outlet reported that Nifong had stated "that a rape examination of the victim done at Duke Medical Center that morning revealed evidence of bruising 'consistent' with a brutal sexual assault, with the most likely place it happened at the lacrosse team party."

- As late as August 25, a *New York Times* article on the crisis emphasized nurse Levicy's statement to Durham police that she had found "blunt force trauma … consistent with the sexual assault that was alleged by the victim," thus reflecting the continuing decisive impact that Levicy's false statements had in the media and upon public opinion, and the aura of credibility that she and Duke Hospital lent to Nifong's rogue investigation.

275.    Duke was in exclusive possession of information demonstrating that

Nifong's statements were false.  In fact, Nifong was simply parroting the false

information that Duke's SANE nurse, Tara Levicy, had told Gottlieb on March 16 and

21. Not only was there "no medical evidence" consistent with Mangum's rape charges, as North Carolina Attorney General Cooper later confirmed after a thorough review of the medical records, but Nifong also made additional specific claims that were contrary to the evidence in Duke's exclusive possession. For example, Nifong repeated Mangum's claims that she had been raped anally. Again, the medical evidence in Duke's possession decisively refuted this claim. As noted above, even Levicy had stated in her March 14 report that there was no evidence of any anal injury (though Levicy later modified her story when speaking to Gottlieb on March 21). Nifong also claimed that the alleged victim had been strangled or choked during the alleged assault. Mangum had not made this allegation in any of the multiple, conflicting versions of her story at Duke Hospital, including her story to Tara Levicy, nor did Levicy's report of Duke's medical examination of Mangum reflect any physical evidence of choking.

### B. Nifong Falsely Implies That Mangum's Rape Allegations Were Consistent And Credible, And Duke Suppresses Officer Day's Contrary Police Report

276. Second, Nifong repeatedly implied that the alleged victim's allegations were consistent and credible. The Durham Investigators and the Durham Supervisors knew this to be false. Duke, likewise, was in exclusive possession of the March 14 police report of Officer Day and the reports of Duke's medical examination of Mangum, both of which provided powerful contemporaneous evidence that Mangum's multiple, conflicting rape allegations were patently incredible.

94

277.    Top-level Duke officials were aware of Officer Day's report and of its exculpatory significance.  From March 14 through March 23, Duke Police Director Robert Dean had advised Duke officials such as Wasiolek and Burness, on the basis of the Day report, that Mangum's inconsistent, ever-changing allegations were not credible and would come to nothing.  Once the case exploded into public view on March 24, however, Duke still did not produce Officer Day's report to the lacrosse players or the public.  On the contrary, on information and belief, Duke actively took steps to suppress this report, to silence Officer Day, and later (when the existence of Day's report became public) to discredit the report.

## C.    Nifong Falsely Accuses Team Of "Wall of Silence," And Duke Falsely Concurs

278.    Third, as detailed above, Nifong's media campaign repeated the accusation that the team members had formed a "wall of silence" and were not cooperating with the police investigation.  For example, on March 27, Nifong accused the team of constructing a "stone wall of silence."  On March 28, Nifong publicly accused the lacrosse team of "covering up for a bunch of hooligans," and stated separately that "I'm disappointed that no one has been man enough to come forward."  On March 29, Nifong stated to CNN: "It just seems like a shame that they are not willing to violate this seeming sacred sense of loyalty to team for loyalty to community."

279.    Duke knew full well that Nifong's charge of noncooperation was untrue. Duke did not contradict it; on the contrary, Duke officials had already, and would continue, to reinforce it.  For example, on March 27, Duke Provost Peter Lange stated to

95

news media:  "The students would be well advised to come forward.  They have chosen not to."

280.    In addition, Nifong repeatedly made statements that were calculated to inflame the racial and class-based passions that had been excited in the Durham community by Mangum's explosive allegations.  For example, on March 27, Nifong told ABC News that "where you have an act of rape—essentially a gang rape—is bad enough in and of itself, but when it's made with racial epithets against the victim, I mean, it's just absolutely unconscionable.…  The contempt that was shown to the victim, based on her race, was totally abhorrent."  On March 28, Nifong told the *New York Times* that "the thing that most of us found so abhorrent … was the combination of gang-like rape activity accompanied by racial slurs and general racial hostility."  On March 29, Nifong told the media that "the circumstances of the rape indicated a deep racial motivation for some of the things that were done.…  It makes a crime that is, by nature, one of the most offensive and invasive even more so."  On March 30, Nifong was quoted in *USA Today* as promising to pursue the case despite "the feeling that Duke students' daddies could buy them expensive lawyers and that they knew the right people."  And at a public forum on April 12, Nifong stated:  "I'm not going to allow Durham's view in the minds of the world to be a bunch of lacrosse players at Duke raping a black girl in Durham."

281.    President Brodhead, and many Duke faculty members, directly reinforced these racially inflammatory comments.  For example, Brodhead publicly stated, among

96

other things, that the allegations against the players had "reviv[ed] memories of the systematic racial oppression we had hoped to have left behind us."

## VIII. Duke's Hostility To The Lacrosse Team Intensifies

### A. Duke Campus Is Flooded With WANTED Posters

282.    The atmosphere of hostility and harassment on the Duke campus continued the next day, Tuesday, March 28, as inflammatory posters were distributed across Duke's campus and in adjacent Durham neighborhoods. On information and belief, an organization called "CrimeStoppers," which includes such Duke officials as Dean of Students Sue Wasiolek and Duke Police Director Robert Dean on its board of directors, was involved in preparing and/or distributing these posters. These posters stated:

> On Monday, March 13, 2006 about 11:00pm, the Duke University Lacrosse Team solicited a local escort service for entertainment. The victim was paid to dance at the residence located at 610 Buchanan. The Duke Lacrosse Team was hosting a party at the residence. *The victim was sodomized, raped, assaulted and robbed. This horrific crime sent shock waves throughout our community.*
> . . .
> Durham CrimeStoppers will pay *cash* for any information which leads to an arrest in this case.

283.    The next day, Duke's campus was flooded with an even more chilling poster featuring the pictures of almost all the lacrosse players (the "Vigilante Poster"). On information and belief, Duke faculty, employees, and students, including Duke Environmental Sustainability Coordinator Sam Hummel, were among those responsible for the production and/or distribution of the Vigilante Poster that blanketed the Duke campus on March 29. Entitled "PLEASE COME FORWARD," the Vigilante Poster

displayed pictures of the faces of 43 of the 46 white lacrosse players. The bottom of the poster clarified that three of the players' pictures were missing because their pictures had been removed from the Duke website before they could be downloaded. The poster quoted Durham Police spokesman Addison: "We're not saying that all 46 were involved. But we do know that some of the players inside that house on that evening knew what transpired and we need them to come forward."

284. On Sunday, April 2, 2006, the *Raleigh News & Observer* published the Vigilante Poster, complete with pictures of 43 lacrosse players, in photo format. The weekend of Friday, March 31 through Sunday, April 2 was a time of maximum racial tension and hostility to the lacrosse players, during which they were subject to drive-by shooting and death threats. The widespread publication and distribution of the players' pictures in the Vigilante Poster, on campus and in a prominent local newspaper, threatened their physical well-being and safety. On information and belief, Duke took no steps to suppress or discredit the Vigilante Poster.

285. Both posters violated the Duke University anti-harassment policy, as set forth in greater detail below. Due to their inflammatory language imputing guilt and their blanket distribution on the Duke campus, the posters incited community and campus resentment and hostility against the lacrosse players that substantially caused and contributed to a vicious campaign of harassment against the players. One Duke professor wrote on May 1, 2006: "I reacted with extreme disgust when I became aware that somebody had taken it upon himself or herself to distribute pictures of all the lacrosse

98

players -- that changed the game, and it gave terrible way to the potential injustice that was being done."

**B.    Brodhead Provides False Assurances To The Players**

286.    Also on Tuesday, March 28, the four lacrosse co-captains, Evans, Zash, Flannery, and Thompson, obtained a meeting with Brodhead in his office. Duke's deputy general counsel, Kate Hendricks, and other Duke officials attended the meeting. Brodhead assured the co-captains of confidentiality, with such words as: "Everything you say here will stay within these walls." Within less than a week of this promise, Duke officials offered to disclose to the Durham Investigators all communications between Brodhead or other administrators and the lacrosse players.

287.    The co-captains again emphatically proclaimed their innocence and unequivocally denied that a rape or other crime had occurred at the party. Brodhead assured them that he believed them. He asked them to consider how much difficulty they had caused *him*, and how he had been placed in a terrible situation. He also urged them to issue a public apology. Duke's in-house counsel advised the co-captains that this might help Brodhead resist cancelling the lacrosse season.

288.    Convinced that Brodhead believed them and could be trusted, the co-captains issued a public apology and denial of the rape charges the same day, March 28. The statement "expressed sincere regret over the lapse in judgment in having the party on March 13 which has caused so much anguish for the Duke community and shame to our

99

families and ourselves." It also "stated unequivocally that any allegation that a sexual assault or rape occurred is totally and transparently false."

### C. Brodhead Suspends The Lacrosse Season

289. That same day, Brodhead held a press conference at which he issued his second public statement in the rape hoax crisis. At this conference, he announced, contrary to Duke's assurances to the team and their parents just three days before, that he was suspending the men's lacrosse season indefinitely -- "until the legal situation is clarified." This decision contradicted Duke's assurances to the team and their parents just three days before, and also departed from subsequent assurances to the co-captains that the team could resume competitive play when the DNA test results came back. He also reiterated, "Physical coercion and sexual assault are unacceptable in any setting and will not be tolerated at Duke. As none of us would choose to be the object of such conduct, so none of us has the right to subject another person to such behavior." The purpose of Brodhead's indefinite suspension of the season and accompanying statements was to distance Duke and its administrators from the lacrosse players, and to appease the angry mob of faculty, student, and community activists calling for immediate and severe sanctions against the team. The effect of Brodhead's statements was to impute guilt to the lacrosse players, and to further inflame public opinion against them.

290. In addition, Brodhead's March 28 statement falsely asserted that Duke had no police investigatory authority over 610 North Buchanan, and that Duke was compelled to be a passive bystander to the Nifong investigation. He stated: "Unavoidably, we have

to look to the Durham Police to take the lead in the investigation. Duke doesn't have the power to compel testimony from citizens of this city, and Duke lacks access to warrants, DNA records, and other confidential information." Likewise, on April 5, Brodhead stated: "Duke must defer its own investigation until the police inquiry is completed … because the police have access to key witnesses, warrants, and information that we lack …."

291. Contrary to Brodhead's statements, Duke Police had full municipal police investigatory powers and had jurisdictional authority to investigate reported crimes (including sexual assault) on Duke-owned property, such as 610 North Buchanan, pursuant to state law and a jurisdictional agreement with the Durham police.

### D.   Brodhead Credits Exotic Dancer's Claims In 911 Tape

292. Also on March 28, the media obtained the tape of Kim Roberts' 911 call placed as she and Mangum were leaving 610 North Buchanan at 12:53 a.m. on March 14. On information and belief, the tape of this 911 call was deliberately leaked to the media by the Durham police in order to inflame race-related community passions against the lacrosse players and to retaliate against them for the exercise of constitutional rights. In leaking the tape, on information and belief, the Durham police suppressed the fact that they knew that Kim Roberts, Mangum's companion dancer, was the caller, and characterized it as an apparently unrelated, racially charged event. A public information officer for Durham police, on information and belief, deliberately misled news media

about the identity of the caller in the 911 tape.  On March 31, moreover, Nifong also falsely denied any knowledge of the identity of the 911 caller, on national television.

293.    In this 911 call, as noted above, Roberts had alleged that she and her "black girlfriend" had been subjected to racial harassment outside of 610 North Buchanan. Brodhead was asked about this call at the March 28 press conference, but stated that he had not heard it.

294.    The story told by Roberts in the 911 call was internally inconsistent and filled with lies.  (Roberts later admitted that her 911 call was false.)  But the 911 call was far more significant for what it did not contain:  Roberts made no allegation that her "black girlfriend" had just been savagely gang raped by three men.

295.    On information and belief, both the Durham Supervisors and high-level Duke officials were aware that Roberts was the caller in the 911 tape.  Durham police had informed Duke police of this fact as early as 3:00 a.m. on March 14.

296.    The next day, Brodhead issued a follow-up statement regarding Roberts' 911 call.  Despite the plain inconsistencies in the 911 tape, Brodhead stated on March 29: "At the news conference I was asked about the 911 tape involving a racial slur, which only became known late yesterday.  I have now had the opportunity to listen to the tape. It is disgusting.  Racism and its hateful language have no place in this community.  I am sorry the woman and her friend were subjected to such abuse."

297.    Brodhead thus seized upon and credited Roberts' claim in the 911 call that Mangum had been subjected to unprovoked racial slurs, but he did not mention the

glaring fact that Roberts had not complained to police that Mangum also had just been brutally gang raped. Nor did Brodhead mention Roberts' statements in the 911 call that she (and, by implication, Mangum) were not "hurt in any way" or "harm[ed] … in any way."

298. Brodhead's statements about the 911 tape sent a clear message that he and the Duke administration believed Mangum's account of what occurred on the night of March 13-14. Concomitantly, it publicly signaled that he and his administration did *not* believe the players' emphatic denial of Mangum's rape allegations. In addition, it directly accused the lacrosse players of being racists who committed unprovoked racial harassment. Brodhead's statement thus reinforced one of the key fictional themes of Nifong's media blitz, namely that the alleged rape was all the more heinous because it was a racially motivated hate crime. Other Duke faculty, as detailed below, would similarly reinforce this pernicious falsehood, which was designed to inflame community passions against the lacrosse players.

### E. Professor Baker Defames The Lacrosse Players As Racist, Violent, Privileged Rapists

299. In the meantime, Duke's activist faculty members and student protestors continued to create a campus atmosphere of hostility and harassment toward the lacrosse players. On Wednesday, March 29, the Vigilante Poster, described above, was distributed throughout the Duke campus.

300. Later that same day, Brodhead met with student protestors. He continued to refuse to meet with the lacrosse players' parents and/or defense counsel.

301.    Also on March 29, Professor Houston Baker wrote an open letter not only condemning the lacrosse players as violent rapists, but also denouncing them on the basis of their race, class, and gender.  On information and belief, Baker distributed this letter publicly, including to media outlets.  The letter, which condemned the Duke administration for not imposing sufficiently severe sanctions on the team, stated, in part (emphases added):

> There is no rush to judgment here about the crime—neither the violent racial epithets reported in a 911 call to Durham police, nor the harms to body and soul allegedly perpetrated by *white males* at 610 Buchanan Boulevard.  But there is a clear urgency about the erosion of any felt sense of confidence or safety for the rest of us who live and work at Duke University.  The lacrosse team—15 of whom have faced misdemeanor charges for drunken misbehavior in the past three years—may well feel they can claim innocence and sport their disgraced jerseys on campus, safe under the cover of *silent whiteness. But where is the black woman who their violence and raucous witness injured for life?  Will she ever sleep well again?*  And when will the others assaulted by racist epithets while passing 610 Buchanan ever forget that dark moment brought on them by a group of drunken Duke boys?  *Young, white, violent, drunken men among us*—implicitly boasted by our athletic directors and administrators—have injured lives.
>     . . .
> All of Duke athletics has now been drawn into the seamy domains of Colorado football and other college and *university blind-eying of male athletes, veritably given license to rape, maraud, deploy hate speech, and feel proud of themselves in the bargain.*
>     . . .
> It is very difficult to feel confidence in an administration that has not addressed in meaningful ways *the horrors that have occurred to actual bodies*, to the Durham community of which we are an integral part, and to our sense of being members of a proactive and caring community.  Rather, gag orders and trembling liberal rhetorical spins seem to be behaviors du jour from our leaders.

There can be no confidence in an administration that believes suspending a lacrosse season and removing pictures of Duke lacrosse players from a web page is a dutifully moral response to *abhorrent sexual assault, verbal racial violence, and drunken white male privilege loosed amongst us.*

How many mandates concerning safe, responsible campus citizenship must be transgressed by *white athletes' violent racism* before our university's offices of administration, athletics, security, and publicity courageously declare: enough!

How many more people of color must fall victim to *violent, white, male, athletic privilege . . .* ?

302.    These hate-filled statements not only falsely declared the lacrosse players guilty of a violent rape, they constituted harassment of the lacrosse players on the basis of race, class, and gender.  They violated Duke's anti-harassment policy.  They interfered significantly with the players' work and education, and adversely affected their living conditions.  Moreover, these words inflamed passions against the players and endangered their safety while inflicting on them grave and irreversible emotional torment and reputational harms.  On information and belief, Baker suffered no disciplinary action for his misconduct.

303.    Professor Baker similarly maligned the lacrosse players at a meeting of Duke's Academic Council on March 30 as well.  At a meeting of about 200 faculty members, Baker and other activist faculty members condemned the team and its members and called for their immediate and severe punishment.

## IX. DNA Evidence Dispositively Exonerates The Lacrosse Players But Is Ignored By Defendants

### A. The State Bureau Of Investigation's DNA Testing Results Are Negative

304.    By March 28, on information and belief, the State Bureau of Investigation ("SBI") concluded an initial examination of the rape-kit evidence from the forensic examination of Mangum at Duke Hospital, and the DNA samples from the lacrosse players.  On March 28 or March 29, the SBI gave an initial report to Nifong regarding its analysis of these materials.

305.    The SBI reported to Nifong that their examination of the rape kit items had not discovered any semen, blood, or saliva on any of the rape kit items.  The absence of semen, blood, or saliva was obviously highly exculpatory, given Mangum's stories at Duke Hospital, which had alleged a violent gang rape without condoms and with ejaculation into both her mouth and her vagina or anus.

306.    Either the same day or the next, Duke officials met with key members of Nifong's investigative team and the Durham city government, including Gottlieb, Himan, Durham City Manager Patrick Baker, and Durham Police Chief Steve Chalmers, among others.  Duke's administration was represented by Aaron Graves, Duke's Vice President for Campus Security, Duke Police Director Dean, and perhaps other Duke officials.  On information and belief, this was the first of several meetings held between Duke and Durham officials during the ensuing investigation.  On information and belief, at this meeting, Nifong, Gottlieb, and Himan reported to Duke and Durham officials that Mangum's accounts of the attack were patently inconsistent, that the SBI lab results had

106

come back negative, and that Mangum had failed to identify any alleged attackers in two separate photo arrays.

307.    John Burness, Duke's chief spokesman, later said that the meeting "was just about the ways the university could assist in the investigation." Gottlieb said in his deposition that Duke Police came to "several" meetings of this same group.

308.    On information and belief, the purpose of this meeting was to coordinate approaches to bolstering the prosecution's case, which was rapidly disintegrating in the face of Mangum's inability to identify any of her purported attackers in the March 16 and March 21 photo arrays and the SBI's report that initial analysis of the rape kit evidence showed no blood, semen, or saliva. On information and belief, during this meeting, the Durham Investigators, the Durham Supervisors, and/or other Durham city officials agreed to expedite the identifications and arrests of Duke lacrosse players, notwithstanding evidence demonstrating the lacrosse players' innocence. On information and belief, Duke Police were present and agreed to cooperate in this expedited effort to make identifications and arrests notwithstanding the evidence.

309.    Also on March 28, Himan conducted a secret interview with Mangum. This interview was not included in Himan's and Gottlieb's police notes that were eventually disclosed to defense attorneys, and was not disclosed during any of the disciplinary proceedings against Nifong. The interview did not come to light until it was reported by the *Durham Herald-Sun* on October 3, 2007.

310.    In the morning of March 30, Nifong again reiterated on CBS's Early Show that his conviction that a sexual assault had occurred was based on the medical and physical evidence reported by Duke Hospital:  "The victim was examined at Duke University Hospital by a nurse who was specially trained in sexual assault cases.  And the investigation at that time is certainly consistent with sexual assault having taken place." Duke knew or should have known that this was false, but never contradicted him or otherwise disclosed that the medical and physical evidence did not support Mangum's rape allegations.  On the contrary, two days later, Theresa Arico, Levicy's supervisor and the director of Duke Hospital's SANE program, would publicly confirm Nifong's statements and their reliance on Duke Hospital's forensic examination of Mangum.

311.    Also, on or around March 30, Nifong received a second exculpatory report from the SBI lab.  The SBI concluded that no DNA from any of the players was found on Mangum's rape kit items or clothing.  The SBI tests detected DNA from one resident of 610 N. Buchanan on a towel found in the house, and DNA from another resident was found on the floor of one of the bathrooms in the house.  On information and belief, the DNA finding from the towel was communicated to Levicy, who (as recounted below) later doctored her SANE exam report to include an allegation that the alleged rapists "wiped [Mangum] off with a rag."

312.    Nifong did not disclose this information to defense counsel until April 10. Together, these SBI reports constituted a decisive confirmation of the absolute innocence of every member of the lacrosse team, as the March 23 NTO application had foretold.

On information and belief, the Durham Investigators, the Durham Supervisors, the Durham Police, and high-level Duke officials were all aware that the SBI lab results had come back negative for the entire team.

## B. Nifong Suggests That Rapists May Have Used Condoms, And Duke Says Nothing

313.    Instead of terminating his investigation after the SBI's reports, Nifong immediately began to tailor his public comments to suggest that condoms might have been used in the alleged rape, to prepare the way for later public disclosure of the exculpatory DNA evidence.  For example, on March 31, Nifong stated to MSNBC that "if a condom were used, then we might expect that there would not be any DNA evidence recovered from, say, a vaginal swab."  Like Nifong and the Durham Supervisors, Duke was aware that this suggestion was false and directly contradicted Mangum's own repeated statements to Duke Hospital that condoms were not used by her fictitious "attackers."  Yet Duke stood by silent and did not correct Nifong.  On the contrary, as detailed below, Levicy subsequently altered her own account of Mangum's examination to allow for the possibility of condom usage.

## X. Players Fear For Their Safety As Campus Hostility Spawns Threats Of Violence

### A.    Duke's Faculty Members Attack Team

314.    On March 30, an extraordinary executive session of Duke's Academic Council was convened, with the full support and participation of President Brodhead. The Academic Council is one of the chief instruments of faculty governance at Duke

University.  It consists of 85-90 elected faculty members who provide for official representation of considered faculty opinion to the Duke administration.  Brodhead and Trask attended the meeting, which was open to all interested faculty.  At the meeting, many faculty members, including Houston Baker, Peter Wood, and Wahneema Lubiano, launched vitriolic attacks on the lacrosse team urging the administration to cancel the lacrosse season and disband the team for three years.  A chemistry professor, Steve Baldwin, later recalled:  "I have never heard presumably intelligent, careful, balanced people being so completely over the top. . . .  It was the most disgusting display I've ever seen in my life."

315.    Activist Duke professors continued to fuel the campus atmosphere of hostility and harassment by making racially inflammatory attacks on the lacrosse team. For example, Professor William Chafe, a professor of History and former Dean of Duke's Arts and Sciences faculty from 1995 to 2004, published an article on March 31 in *The Chronicle* entitled "Sex and Race" that made a reckless and inflammatory comparison to the 1955 lynching of Emmitt Till:  "So sex and race have always interacted in a vicious chemistry of power, privilege, and control.  Emmett Till was brutalized and lynched in Mississippi in 1954 [sic] for allegedly speaking with too easy familiarity to a white woman storekeeper. . . .  What has all this to do with America today, and with Duke? Among other things, it helps put into context what occurred in Durham two weeks ago [at the lacrosse party]."

316.    The campus atmosphere of intense hostility and racial animosity against the lacrosse players boiled over into racial violence and threats of racial violence.  On Friday, March 31, several incidents threatening racially motivated violence against the lacrosse players occurred.

### B.    Duke Players Are Threatened With Racial Violence

317.    At 3:00 a.m. at a restaurant in Durham, two white Duke students were blocked in by another car at the drive-thru window.  A young black man approached the car and told the Duke students they weren't welcome there, because "they're going to rape our women."  The Duke student driving the car was struck in the head and was knocked unconscious.

318.    On March 31, *The Chronicle*, Duke's student newspaper, warned residents of the houses around 610 N. Buchanan of the danger of racially motivated gang violence targeted at Duke students.  Cars drove by on Buchanan Street with their passengers yelling epithets and making obscene gestures at students.

319.    The Duke administration was fully aware of the risk of racially motivated on-campus violence.  On March 31, Duke Vice President for Student Affairs Larry Moneta issued a warning about threats of drive-by shootings against lacrosse players and/or other Duke students in the 610 N. Buchanan neighborhood.

320.    At or around the same time, moreover, an anonymous threatening blogsite was launched in support of Mangum at http://justiceforher.blogspot.com.  The blogger went by the ominous pseudonym "Justice From The Deep South."  The site featured a

logo of two AK-47 assault rifles.  The site went on to list the names, home addresses, and

phone numbers of the parents and families of lacrosse players, and called for readers to

"Let the parents know how you feel."  It also stated:  "I am very angry right now, so

please excuse me if I make comments about castrating these assholes."

321.    Because of the threat of violence, one lacrosse family living in Durham

moved out of its house for fear of attacks.  Many of the players moved out of their

residences.  Others remained secluded in their rooms whenever possible.

## XI.    Duke Improperly Assists Nifong's Patently Corrupt Investigation

### A.    Duke Suppresses Officer Day's Exculpatory Police Report

322.    On March 31, Duke took two actions directed toward bolstering the

credibility of Mangum's rape allegations.  First, Officer Day of the Duke Police added a

"continuation page" as an addendum to his police report prepared at Duke Hospital on

March 14, in which he had noted the manifest inconsistencies in Mangum's allegations.

Day's "continuation page" purported to cast doubt on the reliability of his own

contemporaneous report, which Duke had not yet disclosed to the lacrosse players or the

public, by indicating that it was based on hearsay and imperfectly overheard

conversations.  Upon information and belief, Day was coerced to write this continuation

page by Duke administration officials, who had previously prevented his exculpatory

version of events from becoming public.

323.    On information and belief, in addition to suppressing the Day report, Duke

police officials, at Nifong's request, also directed Duke police officers who had been

present at Duke Hospital on March 14 to write deliberately misleading accounts of what they witnessed that night. The Duke police officers were directed to prepare statements that suppressed exculpatory facts about Mangum's lack of credibility, selectively asserted facts suggesting the guilt of the players, and mischaracterized their own conduct that night by casting the Duke police as mere bystanders. In particular, on information and belief, one Duke officer who prepared such a statement later admitted that, based on his observation at the time, Mangum was "faking" the whole thing; and another Duke officer was directed to suppress the fact that she had overheard a Durham Police officer, upon emerging from Mangum's hospital room, say loudly, "I think she is lying!"

### B.    Duke Illegally Gives Nifong Key Card Reports On Lacrosse Players

324.    Second, at some time on March 31, Investigators Smith and Stotsenberg of the Duke Police handed over to Gottlieb several reports. Among the reports, according to Gottlieb's later testimony, was "*one key card report for the Duke team members from March 13 and March 14*." (Emphasis added.) This report was prepared by the Duke Card Office of Duke University.

325.    The key card reports provided information on when and where the members of the lacrosse team had swiped their Duke ID cards in slots on locations at Duke's campus during March 13 and March 14. Many of the doors, dining facilities, vending machines, photocopy machines, and so forth on Duke's campus are operated by these key card slots. For example, to access virtually any exterior door of Duke's dormitories and academic buildings requires the swiping of a Duke key card. The key

card reports thus allowed the Durham Investigators to roughly track the movements of lacrosse players on Duke's campus on March 13 and 14. These reports therefore aided the Durham Investigators in their effort to determine which lacrosse players had been in Durham on the night of the alleged rape and had likely attended the party.

326. Armed with this information, on April 4 the Durham Investigators presented the third photo identification array to Mangum, which again consisted only of white lacrosse players. The decision to conduct this April 4 photo array was made by Nifong on March 31, the same day the key card reports were obtained.

327. No subpoena had been issued for these reports. In the absence of a subpoena (and the opportunity for the interested parties to quash the subpoena), the disclosure of information in these reports -- most notably, but not necessarily limited to, the key card report -- was a clear violation of the Family Educational Records and Privacy Act (FERPA), as well as Duke's own privacy policies. *See, e.g.,* 20 U.S.C. § 1232g; 34 C.F.R. Part 99; Duke Faculty Handbook, Appendix R, *available at* http://www.provost.duke.edu/pdfs/fhb/FHB.pdf. As also detailed below, Duke would later engage in a fraudulent conspiracy to conceal the fact that it had violated its students' procedural rights under FERPA by giving the key card reports to Gottlieb.

328. On information and belief, this was not the first time that the Duke Card Office had released protected student information to Gottlieb in violation of FERPA.

329. Moreover, the key card information could not have legally been disclosed by Duke even pursuant to a subpoena. As described below, a judge later quashed

114

Nifong's subpoena for this information (which was actually already in his possession) on the ground that the prosecution could not show good cause for its disclosure.

330. Gottlieb later testified that this key card information, along with nurse Levicy's misinformation about the medical and physical evidence from Duke's forensic examination of Mangum, played a critical role in Nifong's investigation by confirming for Nifong and Gottlieb which lacrosse players had likely attended the party: "[W]e ha[d] the time cards, per se …. [E]ach student has a magnetic card that if they go in the parking lot or dorm room or buy food, whatever, they use that card it leaves an electronic stamp. And we have a document showing that he arrived back to the dorm at the time as the people who we knew were at the party. So we were able to put together information to at least corroborate, *one, he was there; two, he met the description; three, she was able to show them*; the SANE nurse's report was consistent with a sexual assault. So we have something to work with for an indictment." (Emphases added.)

### C. Duke Withholds Exculpatory Information That Directly Contradicts Nifong's Public Claims and Accusations

331. Also on March 31, Nifong, aware that the SBI reports had come back negative not only for blood, semen, or saliva, but also for any DNA evidence from any of the 46 white lacrosse players, speculated for the first time on MSNBC that condoms may have been used in the alleged attack. He stated: "If there is no DNA left, then there is obviously nothing to compare. For example, if a condom were used, then we might expect that there would not be any DNA evidence recovered from, say, a vaginal swab." But, as Duke knew or should have known, on March 14 Mangum had unequivocally

115

denied, at least three times, to Duke's medical personnel that condoms had been used in the alleged attack.

332.    In sum, by March 31, in addition to critical evidence of the player's innocence, Duke had abundant additional information revealing that the rape investigation of Nifong and Durham police authorities was not proceeding in good faith against its students.  This information included:

- Duke police officer Day's official report, known only to Duke, revealing that the investigating officers on the evening of March 13-14 uniformly viewed Mangum and her multiple, ever-changing, contradictory, and facially implausible rape allegations as not credible.

- Nifong publicly justified his prosecutorial actions on medical evidence of rape from Duke Hospital's forensic exam of Mangum.  The medical records, in Duke's exclusive possession, contained no medical or physical evidence supporting Mangum's rape allegations.

- Nifong claimed that condoms might have been used during the rape.  Duke knew that Mangum had unequivocally denied this three times to Duke's medical personnel.

- Nifong claimed that Mangum had been choked or strangled.  Duke knew that Mangum had made no such claim during her examinations at Duke Hospital and that there was no physical evidence to support such a claim.

- Duke was aware that the attack Mangum described at Duke Hospital -- a violent, vaginal, anal, and oral gang rape by three lacrosse players, without condoms and with ejaculation in both mouth and vagina or anus -- could not have occurred without leaving DNA traces of *any* of the three alleged attackers.  When Duke became aware of the negative DNA results, it knew or should have known that the lacrosse players were innocent and that Mangum's rape allegations were a tragic and malicious hoax.

Despite the grievous harm and suffering that Nifong's investigation and false public statements were causing to Duke's own students, Duke withheld the exculpatory

116

evidence and information in its exclusive possession, and watched silently as Nifong

characterized the evidence and otherwise commented on the case and the lacrosse players

in a way that Duke knew or should have known to be false. To the contrary, Duke

improperly provided Nifong's investigators with critical credibility and cooperation in a

number of ways: Duke illegally disclosed the key card reports; Duke took official actions

and made official and unofficial statements to the media that were calculated to malign

the lacrosse players and to distance Duke from them; Duke took no significant action to

ensure that its activist faculty members and student protestors, who were presuming the

players' guilt and inflaming public outrage against the lacrosse team, were adhering to

University standards of behavior, including its anti-harassment policy. And Duke would

continue, in the ensuing weeks, to fuel these attacks on its own students.

   **D. Duke Hospital Again Falsely Corroborates Mangum's Rape Charges**

  333. As noted above, in his statements to the press during the week from

Monday, March 27 through Friday, March 31, Nifong had repeatedly relied on the

alleged medical and physical evidence from Duke Hospital and its SANE nurse, Levicy,

as the basis for his claim that a rape had occurred. Duke took no steps to correct this

representation, notwithstanding Duke's actual or constructive knowledge of its falsity.

To the contrary, on Saturday, April 1, in an interview with the *Durham Herald-Sun*,

Theresa Arico, Duke's SANE program director and Levicy's supervisor, took affirmative

steps to confirm Nifong's account of the medical evidence and to ratify Levicy's false

statements to Nifong.

334.    According to the *Herald-Sun* reporter, Arico described Levicy's purported examination of Mangum: "[Arico] described the process as a comprehensive combination of interviews and physical examinations of the person making the sexual assault complaint." Arico also stated that "blunt force trauma" could be diagnosed in a rape victim "with a high degree of certainty" through the use of a colposcope, which magnifies a woman's internal parts where injuries consistent with sexual assault would occur.

335.    This statement implied that Mangum had been examined with a colposcope, and that the physical evidence of blunt force trauma allegedly found by Levicy was thus highly reliable. In fact, on information and belief, Manly had not used a colposcope in Mangum's pelvic examination, and the report of Mangum's examination gave no indication that a colposcope had been used to examine her. Arico thus knew or should have known that Levicy had not herself performed the exam, that a colposcope had not been used, and that the exam report contained no finding of physical or medical evidence of "blunt force trauma" to Mangum.

336.    In the same interview, Arico also stated, "*I can reasonably say these injuries are consistent with the story she told*." (Emphasis added.) On behalf of Duke Hospital, Arico thus publicly corroborated both Levicy's and Mangum's credibility, and her remarks were publicized in the media. Neither Arico nor Duke ever took any steps to correct this understanding.

118

337. These public statements by Arico, Levicy's supervisor, constituted a direct ratification of Levicy's false statements regarding the medical and physical evidence of sexual assault. Arico knew or had reason to know that Levicy's representations to police and prosecutors were false and misleading. Yet she attempted to bolster Levicy's credibility to the police and to the public with intentional or reckless disregard for the truth.

338. Duke had actual or constructive knowledge of facts showing that Levicy had provided false and misleading information to the police. Duke's failure to come forward and correct Levicy's false and misleading statements constitutes an independent ratification of Levicy's conduct.

**E.    Duke Breaks Its Promises Of Confidentiality To The Players**

339. On or around Monday, April 3, Kate Hendricks, Duke's Deputy General Counsel, sent a letter by fax and mail to Nifong. On information and belief, the letter confirmed (as Nifong had publicly speculated) that lacrosse players had spoken confidentially with Duke administrators about the March 13 party, and it advised Nifong that "several administrators … are very willing to provide the information to you and your investigators." It also stated: "Please be assured that a court order will not be necessary." Hendricks' letter offered: "Please have your investigators contact [Hendricks] or [Officer Dean], and either of us can assist in interviews with any Duke personnel who received first-hand accounts of the incident from the players." In

119

accordance with this offer, on information and belief, Duke administrators, including Wasiolek, met with Durham police on April 13.

**F.     Duke Hospital Turns Over Falsified Medical Records To Durham Investigators**

340.     On April 5, Duke Hospital finally produced to Nifong the medical records relating to its forensic exam of Mangum.  As noted above, this was the first access that Nifong had to the medical records other than Levicy's SANE report, although Duke Hospital had been served with the subpoena on March 21.  Prior to April 5, all Nifong's public characterizations of the medical and physical evidence of rape had been based exclusively on nurse Levicy's false and misleading statements to the Durham police investigators about the medical and physical evidence.

341.     On information and belief, Levicy had deliberately falsified the version of the SANE report that Duke Hospital produced to Nifong on April 5.  The doctored version that she produced, on information and belief, included multiple strike-outs and addenda that attempted to render her report inculpatory in light of what Levicy understood the evidence to be at the time.  For example, in the notation about whether the alleged rapists had sought to conceal evidence, Levicy had initially entered "no."  In the version produced on April 5, however, this was crossed out, and "yes" was indicated, with the handwritten notation "wiped her off with a rag."

## XII. Mangum Selects Players Seligmann And Finnerty As Two Of Her Attackers In Third Rigged Photo Identification Procedure

342.    Gottlieb's notes record that, at 9:00 a.m. on April 4, immediately after contacting Mangum and arranging for a photo identification procedure with her later that day, he "spoke to Vice President Graves at Duke University Police via telephone." Gottlieb's notes do not record the content of their conversation.

343.    As noted previously, on April 4, acting on Nifong's instructions, Gottlieb conducted a third photo identification procedure with Mangum.  The photo array again consisted of photos of all and only the white Duke lacrosse players.  The procedure was conducted by Gottlieb himself, who knew, from the co-captains' March 16 uncounseled admissions and from the key card reports illegally supplied by Duke, which players had been in Durham on March 13-14 and had likely attended the party.  At the beginning of the procedure, Gottlieb told Mangum that the photos were only of Duke lacrosse players "whom we have reason to believe attended the party."

344.    In the words of defense counsel, this photo identification procedure was "a multiple choice test with no wrong answers."  To the Durham Investigators, however, there *were* "wrong" answers.  It was essential to the Durham Investigators' case not to indict any players who could readily prove that they had not even attended the party.  The information Duke illicitly provided through the key card reports was critical to ensure that Mangum did not select a "wrong answer" from the photo line-up.

345.    From the perspective of the players who had attended the party, then, the April 4 photo array was the criminal justice equivalent of a game of Russian roulette.

There were three bullets in Nifong's chambers, and they would randomly strike three party attendees. All players were in roughly equal jeopardy of false indictment and further persecution.

346.     Thus, the April 4 photo line-up was conducted in highly suggestive circumstances that violated standard Durham police protocols, as well as fundamental precepts of due process. Durham police protocols in effect in Durham at the time required that a photo identification procedure be conducted by an independent administrator, not someone involved in the investigation, and include five "fillers" (or unrelated photos) for each suspect in the array, with each filler resembling the suspect's description. The April 4 photo array was conducted by Gottlieb with no fillers.

347.     Moreover, on information and belief, Gottlieb or other Durham police coached Mangum both prior to and during the photo identification process.

348.     During the April 4 photo line-up, Mangum identified lacrosse players Reade Seligmann and Colin Finnerty as two of her attackers with "100%" certainty, although she had recognized Seligmann with only "70%" confidence during the March arrays. (Finnerty's photo had not been included in either of the March photo arrays because he did not remotely resemble any of the descriptions that Mangum had provided of her "attackers.") She also identified Dave Evans as one of her attackers with "90%" certainty; again, she had completely failed to recognize Evans when his photo was shown to her twice during the March photo arrays. Moreover, the attackers she identified failed

122

to match any of the descriptions of her attackers that she had provided during her March 16 interview with Gottlieb and Himan.

349.   Mangum again identified, however, lacrosse players who Gottlieb and Nifong knew were *not* at the party at 610 North Buchanan.  She claimed that Brad Ross had been standing outside the house talking to the other dancer.  Gottlieb knew that Ross had not even been in Durham during the party.  Mangum also stated that she saw Chris Loftus sitting in the living room or master bedroom during the party.  Gottlieb knew from the key card reports that Loftus likely was in his dorm room at the time of the party, having used the key card to enter his dorm at 10:59 p.m. on March 13.

350.   During the April 4 photo identification procedure, Mangum also identified a *fourth* lacrosse player, Matthew Wilson, as resembling one of her alleged assailants, "Brett."  Nifong never brought charges against Wilson.  Mangum also identified players who she had failed to recognize during the March photo line-ups, and failed to identify players whom she had recognized during those prior line-ups.

351.   As Gottlieb later testified (quoted above), information supplied by or with the assistance of Duke about who had attended the party was crucial in Nifong's selection of which three members of the lacrosse team to indict.

352.   On information and belief, the Durham Investigators deliberately delayed in disclosing the procedures used in the April 4 photo line-up to the lacrosse players and their counsel, in violation of N.C.G.S. § 15A-282, thus prolonging the investigation and

123

the period in which all the white lacrosse players were in jeopardy of being randomly selected for indictment.

353.    On information and belief, the Durham Investigators and the Durham Supervisors were aware of the abuses involved in the April 4 photo line-up.

354.    On April 4, Nifong's reliance on the authority of Duke Hospital and SANE nurse Levicy to corroborate Mangum's allegations continued to be emphasized in the press.  Mark Johnson, a reporter from the *Charlotte Observer* stated in an interview on national cable news that Mangum "was examined at Duke University Hospital, which as you know is a top flight hospital.  This was a nurse who was trained in dealing with these types of cases and that examination is largely what the district attorney … is basing his opinion on when he says that he believes an attack did occur."

## XIII.  Duke Cancels The Lacrosse Season And Fires Coach Pressler To Appease Activist Faculty And Students

355.    On information and belief, on or before Wednesday, April 5, Duke became aware that the DNA test results had come back negative as to all members of the lacrosse team.  The DNA evidence added decisive proof to the already overwhelming evidence in Duke's possession refuting the rape allegations Mangum had made to Levicy and others at Duke Hospital on March 14.  Despite actual or constructive knowledge of the lacrosse players' innocence, Duke accelerated its actions against the lacrosse team.

356.    On April 5, President Brodhead canceled the remainder of the lacrosse season and forced Coach Pressler to resign, as the activist faculty members and student protestors had demanded.

124

357.    Brodhead announced Coach Pressler's resignation and the cancellation of

the remainder of the lacrosse season in a public statement that opened as follows:

> "Allegations against members of the Duke lacrosse team stemming from
> the party on the evening of March 13 have deeply troubled me and
> everyone else at this university and our surrounding city.  We can't be
> surprised at the outpouring of outrage.  Rape is the substitution of raw
> power for love, brutality for tenderness, and dehumanization for intimacy.
> It is also the crudest assertion of inequality, a way to show that the strong
> are superior to the weak and can rightfully use them as the objects of their
> pleasure.  When reports of racial abuse are added to the mix, the evil is
> compounded, reviving memories of the systematic racial oppression we had
> hoped to have left behind us."

In noting that "the outpouring of outrage" against the lacrosse players on the campus and

within the community was not surprising, Brodhead made clear that he understood and

sympathized with the activist faculty members, student protestors, and others who had

rushed to condemn the lacrosse players for committing a violent gang rape and then

conspiring to cover it up.  Nowhere in his April 5 public statement, nor in any other

public utterance throughout the rape hoax crisis, did Brodhead criticize the activist

faculty members and student protestors or call upon them to stop their outrageous

harassment and threatening behavior and their vitriolic, hate-filled comments toward the

lacrosse players.  Brodhead thus tacitly condoned and encouraged the activist faculty

members and student protestors in their conduct against the lacrosse players.

358.    Brodhead acknowledged in his April 5 statement that "[a]t meetings with

faculty, students, community members, and others," he had "heard a good deal of

criticism of the Duke administration for being slow to respond to the allegations against

the team associated with March 13.  He explained that "it took time to know how to

125

respond" because "we learned the full magnitude of the allegations only gradually, as police and other information was reported in the media . . ." In cancelling the lacrosse season and firing Coach Pressler, and effectively apologizing for not having done so sooner, Brodhead succumbed to the demands of the mob -- the activist faculty members and student protestors who had angrily insisted that precisely these sanctions be imposed upon the lacrosse players -- and effectively communicated to the media and the public Duke's belief in the players' guilt.

359.    Brodhead acknowledged that "[m]any have urged me to have Duke conduct its own inquiry into these [rape] charges." He had refused to do so, however, because "Duke must defer its own investigation until the police inquiry is completed," noting that "the police have access to key witnesses, warrants, and information that we lack, and that a concurrent inquiry might "negatively affect the legal proceedings." Brodhead thus expressed his trust in the integrity and good faith of Nifong's investigation, notwithstanding that Duke had in its possession at that time overwhelming evidence -- in its own medical records, its own police report, and in the DNA test results -- that the lacrosse players were innocent and that Nifong's investigation was corrupt. Not only did Brodhead refuse to inquire into and to disclose the evidence then in Duke's possession, but he also refused repeated efforts by the lacrosse players and their attorneys to demonstrate their innocence to him through the exculpatory evidence that they had gathered and compiled.

360.    Ironically, even as Brodhead in his April 5 statement defended his refusal to examine the evidence before him of the players' innocence, he appointed an Ad Hoc Committee "to look into the behavior of members of the lacrosse team over the past five years, and specifically the record of both charges of inappropriate social conduct and criminal violation and of official Duke, community and team responses to that conduct and those violations." This committee, chaired by James E. Coleman Jr., a member of the Duke law faculty, released a twenty-five page report ("the Coleman Report") on May 1, 2006.

361.    In his April 5 statement, Brodhead claimed to embrace "the principle that we have an obligation to seek the truth, and that truth is established through evidence and disciplined inquiry." But the simple truth is that Brodhead and Duke were indifferent to the truth. Indeed, Athletic Director Joe Alleva candidly told Coach Pressler that his firing and the cancellation of the season were "not about the truth."

362.    Rather, in firing Pressler and cancelling the lacrosse season, Brodhead and the Duke administration sought to disassociate Duke and themselves from the lacrosse team's coach and players and thus to distance Duke and themselves from the intense public hostility that had been the unjust consequence of rape charges that Duke and its administration, by then, knew or should have known to be false.

363.    As noted above, Robert Steel, the chairman of Duke's board of trustees, later acknowledged in an interview with *The New Yorker* that Coach Pressler was forced to resign and the lacrosse season was canceled because "we had to stop those pictures" --

i.e., footage aired in the media of the Duke lacrosse team still playing after the rape allegations. "It doesn't mean that it's fair, but we had to stop it," he said. "It doesn't necessarily mean that I think it was right -- it just had to be done." He also later stated to Sally Fogarty, mother of player Gibbs Fogarty, regarding the firing of Coach Pressler: "Life sucks. Bad things happen to good people and you better get used to it." And in September, Steel defended the firing of Coach Pressler in a meeting with Jason Trumpbour, the spokesman for Friends of Duke, saying that "even though it is not fair, people have to be sacrificed for the good of the organization." Steel further told Trumpbour, in a statement which provided telling insight into Duke's selfish motivation for abandoning the lacrosse players, that Duke actually wanted the case to go to trial because it would be better for Duke's image. In fact, Steel went so far as to suggest that if the indicted players were convicted it would not matter because the problems with the case would be sorted out on appeal.

364.    Along the same lines, Brodhead also later admitted that subsequent investigation had "prove[d] Pressler's history of responsiveness" and had "fully exonerate[d] him" of the charge of lax oversight of the team.

365.    Also on April 5, Brodhead released a second statement, which reiterated: "I once again urge everyone with information pertinent to the events of March 13 to cooperate with authorities." Again, he knew full well that the lacrosse players had been fully cooperating with the investigation from the beginning, and he likewise knew that his statements would imply falsely that the players were attempting to hide the truth**.**

128

## XIV. The "Group Of 88" Members Of The Duke Faculty Publish An Ad Condemning The Lacrosse Players As Guilty And Encouraging Public Protests Against Them

366.   On April 6, 2006, the day after Brodhead canceled the lacrosse team's season and fired Coach Pressler, a full-page advertisement appeared in the *Duke Chronicle*.  It was signed by 88 Duke faculty members and was sponsored by and bore the imprimatur of 15 Duke academic departments and programs.

367.   The cover email sent by Duke faculty member Wahneema Lubianco soliciting support for the Group of 88 ad stated that "African & African-American studies is placing an ad in *The Chronicle* about the lacrosse team incident."  It urged faculty members to solicit official support from Duke departments and department chairs, and noted that the ad would list "the supporting departments and program units."

368.   In large font across the middle of the page, the "Group of 88" ad stated: "What Does a Social Disaster Sound Like?"  The text of the ad leaves no doubt that it was, as Professor Lubiano's cover message made clear, a direct response to the rape allegations against the lacrosse team and was designed to promote and encourage the student protests against the players.  The ad opens with the following introduction:

> **"We are listening to our students.  . . .** [W]hat is apparent everyday now is the anger and fear of many students who know themselves to be objects of racism and sexism; who see illuminated in this moment's extraordinary spotlight what they live with everyday. . . . These students are shouting and whispering about *what happened to this young woman* and to themselves. . . ."

The ad then quotes a series of public statements about the lacrosse case allegedly made by Duke students. Among the quoted statements were the following:

- "We want the absence of terror."

- "If it turns out that these students are guilty, I want them expelled."

- "I am only comfortable talking about this event in my room with close friends."

- "If something like this happens to me . . . What would be used against me -- my clothing?"

- "[N]o one is really talking about how to keep the young woman herself central to this conversation, how to keep her humanity before us . . . she doesn't seem to be visible in this. Not for the university, not for us."

- "I can't help but think about the different attention given to what has happened from what it would have been if the guys had been not just black but participating in a different sport, like football, something that's not so upscale."

- "And this is what I'm thinking right now – Duke isn't really responding to this. Not really. And this, what has happened, is a disaster. This is a social disaster**."**

The ad concluded by expressly encouraging public protests against the lacrosse players: "The students know that the disaster didn't begin on March 13th and won't end with what the police say or the court decides. . . . We're turning up the volume in a moment when some of the most vulnerable among us are being asked to quiet down while we wait. To

130

the students speaking individually and to the protestors making collective noise, thank you for not waiting and for making yourselves heard."

369.    The ad made clear that it was sponsored by, and represented the official position of, 15 Duke academic departments and programs: "We thank the following departments and programs for signing onto this ad with African & African American Studies: Romance Studies; Psychology; Social and Health Sciences; Franklin Humanities Institute; Critical U.S. Studies; Art, Art History, and Visual Studies; Classical Studies; Asian and African Languages and Literature; Women's Studies; Latino/a Studies; Latin American and Caribbean Studies; Medieval and Renaissance Studies; European Studies; and the Center for Documentary Studies."

370.    On information and belief, the Group of 88 ad was paid for by the African and African American Studies Department with Duke University funds.

371.    The ad included a link to a website with the names of 88 Duke faculty and staff who "signed on in support" of the ad but were not named in the ad itself "[b]ecause of space limitations." The ad remained published on the website of Duke's African & African American Studies department for many months.

372.    Months later, after Mangum's rape charge, and the ensuing investigation into it, had been exposed as a malicious and tragic hoax, a professor who signed the Group of 88 ad said to a parent of a lacrosse player: "I deeply regret, deeply regret contributing to tremendous harm that was done to [the plaintiffs]. I can understand any hostility they feel for me." The professor also explained to a lacrosse player that she

dared not break with the Group of 88 and publicly apologize for signing the ad because if she did, "my voice won't count for much in my world."

373. This ad constituted harassment of the players in violation of Duke's anti-harassment policy, as described in further detail below. On its face, and when considered in light of all the circumstances surrounding its publication, the ad made unmistakably clear that its faculty signatories and departmental sponsors believed that Mangum's rape allegations were true, and it wrongfully, knowingly, and willfully subjected the players to notoriety, opprobrium, derision, humiliation, and well-founded fear for their own safety. Due to its defamatory and inflammatory message, its express exhortation to the "protestors making collective noise" to "turn up the volume" and "make yourselves heard," and its high profile on the Duke campus (and throughout the country), the ad interfered significantly with the players' work and education, adversely affected their living conditions, and caused the players serious harm—emotional, reputational, and otherwise.

374. Duke said nothing in response to the Group of 88 ad, refusing to denounce or otherwise disavow its message of guilt and condemnation of the lacrosse players. Through its silence, Duke confirmed that the ad represented the official position not only of 15 Duke academic departments and programs, but of Duke University itself. Months later, after Mangum's rape allegations and Nifong's investigation had been publicly exposed as a malicious and tragic hoax, Brodhead acknowledged that activist faculty members and student protestors "were quick to speak as if the [rape] charges were true . .

. , and some faculty made statements that were ill-judged and divisive." Brodhead also admitted that "the public as well as the accused students and their families could have thought that those were expressions of the university as a whole."

375. On or around April 6, Duke women's lacrosse coach Kerstin Kimel advised President Brodhead of the in-class verbal harassment that some of the lacrosse players were suffering at the hands of their professors. Brodhead was dismissive of her concerns, stating that reports of faculty abuse were exaggerated.

## XV. Mangum's Story Changes Yet Again In Written Statement To Durham Investigators

376. On April 6, Mangum provided Gottlieb and Himan with a written statement recounting her allegations of the events at the March 14 party. This written statement contradicted each of her previous versions in several material respects. The various sex acts allegedly performed by each of her three assailants varied in this statement from her statements at Duke Hospital on March 14 and her oral statement to Gottlieb and Himan on March 16. The identity of the supposed "bachelor" among the three assailants varied among the three accounts as well. Roberts' role in the purported crime varied among the three versions as well, from abettor and robber (March 14), to bystander (March 16), to co-victim of the purported crime (April 6). And, in a transparent effort to reconcile her allegations with her performance in the April 4 photo arrays, Mangum's April 6 written statement differed from her prior accounts by alleging for the first time that she knew that the names used by the three assailants were aliases, not their real names.

377. On information and belief, the Durham Investigators and the Durham Supervisors were aware of the inconsistencies in Mangum's various oral and written statements made between March 14 and April 6.

378. Also on April 6, Nifong, like Brodhead, declined offers to review the mass of exculpatory evidence compiled by defense attorneys. Multiple defense attorneys offered to meet with Nifong throughout the crisis to explain to him the compelling case for innocence, but Nifong repeatedly rejected such offers.

## XVI. Nifong Hires A Private DNA Testing Firm And Then Conspires To Suppress Its Exculpatory Test Results

379. On April 4, Nifong instructed Durham Police Investigator Michelle Soucie to locate a private laboratory to conduct additional DNA testing. At Nifong's direction, Soucie contacted Brian Meehan of DNA Security, Inc. ("DSI"), a private lab in Burlington, North Carolina. Meehan advised Soucie that his lab could perform more sensitive DNA testing than could the SBI, and that DSI was willing to work for discounted rates in order to be involved in the high-profile rape investigation. Nifong decided to hire DSI.

380. The next day, April 5, the District Attorney's office obtained an order from Judge Ronald Stephens to allow the transfer of Mangum's rape kit items to DSI from state custody. On information and belief, Nifong obtained this order through a sealed ex parte application that he did not reveal to the lacrosse players or their counsel. On April 6, the rape kit items were transferred to DSI's custody.

134

381.    From April 7 through April 10, DSI performed sophisticated DNA tests on these items.

382.    On April 8 through April 10, DSI performed analyses on the rape kit items that resulted in the exclusion with 100 percent certainty of every member of the lacrosse team as possible donors of DNA found on the items.  Specifically, DSI concluded that stains and semen residue from Mangum's panties and rectal swab contained the DNA of at least four males.  DSI concluded, with 100 percent scientific certainty, that none of the lacrosse players was the source of this DNA.

383.    On or around April 10, Nifong, Himan, and Gottlieb met with DSI representatives at DSI's offices in Burlington.  Laboratory Director Brian Meehan and DSI President Richard Clark attended the meeting.  At this meeting, Meehan reported the results from DSI's testing to date, including the critical fact that the rape kit provided decisive evidence of Mangum's sexual activity with at least four males around March 13—*none* of whom was a Duke lacrosse player.

384.    Rather than terminating the investigation then and there, on information and belief Nifong, Himan, Gottlieb, Meehan, and Clark conspired to illegally conceal DSI's findings.  They agreed not to take any notes to memorialize these meetings, and agreed to obfuscate or conceal the full results of DSI's tests from the players and their attorneys.  The intention and effect of this conspiracy was to permit Nifong to proceed to indict three randomly selected players for rape, despite dispositive evidence that Mangum's claim was a hoax.

385.    On information and belief, the Durham Supervisors were aware of the substance of this April 10 meeting between Nifong and DSI, yet they continued to allow Nifong to direct the investigation and to proceed with indictments.

## XVII. The SBI's Negative DNA Test Results Become Public

386.    On Monday, April 10, Nifong disclosed to the lacrosse players' defense attorneys, and the public became aware, that the SBI had found no DNA from any of the 46 lacrosse players anywhere on or within Mangum's body, clothing, or belongings.  At this stage Nifong did not, however, reveal the suppression of the even more dramatically exculpatory results from DSI's testing.  Even if Duke had not been aware of the negative DNA test results before then, as of April 10 it was in possession of overwhelming evidence of innocence.  As noted above, if *any* of the inconsistent stories told by Mangum to Duke Hospital personnel on March 14 had been true, it was inconceivable that her assailants would have left no DNA traces whatsoever.  Nevertheless, Duke continued to remain silent and suppress the overwhelming evidence in its possession of the players' innocence.

387.    Though he was aware of the negative test results as early as March 29 or 30, Nifong delayed in disclosing the results to the players until April 10. During the intervening days, several actions taken by Duke served to inflame public outrage against the players and strengthen public trust in Nifong's credibility.  As noted above, these actions included, among other things, Arico's public statement that the forensic examination of Mangum at Duke Hospital yielded evidence "consistent with the story she

136

told," Brodhead's cancellation of the lacrosse season and firing of Coach Pressler, and the Group of 88 ad. As a result of these and other actions, Nifong's investigation retained momentum and credibility in the eyes of the media and the public to survive the release of the negative DNA results.

### A. Nifong Suggests That Rapists May Have Used Condoms, And Duke Says Nothing

388. When the DNA test results were made public, media reports widely reiterated Nifong's strategic public speculation, on March 30 and 31, that condoms might have been used by Mangum's assailants: "I wouldn't be surprised if condoms were used. Probably an exotic dancer would not be your first choice for unprotected sex." Nifong implied the same conclusion at a public forum on April 11: "[T]he absence of DNA … doesn't mean nothing happened. It just means that nothing was left behind." Press accounts also quoted many other commentators who echoed Nifong's statements that condoms might have been used.

389. As Duke knew or should have known, Mangum had affirmatively told Duke Hospital employees at least three times that condoms had not been used in the alleged attack, and that ejaculation had occurred. Duke never made any statement to contradict Nifong's public speculation about condom use to explain the absence of DNA evidence.

137

**B.    Nifong Justifies Continued Investigation On Medical Evidence From Duke Hospital, And Duke Says Nothing**

390.    On April 11, Nifong again invoked the authority of Duke Hospital to counteract the effect of the negative DNA results on public perception and his public credibility.  He was quoted on national cable news stating:  "Duke University Hospital is the best trauma center in the area.  This nurse was specially trained in sexual assault and I would just point out that my conviction that a sexual assault actually took place is based on the examination that was done at Duke Hospital."  Duke knew or should have known that Duke Hospital's examination of Mangum yielded no objective medical or physical evidence supporting her rape allegations, yet Duke remained silent in the face of Nifong's false claims to the contrary.

391.    By April 10, and before, Duke had abundant reason to know that Nifong was not proceeding in good faith against its students, but rather was abusing his prosecutorial powers for his own political purposes.  But Duke continued to suppress exculpatory evidence in its exclusive possession, to defame the lacrosse players in public and private statements, to quietly condone and encourage the outrageous behavior and comments of its activist faculty members and student protestors, and to engage in improper, supererogatory cooperation with Nifong's patently corrupt investigation.

392.    In July 2006 Brodhead privately acknowledged to a lacrosse parent that "after many weeks of media stories that made it seem almost self-evidently true that a rape occurred, recent stories have offered extensive evidence exonerating the indicted students and questioning the legitimacy of the case."  Yet Brodhead still refused to

138

disclose the exculpatory evidence in Duke's possession or otherwise to speak up in defense of the innocent students. Rather, he was resolved to maintain his silence "until our students [are] proved innocent."

393. Months later, after Mangum's rape allegations and Nifong's investigation had been publicly exposed as a malicious and tragic hoax, Brodhead attempted to explain why he had insisted on Duke maintaining its silence even after "evidence mounted that the prosecutor was not acting in accordance with the standards of his profession." Brodhead was "concerned," he said, "that if Duke spoke out in an overly aggressive fashion, it would be perceived that a well-connected institution was improperly attempting to influence the judicial process." He also lamented that "there was no legal recourse against the District Attorney, for me or anyone else. Under North Carolina laws, no one had authority to take an active case from a DA absent the DA's own request, as finally happened in January." So Brodhead and Duke remained silent, and looked on passively as a politically ambitious and plainly unethical prosecutor, abetted by a mob composed of, among others, activist Duke faculty members and student protestors, angry Durham community leaders, and a hostile media, put 47 innocent Duke students and their families through a hellish ordeal.

## XVIII. Duke Assists Durham Investigators In Making Warrantless Entries Of Dorm Rooms And Uncounseled Interrogations Of Players

394. The grand jury was to sit on Monday, April 17, and Nifong had announced his intention to seek indictments on that day. At the end of the prior week, the Durham Investigators made several last-ditch efforts to gather further confirmation of the

139

identities of all the party attendees in order to ensure against indicting a player who could readily establish an alibi. These efforts were facilitated by Duke's cooperation and included, on information and belief, warrantless entry and searches of a dorm and dorm rooms and uncounseled interrogation of lacrosse players known to be represented by counsel. On information and belief, Duke attempted to conceal its cooperation with these warrantless entries and uncounseled interrogations of students. Duke was later forced to make a public statement attempting to explain its cooperation in warrantless entries.

395. The next day, Vice President For Campus Security Aaron Graves issued a statement that stated: "Two Durham police detectives visited a residence hall on the Duke University campus yesterday evening. They were there as part of the ongoing police investigation of the March 13 incident on North Buchanan Boulevard, and they notified the Duke Police Department ahead of time. No search warrants were executed. The purpose of the visit was to conduct interviews. We do not know who they interviewed during the hour and 15 minutes they were in the Edens Residence Hall."

396. As late as Friday, April 14, Himan made repeated phone calls to defense counsel in attempting to determine who had attended the party. On information and belief, Himan was looking for any evidence or statement that would help him confirm which lacrosse players had, and had not, attended the March 13 party. The grand jury was to meet on April 17, and Nifong's team was still deeply concerned about the risk of bringing indictments against players who had not attended the party.

140

## XIX. Lacrosse Players Seligmann And Finnerty Are Indicted

397. On Monday, April 17, Gottlieb testified before the grand jury in support of indictments against two lacrosse players. On information and belief, his testimony placed decisive emphasis on nurse Levicy's attestation that Duke's forensic examination of Mangum yielded physical and medical evidence consistent with her charges of rape, and on the (false) statement that after Levicy "managed to calm [Mangum] down, her story never changed after that point."

398. Again, in subsequently defending the decision to investigate and prosecute Mangum's multiple, conflicting, ever-changing rape charges, Gottlieb placed decisive emphasis on Levicy's corroboration of Mangum's allegations. He stated: "I believe there was corroborating evidence. Meaning, the SANE nurse said the victim's accounts of the attack were consistent with the sexual assault. Her findings were consistent with the sexual assault. And, you know, you have a statement being provided by a victim. You have a SANE nurse who is backing up that person's statement." Without the "findings" of "the SANE nurse," and without the "SANE nurse … backing up [Mangum's] statement," there would have been no credible basis for pursuing the rape investigation, and Mangum's multiple, conflicting, ever-changing stories of what happened at the March 13 party would have been seen, and dismissed, by the police as the facially incredible hoax that it was.

399. On April 17, the grand jury indicted two lacrosse players, Reade Seligmann and Colin Finnerty, on charges of rape, sexual assault, and kidnapping. Nifong made

141

clear that he would indict a third player, which he did, almost a month later, on May 15. In a press release on April 18, Nifong stated: "It had been my hope to be able to charge all three of the assailants at the same time, but the evidence available to me at this moment does not permit that. Investigation into the identity of the third assailant will continue in the hope that he also can be identified with certainty." The threat of a third rape indictment, and perhaps indictments of other players as supposed accomplices, continued to hang over the players and their families after April 17.

400. In a speech on April 20 to the Durham Chamber of Commerce, Brodhead revealed his callous indifference to the truth, suggesting that even if the alleged rape had never occurred, the lacrosse players were getting what they deserved. "If they didn't do it," he said, "whatever they did was bad enough."

## XX. Nifong's Conspiracy To Conceal Private DNA Firm's Exculpatory Test Results Continues

401. At around this same time, Nifong assigned defendant Linwood Wilson, an investigator with the district attorney's office, to coordinate with Gottlieb and Himan on the rape investigation. On information and belief, Wilson had very limited experience prior to this investigation, and had handled only very routine matters such as scheduling witnesses and serving subpoenas. He joined fellow rookie Himan on the investigative team. Moreover, on information and belief, Wilson had a record of misconduct while working as a private investigator.

402. On April 21, the Durham Investigators met again in Burlington with Meehan and Clark of DSI. At this April 21 meeting, Meehan confirmed that the DNA

from four males was found on the items in the rape kit. Every single one of the lacrosse players, including the two who had already been indicted, had been eliminated with 100 percent certainty as a possible source for this DNA.

403. On information and belief, at this meeting, the Durham Investigators, Clark, and Meehan agreed that DSI would produce a written report that would purport to be the final and complete report of the results of all DNA testing conducted by DSI, but that this report would omit crucial exculpatory findings of DSI's testing, including the fact that none of the players' DNA profiles matched or were consistent with any of the DNA found on the rape kit items. Again, the participants of the meeting agreed that there would be no written notes memorializing the substance of their discussions.

404. On information and belief, the Durham Supervisors were aware of the substance of the April 21 meeting, including the agreement for DSI to prepare a final report that omitted the exculpatory nature of DSI's findings, but continued to allow Nifong to direct the investigation and to pursue an indictment of a third player for a rape that they knew had never happened.

## XXI. The New Black Panthers March Against The Lacrosse Team

405. The campus atmosphere continued to be hostile to the lacrosse players. On Monday, May 1, the first day of exam week for Duke students, a radical hate group called the New Black Panther Party conducted a menacing march and rally adjacent to the Duke campus. (Upon information and belief, Duke had originally decided to allow the march to occur on campus, but in order to avoid disturbing the Duke students who were

143

studying for exams, Duke did not allow this. Notably, the refusal to allow the march on campus was not related to concerns for the welfare of the lacrosse players). According to the *Raleigh News & Observer*, the New Black Panther marchers were "dressed in fatigues, combat boots and flak jackets -- some sporting knives on their belts." The group set forth a series of "demands," including a conviction of the accused lacrosse players and expulsion from school for those who attended the lacrosse party.

406.    A spokesman for the New Black Panthers stated the purpose of their mission: "We are conducting an independent investigation, and we intend to enter the campus and interview lacrosse players. We seek to ensure an adequate, strong, and vigorous prosecution." Combined with the New Black Panthers' weaponry and martial array, their words and actions placed the lacrosse players in well-founded fear for their safety.

407.    Lacrosse parents learned of the New Black Panthers march only through news reports. They rounded up most lacrosse players and removed them from the campus on the day of the march. Because the march occurred during exam period, some players had too much work and studying to leave campus. The parents requested that the University put these players up in a hotel or otherwise provide security for them. Duke refused.

## XXII. Duke Releases Study Of Lacrosse Team's Disciplinary Records.

408.    As noted above, on April 5 Brodhead appointed an Ad Hoc Committee, chaired by Duke law professor James Coleman, to investigate the disciplinary records of

lacrosse team members for the previous five years. On information and belief, the data on student behavior supplied by Duke University to the committee was knowingly incomplete and unreliable. Indeed, the Committee itself admitted that a comparison to Duke students generally was not possible because the University did not regularly keep statistics of Duke students' misconduct, at least not instances of misconduct that were as common and minor as the infractions for which lacrosse team members had been cited. Pursuant to its obligations under the Cleary Act, the University kept regular statistics of Duke students' serious misconduct, such as assaults, sexual offenses, and other serious crimes, as well as instances of student alcohol abuse that led to hospitalization. The lacrosse players had not engaged in any instance of such serious misconduct or alcohol abuse. Rather, the Committee undertook only to compare the frequency of team members' petty infractions as compared to selected other teams.

409.    Duke University began in October 2004 systematically recording data of incidents of all alcohol policy violations involving students. Prior to October 2004, records of such misconduct were maintained only to the extent that Stephen Bryan, the Associate Dean of Students and Director of Judicial Affairs, wished to keep them for his own enforcement purposes. Rather than utilize the systematically kept post-October 2004 data, however, the Committee relied upon Bryan's arbitrarily-kept records of pre-October 2004 violations. Upon information and belief, a statistically valid study of the incidents of student misconduct would not support the conclusion that the conduct of the

145

lacrosse team members was aberrant or otherwise out-of-step with the general male student population at Duke University.

410. The Coleman Committee's report was released on May 1 in a press conference attended by virtually every national and local media outlet, which were told extemporaneously by Committee Chairman Coleman that the "pattern" of behavior of the team members was "deplorable"

411. Press accounts of the committee's report, and of Coleman's remarks at the nationally televised press conference, painted a highly prejudicial, highly unfair picture of the behavior of lacrosse players. For example:

- On May 1, 2006, NBC reported that the University's report "found that alcohol abuse is a major factor behind [the lacrosse team's] disciplinary problems both on and off campus."

- On May 2, 2006, a *New York Times* article stated: " 'Deplorable,' said James E. Coleman Jr., describing how team members behaved when they drank excessively."

- On May 1, 2006, ESPN reported that the University's report concluded that "the team needed strict monitoring because of a history of problems tied to alcohol."

412. Ironically, the Coleman Report was largely positive. The Committee found that the players had no record before March 13 of bullying, fighting, racist language or conduct, hostility toward women, cheating, or other serious misconduct. The Committee specifically noted that it "has not heard evidence that the cohesiveness of [the lacrosse team] is either racist or sexist." The Committee found that "members of the Duke Lacrosse team have been academically and athletically responsible students." "The

lacrosse team's academic performance generally is one of the best among all Duke athletic teams." Even the Committee's finding that lacrosse team members "have been socially irresponsibly when under the influence of alcohol," was found "not different in character than the conduct of the typical Duke student who abuses alcohol." More importantly, team members' "reported conduct has not involved fighting, sexual assault or harassment, or racist behavior." Further, as detailed in the Coleman Report, Captain Sarvis of the Durham Police, informed the Committee that "lacrosse players did not represent a special or unique problem" and that "none of the houses rented by lacrosse players was among the worst of those whose loud parties attracted hundreds of disorderly Duke students on weekends." Lacrosse players' houses were not even in the top ten.

413.    In short, the Coleman Report, while detailing some alcohol problems not at all uncommon to almost any university in America, overall was in direct contradiction to the  media's portrayal of the players as hooligans -- a portrayal bolstered by Duke's own statements and actions.

## XXIII.  The Duke And Durham Defendants Discredit Exculpatory Evidence

### A.    Duke Discredits Officer Day's Exculpatory Police Report

414.    As noted above, Duke had suppressed the exculpatory March 14 police report of Officer Day, which recounted Mangum's inconsistent stories and her lack of credibility with the investigating police officers.  In May, the existence of the Day report became public serendipitously.  On May 8, 2006, the so-called Bowen Committee, which had been established by Brodhead to examine complaints, primarily from the activist

147

faculty members and student protestors, that the Brodhead administration had acted too slowly in cancelling the season, issued its report. The report sought to divert any blame for the rape hoax crisis from Brodhead and other high Duke officials. It stated, ironically, that the administration's "slowness" to respond to the allegations was not Brodhead's fault, but was the fault of Duke Police who told administration officials that Mangum's rape charges were not credible. The existence of Officer Day's report was a surprise to the team members, their parents, and their lawyers, who were unaware that the Duke police had made such exculpatory statements based on information from the actual time and place where the false allegations were originally made.

415.    As noted previously, Duke officials such as Vice President Graves, police Director Robert Dean, and Dean of Students Wasiolek had been aware of the report and/or its conclusions since March 14, but had not disclosed it. Moreover, on March 31, Officer Day had been coerced to write a "continuation page" casting doubt on his own report.

416.    Within a day of the report's release, Duke officials and Durham officials rushed to discredit the report. Both Duke and Durham officials provided the same "spin" on the report: that it was unreliable because it was based on partially and imperfectly overhead conversations between Durham police officers, which Officer Day had misunderstood and misrepresented. This was the same story told in the March 31 "continuation page."

417. On May 10, Durham City Manager Baker criticized Officer Day's report, saying that Day "did not speak to our officer" and that he "appears to have overheard half a conversation," by eavesdropping on a Durham Police officer's cell phone conversation.

418. Aaron Graves, Duke's Vice President for Campus Safety and Security, publicly provided exactly the same spin on the Day report. He stated that what Duke police officers "thought they heard… may not have been direct information." Graves said the police report was preliminary, based on secondhand information rather than direct statements from Durham police. Duke's Police Director Dean also publicly dismissed Day's report as "what he overheard at the time."

419. These statements were made within a week before the grand jury that eventually indicted the third lacrosse player was to convene. Their purpose and effect was to dissipate and weaken the exculpatory significance of Officer Day's March 14 report.

420. Upon information and belief, Duke Police and other Duke officers used their authority to silence Officer Day, in order to prevent exculpatory information from coming out.

## B. Durham Destroys And Discredits Evidence That Mangum Not Credible

421. Durham police officials likewise sought to suppress their officers' on-the-scene judgment that Mangum's rape allegations on March 14 were not credible. On information and belief, during the early morning hours of March 14, Durham police officers made numerous comments to each other, over the police radio, expressing grave

149

doubts of Mangum's credibility. This police radio discussion was recorded on tape. When defense lawyers for the indicted players requested the tape, it had been destroyed.

422. Similarly, upon information and belief, in May 2006, senior police and other officials in the City of Durham subjected Sergeant Shelton to an internal investigation, accusations of unprofessional conduct, and threats of disciplinary action in an attempt to intimidate and discredit him for reporting Mangum's recantation of her rape claim while at Duke Hospital on March 13.

423. On information and belief, Duke Police and other Duke officials conspired with the Durham Investigators and Durham Supervisors to suppress exculpatory information related to the judgment of Mangum's credibility made by officers at the scene on the night of March 14, and to discredit that information when it emerged.

## C.    Gottlieb Produces "Supplemental Case Notes"

In a blatant departure from standard police practice, over four months after the start of the investigation into Mangum's rape allegations and only after defense counsel had come forward with exculpatory evidence poking huge holes in the prosecution's case, did Gottlieb produce a type-written, thirty-three page document entitled "Supplemental Case Notes." These "supplemental" notes were created from memory as Gottlieb had virtually no contemporaneous notes of witness interviews or other investigative tasks. Conveniently, these supplemental notes attempted to address many gaping holes exposed by defense counsel in the prosecution's case, and to shore up the case at its weakest points. These "from memory" supplemental notes, however,

150

contradicted the contemporaneous, handwritten notes of the other officers, investigators and medical personnel who saw Mangum the day after the alleged attack.

## XXIV. Nifong Conspires With DNA Testing Firm To Produce A Fraudulent DNA Report

424. On May 12, the Durham Investigators met with DSI's Clark and Meehan again to discuss DSI's report on its DNA testing results.

425. On information and belief, at this meeting Meehan provided Nifong with a 10-page report regarding the DNA testing.

426. The Durham Investigators, Meehan, and Clark understood that this report would be provided to the lacrosse players and to the court under the knowingly false pretense that it represented a  final and complete report of DSI's work and contained all of DSI's findings with respect to DNA testing.

427. The report, however, used a limited reporting formula that the Durham Investigators, Meehan, and Clark had agreed upon to conceal certain DSI findings. Specifically, the May 12 report disclosed only DNA test results of the individuals who had provided DNA for testing—e.g., Mangum's boyfriend and the 46 lacrosse players.  It intentionally omitted reference to DNA findings related to persons who had not provided samples.  In other words, it intentionally omitted any reference to the four unidentified males whose DNA had been found in Mangum's panties and swabs.  By deliberately suppressing some of the results of the DNA testing, this report violated industry standards, North Carolina law, and FBI standards.

151

428.   On May 12, Nifong provided the deliberately misleading report to the lacrosse players.

429.   On information and belief, the Durham Supervisors knew or should have known about the substance of the May 12 meeting and May 12 report, including the fact that it intentionally concealed exculpatory results of DSI's testing.  They continued to allow Nifong to direct the investigation and proceed with a third indictment.

## XXV. Lacrosse Player Evans Is Indicted

430.   The weekend of May 13-14 was graduation weekend at Duke.  That weekend, instead of rejoicing in a spirit of celebration, the graduating lacrosse seniors and their parents endured the severe emotional anguish of anticipating that one of the players would soon be indicted for an atrocious crime that had never occurred.  At the graduation ceremony itself, Duke Provost Peter Lange humiliated the lacrosse seniors and their families before thousands of people by stating to the crowd, "This was a year when it was easy to forget how good most of the Duke students really are."

431.   Even on graduation weekend, Duke acknowledged that its campus had become too perilous a place for the lacrosse players and their families.  For example, the Washington Duke Inn, which is owned by Duke University, refused to allow the 2006 senior lacrosse players and their families to have their graduation dinner at the Inn, despite the fact that they had made reservations a year in advance.  The stated reason for this cancellation was that it would be unsafe to allow the players and their families to attend the dinner at the Inn, which is located on or adjacent to Duke's campus.

152

432.    On Monday, May 15, Nifong sought and obtained from the Durham grand jury an indictment of David Evans on charges of rape, kidnapping, and sexual assault. Though Nifong announced at the time that this would be the last indictment based on "the evidence that we have developed," the remaining lacrosse players nevertheless continued to live in reasonable fear of potential future indictment for many months. Nifong's promises had proven untrustworthy. And in March, Nifong had repeatedly threatened to indict the entire team as accomplices, for their alleged conspiracy of silence.

## XXVI. Duke Conspires With The Durham Investigators To Fraudulently Conceal Duke's FERPA Violations

433.    As noted above, on March 31, Duke had secretly disclosed March 13-14 key card reports for lacrosse players to the Durham police, who had used this critical information to determine which players likely had attended, and had not attended, the March 13 party. Duke never notified the lacrosse players, their families, or their lawyers of this disclosure.

434.    On May 31, Nifong subpoenaed Duke University to obtain the key card records that he already possessed and had used in his investigation and prosecution of the Duke students. This subpoena was a sham. Duke had already turned the key card information over to Nifong illegally. Both Duke and Nifong knew that the subpoena was a sham; they were collaborating in a charade designed to disclose the information pursuant to subpoena in order to paper over the fact of its prior illegal disclosure.

153

435. On June 2, Duke's Director of the key card office, Matthew Drummond, sent letters to all 47 members of the lacrosse team. The letter stated in relevant part as follows:

> Duke University has received a subpoena (copy attached) requiring us to produce certain information regarding use of your DukeCard. If you wish to object to the release of these records by the University, your attorney must file a motion to that effect. If we have not heard from you by Monday, June 12, 2006, at 9:00 a.m., we intend to comply with the terms of the subpoena. If you file a motion to quash or otherwise object to the subpoena please send us copies of the relevant papers at your earliest convenience.

436. Similar letters were sent by Kate Hendricks of Duke's Office of Counsel to defense attorneys for the lacrosse players. In these letters, Duke acknowledged its obligations under FERPA but did not disclose that it had already violated these obligations. For example, a letter dated June 1, 2006, to Bill Thomas, who was counsel for a lacrosse player, stated: "Please find enclosed copies of two subpoenas issued to Duke University that request your client's home address as well as information regarding use of his Duke Card. Duke University considers such information to be educational records subject to the Family Educational Records & Privacy Act, 20 U.S.C. § 1232g ("FERPA"). As such, Duke is obligated to notify your client of the subpoenas and of its intent to comply with the subpoenas." The letter also stated: "We will provide you with a copy of any information produced in response to the subpoenas."

437. These letters from Drummond and Hendricks falsely implied that Duke had never provided the players' key card information to Nifong prior to issuance of the subpoenas.

154

438.    On information and belief, Hendricks, Drummond, Duke Police, Kemel Dawkins, Duke's Vice President for Campus Services, and the Durham Investigators knew that Duke had already produced the relevant key card reports to Nifong and that the subpoena was a sham.

439.    In reliance on the false representation that Duke had not already disclosed this information, attorneys for virtually all of the unindicted lacrosse players prepared and filed motions to quash the subpoena for key card information.  The preparation, filing, and argument of these motions required a significant expenditure of time, effort, and legal fees.

440.    On July 17, Durham County Superior Court Judge Kenneth C. Titus held a hearing on these motions to quash.  At the hearing, Nifong argued strenuously for the State's right to obtain the information.

441.    On information and belief, attorneys for Duke attended the July 17 hearing. Throughout the hearing, these Duke representatives knowingly sat silent as Nifong urged the court to order Duke to provide information that Duke already had provided to him. Through this collaboration, Duke and Nifong jointly perpetrated a fraud upon the court.

442.    On July 21, Judge Titus ruled that the State was not entitled to the FERPA-protected key card information.  The protective order quashing the subpoena stated:  "The request for key card information for all listed students without any showing of materiality or necessity does not rise to the level required to overcome the confidentiality of student information assured by FERPA."

155

443.    Though neither Judge Titus nor the lacrosse players knew it, the protective order was futile because Nifong already had the key card information.  Moreover, the Durham Investigators had already made use of the key card information to obtain indictments from the grand jury.  These indictments ensured that the vitriolic public defamation and harassment on campus and in the media against the lacrosse players, including the unindicted players, would continue unabated for months to come, as would the threat of prosecution by Nifong as accessories to all members of the team.

## XXVII.  Duke Violates Its Own Anti-Harassment Policy

444.    Duke University has a formal, written policy strictly forbidding harassment of any student "for any reason," by anyone enrolled at or employed by Duke.  Similarly, the Duke Faculty Handbook provides:  "Members of the faculty expect Duke students to meet high standards of performance and behavior.  It is only appropriate, therefore, that the faculty adheres to comparably high standards in dealing with students . . . Students are fellow members of the university community, deserving of respect and consideration in their dealings with the faculty."

445.    Many of the actions and statements described above violated Duke's anti-harassment policy.  These acts and statements include but are not limited to:  myriad public and private statements by Richard Brodhead, Robert Steel, John Burness, the activist faculty members and student protestors, and others condemning the plaintiffs, impugning their integrity, and implying and/or explicitly stating that they were guilty of criminal activity; the ad placed in the *Duke Chronicle* and subsequent group and

156

individual statements by the Group of 88; harassing student protests on campus and in front of the lacrosse players' residences, which were conducted and/or organized in part by Duke faculty members and other employees; the "Wanted" and other posters distributed and posted throughout campus because of the acts and/or omissions of Duke and its agents; and in-class condemnations by Duke professors.

446. Duke's anti-harassment policy also specifically prohibits harassment of any student "on any demographic basis," including among other things race, color, ethnic origin, gender, and class. Throughout the rape hoax crisis, however, Duke made no effort whatever to enforce its anti-harassment policy against the open and flagrant violations of the policy by certain activist faculty members and student protestors, as described above. On April 5, as alleged above, when President Brodhead announced the firing of coach Pressler and the cancellation of the lacrosse season, he also appointed a committee to look into and evaluate the "criticism of the Duke Administration for being slow to respond to the allegations against the team associated with March 13." This "Bowen Committee" reported its findings on May 4. As the Committee noted, "the lacrosse team was seen by at least some part of the Duke/Durham Community as a manifestation of white, elitist, arrogant sub-culture that was both indulged and self-indulgent."

447. As noted above, numerous statements made by Duke faculty members evinced discrimination and bias against the lacrosse players on the basis of their race, gender, and class.

157

448.    Professor Houston Baker's open letter to the Duke administration of March

29, 2006 declared the players guilty of rape and denounced them on the basis of their

race, class, and gender.  In an email of June 10, 2006, Baker also stated that "46 white

guys on the lacrosse team at Duke may well have raped more than one woman."  On New

Year's Eve, December 31, 2006, Professor Baker wrote an email to Patricia Dowd,

mother of lacrosse player Kyle Dowd, that was rife with racial animus: "[Y]ou are just a

provocateur on a happy New Year's Eve trying to get credit for a *scummy bunch of white*

*males!*  You know you are in search of sympathy for young white guys … live like a

bunch of farm animals near campus. . . .  Unhappy new year to you . . . and forgive me if

you really are, quite sadly, mother of a farm animal."  (Emphasis added; grammatical and

spelling errors corrected.)  Baker's conduct constituted harassment of the players on the

basis of race and gender in violation of Duke's anti-harassment policy, causing the

players grave emotional harm, interfering significantly with the players' work and

education, and adversely affecting their living conditions.

449.    William Chafe is a professor of History at Duke University and was Dean

of Duke's Arts and Sciences faculty from 1995 to 2004.  On March 31, 2006, he

published an article in the *Duke Chronicle* entitled "Sex and Race."  It stated, in part:

"So sex and race have always interacted in a vicious chemistry of power, privilege, and

control.  Emmett Till was brutalized and lynched in Mississippi in 1954 [sic] for

allegedly speaking with too easy familiarity to a white woman storekeeper. . . .  What has

all this to do with America today, and with Duke?  Among other things, it helps put into

context what occurred in Durham two weeks ago [at the lacrosse party]." By stating that the kidnapping, beating, and murder of Emmett Till provided the proper "context" for understanding the events that transpired on March 13, Professor Chafe harassed the lacrosse players on the basis of race in violation of Duke's anti-harassment policy, causing the players severe emotional harm, interfering significantly with the players' work and education, and adversely affecting their living conditions.

450.    Reeve Huston is a history professor at Duke University.  In Spring 2006, Professor Huston taught a class on United States labor law.  Five members of the lacrosse team were enrolled in the class.  In late March or early April 2006, Professor Huston started class by saying that there was a long-standing problem of alpha white males assaulting black females in America.  Referencing the lacrosse party, Professor Huston said that a sexual assault, complete with ejaculation, had occurred.  Several of the players left class to escape this harassment.  Professor Huston's comments constituted harassment of the players on the basis of race and gender in violation of Duke's anti-harassment policy.  Professor Huston's accusations subjecting the entire lacrosse team (including plaintiffs), as well as the five individuals in the class, to notoriety, derision, humiliation, and caused them to fear for their own safety.  Due to his position of authority in the classroom, Professor Huston's statements were particularly damaging, causing grave emotional and reputational harm while severely interfering with the players' work and education, and adversely affected their living conditions.

451.   As noted above, Duke Professor Tim Tyson, who participated in organized public protests against the players, publicly maligned the players in racially charged terms in an NPR broadcast on March 27.  He likened the lacrosse players to "white supremacists" and said that the March 13 party reflected "the spirit of the lynch mob."

452.   On April 13, Duke Professor Wahneema Lubiano wrote in an online article, "I understand the impulse of those outraged and who see the alleged offenders as the exemplars of the upper end of the class hierarchy, the politically dominant race and ethnicity, the dominant gender, the dominant sexuality, and the dominant social group on campus."  In a similar vein, Duke Professor Karla Holloway wrote in an online article: "Judgments about the issues of race and gender that the lacrosse team's sleazy conduct exposed *cannot be left to the courtroom*."  (Emphasis added.)

453.   Professor Grant Farred stated at a public forum in September 2006 that "[t]he secret of Duke lacrosse came and continues to be burdened, arguably (overly so, we might argue), with its own history . . . A tendency toward misogyny and arrogant sexual prowess."  He later publicly asserted:  "At the heart of the lacrosse team's behavior is the racist history of the South."

454.   When Duke professors made racially biased and harassing statements, Duke stood by silently, making no effort to enforce Duke's anti-harassment policy against them.  Duke did not publicly disavow their statements, let alone publicly rebuke them or otherwise discourage them or other faculty members from continuing their campaigns of racial and sex-based harassment against the players.

455.    Lacrosse players were also subjected to in-class harassment on the basis of race and/or gender.  Duke took no action to investigate, punish, or otherwise enforce its anti-harassment policies against these clear violations.

## XXVIII.  The Lacrosse Team Is Exonerated

### A.    Mangum Recants Rape Charge and Nifong's Corruption Is Exposed

456.    Nifong's case against the indicted players eventually began to unravel under the scrutiny of defense attorneys and responsible journalists.

457.    At a public hearing on December 15, 2006, it became evident that the Durham Investigators had illegally conspired with DSI to conceal DNA results indicating that the DNA of at least four men, none of whom were Duke lacrosse players, had been found in Mangum's vaginal and anal regions.  Nifong had also made fraudulent misrepresentations to the court regarding this conspiracy and suppression.  Nifong was later found guilty of criminal contempt for these misrepresentations and sentenced to one day in jail.

458.    On or around December 20, 2006, Nifong received notice that the North Carolina State Bar was preparing an ethics complaint against him for violations of the North Carolina Revised Rules of Professional Conduct based on his public conduct during the investigation and prosecution of the lacrosse players.  These ethics charges arose, in large part, from Nifong's inflammatory media campaign against the lacrosse players during March and April 2006.

161

459. The challenged statements included Nifong's false public claim that the evidence from Duke Hospital's forensic examination of Mangum had led him to believe that a rape had occurred: "Nifong stated to a representative of the news media that a rape examination of the victim done at Duke Medical Center the morning of the alleged attack revealed evidence of bruising consistent with a brutal sexual assault, 'with the most likely place that it happened at the lacrosse team party.' " As noted above, Duke had known or should have known from the outset that these claims were false, but stood by silent.

460. The challenged statements also included Nifong's public statements falsely speculating that condoms had been used in the alleged rape, which he had made to defuse the impact of the negative DNA test results: "Nifong stated to a representative of the news media '[i]f a condom were used, then we might expect that there might not be any DNA evidence recovered from say a vaginal swab' …. [and] 'I would not be surprised if condoms were used. Probably an exotic dancer would not be your first choice for unprotected sex.' " Again, as alleged above, Duke knew or should have known from the outset that these statements were false, but stood by silent.

461. On December 21 Mangum told Nifong's investigators that she could no longer be 100% sure that she had actually been raped. Nifong dismissed the rape charges against the three indicted lacrosse players on December 22, but continued to prosecute the kidnapping and sexual assault charges.

462. On January 10, 2007, with Nifong under ethics charges for claiming, contrary to the medical records, that Mangum's assailants may have used condoms,

Nurse Levicy met with Durham Investigators Wilson and Himan and speculated, for the first time, that condoms might have been used in the alleged assault. This speculation, as noted above, contradicted her records that Mangum had explicitly denied, three times, that condoms were used in the alleged assault. (On February 28, Nifong relied on this statement of Levicy in his disciplinary proceedings, stating that "his comments [speculating about condom use] are consistent with the opinion of the SANE nurse who examined the victim on the night of the alleged attack.")

463. In her January 10 interview with Durham Investigators Wilson and Himan, Levicy also "stated that she wasn't surprised when she heard no DNA was found because rape is not about passion or ejaculation but about power."

**B.**   **The Attorney General Takes Over The Investigation, Finds "No Credible Evidence" Of Rape, And Declares The Lacrosse Players "Innocent"**

464. On January 12, 2007, Nifong was forced to recuse himself from the prosecution, and he referred the cases to the North Carolina Attorney General.

465. Soon after Nifong was removed from the case, Levicy met with investigators from the North Carolina Attorney General's office and conceded, for the first time, that it was possible that "no attack had occurred."

466. On January 24, 2007, a formal complaint was filed against Nifong before the Disciplinary Hearing Commission of the North Carolina State Bar.

467. The North Carolina Attorney General, who assumed responsibility for the case upon Nifong's recusal, conducted an intensive, thorough, and independent

163

investigation of the evidence. His special investigators pursued the documented inconsistencies in the accuser's allegations, examined the medical and DNA evidence, and reviewed evidence provided by defense counsel.

468.    On April 11, 2007, the Attorney General dismissed all charges against the indicted lacrosse players.  In his public statement the same day, he stated:  "We believe that these cases were the tragic result of a rush to accuse and a failure to verify serious allegations.… [W]e believe these three individuals are innocent of these charges."

469.    The Attorney General also issued a detailed report of his review of the evidence.  The report stated that there was "no credible evidence that an attack occurred in that house that night."  The report concluded:  "Based on the significant inconsistencies between the evidence and the various accounts given by the accusing witness, the Attorney General and his prosecutors determined that the three individuals were innocent of the criminal charges and dismissed the cases April 11, 2007."

470.    The Attorney General's special investigators had conducted a careful review of medical and physical evidence from Duke Hospital's forensic examination of Mangum on March 14.  The Attorney General's report concluded:  "No medical evidence confirmed [the accuser's] stories. The SANE based her opinion that the exam was consistent with what the accusing witness was reporting largely on the accusing witness's demeanor and complaints of pain rather than on objective evidence."

164

### C. Nifong Is Disbarred

471.    On June 16, 2007, Nifong was disbarred by the North Carolina State Bar for his actions relating to the lacrosse players.  In announcing the hearing committee's decision, committee chair F. Lane Williamson stated, "This matter has been a fiasco. There's no doubt about it."  He also stated, "We acknowledge the actual innocence of the defendants, and there's nothing here that has done anything but support that assertion."

### XXIX.  Defendants' Misconduct Severely Injured The Plaintiffs

472.    Defendants' acts and omissions throughout the rape hoax crisis directly and proximately caused numerous injuries to the plaintiffs.

473.    Defendants' actions both directly caused irreparable reputational injury, and enhanced the injury to reputation caused by others, to every member of the lacrosse team. As President Brodhead has himself stated, "if people have their names known across this country and around the world because of a false accusation, that is a serious injustice." Likewise, one Duke professor wrote:

> I do believe absolutely that neither the university administration nor the faculty collective can wash their hands off from protecting their (our) students at the level of defending not only their rights to due process, etc., but also the right to a good name and a good reputation and a good, unblemished record ….

474.    Defendants' actions both directly caused severe emotional distress to plaintiffs, and enhanced the severe emotional distress inflicted by the actions of others. As President Brodhead himself has conceded, "the members of the Duke men's lacrosse team have lived through an ordeal the likes of which few have known….  There is no

undoing the agonies of the last months." One Duke professor, writing as late as

November 2006 to the mother of one of the plaintiffs herein, aptly summarized the ordeal

that all the lacrosse players were still experiencing:

> I know I can't imagine what you've all gone through, are going through.
> The financial toll alone would be crippling. The physiological toll from
> waking up every day with a pit in your stomach must be high as well. And
> the kind of grief for lost ideals you're describing would burn a hole in most
> souls.

475. Defendants' actions subjected plaintiffs to harassment and vile abuse. As

President Brodhead himself has conceded, "team members had to deal with a barrage of

negative and hostile comments, from inside the Duke community as well as outside."

Due to defendants' conduct, plaintiffs feared for their lives and safety. Defendants'

actions subjected plaintiffs to virtual house arrest, restraining their freedom of movement.

Defendants' actions disrupted the lives of plaintiffs, forcing many of them to flee from

their homes and incur economic damages and lost educational opportunities due to

alternative living arrangements.

476. Defendants' actions caused the plaintiffs to suffer unjustifiable losses of

unique and irreplaceable athletic opportunities. Defendants' actions caused the plaintiffs

to lose their unique and irreplaceable opportunity to compete for and possibly achieve the

2006 ACC and National Championship titles in NCAA Division I men's lacrosse.

477. Defendants' actions caused certain plaintiffs to lose job opportunities or

other lucrative business opportunities.

478.   Due to defendants' actions, plaintiffs were forced to engage legal counsel and incur legal and other professional costs and fees to avoid legal jeopardy.  These costs include, but are not limited to, attorneys' fees expended in quashing Nifong's sham subpoena on Duke for plaintiffs' key card reports.

479.   Defendants were aware of, and intentionally or recklessly disregarded, the injuries they inflicted on the plaintiffs.

480.   Plaintiffs are entitled to recover compensatory damages from defendants for all of these injuries.

481.   Defendants' treatment of plaintiffs was fraudulent, malicious, willful and wanton.  Defendants are liable to plaintiffs for punitive damages.

## COUNT ONE

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS -- I
(Against Defendants Duke University, DUHS, Richard Brodhead, Victor Dzau, Theresa Arico, Tara Levicy)

482.   Plaintiffs incorporate the allegations in Paragraphs 1 through 481 above as if set forth fully herein.

483.   Defendant Tara Levicy intentionally provided to the Durham Investigators information about the medical and physical evidence of rape that was false and misleading.  This information was provided in repeated interviews over a prolonged period of time with intentional or reckless disregard for the truth.  The Durham Investigators expressly relied on this misinformation, and without it the rape investigation either would not have occurred or would have been terminated promptly.  Her course of

167

conduct was extreme and outrageous and exceeded all bounds of decency tolerated by society. It was intended to and did cause mental anguish and severe emotional distress to the plaintiffs or was committed with reckless disregard for its foreseeable impact on the plaintiffs' emotional states.

484. Levicy's actions were malicious, willful and wanton.

485. The actions of Levicy were performed in the scope of employment. Managers, trustees, and/or officers of Defendants Duke University, DUHS, and Duke Hospital participated in, condoned, and ratified Levicy's actions.

486. The above-named defendants ratified Levicy's course of conduct by express action through Levicy's supervisor, Theresa Arico. Arico's actions in deliberately ratifying Levicy's conduct were intentional, willful and wanton, and malicious. They were extreme and outrageous and exceeded all bounds of decency tolerated by society. And they were intended to and did inflict mental anguish and severe emotional distress on the plaintiffs or were committed with reckless disregard for their foreseeable impact on the plaintiffs' emotional state. Arico's actions were performed in the scope of employment.

487. The above-named defendants also ratified Levicy's and Arico's course of conduct through inaction, by failing to act after being apprised of material facts, and failing to conduct an investigation or adopt corrective measures in the exercise of ordinary care.

488.   The above-named defendants intended to cause mental anguish and severe emotional distress to plaintiffs or acted in reckless disregard for the plaintiffs' emotional state.  As a direct and foreseeable consequence of these actions, plaintiffs suffered mental anguish and severe emotional distress, as well as other injuries such as reputational harm, economic injuries, lost educational and athletic opportunities, and other harms.

## COUNT TWO

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – I
(Against Defendants Duke University, DUHS, Richard Brodhead,
Victor Dzau, Theresa Arico, Tara Levicy)

489.   Plaintiffs incorporate the allegations in Paragraphs 1 through 488 above as if set forth fully herein.

490.   The actions of the above-named defendants described in Count One were, at least, grossly negligent and reckless with regard to the plaintiffs' emotional state. These defendants failed to exercise due care in discharging their duties.

491.   Levicy's conduct was grossly negligent and reckless in breaching the duty of care and professional judgment required of a sexual assault nurse examiner.  Among other things, she did not exercise due care and recklessly disregarded standards of professional judgment in the examination of Crystal Mangum and her misreporting of it, and in her deliberate and/or reckless mischaracterization of the medical evidence to the Durham Investigators.

492.   Arico's conduct was grossly negligent and reckless in breaching the duty of care and professional judgment required of a SANE supervisor.  Among other things, she

169

did not exercise due care and recklessly disregarded standards of professional judgment in her supervision of Tara Levicy and in her deliberate, public ratification of Levicy's misrepresentations to the Durham Investigators.

493.    The above-named defendants were grossly negligent and reckless in their supervision of Levicy and Arico.  In addition, defendants ratified Levicy's and Arico's negligent conduct through express action and inaction.

494.    It was reasonably foreseeable that these negligent actions would cause the plaintiffs mental anguish and severe emotional distress.

495.    The negligence of these defendants did in fact cause the plaintiffs mental anguish and severe emotional distress, as well as other injuries including reputational injuries, economic injuries, dislocation from their homes and disrupted lives, lost educational, athletic, and business opportunities, and other injuries.

496.    The actions of defendants Levicy and Arico were performed in the scope of employment.  Managers and/or officers of defendants Duke University, DUHS and Duke Hospital participated in, ratified, and condoned these actions.

<u>**COUNT THREE**</u>

**NEGLIGENT SUPERVISION OF EMPLOYEES
ARICO AND LEVICY**
(Against Defendants Duke University, DUHS, Richard Brodhead,
Victor Dzau, Theresa Arico)

497.    Plaintiffs incorporate the allegations in Paragraphs 1 through 496 above as if set forth fully herein.

498. At all relevant times herein, defendants Tara Levicy and Theresa Arico were employees of Duke University, DUHS, and/or Duke Hospital.

499. As alleged above in Count One, Tara Levicy and Theresa Arico, acting in the scope of employment, committed tortious acts resulting in injuries to the plaintiffs.

500. The above-named defendants knew or had reason to know, on the basis of information in their custody, of Levicy and Arico's tortious course of conduct directed against the plaintiffs.

501. These defendants failed to exercise due care to supervise and to take steps to prevent and stop Levicy and Arico from committing and continuing their tortious course of conduct, and failed to exercise due care to correct the injuries caused by plaintiffs by their tortious acts. Rather, these defendants ratified and condoned Levicy's dissemination of misinformation to police and prosecutors.

502. These defendants' breach of their duty to supervise proximately caused injuries to the plaintiffs, including irreparable reputational harm, severe emotional distress, economic injuries, and loss of educational and athletic opportunities, as well as enhancing injuries caused by other actors.

503. On information and belief, the breach of their duty to supervise was committed through knowing and intentional actions of the officers, managers, and directors of Duke University, DUHS, and Duke Hospital acting in their scope of employment. It was willful and wanton, and malicious.

<u>**COUNT FOUR**</u>

**BREACH OF DUTY OF CARE IN CONDUCTING AND REPORTING
OF FORENSIC MEDICAL EXAMINATION**
(Against Defendants Duke University, DUHS, Richard Brodhead,
Victor Dzau, Theresa Arico, and Tara Levicy)

504.    Plaintiffs incorporate the allegations in Paragraphs 1 through 503 above as if set forth fully herein.

505.    The above-named defendants owed plaintiffs a duty of reasonable care in the conduct of Duke Hospital's forensic and/or medical examinations of Mangum in connection with her allegations of rape.  This duty included the duty to exercise due care in collecting, assessing, analyzing, and reporting the physical and medical evidence derived from Duke's examinations of Mangum on March 14, 2006.

506.    The above-named defendants, by and through their managers and employees Arico and Levicy, intentionally and/or recklessly breached this duty of care. This breach included, but was not necessarily limited to, Levicy's misrepresentations to the Durham Investigators and others that the medical and physical evidence was consistent with Mangum's rape allegations; defendants' failure to require sufficient training to its sexual assault nurse examiners and its failure to ensure that a properly trained SANE nurse examined Mangum; defendants' failure to provide adequate supervision of Levicy and other SANE nurses; Levicy's subsequent mischaracterizations of the medical and physical evidence to the Durham Investigators; defendants' suppression of and/or failure to disclose exculpatory information derived from Duke's examinations of Mangum on March 14; Arico's public statements ratifying Levicy's

172

misrepresentations concerning the medical and physical evidence from Duke's examinations of Mangum; defendants' failure to correct Levicy's misrepresentations concerning the medical and physical evidence from Duke's examinations of Mangum; and other actions.

507.    As a direct and foreseeable consequence of these defendants' breach of duty, the plaintiffs suffered injuries including irreparable reputational harm, severe emotional distress, economic injuries, and loss of educational and athletic opportunities, as well as enhancement of injuries caused by other actors.

508.    Levicy and Arico's actions were performed in the scope of employment. Managers and/or officers of DUHS and Duke Hospital participated in, ratified, and condoned this breach of duty.

509.    The breach of this duty was committed through intentional actions, as well as conduct that was reckless, grossly negligent, and/or negligent.  It was willful and wanton, and malicious.

## COUNT FIVE

### BREACH OF DUTY TO WARN AND PROTECT AGAINST HAZARD CREATED BY DEFENDANTS
(Against Defendants Duke University, DUHS, Richard Brodhead,
Victor Dzau, Theresa Arico, Tara Levicy)

510.    Plaintiffs incorporate the allegations in Paragraphs 1 through 509 above as if set forth fully herein.

511.    As related above, defendants Duke University and its controlled affiliates DUHS and Duke Hospital, by and through their officers and employees including Arico,

173

Levicy, and unnamed others, intentionally and/or recklessly created a hazardous condition that foreseeably threatened and injured the liberty, physical safety, reputations, emotional state, and educational opportunities of the plaintiffs and their families. They created this hazardous condition by intentionally and/or recklessly providing false and misleading information to the Durham Investigators and thereby instigating, encouraging, and/or prolonging a baseless criminal investigation against the plaintiffs.

512.    The above-named defendants, based on information in their exclusive possession, knew and should have known that this hazardous condition unjustly and unjustifiably threatened the plaintiffs. The plaintiffs were thereby subject to an unreasonable risk of grievous injury.

513.    The above-named defendants had a duty to warn the plaintiffs about and to protect the plaintiffs from this hazardous condition that defendants themselves had created.

514.    These defendants failed to exercise due care to warn the plaintiffs about and to protect the plaintiffs from the hazardous condition. They took no reasonable steps to disclose to the plaintiffs the false and misleading nature of the information provided to the Durham Investigators or to otherwise protect plaintiffs from the dangerous situation that defendants had created. Rather, they took affirmative steps to maximize the plaintiffs' exposure to the danger by concealing and suppressing exculpatory information, defrauding and harassing the plaintiffs, and actively conspiring and collaborating with the Durham Supervisors and Durham Investigators to aggravate and prolong the ordeal.

515.     The defendants' breach of this duty directly and foreseeably caused injuries to the plaintiffs, including irreparable reputational harm, mental anguish, severe emotional distress, economic injuries, and loss of educational and athletic opportunities, as well as enhancing injuries caused by other actors.

516.     The actions of these defendants in failing to warn and to protect were performed in the scope of employment, and Duke's officers, directors, trustees, and/or managers participated in, ratified, and condoned this breach of duty.

517.     The breach of this duty was committed through intentional actions.  It was fraudulent, willful and wanton, and malicious.

## COUNT SIX

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS -- II
(Against Defendants Duke University, DUHS, Richard Brodhead, Larry Moneta,
Peter Lange, John Burness, Tallman Trask, Sue Wasiolek, Victor Dzau,
Kate Hendricks, Matthew Drummond, the Duke Police)

518.     Plaintiffs incorporate the allegations in Paragraphs 1 through 517 above as if set forth fully herein.

519.     The course of conduct adopted by defendants and by defendant Duke University, by and through the above-named defendant officials and employees, throughout the rape hoax crisis was extreme and outrageous and exceeded all bounds of decency tolerated in society.  It was intended to cause, and did cause, mental anguish and severe emotional distress to the plaintiffs.

520.     The above-named defendants' course of conduct throughout the rape hoax crisis was malicious, willful and wanton.  It involved fraud, duplicity, and deceit.  It was

175

treacherous and involved repeated abuses by Duke officers of positions of trust to achieve their own ends and protect Duke's interests and their own interests at the expense of plaintiffs.

521.   This course of conduct includes, but is not limited to:  defendants' ratification of defendant Levicy's misrepresentations to the Durham Investigators; the abuse of trust by defendants and other Duke officials in attempting to interfere with plaintiffs' exercise of their constitutional rights; defendants' active suppression of exculpatory evidence; the conduct and statements by defendants and other Duke administration officials, including Robert Steel, maligning the lacrosse players and inciting public resentment and passions against them; defendants' active conspiracy and collaboration with the Durham Investigators and Durham Supervisors, who defendants knew or had reason to know to be acting in bad faith, to deprive the plaintiffs of their constitutional and legal rights; defendants' fraudulent conspiracy with the Durham Investigators to conceal violations of FERPA; defendants' bad-faith breaches of contract against the plaintiffs, including harassment and cancellation of the lacrosse season; defendants' unjustified and bad faith discharge of the lacrosse team's coach; defendants' failure to supervise its own professors, employees, and students to prevent them from, or sanction them for, subjecting the plaintiffs to humiliating and defamatory public harassment, including racial and gender-motivated harassment; and defendants' organization, acquiescence in, and approval of campus protests and other public harassment of the plaintiffs by Duke's professors, employees, and students.

176

522.    Defendants performed these actions with intentional and/or reckless disregard for the emotional state of the plaintiffs.

523.    This extreme and outrageous conduct was intended to, and did cause, mental anguish and severe emotional distress to the plaintiffs.

524.    The actions of these defendant officers and employees in perpetrating this outrageous conduct were performed in the scope of employment.  Duke's officers, directors, trustees and/or managers participated in, ratified, and condoned this outrageous course of conduct.

525.    This course of conduct was fraudulent, willful and wanton, and malicious.

## COUNT SEVEN

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – II
(Against Defendants Duke University, DUHS, Richard Brodhead, Larry Moneta,
Peter Lange, Sue Wasiolek, John Burness, Tallman Trask, Victor Dzau,
Kate Hendricks, Matthew Drummond, Duke Police)

526.    Plaintiffs incorporate the allegations in Paragraphs 1 through 525 above as if set forth fully herein.

527.    The conduct described above involved numerous repeated breaches of the above-named defendants' identified duties of due care.  These breaches were grossly negligent and reckless with respect to the duties owed to the plaintiffs and with respect to the plaintiffs' emotional state.  Moreover, taken together, these defendants' breaches of duty constituted a reprehensible course of conduct that, in addition to being intentional, was reckless and grossly negligent with respect to the duties owed to the plaintiffs and to their emotional states.

177

528.    It was reasonably foreseeable that these breaches of duty would cause the plaintiffs mental anguish and severe emotional distress.

529.    These breaches of duty did in fact cause the plaintiffs mental anguish and severe emotional distress, as well as other injuries including reputational harm, economic damages, dislocation from homes and disruption of lives, lost educational, athletic, and business opportunities, and other injuries.

530.    The repeated breaches of duty committed through these actions were malicious, willful and wanton, and were performed in the scope of defendants' employment.  Duke's officers, directors, trustees, and/or managers participated in, ratified, and condoned these actions.

## COUNT EIGHT

### FRAUD AND CONSPIRACY TO DEFRAUD
(Against Defendants Duke University, Kate Hendricks, Matthew Drummond, the Duke Police, the Durham Investigators, the City of Durham)

531.    Plaintiffs incorporate the allegations in Paragraphs 1 through 530 above as if set forth fully herein.

532.    The letters sent to the plaintiffs and their attorneys by defendants Kate Hendricks and Matthew Drummond constituted false representations and/or concealment of the material fact that defendant Duke University had already disclosed the plaintiffs' confidential March 13 and 14 key card reports to the Durham Investigators in violation of FERPA.

178

533.   These representations and concealments were reasonably calculated to deceive plaintiffs and their counsel, and did in fact deceive them, into believing that Duke had not already disclosed the key card information.

534.   On information and belief, the above-named defendants and/or other senior Duke University and Durham officials were aware that Duke had already disclosed this information to the Durham Investigators.  These misrepresentations and concealments were made with intent to deceive plaintiffs.

535.   Plaintiffs and their attorneys reasonably believed and relied upon the representation that the key card information had not been disclosed.  Among other things, they expended significant time, effort, resources, and attorney's fees in moving to quash the sham subpoena that Nifong had served for the key card reports that he already had. The above-named defendants, and/or other Duke University and Durham officials knew that this subpoena was a sham.

536.   On information and belief, the above-named defendants conspired and collaborated with one another in issuing the sham subpoena and the fraudulent letters with the intent to deceive plaintiffs and to conceal Duke University's illegal prior disclosure, and the Durham Investigators' illegal prior use, of the key card reports.

537.   Defendants' actions, individually and in concert, were fraudulent, willful and wanton, and malicious.

538.   The actions of the above-named defendants, individually and jointly, were performed in the scope of employment.  On information and belief, Duke University

179

officers, directors, trustees, and/or managers and the Durham Supervisors participated in, ratified, and condoned the fraud.

## COUNT NINE

### NEGLIGENT MISREPRESENTATION
(Duke University, Kate Hendricks, Matthew Drummond)

539.    Plaintiffs incorporate the allegations in Paragraphs 1 through 538 above as if set forth fully herein.

540.    Even if the misrepresentations and concealments alleged above were not intentional, they were performed by the above-named defendants in breach of their duty to take care not to make false statements to and/or conceal material facts from plaintiffs. The plaintiffs justifiably relied to their detriment on defendants' misrepresentations and concealments.

541.    As a direct and foreseeable consequence of defendants' misrepresentations, plaintiffs suffered injuries including the expenditure of time, effort, resources, and attorney's fees in quashing the sham subpoena.

## COUNT TEN

### ABUSE OF PROCESS AND CONSPIRACY TO ABUSE PROCESS
(Against Defendants Duke University, Kate Hendricks, Matthew Drummond,
the Duke Police, the Durham Investigators, the City of Durham)

542.    Plaintiffs incorporate the allegations in Paragraphs 1 through 541 above as if set forth fully herein.

180

543.     As alleged above, the above-named defendants, acting individually and in concert with one another, obtained the issuance and service of a sham subpoena for plaintiffs' key card reports.

544.     This subpoena was sought and served by these defendants to achieve a collateral purpose not within the intended scope of the process used -- namely, to conceal the facts that Duke University had already illegally disclosed, and the Durham Investigators had illegally used the key card reports.

545.     By collaborating in the issuance and use of a sham subpoena, the defendants committed a willful act whereby they sought to use the subpoena power of the court as a means to gain advantage of the plaintiffs in respect to some collateral matter -- namely, to conceal from plaintiffs defendants' illegal prior disclosure and use of the key card reports.

546.     The defendants' actions, individually and jointly, proximately caused injuries to the plaintiffs, including the concealment of defendants' prior illegal disclosures and use of the key card reports and the consequent expenditure of time, effort, and attorney's fees in seeking to quash the sham subpoena.

547.     Defendants' actions, individually and jointly, were performed in the scope of employment.  On information and belief, Duke's officers, directors, trustees, and/or managers and the Durham Supervisors participated in, ratified, and condoned these actions.

548. The breach of this duty was committed through intentional actions. It was fraudulent, willful and wanton, and malicious.

## COUNT ELEVEN

### CONSTRUCTIVE FRAUD THROUGH ABUSE OF CONFIDENTIAL RELATIONSHIP
(Against Defendants Duke University, Richard Brodhead, Tallman Trask, Sue Wasiolek, J. Wesley Covington)

549. Plaintiffs incorporate the allegations in Paragraphs 1 through 548 above as if set forth fully herein.

550. A relationship of trust and confidence existed between defendant Sue Wasiolek and the plaintiffs, whom she voluntarily undertook to advise during the lacrosse rape hoax crisis. This confidential relationship was based upon her official role as Dean of Students and her status a trusted and authoritative advisor to students in difficulty; her role as an attorney bound by canons of legal ethics and upright dealing; and her role as an authorized representative and agent of Duke University to its students. She stood in a special relationship of mutual benefit and control with respect to the lacrosse players. Defendants Richard Brodhead and Tallman Trask held similar positions of authority at Duke University, and enjoyed a similar relationship of trust and confidence with plaintiffs. Due to this relationship of trust and confidence, the above-named defendants were bound in equity and good conscience to act in good faith and with due regard for the interests of plaintiffs, who reposed confidence in them.

551. Defendants abused their relationship of trust and confidence to harm the plaintiffs. Defendant Wasiolek did so by advising the plaintiff lacrosse players not to tell

182

their parents of the rape allegations made against them and of the legal jeopardy facing them, and advising them not to seek and obtain legal representation, in violation of North Carolina rules of professional ethics. Among other Duke officials, Defendant Brodhead contributed to this constructive fraud by reinforcing and reaffirming that the Duke administration stood in a relationship of trust and confidence with the players, and Defendant Trask contributed to it by reinforcing Wasiolek's advice to the players not to procure legal representation. This conduct was directly contrary to the plaintiffs' interest, placed them in grave legal jeopardy, and had the direct and predictable effect of prolonging and exacerbating the rape hoax crisis, and thereby harmed plaintiffs.

552. These defendants also abused their relationship of trust and confidence with the plaintiffs by steering them to defendant Wes Covington for confidential advice and guidance, including legal advice. Wasiolek and Covington also exploited the unique relationship of trust, confidence, and authority that Coach Pressler enjoyed with the plaintiffs by using Pressler as a conduit for their advice, and a promoter of Covington. Covington and Wasiolek also used Pressler's relationship with the plaintiffs to arrange for uncounseled interrogations with the Durham Investigators that were contrary to the plaintiffs' legal interests.

553. Defendant Wes Covington enjoyed a position of trust and confidence with the plaintiffs. This position was created by his holding himself out to them as their lawyer and/or confidential counselor, and was reinforced by Wasiolek's recommendation that the plaintiffs seek his confidential advice and her representation that he was acting on

183

their behalf.  Covington collaborated with Wasiolek and other Duke officials in abusing this position, and subordinating the interests of the plaintiff lacrosse players to the interests of Duke University and its officials.

554.    In abusing their positions of trust and confidence, above-named defendants were motivated by the desire to serve and protect Duke University's and their own personal interests over the interests of the plaintiffs.  Defendants did not disclose this conflict of interest to the plaintiffs.

555.    Plaintiffs suffered injuries as a direct and foreseeable consequence of the abuse of these positions of trust and confidence.  Among other things, this abuse prevented them from procuring independent legal representation at the critical initial stages of the rape hoax investigation.  It foreseeably and proximately caused the prolonging of the rape investigation and the resulting emotional distress, permanent reputational harm, loss of educational opportunities, and other injuries to plaintiffs.  It also enhanced the injury inflicted on the plaintiffs by other defendants in the rape hoax crisis.

556.    The actions of defendant Duke officers and employees in perpetrating this constructive fraud were performed in the scope of employment.  Duke's officers, directors, trustees and/or managers participated in, ratified, and condoned the fraud.

557.    This constructive fraud was fraudulent, willful and wanton, and malicious.

## COUNT TWELVE

## BREACH OF DUTY OF CARE IN THE CONDUCT OF
## A VOLUNTARY UNDERTAKING
(Against Defendants Duke University, Richard Brodhead,
Tallman Trask, Sue Wasiolek, Wes Covington)

558.    Plaintiffs incorporate the allegations in Paragraphs 1 through 557 above as if set forth fully herein.

559.    As related above, the above-named defendants voluntarily undertook to counsel, advise, guide and assist the plaintiffs in protecting their interests in the rape hoax crisis.  They deliberately acted to discourage the plaintiffs from seeking the advice of other counselors, advisors, and helpers, such as the plaintiffs' parents and independent attorneys.

560.    Having voluntarily undertaken the responsibility of advising, counseling, and guiding the lacrosse players during the crisis, the above-named defendants assumed the duty to exercise due care in the provision of this counsel and guidance.

561.    Defendants failed to exercise due care in the provision of advice, counsel, and guidance.  They were reckless with regard to the well-being of those they undertook to counsel and advise.  They intentionally breached their duty to exercise due care as counselors and advisors, seeking instead to deceive plaintiffs into subordinating their own rights and interests to the interests of Duke University and themselves.

562.    The defendants' breach directly and foreseeably caused injuries to the plaintiffs, including irreparable reputational harm, severe emotional distress, economic

185

injuries, and loss of educational and athletic opportunities, as well as enhancing injuries caused by other actors.

563. The actions of defendants in breaching this duty were performed in the scope of employment. Duke's officers, directors, trustees, and/or managers participated in, ratified, and condoned this breach of duty.

564. The breach of this duty was committed through intentional actions. It was fraudulent, willful and wanton, and malicious.

## COUNT THIRTEEN

### BREACH OF DUTY BASED ON SPECIAL
### RELATIONSHIP OF MUTUAL BENEFIT
(Against Defendants Duke University, Richard Brodhead)

565. Plaintiffs incorporate the allegations in Paragraphs 1 through 564 above as if set forth fully herein.

566. Defendant Duke University has a special relationship with its varsity athletes, including plaintiff lacrosse players. It enjoyed numerous benefits from the lacrosse team, and exerted significant control over the team and its players.

567. Among other benefits, Duke University enjoyed increased revenues and fundraising, recruitment of students and student-athletes, national media attention, and national prestige due to its championship lacrosse team.

568. Defendant Duke University exercises substantial control over the lacrosse players and other student athletes, subjecting them to enhanced expectations of academic performance and on- and off-campus behavior.

186

569.    By virtue of this special relationship of mutual benefit and control, defendants had a duty to take reasonable steps to protect its student-athletes from harm, including threats to their liberty, personal safety, and reputation due to false allegations of rape, harassment, and a rogue criminal investigation.

570.    As related above, defendants repeatedly breached this duty of care by failing to take reasonable steps to protect the lacrosse players from threats to their liberty, physical and economic well-being, reputation, emotional states, and enjoyment of athletic and educational opportunities.

571.    The defendants' breach directly and foreseeably caused injuries to the plaintiffs, including irreparable reputational harm, severe emotional distress, economic injuries, and loss of educational and athletic opportunities, as well as enhancing injuries caused by other actors.

572.    The actions of defendant officers and employees in breaching this duty were performed in the scope of employment.  Duke's officers, directors, trustees, and/or managers participated in, ratified, and condoned this breach of duty.

573.    The breach of this duty was committed through intentional actions.  It was fraudulent, willful and wanton, and malicious.

## COUNT FOURTEEN

### BREACH OF DUTY TO PROTECT STUDENTS FROM KNOWN DANGERS AND HARASSMENT
(Against Defendant Duke University)

574.   Plaintiffs incorporate the allegations in Paragraphs 1 through 573 above as if set forth fully herein.

575.   By and through the adoption, promulgation, and enforcement of the anti-harassment policies described below, among other actions, defendant Duke University voluntarily undertook a duty to exercise reasonable care in preventing harassment against the plaintiffs.

576.   This duty is also reinforced by Duke University's contractual and implied contractual duties to the plaintiffs, and by defendants' duties to plaintiffs as invitees on University property.

577.   The acts of harassment, including racial, class-based, and gender-based harassment by Duke professors, students, and employees against plaintiffs detailed herein were both actually known and foreseeable to Duke University and to defendant University officials.  The persons committing these acts of harassment were subject to defendants' control and supervision.

578.   Defendant Duke University breached its duty to protect the plaintiffs from harassment by negligently failing to prevent the harassment, by failing to exercise its authority to put an end to the harassment and to sanction those responsible for it, and by intentionally inciting, participating in, promoting, and ratifying the harassment.

579. As a direct and foreseeable result of defendants' conduct, the plaintiffs suffered injuries including irreparable reputational harm, severe emotional distress, economic injuries, and loss of educational and athletic opportunities.

580. The actions of defendants in breaching this duty were performed in the scope of employment. Duke's officers, directors, trustees, and/or managers participated in, ratified, and condoned this breach of duty.

581. The breach of this duty was committed through intentional actions. It was fraudulent, willful and wanton, and malicious.

## COUNT FIFTEEN

### BREACH OF CONTRACT
(Against Defendant Duke University)

582. Plaintiffs incorporate the allegations in Paragraphs 1 through 581 above as if set forth fully herein.

583. According to defendant Duke University's 2005-06 Undergraduate Bulletin ("Bulletin"), "[e]ach student is subject to the rules and regulations of the university currently in effect, or which are put into effect from time to time by the appropriate authorities of the university."

584. The Bulletin sets forth an anti-harassment policy, which states: "Harassment of any individual for any reason is not acceptable at Duke University…." The Bulletin defines harassment as "verbal or physical conduct—which may or may not be sexual in nature—that, because of its severity and/or persistence, interferes significantly with an individual's work or education, or adversely affects an individual's

189

living conditions." According to the Bulletin, "[t]he conduct alleged to constitute harassment under this policy shall be evaluated from the perspective of a reasonable person similarly situated to the complainant and in consideration of the context of the behavior."

585.    Duke University faculty and staff are subject to Duke University's anti-harassment policy, and are subject to the same standards of behavior as students.

586.    Plaintiffs applied to and enrolled in Duke University, and paid tuition and/or other fees and expenses to Duke University in reliance on the understanding and expectation that Duke University would implement and enforce these and other promises and policies made in its Bulletin, Faculty Handbook, and other relevant documents, including those not mentioned in this Complaint.

587.    A contract, which is express or in the alternative implied, was therefore formed between defendant Duke University and the plaintiffs and their parents.

588.    Defendant Duke University materially breached its contract with the plaintiffs (as well as an implied covenant of good faith and fair dealing). This breach was committed through conduct by Duke officers, managers, and employees acting in the scope of employment, and by Duke professors, employees, and students acting under the supervision and control of defendants. The breach of contract includes but is not limited to the following:

589.    *Breach of anti-harassment policy.* The actions and statements of Duke University officials, professors, employees, and students as alleged in this Complaint

190

violated Duke University's anti-harassment policy. These acts and statements include but are not limited to: myriad public and private statements by Duke officials, professors, employees, and students condemning and vilifying the plaintiffs, falsely impugning their integrity, and falsely implying and/or explicitly stating that they were guilty of committing, aiding, abetting, and/or concealing a gang rape; the "Group of 88 ad" placed in *The Chronicle* and other group and individual statements by the Duke Professors; harassing protests on campus and in front of the plaintiffs' residences, which were conducted and/or organized in part by Duke professors and employees; the Wanted Poster, Vigilante Poster, and other posters distributed and posted throughout campus because of the acts and/or omissions of Duke University and its agents; in-class condemnations of plaintiffs by Duke professors; and the failure of Duke administrators and other officials to take action to prevent, stop, and sanction these acts of harassment.

590. These statements and actions constituted harassment in violation of Duke's contractual promises through its anti-harassment policy, to provide campus and learning environment free of harassment against students. They constitute words and conduct that, because of their severity and/or persistence, interfered significantly with the plaintiffs' work, athletic activity, and education, and adversely affected the plaintiffs' living conditions and learning environment. Any reasonable person in the plaintiffs' position would experience the humiliation, shame, and public contempt that these acts and statements brought upon the plaintiffs. In context, these actions and statements amounted to a material breach of contract between defendant Duke University and

plaintiffs, causing plaintiffs severe mental, emotional, reputational, educational, and pecuniary harm, and denying them the benefit of their bargain.

591. *Cancellation of the lacrosse season.* Plaintiffs applied to and enrolled in Duke University, and paid tuition and other fees and expenses, in reliance on the understanding that they would have the opportunity to play lacrosse, to compete for the ACC and national championships, and to play lacrosse for Coach Pressler. Plaintiffs were recruited to enroll at Duke University on that basis. Plaintiffs further relied on the implied understanding that the season would not be canceled, and Coach Pressler would not have been forced to resign, in bad faith for invalid and illegitimate reasons. Nevertheless, on April 5, 2006, after already forcing the lacrosse team to forfeit two games for the March 13 party, defendants canceled the remainder of the lacrosse season without valid and legitimate justification. Regarding the cancellation, Board Chairman Robert Steel said: "We had to stop those pictures [of the players practicing]. It doesn't mean that it's fair, but we had to stop it. It doesn't necessarily mean I think it was right— it just had to be done." On the same day, defendants also forced Coach Pressler to resign, also without valid and legitimate justification.

592. By unjustifiably cancelling the lacrosse season and forcing Coach Pressler to resign, defendants materially breached an express and/or implied contract with the plaintiffs, including an implied covenant of good faith and fair dealing, denying them the benefit of their bargain, and causing them to suffer emotional, educational, reputational, and other harm.

192

593. *Violation of procedural rights.* The Bulletin guarantees various rights to students accused of a violation. For example, at pages 35-36, the Bulletin guarantees that "[a]ccused students can expect a presumption of innocence throughout the disciplinary process unless found responsible through a fair and impartial hearing, and will be treated with respect throughout the process." Through numerous actions and omissions described above in this Complaint, defendant substantially breached this contractual term.

594. The plaintiffs applied to and accepted Duke University's offer of admission, and paid tuition and other fees and expenses, in reliance on the understanding that Duke would fulfill its contractual obligations as set forth above. As a result of the actions and omissions of defendants, plaintiffs were denied the benefit of their bargain.

595. As a direct and foreseeable consequence of these breaches, plaintiffs suffered injuries including invasion of privacy, dislocation from their homes, emotional distress, loss of educational and athletic opportunities, economic injuries, as well as enhancement of injuries caused by other actors.

596. Plaintiffs are entitled to recover damages for injuries caused by defendant Duke University's breach of the express and/or implied contractual obligations described above.

## COUNT SIXTEEN

### TORTIOUS BREACH OF CONTRACT
(Against Defendant Duke University)

597. Plaintiffs incorporate the allegations in Paragraphs 1 through 596 above, as if set forth fully herein.

193

598.    As related in Count Fifteen, defendant Duke University materially breached its contract obligations to plaintiffs.

599.    In addition, these material breaches were accompanied by aggravating and bad-faith actions (including but not limited to conspiracy, fraud, and/or misrepresentation as described above) by Duke officials, professors, employees, and students sufficient to constitute tortious breach of contract.

600.    These actions were committed in the scope of employment and were ratified by officers, trustees, and managers of Duke University, as alleged herein.  Also as alleged herein, these actions were fraudulent, willful and wanton, and malicious.

601.    As a direct and foreseeable consequence of defendants' actions, plaintiffs suffered the injuries described above.

## COUNT SEVENTEEN [WITHDRAWN]

### PROMISSORY ESTOPPEL
(Against Defendant Duke University)

602.    [Withdrawn].

603.    [Withdrawn].

604.    [Withdrawn].

605.    [Withdrawn].

## COUNT EIGHTEEN

### INTRUSION UPON SECLUSION, SOLITUDE, AND PRIVATE AFFAIRS
(Against Defendants Duke University, Richard Brodhead,
Tallman Trask, Peter Lange, John Burness, Larry Moneta)

606.    Plaintiffs incorporate the allegations in Paragraphs 1 through 605 above as if set forth fully herein.

607.    Defendant Duke University, through the actions and failures to act of its officers, professors, employees, and students, intentionally intruded upon, and caused intrusions upon, both physically and otherwise, the solitude or seclusion of plaintiffs and on plaintiffs' private affairs or concerns.

608.    The intrusions that were inflicted and/or caused to be inflicted on plaintiffs' solitude, seclusion, and private affairs are alleged in detail in this Complaint and include, by way of example:  physical invasions and incitements of physical invasions on the plaintiffs' homes and private residences; participation in and incitement of loud, obstreperous, threatening, and humiliating protests at plaintiffs' residences and on campus; subjecting plaintiffs to physical harassment in their homes and on campus by media reporters, camera crews, and protestors; subjecting plaintiffs to public harassment, humiliation, and obloquy in their classes and on campus; subjecting plaintiffs to uncounseled, surprise interrogations by the Durham Investigators in their private residences and dorms; and other highly offensive intrusions.

609.    These intentional intrusions were highly offensive to plaintiffs and would be to any reasonable person.

195

610.    As a direct and foreseeable consequence of these intrusions, plaintiffs suffered injuries including invasion of privacy, dislocation from their homes, emotional distress, loss of educational and athletic opportunities, economic injuries, as well as enhancement of injuries caused by other actors.

611.    These actions and failures to act were performed in the scope of employment of Duke's officers, professors, employees, and/or managers.  Duke's officers, directors, and trustees  participated in, ratified, and condoned these intrusions upon the plaintiffs' seclusion and solitude.

612.    The breach of this duty was committed through intentional actions.  It was willful and wanton, and malicious.

## COUNT NINETEEN

### NEGLIGENT SUPERVISION OF DUKE PROFESSORS AND EMPLOYEES
(Against Defendants Duke University, Richard Brodhead,
Larry Moneta, Peter Lange, Tallman Trask)

613.    Plaintiffs incorporate the allegations in Paragraphs 1 through 612 above as if set forth fully herein.

614.    The Duke Officers, professors and employees referenced herein were employees of Duke University during the relevant time periods.

615.    As alleged above and below, these employees of Duke University committed tortious acts resulting in injuries to the plaintiffs.

616.    The above-named defendants knew or had reason to know of these employees' propensity to engage in tortious acts of fraud, intentional and negligent

196

infliction of emotional distress, harassment, nuisance, intrusion upon seclusion, defamation and other torts against plaintiffs. These defendants were advised of the Duke employees' ongoing tortious conduct and they took no action to stop, prevent, or sanction them, but rather condoned, approved, and ratified the incidents of tortious conduct.

617. The defendants' negligent failure to supervise these Duke employees' directly and foreseeably caused injuries to the plaintiffs, including irreparable reputational harm, severe emotional distress, economic injuries, and loss of educational and athletic opportunities, as well as enhancing injuries caused by other actors.

618. Defendants' breach of this duty to supervise was committed through knowing and intentional actions, taken in their scope of employment. It was willful and wanton, and malicious.

## COUNT TWENTY

### VIOLATION OF AND CONSPIRACY TO VIOLATE FOURTH AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983 -- KEY CARD REPORTS
(Against Defendants Duke University, Kate Hendricks, Matthew Drummond, the Duke Police, the Durham Investigators, City of Durham)

619. Plaintiffs incorporate the allegations in Paragraphs 1 through 618.

620. Plaintiffs had a reasonable expectation of privacy in the electronic records of their comings, goings, purchases, and other card-swipe transactions on the Duke campus. This expectation was supported by, among other things, federal privacy laws and Duke's own privacy policies.

621. As alleged in Count Eight, the above-named Duke defendants' illegal disclosure of the key card reports and the defendant Durham Investigators' use of the key

197

card information, and the fraudulent conspiracy and abuse of judicial process designed to conceal that disclosure and use, violated plaintiffs' rights under federal law and the Fourth Amendment of the U.S. Constitution.

622.    This violation of plaintiffs' Fourth Amendment rights was perpetrated by the above-named Duke Defendants acting in concert with the defendant Durham Investigators. The defendant Duke Police and defendant Durham Investigators were acting under color of state law within the meaning of 42 U.S.C. § 1983. Duke University and its officials, employees, and agents were willing participants in this joint activity. There was also an agreement and meeting of the minds between these Duke defendants and the defendant Durham Investigators to deprive plaintiffs of their protected rights. There was also an agreement and meeting of the minds between these Duke defendants and the Durham Investigators to fraudulently conceal the violation of those protected rights.

623.    Defendants' actions, individually and jointly, were malicious and evidenced a callous and reckless disregard for, and deliberate indifference to, plaintiffs' constitutional rights.

624.    As a direct and foreseeable consequence of defendants' conduct, plaintiffs suffered injuries, including invasion of constitutionally protected privacy, economic damages, prolonged subjection to the ordeal of the rape investigation and consequent public obloquy and humiliation, and other harms. In addition, the violation of plaintiffs' Fourth Amendment rights aggravated the injuries due to other actors.

198

625.    The actions of defendants, individually and jointly, were performed in the scope of employment, and were ratified and condoned by Duke University's officers and directors and by the Durham Supervisors.

626.    For the reasons stated in Count Twenty-six, the defendant City of Durham is liable for the Durham Investigators' actions under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1977).

## COUNT TWENTY-ONE

### VIOLATION OF AND CONSPIRACY TO VIOLATE FOURTH AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983 -- DNA SAMPLES
(Against Defendants Duke University, DUHS, Theresa Arico, Tara Levicy, the Durham Investigators, City of Durham)

627.    Plaintiffs incorporate the allegations in Paragraphs 1 through 626.

628.    Plaintiffs had a reasonable expectation of bodily privacy, protected by the Fourth Amendment to the U.S. Constitution, in the provision of DNA samples to the defendant Durham Investigators in connection with the rape hoax investigation.

629.    DNA samples were compelled from the plaintiffs pursuant to a false and overbroad application for a non-testimonial identification order that violated their Fourth Amendment rights.  The overbroad NTO application was prepared by the Durham Investigators, who knowingly premised it, on information and belief, on false and misleading information knowingly provided by Duke Hospital and defendant Levicy.

630.    This violation of plaintiffs' Fourth Amendment rights was perpetrated through the actions of defendant Levicy, acting in concert with the Durham Investigators, who were persons acting under color of state law within the meaning of 42 U.S.C. §

199

1983. The above-named defendants were willing participants in this joint activity. There was an agreement and meeting of the minds between defendant Levicy and the defendant Durham Investigators, to deprive plaintiffs of protected rights.

631. Defendants' actions, individually and jointly, were malicious and evidenced a callous and reckless disregard for, and deliberate indifference to, plaintiffs' constitutional rights.

632. As a direct and foreseeable consequence of defendants' conduct, plaintiffs suffered injuries, including invasion of constitutionally protected privacy, economic damages, prolonged subjection to the ordeal of the rape investigation and consequent public obloquy and humiliation, and other harms. In addition, the violation of plaintiffs' Fourth Amendment rights aggravated the injuries inflicted by other causes.

633. The actions of defendant Levicy and defendant Durham Investigators, individually and jointly, were performed in the scope of employment, and were ratified and condoned by DUHS and Duke Hospital, through defendant Arico, and by the Durham Supervisors.

634. For the reasons stated in Count Twenty-six, the defendant City of Durham is liable for the Durham Investigators' actions under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1977)

## COUNT TWENTY-TWO

## VIOLATION OF AND CONSPIRACY TO VIOLATE FOURTEENTH AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983 -- MALICIOUS INVESTIGATION
(Against All Defendants)

635.  Plaintiffs incorporate the allegations in Paragraphs 1 through 634.

636.  As alleged herein, the defendants were willing participants in a joint course of conduct, together with the Durham Investigators and Duke Police who were acting under color of law, to instigate, promote, facilitate, and prolong a malicious, bad faith criminal investigation of plaintiffs.  This malicious investigation was highly outrageous, undertaken in bad faith, caused by malicious motives, and involved conduct that shocks the conscience.  It violated plaintiffs' due process rights under the Fourteenth Amendment of the U.S. Constitution.

637.  Among defendants' malicious actions that shock the conscience, the Durham defendants knowingly disseminated false information and made false public statements; retaliated against plaintiffs for the exercise of constitutional rights; conspired with other defendants to violate plaintiffs' Fourth Amendment and other constitutional rights; suppressed exculpatory evidence; tampered with and coerced witnesses; manufactured false evidence; violated canons of legal ethics; made public statements falsely asserting plaintiffs' guilt; deliberately inflamed community passions against the plaintiffs, and vigorously pursued a criminal investigation of highly sensational allegations that they knew to be wholly unwarranted and baseless.

201

638. The Duke defendants willfully participated in this joint course of conduct by, among other things, willfully providing false information to investigators; failing to correct government officials' public assertions of false information; making, acquiescing in, and ratifying false and inflammatory public statements maligning and defaming plaintiffs; conspiring to violate plaintiffs' privacy rights protected by federal law and the Fourth Amendment; conspiring to conceal the violation of those privacy rights; suppressing exculpatory evidence; and conspiring to suppress and discredit exculpatory evidence. There was an agreement and meeting of the minds among the Duke and Durham defendants to engage in a course of conduct that violated plaintiffs' substantive due process rights.

639. As a direct and foreseeable consequence of defendants' conduct, plaintiffs suffered injuries including violation of constitutional rights, reputational injury and public humiliation and obloquy, severe emotional distress, economic damages, educational harm and other harms.

640. Defendants' actions, individually and jointly, were malicious and evidenced a callous and reckless disregard for, and deliberate indifference to, plaintiffs' constitutional rights.

641. Defendants' actions, individually and jointly, were performed in the scope of employment and in the scope of official duties. Duke's officers, directors, trustees and/or managers, and the Durham Supervisors, participated in, ratified, and condoned the conspiracy.

642. For the reasons stated in Count Twenty-six, the defendant City of Durham is liable for the Durham defendants' actions under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1977).

## COUNT TWENTY-THREE

### OBSTRUCTION OF AND CONSPIRACY TO OBSTRUCT PUBLIC JUSTICE
(Against All Defendants)

643. Plaintiffs incorporate the allegations in Paragraphs 1 through 642.

644. As related above, the defendants, acting individually and in concert, engaged in acts that attempted to and did prevent, obstruct, impede, and hinder public and legal justice in the State of North Carolina.

645. Defendants, acting individually and in concert, engaged in this obstruction of justice by initiating, pursuing, and prolonging in bad faith a malicious criminal investigation of plaintiffs; making and acceding to false statements that injured plaintiffs' reputations; fraudulently concealing illegal key card disclosures; abusing judicial process to conceal illegal key card disclosures; eliciting an order for non-testimonial identification that invaded plaintiffs' bodily privacy without constitutional justification, based on false and misleading information; suppressing exculpatory evidence; making public statements and actions that excited community passions against the plaintiffs and subjected them to intense public obloquy, humiliation, and ostracism; subjecting plaintiffs to public harassment and protests designed to humiliate them and to interfere and influence criminal and legal proceedings against them; and other actions.

646.    As a direct and foreseeable consequence of defendants' actions, plaintiffs suffered injuries including reputational harms, invasion of seclusion and constitutionally protected privacy, severe emotional distress, loss of educational and athletic opportunities, lost professional opportunities, economic damages, and other harms, as well as enhancement of injuries from other sources.

647.    Defendants actions' in perpetrating this obstruction of public justice were performed in the scope of employment. Duke's officers, directors, and/or managers and the Durham Supervisors participated in, ratified, and condoned these actions.

648.    Defendants' actions in obstructing justice were fraudulent, willful and wanton, and malicious.

## COUNT TWENTY-FOUR

**DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW
IN VIOLATION OF 42 U.S.C. § 1983**
(Against Durham Investigators, Durham Supervisors, City of Durham)

649.    Plaintiffs incorporate the allegations in Paragraphs 1 through 648.

650.    Acting under color of law and in bad faith, the Durham Investigators instigated, promoted, and executed a malicious criminal investigation of plaintiffs that was calculated to inflict maximum injury on plaintiffs' reputations. This malicious investigation was highly outrageous, undertaken in bad faith, caused by malicious motives, and involved conduct that shocks the conscience. As alleged above, this conduct included dissemination of knowingly false information, false public statements, deliberate inflammation of community and university passions against the plaintiffs,

204

deliberate arousal of race, class, and gender-based hostility against the plaintiffs, and

other actions that caused the plaintiffs grave reputational injuries.

651.    Defendants' actions were malicious and evidenced a callous and reckless

disregard for, and deliberate indifference to, plaintiffs' constitutional rights.

652.    As a direct and foreseeable consequence of these actions inflaming

community and university passions against the plaintiffs, plaintiffs suffered the loss of

liberty and/or property interests, without due process of law.  These losses include

reputational injury and lost educational opportunities, including the loss of the unique

athletic opportunity to participate in the 2006 Division I men's lacrosse season, including

the ability to compete for the 2006 ACC Championship and the NCAA Division I

National Championship—a goal for which many had aspired and trained for much of

their lives.

653.    For the reasons stated on Count Twenty-Six, the City of Durham is liable

for the Durham Investigators' actions under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658

(1977).

## COUNT TWENTY-FIVE

### FALSE PUBLIC STATEMENTS IN VIOLATION OF 42 U.S.C. § 1983
(Against the Durham Investigators, David Addison, City of Durham)

654.    Plaintiffs incorporate the allegations in Paragraphs 1 through 653.

655.    As alleged above, acting under color of law, the Durham Investigators and

Addison made multiple public statements that were knowingly false relating to their

criminal investigation of plaintiffs.

656.     In their public statements, Nifong and Addison falsely asserted, among other things, that three members of the lacrosse team had perpetrated a brutal, racially motivated gang rape; that the lacrosse players had refused to cooperate with the police in the investigation, instead putting up a "stone wall of silence"; that the physical and medical evidence indicated that a rape had occurred; that other members of the lacrosse team had aided and abetted in the alleged rape; and that condoms had likely been used in the alleged rape.

657.     These false statements were published through local, national, and international media, conveying them to a worldwide audience of untold millions of people.

658.     These false statements were intended to inflame the community against the plaintiffs in order to prolong the investigation and compromise the fairness of subsequent proceedings against the lacrosse team.

659.     In making these knowingly false statements, defendants' actions were malicious and evidenced a callous and reckless disregard for, and deliberate indifference to, plaintiffs' constitutional rights.

660.     As a result of these false public statements, plaintiffs continued to be subjected to a malicious investigation in violation of their Fourteenth Amendment rights.

661.     As a result of these false public statements, plaintiffs suffered deprivation of property interests without due process of law, including for certain plaintiffs lost

206

economic and job opportunities, due to the reputational injury inflicted by the false public statements.

662.    As a result of defendants' unconstitutional actions, plaintiffs suffered the deprivation of their liberty and/or property interest in the athletic opportunity to complete the 2006 NCAA Division I lacrosse season, without due process of law.

663.    As a direct and foreseeable consequence of these false statements, plaintiffs suffered injuries, including reputational injury, emotional harm, economic losses, prolonged subjection to the ordeal of criminal investigation, and other harms.

664.    For the reasons stated in Count Twenty-six, the City of Durham is liable for Nifong's and Addison's actions under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1977).

## COUNT TWENTY-SIX

**VIOLATIONS OF 42 U.S.C. § 1983 UNDER *MONELL v. DEP'T OF SOC. SERVS.***
(Against the City of Durham; Durham Investigators in their official capacities;
Durham Supervisors in their official capacities)

665.    Plaintiffs incorporate Paragraphs 1 through 664 above.

666.    As alleged above, the Durham Investigators violated several of plaintiffs' constitutional rights in violation of 42 U.S.C. § 1983.

**A.    While Exercising Delegated Final Policymaking Authority
For The City Of Durham, Nifong Implemented Policies
That Violated Plaintiffs' Constitutional Rights.**

667.    On or around March 24, the Durham Supervisors and other officials with final policymaking authority for the City of Durham voluntarily delegated final

207

policymaking authority over the criminal investigation of Mangum's claims to Nifong. They agreed that Nifong would have full responsibility and authority for that investigation.

668. Among other actions, Defendant Lamb instructed Gottlieb and Himan to take direction directly from Nifong regarding the investigation, placing them outside the ordinary Durham Police chain of command.

669. On information and belief, in his capacity as an official exercising delegated final policymaking authority, Nifong implemented the previously described policies and actions occurring on or after March 24 that violated plaintiffs' constitutional rights. Nifong implemented these policies and actions with knowledge of and deliberate indifference to the violations of the constitutional rights of plaintiffs.

670. On information and belief, the Durham Supervisors and other officials in the City of Durham and the Durham Police ratified these unconstitutional policies and actions of the Nifong investigation.

671. As a direct and foreseeable consequence of these policies and actions, plaintiffs were deprived of their constitutional rights and suffered other injuries.

**B.     Durham Officials With Final Policymaking Authority
        Approved And Ratified The Unconstitutional Conduct
        Of Their Subordinates.**

672. On information and belief, the Durham Supervisors and other Durham officials with final policymaking authority for the City of Durham and Durham Police

had contemporaneous knowledge of the violations of plaintiffs' constitutional rights perpetrated by the Durham Investigators.

673. It would have been plainly obvious to a reasonable policymaker that these actions would lead to violations of plaintiffs' constitutional rights.

674. On information and belief, the Durham Supervisors and other Durham officials agreed to, approved, and ratified this unconstitutional conduct by Nifong and their subordinates in the Durham Police.

675. As a direct and foreseeable consequence of these policy decisions, plaintiffs were deprived of their constitutional rights.

## C.    Durham Officials With Final Policymaking Authority Failed To Exercise Adequate Supervisory Authority Over Nifong.

676. As alleged above, the Durham Supervisors and other Durham officials knowingly and voluntarily delegated final policymaking authority to Nifong with respect to the criminal investigation of the Duke lacrosse team.

677. On information and belief, the Durham Supervisors and other officials with final policymaking authority had actual or constructive knowledge that Nifong did not have adequate experience to direct a criminal investigation, that he was subject to a conflict of interest arising out of his hotly contested re-election campaign, that he had a history of explosive and irrational behavior, that his desire to direct the investigation was motivated by political ambition, and that he had made public statements announcing the lacrosse players' guilt throughout the investigation.

209

678.    In these circumstances, it would have been obvious to a reasonable policymaker that delegating authority to Nifong to direct the investigation would lead to deprivations of plaintiffs' constitutional rights.  Nevertheless, the Durham Supervisors and other officials knowingly ceded control of the investigation to Nifong with knowledge of or deliberate indifference to the violation of plaintiffs' constitutional rights.

679.    After Nifong assumed control of the investigation, the Durham Supervisors and other officials with final policymaking authority in the City of Durham and the Durham Police had actual or constructive knowledge that Nifong had authorized and/or personally engaged in decisions from which it would have been plainly obvious to a reasonable supervisory official that violations of Plaintiffs' constitutional rights inevitably would occur.  Nevertheless, the Durham Supervisors and other officials in the City of Durham and the Durham Police took no corrective action and instead continued to recognize Nifong's authority with respect to the rape investigation and continued to direct Durham Police to report to Nifong, knowing or with reckless disregard or deliberate indifference to the likelihood that their decision would result in further violations of plaintiffs' constitutional rights.

680.    As a direct and foreseeable consequence of these policy decisions, Plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

**D. Durham Officials With Final Policymaking Authority Failed To Exercise Adequate Supervisory Authority Over Gottlieb.**

681. On information and belief, as of March 13, 2006, defendant Mark Gottlieb had a documented history of selective and malicious prosecution, excessive use of force, manufacturing of false evidence, and filing of false police reports in his dealings with Duke University students.

682. The Durham Supervisors and other officials in the City of Durham and the Durham Police Department consistently failed to take adequate or meaningful steps to discipline Gottlieb, correct his behavior, or terminate his employment.

683. By these omissions, these officials endorsed and ratified Gottlieb's unconstitutional conduct, established a custom or practice of targeting Duke University students for harsh or disproportionate treatment, or established a custom and practice of failing to correct the unconstitutional conduct of Durham Police officers.

684. In these circumstances, it would have been plainly obvious to a reasonable policymaker that the decision to place Gottlieb in a lead position on this investigation would lead to deprivations of plaintiffs' constitutional rights.

685. Despite this evidence, the Durham Supervisors and other officials in the City of Durham and the Durham Police, assigned Gottlieb to a leadership role in the rape investigation knowing, or with deliberate indifference to the likelihood, that their decision would result in violations of plaintiffs' constitutional rights.

211

686.    As a direct and foreseeable consequence of this official action, plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

**E.    Durham Police Had An Established Policy Or Custom Of Targeting Duke Students For Harassment Through Selective And Improper Criminal Law Enforcement.**

687.    On information and belief, the Durham Supervisors and other officials in the City of Durham and the Durham Police established a policy or custom encouraging Durham Police officers to target Duke University students for selective enforcement of the criminal laws.

688.    It would have been plainly obvious to a reasonable policymaker that such conduct would lead to deprivations of plaintiffs' constitutional rights.  In fact, the Durham Supervisors had actual or constructive knowledge that Gottlieb had attempted to effectuate this policy by engaging in selective and malicious prosecution, excessive use of force, manufacturing of false evidence, and filing of false police reports against Duke University students, yet they consistently failed to take adequate or meaningful steps to discipline Gottlieb, correct his behavior, or terminate his employment.

689.    As a direct and foreseeable consequence of this policy decision, plaintiffs were deprived of their constitutional rights.

**F.    Durham Police Had An Established Policy Or Custom Of Prematurely Publishing Conclusions Of Criminality Or Guilt.**

690.    Defendant Addison, acting in his official capacity as spokesman of the Durham Police, pursuant to established custom or policy, and with the acquiescence or

212

approval of the Durham Supervisors, made a series of public statements expressing the Department's official conclusion that Mangum had been raped, sexually assaulted, and kidnapped by members of the Duke lacrosse team. Similar, and even more inflammatory statements, were made by Nifong, who was exercising delegated supervisory and policymaking authority on behalf of the City of Durham.

691. In addition, defendants Addison and Nifong repeatedly expressed Durham's official view that Plaintiffs and other members of the Duke lacrosse team were obstructing justice by failing to confess their knowledge of, or involvement in, the alleged assault.

692. Addison, acting pursuant to established customs or policies of the City of Durham and the Durham Police, with the acquiescence or approval of the Durham Supervisors and other policymaking officials in the Durham Police, and in his official capacity as coordinator of Durham Crimestoppers, caused the publication of a series of "Wanted" posters that contained inflammatory and conclusory allegations of rape, sexual assault, and kidnapping against members of the Duke lacrosse team

693. Defendant Hodge, in his capacity as Deputy Chief of Police and the second-highest-ranking official in the Durham Police, stated publicly that the Durham Police had a strong case against members of the Duke lacrosse team.

694. As a direct and foreseeable consequence of the custom or policy allowing Durham Police officials to publish premature official conclusions of criminality and guilt, plaintiffs were deprived of their constitutional rights.

* * * * *

695.  As a direct and foreseeable consequence of the foregoing constitutional violations caused by the policymaking officials, customs and practices, and policies of the City of Durham and the Durham Police, plaintiffs suffered injuries, including deprivation of constitutional rights, reputational injury, emotional harm, economic losses, prolonged subjection to the ordeal of criminal investigation, loss of educational and economic opportunities, and other harms.

**COUNT TWENTY-SEVEN**

**NEGLIGENT SUPERVISION OF THE DURHAM INVESTIGATORS
IN VIOLATION OF 42 U.S.C. § 1983**
(Against the Durham Supervisors)

696.  Plaintiffs incorporate the allegations in Paragraphs 1 through 695.

**A.  The Durham Supervisors' Failure To Supervise The Investigation Resulted In Violations Of Plaintiffs' Constitutional Rights.**

697.  On or about March 24, 2006, Nifong, with the acquiescence or approval of the Durham Supervisors, was given responsibility to direct or help direct the police investigation into allegations of rape, sexual assault, and kidnapping made by Crystal Mangum.

698.  On or about March 24, the Durham Supervisors ordered defendants Gottlieb, Himan and other officers involved in the investigation to report to Nifong, but required that they continue to provide information about the investigation to their chain of command.

214

699. On information and belief, on or around March 29, the Durham Supervisors ordered Himan and Gottlieb to expedite the identifications and arrests of white Duke lacrosse players, notwithstanding the evidence demonstrating plaintiffs' innocence, in order to calm and to satisfy a Durham community that had been inflamed and misled by the defendants' false and inflammatory statements into believing Mangum's false charges that three white Duke lacrosse players had committed a violent and racially-motivated gang rape.

700. During the course of the investigation, the Durham Investigators, acting individually and in concert, engaged in a number of investigative abuses, including intimidation of witnesses, manufacturing of false evidence, suppression of exculpatory evidence, and manipulation of witness identification procedures.

701. The Durham Supervisors knew, or should have known, about these abuses and failed to take meaningful preventative or remedial action.

702. The Durham Supervisors' actions evidenced a reckless and callous disregard for, and deliberate indifference to, plaintiffs' constitutional rights.

703. As a direct and foreseeable consequence of these acts and omissions, plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

704. As a direct and foreseeable consequence of these deprivations, plaintiffs have suffered economic loss, emotional trauma, loss of privacy, loss of educational, athletic, and economic opportunities, and irreparable harm to their reputations.

**B.** **The Durham Supervisors' Failure To Control And Supervise Gottlieb Resulted In Violations Of Plaintiffs' Constitutional Rights.**

705.    By March 2006, defendant Gottlieb had a demonstrated history of bias against Duke students, marked by numerous incidents of excessive use of force, malicious prosecution, and manufacturing of evidence.

706.    The Durham Supervisors knew or should have known about Gottlieb's history, but failed to take meaningful remedial action.

707.    In light of Gottlieb's history, the Durham Supervisors acted recklessly or with deliberate indifference when they put him in a position to lead the investigation into Mangum's allegations.

708.    The Durham Supervisors' actions evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

709.    As a direct and foreseeable consequence of these acts and omissions, plaintiffs were deprived of their rights under the Fourth and Fourteenth Amendments to the United States Constitution.

710.    As a direct and foreseeable consequence of these deprivations, plaintiffs have suffered economic loss, emotional trauma, loss of liberty, loss of privacy, loss of educational, athletic, and economic opportunities, and irreparable harm to their reputations.

**C.** **The Durham Supervisors' Failure To Train, Control, And Supervise Addison Resulted In Violations Of Plaintiffs' Constitutional Rights.**

216

711.    In March 2006, defendant Addison was the official spokesperson of the Durham Police Department and the coordinator of the Durham Crimestoppers program.

712.    Prior to placing him in this role, and during the pendency of his tenure in that role, the Durham Supervisors demonstrated reckless or callous indifference to the rights of potential criminal suspects by failing to provide Addison with adequate training regarding the legal and constitutional dimensions of his position.

713.    During his tenure as spokesperson and Crimestoppers' coordinator, Addison demonstrated a consistent pattern of publishing premature declarations of guilt and illegality.

714.    The Durham Supervisors demonstrated reckless or callous indifference to the rights of potential criminal suspects by failing to take meaningful action to correct this conduct.

715.    In March and April 2006, Addison, acting in his role as spokesman for the Durham Police Department and as coordinator of Durham Crimestoppers, published a series of inflammatory statements expressing the Department's official conclusion that Crystal Mangum had been raped, sodomized, sexually assaulted, and kidnapped by members of the Duke lacrosse team. In addition, Addison repeatedly expressed the Department's official view that plaintiffs were obstructing justice by failing to confess their knowledge of or involvement in the alleged assault on Crystal Mangum.

716.    The Durham Supervisors knew or should have known about these statements, but demonstrated reckless disregard or deliberate indifference by failing to take prompt and meaningful preventative or remedial action.

717.    To the contrary, defendant Hodge publicly stated that Durham Police had a strong case against members of the Duke lacrosse team at a time when he knew or should have known that such a statement was false.

718.    The Durham Supervisors' actions evidenced a reckless and callous disregard for, and deliberate indifference to, plaintiffs' constitutional rights.

719.    As a direct and foreseeable consequence of the Durham Supervisors' failures to train and supervise defendant Addison, plaintiffs were deprived of their rights under the Fourteenth Amendment to the United States Constitution.

720.    As a direct and foreseeable consequence of these deprivations, plaintiffs have suffered economic loss, emotional trauma, loss of liberty, loss of privacy, loss of educational, athletic, and economic opportunities, and irreparable harm to their reputations.

## COUNT TWENTY-EIGHT

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS -- III
(Against Durham Investigators, Durham Supervisors, City of Durham)

721.    Plaintiffs incorporate the allegations in Paragraphs 1 through 720 above.

722.    The course of conduct adopted by the Durham Investigators, the Durham Supervisors, and the City of Durham throughout the rape investigation was extreme and

218

outrageous. It was beyond all bounds of decency tolerated in society. It was intended to cause, and did cause, severe emotional distress to the plaintiffs.

723. The above-named Defendants' course of conduct throughout the rape hoax crisis was malicious, willful and wanton. It involved fraud, duplicity, deceit, and conscience-shocking breaches of public trust and abuses of public authority.

724. As alleged above, this course of conduct included, but was not limited to, instigating, pursuing, and prolonging a malicious criminal investigation against plaintiffs in the face of overwhelming exculpatory evidence; knowingly making false public statements condemning the plaintiffs for committing rape and hiding behind a conspiracy of silence; suppressing exculpatory evidence and fabricating false inculpatory evidence; maliciously conspiring among themselves and with Duke officials; fraudulently abusing legal process; and betraying the public trust vested in them by virtue of their positions of public authority.

725. Defendants performed these actions with intentional or reckless disregard for the emotional state of the plaintiffs.

726. This extreme and outrageous conduct was intended to and did cause plaintiffs mental anguish and severe emotional distress, as well as other injuries including reputational harm, economic damages, dislocation from homes and disruption of lives, lost educational opportunities, and other injuries.

727. This outrageous conduct was performed in the scope of employment. The Durham Supervisors participated in, ratified, and condoned this outrageous course of conduct.

728. This course of conduct was fraudulent, willful and wanton, and malicious.

## COUNT TWENTY-NINE

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – III
(Against Durham Supervisors, Durham Investigators, City of Durham)

729. Plaintiffs incorporate the allegations in Paragraphs 1 through 728 above.

730. The conduct described above involved numerous repeated breaches of the defendants' identified duties of due care. These breaches, in addition to being intentional, were grossly negligent and reckless with respect to the duties owed to the plaintiffs and with respect to the plaintiffs' emotional state. Moreover, taken together, defendants' breaches of duty constituted a reprehensible course of conduct that was reckless and grossly negligent with respect to the duties owed to the plaintiffs.

731. It was reasonably foreseeable that these breaches of duty would cause the plaintiffs mental anguish and severe emotional distress.

732. These breaches of duty did in fact cause the plaintiffs severe emotional distress, as well as reputational harm, economic damages, dislocation from homes and disruption of lives, lost educational opportunities, and other injuries. The repeated breaches of duty committed through these actions were malicious, willful and wanton.

733.    The actions of the Durham Investigators were performed in the scope of employment.  The Durham Supervisors participated in, ratified, and condoned these actions.

## COUNT THIRTY

### NEGLIGENCE BY DURHAM POLICE
(Against Durham Investigators, Durham Supervisors, City of Durham)

734.    Plaintiffs incorporate the allegations in Paragraphs 1 through 733 above.

735.    The Durham Investigators owed plaintiffs a duty to use due care with respect to public statements concerning the investigation of Mangum's rape allegations.

736.    The Durham Investigators also owed plaintiffs a duty to use due care with respect to the conduct of their investigation of Mangum's allegations.

737.    The public statements made by the Durham Investigators and defendant Addison were false and inflammatory and violated this duty of due care.

738.    The acts and omissions detailed above, perpetrated by the Durham Investigators in their investigation of plaintiffs, knowingly violated or departed from the duty of due care owed to plaintiffs, as shown in part by their departure from established norms of professional conduct, violation of constitutional rights, and violation of Durham Police Department policies.

739.    In committing these statements, acts, and omissions, the Durham Investigators negligently breached said duties to use due care, which directly and proximately resulted in the injuries and damages to the Plaintiffs as alleged herein.

221

740.    The Durham Investigators' actions in perpetrating this obstruction of public justice were performed in the scope of employment.  The Durham Supervisors participated in, ratified, and condoned these actions.

741.    Defendants' actions in obstructing justice were fraudulent, willful and wanton, and malicious.

## COUNT THIRTY-ONE

### NEGLIGENT HIRING, TRAINING, SUPERVISION, RETENTION, AND DISCIPLINE BY DURHAM POLICE
(Against Durham Supervisors, City of Durham)

742.    Plaintiffs incorporate the allegations in Paragraphs 1 through 741 above.

743.    The Durham Supervisors and the City of Durham owed plaintiffs a duty under North Carolina law to use due care in the hiring, training, supervision, discipline, and retention of Durham Police personnel, including the Durham Investigators and other personnel involved in the investigation of Mangum's rape allegations.

744.    The Durham Supervisors negligently breached this duty of due care with respect to defendants Gottlieb, Himan, and Addison through the act and omissions described above, which are incorporated by reference herein.

745.    The Durham Supervisors negligently supervised Defendant Himan by assigning him to the police investigation into Mangum's allegations, notwithstanding Himan's lack of prior experience in major felony investigations.

222

746. The Durham Supervisors' negligent breach of this duty to use due care directly and proximately resulted in the injuries and damages to Plaintiffs as alleged herein.

## COUNT THIRTY-TWO

### VIOLATION OF ARTICLE I, SECTION 19 OF THE NORTH CAROLINA CONSTITUTION
(Against the City of Durham directly and by way of the actions of the Durham Supervisors and the Durham Investigators in their official capacities)

747. Plaintiffs incorporate the allegations in paragraphs 1 through 746 above.

748. As a direct and foreseeable result of the conduct of the City of Durham, the Durham Supervisors and the Durham Investigators, Plaintiffs have suffered deprivations of their rights under Article I, Section 19 of the Constitution of North Carolina.

749. As a direct and foreseeable consequence of said deprivations, Plaintiffs have suffered economic injury, physical injury, loss of liberty, loss of privacy, and emotional, psychological, educational, and reputational harm incidental to the loss of the 2006 lacrosse season.

750. Plaintiffs plead this cause of action in the alternative, in the event that the City of Durham should prevail on its argument that the other state-law causes of action pleaded in this complaint are barred in whole or in part by principles of governmental immunity, which would render the plaintiffs' state-law remedies inadequate under North Carolina law and plaintiffs would possess direct claims under the North Carolina Constitution.

## PRAYER FOR RELIEF

751.    Wherefore, Plaintiffs pray for the following relief:

a.      damages, in an amount to be established at trial, as compensation for injuries to reputation, emotional suffering, past and future economic losses, invasion of privacy, constitutional deprivations, loss of educational and athletic opportunities, loss of future career prospects, legal and other expenses, and other injuries proximately caused and enhanced by defendants' wrongful conduct;

b.      damages, in an amount to be established at trial, to punish defendants for fraudulent, willful and wanton, and malicious conduct; to punish defendants for outrageous conduct pursued with actual malice that recklessly and callously disregarded plaintiffs' physical and emotional well-being and constitutional rights; to discourage defendants from engaging in similar conduct in the future; and to deter others similarly situated from engaging in similar wrongful conduct;

c.      an award of attorneys' fees and costs, including attorneys' fees pursuant to 42 U.S.C. § 1988;

d.      an award for reasonable and customary costs, expenses, and interest incurred in pursuit of this action;

e.      any other relief deemed just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby request a trial by jury on all claims so triable.

February 22, 2010    Respectfully submitted,

**COOPER & KIRK, PLLC**

By:  /s/ Charles J. Cooper
    _____
    Charles J. Cooper
    ccooper@cooperkirk.com
    David H. Thompson
    Brian S. Koukoutchos
    Nicole Jo Moss (N.C. Bar # 31958)
    nmoss@cooperkirk.com
    David Lehn
    1523 New Hampshire Avenue, NW
    Washington, DC  20036
    Tel. (202) 220-9600

      -and-

**THOMAS, FERGUSON & MULLINS, L.L.P.**

By:  /s/ William J. Thomas
    _____
    William J. Thomas, II (N.C. Bar # 9004)
    thomas@tfmattorneys.com
    119 East Main Street
    Durham, NC  27701
    Tel. (919) 682-5648

*Attorneys for Plaintiffs*